# UNITED STATES DISTRICT COURT
## NORTHERN DISRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| FAHAD SYED, | ) | |
| | ) | |
| Plaintiff[s], | ) | |
| | ) | |
| vs. | ) | CASE NO. 1:21-cv-00267 |
| | ) | |
| ILLINOIS BOARD OF HIGHER | ) | |
| EDUCATION; NORTHWESTERN | ) | |
| UNIVERSITY, and VICE PRESIDENT FOR | ) | |
| STUDENT AFFAIRS JULIE PAYNE- | ) | |
| KIRCHMEIER, INTERIM DEAN OF | ) | |
| STUDENTS MONA DUGO, DEPUTY | ) | |
| TITLE IX COORDINATOR AMANDA | ) | |
| DESILVA, TITLE IX COORDINATOR | ) | |
| COLLEEN JOHNSTON, DIRECTOR OF | ) | |
| EQUAL OPPURTUNITY AND ACCESS | ) | |
| KAREN TAMBURO, NU SENIOR EQUITY | ) | |
| SPECIALIST ISH FAITH-ORKAR, | ) | |
| ASSISTANT DIRECTOR OF | ) | |
| COMMUNITY STANDARDS HEATHER | ) | |
| COHEN, ASSISTANT DIRECTOR OF | ) | |
| STUDENT CONDUCT CHRISTINE | ) | |
| DEPILLA,  ASSISTANT DEAN AND | ) | |
| DIRECTOR OF STUDENT CONDUCT | ) | |
| LUCAS CHRISTIAN, NORTHWESTERN | ) | |
| UNIVERSITY POLICE DEPARTMENT | ) | |
| ("NUPD"), and NUPD DEPUTY CHIEF | ) | |
| ERIC CHIN, NUPD COMMANDER CINDY | ) | |
| BENSON, NUPD DECTECTIVE SARAH | ) | |
| STARK (Badge #21), NUPD DECTECTIVE | ) | |
| SANGHOON LEE, NUPD OFFICER | ) | |
| THOMAS HEALY (Badge #22), NUPD | ) | |
| OFFICER FRANK WALSH (Badge #26), | ) | |
| NUPD SERGEANT DONALD MOORE | ) | |
| (Badge #56); the CITY OF EVANSTON, a | ) | |
| Municipal Corporation, and CITY OF | ) | |
| EVANSTON POLICE DEPARTMENT | ) | |
| ("EPD"), EPD DETECTIVE M. JONES | ) | |
| (Badge #162), EPD DETECTIVE CEPIEL | ) | |
| (Badge #186), EPD DETECTIVE PACK | ) | |
| (Badge #176), EPD DETECTIVE | ) | |
| SVENDSEN (Badge #164); the CITY OF | ) | |
| CHICAGO, a Municipal Corporation, and | ) | |
| CHICAGO POLICE DEPARTMENT | ) | |
| ("CPD"); COOK COUNTY STATE | ) | |

ATTORNEY'S OFFICE, and ILLINOIS        )
STATE ATTORNEY KIMBERLY M.             )
FOXX; FEDERAL BUREAU OF                )
INVESTIGATIONS ("FBI"), and FBI S.A.   )
BOERTIE, FBI T.F.O. FERGUSON;          )
HUSCH BLACKWELL LLP, and SCOTT L.      )
WARNER, KAREN L. COURTHEOUX;           )
NORTHWESTERN MEMORIAL
HOSPITAL ("NMH"), NMH M.D.
ANDREW J. BERG, NMH M.D. SCOTT A.
GERSHAN, NMH R.N. JEREMY BAKER,
NMH M.D. EUGENE LOZZA, NMH L.S.N.
FRED CABRA; USAMA IBRAHIM,
OSAMA ALKHAWAJA, MUAAZ
MAKSUD, GLORIA CANGE,
EVANGELINE GARGULA, as individual


          Defendant[s].


## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Fahad Syed, Pro Se, hereby complains and alleges against all Defendants as follows:

## INTRODUCTION

1.   This is a Complaint for Damages and Injunctive Relief brought by a former law student of Northwestern University ("NU") School of Law. The essence of this suit lies in the valid contract for graduate education in law which Plaintiff entered into with NU, and that the latter violated repeatedly through unchecked willful and wanton conduct, negligence, discrimination, and deprivation of Plaintiffs over the course of five years. Plaintiff suffers from ADA learning and cognitive disabilities of bipolar disorder and ADHD, as well as comorbid anxiety and depression that entitle him to certain academic accommodations. On 8/23/20, after Plaintiff requested such accommodations, defendant Eric Chin ("Chin"), acting Deputy Chief of Northwestern University Police Department ("NUPD"), and Mona Dugo ("Dugo"), Interim University Dean of Students for Northwestern University ("NU"), unilaterally determined that he was a safety threat on the basis of threat from his perceived disability, religion, color, national origin, and other protected class characteristics resulting from two private phone calls which occurred on 8/23/20 and were recorded without the Plaintiff's knowledge or consent in violation of 720 ILCS 5/14-2 (a)(2), (a)(3), and (a)(5) and suspended Plaintiff without notice or hearing in violation of his 14th Amendment right to due process and 5th Amendment right to notice.

2.   According to 720 ILCS 5/14-2 (a) A person commits eavesdropping when he or she knowingly and intentionally: (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation; (3) Intercepts, records, or transcribes, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication; or (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties. 720 ILCS 5/14-2

3.   There is an exemption according to 720 ILCS 5/14-3: (i) Recording of a conversation made by or at the request of a person, not a law enforcement officer or agent of a law enforcement officer, who is a party to the

conversation, under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person or a member of his or her immediate household, and there is reason to believe that evidence of the criminal offense may be obtained by the recording. 720 ILCS 5/14-3 (i) is inapplicable given the absence of any suspicion of a past present or future criminal offense on the part of the Plaintiff against the perpetrator for which the recordings could serve as evidence. Due to knowingly using the audio as evidence against the Plaintiff for school disciplinary proceedings, every person from NU, including his two student conduct investigators, are guilty of two felony counts of 720 ILCS 5/14-2 (a)(5), one for each of the recordings, for using the information on the audio to make a determination as to whether Plaintiff committed gender-based harassment. With the arbitrary and unjust suspension, NU, Chin, and Dugo continued a long-standing pattern of discrimination with various malicious, coercive and retaliatory actions and measures against Plaintiff that culminated in his being expelled and banned from the Law School on 12/21/21, in addition to permanent notation on Plaintiff's transcript which ruins his ability to seek education from another institution and inflicting needless and unrelenting grievous suffering, psychological trauma, and emotional distress on the Plaintiff in violation of his Eighth Amendment's protections against cruel and unusual punishment. This matrix of facts gave rise to the instant complaint.

4.  Over the course of three full years, Plaintiff suffered a pattern of repeated, systematic, and unmitigated discrimination and unchecked retaliation by NU students and employees in violation of his First Amendment Right to Free Speech, and his 14th amendment right to equal protections and due process. This is despite his filing countless complaints notifying NU administration of his mistreatment. On information and belief, NU's deliberate indifference to Plaintiffs immense suffering was such that in total Plaintiff filed over 100 separate complaints in various forms with NU over the course of his time at the university, and *not a single one* was actioned upon or investigated to date.

5.  Starting in 2018, he was unfairly subject to an irregular post-admission application review based on unsubstantiated allegations from an unknown person or persons which led to discriminatory sanctions and pre-conditions for his deferral from the entering NU Law Class of 2018 to 2019 in violation of his 14th amendment right to equal protections and due process. Following his re-enrollment in 2019, Plaintiff was subjected to hostile learning environments on the basis of unsubstantiated sexual harassment allegations from an unknown female student starting in August, and then a hostile environment based on threat from his perceived disability and religion starting in November.

6.  Chin was personally responsible for the incident that occurred on 11/1/19, for which the Plaintiff was falsely imprisoned from 11/1/19-11/8/19 directly resulting from threat from his perceived disability and retaliation against his first amendment right to free speech and religion and suspended for two semesters following highly discriminatory 2019 University Hearing And Sanctions (UHAS) process in which investigators deliberately ignored the results of their own investigative findings. At a time when most would argue that the world-wide specter of Covid-19 was beginning to infect the world, he was illegally evicted and given 5-day notice to vacate from his university affiliated residence, which upon his desperate request for more time based on the school having full knowledge of Plaintiffs familial status, was extended by only 2 days for a total of only 7-days-notice. The documentation proves that Plaintiff was the victim of a conspiracy against his civil rights and false imprisonment during this incident, and that he did NOT approach the Defendant Osama Alkhawaja ("Alkhawaja"), at any time, nor did he initiate contact with Defendant Alkhawaja. Plaintiff has filed Illinois Department of Human Rights complaint 2020CH2546 substantiating the threat from his perceived religion resulting in his illegal eviction.

7.  Plaintiff had attended the event to seek consolation for his mother's death from cancer and had not slept in two days prior to his attendance due to emotional distress. While at the event, Plaintiff was repeatedly targeted and harassed with threatening and suggestive comments, intimidating behavior, invasive questioning, and unwanted physical contact by an unknown male (Alkhawaja) on four separate occasions, culminating in a vicious physical attack where he kicked Plaintiff several times on the leg, then tackled Plaintiff onto the ground, and choked Plaintiff in a headlock until Plaintiff nearly lost consciousness. Defendant Osama A. took these actions acting in agency as "Event Organizer" ("EO") for Northwestern University and based directly on his threat from Plaintiff's perceived disability. No one witnessed this vicious physical assault. He then called out to his two friends (Muaaz Maksud and Usama Ibrahim) who were nearby, and together the three physically restrained Plaintiff, restricting his freedom of movement to leave the premises and with intent to initiate his imprisonment of plaintiff

based on perceived mental impairment to Plaintiff. They then called police and falsely reported to police that Plaintiff attacked one of them.

8.   Claimant was the victim of a malicious conspiracy against his civil rights, involving: assault; battery; targeting, discrimination, harassment, and false imprisonment based on perceived threat from existing ADA disability; libel; defamation; slander; tortious interference with educational contract; and tortious interference with economic advantage by individual students. This process involved targeting Plaintiff in violation and retaliation of his First Amendment right to free speech and religious, false witness testimony, obstruction of justice, and the unlawful disclosure of claimants mental health history in violation of Health Insurance Portability and Accountability Act and the Illinois Mental Health and Developmental Disabilities Confidentiality Act ("IMHDDCA") by the students which resulted in his unreasonable seizure using excessive force in violation of the Fourth Amendment, and his subsequent false imprisonment in violation of his 5th and 14th Amendment right to due process and 14th Amendment Equal Protections; negligence "per se" and negligent maintenance, training, hiring, retention, and supervision; obstruction of justice; police report falsification; and conspiracy to falsify commitment petition in violation of 405 ILCS 5/3-601 and 405 ILCS 5/3-606, assault; battery; discrimination and false imprisonment based on threat from perceived disability; libel; defamation; slander; tortious interference with educational contract; and tortious interference with economic advantage by NUPD.

9.   Northwestern Memorial Hospital staff committed assault; battery; discrimination based on perceived threat from existing ADA disability; libel; defamation; slander; tortious interference with educational contract; and tortious interference with economic advantage by law enforcement; conspiracy, false imprisonment and medical malpractice in violation of 405 ILCS 5/3-601 petition procedure, violation of 405 ILCS 5/3-602 patient rights advisory, violation of 405 ILCS 5/3-608 treatment refusal rights, and 405 ILCS 5/3-609 violation of his right to receive copies of petition and phone call; violation of 405 ILCS 5/3-610 filing requirements, and violation of 405 ILCS 5/3-611 notice and filing requirements and in violation of his 5th Amendment right to fair notice, 4th Amendment right against unreasonable seizure, and 14th Amendment right to due process and Equal Protections. Plaintiff has filed Illinois Guardianship and Advocacy Commission complaint #20-030-9020 substantiating his false imprisonment. Plaintiff has also filed separate suit in a related claim 20CV1772 under the Crime Victims Compensation Act for these incidents in the Court of Claims for the State of Illinois, and it was assigned to commissioner Ron Serpico on 11/24/20, further substantiating these allegations.

10. NU Student Conduct representatives Christine Depilla and Heather Cohen willfully and maliciously disregarded and suppressed substantial evidence which indicated that Plaintiff was subjected to a conspiracy against his civil rights, and actively suppressed Plaintiff's attempts to report the unlawful behavior to NU. This incident continues to negatively impact Plaintiff until this day: It took Plaintiff almost 10 months to overcome the repeated discriminatory obstacles the school placed on his ability to re-enroll as a result of threat from his perceived disability resulting from the event, and he finally completed the last on in late July of 2020. In retaliation for complaints he had lodged against the school with the Illinois Department of Human Rights for an illegal eviction, and due to his multiple University complaints alleging disability discrimination for the obstacles places on his re-enrollment, and due to open bias against plaintiffs religion, color, disability, sex, and religion, certain employees of NU and NUPD began to formulate a plot to prevent Plaintiff from re-enrolling at the law school. The employees include: Christine DePilla. Heather Cohen, and Lucas Christain.

11. The week of August 17th, just over a month since Plaintiff finished his effective reinstatement and re-enrolled in the entering class of 2020, he was deliberately excluded from law school orientation events and planning for the incoming JD class of 2020 in retaliation for his many internal and external grievances with NU. As a result of his deliberate exclusion on the basis of threat for his perceived disabilities, he was unable to meet any of the students in the incoming class and was forced to rely on the class group chat instead.

12. Plaintiff was the victim of a hostile learning environment based on threat from his perceived disability effectuated through open hostility in a school-wide online chat forum, followed by multiple hate crimes and intimidation, in a malicious conspiracy against his right to education perpetrated by staff and students the weekend of August 21-23rd, 2020. On August 21st, just one day after he had joined the group, he was stalked and harassed by a fellow incoming 1L defendant Evangeline Gargula ("Gargula"), a white transgender student without disabilities, in a vicious hate crime on the basis of perceived disability with harassing messages and two obscene 1 AM phone calls, both of which were recorded and maliciously shared with NU and other students without his consent or knowledge, and in violation of state law. He was then maliciously discriminated against on the basis of sex and

disability by staff, and again was the target of a brutal retaliation against his First Amendment right to report unlawful conduct, and malicious conspiracy against his right to education, by staff in a cooperative effort during his 2020 UHAS Hearings. Plaintiff filed Department of Education complaint #05-20-2444 on 8/27/20 and received a 15-day response on 10/15/20, substantiating his gender and disability discrimination claims.

13. In August-December 2020 he was again the subject of malicious student disciplinary process in retaliation for reporting the numerous discriminatory actions of NU law current student Muaaz Maksud and former NU law student Usama Ibrahim in relation to a hate crime of false imprisonment based on disability which they committed against him in 2019, in addition to his reporting of NU employees Christine DePilla and Heather Cohen from their egregious handling of the student disciplinary process from 2019. Chin was personally responsible for the incident that occurred on 8/23/20, for which the Plaintiff suspended for one semester without hearing or investigation prior to a highly discriminatory 2020 University Hearing And Sanctions (UHAS) process in which investigators again deliberately ignored the results of their own investigative findings. The documentation proves that Plaintiff was the victim of a conspiracy against his civil rights and educational intimidation during this incident, and that he did not threaten Gargula at any time, nor did he initiate contact with Defendant Gargula.

14. Dugo and Chin were responsible for masterminding a coverup and suppression of two felonious audio tapes made in violation of eavesdropping 720 ILCS 5/14-2 in connection with the conspiracy, which were revealed during the course of the investigation to be the reason they suspended Plaintiff on 8/23/20. Chin was personally responsible for suppressing the report or investigation of the felonious audio tape both within NUPD and within Chicago Police Department 18th district. On October 11, 2020 Plaintiff filed police report JD395768, and it was subsequently inappropriately closed without investigation when Eric Chin of NUPD unlawfully disclosed the detail of Plaintiff's 2019 involuntary commission, in violation of HIPAA, to detective O Shaughnessy. He also knowingly falsely told the detective that Plaintiff had given his concern for the recordings in question, discriminating on the basis of perceived disability and directly causing in Plaintiff's report being closed without investigation.

15. On 11/19/20, Plaintiff was again the victim of a malicious conspiracy against his civil rights and false imprisonment in cooperation with Evanston Police Department Detective Jones and NUPD Detective Stark after Dugo purposefully took the action of misleading the Second District County Court in securing a Stalking No Contact Order (SNCO) on false and misleading pretenses on 11/5/20, and then reporting an alleged violation of said SNCO on 11/19/20 on false and misleading pretenses, in retaliation for: the SNCO Hearing (20 OP 78277) that Plaintiff had entered against Dugo on 11/17/20; a Department of Education ("DOE") complaint (#05-20-2444) which Plaintiff filed against Dugo and NU for his unlawful suspension on 8/27/20; and numerous other violations of NU policy which Plaintiff reported Dugo and Chin for through the NU, including emails sent on 11/17/20 to NU resulting from Dugo's unlawful contact of Plaintiffs sister in relation for said DOE complaint, in order to maliciously tarnish the Plaintiff's unblemished criminal record.

16. In total, Plaintiff was subjected to multiple hostile learning environment which altered the terms of his education in (1) 2019 based on unsubstantiated sexual harassment allegations, and (2) in 2019 based on threat from his perceived disability, and (3) in 2019 based on threat from his perceived religion and, (4) in 2020 based on threat from his perceived disability, and (5) in 2020 based on threat from his perceived religion.

17. Plaintiff suffered five separate instances of violations of his 14th amendment right to due process: (1) in his discriminatory 2018 deferral, and (2) the flawed 2019 UHAS hearings and suspension and (3) false imprisonment from 2019, and (4) the flawed 2020 UHAS hearings and suspension and (5) false imprisonment from 2020.

18. Plaintiff was the victim of multiple malicious conspiracies against his right to education and freedom both in 2019 and 2020: (1) first by students and staff against his freedom and education resulting in his false imprisonment in 2019, and by (2) staff against his education in retaliation for his complaints in 2019, and by (3) students against his education resulting from threat from his perceived disability in 2020, and by (4) staff against his education in retaliation for his complaints in 2020, and by (5) staff and police against his education and freedom resulting from threat from his perceived disability in 2020.

19. Plaintiff was twice a victim of false imprisonment both on 11/1/19 and 11/19/20, and of severe harassment and discrimination caused by the negligence of Defendants Northwestern University and the malicious conspiratorial actions of its staff and students.

20. Defendant Northwestern University's negligence proximately caused all of Plaintiffs injuries.

## I. PATTERN AND PRACTICE OF DISCRIMINATORY CONDUCT

21. Northwestern University "NU" and the Northwestern University Police Department ("NUPD") failed to properly supervise and monitor: Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and I n particular it's officer: Deputy Chief Eric Chin.

22. As a result of such failure, NU and NUPD allowed for a pattern and practice of discriminatory conduct to exist whereby numerous repeated policy violations on the basis of protected class were permitted, committed, and encouraged, which effectively discriminate against male, non-white, Muslim, and disabled applicants and students. The structural pattern of this discrimination is that the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class, then take an adverse action against him, such as suspension or deferral, as a result of that discrimination, and finally place some quantity of discriminatory conditions on his eligibility to re-enroll. Once he completed his required conditions and re-enrolled, NU or NUPD would repeat this pattern and practice of discriminatory conduct again. The end result was the Plaintiff spent over five full years, from 2017-2021, pursuing entrance into the graduate law program which he was originally admitted to in 2017, and which NU never actually intended to let him enroll in or complete due to unmitigated bias against his color, socio-economic factors such as his background and family, his disability, race, and religion.

23. The major themes of the pattern and practice are negligent hiring, maintenance and supervision of employees who are untrained on and often times bias against certain classes of students; the negligent maintenance of hostile learning environments permeated with persistent, severe, and unchecked harassment and intimidation; a negligent, reckless and wonton failure to accommodate students with disabilities; an oppressive climate of administrative corruption with little to no accountability or oversight of discrimination and bias laden student disciplinary process'; and a broad scope of frequent, severe, petty, and calculated retaliatory conduct for _any_ filing of legitimate grievances both inside and outside of the university.

24. Plaintiff has a disability that entitles him to certain academic accommodations. After Plaintiff requested such accommodations, Mona Dugo, Interim Dean of Students for NU, unilaterally determined that he was fabricating his disability to gain unfair advantage. The Dean took various coercive and adverse actions against Plaintiff that culminated in him being constructively expelled and banned from the Law School. This matrix of facts gave rise to the instant complaint. Plaintiff asserts the following federal causes of action: (1) race, color, and national origin-based discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq. ("Title VI"); (2) disability-based discrimination under Title II of the Americans with Disabilities Act, 42 USCA §§ 12131, et seq. ("Title II"); (3) disability-based discrimination under Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181, et seq. ("Title III"); (4) disability-based discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. ("Section 504"); and (5) sex-based discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"). Plaintiff also asserts various state claims against both NU and Dean Mona Dugo, including breach of contract, tortious interference with contract, intentional infliction of emotional distress, defamation, and public disclosure of private facts.

25. Plaintiff seeks a declaration that Defendant violated his rights under the Fourth and Fourteenth Amendment of the United States Constitution, the Illinois Constitution, and injunctive relief restoring him to the JD program, compensatory and nominal damages, and attorneys' fees. Plaintiff states his claims pursuant to **42 U.S.C. § 1983**.

26. Plaintiffs also seek relief under the Federal Tort Claims Act, 28 U.S.C. §2671, et seq., ("FTCA") for the torts of false imprisonment, negligence, and the intentional infliction of emotional distress. Plaintiffs seek compensatory damages from the United States for the harm suffered as a result of Defendants' tortious conduct. All Defendants employed at FBI at the time of the conduct at issue in this suit were working as law enforcement officers under 28 U.S.C. § 2680(h). All FBI Defendants were acting within the scope of their employment by the United States when they committed the conduct in question. The conduct in question occurred at the times and places where Defendants were performing the duties of their employment, that are traditionally a part of their employment duties in their service to the United States.

## JURISDICTION

1. 28 U.S.C. § 1331 ("Section 1331") provides that federal district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2. This action arises under the U.S. and Illinois Constitutions and laws of the United States, specifically, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, prohibition against unreasonable seizure under the Fourth Amendment to the United States Constitution, Illinois Constitution, Article I, § 2, certiorari, and mandamus.

3. This Court has jurisdiction over this matter under 28 U.S.C. § 1343 (civil rights) 28 U.S.C. § 1331 (federal question) because all of Plaintiff's claims arise under laws of the United States—specifically, the ADA, Section 504, and Title IX and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

4. Supplemental jurisdiction over Plaintiff's pendent state law claims rests upon 28 U.S.C. 1367, since the claims arise out of the same transaction and occurrence as Plaintiff's federal claims.

5. The Federal Tort Claims Act confers original jurisdiction on the federal district courts to hear tort claims against the United States. 28 U.S.C. § 1346

6. This Court also has jurisdiction pursuant to **42 U.S.C. § 1983**, which prohibits the deprivation of constitutional rights or rights secured by the laws of the United States by persons acting under the color of state law.

## VENUE

7. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. 1391(b) because violations of the above referenced laws have taken place and continue to take place in the Northern District of Illinois and Defendants are located in this district and it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

8. Plaintiff, Fahad Syed, at all relevant times was a resident of the State of Illinois and a student at the Northwestern University School of Law ("the Law School"), a school of Northwestern University, a private university.

9. Plaintiff is a qualified individual with a disability, as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 705(20) ("Section 504") and Title III of the Americans with Disabilities Act, 42 U.S.C. 12131(2) (the "ADA").

10. Defendant, Northwestern University ("the University"), is an institution of higher education duly organized and existing under the laws of the State of Illinois as an Illinois not-for-profit corporation. The University receives federal financial assistance, as defined by Section 504, 29 U.S.C. 794.

11. The University, as an undergraduate and postgraduate private school, is a "place of public accommodation," as defined by 42 U.S.C. 12181(7)(j) and is therefore covered by the ADA.

12.     The University employs its own police staff, including individual Defendant Northwestern University Police Officers Thomas Healy (Badge No. 22); Frank Walsh (Badge No. 26); Detective Sarah Stark (Badge No. 21); Sgt. Donald Moore (Badge No. 56); Cmd. Cindy Benson; Deputy Chief Eric Chin; Detective Sanghoon Lee; and other unknown Northwestern University Police Officers, relevant to certain incidents involving Plaintiff (and collectively referred to as the "Individual Defendant NUPD officers").

13.     The City of Evanston is a municipal corporation and home rule unit of government organized and existing under the constitution and laws of the State of Illinois. Evanston was incorporated in 1857, and is home to approximately 74,895 residents.

14.     The City of Evanston employs its own police staff, including individual Defendant EPD Police Officers Detective Jones (Badge No. 162); EPD Detective Cepiel (Badge No. 186); EPD Detective Pack (Badge No. 176); EPD Detective Svendsen (Badge No. 164) ; and other unknown EPD Officers, relevant to certain incidents involving Plaintiff (and collectively referred to as the "Individual Defendant EPD officers").

15.     Individual Defendant NUPD officers; and individual defendant EPD Officers, are sworn officers of the NUPD and EPD respectively, and are sued in both their official and individual capacities for actions they took by virtue of their authority as police officers, which exceeded the scope of their authority.

16.     Individual Defendant NUPD officers at all times relevant to this Complaint, acted under color of state law as police officers for the University, and acted in the course and within the scope of their employment.

17.     Individual Defendant EPD Officers at all times relevant to this Complaint, acted under color of state law as police officers for the City of Evanston, and acted in the course and within the scope of their employment.

18.     Plaintiff experienced the individual Defendant NUPD and EPD officers' civil rights violations, as well as their other unlawful actions towards him, in Chicago, Cook County, Illinois.

19.     Plaintiff brings claims against the individual Defendant NUPD and EPD officers pursuant to pursuant to 42 U.S.C.A. §§ 1981, 1983, 1985, and 1986 for their violations of his constitutional rights while acting under color of state law.

20.     Defendant, Northwestern Memorial Hospital, is a corporation organized under Illinois law and engaged in operating a general hospital. Defendant hospital's principal place of business is at 320 E. Superior St., Chicago, Cook County, Illinois.

21.     Defendant, EUGENE LOZZA M.D., ANDREW J. BERG M.D., SCOTT A. GERSHAN M.D., R.N. KATHERINE CAMERENA, R.N. JEREMY BAKER, L.S.W. FRED CABRAS, and PATIENT REPRESENTATIVE R.N. TAYLOR (and collectively referred to as "Individual Hospital Defendants") were at all relevant times in during this complaint employed by Defendant Northwestern Memorial Hospital.

22.     Plaintiff experienced the individual Hospital Defendants civil rights violations, as well as their other unlawful actions towards him, in Chicago, Cook County, Illinois.

23.     Plaintiff brings claims against the individual Hospital Defendants pursuant to pursuant to 42 U.S.C.A. §§  1981, 1983, 1985, and 1986 for their violations of his constitutional rights, while acting under color of state law.

24.     Defendant Usama Ibrahim ("Defendant Ibrahim") is, upon information and belief, a resident and citizen of Cook County, Illinois, and was, at the times referenced herein, a graduate student at the University.

25.     Defendant Muaaz Maksud ("Defendant Maksud") is, upon information and belief, a resident and citizen of Cook County, Illinois, and was, at the times referenced herein, a graduate student at the University.

26.     Defendant Osama Alkhawaja ("Defendant Alkhawaja") is, upon information and belief, a resident and citizen of Cook County, Illinois, and was, at the times referenced herein, a visiting graduate student of NU from the University of Chicago Law School.

27.     Plaintiff experienced Defendant Alkhawaja, and Ibrahim, and Maksud's (and collectively referred to as "Individual Student Group #1") unlawful actions towards him in Chicago, Cook County, Illinois.

28.     Individual Student Group #1 at all times relevant to this Complaint, acted in their roles as event "Event Organizers" for NU on 11/1/19, and acted in the course and within the scope of their roles in agency for the University.

29.     Defendant Ibrahim and Maksud at all times relevant to this Complaint acted in their roles as student group leaders for NU as President and Vice-President of Muslim Law Students Association (MLSA)

(Muslim Affinity Group), and acted in the course and within the scope of their roles in agency for the University.

30.     Individual Student Group #1 were agents of the Northwestern University, and are sued in both their official and individual capacities for actions they took by virtue of their authority and roles as "Organizers" and affinity group leaders, which exceeded the scope of their authority.

31.     Plaintiff brings claims against Individual Student Group #1 pursuant to 42 U.S.C.A. §§ 1981, 1983, and 1986 for their violations of his constitutional rights.

32.     Defendant Evangeline Gargula ("Defendant Gargula") is, upon information and belief, a resident and citizen of Cook County, Illinois, and was, at the times referenced herein, a graduate student at the University.

33.     Defendant Gloria Cange ("Defendant Gange") is, upon information and belief, a resident and citizen of Cook County, Illinois, and was, at the times referenced herein, a graduate student at the University.

34.     Defendant Cange, Gargula, and unknown "OutLaw" group members (and collectively referred to as "Individual Student Group #2") at all times relevant to this Complaint (and collectively referred to as "Individual Defendant Student Group #2"), acted in their roles as student group leaders and members for NU as President and Co-President and Vice-President of Out Law (LGBTQ Affinity Group) and acted in the course and within the scope of their roles in agency for the University.

35.     Plaintiff experienced Individual Student Group #2's unlawful actions towards him in Chicago, Cook County, Illinois.

36.     Individual Student Group #2 are sued in both their official and individual capacities for actions they took by virtue of their authority and roles as affinity group leaders, which exceeded the scope of their authority.

37.     Plaintiff brings claims against Individual Student Group #2 pursuant to 42 U.S.C.A. §§ 1981, 1983, and 1985 for their violations of his constitutional rights.

38.     Defendant JULIE PAYNE-KIRCHMEIER was at all relevant times, VICE PRESIDENT FOR STUDENT AFFAIRS for NU. She is named in this complaint in both her individual and official capacity.

39.     Defendant AMANDA DESILVA was at all relevant times, DEPUTY TITLE IX COORDINATOR for NU. She is named in this complaint in both her individual and official capacity.

40.     Defendant COLLEEN JOHNSTON was at all relevant times, TITLE IX COORDINATOR for NU. She is named in this complaint in both her individual and official capacity.

41.     Defendant, MONA DUGO ("Dugo"), at all times relevant was the Interim Dean/Dean of Students for the University. She is named in this complaint in both her individual and official capacity.

42.     Defendant KAREN TAMBURRO was at all relevant times, DIRECTOR OF EQUAL OPPURTUNITY AND ACCESS for NU. She is named in this complaint in both her individual and official capacity.

43. Defendant LUCAS CHRISTAIN was at all relevant times, ASSISTANT DEAN AND DIRECTOR OF STUDENT CONDUCT for NU. He is named in this complaint in both his individual and official capacity.

44. Defendant ISH FAITH-ORKAR was at all relevant times, SENIOR EQUITY SPECIALIST for and University Hearing Officer #3 NU. She is named in this complaint in both her individual and official capacity.

45. Defendant, Christine DePilla ("DePilla"), at all times relevant was ASSISTANT DIRECTOR OF STUDENT CONDUCT and University Hearing Officer #1 for the University. She is named in this complaint in both her individual and official capacity.

46. Defendant, Heather Cohen ("Cohen"), at all times relevant was the ASSISTANT DIRECTOR OF COMMUNITY STANDARDS and University Hearing Officer #2 University. She is named in this complaint in both her individual and official capacity.

47.     Plaintiff experienced Defendant Payne-Kirchmeier. DeSilva, Johnston, Tamburro, Cristain, Faith-Orkar, DePilla, Cohen,  and Dugo's (and collectively referred to as "Individual NU Defendants") unlawful actions towards him in Chicago, Cook County, Illinois.

48.     Plaintiff brings claims against Individual NU Defendants pursuant to 42 U.S.C.A. §§  1981, 1983, 1985, and 1986 for their violations of his constitutional rights.

49.     Defendant Illinois Board of Higher Education ("IBHE") consists of 16 members as follows: 10 public members are appointed by the Governor and confirmed by the Senate, one of which must be a faculty

member at an Illinois public university; one member of a public university governing board appointed by the Governor; one member of a private college or university board of trustees appointed by the Governor; the chairman of the Illinois Community College Board; the chairman of the Illinois Student Assistance Commission; and two student members selected by the Student Advisory Committee of the Board of Higher Education, one must be a non-traditional undergraduate student who is at least 24 years old. The Governor shall designate the Chairman of the Board to serve until a successor is designated.

50.     IBHE's Statutory Responsibilities Include: (1) Master Planning: Analyzing the needs and requirements of Illinois' higher education system and modifying policies that guide the state's system of public and private colleges and universities; (2) Program Approval: Approving or denying proposals by public university governing boards and the Illinois Community College Board for new units of instruction, research, or public service; also, reviewing existing instruction, research, and public service programs to determine their continued educational and economic justification; (3) Institution Approval: Authorizing independent (non-profit, proprietary, Private Business and Vocational Schools, and out-of-state) institutions to operate and offer degree programs or postsecondary programs in Illinois; also, reviewing to assure that these institutions maintain the condition under which they were authorized to operate, and revoke operating authority when necessary; and (4) Grants Administration: Administering state and federal higher education grant programs.

51.     Defendant IBHE is relevant to certain incidents involving the plaintiff and is named in its official capacity.

52.     Plaintiff experienced IBHE's unlawful actions towards him in Chicago, Cook County, Illinois.

53.     Defendant Cook County State's Attorney's Office ("Cook County") is the office is responsible for the prosecution of all misdemeanor and felony crimes committed in Cook County, its office is located at 69 W. Washington, Chicago, IL 60602.

54.     Defendant Kimberly M. Foxx is and was at all times relevant the Cook County State's Attorney, and the final policy maker for Cook County.

55.     Defendant Kimberly M. Foxx and Cook County are relevant to certain incidents involving the plaintiff and are named in their official capacity.

56.     Plaintiff experienced Defendant Kimberly M. Foxx and Cook County's unlawful actions towards him in Chicago, Cook County, Illinois.

57.     Plaintiff brings claims against Defendant Kimberly M. Foxx and Cook County pursuant to 42 U.S.C.A. §§ 1981 and 1983 for their violations of his constitutional rights.

58.     The Federal Bureau of Investigations ("FBI ) employs more than 35,000 people, including special agents and support professionals such as intelligence analysts, language specialists, scientists, and information technology specialists, including Defendant Special Agent Boertie and Defendant TFO Ferguson (and collectively referred to as "Defendant FBI Agents") and their field office is located at 2111 W. Roosevelt Road, Chicago, IL 60608.

59.     Defendant FBI Agents are relevant to certain incidents involving the plaintiff and are named in their individual and official capacity.

60.     Plaintiff experienced Defendant FBI Agent's unlawful actions towards him in Chicago, Cook County, Illinois.

61.     Plaintiff brings claims against Defendant FBI Agents pursuant to 42 U.S.C.A. §§ 1981 and 1983 for their violations of his constitutional rights.

62.     Husch Blackwell LLP is a law firm who employs Defendant Scott L. Warner and Defendant Karen L. Courtheoux (and collectively referred to as "Law Firm Defendants") and their office is located at 120 South Riverside Plaza, Suite 2200, Chicago, IL 60606.

63.     Law Firm Defendants are relevant to certain incidents involving the plaintiff and are named in their individual and official capacity.

64.     Plaintiff experienced Law Firm Defendants unlawful actions towards him in Chicago, Cook County, Illinois.

65.     Plaintiff brings claims against Law Firm Defendants pursuant to 42 U.S.C.A. §§ 1985 and 1986 for their violations of his constitutional rights.

46.     At all times relevant, Defendants' actions took place in Cook County, in the State of Illinois.

47.     Defendants committed the acts and omissions alleged in this complaint in bad faith and with

knowledge that their conduct violated established and settled law.

## STATEMENT OF FACTS

48.     Plaintiff is Fahad Syed, a first-generation college graduate from a low-income, racial and ethnic minority household and was raised by a single mother, and the first in his family to attend law school. Plaintiff's parents legally separated when he was 8 years old due to his father's violence towards the children, and Plaintiff grew up in an inner-city low-income housing project, a crime-laden environment devoid of positive male role-models and influences.

### Introductory Information

49.     Plaintiff is a first-generation college graduate from a low-income, racial and ethnic minority household and was raised by a single mother, and the first in his family to attend law school. Plaintiff's parents legally separated when he was 8 years old due to his father's violence towards the children, and Plaintiff grew up in an inner-city low-income housing project, a crime-laden environment devoid of positive male role-models and influences.  His federal protected classes include (actual or perceived): Race: Asian; Color: Brown; Religion or creed: Islam; National origin or ancestry: Muslim, Descendent of Prophet Muhammed ("Syed"), and Pakistani; Sex: Male; Physical or mental disability: ADHD, Bipolar, Anxiety, depression; Genetic information: Syed, Muslim, Pakistani, Citizenship: Immigrant, Pakistani

50.     Plaintiff suffers from multiple ADA learning and cognitive disabilities of bipolar disorder and ADHD, as well as anxiety and depression. One of the major "episodic manifestations" of Plaintiffs bipolar disorder are "psychotic episodes" triggered by stress, which induce varying levels of anger, paranoia, frustration, irritability, temper, etc.

51.     Plaintiff first made the decision to pursue law school in 2015, at the age of 25. Plaintiff had a successful career managing IT operations at a Fortune 100 company after graduating in 2012 with a 3.0 overall GPA from a Top 50 undergrad with a Top 10 undergrad business ranking with dual bachelors degrees in busines economics and political science and 3.3 and 3.9 major GPA's respectively. In addition, plaintiff holds multiple industry standard IT certifications, further illustrating his professional competency and capabilities. Plaintiff is actively involved in community building efforts, and helped found a non-profit for refugee assistance (Iraqi Mutual Aid Society) during college, and is currently affiliated with another non-profit (Inner-City Muslim Action Network) for which he does volunteering and other work.

52.     Plaintiff's mother was diagnosed with terminal metastatic ovarian cancer and was undergoing intense chemotherapy sessions during this period and Plaintiff dedicated the next 2 years of his life to study for the Law School Admissions Test (LSAT), living at home with his mother to study full time and work part time occasionally as his mother's caretaker.

### Class of 2017 Admission and Rejection

53.     Plaintiff always wanted to attend law school at NU, and his studying eventually paid off as he took the LSAT two times in 2017, receiving two 166 (93rd Percentile) scores on both attempts, and applied for Early Decision Admission to NU Law School in 2017 by the age of 27, but subsequently received a rejection.

### Class of 2018 Early-Decision Admission

54.     Despite the rejection, Plaintiff was still determined to attend law school at NU, and studied and retook the LSAT again on two separate occasions, scoring 168 (96[rd] Percentile) and 170

(98rd Percentile) and successfully re-applied for admission through Early Decision ("ED") to Northwestern University Law School JD class of 2018 with 150K scholarship on December 13th, 2017 at the age of 28. This was the happiest moment of Plaintiff's life.

## 2018 Discriminatory Conduct

55.     On April 26th, 2018 Plaintiff's 2018 Early-Decision Application and subsequent admission was subject to an unannounced post admission review which was highly irregular in process and was on the basis of "alleged inaccurate information in [Plaintiff's] Fall 2018 JD application related to [Plaintiff's] employment history, collegiate extracurricular activities, and *family background*." As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background."

56.     The source or intended meaning of allegations in paragraph 3 was never revealed, even after Plaintiff successfully cleared the investigation on May 21, 2018. As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit who's application was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background" ever successfully completed the verification without learning the source of the allegation nor the allegations themselves.

## 2018 Adverse Action and Discriminatory Sanctions

57.     As a result of this investigation, Plaintiff was forced to "defer" his admission and enrollment to 2019, pending the completion of the first of series of repeated discriminatory measures on the basis of perceived threat from his disability:

    (1) Behavioral Services Center Anger Management Evaluation and Treatment, which he completed by June 2018.

    (2) Behavioral Services Center Substance Use Evaluation and Treatment, which he completed by June 2018.

58.     As far as plaintiff knows, no other similarly situated 2018 early decision admit, nor 2018 general admit who's application was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background," and who successfully completed the verification without learning the source of the unsubstantiated allegations nor the allegations themselves, was forced to "defer" his admission and enrollment to 2018 pending the completion of these two Behavioral Services Center substance abuse and anger management evaluations on the basis of perceived threat from his disability.

59.     As a further result of this sudden change plaintiff was left homeless because of poor credit and finances and forced to live at the Christian Pacific Garden Mission at 1458 S Canal St, Chicago, IL. Plaintiff's religious devotion led him to the Downtown Islamic Center at 231 S State Street and eventually met a near friend, and through him, was introduced to Inner-City Muslim Action Network (IMAN), a 501 (c)3 organization dedicated to community building and gang violence reduction efforts in Chicago's South-Side Englewood neighborhood.

60.     Plaintiff met and became friends with Rami Nashashibi and upper management of the organization and came to live in IMAN Green-Reentry Englewood housing at 6053 S. Washtenaw Ave., a half-way house for formerly incarcerated individuals, mostly convicted felons with extensive gang history and violent criminal records. There he came to meet and know Jackie Wilson and learn of detective Jon Gram Burge while doing work for the organization leading prayer and performing academic tutoring, until he was able to find the apartment where he lives now, in Streeterville, Chicago in August 2019.

## 2019 Re-Enrollment

61.     In August 2019, Plaintiff enrolled in the class of entering JD class of 2019 at NU Law School at the age of 29 and started Fall 2019 Semester.

62.     During Fall 2019 Semester, Plaintiff was dealing with tremendous family concerns as Plaintiff watched his mother slowly start to pass away from ovarian cancer because she had finally become resistant to treatment.

63.     During the months September and October of 2019, Plaintiff watched his mother slowly starved to death because she had finally become resistant to treatment, and metastatic ovarian cancer had filled her entire stomach and esophagus with tumors which made it so painful to eat that she chose to starve to death rather than be placed on a feeding machine. Because she elected his other siblings as her power of attorney and power to make health decisions, and specifically indicated a do not resuscitate order (DNR) and no life support options in her will, he was unable by law, to even suggest that if she tried to eat or find some way to get nutrition into her body, that she would live.

64.     Despite her impending passing, and knowing that this was the last remaining time that he would have with her, because of his enrollment and commitment to law school, he sacrificed much of the precious time that he had left with his mother in order to attend classes and pursue coursework. Plaintiff would attend classes and complete coursework during the weekday working hours, come home and complete homework assignments, then travel up to Skokie from his apartment in Streeterville (1-hour trip on average) in order to spend time with his mother during the night. He sacrificed spending this time with her because his legal education and future legal career was the most important thing to him next to his late mother.

65.     Despite his family issues, Plaintiff tried to attend school and try to have relatively normal social experience by participating in social outings, joining student organizations and religious student groups, and trying to participate in the school group chat for the entering JD class of 2019.

**Hostile Environment #1 Fall 2019 Semester (Sexual Harassment)**

66.     It was some time after August 28th, 2019, his 30th birthday, when Plaintiff started to be viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment accusations from a similarly situated non-Muslim, white, female student without disabilities, which were never shared with Plaintiff at any time by any person. As far as plaintiff knows, no other similarly situated non-Muslim, white female 2019 early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 regular decision admit without disabilities was subject to this kind of vicious harassment or ridicule or banning and exclusion from school activities based on unknown sexual harassment accusations from a similarly situated non-Muslim, white female student without disabilities.

67.     These vicious rumors were allowed to circulate unchecked among the student body of the law school and culminated in a group discussion with the entire law class discussing the Plaintiff on the entering class Group Chat application ("Group Me"), which Plaintiff was deliberately and maliciously excluded from participating in, and of which the university was fully aware of, and resulted in almost the entire school treating Plaintiff like a sexual predator. As far as plaintiff knows, no other similarly situated non-Muslim, white female 2019 early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 regular decision admit without disabilities was subject to this kind of vicious harassment or ridicule such as a public discussion about the student on the entering JD class group chat which the university was fully aware of and did nothing to address and which the student was deliberately and maliciously excluded from participating in. These actions by NU students and staff created a hostile learning environment that altered the terms and conditions of Plaintiff's education as follows:

68.     No one talked to Plaintiff, or sat near Plaintiff in class, making it difficult to complete assignments requiring group work. Other students refused to participate in group assignments in in-class group work with him, and Plantiff was forced on several assignments for extra credit in Kaden's class to submit assignments solo by special permission from the instructor due to this hostility towards plaintiff in school.

69.      People performed overt and childish gestures such as visibly retreating from and avoiding coming near of talking to Plaintiff in public settings in and around the law school, swerving to avoid plaintiff in hallways as if plaintiff carried a contagious disease, avoiding eye contact with Plaintiff, making obviously noticeable and sensationalized faces of disgust when seeing Plaintiff in hallways, as if Plaintiff had feces on his face. At one mock interview event in September, not a single student spoke to plaintiff during the entire event, and plaintiff was forced to talk to alumni and recruiters the whole night.

70.      People made mean jokes about Plaintiff and talked behind his back, plaintiff was called "rapist" and "creep" and "disgusting" and "pig" and "terrorist" and "jahadi-fahadi" and "Jafar" and "bomb-maker-extraordinaire" and on more than one occasion by more than one, mainly female students. Plaintiff frequently walked by groups of students openly discussing him on routine occasions during his time in classes.

71.      During this time, students and staff alike, through these actions and through associating my religion, Islam, with violence, misogyny, and rape, propagated and supported negative stereotypes about my religion, specifically that myself and other adherents to my religion are violent and oppressors of women.

72.      Plaintiff was especially reviled by female students, and the subject of intense rebuke in class discussions and unwarranted objections and arguments to his point of view during class discussions.

73.      This environment of harassment and hostility went on unabated for 10 weeks. As far as plaintiff knows, no other similarly situated non-Muslim, white 2019 female early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 general admit without disabilities was subject to this kind of treatment based on allegations of sexual harassment.

74.      The school allowed these vicious rumors to circulate unchecked despite the fact that Plaintiff brought this to their attention so they had full awareness of the distress that Plaintiff was suffering from a result of it. Plaintiff was called into a meeting sometime shortly after 8/28/19 with Dean of Students Susie Spies-Roth and Shannon Bartlett in order to inform Plaintiff that the Black Law Students Association ("BLSA") student group had dis-invited Plaintiff from the annual boat party that Plaintiff had been invited to and was excited to attend. Plaintiff was informed that many of the students in the group felt "uncomfortable" with Plaintiff, but was not told exactly why. During this meeting which plaintiff informed them of the abusive and hostile environment and the vicious rumors and was informed that they [Susie and Shannon] were already aware of it, and that were the reason that Plaintiff was dis-invited to the boat party. As far as plaintiff knows, no other similarly situated non-Muslim, white female 2019 early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 regular decision admit without disabilities was subject to this kind of treatment based on allegations of sexual harassment which were never shared with the student and over which the student was prevented from participating in school events and social outings.

75.      On 9/19/19, Plaintiff suffered a nervous breakdown in class due to other students playing a blatant and childish prank on Plaintiff in CLR class by not intentionally not handing Plaintiff the class handouts, and participating in an bizarre coordinated act of ridicule and laughter as a result, by all the students in the first row simultaneously turning to Plaintiff and laughing. As a result of his breakdown, Plaintiff missed his "Dean's Round Table" lunch date with the Dean of the Law School, Kimberly Yurako, which was scheduled to take place that day. Plaintiff informed his instructor, Rebeka Holman, of this abuse after the class session, and rather than addressing the behavior, she attempted to have plaintiff examined for involuntary commission to a mental institution. (By escorting plaintiff to separate room and asking plaintiff a series of questions designed to gauge the outward behavioral indications of threats of violence to self or others). As far as plaintiff knows, no other similarly situated 2019 white female early decision admit without disabilities, nor 2019 similarly situated white female general admit without disabilities was subject to this kind of open humiliation and degrading treatment from students or staff.

76.      Despite the hostile learning environment Plaintiff was faced with, he was performing academically well in his courses, and had attended all 10 weeks of classes every day with good attendance and with satisfactory grades and was actively involved in class discussions, submitted

coursework for credit and also submitted the mid-term writing assignment. Plaintiff was attending professors office-hours and spending significant time and effort attending to his academic responsibilities, indeed his Torts professor, Emily Kadens, saved the *Palsgraff* (a difficult torts case) case for his in-class discussion turn, and referred to him as the "smartest" person in the class in front of all the students on one occasion, and no one objected. In addition, plaintiff actively enjoyed interacting with staff and teachers, and frequently and enthusiastically expressed his interest and enjoyment in the academic subject matter and quality of instruction to staff.

77.    Plaintiff's mother passed away on October 23rd, 2019, and after arranging her funeral and attending her burial, he spent a few days trying to rest and recover. Plaintiff then attempted to rejoin classes and school activities the next week.

78.    Professor Emily Kadens was Plaintiff's Torts professor, and shortly before this incident occurred, Plaintiff had visited her office hours to discuss assignment question #3, Assignment 20, pg. 233 of her course book. This was shortly before the incident on November 1st occurred. She would be able to attest to the severe emotional distress that Plaintiff was feeling near the time of the indecent as a result of the harassment and death.

79.    Professor Susan Provenzano was Plaintiff's civil procedure professor. Plaintiff visited her office hours on 10/9/19 and 10/16/19, and during both of those times Plaintiff was operating under stress of his mother's, then impending, death. Provenzano would also be able to attest to the severe emotional distress that Plaintiff was feeling near the time of the indecent as a result of the harassment and death.

**Discriminatory Conduct and Hostile Environment #2 Fall 2019 Semester – False Imprisonment (Disability Harassment)**

80.    On November 1, 2019, roughly one week after his mother died on October 23rd, 2019, at approximately 6:37 PM CST Plaintiff attended a law school event in the Levy Mayer wing of the law school building located at 357 E Chicago Ave., Chicago IL 6061 attended by defendant and University of Chicago (3L) law student Osama Alkhawaja,("Alkhawaja") and defendants and fellow Northwestern University law students Usama Ibrahim (3L) ("Ibrahim") and Muaaz Maksud (2L) ("Maksud"), and approximately 60 other fellow law students from mine and other law schools in total.

81.    Plaintiff had attended the event to seek consolation for his mother's death and had not slept in 2-3 days prior to his attendance due to emotional distress. While at the event, Plaintiff was repeatedly targeted and harassed with threatening and invasive questioning and unwanted physical contact by an unknown male (Osama Alkhawja) on 4 separate occasions, culminating in a vicious physical attack where he kicked Plaintiff several times on the leg, then tackled Plaintiff onto the ground, and choked Plaintiff in a headlock until Plaintiff nearly lost consciousness. Defendant Osama A. took these actions acting in agency for Northwestern University and based directly on his perception of his mental impairment. As far as plaintiff knows, no other similarly situated 2019 early decision admit without disabilities, nor similarly situated 2019 general admit without disabilities was subject to this kind of vicious attack based directly on his perceived threat from their disability.

82.    No one witnessed this vicious physical assault. He then called out to his two friends (Muaaz Maksud and Usama Ibrahim) who were nearby, and together the three physically restrained Plaintiff, restricting his freedom of movement to leave the premises and with intent to initiate his imprisonment of plaintiff based on perceived mental impairment to Plaintiff. They then called NUPD and unlawfully told them that plaintiff was suffering from "mental illness" and falsely reported to police that Plaintiff attacked Osama.

83.    University Police Reporting Officers Healy #22, Walsh #26, and Sgt. Moore #56 arrived on scene and found plaintiffs being unlawfully restrained against his will by defendants Alkhawaja, Ibrahim, and Maksud, whereupon defendant Alkhawaja falsely alleged to reporting officers that plaintiff attacked him, and Maksud falsely attested to witnessing the battery occur. Defendants Osama, Usama, and Muaaz took these actions with the intent to initiate false imprisonment of plaintiff against his will based on a threat from perceived disability of plaintiff. Each of the defendant law students treated plaintiff differently than the other two similarly situated law student defendants without disabilities

based solely on threat from perceived disability of the plaintiff. Each of the defendant officers treated plaintiff differently than the other three similarly situated law student defendants without disabilities based solely on threat from perceived disability of the plaintiff.

84.     When police arrived (NUPD Reporting Officers Healy #22, Walsh #26, and Stg. Moore #56) they found Plaintiff being restrained, and immediately handcuffed Plaintiff and questioned Plaintiff. When Plaintiff attempted to explain, they brutally threw Plaintiff to the ground despite the fact that Plaintiff had not made any aggressive or threatening statements or actions. NUPD then called EMS while brutally holding Plaintiff face down on the ground, and when EMS arrived, one officer (Healy #22) forcibly transported Plaintiff in his custody via ambulance to the Northwestern Memorial Hospital (NMH) at 320 E. Superior St., along with paramedics, to be certified for involuntary inpatient admission without production of clear and convincing evidence of plaintiff's threat to physical safety of self or others. Defendant NUPD officers treated Plaintiff differently than other similarly situated law students without disabilities by assuming, because the other students had told them that plaintiff was suffering from "mental illness," and the fact that all three were falsely reporting that Plaintiff was "randomly attacking people," that plaintiff was guilty and should be thrown to the ground and held there like an rabid animal until he could be involuntarily committed and not listen to anything Plaintiff said.

85.     At the hospital, a mental health worker, R.N. Jeremy Baker, prepared a petition for plaintiff's involuntary admission under IL ST CH 405 § 5/3-600. Section 3-601 defines a person "subject to involuntary admission" as a person with mental illness who because of mental illness is reasonably expected to inflict serious physical harm on himself or another in the near future. 405 ILCS 5/3-601 states "(b) The petition shall include all of the following: (1). A detailed statement of the reason for the assertion that the respondent is subject to involuntary admission on an inpatient basis, including the signs and symptoms of a mental illness and a description of any acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence.(2.) The name and address of the spouse, parent, guardian, substitute decision maker, if any, and close relative, or if none, the name and address of any known friend of the respondent whom the petitioner has reason to believe may know or have any of the other names and addresses. If the petitioner is unable to supply any such names and addresses, the petitioner shall state that diligent inquiry was made to learn this information and specify the steps taken. (3). The petitioner's relationship to the respondent and a statement as to whether the petitioner has legal or financial interest in the matter or is involved in litigation with the respondent. If the petitioner has a legal or financial interest in the matter or is involved in litigation with the respondent, a statement of why the petitioner believes it would not be practicable or possible for someone else to be the petitioner. (4.) The names, addresses and phone numbers of the witnesses by which the facts asserted may be proved." 405 ILCS 5/3-601 also states "(c) Knowingly making a material false statement in the petition is a Class A misdemeanor."

86.     NUPD Officer Healy #22 partially completed a petition for involuntary commitment stating that Plaintiff had battered Osama and listing Muaaz as the witness, however the official petition Plaintiff received was completed by R.N. Jeremy Baker, and indicated that Plaintiff had not been brought in by a peace officer, listed two staff members, Eugene Lozza and Fred Cabra, as the witnesses to the battery, and failed to provide the officers identifying information on the petition which Plaintiff was served. The petition and both certifications indicated that police brought Plaintiff in and that Plaintiff had "attacked" a fellow law student at a school event. R/O Healy then made false statements in NUPD Case #2019-00000595 report narrative, falsely indicating that he [R/O Healy] had completed the petition for commitment and falsely indicating that Muaaz Maksud had witnessed the alleged act of battery. Defendants NUPD took this action based on threat from perceived disability of plaintiff, treating the plaintiff differently than similarly situated law students (Maksud, Ibhahim, and Alkahawja) without disabilities solely on the basis of his disability.

87.     "Healy #22" deliberately violated 405 ILCS 5/3-606 procedure by failing to complete the official petition and/or failing to include identifying information in said petition. Defendant Northwestern University police and its agents took this action based on perceived mental impairment of plaintiff, and discriminated against plaintiff based solely on his disability by treating him differently than

the similarly situated law students without disabilities, who's account they believed based solely on the fact that they had had did not have disabilities and someone had told them that Plaintiff was suffering from "mental issues." The sole evidence that staff had supporting any threat to the safety of myself or others was the police report which falsely stated that Plaintiff had committed a battery.

88.     On information and belief, Healy #22 coerced NMH RN Jeremy Baker into knowingly falsifying information on petition on pg. 3, whereupon he [Baker] should knowingly and falsely indicate that Plaintiff had not been detained and/or brought into the hospital by a peace officer. NUPD and its agents took this action based on threat from plaintiff's perceived disability and treated Plaintiff differently than similarly situated law students without disabilities by believing everything they said and not listening to anything plaintiff said based solely on the fact that someone told him plaintiff was "experiencing mental issues."

89.     On information and belief, Defendant RN Jeremey Baker, acting on unlawful coercion from Healy #22, then knowingly made false statements in petition for involuntary commitment indicating that no peace officer had detained Plaintiff, while indicating that Plaintiff "presents with police" in examination notations of said petition. Defendants NMH and its agents took this action based on threat and hostility towards and from perceived disability of plaintiff and treated Plaintiff differently than similarly situated law students without disabilities by believing everything they said and not listening to anything plaintiff said based solely on the fact that someone NUPD reported plaintiff was "randomly attacking people" and "experiencing mental issues."

90.     Healy intentionally committed this commitment petition falsification in conspiracy with the Osama, Usama, Muaaz, NMH employees in order to have Plaintiff falsely imprisoned  due directly to prejudice against his perceived mental health disability or threat he perceived as a result of his mental health disability; he thought Plaintiff was dangerous because someone at the scene of the incident (Cite Usama Ibrahim's comments from student conduct interview) told him Plaintiff was "experiencing mental health issues." He also acted to prevent himself from getting disciplinary action as a result of his brutal act of throwing Plaintiff to the ground unnecessarily and holding Plaintiff there against his will, in a blatant acct of unnecessary and excessive force perpetrated against Plaintiff due to his [Healy's] perceived threat from his ADA mental health disability status, he thought Plaintiff am was a violent crazy person simply because someone told him Plaintiff was "experiencing mental health issues."

91.     The hospital staff failed to notify me of my rights, I was not offered a chance to speak to an attorney, they did not contact any relatives or ask me if I wanted to notify anyone I was being detained, they did not list any of my friends or relatives indicate any steps which they took to find my friends or relatives.

92.     My religion (Islam) strictly forbids opioid-based medication, which I informed the staff of and they completely ignored. Additionally, I informed staff of the fact that I had gone without sleep for 2-3 days because of emotional distress stemming from my mother's death. In spite of these facts, they immediately sedated me with 10MG of psychotropic medication against my will, and in blatant violation of my religious views, without me making any threatening statement or actions which were an immediate threat of safety to myself or anyone else—this fact is reflected in the medical observational notes. They failed to notify me of my right to refuse this medication or to notify me of the associated risks or side-effect. The sole evidence that staff had supporting any threat to the safety of myself or others was the police report which falsely stated that I had committed a battery.

93.     Dr. Eugene Lozza MD, a resident in psychiatry, prepared a certificate in support pursuant to 405 ILCS 5/3-602. Section 3-602 requires that the petition be accompanied by a certificate executed by a physician, qualified examiner, psychiatrist, or clinical psychologist that states that the respondent is subject to involuntary admission and requires immediate hospitalization. Eugene Lozza MD, a psychiatrist on staff at Northwestern Memorial Hospital examined plaintiff on 11/1/19, pursuant to 405 ILCS 5/3-610. Section 3-610 states "As soon as possible but not later than 24 hours, excluding Saturdays, Sundays and holidays, after admission of a respondent pursuant to this Article, the respondent shall be personally examined by a psychiatrist. The psychiatrist may be a member of the staff of the facility but shall not be the person who executed the first certificate. If a certificate has already been completed by a psychiatrist following the respondent's admission, the respondent shall be examined by

another psychiatrist or by a physician, clinical psychologist, advanced practice psychiatric nurse, or qualified examiner. If, as a result of this second examination, a certificate is executed, the certificate shall be promptly filed with the court." Section 3-610 further states that if no examination occurs within 24 hours of admission or if the examining psychiatrist does not execute a certificate, "the respondent shall be released forthwith."

94.     After examining plaintiff on 11/1/19, Eugene Lozza MD was required to either execute a second certificate or release plaintiff "forthwith." Eugene Lozza MD failed to execute the second certificate, yet he held Plaintiff in the psychiatric unit until the following morning.  Eugene Lozza MD unlawfully restrained plaintiff by failing to release him "forthwith" on 11/1/19.

95.     Plaintiff was certified for involuntary inpatient admission by Eugene Lozza MD of Northwestern Memorial Hospital on 11/1/19, while sedated and not in a reasonable capacity to understand the situation, not presented an explanation of rights in the situation, and without identification of clear and convincing evidence of imminent threat to the physical safety of self or others, in violation of 405 ILCS 5/3 admissions, hearing, and notice procedures. Defendants Northwestern Memorial Hospital and its agents took this action based on perceived mental impairment of plaintiff and hostility towards plaintiff's religion, perceived mental impairment and national origin and with willful failure to contact plaintiff's close family or relatives or make alternative arraignments for patient care. The sole evidence that staff had supporting any threat to the safety of myself or others was the police report which falsely stated that Plaintiff had committed a battery.

96.     The staff completed the petition examination and first certification for commitment within 5-6 hours of sedating Plaintiff and while Plaintiff was heavily under the influence of medication and not aware of what was going on, where Plaintiff was, or in any state to properly represent himself. Plaintiff was falsely imprisoned for seven days from November 1st-8th of 2019 in involuntary or voluntary patient admission status in the hospital against his own free will, which prevented Plaintiff from attending class or submitting coursework, ultimately resulted in a 3 semester suspension (Fall 2019, Spring 2020, and Fall 2020) directly impacting plaintiffs right to education, and long-term earnings and associated economic and benefits of education. During my time inside of the hospital, the staff forced me to take various medications and participate in various group sessions and activities in order to be released, despite the fact that I am a strictly practicing Muslim and vehemently requested that my treatment plan be limited only to prayer and religious activities. I was not informed of my right to least restricted treatment environment

97.     The hospital staff failed to file the petition, either certificate, proof of service of the petitions or my statement of rights with the court within 24-hours of my arrival, which was a Friday night, or on following Monday or Tuesday. They ultimately failed to file the petition or serve me with proof of filing at any time during my time at the hospital or after. The Illinois Guardianship and Advocacy Association is currently investigating my case. I was not given a copy of the petition to send to my attorney or guardian, nor was I asked if I wanted to send copies of the petition to anyone.

98.     These actions by NU event organizers and NUPD supervisors and employees and NMH supervisors and employees created a hostile learning environment that altered the terms and conditions of Plaintiff's education wherein Plaintiff was the victim of a brutal physical assault and falsely imprisoned for one week while at a law school student organization dinner and forced on a medical leave of absence as a result of discrimination directly related to his disability from November 1 – November 8th, 2020. As far as plaintiff knows, no other 2019 early decision admit, nor 2019 general admit was subject to this kind of treatment.

## 2019 Adverse Action and Discriminatory Sanctions

99.     On 11/1/19, Usama then called the law school Dean of Students Susie Spies-Roth and initiated a separate, school disciplinary process.

100.     NUPD Officer Healy #22 then notified his law school of the false narrative of this incident as it was recorded in the police report due directly to prejudice against his perceived mental health disability or threat he perceived as a result of his mental health disability and to save himself from

disciplinary action as a result of his brutal unnecessary and excessive force perpetrated against Plaintiff due to his [Healy's] perceived threat from his ADA mental health disability status.

101.    Plaintiff was served with an interim-suspension and notice papers on November 6th 2019 stating that the school had received a report that Plaintiff struck an individual in the "mouth" during a law school event, while Plaintiff was still inside the hospital, and Plaintiff was requested to evacuate his university-affiliated residence within 5 days of leaving the hospital on November 8th 2019, under penalty of trespass and further school sanctions.

102.    After Plaintiff was released from the hospital Plaintiff received two separate letters in the mail from his insurance company denying the hospitals requests on November 5th and November 7th of 2019 for insurance coverage of continued inpatient stay, stating on both occasions, that "an independent review organization medical doctor, board certified in Psychiatry" reviewed the requests and determined that "continued inpatient stay has not been shown to be medically necessary to improve or correct your bipolar disorder."

103.    Following Plaintiffs return from medical leave, Plaintiff was forced to undergo a brutal defamatory student conduct interviews, wherein the attackers explicitly and in writing, admitted to harassing Plaintiff on the basis perceived threat from his disabilities, and Plaintiff made every effort to attempt highlight the fact that the University had failed to uphold its duty to provide students with disabilities the opportunity to pursue education free of harassment and discrimination by reporting all of the discriminatory conduct to the university.

104.    The account that was documented in the narrative of the police report (2019-00000595) was that Plaintiff had "become incoherent" while taking to "fellow law students" in the hallway and "stuck fellow law student Osama A. in the mouth" while at a law school event, and listed Muaaz on the report as witness to the battery. The report failed to document any visible injury to Osama, and to his knowledge, there was also no photographic evidence of any injury to him.

## 2019 UHAS Hearing Witness Conflict of Interest

105.    Upon the onset of the investigation, Plaintiff was asked by student conduct representative Christine DePilla, who served as his hearing officer, to provide a list of individuals who Plaintiff wanted interviewed in order to explain what they saw and heard during the incident.

### Initial Request To Have These individuals Contacted

106.    On 11/19/19 Plaintiff had articulated several reasons to interview Maksud and Ibrahim. Plaintiff initially requested that they be contacted because Maksud and Ibrahim were the NU Law students who coordinated and planned the MLSA event during which the alleged conduct incident in question occurred. Maksud and Ibrahim, close personal friends from childhood who grew up in the same part of Illinois, attended the event and were present at the time of the incident in question.  Maksud and Ibrahim were also among the NU law students who were aware of his mother's death on 10/23/19, and subsequently also attended his mother's funeral and burial on 10/24/19, at Rosehill Cemetery in Chicago.

107.    On 11/20/29 Ibrahim requested a non-contact order against Plaintiff through the university.

108.    Given Ibrahim and Maksud's friendship, Plaintiff sent an email to Depilla and Adams on 11/21/19 outlining the following concerns and requesting that the two individuals, Ibrahim and Maksud, no longer be contacted as part of his request for investigation about his student conduct resolution process AND that any damaging information that either one provides in relation to his conduct be viewed in light of the following facts.

109.    Prior to 11/21/19, Plaintiff considered Maksud and Ibrahim as close, personal friends. As of 11/21/19, it is no longer the case.

### Conflict of Interest

110. The reason that I no longer consider Maksud and Ibrahim as appropriate subjects for providing testimony about this event is that Ibrahim filed a protection order against me on 11/20/19, and these two individuals (Usama and Muaaz) have a close personal relationship.

111. These two individuals present a clear conflict of interest in providing unbiased testimony about the incident, because of the fact that they were involved with coordination of the event, for which they unjustly prevented me from inviting several individuals who shall be mentioned in the following sections.

112. Maksud and Ibrahim justified the denial of admission of my invitees by claiming that no "non-law students" could attend.

113. Maksud and Ibrahim subsequently invited their own personal friend, Shazeb Hassan - a non-law student (NU medical student), who attended the event with their express approval, even though he (Hassan) should have been denied permission to attend on the same grounds that my invitees were denied.

114. Maksud and Ibrahim then, improperly and unlawfully, provided Hassan with THREE full pans of food from the event, food which they had purchased with school funding, pans of food which they (Usama and Muaaz) referred to as "leftovers."

## Prior Concerns About MLSA's Misappropriation of Student Funding

115. I had, prior to the MLSA event in question, expressed my concerns to both of these individuals that they were misusing/abusing and/or misappropriating the school's financial support/funding that they were receiving in order to coordinate events through the Muslim Law Students Association, hereby referred to as the "MLSA."

116. The MLSA had historically spent significant amounts of their funding in order to take the members of the group out to dinner at various restaurants throughout the city.

117. Plaintiff was of the opinion that the MLSA should be using their funds for philanthropic and/or charitable causes, in order to benefit the Muslim community in Chicago and in the United States. This is due to Northwestern University Law School's standing reputation as one of the premier legal institutions in the country, and the individual Islamic responsibility of a member of the Muslim Law Students Association at said law school.

## Denial of Admission for invitations I Made to Individuals For Attending the MLSA Conference on 11/1/19

118. On 10/31/19, I expressed my desire that 3 other Muslim members of the Northwestern University community be invited to and allowed to attend the event in question. This is because Muslims are a small minority in the Northwestern University community, and I thought that we should all be allowed to attend each other's events.

119. The individuals who I expressed interest in inviting, and who I did invite are: (1) Shazeb Hassan (410-952-8357) - Second year medical student at NU School of Medicine, (2) Ali Mahmood (708-407-5749) - Unknown year medical student at NU School of Medicine, and (3) Taha (Last name Unknown) (612-806-7196) - Unknown year medical student at NU School of Medicine.

120. I then asked Maksud and Ibrahim for permission to bring two other Muslim, non-university affiliated guests to the event, the first is Rami Nashashibi: the executive director of the Inner-City Muslim Action Network (IMAN). He is a MacArthur "Genius Grant" Fellow and a 2018 Opus Prize laureate. He received a Ph.D. in sociology from the University of Chicago and has taught courses at multiple universities since, including a teaching appointment at the Chicago Theological Seminary. He was appointed by President Barack Obama to the President's Advisory Council on Faith-Based and Neighborhood Partnerships. Rami serves on the board of the Marguerite Casey Foundation, and is an advisor to a number of strategic initiatives across the country. His work with IMAN continues to feature in many national and international media outlets.

121.    The second individual who I invited was Bilaal Evans:  Unofficial Head of 501(c)(3) Inner-City Muslim Action Network Green-Re-entry Program.

122.    The work of these individuals and their organization, and it's applicability to a national conference of Muslim law students at one of the nations top 10 ranked law schools is self-evident. More information about the group can be found at: https://www.imancentral.org/.

123.    When I texted Usama and Muaaz to invite these aforementioned individuals, one or both responded with the following messages:

*124.    "Hey bro, I'm so sorry we've had to turn away prospective law students, spouses, and others cuz it's supposed to be catered to current law students only, but we will likely have a ton of food left over and you can def get a ton if so! If it was just us hosting it, I wouldn't mind at all but we're co-hosting with U Chicago and they're the ones who've had to tell ppl no so we cant let non-law students in and put them in a bad spot"*

## 2019 UHAS Interviews

125.    Despite this, student conduct chose to interview them. Usama interviewed and gave his statements on November 19th, Osama on the 20th and Muaaz on the 21st of November 2019.

126.    The 3 attackers (Osama, Muaaz, and Usama) voluntarily and deliberately made false attack allegations, and additional false and defamatory allegations during a student conduct investigation conducted by his law school. Each one of the attackers made specific articulable statements during their interviews indicating that they were at least tacitly aware of his mental disability or that Plaintiff was experiencing mental health issues at that time.

127.    Muaaz gave detailed accounts about how Plaintiff was "out of it" and about Plaintiff "asking people for pen" and "clapping randomly" and "rambling." He made additional unnecessary and lengthy remarks about his clothing which indicated that his true intent in giving the interview was malicious and defamatory. Both Usama and Muaaz confessed during his interview that he had not actually witnessed Plaintiff strike anyone, but had both entered the room and witnessed Osama choking Plaintiff on the ground.

128.    Osama reported in his interview that Usama told him that Plaintiff was "experiencing mental health issues." Osama confessed to repeatedly approaching and harassing Plaintiff on 4 occasions, including once when he admitted to unwanted physical contact where he touched Plaintiff on his back, out of concern about his "strange comments" and "the way Plaintiff was talking," but without ever making any specific mention to any threatening comments or threatening behavior whatsoever. Osama then claimed that Plaintiff was talking to an unidentified female, during which he apparently intervened on her behalf, and Plaintiff subsequently struck him in the "eye." Osama's comments strongly indicated that he targeted Plaintiff due specifically to "concern" about his disabilities, and this fact is reflected strongly in the interview transcript which he voluntarily participated in.

129.    All three had matching details relating to the severity and physical appearance of the alleged injury to Osama's eye in the immediate aftermath of alleged "attack" which strongly conflicted with the lack of notation in the police report or any physical pictures or evidence of injury to Osama. Plaintiff later confirmed with NUPD Deputy Police Chief Chin that standard NUPD procedure would be to document injuries of a severity which matched the description given by the three attackers.

130.    The student conduct investigation revealed that there was absolutely no evidence supporting Osama's false allegation that Plaintiff "attacked" or "battered" him. It also revealed that there was no mention made to police, staff, or administration during or immediately after the incident of the female who he and Usama alleged to have precipitated the altercation. Osama and Usama failed to identify the female during their interviews, despite their roles as event organizers. The police report made no mention of this alleged female.

131.    On 11/14/19, following the interviews with the three individuals, DePilla changed the allegations against Plaintiff from "stuck" a fellow law student in the "mouth"  which was stated in the November 6th suspension notice Plaintiff received, to "stuck" them in the "face," in later versions of investigation reports, in order to maliciously proceed with conduct investigation despite full knowledge

of these major discrepancies in details and blatantly illegal behavior committed by Muaaz. Student conduct also constructively omitted many of the details which Plaintiff cited to support his defense from the final version hearing notice. They took these actions because they had already decided Plaintiff's guilt based on the fact that Plaintiff was arrested by NUPD and involuntarily committed, treating Plaintiff differently than similarly situated law students without disabilities , Maksud, Ibrahim, and Alkhawaja and propagating the negative and discriminatory stereotype that people with disabilities and Muslins are violent criminals or that they are insane, even when the facts tend to support their innocence, such as in this case.

### Discrimination, Complaints, Deliberate Indifference, and Retaliation 2019

132.    On or around 12/5/20, Plaintiff reported the vast array of discriminatory behavior to University Student Conduct Representatives and Hearing Officers, Heather Cohen and Christine DePilla, and additionally requested to share the interview materials with NUPD in order to report disability discrimination. At that time, DePilla informed Plaintiff that "the investigation report cannot be shared, including with police." They never addressed any of my concerns at that point or at any subsequent point for the remainder of my interactions with them. Notably, when Plaintiff reported Healy's #22 violation of 405 ILCS 5/3-606 to DePilla and  Cohen on 12/5/19, they failed to respond or report the matter to the Office of Equity even though this very clearly qualified as harassment based on a protected class (ADA Disability Harassment). Plaintiff would like their direct awareness and deliberate and malicious indifference noted for the record.

133.    On 12/10/19, Plaintiff sent two complaints at 2:35 AM and 3:01 AM email to all of the of the people on the police board including Chief Lewis, Cmd. Benson, and DC Chin. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

134.    On 12/12/19 at around 9:42 AM Plaintiff filed "Ethics Point" report ("EOP 597") and received response that NUPD was the proper party to contact. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

135.    On 12/10/19 at 7:26 PM Plaintiff sent email to Kadens and Provenzano informing them of the battery and false imprisonment, to date they never responded. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

136.    On 12/10/19 at 2:57 PM DePilla sent an email instructing DC Chin and NUPD of the following, "This document [UHAS 2019 Preliminary Hearing Report] should not be used as evidence in any follow up/investigation of the complaints filed." In this malicious act of deception, DePilla recklessly violated ADA discrimination states and brutally further victimized me by preventing my legitimate reports of discrimination and desperate pleas for help from being heard or investigated. She did this behind my back, and never informed me that she was secretly telling everyone at the school that I was insane and that no one should listen to anything I said. She did this based on open animus towards me for my color, religion, disability and gender. In doing so she blatantly and deliberately and maliciously violated the schools police on reporting and non-retaliation by failing to address my concerns, then deceptively and secretly suppressing the evidence and reports that I made about the attack or commission, or subsequent reports about her failure to act and discriminatory conduct both during and after the process. She watched and enjoyed every second of my misery and pain from the incident, and intentionally compounded it to the greatest extent that she possibly could with such a malignant

disregard for my feelings as a human being. She is a hate-filled malicious predator and should be locked in a cage in federal prison with other predators of her kind, and never allowed anywhere near vulnerable individuals again in her life. Were it not for her blocking my complaints from being investigated at this time and in this incident, none of the subsequent events following this one would have occurred, and she is therefore liable for each and every single event.

137.    On information and belief, DePilla is still continuing to retaliate against me for the complaints which I have submitted both against her and about the incident, including being responsible for over 12 separate counts of "inappropriate sharing" which I am currently charged with in my current 2020 student conduct hearing. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

138.    At some point DC Chin responded and assigned Detective Sarah Stark ("Stark") to supposedly to "investigate" his concerns, and on 1/1/20 at 5:46 PM plaintiff requested an investigation about the false imprisonment and other concerns. TO date, she never responded. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

139.    Plaintiff has filed at least 10 separate complaints with the University and with NUPD about Healy's #22 violation of 405 ILCS 5/3-606, but to date they never responded. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats Plaintiff like he is making everything up solely on the basis that I was involuntarily committed.

140.    NUPD officers #22, #26, #56, and administration including Deputy Chief Eric Chin and Commander Benson have all displayed blatant bias towards Plaintiff as a direct result of his ADA disability, they think that Plaintiff is not intelligent enough for his complaints to warrant concern or investigation because of his disabilities, and have repeatedly failed to respond to his complaints or questions regarding this incident. NUPD and the Office of Equity have failed to respond to his complaints because of bias and prejudice towards his disabilities and an interest in protecting their University employees for their blatant and predatory discrimination. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she treats Plaintiff like he is making everything up solely on the basis that he was involuntarily committed.

141.    This hostile learning environment continued unabated despite Plaintiff's complaints to NU and NUPD managers and supervisors.

142.    DePilla and Cohen's treated non-disabled law students in Student Group #1 more favorably than Plaintiff with respect to terms and conditions of education.

143.    DePilla and Cohen's disparate treatment of Plaintiff continued unabated despite Plaintiff's complaints to NU and NUPD.

## Discrimination and Retaliation 2019

144.    As part of the continuing pattern of harassment and discrimination, during the student conduct process, the Christine DePilla and Heather Cohen engaged in various discriminatory actions and treatment in order to find Plaintiff guilt, including:

145.    Explicitly referencing alleged statements of the Plaintiff's religious beliefs as if they were reasons that the plaintiff was mentally unwell or guilty on the basis of perceived threat from his disability and religious beliefs, and in violation of plaintiffs first amendment rights to free speech and

religion; Treating plaintiff differently than similarly situated students who are not Muslim and those without disabilities, such as Maksud, Ibrahim, and Alkhawaja.

146.    Making derogatory comments, referring to Plaintiff's religious beliefs as "violent extremism" and directly calling Plaintiff "nut-job" and referring to Plaintiff as "psychotic" and "delusional" and "schitzo" on several separate occasions. Treating plaintiff differently than similarly situated students who are not Muslim and those without disabilities, such as Maksud, Ibrahim, and Alkhawaja.

147.    Explicitly relying on the factors indicating cognitive functions such as "memory" and "consistency" which are conditions directly impacted by plaintiffs disabilities in order to make a determination about guilt during the proceedings, treating the plaintiff differently than similarly situated law student Maksud and Ibrahim and Alhawaja, based solely on the fact that the attackers stories were consistent with each other and they remembered more details. Treating plaintiff differently than similarly situated students who are not Muslim and those without disabilities, such as Maksud, Ibrahim, and Alkhawaja.

148.    Violating Discrimination and Reporting policy Deliberately failing to report the numerous disability related discriminatory acts committed by plaintiffs attackers even after Plaintiff brought them to their attention in violation of university reporting policy, and deliberately preventing Plaintiffs numerous disability related complaints from being investigated by law enforcement or university in violation of university reporting and retaliation policy. Treating plaintiff differently than similarly situated students who are not Muslim and those without disabilities, such as Maksud, Ibrahim, and Alkhawaja.

149.    On information and belief, she has blocked at least 20 different reports to current date from being investigated or heard related to the incident to date in retaliation for me filing each one, and violated Non-Retaliation Policy each time she blocked a report, retaliating against plaintiff for reporting his concerns by secretly having them blocked without telling him, and then compiling an extensive list of the reports which she blocked in order to retaliate against me by using them in my current student conduct hearings.

150.    On information and belief, she is directly responsible for adding over 12 separate counts of inappropriate "sharing" to plaintiffs current 2020 student conduct charges at this date and time. in retaliation for me filing each one, and violated Non-Retaliation Policy each time she blocked a report, retaliating against plaintiff for reporting his concerns by secretly and indirectly having him punished in his current student conduct investigation without being exposed to direct liability or responsibility.

151.    As part of the continuing pattern of harassment and discrimination, On December 19, 2019 DePilla and Cohen found Plaintiff guilty of "endangering myself or others" based off the testimony of his three attackers, and the police report which stated that Plaintiff battered Osama and Muaaz witnessed the battery, despite having full knowledge Muaaz had confessed to not witnessing anything except seeing Plaintiff being choked by Osama as he entered the room, and confessed to then aiding him [Osama] in physically restraining Plaintiff. Student conduct found that his attacker's repeated targeted and predatory harassment was justified because he was one of the "organizers" of the event and was concerned for vague and unspecified "safety" reasons.

152.    Additionally, they failed to address a majority of the major issues which Plaintiff raised during the investigation and in his defense. They never identified where the privileges and rights of event "organizers" were stated in the student handbook, or anywhere else. They failed to address why Osama did not notify the proper authorities rather than repeatedly attempting to confront Plaintiff for the alleged behavior that he found so concerning. Crucially, despite his vehement requests they also made absolutely no attempt to identify or contact the "woman" in question, neither through the list of attendees which was readily available through the university given their roles as university investigators, nor through asking all three of the attackers, who were also the event organizers.

153.    DePilla and Cohen's stated reasons for disciplining Plaintiff on December 19, 2019 were a pretext for disability, race, color, religion, gender, and national origin discrimination.

**Appeal of 2019 UHAS Hearings**

154. On 1/2/20 Plaintiff sent an email to Lucan Christian of student conduct, partially outlining the major concerns Plaintiff held during the process. The purpose was to appeal the decision to find Plaintiff, Fahad Syed, responsible for violation of the 2019-2020 Endangering Self or Others policy, which prohibits "Any action (or threat of action) that endangers or threatens to endanger the health, safety, or wellbeing of any person (including oneself). Severity and/or persistence may be considered" (pg. 32). Additionally, this document sought to appeal the variety of sanctions imposed a result of the alleged violation. The grounds for appeal are outlined in the following sections below, each under the relevant subheading.

## **Procedural Errors That Substantially Affected the Fairness of the UHAS 2019 Hearings**

**155.** **Deliberate Modification of Location of Injury in Original Allegations by Christine DePilla in Order to Knowingly Proceed with Disciplinary Process under False Pretenses and Manifest Injustice**

   (1) On 11/6/19, while inside of Northwestern Memorial Hospital, I was served with a fax from student affairs notifying me of an immediate interim suspension. The first paragraph of the document contained the following sentence: "**Specifically, it has been alleged that during the evening of November 1, 2019 you became incoherent while speaking with fellow law students and struck a University of Chicago law student in the mouth with your fist**."[1]

   **(2)** On 11/14/19, I received an electronic copy of the notice of charges from student affairs which contained the following sentence: "**The Office of Student Conduct has received a report concerning an incident that occurred on November 1, 2019, alleging that your physically assaulted a guest at a Law School event, by punching that individual in the face.**"[2]

   (3) According to the record of the student conduct investigation conducted by Christine DePilla, she did not interview the individual making these allegations, Osama Alkhawaja, until 11/20/19. During that interview, it was apparently learned that Osama was actually allegedly stuck in his "eye."

   (4) Christine DePilla deliberately generalized and broadened the original allegation, which was taken almost verbatim from Police Report Case #2019-00000595 on her own accord, and without any evidence to support such a modification. In doing so, she deliberately interfered with my right to receive specific notice of the allegations being made against me, and diminished my capacity to respond to those substantive allegations, thereby substantially impacting the fairness of the hearing.

   (5) Furthermore, even after she was made aware through her interview with Osama on 11/20/19, that the original allegation was false: by his own admission, I did not strike Osama Alkhajawa in his mouth, Christine DePilla deliberately disregarded a substantial inconsistency with the original allegations in order to knowingly proceed with the student conduct disciplinary process under false pretenses, committing flagrant misconduct as a hearing officer.

**156.** **Failure to Follow Proper Investigation Procedure for "Complex" Investigations**

   (1) "When more complex investigations are required, similar procedures as are outlined in Panel Hearing Investigations will apply, though a formal investigative report is not written." (pg. 114)

   (2) The investigation for this incident required interviews with five separate parties, including two interviews with me, in addition to follow up interviews with R/O Healy #22 of the Chicago Police Department. Therefore, it was sufficiently "complex" as required by pg. 114 of the student handbook.

[1] Documentation Attached: 11/6/19 Notice from Student Affairs
[2] Documentation Attached: 11/14/19 Notice from Student Affairs

(3) "The reporter and the respondent will both have the opportunity to speak with the investigator, to present a list of witnesses from which they suggest the investigator solicit information, ***and to provide a list of questions they suggest the investigator ask the other party.***" (pg. 117)

(4) I was not given an opportunity to provide a list of question to ask the other party. Had I been given this opportunity, as required by the procedure, I would have posed the following list of questions to Osama A.:

 i. Do you know the difference between your mouth and your eye?

 ii. Do you know the difference between your mouth and your face?

 iii. Do you know the difference between your eye and your face?

 iv. Why did you tell the investigating police officer that you were hit in your mouth, and tell the student conduct officer that you were hit in your eye?

 v. Can you explain why your account of the incident to the police which is recorded in the narrative of the police report is different from your account of the incident which you reported to the student conduct investigator?

 vi. Are you aware that lying to the police is against the law?

 vii. Are you aware that coordinating a false narrative of events with other individuals in order to have someone involuntarily committed inside of a mental institution is against the law?

 viii. How long have you known Usama I. and Muaaz M.?

 ix. Did you have any communication with Usama and/or Muaaz, after the incident in question, which pertained in any way to the incident in question? If so, what exactly were the contents of those communications?

 x. Do you know the identity of the woman who you alleged was involved in the incident in question?

 xi. Do you acknowledge that as your role as an event organizer, that you had access to the identify of all individuals who were invited to, and/or who attended the event?

 xii. Is there any reason why you did not identify or provide the contact information of the woman who you alleged was involved in the incident in question?

 xiii. Do you have any idea why the woman who you alleged was involved in the incident would not be able to decide for herself whether she felt threatened, and if so take the appropriate actions for her own safety?

 xiv. Do you have any idea why the woman who you alleged was involved in the incident in question would not make a statement to police, or any other authorities whatsoever?

 xv. Can you explain why you failed to mention the woman who you alleged was involved in the incident in question to the investigating police officer at the time of the incident?

 xvi. Can you describe your role and duties as event organizer for the event in question?

 xvii. To your knowledge, did your role in any way involve providing security for the safety of others at the event, and if so, can you describe what those responsibilities would entail?

 xviii. Were you aware that you could call the police or contact Northwestern authorities or other event staff in order to report individuals who you felt were threatening the safety of others? If so, why did you take it upon yourself to provide for the security of the woman who you alleged was involved in the incident in question?

xix. Were you at any time made aware that Fahad Syed may be suffering from "mental" distress of any kind prior to approaching him in any of the four recorded incidents wherein you interacted with him?

xx. Did you identify yourself and your role as event organizer at any time during the four incidents wherein you interacted Fahad Syed?

xxi. To your knowledge, did Fahad Syed make any statements which could be considered "threatening" or endangering the safety of yourself or others, and if so what were those statements?

xxii. Can you describe what walking "aggressively" looks like?

xxiii. Can you acknowledge that if someone felt they were being harassed, that they might walk away at a rate of speed higher than normal, in order to retreat from that perceived harassment?

xxiv. Can you acknowledge that harassment is a subjective concept, which is based on the perceptions of the person who is subject to harassment?

xxv. Are you aware that making "intense" eye contact while aggressively questioning someone who you do not know with with questions which they may find inappropriate could be considered threatening behavior?

xxvi. Are you aware that interrupting the personal conversation of two strangers, in order to question one party on the appropriateness of their interactions, could be considered provocative or threatening?

xxvii. Can you describe how, when observing one male sit next to a female, neither of whom you know, and observing the female leave, and the other person asking her to "stay," was an event which prompted your personal intervention?

xxviii. Can you explain what prevented the female in question to act on her own behalf to secure her safety during this incident?

xxix. Is there any reason why, after you were allegedly punched, why you chose to tackle Fahad Syed instead of immediately going for help or calling the police?

xxx. Can you describe how your tackling Fahad Syed and viciously choking him was intended to provide for the safety of others, and who exactly those "others" when there was no other person in the vicinity when the alleged physical altercation occurred?

157. The prevention of posing these questions to Osama substantially affected the fairness of the hearing because they did not allow me to highlight and illustrate the concerns about the credibility of Osama's account, which I articulated about the incident and ensuing investigation. These concerns were ultimately either deliberately discarded or intentionally evaded by the student conduct. Those concerns include the following:

(1) Concerns about conspiratorial efforts, both to have me involuntarily committed, and then to maliciously ruin my law school career through the student conduct process.

(2) Concerns about prior existing relationships between three of the individuals interviewed for the student conduct process, and further concerns about a conflict of interest which prevented those witnesses from acting as reliable and unbiased sources of testimony for the incident in question.

(3) Concerns about deliberate and targeted harassment, which were completely discarded by student conduct.

(4) Glaring inconsistencies between the police report and the student conduct interviews, which were ultimately deliberately ignored or evaded by the student representatives, despite multiple instances wherein I brought them forward.

(5) Evidence of malicious criminal conduct on behalf of at least 2 of the witnesses interviewed as part of the student conduct process.

(6) Concerns about the woman who figured prominently in the narrative of the events which led to the altercation, about whether it was appropriate for Osama to attempt to act as her personal bodyguard, and whether she actually felt threatened, and whether

she was competent to speak for herself or take actions to secure her own safety, had she in fact felt threatened.

(7) Concerns about whether I actually spoke to this woman at all, which I stated on multiple occasions that I did not recall.

158. **Deliberate Disregard of Individual ADA Disability Rights**

(1) Deliberate and malicious disregard to account for my rights as an individual with two documented ADA disabilities to attend a student function without fear of harassment or intimidation or threats or physical violence directed at me on the basis of my perceived mental condition. This is despite evidence which will be outline in the following section which clearly showed that Osama was aware of some element of mental distress and targeted me for malicious and predatory harassment specifically on the basis of that perceived mental condition.

(2) The failure by student conduct to consider my disabilities, or perspective on the multiple instances of targeted harassment committed by Osama during the event in question substantially affected the fairness of the hearing by allowing student conduct to justify the multiple instances of harassment committed by Osama in terms solely articulated from his perspective, thereby rendering my perspective invalid and clearing him of all wrongdoing while blaming me for being victimized repeatedly and maliciously.

159. **Failure to Interview or Identify Woman Alleged to Have Been Involved in Precipitating Events to Altercation**

(1) Student conduct failure to identify or interview the woman who was alleged to have been involved in precipitating the physical altercation in question. Statements were attributed to her, and to me, which I denied. Her perspective is important as to whether she felt threatened, or whether she felt she needed Osama to intervene on her behalf, and to whether his harassment was considered threatening or provocative by student conduct. Given Osama, Usama, and Muaaz were all event organizers, they had access to the identity of all attendees and should have identified the woman that was alleged to have been involved in the precipitation of the conflict, given her central alleged role in justifying Osama's malicious harassment. If there were concerns about the protection of her identity, student conduct could easily have kept her identity anonymous after confirming that she was, in fact, involved in the precipitating events of the physical altercation in the manner alleged by Osama and Usama.

(2) The blatant failure by student conduct to interview, or even simply identify this woman, coupled with the deliberate use of her alleged involvement as justification for Osama's fourth consecutive instance of predatory and unwarranted harassment substantially affected the fairness of the hearing, because her alleged perspective was taken as justification by student conduct for the fourth incident of harassment committed by Osama, which directly led to the physical altercation in question.

160. **Student Conduct's Deliberate Disregard of Investigation Results and Resultant Concerns**

(1) Student conduct failure to properly consider the results of their own investigation process, and to properly consider the concerns that I brought forth about the findings of the investigation process. These concerns were directed at the multiple glaring inconsistencies in the version of events presented by Muaaz, Osama, and Usama and included:

(2) Difference between the police report narrative of events and the narrative of events later presented by Muaaz, Osama, and Usama.

(3) The fact that Muaaz M. was listed as a witness to the battery police report and then in the interviews admitted to not witnessing the battery.

(4) The location and description of the injury in the police report and that reported and described in the interviews, in addition to the inconsistency of the description of the injury reported by R/O Healy #22.

(5) The absence of any mention of the woman alleged to have been involved in the incident in the police report.

**(6)** The discrepancy between the descriptions of Usama and Osama with regards to my alleged interaction with the woman alleged to be involved in the precipitating events which led to the physical altercation in question, specifically with regards to whether I was standing or seated when Osama approached and harassed me.

(7) The deliberate disregard by student conduct to address these concerns substantially impacted the fairness of the hearing, because the "consistency" between the witness accounts and Osama's allegation was taken as justification for concluding that his account of events was more likely to be true by student conduct.

**161.**   **Deliberate Disregard of Witness Credibility and Bias Witness Testimony Concerns**

(1) Deliberate disregard by student conduct of the concerns about conflict of interests which I had previously brought forth about Usama I. and Muaaz M. which spoke to their inability to act as impartial witnesses or provide unbiased testimony relating to the event in question. Evidence for this includes the fact that there a current protection orders between me and both aforementioned individuals issued thought the student conduct office[3]. Additionally, I sent an email outlining these concerns to Christine DePilla, Dean Adams, and Student Conduct on 11/21/19[4].

(2) The deliberate disregard of these concerns substantially affected the fairness of the hearing because the "consistency" between the witness accounts and Osama's version of events was taken as justification for taking his version of events as more likely to be true.

**An Outcome of Findings That Was Manifestly Contrary to the Weight of the Information Presented During the 2019 UHAS Hearings**

162.     The outcome of the findings of the student conduct process which found me responsible for endangering the safety of others was egregiously unsupported by the evidence at hand. Student conduct apparently disregarded almost everything that I said about feeling threatened and harassed, and wholly took Osama's fabricated narrative of events as a factual basis without even a shred of supporting evidence.

163.     The evidence consistently and strongly supports the fact that I was suffering from severe mental and emotional distress at the time of the incident in question, which left me in a vulnerable mind state, which is in turn was taken advantage of in a predatory and callous nature by Osama A. As previously stated but almost wholly ignored by Christine DePilla, a combination of my religious obligations to spend time with my dying mother, stress from conditions and circumstances of her death[5], circumstances related to a particular class assignment[6], two recognized and documented ADA disabilities[7], academic challenges of 1L year course load, the additional advocacy initiatives that I was engaged in[8], and being unable to find time to sleep or take my prescribed medication for several days prior to the conference in question, all impacted my behavior at the time of the incident. Because of the fact that I had been using and relying on my religion to help me cope with my mother's recent death, it was in my vulnerable state of mind at that time, that I felt that attending a conference where there were other people in my faith group who I could share my experience with would be beneficial to helping me mentally process and cope with my loss.

---

[3] Documentation Attached: Student Conduct Protection Orders for Usama Ibrahim and Muaaz Maksud
[4] Email Correspondence outlined concerns sent on 11/21/19.
[5] Documentation Attached: Death Certificate and Burial Documentation
[6] Documentation Attached: Class Assignment Pictures – Date of Assignment and Subject Matter
[7] Documentation Attached: ADA Disability Documentation
[8] Documentation Attached: IMAN-NU Law Initiative Email Correspondence

164.     The evidence clearly shows that I was maliciously targeted by Osama in repeated instances of unwarranted, and predatory harassment on the basis of my perceived mental condition, wherein he touched me inappropriately, used threatening and provocative language, and persistently presented himself as an increasingly severe threat to my physical safety on no less than four separate occasions. The evidence shows that he was informed of my mental condition, and targeted me on that specific basis. The evidence shows that all interviewed parties were aware of indicators of my mental and emotion distress, and that it was obvious and apparent to all parties involved. The evidence shows that I attempted at every instance to deescalate the situation and/or retreat from his predatory approaches, yet despite my repeated attempts to escape, he relentlessly targeted me with unwarranted harassment, and blatantly and recklessly instigated an altercation by displaying himself in an increasingly threatening and provocative manner, which ultimately led to the physical altercation in question. The evidence clearly indicates that at no time did I use any language or make any statements that could be construed as threatening to the physical safety of myself or others, nor was my physical demeanor threatening to the physical safety of myself of others in any obvious or apparent manner.

165.     At all times I have maintained that I do not recall striking Osama. I distinctly and consistently recalled perceiving him as a severe threat to my physical safety immediately prior to the physical altercation in question, and I felt that he was invading my personal space immediately prior to the physical altercation in question. *I strongly disagree with the baseless allegation that I struck Osama "without any physical touch by Osama in the contemporaneous interaction," furthermore there is no evidence substantiating that allegation whatsoever. I strongly disagree with the notion that I initiated the physical altercation in question, strongly disagree with the notion that I struck Osama without his first physically touching me during the physical altercation in question.* I strongly disagree with the notion that I stuck Osama in any manner other than one intended in self-defense, and I have consistently articulated this fact at all times throughout this process of this investigation.

166.     The evidence clearly shows Osama was the aggressive party at all times and in all four instances where he interacted with me, that approached me repeatedly without any warranted justification, that he never identified himself or his role as event organizer, that he committed a legal act of battery without any justification whatsoever, that he acted egregiously and far beyond the scope of his responsibilities as event organizer, and that he committed serious misconduct and failed to properly execute any responsibility which he may have had relating to event security, which was only to notify the proper authorities on the basis of a perceived threat. The evidence shows that Osama heinously took advantage of my mentally distressed state to inflict malicious harassment upon me at will, abusing his authority and position as event organizer to do so, and using his position as an excuse to escape any responsibility for his heinous and predatory actions.

167.     As previously stated but deliberately ignored by student conduct, when police arrived on scene to question me, I was extremely disoriented and confused because of the physical altercation. I was frustrated that no one, especially police, was listening to my side of the story, everyone listened to Osama's false allegations. Due to my disorientation, I had difficulty trying to explain the situation, and at some point during the police questioning, I mentioned Jon Graham Burge of the Chicago Police Department[9]. It was at that point that officers almost instantaneously started to drag me down the stairs. Due to my disorientated state, confusion, and fear, I legitimately thought that the police were going to harm me, and I started calling for help and resisting the detention.

168.     My friend and mentor Bilal Evans, from the Inner-City Muslim Action Network (IMAN), where I have been heavily involved with volunteer and advocacy efforts[10], told me about Burge. Though my involvement at IMAN, I also personally came to know Jackie Wilson[11], brother of the late Andrew Wilson, and was told in detail about his case, which directly resulted in uncovering the vast history of unlawful activities committed by Burge. I actually lived in the same house as Jackie for a period of almost seven months in 2019, in Englewood on the south-side of Chicago. In the week after my mother's death and prior to attending the event in question, I had visited the Center for Wrongful Convictions to

---

[9] Jon Graham Burge (December 20, 1947 - September 19, 2018) was an American police detective and commander in the Chicago Police Department who was accused of torturing more than 200 criminal suspects between 1972 and 1991 in order to force confessions.
[10] Documentation Attached: IMAN Volunteer Hours
[11] Photographic Evidence Attached

inquire about the Burge case, in addition to discussing the case with Maureen Stratton in the NU Bluhm Legal Clinic. In addition, in that same week, I had discussed the case and the details extensively with NU criminal law Professor Len Robinowitz.

169.     During my student conduct interview, I specifically asked Christine DePilla to contact Maureen Stratton, Bilal Evans, and Professor Rubinowitz in order to confirm that I had recently been in contact with them about the case, yet Christine flagrantly disregarded my request. Christine then specifically mentioned how I "thrashed" about when the police were detaining me as evidence supporting the baseless and malicious accusations made by Osama, without so much as a mention of the reason I was experiencing such fear of the illegal detention. At no time during my illegal detention by police, or prior, did I make any statements which could be construed as threatening to the safety of myself or others. This fact is reflected in the involuntary commitment paperwork, where police used the battery as sole justification for the illegal involuntary commitment[12].

170.     Furthermore, the evidence clearly shows that Osama misrepresented the facts of the incident to the investigating police officers on the night in question in a malicious and deliberate attempt to have me involuntarily committed and evade any responsibility for his heinous attack. Muaaz Maksud deliberately and falsely claimed to witness an alleged act of battery in order to substantiate Osama's malicious allegations. The evidence further shows that Usama, Osama, and Muaaz then deliberately conspired to formulate a second fabricated narrative which they reported to the student conduct investigator, which itself held multiple glaring inconsistencies with the original fabricated narrative reported to the police, in a deliberate attempt to ruin my law school career and absolve themselves of any responsibility for their malicious actions.

171.     **Consistently Articulated Perspective of Perceived Threat from Unknown Individual Later Identified as Osama** Interview on 11/19/19

    (1) • Fahad said he remembers being outside of a room and talking to an unknown individual. Fahad said he believes the individual went to the University of Chicago.

    (2) • Fahad said he "felt the individual was very close to him and "invading his space." Fahad said the individual was asking questions very rapidly."

    (3)   o Fahad said he was not in the "correct state of mind" when this individual was questioning him.

    (4)   o Fahad said he does not remember what the individual was asking him.

    (5)     o Fahad said that the individual should have known to not approach someone "in that state."

    (6)   Fahad was asked how the individual would have known the reason for his current state. Fahad said, "Someone could have told him."

    (7) • Fahad said he asked the individual to "back up."

    (8) • Fahad said the next thing he remembers is being on the ground and people holding him. Fahad said he remembers the police talking to him.

    (9) o Fahad said he remembers being confused about what was happening.

172.     Interview on 11/27/19

    (1) •Fahad was asked to explain his statement in the first interview where he said, "I do not recall attacking someone" and "I don't see evidence that this was a one-side altercation."

    (2) o Fahad said that he "accepts the facts at hand" and accepts responsibility for his actions and he is praying that things will work out equitably.

    (3) o Fahad said that he does not recall the incident that led to striking the individual or what led to the altercation, except that he remembers talking to the "guy" and he was in his space.

    (4) o Fahad said he could not recall why he would do that and he is ashamed for the time "they" put in planning the event.

---

[12] Documentation Attached: (Illegal) Petition for Involuntary Commitment

(5) o Fahad said that he "wishes he could take it back." Fahad said it has been painful to not go to class. Fahad said he would never intentionally try to ruin his own future.

(6) o Fahad said his time in the hospital was helpful and he was able to get back into a routine.

(7) Fahad was asked if he recalled sitting next to a woman who was on the phone. Fahad said he was not sitting next to her. Fahad said he thought the woman was "out there on the phone, talking about him, and wanted to know why." Fahad said he was not in the "right frame of mind at the time." [SEP]

(8) Fahad said he did not know Osama and did not understand why he was asking questions and presenting himself in a threatening manner. [SEP]

(9) o Fahad said he was surprised that Osama would approach him based on his "frame of mind," and "how he was acting that night."

(10) Fahad was asked if he told Osama he felt threatened by him. Fahad said he does not remember if he told Osama that he felt threatened. [SEP]

(11) Fahad was asked how Osama was presenting himself in a threatening manner. Fahad said he thought Osama was being aggressive because he was standing close to him and "rapidly" asking questions. [SEP]

(12) Fahad was asked about the questions that Osama was asking him. Fahad said he does not remember the questions.

(13) Fahad was asked if he recalled the individual(s) who were holding him down on the ground. Fahad said that Osama had him in a headlock. [SEP]

**173.** **First and Second Harassing Approaches and Use of Threatening and Provocative Language**

(1) • Meher said that Fahad stopped speaking when Osama calmly approached Fahad and said, "Let's talk about this elsewhere."

(2) • Usama said Osama approached Fahad and asked him to "wrap it up" and speak with him outside.

(3) o Usama said Fahad quieted down.

(4) Usama said that Osama approached Fahad again and said, "Let's go outside" and Fahad quieted down. [SEP]

(5) • Muaaz said one of the University of Chicago students approached Fahad and asked him to stop and allow the speakers to move on with the reception.

(6) o Muaaz said the individual from University of Chicago asked to him to stop again and offered to speak with him individually.

**174.** **Battery Admission**

(1) • Osama said he approached Fahad, touched him on the back, and said that he "appreciated the comments but to save the questions for later." Osama said that Fahad stopped.

**175.** **Statements and Evidence Admitting Tacit or Direct Awareness of Mental Distress by All Parties Interviewed**

(1) • Meher said that she would describe Fahad as looking disoriented.

(2) • Osama said that Fahad made "strange comments."

(3) • Osama said after the opening remarks, he approached Usama and asked, "Is this someone who will continue to interrupt?"

(4) o Osama said that Usama responded, "I don't know."

(5) o Osama said that Usama told him that Fahad might be experiencing some mental health issues.

(6) Osama said he decided not to press charges because he thought Fahad was mentally unwell and that he needed help as opposed to punishment. [SEP]

(7) Usama I. attended my mother's funeral and burial, along with Muaaz M. and other members of the NU Muslim Law Students Association. The fact that he didn't admit

that fact to anyone does not remove the fact that he was fully aware of the fact that I was suffering from mental and emotional distress over her death.

(8) • Muaaz said the week leading up to the conference; Fahad's mother had passed away. Muaaz said he was in contact with Fahad and tried to be there for him.

(9) • Muaaz said that Fahad was not "present in the moment" and not talking much. Muaaz said Fahad "seemed different from previous interactions."

**176.** **Third Unwarranted and Harassing and Threatening Approach and Further Provocation and Evidence of my Efforts at De-Escalation.**

(1) • Osama said that after dinner he was standing outside of the keynote speaker's room.

(2) • Osama said he approached Fahad

(3) • Osama said Fahad walked away. Osama said he was not afraid by this interaction

**177.** **Fourth Unwarranted and Harassing and Threatening Approach Leading to Physical Altercation**

(1) • Osama said at that point, he approached Fahad and the female and told the female she did not

(2) need to stay.

(3) • Osama said that Fahad was sitting on the bench and he was standing five feet away from him.

(4) o Osama said during the interaction, he and Fahad were making "intense eye contact with one another."

(5) • Osama said he asked Fahad, "Why did you ask her to stay?"

(6) • Osama said he asked Fahad "Was that appropriate?"

(7) • Osama said that he told Fahad, "I don't think it's appropriate what you said and the manner that you said it."

(8) Osama said he then lowered his head in an attempt to tackle Fahad. 🔲🔲🔲

(9) Osama said he put Fahad in a "head lock" so he could not move and yelled out to Usama three times. 🔲

(10) Osama said that Usama and Muaaz came outside and Muaaz held Fahad's arms down. 🔲

(11) Osama said that Fahad said, "I can't breathe." In response, Osama said he let go of any pressure but stayed on top of his chest so he could not move. 🔲

**178.** **Multiple Witness Reports of Osama Choking Me**

(1) • Osama said he put Fahad in a "head lock" so he could not move and yelled out to Usama three times.

(2) • Osama said that Fahad said, "I can't breathe." In response, Osama said he let go of any pressure but stayed on top of his chest so he could not move.

(3) • Muaaz said he observed Fahad's arms around Osama's neck and body. Muaaz said he observed Osama trying to hold Fahad down.

(4) • Usama said he walked out of the room and observed Fahad on the ground and Osama was restraining him.

**179.** **No Reported Use of Threatening Language or Statements**

(1) You were making comments, which included; "the reasonable person standard, a six-year old could understand," and "look it up on the internet."

(2) Meher remembers Fahad saying phrases like, "reasonable person standard and six year old," "loves his mom and being here."

(3) • Muaaz said Fahad's thoughts "were all over the place" but remembers Fahad saying, "thankful for MSLA for being there for him."

(4) Muaaz said he only remembers the phrases, "look it up on the internet," "show in video," "the reasonable person standard, a six year old could understand."

**180.** **Fabricated and Inconsistent Reports of Alleged "Threatening" Behavior Involving "Mystery" Woman**

181. Usama Interview

(1) • Usama said he and Osama were standing outside of the door and *saw Fahad sit next to a woman*. Usama said the woman was speaking to family in an "angry way" on the phone.

(2) • *Usama said the woman stood up and started walking away and Fahad started to follow her.*

(3) • *Usama said that Osama approached Fahad. Usama observed Osama and Fahad speaking "comfortably" at this time*.

182. Osama Interview

(1) • Shortly thereafter, Osama observed Fahad walk aggressively to an unknown female sitting on a bench and *sat down next to her* making shoulder-to-shoulder contact.

(2) • Osama said the female immediately got up and Fahad told the female, "stay."

(3) • Osama said the female responded, "I don't have to stay."

(4) • *Osama said at that point, he approached Fahad and the female* and told the female she did not need to stay.

(5) • *Osama said that Fahad was sitting on the bench and he was standing five feet away from him.*

(6) o Osama said during the interaction, he and Fahad were making "intense eye contact with one another."

**183.** **Osama's Inconsistent Reports of Alleged Perceived Threat.**

(1) Osama said Fahad walked away. Osama said *he was not afraid by this interaction*

(2) Osama said he then lowered his head in an attempt to tackle Fahad. Osama said *he did not want Fahad to harm anyone else.*[SEP][SEP]

(3) Osama said *he did not perceive Fahad to be a threat* so initially decided not to call 911

**184.** **Major Inconsistencies with Police Report Narrative and Osama's Student Conduct Interview**

(1) Police Report Case # 2019-00000595 Narrative: "Upon arrival, R/O's found the offender/law student, now known as Fahad B Syed, being restrained o the second floor by several male law students. Investigation determined that Mr Syed was talking with fellow law students in the hallway when he became incoherent and started swinging his fists. He struck fellow law student Osama Alkhawja (law student at University of Chicago) in the mouth. R/O's placed Mr Syed into protective custody without incident."

**(2)** Please cite Osama's allegation's of the event to determine the flagrant inconsistency with the above narrative.

**185.** **Major Inconsistency with Police Report Witness and Student Conduct Interview- PROOF OF OBSTRUCTION OF JUSTICE and FALSE IMPRISONMENT**

(1) Police Report Case # 2019-00000595 – Lists Muaaz Maksud as "witness" to "battery" which is listed as "committed." Other than this witness, there is no other way police could have proven that I committed a battery, because there were no witnesses to the battery according to all parties involved, including the police and Osama.

(2) • Usama said a short time later, he heard Osama calling his name.

(3) • Usama said he walked out of the room and observed Fahad on the ground and Osama was restraining him.

(4) • Osama said no one observed the conversation and subsequent altercation between him and Fahad.

(5) • Muaaz said 5-10 minutes into the keynote speech; he was exiting the room to grab something and heard "thumps." Muaaz said he "rushed out of the room" and heard Osama calling out for Usama.

(6) In a follow-up conversation with Officer Healy on 12/5/19, he indicated that Muaaz was present at the incident. Officer Healy said he does not have a formal report regarding information shared by Muaaz.[SEP]

**186.** **Major Inconsistency Between Police Report Description of Injury, Student Conduct Description and Location of Injury, and Follow-Up R/O Healy #22 Description and Location of Injury**

    (1) Police Report Case # 2019-00000595 Narrative: "He [Fahad Syed] struck fellow law student Osama A. in the mouth."

    (2) • Usama said he then went to help set-up for the keynote speaker.

    (3) • Usama said a short time later, he heard Osama calling his name.

    (4) • Usama said he walked out of the room and observed Fahad on the ground and Osama was restraining him.

    (5) • Usama said he observed Osama's eye was swollen and bleeding.

    (6) • Osama said he felt Fahad hit him on his left eye.

    (7) o Osama said that his eyelid was purple and red and there was a cut underneath his eye.

    (8) o Osama said that he did not need to go to the doctor, his vision was fine, and there was no

    **(9)** serious repercussions. Osama said his eye only "stung in the cold."

    (10)    During a follow-up conversation with Officer Healy on 12/5/19, he was asked to reconcile the report indicating that Osama was struck in the mouth and Osama's statement that he was struck in the eye. Officer Healy responded that he remembers that Osama was struck in the face *and observed redness and minimal amount of blood on Osama's face*.

**187.** **Inconsistent and Irrational Student Conduct Reasoning – Finding "Insufficient" Evidence of Battery yet Sufficient Evidence of "Endangering Self or Others."**

    (1) **#1 - "To make a determination, we considered your actions during this incident, which included striking an individual without any physical touch by Osama in the contemporaneous interaction, which we found to be severe."** – Please note that there is no evidence or support for this allegation.

    (2) **#2 - "We noted that you communicated specific points in the hearing in regards to the Illinois Statute for Battery. Based on insufficient evidence, we decided that we would not consider the allegation further and therefore did not make a determination on whether a violation of the Violation of Other Policies occurred."** – The specific point which I articulated were that a criminal battery consists of unprovoked harmful contact. To make a determination of endangering self or others, as indicated from the above statement (#1), student conduct found sufficient evidence for harmful contact. Therefore, for student conduct to find insufficient evidence for unprovoked harmful contact, they must have acknowledged that there was some manner of provocation.

    (3) Therefore, the following statement does not rationally follow from the above two statements (#1 and #2):

    **(4) #3 - "Thus, we did not consider Osama's behavior to be provoking or as otherwise justifying your conduct in relation to Osama, including you striking Osama in the face. We also found the manner in which Osama engaged you during the opening remarks and later before the keynote address was not threatening or provoking."**

**An Outcome of Sanctions That Was Manifestly Contrary to the Weight of the information Presented During the 2019 UHAS Hearings**

    188.    The imposition of sanctions by student conduct was beyond unreasonable given the many glaring and unresolved inconsistencies and issues contained within police report and subsequent investigation. Furthermore, student conducts blatant disregard of nearly every concern I brought forth, and deliberate and reckless disregard of my perspective regarding the incident, including the deliberate

failure to consider my basic civil rights and human decency, created a vastly disproportionate outcome of sanctions regarding the incident in question. Moreover, student conduct's deliberate disregard of the severe emotional distress and pain and suffering resulting from the interim suspension and loss of my mother, my illegal involuntary commitment, coupled with my inability to grieve upon my release due to my constant responsibility to defend myself against blatant, baseless, and malicious false allegations of wrongdoing is without question highly evident in their outrageously reckless and negligent handling of the conduct process from start to finish.

189.     My mother died on 10/23/19. On 11/1/19, I attended this event where I was maliciously harassed, then falsely accused of battery, then illegally involuntarily committed to Northwestern Memorial Hospital, in an act of negligent false imprisonment. On 11/6/19, while I was inside of the hospital, I was served with a student conduct interim suspension notice. The day of my discharge from the hospital on 11/8/19, I was given seven days to vacate my home and no other housing provision offered. No alternative housing accommodations or provisions have been made or suggested for my housing since that time. On approximately 11/14/19, student conduct began its "investigation" of this alleged incident of battery, wherein it became by 11/21/19 that the nature and location of the injury was disputed, and no person actually witnessed the alleged "battery" occur.

190.     Despite discovering the evidence of obstruction of justice and false imprisonment in her own investigation, Christine Depilla deliberately discarded the results of her own investigation in order to recklessly and negligently pursue the blatantly malicious and fabricated claims of battery advanced by Osama and his criminal accomplices Usama and Muaaz. Despite my repeated pleas for assistance from within the Northwestern University community, including professors, the office of equity, the office of equal opportunity, Dean of Students Todd Adams, Dean of Students Susie Spies-Roth, and others, no one was able to step in and stop Christine DePilla from painfully dragging on her reckless and negligent excuse of an "investigation" and ensuing "deliberation," nor her delaying rendering her bias, irrational, and negligent decision until there were only two business days left until winter break—indeed not even the standard five days left for appeal which is given to ALL other students in these situations.

191.     In the deliberate delay of rendering her blatantly bias decision, Christine disregarded almost wholly every single piece of evidence or concerns which I had brought forward, in a singularly focused attempt to craft a narrative wholly around the baseless allegations made by Osama. In doing so she disregarded any piece of evidence or support which supported my narrative of events and recklessly focused on finding some grounds for which to sanction me further. In doing so, she made the 10 weeks worth of classes and assignments that I had already completed, and the time I sacrificed spending with my dying mother, completely worthless. I was not able to take finals or earn credit for the coursework of Fall 2019 semester.

192.     Now I will never be able to get the time that I sacrificed on classes and coursework rather than spending time with my dying mother back. That notion never once crossed Christine's negligent mind in rendering her deliberately delayed and disgustingly bias, atrocious, and negligent "decision." After the rendering of this spectacularly unjust decision to level further sanctions on me, I have had a post-traumatic stress incident which saw me awakened in the dead of night in tears of horror at the realization that I will never be able to see my mother again and that I needlessly sacrificed much of the precious time I had left with her on earth because of Christine's inhumane, negligent, reckless, and irrational investigation and decision making prowess.

193.     The entire incident, interim suspension, and "investigation" process inflicted severe mental and emotional distress upon me throughout the entirety of its length, even up until this very moment. It ruined my experience of law school and my first semester, which I had dearly anticipated since the day of my admission. I missed all of the law school events that were held since these allegations were made, including career and professional development focused events. I was unable to apply for summer jobs or internships for this summer, which was my number one goal after my first year in law school. Due to her negligent decision, I was forced to spend the entirety of winter break painstakingly composing this appeal rather than enjoying the holidays like every other student at the school was able to do.

194.     In addition to the aforementioned consequences and repercussions of the incident, I have suffered severe and irreparable financial consequences from the reckless handling of the student conduct process. Over $45,000 in tuition, fees, rent, and other living expenses was incurred for this semester of classes[13], which was taken out of my scholarship funding, federal student loans, and private loans. All of that money was rendered completely void, and spent without anything to show for it. $45,000 disappeared because one person made a malicious and fabricated claim to get out of trouble for his act of predatory harassment, this false claim had me unlawfully involuntarily committed, and rendered nearly an entire semester's worth of classes, completed coursework, and hard work invalid. Furthermore, I have been forced to watch as the perpetrator and enablers of these malicious false allegations, which have devastated my life, go free and unpunished, suffering no consequences or repercussions for their actions or involvement in these events.

195.     As a result of the imposition of further sanctions by student conduct, I have been forced to attempt to seek and secure new housing with no notice. I have been forced to consider breaking my current lease, which will likely damage my already weak credit. I have little to no savings, and no friends or family to take me in. It is highly likely that I will be forced to live in a homeless shelter for the rest of the winter and spring, while trying to secure work to gain funds to pay for the behavioral program which I have been required to complete. After that, I will be forced to again endure Christine DePilla as the gatekeeper for rendering her "educated" opinion on whether to allow me to re-enter classes to re-take the same courses which I had already nearly completed during fall semester, which I was unable to complete because of her negligent and flagrantly bias investigative and decision making abilities. All this because one coward took advantage of my mental distress and vulnerability after loosing my mother just days earlier, subjected me to repeated instances of vicious and predatory harassment, had me illegally involuntarily committed, and to evade responsibility, made a completely unsubstantiated allegation that I punched him in the mouth, or eye, or face.

196.     Due to Christine and Heather's blatantly bias and negligent handling of the student conduct process, and their deliberate and malicious disregard of my concerns and human decency, I strongly wish to have another person other than Christine or Heather Cohen to be assigned to facilitating any student conduct sanctions that are assessed following the outcome of this appeal. My experience dealing with Christine and Heather has left me very painful memories and trauma, and has been the single worst experience of my entire life. I sincerely wish to never again be subjected to their horrendously humiliating debasement and incompetent, irrational, and bias decision making in my life.

### 2019 UHAS Hearing Adverse Action and Discriminatory Sanctions

197.     As part of the continuing pattern of harassment and discrimination, Plaintiff was given further "disciplinary sanctions" on December 12, 2019.

198.     DePilla and Cohen and NU's stated reasons for disciplining Plaintiff on December 12, 2019 were a pretext for race, color, religion, gender, and national origin discrimination.

199.     Despite showing compelling exonerating evidence, Plaintiff was found guilty and subjected to various discriminatory measures on the basis of perceived threat from his disabilities, including:

(1) Enduring a discriminatory student conduct process conducted on bad faith pretenses which ignored obvious evidence of misconduct such as the unsigned commitment petition, the lack of identifying information for the female allegedly involved in the altercation, and glaring inconsistencies between the description and location of the injury in the police incident report and subsequent student conduct interviews.

(2) Having his legitimate attempts for assistance deliberately and maliciously ignored, in reckless and negligent fashion given the compounded effect of plaintiffs intense emotional order with his mothers passing from cancer, and his multiple co-morbid

---

[13] Documentation Attached: Fall 2019 Semester Bill

disabilities, and recent homelessness on Plaintiffs mental, physical, emotional and psychological well-being.

(3) 1-semester interim suspension for Fall 2019 during the duration of the student conduct investigation and hearing process.

(4) 1-semester suspension for Spring 2020 as a disciplinary sanction issued by student conduct following the results of an appeal.

(5) Specialized Education Program for the Prevention of Abusive and Controlling Behaviors at the Center for Contextual Change with Jessica Renner.

(6) Forensic threat assessment evaluation facilitation by Northwestern University Police Chief Threat Detection Officer Michelle Hoy-Watkins.

(7) Forensic threat assessment evaluation conducted by Midwest Behavioral Management Services and Dr. Mark Brenzingger.

(8) 1250-Word Essay on learning from the suspension.

(9) July 9th 2020 Re-Instatement meeting with Lucas Christian of Student Conduct.

(10) July 16th 2020 Follow-Up Re-Instatement meeting with Dean of Students Susie Spies-Roth.

(11) Required monthly meetings with Spies-Roth for 2 semesters following re-enrollment.

(12) Mandatory disclosure of Mental Health Treatment and Progress Records and ROI's with both Plaintiff's Therapist, Brian Tobin, and his psychologist, Irma Funes.

200. Despite his strong disagreements and providing copious amounts of convincing and compelling evidence against his accusers, Plaintiff again worked with the administration of the law school a year in order to complete mental health assessments and a variety of other pre-conditions which would allow Plaintiff to return to school, this is because his legal education is the most important thing to Plaintiff in the entire world. As far as Plaintiff knows, no other similarly situated student without disabilities was subjected the pre-conditions discussed in paragraph 11 prior to their re-enrollment in the law school following a medical leave of absence directly related to their disability.

201. NU and NUPD knew about DePilla and Cohen's racial, disability and religious harassment of Plaintiff, but NU and NUPD failed to take prompt and effective remedial action.

202. NU and NUPD is strictly liable to Plaintiff for the hostile educational environment created by its representatives and supervisors.

203. NU and NUPD intentionally discriminated against Plaintiff because of his race, religion, gender, and national origin.

204. The actions of NU and NUPD supervisors and employees as stated herein were done with malice or reckless indifference to Plaintiff's federally protected rights.

205. The actions of NU and NUPD supervisors and employees in intentionally engaging in and condoning discrimination and harassment against Plaintiff has caused him great mental anguish, humiliation, degradation, emotional distress, pain and suffering and other consequential damages

**2020 Re-Enrollment at NU Law**

206. In mid-July of 2020 Plaintiff finally completed the last of his mandatory pre-conditions, and eagerly re-enrolled in the entering JD class of 2020.

207. Plaintiff's Facebook is currently set to "private" mode for various reasons, as opposed to "public" mode, and no one outside of individuals who he is "friends" with on the application, and who he shares "groups" with on the application can search or find his information.

208. Plaintiff currently shares "Official Northwestern Pritzker Class of 2023 Admitted Students Page" with Evangeline Gargula, a white female transgender incoming 1L student at NU Law. It is a "private" group with 280 members because only members can see who is in the group and what they post.

209. It is solely on account of his sharing the aforementioned Facebook group with Gargula that she was able to cyberstalk Plaintiff as indicated in the upcoming paragraphs, this is because only

members can see who is in the group and what they post. Members who are outside of this group cannot search or find my profile because it is not in "public" mode.

210.     Plaintiff wishes to make abundantly clear that he has never met or interacted with Evangeline Gargula prior to these incidents in any way, shape, or form.

### 2020 Discriminatory Conduct and Hostile Environment (Disability)

### Timeline of Events

**211.     On the weekend of August 21st 2020, I was involved in verbal altercations with a number of law classmates after I joined a first-year Law GroupMe chat titled "NU Kids on the Block '23" on Friday, August 21st and attempted to post a message asking other students if they wanted to meet up for drinks in accordance with safe social distancing policy. Other students had been permitted to meet up in person for activities such as "walking around" and going to restaurants in small groups, other students had met up for these types of social activities and my intent was to do the same with other members of the class.**

**212.     I was attempting to abide by my strategy and plan for success which I had outlined in my strategy by attempting to utilize the group chat's to secure workout partners and limiting my interaction with others in the class to as great of an extent as I could without completely excluding myself social interactions. My intent with these particular messages was to meet a few other students before class started, due to the fact that I was left off of orientation schedule for the incoming 1L class and therefore had not had a chance to meet other members of the class during the week.**

**213.     PLAINTIFF wishes to report retaliation and obstruction of justice in the following. PLAINTIFF is really feeling cornered about his safety right now. PLAINTIFF can't file a police report because Mona Dug, Eric Chin, and Sanghoon Lee are preventing him from doing so, and harassing and intimidating him through Detective Lee.**

### 2020 Hostile Environment

**214.     As a result of my posts, several students began to directly respond to me in the public GroupMe in a manner that I found offensive and provocative:**

**215.     The first attempt I made at posting was in another GroupMe called "Meet the NU Kids (IRL)" and in that chat, at some point, I began to be repeatedly engaged by other members of the class, first by an individual named "Meegan" who persisted in addressing me after I had acknowledged her point and asked her not to continue.**

**216.     Second, an individual named "Adrienne Ou" began repeatedly attempting to engage me in the GroupMe in a provocative manner rather than messaging me directly, and who I had additionally simply asked to refrain from addressing or engaging me. After posting indicating my misunderstanding about that group, I left the "Meet the NU Kids (IRL)".**

**217.     I then posted in "NU Kids on the Block '23" wherein "Meegan Mayer" and "Adrienne Ou" continued to make comments directed at me in that chat as well.**

**218.     At that point, I expressed my feelings that I felt I was being attacked, and that I was being bullied by other students and not being able to post in the GroupMe like others had been doing without being subject to several people making nasty, rude, and disrespectful comments. I attempted to make it clear multiple times that I was not going to let others attempt to bully me, and I accept that my attempts to confront what I felt was bullying may have been construed as aggressive behavior on my part, but my intent in making my feelings known was to ultimately to create a more inclusive atmosphere by addressing what I felt was a situation wherein certain members of the law school were attempting to unduly exert influence on others by regulating and ultimately excluding them from the social networking platform that everyone else is using to communicate with and meet others.**

219.    **Meegan Mayer harassed me in the "Meet the NU kids IRL" group chat repeatedly, before driving me out and then continuing to harass me here. She made at least 8 different comments at me, most of which were inappropriate and disrespectful. Although the chat transcripts don't show her comments, if you got a full transcript they would, especially in the IRL group chat. I want her conduct described in detail, including the multiple messages she sent me. And her pervasive and aggressive attitude and persistence after I calmly asked her to stop at least twice. She was a bully and you are hiding it. I asked her and Adrienne to stop approximately 10 separate and distinct times.**

220.    **Adrienne Ou harassed me the worst out of everyone, including in both chats. She aggressively Direct Messaged me which I provided evidence of and I want included in the report as harassment. The other students who I mentioned were also witness to this. I want her conduct described in detail, including the multiple direct and threatening messages she sent me. And her pervasive and aggressive attitude and persistence after I calmly asked her to stop at least 10 times. She was a bully and you are hiding it. I asked her and Meegan to stop approximately 10 separate and distinct times. Meegan stopped after the first 7 times I asked her to stop insulting and engaging me. I asked her to stop 10 SEPARATE TIMES and she made 23 separate and distinct comments, directly disregarding my request, towards me and about me which were disrespectful and demeaning. This included her directly tagging me in six of the messages. In the group chat she said "Funny thing is that if he'd kept his mouth shut I would have suggested a spontaneous Zoom drinking session & invited him" as if she were the owner of the group and was entitled to make decisions for me and everyone else. That is DIRECT EVIDENCE of her bullying and harassment and misconduct. Over 1/3 of the total comments made at me in this group were from Adrienne Ou.**

221.    **During this time I had another member of the class named "Hayden Golmon" message me privately in what seemed like a sincere gesture to understand why I was so agitated, who then posted a screen shot of our private conversation and wrote a post personally directed at me indicating his personal feelings towards me for attempting to meet up with other members of the class.**

222.    **During this time I had other members of the class, such as "Anton" make posts directed at me telling that "I was doing a good job of making sure that no one wanted to hang out with me."**

223.    **During this time other members of the class made inappropriate and provocative comments and other forms of harassment which I have yet to have access to in the form of the group chat transcripts from both aforementioned group chats.**

224.    **I was only in the group chat for 3 total days, from Wednesday night until Saturday morning. In total, there were 135 comments made in the group chat. Of those 135 comments I made 72 comments in total. Of my 72 comments, 63 (88%) were responses to defamatory personal attacks or comments made about me or directed towards me.  Of the remaining 63 comments made by other students, 47 (75%) were directed at me. In total, I suffered 24 (38%) comments which directly tagged me in the posts by Adrienne Ou, Rachel Cox, Jas Sethi, Jared Stehle, Sarah Chase, Hayden Goleman, Evangeline Gargula, Jake Besanceney, Jaina Solo, and Caleb Linton.**

225.    **Jaina Solo spread the following defamatory and FALSE rumor about me "According to 2Ls, last year he escalated in his aggressive behavior and speech after being kicked out of the group me. Unfortunately in person at times."**

226.    In 2020, despite every single one of his efforts and attempts, the university again failed to uphold his right as a student to pursue education free of harassment by allowing a stalker to maliciously harass Plaintiff and file multiple dishonest and deceitful complaints against Plaintiff, ultimately resulting Plaintiff again being suspended on August 23, 2020. The university has offered Plaintiff absolutely no meaningful support whatsoever in this situation, and in fact has enforced a policy of brutal isolation which has now lasted over 1 year and is currently ongoing. This isolation has been a critical factor contributing to his mental health deterioration, and feelings of agitation, frustration, and harassment.

227.    On the weekend of August 21st 2020, Plaintiff was involved in verbal altercations with a number of law classmates after Plaintiff joined a first-year Law GroupMe chat titled "NU Kids on the

Block '23" on Friday, August 21st and attempted to post a message asking other students if they wanted to meet up for drinks in accordance with safe social distancing policy. His intent was to meet a few other students before class started, due to the fact that Plaintiff was left off of orientation schedule for the incoming 1L class and therefore had not had a chance to meet other members of the class during the week. As a result of his posts, several students began to directly respond to Plaintiff in the public GroupMe in a manner that Plaintiff found offensive and provocative. Other students were being permitted to meet up in person for activities such as "walking around" and going to restaurants in small groups, other students had met up for these types of social activities and his intent was to do the same with other members of the class.

228.    The first attempt Plaintiff made at posting was in another GroupMe called "Meet the NU Kids (IRL)" and in that chat, at some point, Plaintiff began to be repeatedly engaged by other members of the class, first by an individual named "Meegan" who persisted in addressing Plaintiff after Plaintiff had acknowledged her point and asked her not to continue. Second, an individual named "Adrienne" began repeatedly attempting to engaged Plaintiff in the GroupMe in a provocative manner rather than messaging Plaintiff directly, and who Plaintiff had additionally simply asked to refrain from addressing or engaging Plaintiff.

229.    After posting indicating his misunderstanding about that group, Plaintiff left the "Meet the NU Kids (IRL)" and posted in "NU Kids on the Block '23" wherein "Meegan" and "Adrienne" continued to make comments directed at Plaintiff in that chat as well. At that point, Plaintiff expressed his feelings that Plaintiff felt Plaintiff was being attacked, and that Plaintiff was being bullied by other students and not being able to post in the GroupMe like others had been doing without being subject to several people making nasty, rude, and disrespectful comments.

230.    Plaintiff attempted to make it clear multiple times that Plaintiff was not going to let others attempt to bully Plaintiff, and Plaintiff accept that his attempts to confront what Plaintiff felt was bullying may have been construed as aggressive behavior on his part, but his intent in making his feelings known was to ultimately to create a more inclusive atmosphere by addressing what Plaintiff felt was a situation wherein certain members of the law school were attempting to unduly exert influence on others by regulating and ultimately excluding them from the social networking platform that everyone else is using to communicate with and meet others.

231.    During this time Plaintiff had another member of the class named "Hayden" message Plaintiff privately in what seemed like a sincere gesture to understand why Plaintiff was so agitated, who then posted a screen shot of our private conversation and wrote a post personally directed at Plaintiff indicating his personal feelings towards Plaintiff for attempting to meet up with other members of the class.

232.    During this time Plaintiff had other members of the class, such as "Anton" make posts directed at Plaintiff telling the at "Plaintiff was doing a good job of making sure that no one wanted to hang out with Plaintiff."

233.    On August 22nd 2020 an incoming 1L transgender student defendant Evaline Gargula" ("Gargula") performed actions which constituted stalking under university policy by maliciously posting his private information, including work history, on a first-year Law GroupMe chat titled "NU Kids on the Block '23." This individual brought up his prior year in school, causing Plaintiff significant emotional distress because they brought up painful memories of when his mother died and Plaintiff withdrew from school for mental health concerns last year. They made disparaging and ridiculing remarks, defamed his character by inciting speculation as to his status in the law class, and posted a picture of an animal (frog) with a caption entitled "airhead" in reference to Plaintiff.

234.    Northwestern University defines stalking as (Pg. 133 Student Handbook):

235.    *C. Stalking: Knowingly engaging in a course of conduct directed at a specific person that one knows or should know would cause a reasonable person to fear for their safety (or the safety of a third party) or suffer emotional distress. "Emotional distress" means significant mental suffering, anxiety or alarm.*

*236.    Conduct that can amount to stalking may include two or more actions directed at another person, whether done directly, indirectly, through others, via devices, or via any other methods or means (specifically including electronic means e.g. cyberstalking), including but not limited to:*

       *(1) • Following a person;*
       *(2) • Being or remaining in close proximity to a person;*
       *(3) • Entering or remaining on or near a person's property, residence, or place of employment;*
       *(4) • Monitoring, observing, or conducting surveillance of a person;*
       *(5) • Threatening (directly or indirectly) a person;*
       *(6) • Communicating to or about a person;*
       *(7) • Giving gifts or objects to, or leaving items for, a person;*
       *(8) • Interfering with or damaging a person's property (including pets); or*
       *(9) • Engaging in other unwelcome contact.*

**237.    On 8/21/20 I was cyberstalked by Evangeline Gargula, a fellow 1L student at Northwestern University Law School. She conducted surveillance of me on google and facebook and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as my work history, contact information, dates about my school history, and dates about my pictures on a group chat and on facebook.**

**238.    Posted my private Facebook information on the chat, which included my work history.**

**239.    She stated that my Facebook said that I was a "2L"**

**240.    She stated that my profile picture was a profile picture from 2018, which is impossible for her to know unless she was stalking me.**

**241.    She inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities.**

**242.    She posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.**

**243.    She posted a frog, directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities.**

**244.    She posted a frog with the caption "NO THOUGHTS EMPTY HEAD" in direct reference to my mental health and a stereotype about people with mental health problems and disabilities.**

**245.    She encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems.**

**246.    By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my work and education history was something that I could not possibly have because of my mental health status and cognitive capacity.**

**247.    On 8/22/20 She then posted this information on a first year law Group Me chat entitled "NU Kids on the Block '23" in order to harass and ridicule me. She sent me harassing and unwanted direct messages on the group chat and via text.**

248.    **On 8/23/20 When I offered her my number to take our disagreement offline, she called me at 1 AM menacingly and illegally recorded our conversation, then illegally submitted the tape to my university and resulted in my suspension from school.**

249.    **On 8/23/20 she then requested a non contact order from the school and texted me afterward in order to provoke me into responding and violating the order.**

250.    **On 8/23/20 she then directed Ishani Chokshi, another 1L, to make harassing messages on my Facebook.**

251.    On 8/23/20 she then directed Tessa Wiel, another 1L, to send me harassing messages **on Dischord chat.**

252.    **Evangeline's comments directly led to Plaintiff's banning from the group chat and discord servers, as well as my suspension from school and isolation from student population, and prevented my access to all those things plus all the other associated educational resources of a law student. The impact of her actions created an environment that was so severe and saturated with ridicule and debasement based on my mental health, that it restricted my access to educational opportunities that would have been offered absent the brutal harassment.**

253.    **She knew fully well from my comments in the group chat that I was experiencing mental or emotional distress and preyed on the outward symptoms of my emotional and psychological vulnerability in a predatory manner based on my disability and mental health status.**

## 2020 Cyberstalking and Hate Crimes

254.    On or around 8/21/20 I was cyberstalked by Evangeline Gargula, a white female transgender incoming 1L student at NU Law, in violation of cyberstalking 720 ILCS 5/12-7.5. She committed a Hate crime in violation of 720 ILCS 5/12-7.1 (a) by cyberstalking me on the basis of actual or perceived mental disability. She conducted surveillance of me on "Google" and "Facebook" and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history. She gathered my personal data, including my photo, from "Facebook," "Google," and other possible locations for malicious personal use on or around 8/22/20, and also to post it in first-year Law GroupMe chat titled "NU Kids on the Block '23" on or around 8/21/20.

255.    On 8/22/20 at 2:22 AM she committed a Hate crime in violation of 720 ILCS 5/12-7.1 (a) by Transmission of obscene messages in violation of 720 ILCS 5/26.5-1(a), Harassment through electronic communications in violation of 720 ILCS 5/26.5-3 by posting my private information which she gathered through surveillance in first-year Law GroupMe chat titled "NU Kids on the Block '23" in committing harassment based on ADA disabilities and Her actions caused me significant emotional distress by bringing up my last year in school, which was when my mother died, I was hospitalized for grief, and I had to withdraw from school for mental health concerns.

256.    On 8/22/20 at 2:22 AM She committed a Hate crime in violation of 720 ILCS 5/12-7.1 (a) by Transmission of obscene messages in violation of 720 ILCS 5/26.5-1(a) harassing me through electronic communications in violation of 720 ILCS 5/26.5-3 in a first-year Law GroupMe chat titled "NU Kids on the Block '23," wherein she committed the following acts:

257.    She committed by transmission of obscene messages in violation of 720 ILCS 5/26.5-1(a) when she posted a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities

258.     She posted my private Facebook information on the chat, which included such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history.

259.     She committed transmission of obscene messages in violation of 720 ILCS 5/26.5-1(a) when she inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities.

260.     She committed transmission of obscene messages in violation of 720 ILCS 5/26.5-1(a) when she posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

261.     **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(3) when she committed a violation of intimidation statutes 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) when she encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my work and education history was something that I could not possibly have because of my mental health status and cognitive capacity. Therefore, by ridiculing and trying to poke holes in my work history and inciting hatred and speculation about me, they directed comments at my ADA disabilities.

262.     **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(2) when her harassment "created a hostile environment and/or substantially interfered" with my "access to a University program or activity from an objective perspective" when I was banned immediately from group chat and discord after my comments in the chat, furthermore I was immediately suspended from school, thereby effectively impeded from those university activities directly resulting from Evangeline's influence and injured in my property in educational opportunities and law career due to her malicious intent to get me expelled from school.

263.     **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3) when she Engaged in intimidation in violation of 720 ILCS 5/12-6 (a)(1) by Indirectly threatening my safety when she posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class. At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

264.     On or around 8/22/20, after she had harassed me on the Group chat, and I had been removed from both the Discord and Group Me by other biased students, I made a legitimate offer to Gargula to settle our grievances offline by offering my personal number and asking her to call me "if there was an issue."

265.     **She committed assault in violation of 720 ILCS 5/12-**1(a) when she put Plaintiff in imminent fear of battery when she **committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and Engaged in intimidation in violation of 720 ILCS 5/12-6 (a)(1) when she engaged in harassment by telephone in violation of 720 ILCS 5/26.5-2 and directly threatened my safety by calling me at 1:08 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly asking "Is this Fahad Syed?" then paused and breathed into the phone menacingly, then failed to identify herself after repeated inquiry, replying only "you gave me your number" and "you told me to call you." She took my

legitimate offer to settle our grievances offline to call me 1:08 AM threateningly and menacingly, instead of trying to arrange a meeting at normal hours via email or text. She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety. She also committed Aggravated assault in violation of 720 ILCS 5/12-2(a) by committing the assault resulting from gaining my information in "NU Kids on the Block '23" which is a school affiliated group, or a "place of public accommodation." She also committed aggravated assault in violation of 720 ILCS 5/12-2(b)(1) by knowingly assaulting a person with ADA disabilities.

266.    Evangeline committed intimidation in violation of 20 ILCS 5/12-6 (a) (1) when she engaged in harassment by telephone in violation of 720 ILCS 5/26.5-2 by illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3)  when she  recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school.

267.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(2) when Evangeline committed Eavesdropping in violation of 720 ILCS 5/14-2(a)(5) when she engaged in harassment by telephone in violation of 720 ILCS 5/26.5-2  and Harassment through electronic communications in violation of 720 ILCS 5/26.5-3 when she used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

268.    **She committed Educational intimidation in violation of 720 ILCS 5/12-7.**2(a)(3) and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Jaina Solo," an incoming female 1L , to speculate negatively "According to 2Ls, last year he escalated in his aggressive behavior and speech after being kicked out of the group me. Unfortunately in person at times. If he messages any of you, rather than engaging with him I recommend emailing [NU] with screenshots," in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20. Where Solo and Gargula had previously met and spoken.

269.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3) when and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) in cooperation with "Jake Besanceney," an incoming white male 1L , to state "Please keep further discussion about Fahad at a respectful level, and preferably at a minimum, outside of what is necessary" after removing me from in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20. Where Solo and Besanceney had previously met and spoken.

270.    **She committed Educational intimidation in violation of 720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3)and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , to unfairly influence school administration to suspend me from NU on Behalf of Evangeline on 8/23/20, where Cange forwarded messages and screenshots and called Shannon Bartellete, the associate dean of Inclusion and Engagement to speak to Associate Dean and Dean of Students Susie Spies Roth and others. Where Evangeline sent Cange and email falsely indicating that Plaintiff had initiated the phone contact between Evangeline and Plaintiff and where Evangeline and Cange had previously met and were both part of the LGBTQ affinity group.

271.    **She committed Educational intimidation in violation of 720 ILCS 5/12-7.**2(a)(3) and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Ishani Choski," a female transgender 2L student at Northwestern Law, to harass me six separate times with unwanted comments on Facebook on 8/23/20, where she made

repeated reference to me "sliding into white girls dm's" and other harassing comments on my status posts. Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

272.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(3) and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "tessaweil13," a white female incoming 1L student, to harass me with offensive statements on Dischord on 8/23/20 on Behalf of Evangeline where both Evangeline and Tessa had previously spoken and met.

273.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3) when and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Wren Chernoff," an incoming white female male-transgender 1L , to participate in a student disciplinary hearing against me where she stated during an interview on 9/1/20 that "while this semester is largely remote, [I] don't want to be in the hall with him to and from class and have some sort of confrontation," and where she said it would be "Very easy to imagine using the women's restroom" and seeing him go in and out of the restroom at the same time, "and… start a confrontation." Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

274.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3)and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , to participate in a student disciplinary hearing against me where she stated during an interview on 9/2/20 that "she is working on an action plan so this doesn't happen again." She also stated "(This feeling is) reciprocated among our board, because they were all taking about it [the group chat altercation] as it happened" further indicating the defamatory rumors and hate and ridicule Gargula incited about me to the law school. Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

275.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3) when and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Andrew Lang-Reyes," an incoming gay 1L , to participate in a student disciplinary hearing against me where he falsely claimed during an interview on 10/27/20 that I was making comments "geared directly at a person's attributes" in attempting to mischaracterize and defame me as a transphobic person. Where Gargula and Lang-Reyes had previously met and were both part of the LGBTQ affinity group.

276.    **She committed Educational intimidation in violation of  720 ILCS 5/12-7.**2(a)(1) and **720 ILCS 5/12-7.**2(a)(3) when and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by inciting, encouraging, and/or influencing "Shen Peng," an incoming 1L , to participate in a student disciplinary hearing against me where she claimed during an interview on 10/27/20 that "there were rumors concerning the first time Fahad was in law school two years ago." Peng indicated that it was "rumored that due to inappropriate physical conduct, Fahad left law school two years in a row and this fall was placed in section 4." Where Peng and Gargula had previously met and knew each other.

277.    **She committed Educational intimidation in violation of 720 ILCS 5/12-7.2 (a)(2)**, when she engaged in harassment by telephone in violation of 720 ILCS 5/26.5-2  and Harassment through electronic communications in violation of 720 ILCS 5/26.5-3 by texting me at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that she had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

278.    **She committed Educational intimidation in violation of 720 ILCS 5/12-7.2 (a)(2)**, when she engaged in harassment by telephone in violation of 720 ILCS 5/26.5-2  and Harassment through electronic communications in violation of 720 ILCS 5/26.5-3 by communicating to the law class

about me by posting my private information in the first-year Law GroupMe chat titled "NU Kids on the Block '23 from 8/22/20-8/23/20, communicating to others about me by making and encouraging defamatory speculation and remarks directed towards ADA disabilities for the purposes of having me maliciously expelled from law school.

279.    She committed **Criminal damage to property in violation of 720 ILCS 5/21-1)(a)(1) in excess of $100,000, she committed Educational intimidation in violation of 720 ILCS 5/12-7.2 (a)(2) and 720 ILCS 5/12-7.2 (a)(3)** and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) by damaging to my property in the form of my character and personal and professional reputation within the law school and legal profession by defaming me and inciting hatred and speculation against me in first-year Law discord chat on 8/21/20 or 8/22/20 in order to get me maliciously expelled from law school.

280.    She committed **Criminal damage to property in violation of 720 ILCS 5/21-1(a)(1) in excess of $100,000, she committed Educational intimidation in violation of 720 ILCS 5/12-7.2 (a)(2) and 720 ILCS 5/12-7.2 (a)(3)** and she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) when she damaged my property in terms of my character through defamatory statement and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20 in order to get me maliciously expelled from law school.

281.    She committed **Criminal damage to property in violation of 720 ILCS 5/21-1(a)(1) in excess of $100,000, she committed Educational intimidation in violation of 720 ILCS 5/12-7.2 (a)(2)** when she damaged my property in the form of my educational opportunities by having me suspended and expelled through lies and deceit and defaming me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

## 2020 Adverse Action and Discriminatory Sanctions

282.    Plaintiff made strong remarks in response to the stalking behavior within that group chat, comments which were in immediate proximity to the stalking comments in the group chat which were directed at Plaintiff, referring to the stalker (Evaline) as a "stalker" and as "creepy." At this time, due to his intense emotions, Plaintiff also made one careless and insensitive remark which Plaintiff now understand was interpreted in a way that seemed disparaging towards Evaline's transgender identity. The university allowed Evaline to submit all of those comments in a single "screenshot" which served as misleading evidence of comments directed at her "gender identity." When Plaintiff offered Evaline his personal contact information in an attempt to resolve any issues shortly after the incident had occurred, Evaline called Plaintiff at 1:08 AM that night in an extremely threatening manner. When Plaintiff sent text responses, out of a strong emotional reaction of genuine fear for his own personal safety at the time, the university allowed Evaline to submit those particular text messages as evidence that Plaintiff "threatened their safety."

283.    Gargula then reported his comments which came in response to their threatening call, which Plaintiff made out of genuine fear for his own safety, as misleading evidence that Plaintiff made comments about their gender identity, when in fact his comments were aimed as a response to their behavior which constituted "stalking" under university policy. In this way, they initiated a malicious student conduct disciplinary process wherein they used dishonest and deceitful means to have Plaintiff suspended through selective mischaracterization and deliberately obscuring evidence of their own intentionally provocative and malicious actions.

284.    In addition, Evaline Gargula also violated a no-contact direct put in place on August 22nd by text messaging Plaintiff on August 23rd in a provocative manner in another underhanded attempt to lure Plaintiff into conflict, which Plaintiff reported. In addition, Evaline Gargula incited other members of the NU community to contact Plaintiff in a highly offensive and provocative manner including "tessaweil13" on August 22nd at 3:33pm on "Discord" and "Ishani Chokshi" on "Facebook" on August 23rd of 2020. The details of these incidents have been reported to the university. In addition, Evaline Gargula incited the owners of both school communication channels "discord" and "group chat" to ban Plaintiff from accessing the service.

285.    Plaintiff have been responding to attempts at intimidation and harassment from Evaline and Plaintiff do not consider the actions that Plaintiff took in respond to her attempt at intimidating Plaintiff as a cause for Plaintiff to receive disciplinary actions. Plaintiff had no intent on causing any sort of disruption in any of the school venues, and had Plaintiff not been persistently subjected to ridicule and personal attacks and been allowed to simply post his intended message on the chat than this situation would not have occurred. This is supported by the other messages that Plaintiff posted on GroupMe and Discord which did not generate a remotely similar disruption.

286.    Plaintiff again want to make it absolutely and abundantly clear that his comments were in no way directed at their gender identity, and were directed squarely at describing his feelings towards their actions, which formed the basis for stalking as outlined in university policy.

287.    Plaintiff can honestly say that Plaintiff am by no means a perfect individual, in fact Plaintiff spent the last year battling back from mental illness in order to return to being able to pursue his education this year. Plaintiff have struggled with bi-polar disorder and have been vehemently attempting to work through his issues with the support of the school. Plaintiff feel as though Plaintiff was unwittingly lured into a conflict and that his comments are being intentionally misconstrued as being directed towards gender identity in order to defame his character and paint Plaintiff in the most negative light.

288.    Plaintiff wish to make absolutely and abundantly clear that Plaintiff in no way endorse transphobia, homophobia, or bigotry of any kind and condemn those ideas as abhorrent in every way. Plaintiff deeply support freedom of expression and dignity for all members of a community, and his intent in using the words "disgusting" "creepy" and "freak" was to describe actions like "stalking" and was to condemn behavior, which Plaintiff strongly felt constituted stalking, in the strongest possible terms. Plaintiff strongly oppose any attempts to mischaracterize Plaintiff as a bigot by taking his comments out of context, as Plaintiff feel has been done by Evaline.

289.    Plaintiff want to make clear the steps that Plaintiff took to remove myself from other potentially disruptive situations by leaving all of the other group chats that Plaintiff was in and limiting his contact to one single group. In addition, Plaintiff refrained from attempting personally contacting anyone in the class since that incident occurred prior to being asked to do so by the school, aside from contacting one member who removed Plaintiff from the school "discord" server in what Plaintiff felt was a bias and unfair manner. In addition, Plaintiff refrained from engaging Evaline after they texted Plaintiff in violation of the no-contact directive and refraining from engaging with "Ishani Chokshi" when they attempted to provoke Plaintiff into confrontation on Facebook. In closing, Plaintiff additionally want to make it clear that Plaintiff feel that Plaintiff am the only party involved in this incident who has been completely upfront in their role in creating this situation.

290.    Plaintiff was attempting to abide by his strategy and plan for success which Plaintiff had outlined in his strategy by attempting to utilize the group chat's to secure workout partners and limiting his interaction with others in the class to as great of an extent as Plaintiff could without completely excluding himself from social interactions.

291.    The university issued an "interim" suspension on Sunday August 23, with the Interim Dean of Students of the University "Mona Dugo," and NUPD Deputy Chief  "Eric Chin" calling Plaintiff to inform Plaintiff that "they" had decided to suspend Plaintiff based off the comments described above. During that call she referenced being aware that Plaintiff was on "probation" from a previous disciplinary infraction. On that call, with NUPD Deputy Chief Chin, Plaintiff informed both individuals that Plaintiff had been stalked and that his comments were in response to a late-night call and blatant harassment, and neither took any action whatsoever to note his concerns. They made specific mention of the fact that they were "not aware" of any of his personal concerns or grievances at that time. On information and belief, The Interim University Dean of Students, Mona Dugo, negligently suspended Plaintiff, and reported Plaintiff to the Northwestern University Police Department (NUPD), for a perceived threat from his disability which resulted from communications between Plaintiff and fellow current 1L Evangeline Gargula and occurred between 8/22/20-8/23/20. She called Plaintiff on 8/23/20 and explicitly stated "we've been watching your Facebook and other social medial posts" and on a 3-way call with Chin, Dugo, and Plaintiff.

292.    When Plaintiff expressed to them that Plaintiff was subjected to harassment and that evidence was only obtainable through "GroupMe" chat history which Plaintiff did not have access to because Plaintiff was maliciously banned, the university made no attempt at helping Plaintiff secure that history and expressed no interest in reviewing it. They continue to be elusive in referencing or acknowledging any of his grievances of harassment from the group chat, despite his complaint for stalking which Plaintiff filed through the university. During the conversation they made it very clear that they were not aware of any comments from the GroupMe which were directed at Plaintiff, which proves that they were not remotely interested in genuinely resolving this issue in his best interest.

293.    On August 23rd 2020, Plaintiff received an electronic notification from the university about the suspension, which indicated not only the infractions resulting from the stalking incident, but also a separate incident which occurred on June 18, 2020. This incident was added onto the list of approximately five different policy violations that they accused Plaintiff of as a result of these occurrences. This alleged infraction/incident was never made clear at any point prior to a reinstatement meeting with university officials which Plaintiff held in July 2020.

294.    Despite all of the above infractions, no other student was disciplined. Northwestern University representative "Mona Dugo" suspended Plaintiff based off a threat that she perceived resulting from his ADA disability, prior to having even a basic understanding of the circumstances of this altercation. She assumed that Plaintiff was dangerous and guilty due specifically to his stalking ADA disabilities, which she assumes makes Plaintiff a criminal. Another reason Plaintiff know the discrimination is because of his mental disability is because during his initial suspension call, Mona and Eric referenced the fact that Plaintiff was on "probation" and therefore could reasonably be expected to know the reason Plaintiff was on probation was related to his mental health. Plaintiff also know that this is discrimination because they brought up alleged infractions from June 18th, 2020 which if valid, should have been addressed during or prior to his reinstatement meeting in August 2020.

295.    On August 23, 2020 Plaintiff was notified that Usama Ibrahim reported to the school that Plaintiff had threatened him and violated the school's no-contact directive between him and myself which was put in place in November of 2019. Usama Ibrahim had already graduated as of the time of the alleged contact which he reported, and his sole reason to report this to the school was because of his continued prejudice towards Plaintiff for his disability and his wishes to further maliciously interfere with his education in retaliation for plaintiff filing multiple complaints, including DOE complaint. This is due to his intense hatred of disabled people.

296.    The university and its representatives showed clear bias in this suspension by enforcing the implied rights of the similarly situated transexual student in blatant violation of my rights as a disabled student of color not to be stalked or harassed, and doing so solely on the basis of gender. This was de-facto gender discrimination given that we are similarly situated, and the only difference from her is that I am male, Muslim, colored, and disabled, which are all protected classes. In doing this they again showed a theme of disparate impact on males in the University Hearing and Appeals process.

297.    On information and belief, Plaintiff contends that a majority of the male students who are accused of Title IX and UHAS hearing violations are found guilty in the last 3 years.

298.    On information and belief, Plaintiff contends that a majority of students found responsible for Title IX and UHAS hearing violations are male, or have male first names in the last 3 years.

299.    On information and belief, Plaintiff contents that a majority of students accused of Title IX and UHAS hearing violations are male, or have male first names in the last 3 years.

300.    Despite every single one of his efforts and attempts, the university again failed to uphold his right as a student to pursue education free of harassment by allowing a stalker to maliciously harass Plaintiff and pursue multiple dishonest and deceitful complaints against Plaintiff, ultimately resulting Plaintiff again being suspended. The university has offered Plaintiff absolutely no meaningful support whatsoever in this situation, including willfully evading 100% of his complaints in a careless and increasingly belligerent and negligent manner and blatant violation of Title IX selective enforcement policies.

## 2020 UHAS Hearings Procedural and Substantive Unfairness

**Situation #1 – Evangeline**

301. **Exceptional Circumstances**

(1) **As a result of unjust and outrageously discriminatory 2019 student conduct sanctions, I was forced to be isolated from the Northwestern community from 11/1/19 until 8/19/20. I overcame an emotional ordeal last year including false imprisonment and my mother's death. I can honestly say that I am by no means a perfect individual, in fact I spent the last year battling back from mental illness in order to return to being able to pursue my education this year. I have struggled with bi-polar disorder and have been vehemently attempting to work through my issues with the support of the school. However, I feel as though I was unwittingly lured into a conflict as a result of Evangeline taking advantage of my ADA disabilities, in the form of my intentionally provoking my irritability and temperament, and that my comments are being intentionally misconstrued as being directed towards gender identity in order to defame my character and paint me in the most negative light. This situation is completely over-blown and mischaracterizing and defamatory in every way. This is a complete travesty where you knowingly abetted a felon in committing their felonious acts against me simply because she is transgender. You are taking one single comment out of context of the entire line of comments and alleging that it was directed towards gender, whereas in reality, the line of questions was: "I don't know what to call you, stalker, disgusting, creepy…." NONE of my comments were directed towards Evangeline's gender identity, ALL of them were responses to her stalking and harassment based on disability.**

(2) **To start Fall 2020 Semester, I was deliberately left off orientation schedule through no fault of my own, and not able to participate in any events or meet anyone in the class as a result. This was the direct cause-in-fact which created this situation. Because had I been on the schedule, I would not have felt compelled to meet people through the group chat.**

(3) **The group chat incident was a "episodic manifestation of my underlying disability" and my anger, frustration, irritability, temper, etc. were symptoms of a "psychotic episode" triggered by stress from the negligent maintenance of a hostile learning environment in the Group Chat. Please note that an appropriate accommodation of my disability would be a learning environment free of harassment, intimidation, or other abuse. Please pay particular attention to how your negligent maintenance of a hostile learning environment on the GroupMe, by not having a moderator, which would not have been an undue burden or hardship and would have costed almost nothing, caused my symptoms to be exacerbated, and caused me severe emotional and psychological distress, and resulted in an adverse action to me (suspension). [A]n intermittent impairment that is a characteristic manifestation of admitted disability is part of the underlying disability and, hence, condition that employer must reasonably accommodate. Americans With Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Equal Employment Opportunity Commission Procedural Regulations, § 1630.2e(j), 42 U.S.C.A. foll. § 2000e–4. Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538 (7th Cir. 1995) For purposes of ADA section defining discrimination to include employer's not making reasonable "accommodations" to the known physical or mental limitations of an otherwise qualified individual with disability, "accommodation" means that employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions to enable disabled individual to work. Americans With**

Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A).<u>Vande Zande v. State of Wis. Dept. of Admin.</u>, 44 F.3d 538 (7th Cir. 1995)

302. <u>Official University Policy and Definitions</u>

(1) <u>Disorderly Conduct (b)</u>

*2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

(2) <u>Sexual Misconduct</u>

*2019-2020 Student Handbook, p.128: Northwestern prohibits all forms of sexual misconduct, including …stalking, dating or domestic violence, and sexual harassment.*

*2019-2020 Student Handbook, p.38: Violations of the University's policy on Sexual Misconduct (see page 132), including, but not limited to,*

　　i. *Stalking;*

(3) <u>Stalking (c)</u>

*2019-2020 Student Handbook, p.133: Knowingly engaging in a course of conduct directed at a specific person that one knows or should know would cause a reasonable person to fear for their safety (or the safety of a third party) or suffer emotion- al distress. "Emotional distress" means significant mental suffering, anxiety or alarm. Conduct that can amount to stalking may include two or more actions directed at another person4, whether done directly, indirectly, through others, via devices, or via any other methods or means (specifically including electronic means e.g. cyberstalking), including but not limited to:*

　　i. *Monitoring, observing, or conducting surveillance of a person;*

　　ii. *Threatening (directly or indirectly) a person;*

　　iii. *Communicating to or about a person;*

　　iv. *Interfering with or damaging a person's property (including pets); or*

　　v. *Engaging in other unwelcome contact.*

(4) <u>Misrepresentation</u>

*2019-2020 Student Handbook, p.38: Acts of fraud, misrepresentation, or dishonesty, including the following:*

　　i. *Forgery, alteration, or misuse of University documents, records, or identification or other materials;*

　　ii. *Knowingly furnishing false, forged, or inappropriately altered information to the University, any University official, or emergency response personnel;*

　　iii. *Intentionally initiating or causing to be initiated any false report, warning, or threat of emergency or crisis;*

(5) <u>Endangering Self or Others</u>

*2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

(6) <u>Destruction of Property</u>

*2019-2020 Student Handbook, p.28: Destroying, damaging, defacing, or vandalizing property.*

(7) <u>Discrimination and Harassment</u>

*2019-2020 Student Handbook, p.28: Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, services, or in the educational programs or activities it operates.*

303. **Unmitigated and Startling Disparity in Treatment During 2020 Disciplinary Process**

(1) During the course of this process, and throughout my time at this university, note the disparity in treatment and discriminatory difference in treatment between my concerns and the Concerns of White Females by the Office of Equity.

(2) Apiil 2020 - Forensic Threat Evaluation - During this evaluation, I was asked questions about an incident which occurred in late August wherein an unidentified female claimed that I "grazed her butt" during a law school outing. I faced disciplinary action due to this allegation in an August meeting with Amanda DeSilva, however, when I told administration that I was assaulted by Osama, Muaaz, and Usama, the law school failed to take any action of any kind on my behalf. In this manner the school administration violated title IX by treated me differently than a female who made similar allegations of unwanted physical contact against me, by not investigating my concern while they investigated the allegations made by the female and noted the incident in my school disciplinary record.

(3) On August 6th, Equity held a meeting with me wherein they discussed the concerns of several other female students and staff, all of whom were white females. The nature of the overwhelming majority of the "concerns" which were shared with me involved several incidents from the night of my 30thbirthday when I was heavily intoxicated. None of these concerns was formally reported. One of the incidents was the one which was referenced in my forensic threat evaluation. The nature of the concerns was at least comparable in nature to the concerns which I have reported, none of which went addressed.

(4) THE University, BRUTALLY VICTIMIZING ME: Every single complaint (100%) that I have filed with the Office of Equity and the University, both informal and formal, has been determined not to state a cause for investigation or action of <u>any kind whatsoever</u>. I have filed at least 20 different complaints with that office for a variety of different concerns, not a single one was adequately addressed. Moreover, no concern was ever shown for my distress from any of the incidents, not even.

(5) The University, PROTECTING EVAGELINE: She had a complain initiated ON HER BEHALF by THE UNIVERSITY and without her knowledge, regarding her "concerns" and the "concerns" of the other, mostly white female students , on who's behalf I was suspended.

(6) THE University, BRUTALLY VICTIMIZING ME: Every single one of the reports of harassment which I made related to this incident were disregarded and ignored by the university and Amanda DeSilva, including the THREATENING 1 AM PHONE CALL AND THE AUDIO OF THE CALL WHICH EVAGELINE DELIBERATELY RECORDED IN ORDER TO GET EVIDENCE TO GET ME KICKED OUT OF SCHOOL.

(7) The University, PROTECTING EVAGELINE: Mona Dugo knowingly concealed the FACT that Evangeline maliciously and ILLEGALLY recorded my conversation with her without my knowledge or consent, and SUSPENDED ME OVER IT.

(8) THE University, BRUTALLY VICTIMIZING ME: The university suspended me over ONE COMMENT which could POSSIBLY have been directed towards Evangeline's gender identity, and the rest were clearly directed at her STALKING WHICH THEY IGNORED. They used her illegal work product to suspend me over, instead of reporting her to the authorities like would have been done with a minority student, or male. THEY BRUTALLY SUPPRESSED AND

PREVENTED ME FROM REPORTED EVANGELINES ILLEGAL CONDUCT TO THE AUTHORITIES.

(9) The University, PROTECTING EVAGELINE: Allowing her incredibly deceitful conduct go unchecked, and allowing her to go to orientation, meet everyone, participate in meet up and enjoy all the resources of the law school

(10) The University, BRUTALLY VICTIMIZING ME: Negligently leaving me off the orientation schedule, then not even having the decency to give me a break when I attempted to meet people on the group chat on THE WEEKEND BEFORE SCHOOL BEUCASE I HADNT MET ANYONE OR DONE ANYTHING ALL WEEK BECAUSE OF BEING NEGLIGENTLY LEFT OFF THE ORIENTATION SCHEDULE FOR THE ENTIRE WEEK.

(11) The University, PROTECTING EVAGELINE: Evangeline received heartwarming attentional and support from all levels of the university, from student groups and other students, and staff as well. She was not disciplined in the slightest bit for ANYTHING she did, OR CONTIUES TO DO, to me. She is allowed to continue her life like normal, go to school, and during her spare time, victimize and torture me in this process.

(12) THE University, BRUTALLY VICTIMIZING ME: I was IMMEDIATELY and NEGLIGENTLY suspended, isolated further for what has now been almost 1 full year, and received NO SUPPORT WHATSOEVER FROM ANYONE. Even the requests for things like rescheduling my hearing so it wouldn't be on the anniversary of my mothers death, refusing to accommodate MY EYE SURGERY by giving me another FIVE DAYS to respond to this brutal onslaught of accusations, were painstakingly received.

(13) NO THOUGHT FOR A PERSON GRIEVING OVER THEIR MOTHERS DEATH, WHICH I HAVE UNABLE TO GRIEVE FOR BECAUSE OF DEALING WITH STUDENT CONDUCT FROM THE DAY SHE DIED UNTIL RIGHT NOW. This is the most brutal comparative treatment of a human being imaginable.

304. <u>Unprovoked and Unchecked Malicious Harassment by Gargula</u>

(1) On August 22nd 2020 an incoming 1L transgender student named "Evangeline Gargula" performed actions which constituted stalking under university policy by maliciously posting my private information, including work history, on a first-year Law GroupMe chat titled "NU Kids on the Block '23." This individual brought up my prior year in school, causing me significant emotional distress because they brought up painful memories of when my mother died and I had to withdraw from school for mental health concerns last year. They made disparaging and ridiculing remarks about my disability and color, defamed my character by inciting speculation as to my status in the law class, and posted a picture of an animal (frog) with a caption entitled "airhead" in reference to my ADA disabilities. Below is a detailed list of the total infractions and harassment Evangeline committed against me:

305. <u>Stalking</u>:

(1) Conducted surveillance of me by gathering my personal data from "Facebook," "Google," and other possible locations for malicious personal use on or around 8/22/20, and also to post it in first-year Law GroupMe chat titled "NU Kids on the Block '23" on or around 8/21/20.

(2) Conducted surveillance of me by illegally recording a phone conversation without my knowledge or consent, and submitting it to the school but retaining ownership of it, in order to maliciously and deceitfully get me expelled from law school.

(3) Engaged in unwelcome contact with me by posting my private information which she gathered through surveillance, posted mean pictures of me such as a "frog" with reference to my learning disability, and defamatory remarks about my color through remarks about my work history, all of which I was forced to respond to in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20. Her actions caused me significant emotional distress by bringing up my last year in school, which was when my mother died, I was hospitalized for grief, and I had to withdraw from school for mental health concerns.

(4) Engaged in unwelcome contact by calling me at 1:08 AM on 8/23/20 in a manner which I found highly threatening do to the fact that she called at a late night hour, and didn't say anything at first, but just breathed into the phone menacingly. In addition, she took my legitimate offer to settle our grievances and decided to call me at 1:08 AM instead of trying to arrange a meeting at normal hours. She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then used my comments to report to Equity that I had threatened her safety. She reported my comments in a malicious attempt to take advantage of her gender identity.

(5) Engaged in unwelcome contact by inciting, encouraging, and/or influencing "Ishani Choski," a female transgender 2L student at Northwestern Law, to harass me six separate times with unwanted comments on Facebook on 8/23/20, where Ishani made repeated reference to me "sliding into white girls dm's" and other harassing comments on my status posts.

(6) Engaged in unwelcome contact by inciting, encouraging, and/or influencing "tessaweil13," a white female incoming 1L student, to harass me multiple times with uneducated judgment and offensive statements on Dischord on 8/22/20, where she berated me with offensive judgments about my comments on Behalf of Evangeline, all while failing to understand my legitimate concerns about privacy, safety, and equal access to school programs and activities.

(7) Directly threatening my safety by calling me at 1:08 AM on 8/23/20 in a manner which I found highly threatening do to the fact that she called at a late night hour, and didn't say anything at first, but just breathed into the phone menacingly. In additional, she took my legitimate offer to settle our grievances and decided to call me at 1:08 AM instead of trying to arraigned a meeting at normal hours. She took these actions in order to take advantage of my ADA learning and cognitive disabilities to bait and entrap me into responding, and then used those comments to report to Equity that I made comments threatening her safety.

(8) Indirectly threatened my safety when she posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class.

(9) Engaged in unwelcome contact by texting me at 8:34 PM on 8/23/20, after knowingly cooperating with Equity to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that I had been

suspended, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with Equity.

(10)  Communicating to the law class about me by posting my private information in the first-year Law GroupMe chat titled "NU Kids on the Block '23 from 8/22/20-8/23/20, communicating to others about me by making and encouraging defamatory speculation and remarks directed towards my ADA disability, my status in the law class as a student of color, and my economic status through remarks about my work history.

(11)  Damaging to my property in the form of my personal and professional reputation within the law school and legal profession by defaming me and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

(12)  Damaged my property in terms of my character through defamatory statement and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

(13)  Damaged my property in the form of my educational opportunities by having me suspended through lies and deceit and defaming me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

306.  <u>Endangering my Physical Safety</u>:

(1) Indirectly threatened my safety when she posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class.

(2) Directly threatening my safety by calling me at 1:08 AM on 8/23/20 in a manner which I found highly threatening do to the fact that she called at a late night hour, and didn't say anything at first, but just breathed into the phone menacingly. In addition, she took my legitimate offer to settle our grievances and decided to call me at 1:08 AM instead of trying to arrange a meeting at normal hours. She took these actions in order to take advantage of my ADA learning and cognitive disabilities to bait and entrap me into responding, and then used those comments to report to Equity that I made comments threatening her safety.

307.  <u>Defamation</u>: Posted a disparaging image of a frog with the title "airhead" in reference to my ADA learning disabilities in attempting to insult and ridicule me in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; made additional defamatory statements about me.

308.  <u>Harassment:</u>  Based on ADA Disability Status, Student of Color Status, and Economic Status: Substantially interfering with, limiting or depriving a member of the community from accessing or participating in the academic or employment environment, and/or substantially interfering with an individual's academic performance or work performance; or Creating an academic or working environment that a reasonable person would consider to be intimidating, hostile, or offensive.

(1) Incited hatred and speculation about my status as a 1L student with the other students in the class making comments inciting speculation and ridicule about my work history, inciting speculation about my status in the class being a student of color, and insinuating that because I was a student of color that meant that I was low-economic status and of low cognitive capabilities.

(2) Therefore, by ridiculing and trying to poke holes in my work history and inciting hatred and speculation about me, they directed comments at my economic status, my status in the class as a student color, and my cognitive abilities as a student with disabilities.

(3) Posted a disparaging image of a "frog" with the title "NO THOUGHTS HEAD EMPTY" in reference to my ADA disabilities, in order to insult and ridicule me first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 for being a student of color with disabilities by comparing my cognitive faculties to a frog because I have disabilities

(4) Her harassment helped "create a hostile environment and/or substantially interfere with access to a University program or activity from an objective perspective" when I was banned immediately from group chat and discord after my comments in the chat, further more I was immediately suspended from school, thereby effectively impeded from those university activities directly resulting from Evangeline's influence.

309. <u>Misconduct</u>: They impeded my access from participating in the group chat and discord by inciting speculation and hatred towards me and damaging my reputation in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/2. She additionally ILLEGALLY recorded the phone call and submitted it to the school in order to have me suspended by failing to tell the school that she was intentionally provoking me in order to elicit a response. Directly resulting from their post about me and their calls and my response, I was banned from Discord and Group Chat, thereby effectively impeded from those university activities directly resulting from Evangeline's influence. I was suspended from school, thereby effectively impeded from those university activities directly resulting from Evangeline's influence.

310. <u>Character Assassination</u>: Incited negative speculation about my work history and professional credentials in order to directly assail my character and fitness to practice law as a student of color with ADA disabilities from a disadvantaged socio-economic background.

311. <u>Destruction of Property:</u>

(1) Damaging to my property in the form of my personal and professional reputation within the law school and legal profession by defaming me and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

(2) Damaged my property in terms of my character through defamatory statement and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

(3) Damaged my property in the form of my educational opportunities by having me suspended through lies and deceit and defaming me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

312. <u>Misrepresentation</u>:

(1) She initiated a false student conduct investigation against me where she knowingly and misleadingly gathered information about me through surveillance on "Linkedin," posted mean pictures of me such as a "frog" with the caption "air head" in reference to my learning disability, and defamatory remarks about my color through ridiculing remarks about my work history, all of which I was forced to respond to in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20 in order to defend my reputation and character from savage unprovoked attack.

(2) Her actions caused me significant emotional distress by bringing up my last year in school, which was when my mother died, I was hospitalized for grief, and I had to withdraw from school for mental health concerns.

(3) When I responded, she reported my responses to her actions as comments which were aimed at her gender identity, in a malicious and deceitful attempt to take advantage of her protected class status.

(4) She produced altered information in the form of screenshot of only the comments which I made as a response to her previously described activities on 8/22/20 and 8/23/20, and misleadingly stated that I made those comments directed towards her gender identity.

(5) By providing those screenshots, she knowingly presented a misleading picture of the nature of our conversation to University officials and thereby instituted a fraudulent student conduct process against me.

(6) She initiated a false student conduct investigation against me where she knowingly and misleadingly placed a threatening phone call to me at 1:08AM on 8/23/20 and reported my responses by producing pictures of my text message replies, made of out genuine fear for my safety at that time, as comments threatening her physical safety, without telling investigators that they were in response to her threatening 1:08 AM call. She additionally ILLEGALLY recorded the phone call and submitted it to the school in order to have me suspended by failing to tell the school that she was intentionally provoking me in order to elicit a response.

(7) In this way she initiated a false safety threat by furnishing altered information to University officials about the manner and context of our conversation, by deliberately and constructively omitting the fact that she had deliberately called me, and these actions resulted in me being immediately suspended on 8/23/20.

(8) She produced pictures of our text message conversation in malicious and deceitful attempt to take advantage of my ADA learning disability, and a result of these actions, she knowingly initiated a false safety threat which resulted in my immediate suspension on 8/23/20.

313. <u>Official University Policy, Definitions, and Corresponding Violations Committed by Evangeline</u>

(1) <u>Disorderly Conduct (b)</u>
*2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

(2) <u>*Sexual Misconduct*</u>
*2019-2020 Student Handbook, p.128: Northwestern prohibits all forms of sexual misconduct, including …stalking, dating or domestic violence, and sexual harassment.*
*2019-2020 Student Handbook, p.38: Violations of the University's policy on Sexual Misconduct (see page 132), including, but not limited to,*
    i. *Stalking;*

(3) <u>Stalking (c)</u>
*2019-2020 Student Handbook, p.133: Knowingly engaging in a course of conduct directed at a specific person that one knows or should know would cause a reasonable person to fear for their safety (or the safety of a third party) or suffer emotion- al distress. "Emotional distress" means significant mental suffering, anxiety or alarm. Conduct that can amount to stalking may include two or more actions directed at another person4, whether done directly, indirectly, through others, via devices, or via any other methods or means (specifically including electronic means e.g. cyberstalking), including but not limited to:*

      i. *Monitoring, observing, or conducting surveillance of a person;*
     ii. *Threatening (directly or indirectly) a person;*
   iii. *Communicating to or about a person;*
   iv. *Interfering with or damaging a person's property (including pets); or*
    v. *Engaging in other unwelcome contact.*

**(4) Misrepresentation**
*2019-2020 Student Handbook, p.38: Acts of fraud, misrepresentation, or dishonesty, including the following:*
      i. *Forgery, alteration, or misuse of University documents, records, or identification or other materials;*
     ii. *Knowingly furnishing false, forged, or inappropriately altered information to the University, any University official, or emergency response personnel;*
   iii. *Intentionally initiating or causing to be initiated any false report, warning, or threat of emergency or crisis;*

**(5) Endangering Self or Others**
*2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

**(6) Destruction of Property**
*2019-2020 Student Handbook, p.28: Destroying, damaging, defacing, or vandalizing property.*

**(7) Discrimination and Harassment**
*2019-2020 Student Handbook, p.28: Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, services, or in the educational programs or activities it operates.*

314. **The culmination of the hostile environment created by the multiple unchecked instances of targeted harassment committed by the aforementioned students, including the actions of Evangeline, Anton, Meegan, Adrianne, Hayden, Tessa, and Ishani created an academic environment that a reasonable person would consider to be intimidating, hostile, or offensive, and substantially interfered with, limited, or deprived me from accessing or participating in the academic environment, and/or substantially interfered with my academic performance by resulting in my suspensions and being barred from accessing all of the University resources and activities of a normal law student, including being able to attend classes, and participating in the "group chat" and "discord" servers.**

315. **Intent**
   (1) **Evangeline: Evangeline maliciously and without cause or any provocation initiated the conflict solely so that she could violate the schools code of professional civility and commit blatant sexual misconduct by stalking and harassing me and violating a host of other policies in a purely malicious and defamatory unprofessional and un-collegial effort. Additionally, her actions were completely unprovoked on my part.**
   (2) **Fahad: I had just come off suspension around mid-August which had been in effect since 11/1/2019, which was brutally isolating me. Very much like the new suspension is continuing to isolate me now. I was left off the orientation schedule by the university through no fault of my own, and therefore didn't meet any members of the incoming law class or attend any events or programming for the entire week of orientation, nor was I able to meet anyone over the summer because of my suspension which officially ended with my reinstatement meeting**

with on July 9th, 2020. I was attempting to abide by my strategy and plan for success which I had outlined in my reinstatement meeting by attempting to utilize the group chat's to secure workout partners and limiting my interaction with others in the class to as great of an extent as I could without completely excluding myself social interactions.

(3) My original intent in posting in the group chat was to a few people in the law class safe social distancing meetings in small groups the weekend before classes started.

(4) My comments to Evangeline were in defense and a response to her blatant attack on me and violation of the university harassment, stalking, and sexual misconduct policy, and all except one of them were referring to Evangeline's membership in the "stalker" class, not her gender identity. All of my comments were in reference to her stalking activity and activities related to stalking and those who commit it, like Evangeline. I would have made the same comments to any individual who performed the stalking actions Evangeline took, they were in no way related to her gender. They were 100% in reference to her activity of stalking.

(5) I had no idea that Evangeline was a transgender person, there was no objective notification of her membership in that class to my knowledge, given that I had not seen any announcement on her part or statements indicating that she belonged to that class. Therefore, there was no way I could have had the requisite knowledge required to possess the intent to harass her, I didn't even know she was transgender. I didn't know what gender she was or how to address her at that time, that was the intent of my "I don't know whether to call you he, she, or it" statement.

(6) Therefore, my comments were not directed at Evangeline due to her membership in a protected class, they were directed at her due to her stalking me in accordance with the official University policy on pg. 133 of the student handbook, and maliciously and without cause or any provocation initiating the conflict solely so that she could violate the schools code of professional civility, commit blatant sexual misconduct, and harass me based on my disabilities, in addition to violating a whole host of other policies in a purely malicious, defamatory, unprofessional, and un-collegial effort.

(7) I wish to make absolutely and abundantly clear that I in no way endorse transphobia, homophobia, or bigotry of any kind, and condemn those ideas as abhorrent in every way. I deeply support freedom of expression and dignity for all members of the Northwestern community, and have always been on the side of those fighting for their rights against oppression. My intent in using the words "disgusting" "creepy" and "freak" was to describe actions like "stalking" and was to condemn her [Evangeline's] behavior, which I strongly felt constituted stalking, in the strongest possible terms. I should have been far more cognizant of how those descriptive terms could be misleadingly construed as being aimed at her expression of gender identity, and potentially offensive to individuals in the LGBTQ community. I would like to offer my sincerest apology to any individuals in the LGBTQ community which I may have offended with my comments, and to make it clear that I support LGBTQ rights, and in no way meant for my comments to be directed at my community. I strongly oppose any attempts to mischaracterize me as a bigot by taking my comments out of context, as I feel has been done by Evangeline.

(8) The main reason that I believe this situation occurred is that I exercised a poor choice of words in being involved in a verbal disagreement with another student, wherein I used words to describe their behavior which I should have been more

careful of because of that students expression of gender identity. I again want to make it absolutely and abundantly clear that my comments were in no way directed at their gender identity and were directed squarely at describing my feelings towards their actions, which formed the basis for "stalking" as outlined in University Handbook, pg. 133.

316. <u>Initiation of Conflict</u>

(1) Evangeline maliciously and without cause or any provocation initiated the conflict solely so that she could violate the schools code of professional civility and commit blatant sexual misconduct by stalking me and then by engaged in unwelcome contact with me by posting mean pictures of me and defamatory remarks about me which I was forced to respond to in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20. I have never met her before and never did anything to her.

317. <u>Final Action in Conflict</u>

(1) Evangeline engaged in unwelcome contact by texting me at 8:34 PM on 8/23/20, after having me suspended earlier that day, in order to further maliciously entrap me into a response. She knew that I had been suspended and was attempting to again lure me into responding so that she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions.

318. <u>Review of Conflict Trigger Actions/Actions of Escalation or Persistence</u>

319. Evangeline

(1) Evangeline started the conflict with malicious and defamatory intent, and it was completely unprovoked on my part. I had not done or said a <u>single thing</u> to this woman. Then…

(2) Evangeline stalked me by performing surveillance of my "LinkedIn, and/or "Facebook," neither of which we were connected on.

(3) Gathered my information in her private records for clearly malicious and nefarious purposes.

(4) Made disparaging remarks about me.

(5) Incited hatred, ridicule, and speculation against me amongst the entering 1L class.

(6) Posted my private information without my consent to

(7) Posted a defamatory image with the caption "air head" referencing my ADA disability status.

(8) When I responded to all of the above out of anger, she initiated a malicious student conduct process against me on false and misleading pretenses by providing altered information to authorities in the form of screen shots of only my responses to her stalking and not telling authorities that she had stalked me.

(9) She then incited Tessa Weil to harass me that day.

(10)    She was instrumental in influencing both the group chat and discord owners to ban me from the service that day.

(11)    After having me banned, called me threateningly at 1:08 AM that same night in order to provoke and entrap me, and then deceptively reported my responses to her threatening call in order to initiate another student conduct process against me by misleadingly again providing altered version of our message exchanges and failing to indicate they resulted from her threatening call, thereby intentionally having me suspended from school.

(12)    Incited Ishani Chokshi to harass me the next day.

(13)    She illegally recorded the phone call where she threatened me.

(14)    She illegally submitted the phone call where she illegally recorded me to the university, resulting in my illegal suspension.

(15)     Evangeline also ended the conflict when, after being fully aware that she had me suspended with a no-contact directive as a result of her actions, and had me banned from both Discord and group chat as a result of her actions, she still hadn't had enough, so she texted me again that night in order to further attempt provoke a response by taking advantage of my ADA disabilities in the form of my irritable temperament and disposition which she was fully aware of by that point because of our multiple interactions.

320.    Fahad

(1) I have never seen, met, or directly or intentionally interacted in <u>any</u> way this woman before <u>IN MY LIFE</u>. My actions were all solely in self-defense to Evangeline's vicious, unprovoked attack which consisted of blatant sexual misconduct, stalking, harassment and provocation, and they [my actions] consisted of messages, and one phone call in response to a threat. The messages that are allegedly threatening her safety were responses to a threat which were made out of genuine emotional fear at that time and intended in 100% in self-defense. They were intended to dissuade her from stalking, threatening, or harassing me again. My comments were not aimed at her gender identity in any way, and my behavior did not "create a hostile environment and/or substantially interfere with access to a University program or activity from an objective perspective" because I was banned immediately from group chat and discord after my comments in the chat, further more I was immediately suspended so I posed no threat to her ability to access any University program or resource.

321.    De-Escalation Steps

(1) I took steps to remove myself from other potentially disruptive situations by leaving all of the other group chats that I was in and limiting my contact to one single group. In addition, I refrained from attempting personally contacting anyone in the class since that incident occurred prior to being asked to do so by the school, aside from contacting one member who removed me from the school "discord" server in what I felt was a bias and unfair manner. In addition, I refrained from engaging Evangeline after they texted me in violation of the no-contact directive and refraining from engaging with "Ishani Chokshi" when they attempted to provoke me into confrontation on Facebook. In closing, I additionally want to make it clear that I feel that I am the only party involved in this incident who has been completely upfront in their role in creating this situation.

(2) I would also like it to be know that I was attempting to abide by my strategy and plan for success which I had outlined in my strategy by attempting to utilize the group chat's to secure workout partners and limiting my interaction with others in the class to as great of an extent as I could without completely excluding myself social interactions.

322.    Severity of Impact

(1) The fact that complainant did not even request investigation proves that my impact from harassment was more severe, given my mother's death and the fact that I filed a formal complaint about the emotional distress I suffered as a result of the harassment. The only reason there was any delay in filing was because I did not have access to the chat transcripts and was unaware of the process to request them, eventually filing without them.

(2) I've now been suspended for nearly four weeks, prevented from contacting anyone and completely isolated as a result. I can't pursue coursework, which is the only thing that I have been trying to do for three years now. I was the only one disciplined resulting from this incident, and Equity showed selective enforcement and gender bias in their blatant refusal to enforce the official

university policy. They tried their best to avoid helping me, rather than to try and help me.

323. **Conclusion and Reponses to Charges**

(1) **Disorderly Conduct (b)**

*2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

    i. **Not Guilty** – My conduct did not impede Evangeline's or anyone else's access to anything. Similar to how Evangeline's contact with me was deemed non-threatening and harassing due to her "mutual contact" with me, my conduct was the result of "mutual contact" with Evangeline and therefore non-threatening or harassing.

(2) **Endangering Self or Others**

*2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

    i. **Not Guilty** – My conduct was misleadingly framed as being the aggressor, when it was in reality all self-defense and in reaction to Evangeline's blatantly malicious behavior. Similar to how Evangeline's contact with me was deemed non-threatening and harassing due to her "mutual contact" with me, my conduct was the result of "mutual contact" with Evangeline and therefore non-threatening or harassing.

(3) **Harassment**

*2020-2021 Policy on Institutional Equity, p.4: Prohibited harassment is verbal or physical conduct or conduct using technology directed toward someone because of their membership (or perceived membership) in a protected class that has the purpose or effect of: Substantially interfering with, limiting or depriving a member of the community from accessing or participating in the academic or employment environment, and/or substantially interfering with an individual's academic performance or work performance; or Creating an academic or working environment that a reasonable person would consider to be intimidating, hostile, or offensive. In determining whether the conduct is sufficiently severe or pervasive so as to meet the above standards, OE examines the context, nature, scope, frequency, duration, and location of incidents, as well as the relationships of the persons involved. A person's subjective belief that behavior is intimidating, hostile, or offensive does not make that behavior prohibited harassment under this Policy. The behavior must create a hostile environment and/or substantially interfere with access to a University program or activity from an objective perspective.*

    i. **Not Guilty** – My comments were not aimed at Evangeline's gender identity, but rather at her actions which constituted stalking and sexual misconduct under University policy. Furthermore, I had no idea that she was a transgender student, and she provided no objective indication of such. In addition, my activities did not prevent Evangeline from accessing any University resource because I was banned and suspended immediately, and they did not create a hostile environment for the same reason. Similar to how Evangeline's contact with me was deemed non-threatening and harassing due to her "mutual contact" with me, my conduct was the result of "mutual contact" with Evangeline and therefore non-threatening or harassing.

324. **Response to Evangeline Gargula's Interview and Statements:**

325.     she was in the GroupMe chat and observed "friction" between Fahad and other members of the group.

        (1) What kind of "friction"? It sound like you are making it seem like I was starting trouble when in reality I was defending myself from repeated and savage attacks alone, because the atmosphere was so hostile that other students like Shen Peng and others were unable to speak up in my defense because they were scared of being similarly singled out and attacked for doing nothing but trying to meet up just like all of the other white students were doing.

326.    She said that Fahad was saying "frightening" things and "losing control."

        (1) Please be specific, what things was I saying which were "frightening" and why? What things was I saying and/or doing which were "losing control" and why? You still haven't specifically articulated a single comment.

327.    Evangeline said she is a "skeptical" person who likes doing her "due diligence" so she googled Fahad. She said she found his Facebook profile and noticed the profile indicated that Fahad started law school in 2019. She said according to the profile, Fahad would have been a 2L, so she wondered if Fahad was actually who he was claiming to be in the group.

        (1) This is called stalking, according to university policy on pg. 133 of the student handbook. Why were you singling me out to do stalking research on me? Why are you referring to stalking as "due diligence"? What if I did "due diligence" on your mother and father. Are we friends on Facebook? "The Official Northwestern Pritzker Class of 2023 Admitted Students Page" is the only reason you were able to see my profile. That is because we are in the same group. You act like you are not aware of this group, but no one outside of that group can find my profile on Facebook. Therefore, because we share this private group, you were able to stalk me and find my information, and therefore my information is not "publicly available."

328.    Evangeline described her post as "publicly available information," and she believed the rest of the class should have been aware of this information.

        (1) What information was it that she "believed" the rest of the class "should" have been aware of, and why? She described putting my work information and facebook profile on a public site, as well as information about the dates of my pictures and stereotypes about people with disabilities such as "assumed identity" and "psyop" and posting a meme of a frog with "NO THOUGHTS HEAD EMPTY" in direct reference to my disabilities as "publicly available information" that "she believed the rest of the class should be aware of." You never specifically stated why you wanted the class to be aware of this information for? Why should the rest of the class be aware that my mother died last year from cancer, that I was inappropriately accused of "physical conduct" and that there were RAMPANT rumors circulating about me which the school made absolutely no effort to stem, and that I was illegally involuntarily committed by NUPD and suspended for no reason? If that information is publically available? I don't see where the date of my picture is listed. I don't see where my information says that I'm a 2L or that I'm doing a "psyop" or that I'm under an "assumed identity". Please remove yourself from that facebook group, or find someone who isn't in that Facebook group with me, and then go and find my information to prove that it's "publicly available" Like I said before, my information is private.

329.    Evangeline said Fahad kept getting angry that she called him at 1:00 a.m.

        (1) But yet you still stayed on the call for 10 minutes laughing and trying to entrap me.

330.    Evangeline said when Fahad called again

        (1) Fahad only called once. This is more direct evidence of the lying and deceitful nature of Evangeline.

331.    She said Fahad was trying to get her to meet him somewhere. Evangeline said she understood him to mean to "fight or something" but felt Fahad was deliberately not being precise with his language.

>   (1) If you understood it to mean a fight, why did you understand it that way? Why did you call and continue to be on the phone if it was for a fight? It's because you were trying to entrap me into saying something threatening by provocation.

332.    Evangeline said she went to sleep, and woke up to messages of support from her classmates. She said the messages were asking if she was OK, and were expressing concern for what she was going through.

>   (1) What were you going through? Stalking and harassing me?

333.    She described the messages as "kind of threatening."

>   (1) Please be specific, what things was I saying which were "kind of threatening" and why? You still haven't specifically articulated a single comment.

334.    She said Fahad left his phone number in one of the messages, and asked her to call him. Evangeline said she then called to see what was going on. Evangeline said she wanted to see if Fahad would be more reasonable on the phone.

>   (1) Did the tone and manner of the communication, which was apparently so frightening, give you an indication that it would be appropriate to call at that particular time? Why did you call if you were so frightened, why did you call at 1:08 am. It sure doesn't sound like you were in shock on the phone, it sounds like you are purposefully provoking me on the phone to try to bait me into saying something threatening which you were illegally recording for the malicious purposes of felonious entrapment. It sounds like you are having fun on the tape, you are laughing and smirking. You laughed at least 3 different times, I'm the one who sounds frustrated and angry. You sound giddy. That doesn't sound like you are in shock. Again you lied about situation and misrepresented it. You called me in order to provoke me and record a threatening response. Stop lying. This account conflicts with the one given to Gloria, who reported the following:

335.    Gloria said that at 1:50 am, the student (Evangeline) sent Gloria an email to say she was becoming concerned because Fahad contacted Evangeline directly.

>   (1) You failed to inform Gloria that you had threateningly called Fahad at 1:08 AM, and that is why he was messaging you. You misrepresented the situation, making it seem as though I was initiating the conflict, when In reality you first stalked me, then harassed me on the group chat, then called me and illegally recorded my phone call in a malicious and dishonest attempt to get me kicked out of school and I never met you before in my life. You are disgusting, lying repeatedly to the school and students and spread negative and false rumors about me which the school STILL HAS NOT ADDRESSED.

336.    Evangeline said Fahad kept getting angry that she called him at 1:00 a.m. She said he took offense to that, and kept saying that because she called him at 1:00 a.m. she clearly wanted to fight him.

>   (1) This statement clearly indicates that Evangeline was aware that I was upset and under distress, and was still recording our conversation for malicious use during this time.

337.    she recalled saying were, "Is this Fahad?" when she first called, and later, when he asked her to meet him at Pearson and Chestnut to sort things out, she asked, "What do you mean?" She said that for the rest of the call Fahad was mostly yelling and going into "tirades" about the time at which she called him.

>   (1) This statement clearly indicates that Evangeline was aware that I was upset and under distress, and was still recording our conversation for malicious use during this time. If she was so terrified, why was she sitting here listening to me go on a tirade, voluntarily, for 15 minutes?

338.     Evangeline said that Fahad hung up on that call and began texting her. (Attachments, page 17) She explained that Fahad now had her phone number since she had called him.

(1) This statement clearly indicates that Evangeline was aware that I was upset and under distress, and had taken several clear distinct and malicious actions to cause me to be distressed and triggered my responses, which I made under genuine fear and alarm.

339.     Evangeline said that a few minutes later, Fahad called her back and continued to "threaten" her. She said he called again to let her know the time and place they would meet,

(1) This statement clearly indicates that Evangeline was aware that I was upset and under distress, and had taken several clear distinct and malicious actions to cause me to be distressed and triggered my responses, which I made under genuine fear and alarm. Additionally, I let her know what would happen if she tried to attack me and that I wasn't going to be intimidated, and that IF she wanted to try, that I would be ready at that precise location to defend myself from more of her malicious and deceitful attempts.

340.     Evangeline pointed to the texts she received from Fahad in which he referred to her as a child molester. She said that these comments are "playing off transgender stereotypes."

(1) These comments were directed at stalker stereotypes. Stalkers like Evangeline, who committed sexual misconduct and wasn't reprimanded because she is white.

341.     She said she did not know how Fahad had knowledge that she was transgender, as her name in the group isn't "super gendered."

(1) Now she is admitting that she knew I didn't know her gender identity, and that is what I said to. I didn't know her gender identity and my comments were therefore not be directed at it.

342.     she called him because she didn't know who "this person was and why they were doing any of this."

(1) Doing any of what? I don't even know you and never met you, you go around picking on people with disabilities, posting their information on a group chat and ridiculing them and their disability, then getting them banned from the group chat, then calling someone at 1:08 AM, recording their phone call illegally, then submitting it to the school to get them kicked out without even knowing them. She doesn't even have any rationale reason for calling me, besides entrapping me, which she proved with the illegal audio tape she made of our conversation.

343.     She said she wondered if he knew the neighborhood she lived in. She said she wondered if she would see him on the streets in Streeterville, or if they would have classes together.

(1) This is more evidence of the creepy stalking and premeditation done by this malicious and deceitful person. She's been sitting here, lying, plotting and scheming on me for no reason other than I don't want to be this malicious felon's punching bag.

344.     Evangeline said that after they spoke, she began checking her locks every 5 minutes and was scared to be alone in her apartment. She said she experienced sleep disruption the following night. She said for the rest of the weekend she couldn't focus on her work and on preparing for classes.

(1) This seems like a deeply over exaggerated and sensationalized response to stalking someone who doesn't know you and never met you, posting their information on a group chat and ridiculing them and their disability, then getting them banned from the group chat, then calling someone at 1:08 AM, recording their phone call illegally, then submitting it to the school to get them kicked out without even knowing them. It seems like I should be the one checking my doors, because you are the malicious stalker who did all of the

above. Her exaggerated tendency and hostile nature are supported by Shen Peng's comments.

345.    Evangeline said she disclosed the communication she received from Fahad to the president of law school organization OUTlaw.

(1) This is more evidence of encouraging negative speculation among the class and damaging my reputation and character in the law school. Now Gloria thinks I'm a transphobic person, when really, I just dislike stalkers like Evangeline, who do the things that she does and then hides behind their gender identity to get out of it.

346.    When asked if she was aware of a Facebook group for law students, Evangeline said she was not aware of such a group.

(1) The group is called "The Official Northwestern Pritzker Class of 2023 Admitted Students Page" is the only reason you were able to see my profile. That is because we are in the same group. You act like you are not aware of this group, but no one outside of that group can find my profile on Facebook. Therefore, because we share this private group, you were able to stalk me and find my information, and therefore my information is not "publicly available." This is direct evidence of the lying, malicious, and deceitful nature of Evangeline who at all times has been dishonest and untruthful during this process. Stating that she is not aware of this group is a ANOTHER direct and blatant lie.

347.    When asked how she accessed Fahad's Facebook profile information, Evangeline said that she searched for his name, clicked on his Facebook, and shared what was available.

(1) That is because we are in the same group. The group is called "The Official Northwestern Pritzker Class of 2023 Admitted Students Page" is the only reason you were able to see my profile. You act like you are not aware of this group, but no one outside of that group can find my profile on Facebook. Therefore, because we share this private group, you were able to stalk me and find my information, and therefore my information is not "publicly available."

348.    Evangeline said after posting Fahad's Facebook profile information, she wrote "assumed identity" and "psyop" to convey that "maybe someone is messing with us."

(1) What exactly do you mean by "messing" with you?

349.    Evangeline said after posting Fahad's Facebook profile information, she wrote "assumed identity" and "psyop" to convey that "maybe someone is messing with us." Evangeline said that she then posted the image of the frog to convey her own thoughts. She explained to investigators, "Those are my thoughts, my head is empty."

(1) This is yet more evidence of the lies and deceit by this malicious felon, that train of thought doesn't make sense. You said that this was information you believed the rest of the class should be aware of in your first interview. Why then did you post the caricature of the frog and reference you own thoughts? Why would you not say that those were you own thoughts? No, you're a lying ugly felon. You posted those demeaning and discriminatory posts about me, and posted the frog about me to imply that I am an animal with "No thoughts" and "Empty Head" in reference to my disabilities.

350.    When asked if she recorded the phone calls between her and Fahad, Evageline said that she did. She explained that she recorded them for her own purposes, as she felt as if she didn't know "what was going to happen." She said she was "scared" and "it felt like the right thing to do."

(1) Why would you call me if you are so scared? And why would you immediately record the call on your first time calling me if it was just to "see if I would be more reasonable"? You are laughing and smirking on the call, you sound like you are thoroughly enjoying yourself. Did you know that you committed two felonies?

351.     When presented with Fahad's observation that despite her stated fear, she remained on the phone calls with Fahad, Evangeline said that she did so because she was really in "shock."

    (1) You are laughing and smirking on BOTH calls, you sound like you are thoroughly enjoying yourself. So how then were you in shock both times? This is a flat out lie.

352.     She said during the first phone call she was more confused than scared.

    (1) I sent you my information and said if there is a problem give me a call. You called me, therefore there was evidently some issue you were calling me over. Yet, you don't sound confused on the first call. You called me up at 1 AM and knew my name, and were repeating it over and over again. I had no idea who you were on the calls, you never identified yourself. You sounded like a guttural creepy stalker.

353.     She said when Fahad started texting her and subsequently called her, "it was a lot scarier."

    (1) You are laughing and smirking on BOTH calls, you sound like you are thoroughly enjoying yourself. So how then were you in shock or scared both times? This is a flat out lie.

354.     When presented with Wren's statement that Evangeline had referred to Fahad's "he she it" comment in the group chat as "a pretty lame insult," Evangeline said that while she recalled telling Wren this, it was not accurate to what she was feeling at the time. She said she did not know Wren really well then, and so she was "playing it off."

    (1) So you lied about it, again? What do you actually believe or feel? This is more evidence of her lying and deceitful and unethical behavior.

355.     Evangeline said that a few minutes later, Fahad called her back and continued to "threaten" her.

    (1) How was I threatening when all I was doing was asking to meet outside? I wanted to play basketball like men.

356.     <u>Response to My Reported Interview and Statements:</u>

357.     Fahad called Evangeline back, to let her know "the time and place" and again texted his phone number.

    (1) That is not true. I called her to tell her to let ME know a time and place.

358.     On September 24, 2020, the investigators emailed Fahad and asked him to submit any additional relevant messages in his possession. Fahad responded that same day and indicated that he had "provided any and all documentation which was relevant to this case" in a prior email. None of the documentation Fahad provided included messages between Fahad and Evangeline.

    (1) I provided this information on two occasions, including today 11/13/20

359.     Fahad said that there was "silence" on the call, during which he heard breathing which he found to be disturbing. Fahad said this was especially disturbing since he had just experienced several instances of what he felt was harassment. He further stated that he experienced Evangeline's phone call as "threatening" due to the nature of the call and its timing.

    (1) It was threatening because she called me at 1:08 AM and knew my name, and was repeatedly asking if it was me. She never identified herself and was menacing and laughing on the phone in a evil way trying to provoke me.  A deep guttural voice that sounded like a malicious person right away.

360.     When presented with the information that it was 1:00 a.m. when Fahad asked Evangeline to call him, Fahad responded that if Evangeline chose to call him at 1:00 a.m., it speaks to her intent, not his. Fahad shared an example and said if his advisor provided her contact information, he would not call her at 1:00 a.m., regardless of when the information was emailed to him.

    (1) What also speaks to her intent is the FACT that she recorded the conversation. It doesn't make sense for you to voluntarily call someone and record their call unless you are doing it to entrap them. That, coupled with her knowledge of the

symptoms of my disability, and already knowing that she got me kicked out BOTH the group me and discord server, called me at 1:08AM IN ORDER to MALICIOUSLY entrap me and further try to harm me by getting evidence to get me kicked out of school.

361.    Fahad described the experience of reading Evangeline's posts as being like "a knife in [his] heart." He said it hurt.

(1) I want you to be specific here, it brought up devastating memories of my mothers slow debilitating death in pain from cancer last year, and when I had to withdraw from school for mental health reasons. That is why it hurt. Make sure you include ALL that.

362.    He said he knew Evangeline's conduct was stalking in accordance with the definition in the student handbook

(1) Pg. 133 of the University Handbook, very clearly stated, which the university is refusing to acknowledge or apply due to bias.

363.    Fahad said that when Evangeline posted a picture of a frog to reference his disability, he insinuated the frog was a picture of her mother because he was trying to respond to her "childish insult" by saying "that's not me that's you." Fahad said he interpreted the frog picture as an attempt to reference his disability because it was calling him an "airhead" which is he said is "like a mentally disabled person."

(1) I said referring my disability because the frog is dumb, like a perceived mentally disabled person AND "NO THOUGHTS EMPTY HEAD" as the caption is EXPLICILTY in reference to mental capacity of a mentally disabled person.

364.    He said he believed the group chat is a means by which some students exercise their privilege over other students. He said, "If they have a personal vendetta they get you kicked off the group chat."

(1) This is exactly what Evangeline did to me in this situation, along with Meegan.

365.    He indicated that an individual can only exist peacefully for so long. Fahad indicated that Evangeline knew he had a temper. He said he has been working on controlling his behavior, but then had someone who was provoking him with "malicious behavior."

(1) That is NOT what I said, I said that an individual can only exist peacefully for so long WHILE BEING REPEATDIDLY and MALICOUSLY HARRASSED.

366.    Fahad said he sent these messages after Evangeline had called him.

(1) I want you to articulate this clearly so that the sequence of events is clear. FIRST THEY STALKED ME, THEN THEY CALLED ME, THEN THEY ILLEGALLY AND FELONIOUSLY RECORDED ME TWICE, THEN I sent those messages.

367.    He said there were "uncalled for" statements that referenced his disabilities and his mother.

(1) Specially the ones about the frog and bring up my mothers death by bringing up last year and speculating as to why I withdrew.

368.    Fahad said he began getting messages on Facebook from people that were upset with him, and then he decided to text Evangeline to resolve their issues, and she called him at 1:08 a.m.

(1) I want you to specifically include Ishani Choksi and the evidence of harassment that I submitted, you are deliberately concealing it.

369.    referring to her ignorance, and what he perceived as racism. Fahad said he felt his removal from the group chat was initiated by "Caucasian females pelting me with their rules and regulations." Fahad said he was ultimately banned because "another Caucasian female" (Evangeline) wanted to harass him unprovoked and mischaracterize what he said. Fahad said that he characterized this as "white privilege" and noted that the owner of the group chat was also white. Fahad further stated that it was "another Caucasian female" involved in the situation "last year."

(1) Last year a white female accused me of some kind sexual assault which was never revealed to me and I was labeled as a sexual predator by the student body, as a result of the rumor spreading and an altercation on GroupMe. This is the exact same thing.

370. Fahad said that he thought Evangeline was "hiding behind her gender." He said that she took deliberate actions to provoke him, and then hid behind her gender identity to "get out of them." Fahad said that no one asked Evangeline to conduct surveillance on him, post on a group chat and ridicule him.

(1) Or to call me at 1 AM and record the phone call IN ORDER to MALICIOUSLY have me expelled from school.

371. Fahad said that he believes Evangeline is misrepresenting the situation, and shared an "altered" version of the chat messages to university officials.

(1) She produced an altered version of events, failing to indicate that she has stalked me or to provide her comments of the group chat. Failing to indicate that she had called me at 1:08 AM threateningly, purportedly to see if I would act more "reasonable" over the phone, but also recording it and failing to indicate that she recorded it to me or the school.

372. Fahad added that he did not anticipate that after Evangeline stalked him, he would get in trouble for calling her a stalker.

(1) Indeed, I did not anticipate that the school would allow her to submit an illegal audio tape and have me suspended over it either.

373. Fahad said that that as someone with disabilities that "you know" isn't able to control their impulses.

(1) That is not true. I said that as a person with disabilities, I have intermittent manifestations of psychosis during which I lose touch with reality and become angry and paranoid. During those intermittent manifestations, the impulses of anger, frustration, and impatience are difficult to control.

374. Fahad said he knew Evangeline was aware of his disabilities because she posted the picture of the frog.

(1) I said referring my disability because the frog is dumb, like a perceived mentally disabled person AND "NO THOUGHTS EMPTY HEAD" as the caption is EXPLICILTY in reference to mental capacity of a mentally disabled person.

375. Fahad said he thought his information on Facebook was private.

(1) The information on it is private, and is my own property for me to share with others as I please. It is not "public." Prove it then by finding my information from a person who is not in the same group as me. The group for incoming law class Evangeline and I share is private.

376. Fahad said that his understanding was that that as long as laws were not being broken, the information was to be kept confidential for "process concerns and stuff."

(1) Northwestern strictly prohibits retaliation against any member of its community for reporting or inquiring in good faith about what the member believes to be wrongful or unlawful activity, or for participating in an investigation or proceeding related to such activity. The University considers such reporting, inquiring, or participating to be protected activities in which all members of the Northwestern community may freely engage. (*Policy on Non-Retaliation*, Pg. 1)

377. Fahad said he had received explicit permission that he could share the report if it contained information that a crime had been committed against him.

(1) I called the Northwestern Office of Student Conduct after 12/5/20 and posed a hypothetical murder question, for which a university police officer called me back and told me I was able to share reports with evidence of laws being broken in it.

378.    Fahad responded that it was his understanding that as long as there weren't any laws being broken, the report was to remain confidential.

    (1) Northwestern strictly prohibits retaliation against any member of its community for reporting or inquiring in good faith about what the member believes to be wrongful or unlawful activity, or for participating in an investigation or proceeding related to such activity. The University considers such reporting, inquiring, or participating to be protected activities in which all members of the Northwestern community may freely engage. (*Policy on Non-Retaliation*, Pg. 1)

379.    Fahad said that the report in question contains evidence of a conspiracy to commit false imprisonment against him.

    (1) Muaaz Maksud was listed as witness on the police report and in the investigation admitted to not witnessing anything except me being choked. Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination. (*Policy on Non-Retaliation*, Pg. 2)

380.    Fahad said he filed multiple complaints which were not adequately addressed at any time.

    (1) Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination. (*Policy on Non-Retaliation*, Pg. 2)

381.    Fahad said he contacted NUPD so that he could share the report within the bounds permitted by law, such as, evidence of Usama's criminal activity.

    (1) Usama illegally disclosed my mental health history to Osama, and to the police after he called them and initiated my false imprisonment based on hate towards my perceived disability. Muaaz Maksud was listed as witness on the police report and in the investigation admitted to not witnessing anything except me being choked. Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination. (*Policy on Non-Retaliation*, Pg. 2)

382.    Fahad said he submitted multiple complaints through any channel he could find in the university to address his concerns. He said he wasn't aware of a detailed list. He said he tried to file multiple reports because "no one was listening."

    (1) Usama illegally disclosed my mental health history to Osama, and to the police after he called them and initiated my false imprisonment based on hate towards my perceived disability. Muaaz Maksud was listed as witness on the police report and in the investigation admitted to not witnessing anything except me being choked.  Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination. (*Policy on Non-Retaliation*, Pg. 2)

383.    Fahad said Usama participated in the conspiracy to commit false imprisonment against him. He said that further, Usama tried to have Fahad suspended less than a week after Fahad attended his (Fahad's) mother's funeral.

    (1) He did these things because he has a prior motive related to my trying to invite people to the MLSA conference and getting into an argument with him about it. I have attached evidence of both his attending her funeral and our earlier argument as evident of his motive.

384.    Fahad said he expressed his intention to pursue legal action against the perpetrator of the crimes committed against him with Lucas in August, 2020.

(1) **This was specially discussed by Lucas and I during my re-instatement meeting on July 9th, 2020.**

385. Fahad said his intent was to notify Usama that he planned to notify the bar association of his role in the false imprisonment of Fahad from November 4-8, 2019, and of his conspiracy to commit civil and criminal activities that range all the way up to felonies.

(1) **Usama illegally disclosed my mental health history to Osama, and to the police after he called them and initiated my false imprisonment based on hate towards my perceived disability. Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination. (*Policy on Non-Retaliation*, Pg. 2)**

386. Fahad said he sent the messages to Usama after his graduation

(1) **Please be specific and say that they were sent after his graduation, in Mid-June. This was well after the graduation date, and he is not currently a student, nor was he at that time.**

387. Fahad said that, "According to the student handbook, p. 137, the Code of Conduct is from the time of the student's application of admission to the rewarding of the degree. He had graduated so therefore he is not within scope of Student Conduct."

(1) **Please don't say "Fahad said…" this, this is DIRECTLY from the handbook, its just something you are CHOOSING not to follow especially because you are bias against me.**

388. "That was a neat little story you and your boyfriend made up Usama" (Attachments, page 59) Fahad said he was referring to the "the story they made up"

(1) **The story they made up included changing the location of his injury from mouth to eye, then altering the description of it with matching facts which conflicted with the police report. Additionally, they made up some woman who they alleged that I was "Harassing" but never resolved whether I was sitting or standing when Osama approached me for the fourth time, additionally despite all 3 Osama, Usama, and Muaaz being event organizers, none of them identified the woman, nor was she in police reports nor noted at any time to administration. Student conduct never bothered to identify or interview the woman they made up in order to justify Osama's brutal physical assault on me on school property.**

389. regarding the severity of the injuries to Osama's eye.6 Fahad noted that the severity was not documented and was not photographed.

(1) **The police report and original suspension notice said "Mouth" then the later interviews said eye. There was no documentation of visible injury in the police report, as per standard police procedure, nor any photographic evidence. Nor was there evidence that EMS was called for Osama, which would also be standard procedure for an injury of the severity they described.**

390. The investigators asked Fahad if he recalled meeting with Assistant Dean Lucas Christain on July 9, 2020, to discuss his return to campus and disciplinary probation, and asked what Fahad's insight and takeaways were from that meeting, as it related to expectations moving forward.

(1) **During this meeting I specially said I was going to pursue legal action, as well as alluding to it in my re-instatement essay.**

391. Fahad said that on his first attempt to meet with students in real life, he was repeatedly engaged by Meegan (Mayer) even after he told her not to engage with him.

(1) **She also harassed me in the "Meet the NU kids IRL" group chat repeatedly, before driving me out and then continuing to harass me here. She made at least 8 different comments at me, most of which were inappropriate and disrespectful. Although the chat transcripts don't show her comments, if you got a full transcript they would, especially in the IRL group chat. I want her conduct**

described in detail, including the multiple messages she sent me. And her pervasive and aggressive attitude and persistence after I calmly asked her to stop at least twice. She was a bully and you are hiding it. I asked her and Adrienne to stop approximately 10 separate and distinct times.

392. Fahad said another student, Adrienne, was basically doing the same thing as Meegan.

(1) She harassed me the worst out of everyone, including in both chats. She aggressively Direct Messaged me which I provided evidence of and I want included in the report as harassment. The other students who I mentioned were also witness to this. I want her conduct described in detail, including the multiple direct and threatening messages she sent me. And her pervasive and aggressive attitude and persistence after I calmly asked her to stop at least 10 times. She was a bully and you are hiding it. I asked her and Meegan to stop approximately 10 separate and distinct times. Meegan stopped after the first 7 times I asked her to stop insulting and engaging me. I asked her to stop 10 SEPARATE TIMES and she made 23 separate and distinct comments, directly disregarding my request, towards me and about me which were disrespectful and demeaning. In the group chat she said "Funny thing is that if he'd kept his mouth shut I would have suggested a spontaneous Zoom drinking session & invited him" as if she were the owner of the group and was entitled to make decisions for me and everyone else. That is DIRECT EVIDENCE of her bullying and harassment and misconduct.

393. Regarding his comments to Evangeline, Fahad stated that "...all except one of them were referring to Evangeline's membership in the "stalker" class, not her gender identity."

(1) You are misrepresenting what I'm saying. NONE of the comments were directed at her gender, ALL were directed at NOT KNOWING how to address her. That is why my line of questioning was "I don't know what to call you, stalker, disgusting, etc."

394. Fahad stated that he believed this incident occurred because he "exercised a poor choice of words in being involved in a verbal disagreement with another student, wherein [he] used words to describe their behavior which [he] should have been more careful of because of that students expression of gender identity.

(1) I now know that this incident occurred because my ONE comment is being taken unfairly out of context from the rest of my comments.

395. Fahad further described the experience of reading Evangeline's posts. He stated that it brought up devastating memories from last year of his mother's "slow and debilitating death" from cancer, and when he had to "withdraw from school for mental health reasons." Fahad described having experienced a negative impact as a result of being banned from the Discord chat, being banned from the GroupMe chat, being suspended, and enduring negative speculation among his class regarding his "mental health and general fitness and character." Fahad referenced experiencing isolation as a result of his suspension and being prevented from contacting other students. He noted that he is also unable to "pursue coursework" which he has been trying to pursue for the past three years.

(1) I have described A LOT MORE negative impacts than this. PLEASE stop playing with me, include the information about Mona and Chin and Lee. The police reports and the COPA reports, I want it all described as impact.

396. Fahad added the he believes "a lot of these things" are being taken out of context and are being mis-characterized.

(1) The one "He she it" comment is being taken out of context of the rest of my comments and being used to mischaracterize my comments as transphobic.

397. He said it hurt. He said he knew Evangeline's conduct was stalking in accordance with the definition in the student handbook.

(1) Please indicate that it is on page 133 of the student handbook.

398.　Fahad said that all of the comments he made to Evangeline, apart from "he-she-it" comment, were directed at her stalking behavior.

(1) Please don't misrepresent what I said. You are misrepresenting what I'm saying. NONE of the comments were directed at her gender, ALL were directed at NOT KNOWING how to address her. That is why my line of questioning was "I don't know what to call you, stalker, disgusting, etc."

399.　Fahad said he interpreted the frog picture as an attempt to reference his disability because it was calling him an "airhead" which is he said is "like a mentally disabled person."

(1) Stop misrepresenting what I said. On 8/21/20 I was cyberstalked by Evangeline Gargula, a fellow 1L student at Northwestern University Law School. She conducted surveillance of me on google and Facebook and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as my work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook. She posted my private Facebook information on the chat, which included my work history. She stated that my Facebook said that I was a "2L". She stated that my profile picture was a profile picture from 2018, which is impossible for her to know unless she was stalking me. She inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities. She posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems. She posted a frog, directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities. She posted a frog with the caption "NO THOUGHTS EMPTY HEAD" in direct reference to my mental health and a stereotype about people with mental health problems and disabilities. She encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems. By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my work and education history was something that I could not possibly have because of my mental health status and cognitive capacity. On 8/22/20 She then posted this information on a first year law Group Me chat entitled "NU Kids on the Block '23" in order to harass and ridicule me. She sent me harassing and unwanted direct messages on the group chat and via text.

400.　<u>Response to Wren Chernoff Interview and Statements::</u>

401.　Wren said that she specifically became aware of the comments from student Fahad Syed attempting to encourage people to go out and arrange some sort of bar night.

(1) That is the same thing as others were doing. I was attempting to meet up in accordance with safe social distancing policy like everyone else. This is supported by Shen Peng. I wasn't trying to arrainge a bar night, where did she get that information from? I wanted to meet up with a few people for drinks because I didn't meet anyone because I was deliberately and maliciously excluded from the orientation schedule by NU.

402. Wren said that people responded about Wildcat Wellness, and commented that any meet ups should be conducted in a safe and socially distanced way.

    (1) No, that is not what happened. I wanted to meet up in accordance with policy, and other people were discouraging it. Period.

403. Wren said Fahad became very angry at those suggestions,

    (1) I wanted to meet up in accordance with policy, and other people were discouraging it. Period. They were treating me differently than everyone else who had met up. I was angry at being treated differently than others, like Shen Peng said.

404. Wren said Evangeline also questioned why Fahad was in the 1L chat if his Facebook profile indicated he was a 2L,

    (1) My Facebook indicates class of 2023. What proof do you have, or any indication that I was a 2L beyond that

405. but that crossed into blatant transphobia." She said this caused her concern.

    (1) This conflicts, because later :

        i. Wren said she immediately reached out to Evangeline, and Evangeline said it was a pretty lame attempt at an insult.

406. When asked about the impact of these interactions, Wren said "my feeling is kind of similar to Evangeline's on the surface, kind of a weak insult."

    (1) Then Later she goes on:

        i. "It's definitely increased my concern about the community as a whole as looking through various groups in the law school, wanting to have assurance about their trans-friendliness.

    (2) How is it "blatant"? Please describe what made it so blatant. The same sensitivity should have been given to me for my disability and mothers death, but wasn't. Those were EXTREMELY BLATANT to me. "Assumed Identity" and "Psyop" and posting a picture of a frog with the caption "NO THOUGHTS HEAD EMPTY" were all blatant attacks on my disability and perpetuating negative stereotypes about people with disabilities. How did this increase your concern for the community as a whole so much since that thought it was such a weak insult. That doesn't make sense.

407. Wren said she later learned Fahad had direct messaged Evangeline and others involved in the incident. Wren said she knows Fahad messaged Hayden directly, but knows Hayden mentioned that he messaged Fahad because he was concerned.

    (1) This is evidence of negative speculation and hatred Evangeline incited towards me

408. Wren said however, that she is "more concerned with the insult tied to Fahad's behavior as a whole."

    (1) Please be specific about how the "insult tied to my behavior as a whole" please. Please provide as much detail as possible for this. You never specifically articulated how that insult "tied to Fahad's behavior as a whole."

409. Wren said she was less concerned with Fahad's blatant transphobic remark but noted that, at least in her limited interactions with him, "...he's prone to challenging people to physical confrontations."

    (1) Evidently, the other trans person was able to accurately gauge my temperament. This is more evidence that a reasonable person in Evangeline's situation would KNOW about the outward signs of my disability. This is evidence that Evangeline planned the call at night in order to entrap me by preying on the outward symptoms of my disability like the predator she is, and that she planned to try to get me kicked out of school using deceitful means.

410. concerned with someone who is hotheaded and would not back down on a fight if I called him out

(1) Evidently, the other trans person was able to accurately gauge my temperament. This is more evidence that a reasonable person in Evangeline's situation would KNOW about the outward signs of my disability. This is evidence that Evangeline planned the call at night in order to entrap me by preying on the outward symptoms of my disability like the predator she is, and that she planned to try to get me kicked out of school using deceitful means.

411. <u>Response to Gloria Cange Comments:</u>

412. At the time of the interview, Gloria serves as the co-president of OUTlaw, a Pritzker student organization.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension.

413. Gloria said that at 1:50 am, the student (Evangeline) sent Gloria an email to say she was becoming concerned because Fahad contacted Evangeline directly.

(1) This is more evidence of the lies and deceit of Evangeline, because she did not say that SHE was the one who had CALLED ME AT 1:08 AM threateningly prior to me contacting her "directly."

414. Gloria said she emailed Evangeline at this time to let her know OUTlaw wanted to support her in the way Evangeline felt best.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension. This is also evidence of the disparate discriminatory treatment from similarly situation white females who are not disabled which I was subjected to, being harassed and intimidated by students and police, and having my police reports suppressed.

415. Gloria said she forwarded the messages to Shannon Bartlett, Associate Dean of Inclusion & Engagement at 8:10 am and her OUTlaw Co-President.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension.

416. Gloria said that approximately a half hour later she forwarded screenshots people were sending her to Shannon.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension.

417. Gloria said she then spoke with Shannon by phone, where she asked what actions the school was taking. Gloria said that Shannon replied she was in conversation with Associate Dean and Dean of Students Susie Spies-Roth and others.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension.

418. Gloria said that Shannon advised her that Gloria and others could submit a complaint regarding what happened if she or others felt it appropriate.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension.

419. Gloria said she is currently working on an action plan so this doesn't happen again.

(1) This is evidence of the unfair pressure that student groups and leaders put on my proceeding and disciplinary action, resulting in my unfair suspension. This is also evidence of the disparate discriminatory treatment from similarly situation white females who are not disabled which I was subjected to, being harassed and intimidated by students and police, and having my police reports suppressed.

420. they were all talking about it as it happened.

(1) This is evidence of negative speculation and hatred Evangeline incited towards me.

421. <u>Response to ANDREW LANG-REYES Interview and Statements:</u>

422. He explained to the investigators that he wanted to learn more about Fahad's story and what he had been through up until that point, to have a "full picture" of who Fahad was.

(1) Evidently you failed to provide that picture to investigators. How about explaining how Fahad said that he was feeling and explaining what the conversation between you two was about and what it consisted of?

423.     Andrew stated that he found Fahad's remarks to be "transphobic," and "personal."

(1) What specific comment or comments are you referring to? The one comment that was taken out of context?

424.     Andrew said that because Fahad's statements were geared directly at a person's attributes, he found the remarks to be "off putting,"

(1) What comment are you talking about and how were they "geared towards a person's attributes"? Can you explain?

425.     Andrew said he found the comments to demonstrate "extreme aggression," and said it was as if the comments were designed to "bring down that person."

(1) How were they "aggressive" when they were made in response to someone who stalked and attacked me on the basis of my disability? What was your opinion about the comments that Evangeline made towards me?

426.     Reflecting on the messages directed at Fahad, Andrew stated that he did not think "an ordinary person would have found the messages insulting."

(1) You don't think someone going around picking on people with disabilities, posting their information on a group chat and ridiculing them and their disability, then getting them banned from the group chat, then calling someone at 1:08 AM, recording their phone call illegally, then submitting it to the school to get them kicked out without even knowing them. She doesn't even have any rationale reason for calling me, besides entrapping me, which she proved with the illegal audio tape she made of our conversation. On 8/21/20 I was cyberstalked by Evangeline Gargula, a fellow 1L student at Northwestern University Law School. She conducted surveillance of me on google and Facebook and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as my work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook. She posted my private Facebook information on the chat, which included my work history. She stated that my Facebook said that I was a "2L". She stated that my profile picture was a profile picture from 2018, which is impossible for her to know unless she was stalking me. She inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities. She posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems. She posted a frog, directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities. She posted a frog with the caption "NO THOUGHTS EMPTY HEAD" in direct reference to my mental health and a stereotype about people with mental health problems and disabilities. She encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems. By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my

work and education history was something that I could not possibly have because of my mental health status and cognitive capacity. On 8/22/20 She then posted this information on a first year law Group Me chat entitled "NU Kids on the Block '23" in order to harass and ridicule me. She sent me harassing and unwanted direct messages on the group chat and via text.

(2) Do you think a normal person would have found any of the above "insulting"?

427.    He said considering what led up to the moment, Fahad's response (messages that were very targeted and directed at the character of the person) wasn't required.

(1) You are being very vague and broad with this mischaracterization, please explain how my comments were directed at the "character" of the person, who is malicious, felonious, and prone to sexual misconduct stalking while also being directed at the physical gender identity. They are either one or the other, not both.

428.    Andrew said he thought Fahad's actions were "completely unjustified."

(1) How were my comments completely unjustified when you yourself acknowledge that Evangeline made comments directed at me which were insulting to me. When you yourself acknowledge that I made the comments IN RESPONSE to Evangeline's stalking, disability discrimination, and harassment. Completely unjustified is what Evangeline did to me, given that I didn't do anything to her.

429.    <u>Response to Shen Peng's Interview and Statements:</u>

430.    Shen said she first heard of Fahad at a friend's birthday party, prior to the beginning of the fall 2020 semester. Shen said there were rumors shared concerning the first time Fahad was in law school two years ago. She indicated that it was rumored that due to inappropriate physical conduct,

(1) I would like for you to elaborate on this evidence of the hostile environment which I was facing as a result of rumors and discrimination related to my disability. Why was the university not stepping in to stem these rumors? How many people know about these rumors? Who is spreading them? What kind of physical conduct? Sexual?

431.    She described how Fahad asked if anyone was up for a drink and Meegan told him that meeting up was "against policy." Shen remarked that this wasn't true, because several students were getting together in person.

(1) This is evidence that Gargula and Chernoff are lying. They said I was trying to arrange a bar night and start a fight. They claimed I wasn't trying to practice social distancing which I was.

432.    Shen said this made her uncomfortable, and she felt there was a "double standard" imposed concerning Fahad. She noted that Fahad had joined the group chat later and wanted to meet people. She said she did not think he was fairly treated.

(1) That is what I have been saying this entire time, thank you Shen for being honest and brave.

433.    Shen stated that a member of the group who "spoke" up, Evangeline, wanted to "mix words." Shen described her as a "character." Shen said that earlier in the group chat, Evangeline was in an "oral fight" with another girl from section 1.

(1) This is evidence that Evangeline likes to provoke and fight people for no reason. It shows her malicious and deceptive character. She has done this before, the only difference is that time it was with another white girl, so no one paid any attention.

434.    She said she [Evangeline] "exaggerates stuff sometimes."

(1) This is direct evidence of Evangeline's deceitful and dishonest and unethical nature. Its called lying, and Evangeline does it all the time, take this entire situation for example. She's an active felon who recorded me in order to get me kicked out of school through malicious entrapment. This was after she stalked

me, made fun of my disabilities, incited rampant negative rumors about me, got me kicked out of BOTH group me and discord, and got me suspended, and now is trying to get me expelled through lies and deceit. This is all over one alleged comment clearly taken out of context of the rest of the statements it was in, lying about it being made towards her gender identity.

435. Shen stated that Hayden had not said anything like that to the thirty of them who had gotten together prior to that interaction. She said Fahad "was pretty pissed" about that, and noted that Fahad had been removed from both group chats.

(1) Neither did Evangeline or Meegan or Adrienne, yet they were all three jumping down my throat when I asked to go out.

436. Shen said she did not contribute any statements to the group chat because she worried that if she spoke up for Fahad she would be "attacked." She referenced a student who spoke up for Fahad after he was removed from the group, and suggested that Fahad be "given a second chance." Shen indicated that the suggestion was not met with a favorable response.

(1) THIS IS EVIDENCE OF THE BULLYING THAT I FACED. THIS PISSED ME OFF. WHY IS THE UNIVESRITY IGNORING MY PAIN AND SUFFERING????????????????????????????????????????????? WHY AREN'T YOU ADDRESSING THIS HOSTILE ENVIROMENT?

437. <u>Outstanding Questions and Concerns from 2020 UHAS Hearings</u>

438. <u>GroupMe Chat Transcripts:</u>

(1) I do not think that you have the entire chat transcript in the report, specially you are missing the numerous comments which were directed at me by other members of the group chat, which evidence the harassment I was subject to. You are also missing all of "Meet the NU Kids '23 (IRL)" which contains the specific acts of aggression made by Meegan Mayer and Adrienne Ou. Do you have the entire chat transcripts? How do you know? I wanted to point out that they were presented to me in this order, and deliberately manipulated to be out of sequence.

(2) Please note the my first interaction occurred in "Meet the NU Kids (IRL)" but that group chat is presented out of order and shuffled in among the "Nu Kids on the Block '23" . In that interaction both Meegan Mayer and Adrieenne Ou repeatedly made comments at me which drove me out of the group chat and into the regular group chat. In the transcripts provided, something like 10 comments which Meegan Mayer made at me in both group chats are deliberately left out.

439. <u>Witness Discrepancy:</u>

(1) You interviewed Wren Chernoff on the basis that she was witness to the group chat comments. I three names who you should contact regarding the disability related comments and stalking. I noticed that each of the witnesses is attesting to their opinion of the "gender" related comments which were made, whereas the disability related comments were not addressed by each of the witnesses to them. I would like for each witness to address the disability related comments from my perspective in the same was that they addressed my gender related comments towards Evangine from the perspective of a "transexual" student. This is because the comments made towards my disability stem from the same core set of facts as the alleged comments made towards Evangelines gender identity.

(2) You interviewed Gloria Cange on the basis that she had communication with Evageline during and after the incident. I indicated numerous negative impacts from the police, can you first state the basis for interviewing this person, and then difference of basis for the interviews please? Why is what she is saying relevant when she didn't actually witness the comments in question or the phone calls. She just said Evangeline sent her messages saying she feloniously recorded

me, I want her interview excluded because it's not relevant and she has not witnessed any statements or calls which are in question.

440. **1L: Andrew Lang-Reyes – Hostile Environment and Harassment in Group Chat**

441. **1L: Matt Choi - Hostile Environment and Harassment in Group Chat**

442. **1L: Shen Peng - Hostile Environment and Harassment in Group Chat**

(1) These individuals are important to witness the harassment from other students which I was receiving at the hands of other students in the groups chat, along with the fact that they each messaged me and were concerned that other students were harassing me, and can witness the hostile environment I was facing.

(2) They are witnesses to the fact that what Evangeline did was stalking.

(3) They are witnesses to the fact that my stalking attack was unprovoked, and that I was a victim of stalking, and witness the statements that were made about me which I considered staking and which I made in response to the stalking.

(4) They are witness to the comments being directed at me from Evangeline in the group chat were considered as directed towards a disability, as that is a matter of judgement.

(5) Each of the students was witness to the stalking incident, and how the harassment impacted me.

(6) They are witness to the fact that my conduct in the group chat indicated that I was feeling attacked.

(7) They are witness to whether my conduct and comments in the group chat would provide reasonable notice to someone that I was suffering from mental distress.

(8) They are witness to whether my conduct and comments in the group chat would provide reasonable notice to someone about the outward symptoms of a mental disability.

(9) They are witness to what Meegan, Adrienne, and Hayden did was harassment.

(10)   Without interviewing these witnesses for their opinions about the disability discrimination, you are not accounting for the hostile environment and buildup in the chat room which led to my response. The disability discrimination in the buildup was part of what aggravated me, and the stalking incident was what caused me severe emotional distress because of bring up painful memories of my mothers death last year. I would these people interviewed, otherwise I will include it in my federal complaint for unfair process and deprivation of due process and breach of contract.

443. <u>Illegal Audio Tape and Illegal Use of Evidence</u>: I would like to address the illegal audio tape that the university is in possession of, which was:

(1) Not reported as a crime to pursuant to Eavesdropping State Statute Below:

(720 ILCS 5/14-2) (from Ch. 38, par. 14-2)
Sec. 14-2. Elements of the offense; affirmative defense.
(a) A person commits eavesdropping when he or she knowingly and intentionally:
(1) Uses an eavesdropping device, in a surreptitious manner, for the purpose of overhearing, transmitting, or recording all or any part of any private conversation to which he or she is not a party unless he or she does so with the consent of all of the parties to the private conversation;
(2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so

with the consent of all other parties to the private conversation;

446.

   (3) Intercepts, records, or transcribes, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all

447.  parties to the private electronic communication;

   (4) Manufactures, assembles, distributes, or possesses any electronic, mechanical, eavesdropping, or other device knowing that or having reason to know that the design of the device renders it primarily useful for the purpose of the surreptitious overhearing, transmitting, or recording of private conversations or the interception, or transcription of private electronic communications and the intended or actual use of the device is contrary to the provisions of this Article; or

449.

   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

450.

**(1)** Illegally used by Mona Dugo factor influencing her decision to suspend me on 8/23/20.

**(2)** Illegally used as retaliation by Mona Dugo, as indicated in the supporting letter from my therapist, Brian Tobin, for my DOE complaint.

**(3)** Not counted as "negative impact" on me resulting from Evangeline's actions.

**(4)** Unlawfully prevented from report (JD395768) being investigated through the illegal conduct of Deputy Chief Eric Chin, illegally disclosing my mental health history to the detective, and falsely reporting that I    gave my consent to have the audio recorded.

451.   <u>Mischaracterizing Allegations</u>: I would like to address the numerous allegations which were included in the report which were mischaracterizing to me, such as having an "impact" section for Evangeline and not for me, failing to include all of the negative impact on me caused by Evangeline's conduct inducing but not limited to:

**(1)** Getting me banned from Discord Chat

**(2)** Getting me banned from GroupMe chat

**(3)** Getting me suspended.

**(4)** Causing RAMPANT negative speculation among the class about my mental health and general fitness and character.

**(5)** Causing Tessa Wiel To harass me on Dischord.

**(6)** Causing Ishani Choksi to harass me on Facebook.

**(7)** Causing Mona Dugo to harass me by illegally contacting my therapist and showing him the illegal audio tape that Evangeline produced of the of time when she threatened me at 1:00AM with a phone call.

**(8)** Causing NUPD Detective Lee to RELENTLESSLY harassment with no more than FIVE DIFFERENT intimidating and threatening phone calls to date.

**(9)** Causing Eric Chin to illegally suppress and prevent my lawful police report by illegally contacting Chicago Police and ILLEGALLY disclosing my mental health information to the detective in order to illegally have my lawful report (JD395768) cancelled WITHOUT INVESTIGATION.

**(10)**    Causing, indirectly, Northwestern Police to contact my sister, Sophia Syed.

452. <u>Conflict of Interest</u>: Heather Cohen not only discriminated against me due to my disability, but also my religion, and that has not been address and she is still a hearing officer on my case.

453. <u>Religious Intolerance, Insensitivity, and Harassment</u>: I would like to request an advisor and resources from the university for Islam, the people on this panel are not sensitive to my religious concerns and are bias against me for my religious beliefs.

454. <u>Unfair outside Pressure from student groups:</u> I would like to address why in the report, no attention or weight is placed on the numerous actions from the head of the student group who exerted unfair pressure on the administration in order to force me into getting punished by exerting unfair and bias pressure. Specifically Gloria Cange of the Outlaw group.

455. <u>Unaddressed Questions and Comments:</u>

(1) What am I accused of threatening to retaliate against Osama for?

(2) The charge states that I threatened to retaliated against him for his role in reporting, and then it just lists text messages where I notified him that I am going to notify the bar association of his misconduct as well as pursue legal action against him for his role in falsely imprisoning me from 11/1/19 – 11/8/19 at Northwestern Memorial Hospital, committing conspiracy to commit false imprisonment, and a host of other civil and criminal offenses which range in severity up to felonies.

(3) Why wasn't the June charge brought up at the reinstatement meeting or prior or after until this incident?

(4) Why did you intentionally added it once I was in trouble to increase my difficulties in resolving the process?

(5) Why are you selectively enforcing official university policies based on your bias in favor of female over male concerns?

(6) Why are you selectively enforcing official university sexual misconduct policies based on your bias in favor of female over male concerns?

(7) Why are you refusing to enforce the university sexual misconduct policy on stalking against Evangeline?

(8) The handbook say's Equity handles all matters of sexual misconduct and stalking is considered sexual misconduct.

(9) Why are you selectively enforcing disorderly conduct based on your bias in favor of female over male concerns?

(10) Why was I the only one charged with disorderly conduct?

(11) Why was I charged with disorderly conduct when I had already been banned, and therefore could not impede Evangeline's access to anything.

(12) Why was Evangeline not charged when her actions impeded my access to University resources and resulted in my ban from group chat and discord, as well as suspension from classes?

(13) Why was my behavior considered threatening while Evangeline's was not, when you classified our interaction as "mutual contact."

(14) Why are you ignoring that Evangeline did not tell you about the 1:08 AM Phone call on 8/23/20.

(15) Why are you ignoring the fact that Evangeline showed you altered information in the form of screen shots which presented a misleading picture of the situation without showing you or informing you of any of the posts she made about me in the first-year Law GroupMe chat titled "NU Kids on the Block '23," when she showed you screen shots?

(16) Why are you showing preference to the informal concerns of females who are mostly white over my formal complaints, a male student of color?

(17) You initiated an investigation on your own on her behalf based on her informal concerns.

(18)    **Apparently she originally had not filed a formal complaint.**
(19)    **What is the date of her formal complaint?**
(20)    **What is the date of my formal complaint?**
(21)    **You blatantly refused to investigate even one of the over 10 different incidents which I reported to you.**

456.    **Situation #2 – Usama Ibrahim**

457.    **Allegations:**
(1) On or around June 18, 2020, I sent messages to Usama Ibrahim, a reporting party associated with the November 1, 2019 incident, threatening to retaliate against him for his role in reporting [what?]:
(2) PLEASE NOTE: At this time, the University has not yet specifically articulated what the allegations are for this charge:
(3) They have not clearly indicated <u>what</u> specifically I am threatening to retaliate against Usama for.
(4) They have not clearly indicated <u>any</u> action or intended action on my part which is <u>prohibited</u> by law or University policy. [Cite Equity Disability Complaints].

458.    **Charges:**
*(1) Misconduct within the Student Conduct Process (d) 2019-2020 Student Handbook, p.37: Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Any action that attempts to retaliate against, intimidate, threaten, coerce, discriminate against, or improperly influence any student for reporting alleged violations of policy or concern for the health or safety of a Northwestern community member, assisting another in making such a report, or participating in an investigation or resolution of such matters.*
*(2) Misconduct within the Student Conduct Process (f) 2019-2020 Student Handbook, p.38: Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Failure to comply with the sanctions or outcomes imposed for violations of this code or other University policies.*

459.    **Circumstances**
(1) Usama participated in a felony conspiracy against my civil rights to maliciously involuntarily commit me to Northwestern Memorial Hospital on 11/1/19. [Cite Equity Complaint]
(2) Personal Business - Betrayal by lying and instituting a malicious student conduct process to have me suspended my <u>less than one week after having attended my mothers funeral</u> and being <u>fully aware</u> of my family circumstances and lack of support.
(3) Already Graduated by the time when they received messages in question.
(4) I expressed my intention to pursue legal action against the perpetrators of the crimes committed against me in my forensic threat analysis with Midwest Behavioral Management in April 2020 and this was also documented as accepted behavior in the report of the findings they issued [available on request].
(5) I expressed my intention to pursue legal action against the perpetrators of the crimes committed against me in my re-instatement essay on July 7th, 2020 [available on request].
(6) I expressed my intention to pursue legal action against the perpetrators of the crimes committed against me in my re-instatement meeting with Lucas Christian on July, 7th 2020.

460.    **Official University Policy and Definitions**
(1) <u>Disorderly Conduct (b)</u>

*2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

(2) *Misrepresentation*

*2019-2020 Student Handbook, p.38: Acts of fraud, misrepresentation, or dishonesty, including the following:*

    i. *Forgery, alteration, or misuse of University documents, records, or identification or other materials;*

    ii. *Knowingly furnishing false, forged, or inappropriately altered information to the University, any University official, or emergency response personnel;*

    iii. *Intentionally initiating or causing to be initiated any false report, warning, or threat of emergency or crisis;*

(3) <u>**Endangering Self or Others**</u>

*2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

(4) <u>**Destruction of Property**</u>

*2019-2020 Student Handbook, p.28: Destroying, damaging, defacing, or vandalizing property.*

(5) <u>**Discrimination and Harassment**</u>

*2019-2020 Student Handbook, p.28: Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, services, or in the educational programs or activities it operates.*

(6) <u>**Scope of the Code of Conduct**</u>

*2019-2020 Student Handbook, p.37: The Student Code of Conduct applies to the following situations. The University reserves the right to investigate and resolve reports of alleged misconduct in all of these situations:*

    i. *Involving students, a group of students, or a student organization affiliated with any school or department or the University as a whole (undergraduate or graduate).*

    ii. *Occurring from the time of a student's application for admission through the actual awarding of a degree.*

(7) <u>**In good faith**</u>

*2019-2020 POLICY ON NON-RETALIATION, p.1: done with honest belief that wrongful or unlawful activity may have occurred.*

(8) <u>**Materially adverse**</u>

*2019-2020 POLICY ON NON-RETALIATION, p.1: sufficiently harmful to deter a reasonable person from engaging in protected activities.*

(9) <u>**Protected activities**</u>

*2019-2020 POLICY ON NON-RETALIATION, p.1: include (i) reporting (whether internally or externally) or inquiring, in good faith, about suspected wrongful or unlawful activity; (ii) assisting others in making such a report; or (iii) participating in an investigation or proceeding related to suspected wrongful or unlawful activity.*

(10) <u>**Retaliation**</u>

*2019-2020 POLICY ON NON-RETALIATION, p.1: an action, performed directly or through others, that is aimed to deter a reasonable person from engaging in a protected activity or is done in retribution for engaging in a protected activity. Retaliation can take many forms, as described in Section II below. Action in*

*response to a protected activity is not retaliatory unless (i) it has a materially adverse effect on the working, academic, or other University-related environment of an individual; and (ii) it would not have occurred in the absence of the protected activity.*

**(11)** <u>**Wrongful or unlawful activity**</u>

*2019-2020 POLICY ON NON-RETALIATION, p2: activity of a community member that violates the law, Northwestern policy, or professional standards of conduct, including the laws, policies, and standards referenced in Section I below.*

461. <u>**Timeline of Events**</u>

**(1) On or around 6/18/20, after I had reasonable information leading me to believe that Usama Ibrahim had graduated and left the University, I texted Usama to notify him of the following:**

**1.) That his friend Osama had kicked me several times prior to me ever touching him during the incident from 2019.**

**2.) I knew that he, Osama, and Muaaz M. had concocted the story about the details of the injury to his [Osama's] eye and about the "mystery woman" who was central to their argument yet remained ultimately unidentified.**

**3.) To inform him that I plan to notify the bar association of his misconduct as well as pursue legal action against him for his role in falsely imprisoning me from 11/1/19 – 11/8/19 at Northwestern Memorial Hospital, committing conspiracy to commit false imprisonment, and a host of other civil and criminal offenses which range in severity up to felonies, in accordance with all applicable state and federal law.**

**(2) After those messages, I never contacted him again.**

462. <u>**Official University Policy, Definitions, and Corresponding Violations Committed by**</u> <u>**Usama**</u>

**(1)** <u>**Disorderly Conduct (b)**</u>

*2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

**(2)** <u>**Misrepresentation**</u>

*2019-2020 Student Handbook, p.38: Acts of fraud, misrepresentation, or dishonesty, including the following:*
  - *i. Forgery, alteration, or misuse of University documents, records, or identification or other materials;*
  - *ii. Knowingly furnishing false, forged, or inappropriately altered information to the University, any University official, or emergency response personnel;*
  - *iii. Intentionally initiating or causing to be initiated any false report, warning, or threat of emergency or crisis;*

**(3)** <u>**Endangering Self or Others**</u>

*2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

**(4)** <u>**Destruction of Property**</u>

*2019-2020 Student Handbook, p.28: Destroying, damaging, defacing, or vandalizing property.*

(5) <u>Discrimination and Harassment</u>
*2019-2020 Student Handbook, p.28: Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, services, or in the educational programs or activities it operates.*

463.   <u>Intent</u>
(1) **Usama: He was not in school at the time of the messages, having already graduated in May 2020, so his educational opportunities were not being hindered or at all affected. Therefore his only intent in reporting me was to initiate further negative consequences against me <u>in hopes of further maliciously disrupting my legal education.</u>**
(2) **Fahad: To notify him of my intent to inform him that I plan to notify the bar association of his misconduct as well as pursue legal action against him for his role in falsely imprisoning me from 11/1/19 – 11/8/19 at Northwestern Memorial Hospital, committing conspiracy to commit false imprisonment, and a host of other civil and criminal offenses which range in severity up to felonies, in accordance with all applicable state and federal law.**

464.   <u>Initiation of Conflict</u>
(1) **Usama - Started the conflict by falsely imprisoning me from 11/1/19 – 11/8/19 at Northwestern Memorial Hospital, committing conspiracy to commit false imprisonment, and a host of other civil and criminal offenses which range in severity up to felonies, in accordance with all applicable state and federal law. Then having me suspended for a period of 1 year, in addition to host of other school related sanctions.**

465.   <u>Final Action in Conflict</u>
(1) **Usama – He was not in school at the time of the messages, having already graduated in May 2020, so his educational opportunities were not being hindered or at all affected. Therefore, when contacting my school again in 2020, his only intent in reporting me was to initiate further negative consequences against me in hopes of further maliciously disrupting my legal education. (Off of the record, I'm pretty sure he even stole my jacket from that night).**

466.   <u>Trigger Actions or Major Actions of Escalation or Persistence committed by Usama</u>
(1) **Committed False Imprisonment, Conspiracy Against Civil Rights, and a host of other state and federal law violations in relation to his role in the 11/1/19 incident.**
(2) **Had me suspended from school for Fall 2019 and Spring 2020 through lies, misrepresentation and deceit in the student conduct process.**
(3) **Defamed my reputation and character among my peers at the law school in 2019 and 2020.**
(4) **Contacted my school again in June 2020 and again had me suspended for Fall 2020 for conduct in relation to the 11/1/19 incident.**
(5) **He did all of the above after having attended my mother's funeral on 10/23/19 and being fully aware of the emotional distress I was suffering at that time.**

467.   <u>De-Escalation Steps</u>

     (1) I notified the authorities and the school about the incident, and after I notified Usama about my intent to pursue legal action against him, I never contacted him again. I also kept all of the details about his malicious actions confidential

468. <u>Severity of Impact</u>

     (1) Usama has been maliciously and viciously attacking me since the day I let him attend my mother's funeral. He had me falsely imprisoned less than one week afterwards, then had me suspended from school for a year. Then he defamed me to the student body, then he contacted my school to have me suspended for another semester in hopes of having me expelled.

     (2) I've now been suspended for nearly three weeks, prevented from contacting anyone and completely isolated as a result. I can't pursue coursework, which is the only thing that I have been trying to do for three years now. I was the only one disciplined resulting from this incident, and Equity showed bias in their blatant refusal to enforce the official university policy preventing disability targeting, harassment, and discrimination. They tried their best to avoid helping me, rather than to try and help me. As a result of Usama's actions, I have been isolated as a result of suspensions since 11/1/2019 until today.

     (3) Usama has faced absolutely no consequences whatsoever for his blatant and malicious violations of state and federal law, in addition to violating numerous school policies. The school is fully aware of these circumstances and has taken absolutely no steps to address it, despite the numerous complaints I have filed since the incident occurred.

469. <u>Analysis</u>

470. <u>Scope of the Code of Conduct</u>

     *(1) 2019-2020 Student Handbook, p.37: The Student Code of Conduct applies to the following situations. The University reserves the right to investigate and resolve reports of alleged misconduct in all of these situations:*

          *i. Involving students, a group of students, or a student organization affiliated with any school or department or the University as a whole (undergraduate or graduate).*

          *ii. Occurring from the time of a student's application for admission through the actual awarding of a degree*

     (2) Usama is not a student

     (3) His degree has already been awarded

     (4) The conduct in question occurred after the degree was awarded in May 2020.

     (5) Therefore, he is not within the scope of enforcement of student conduct, much like the harassment I experienced was not in the scope of Equity, according to their irrational standards.

471. <u>Unenforceable Contract</u>

     (1) When the no-contact order was explained to me by Lucas Christian of student conduct, I was told that it was in effect as long as both parties are still in school in order to facilitate the learning process for both parties. Given that Usama was a 3L in 2019, my understanding was that he graduated in May 2020. Therefore, there are unclear, vague or unspecified terms in the contract with respect to the length of time that it was to be in effect.

     (2) [A]n enforceable contract requires mutual assent as to sufficiently definite essential terms. <u>Kolodziej v. Mason</u>, 774 F.3d 736 (11th Cir. 2014) Essential terms were not sufficiently definite, as would be required for unilateral contract under [Illinois] law. <u>Kolodziej v. Mason</u>, 774 F.3d 736 (11th Cir. 2014) *Id.*

     (3) Given that there were unclear essential terms contained within the contract, the contract is not enforceable by law.

472. <u>Policy Aims</u>

(1) **It makes no sense to enforce this even from a policy perspective because I would violate it when I serve him with a summons when I sue him for false imprisonment and a whole host of other crimes, which I am going to do. He also isn't being hindered from accessing any university programs or resources by my actions because he has already graduated.**

473. **Conclusion and Reponses to Charges**

(1) **Misconduct within the Student Conduct Process (d)**

**2019-2020 Student Handbook, p.37: Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Any action that attempts to retaliate against, intimidate, threaten, coerce, discriminate against, or improperly influence any student for reporting alleged violations of policy or concern for the health or safety of a Northwestern community member, assisting another in making such a report, or participating in an investigation or resolution of such matters.**

     i. **Not Guilty – He initiated a malicious process using lies and deceit which was illegal and unjust and unethical. He engaged in a wrongful and unlawful activity, for which I filed a report, which is a protected activity. I never threatened to retaliate against him for reporting the text messages which you have indicated. I have reported my concerns to various agencies and the Office of Equity multiple times, and I am currently working with The Illinois Guardianship ad Advocacy Association, the Illinois Department of Human Rights, and the Department of Education over the incident.**

(2) **Misconduct within the Student Conduct Process (f) 2019-2020 Student Handbook, p.38: Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Failure to comply with the sanctions or outcomes imposed for violations of this code or other University policies.**

     i. **Not Guilty - There are unclear, vague or unspecified terms in the contract with respect to the length of time that it was to be in effect. When the order was explained to me by Lucas Christian of Student Conduct, I was told it was to be in effect while we were both in school. Osama is no longer a student, and therefor not within the scope of student conduct to police my conduct towards people who are outside of the Northwestern Community.**

474. **Situation #3 – UHAS Report Disclosure**

475. **Allegations:**

(1) **You are alleged to have shared copies of documents from a UHAS hearing related to a November 1, 2019 incident (e.g., investigative report, outcome letter, appeal outcome) with one or more individuals without authorization. Additionally, it has been alleged that this occurred after you were instructed by the Office of Community Standards that these documents and the information included in them is confidential and not to be shared outside of the student conduct process**

476. **Charges:**

(1) **Misconduct within the Student Conduct Process (e) *2019-2020 Student Handbook, p.38*: Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Unauthorized release or disclosure of information related to a student conduct proceeding.**

477. **Official University Policy and Definitions**

(1) **Non-Retaliation Policy Statement**

*2019-2020 POLICY ON NON-RETALIATION p.1: Northwestern strictly prohibits retaliation against any member of its community for reporting or inquiring in good faith about what the member believes to be wrongful or unlawful activity, or for participating in an investigation or proceeding related to such activity. The University considers such reporting, inquiring, or participating to be protected activities in which all members of the Northwestern community may freely engage.*

(2) <u>Reporting Obligation</u>
*2019-2020 POLICY ON NON-RETALIATION p.2: Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination, harassment.*

(3) <u>Protection from Retaliation</u>
*2019-2020 POLICY ON NON-RETALIATION p.2-3: Examples of materially adverse actions that could constitute retaliation include, but are not limited to: removing one from a student organization, academic program, or lab;*
*2019-2020 POLICY ON NON-RETALIATION p.3: In addition, no community member may be retaliated against for refusing to carry out a directive ordering the member to engage in wrongful or unlawful activity.*

(4) <u>In good faith</u>
*2019-2020 POLICY ON NON-RETALIATION, p.1: done with honest belief that wrongful or unlawful activity may have occurred.*

(5) <u>Materially adverse</u>
*2019-2020 POLICY ON NON-RETALIATION, p.1: sufficiently harmful to deter a reasonable person from engaging in protected activities.*

(6) <u>Protected activities</u>
*2019-2020 POLICY ON NON-RETALIATION, p.1: include (i) reporting (whether internally or externally) or inquiring, in good faith, about suspected wrongful or unlawful activity; (ii) assisting others in making such a report; or (iii) participating in an investigation or proceeding related to suspected wrongful or unlawful activity.*

(7) <u>Retaliation</u>
*2019-2020 POLICY ON NON-RETALIATION, p.1: an action, performed directly or through others, that is aimed to deter a reasonable person from engaging in a protected activity or is done in retribution for engaging in a protected activity. Retaliation can take many forms, as described in Section II below. Action in response to a protected activity is not retaliatory unless (i) it has a materially adverse effect on the working, academic, or other University-related environment of an individual; and (ii) it would not have occurred in the absence of the protected activity.*

(8) <u>Wrongful or unlawful activity</u>
*2019-2020 POLICY ON NON-RETALIATION, p2: activity of a community member that violates the law, Northwestern policy, or professional standards of conduct, including the laws, policies, and standards referenced in Section I below.*

478. <u>Official University Policy, Definitions, and Corresponding Violations Committed by Christine DePilla</u>

(1) **On December 5th, 2019, in an email response to my request to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination, or harassment, Christine DePilla stated "the investigative report cannot be shared, including with the police." She unlawfully prevented me from university reporting policy, in violation of the non-retaliation policy. (Email is containing in the attachments produced with this report.)**

(2) On December 5th, 2019, in an email response to Eric Chin of my request to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination, or harassment, Christine DePilla directed Eric Chin of the following with regards to using the report: "This document should not be used as evidence in any follow up/investigation of the complaints filed." She prevented my lawful reports from being investigated, in violation of the non-retaliation policy. (Email is containing in the attachments produced with this report.)

479. **Exceptional Circumstances**

(1) All of the reported instances charges were protected activities made in good faith that wrongful activity may have occurred, in accordance with the Policy on Non-Retaliation.

(2) The report in question contains evidence of obstruction of justice and conspiracy to commit false imprisonment committed against me in relation to the 11/1/19 incident. [Cite Equity Complaint]

(3) Please note that reporting ADA disability discrimination is considered a protected reporting activity and any attempt at preventing or discouraging its report is considered unlawful obstruction.

(4) Prior to Depilla's email dated 12/5/20, my understanding of the confidentiality of the report was unclear. I was under the understanding that I could share the report with staff and/or faculty if I had concerns about the inherent fairness of the process – and at that time I was attempting to report ADA disability targeting to the University, but did not know who the proper authorities were or what the process was because I was new to the school.

(5) Prior to ever sharing the report with law enforcement, I contacted the Northwestern University Police Department and received explicit confirmation that I was able to share the details of the report in accordance with applicable state and federal law in order to provide evidence of direct targeting because of my ADA disabilities, and other criminal acts which were perpetrated against me by Osama A. Usama I. and Muaaz M. and contained within the details of the report.

(6) During my UHAS Hearing on 12/9/20, I was instructed by student conduct representatives DePilla and Cohen that I should share my concerns about violations of the law with the police, and I immediately did so. They were fully aware of the concerns of illegal targeting based on my disabilities which I expressed repeatedly throughout the course of the UHAS hearing and investigation process, and they failed to report them to the proper authorities at that time, in violation of university reporting policy.

(7) Please note: At this time "Cohen" presents a direct conflict of interest with serving as my UHAS officer for this charge due to her role as a witness to the explicit verbal authorization statements made during my UHAS hearing on 12/9/20.

(8) Please be advised of the following ACTIVE State and Federal Investigations Related to 11/1/19 UHAS Incident and the 8/23/20 UHAS Incident:
   i. Dept. of Ed., OCR Complaint #05-20-2444
   ii. Illinois Guardianship and Advocacy Commission Case #20-030-9015
   iii. Illinois Department of Human Rights (IDHR) Case # 2020CH2546; HUD Case #05-20-9282-8

480. **Intent**

(1) To notify the authorities of the ADA disability harassment and vicious hate crime which I experienced on 11/1/19, in addition to my illegal eviction notice, which I am free to do by law. To promote an academic, research, and work

**environment that encourages community members to report any activity they believe in good faith to be wrongful or unlawful.**

481.  **Conclusion and Reponses to Charges**

(1)  **Misconduct within the Student Conduct Process (e)**

*2019-2020 Student Handbook, p.38*: **Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Unauthorized release or disclosure of information related to a student conduct proceeding.**

i.  **Not Guilty – I received explicit authorization from both Christine DePilla and Heather Cohen in my UHAS hearing on 12/9/20 prior to sharing my concerns with NUPD, and then I received explicit authorization from NUPD to share my concerns from the hearing report with NUPD and other law enforcement agencies. I reported Usama and the others indicated in the report because I had good faith that wrongful or unlawful activity had occurred when Usama initiated a malicious process using lies and deceit, which was illegal and unjust and unethical. I had good faith that he engaged in a wrongful and unlawful activity, for which I filed a report, which is a protected activity under the retaliation policy. Now I am being retaliated against by the University and Christine DePilla and Heather Cohen for filing my legitimate reports about disability discrimination, which are protected activities under the non-retaliation policy. All of the times which are noted in the report were protected reporting activities, made on a good faith basis that wrongful activity had occurred, and are therefore all protected under the university non-retaliation policy.**

**2020 Conspiratorial Disability Harassment, Retaliation, and Unlawful Obstruction of Justice**

482.  On information and belief, sometime around 8/23/20, The Interim University Dean of Students, Mona Dugo ("Dugo"), and the Deputy Chief Eric Chin ("Chin") of Northwestern University Police Department (NUPD) negligently suspended Plaintiff (Fahad Syed: Current 1L Law Student) from Northwestern University Law School, and reported Plaintiff to the Northwestern University Police Department (NUPD), for a perceived threat from his disability which resulted from communications between Plaintiff and fellow current 1L Evangeline Gargula and occurred between 8/22/20-8/23/20. She called Plaintiff on 8/23/20 and explicitly stated "we've been watching your Facebook and other social medial posts" and on a 3-way call with Chin, Dugo, and Plaintiff.

483.  On 8/27/20, Plaintiff filed Department of Education, Office of Civil Rights Complaint #05-20-2444 alleging discrimination on multiple grounds, including disability discrimination and hostile environment.

484.  On 9/3/20 at 7:45 AM, Plaintiff informally and indirectly notified the university via email to Lucas Christian of the Office of Community Standards that the Plaintiff had complained about the University to an outside entity, Illinois Department of Human Rights and Illinois Guardianship and Advocacy Commission.

485.  On 9/3/20 at 9:05 AM, Plaintiff wrote an email addressed, in part, to Dugo and Chin, requesting the chat transcripts of the incident which resulted in his suspension on 8/23/20.

486.  On 9/6/20 at 12:15 AM Plaintiff submitted a discrimination report about the incident, to date no one responded. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

487.  On 9/6/20 at 8:15 AM Plaintiff submitted a discrimination report about the incident, to date no one responded. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant

discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she treats me like I am making everything up solely on the basis that I was involuntarily committed.

488.    On 9/7/20 at 6:07 PM Plaintiff submitted a "Hate and Bias Report" about the incident, to date no one responded. DePilla retaliated against me for reporting this item in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of my disability, because she still treats me like I am making everything up solely on the basis that I was involuntarily committed.

489.    On 9/13/20 at 1:49 PM Plaintiff formally notified the University via email to The Office of Equity, its employees Amanda DeSilva and Ish Faith Orkar, and Lucas Christian and Heather Cohen of the Office of Community Standards, that the Plaintiff had complained about the University to an outside entity: The Department of Education, Illinois Department of Human Rights, and Illinois Guardianship and Advocacy Commission.

490.    On 9/14/20 at 5:29 PM, Chin had unauthorized telephone communications with Plaintiff's private psychiatrist(s) in violation of the IMHDDCA and HIPAA. Chin left Tobin a voicemail specifically, twice, acknowledging that he did not have an ROI for contacting him [Tobin], and requesting to "share information" with him and requesting Tobin call him back on his cell phone.

491.    On 9/14/20 at 6:11 PM PLAINTIFF was notified via email by his therapist, Brian Tobin ("Tobin"), that Deputy Chief Chin had contacted him, and he [Tobin] subsequently asked Plaintiff to sign an ROI form.

492.    On 9/15/20 at 12:11 PM, during a 6-minute incoming phone call, NUPD Detective Sanghoon Lee ("Lee") inappropriately contacted and aggressively questioned Plaintiff regarding Plaintiff's Facebook post about his discrimination complaint with the Department of Education, in order to retaliate against Plaintiff for making said complaint, and to threaten, intimidate, and coerce Plaintiff into dropping said complaint. During this call, Lee said "you know why I'm calling," mentioned Dugo by name, and instructed Plaintiff not to post anything about Dugo without "running it by [Lee's] office first." Plaintiff indicated to Lee that Plaintiff had filed the DOE complaint, gave Lee the complaint number, and directed Lee to "contact [Plaintiff's] attorney regarding the posts if he had any other questions."

493.    On 9/16/20 at 3:03 PM, Dugo had unauthorized email communications with Plaintiff's private psychiatrist, Brian Tobin, in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (IMHDDCA) and Health Insurance Portability and Accountability Act (HIPAA) under the pretext of responding to Plaintiff's 9/3/20 email requesting group transcripts. In the communication, she stated: "I'm not sure if Fahad signed a release of information when he made this request. I would like to be able to share some information with you as we have a lot of on going concerns about Fahad."

494.    On 9/22/20, The Dean knowingly and inappropriately shared an illegally obtained audio recording of Plaintiff, of a phone call with another current law student (1L Evangeline Gargula) from 8/22/20, with Plaintiff's medical providers in order to assassinate his character in retaliation for the Department of Education complaint which she referenced during the call and is discussed in the letter from the his therapist. The Dean discriminated against me on the basis of his mental health, in retaliation for the Department of Education complaint which, and which she was fully aware through the university on 9/3/20 through an email to Lucas Christian and 9/13/20 through an email to the Office of Equity.

495.    On or around 9/28/20, during their next session, Plaintiff's therapist, Brian Tobin, informed Plaintiff of the audio recording. It was at this time that Plaintiff realized that this was audio which was illegally submitted to his university by Evangeline Gargula and illegally resulted in his suspension sometime around 8/23/20.

496.    On or around 9/28/20 as a result of the aforementioned unlawful contact with Plaintiff's therapist, Mona Dugo, Eric Chin, and Sanghoon Lee were repeatedly informed not to contact Plaintiffs family members via text messages from plaintiff to their cells phones.

497.    On 10/10/20, at 8:33 PM PLAINTIFF attempted to file an eavesdropping charge with Northwestern University Police Deputy Chief Eric Chin via text message for a phone call which PLAINTIFF took at his apartment in the 18th district (244 E Pearson St), which was illegally recorded and submitted to his

law school, resulting in his suspension. At 8:44 PM Chin responded via text and instructed Plaintiff to file a report with Chicago Police Department (CPD) because NUPD did not have jurisdiction in the matter.

498.    On 10/11/20, PLAINTIFF filed a police report for Eavesdropping in the CPD 18th district, with the non-emergency line (312-746-6000) because they have jurisdiction over a phone call which PLAINTIFF took at his apartment in the 18th district (244 E Pearson St) which was illegally recorded and submitted to his law school, resulting in his suspension. Reporting Officer Aldahhondo (Star 5142) took the report and Supervisor O Shaughnessy (Star 1829) approved it. (Report JD 395786 attached.)

499.    On 10/14/29, NUPD Detective Lee called Plaintiff and brutally interrogated Plaintiff for 18 minutes about exactly how and when Plaintiff found out about the illegal audio tape. Had the illegal audio tape not been made and the university not knowingly suspended me over it, Plaintiff would never have received such an intimidating and harassing interrogation. During the call the detective asked my CPD report number and claimed that he was filing a report with NUPD. Approximately 3 days later he called Plaintiff provided him with report 2020-0356 which he claimed was filed for the eavesdropping case.

500.    On 10/19/2020, at approximately 3:00 PM PLAINTIFF called CPD non-emergency (312-746-6000) and was told by the officer on duty, Philp (Emp #19035) that the report had been "cancelled without investigation," citing a "lengthy cancellation report" involving "NUPD Deputy Chief Chin and the sergeant" as the reason.

501.    Sometime between 10/11/20 – 10/19/20, Chin cancelled his report illegally by illegally revealing his mental health history to the detective without having an ROI in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act and Health Insurance Portability and Accountability Act of 1996 (HIPAA), discriminating against Plaintiff on the basis of his mental health, in retaliation for the Department of Education complaint which PLAINTIFF filed on 8/27/20, and which he [Chin] was fully aware through the university on 9/3/20 through an email to Lucas Christian and 9/13/20 through an email to the Office of Equity. The call in question never took place on University property, and DC Chin knew that due to the prior text conversation.

502.    He [Chin] revealing that plaintiff had involuntarily committed to a hospital in November 2019 for an involuntary mental evaluation, directly and deliberately implying or stating to the detective that PLAINTIFF was crazy and his lawful report shouldn't be investigated on the basis of his mental health status.

503.    He also told the detective and express lie about his consent during the recording in question: telling the detective that PLAINTIFF consented having his conversation recording when PLAINTIFF did not, as was the very reason why PLAINTIFF filed the eavesdropping report. PLAINTIFF did not consent to having his conversation recorded, nor did PLAINTIFF have knowledge of the recording at any time, and DC Chin knew that because I attempted to file the report with him first.

504.    As a result of the call, plaintiffs report (JD 395768) was cancelled.

505.    In approximately 10 separate follow-up calls and 50 text messages to Lee, which occurred in the weeks after my CPD report was cancelled, he never responded to my follow-ups about report 2020-0356. This proves that his purpose in interrogating me was under the false pretext of filing a report whereas in reality he was retaliating for my CPD report and my DOE complaint. The university has deliberately failed to provide that report on my multiple email requests.

506.    On information and belief, sometime between 10/11/20 – 10/19/20, Chin called and told CPD non-emergency response officers (312-746-6000), between 12pm-6pm, not to respond to reports about eavesdropping from students at Northwestern, or informed the desk sergeant of such.

507.    PLAINTIFF called CPD non-emergency (312-746-6000) 6-7 times in a row between 3p-5pm on 10/19/2020 in order to file another report, and as soon as PLAINTIFF told them PLAINTIFF was a student from NU filing an eavesdropping report, they hung up.

508.    On information and belief, on or around on the week of 10/19/2020, Chin called Area 3 Supervising Detective Rose #982 at (312-744-8263) and asked him not to respond to reports about eavesdropping from students at Northwestern or related cancellations. On 10/19/2020 PLAINTIFF called Area 3 Supervising Detective Rose #982 at (312-744-8263) from 4-5PM , to report the incident of improper cancellation of my report, citing jurisdiction, and he refused to disclose any details about why the report was cancelled, telling me to "file another report."

509.     On information and belief, on or around on the week of 10/19/2020, Chin called and told 18th District Supervisor Sergeant Vogt at (312-742-5870) and asked him not to respond to reports about eavesdropping from students at Northwestern or related cancellations. On 10/19/2020 PLAINTIFF called 18th District Supervisor Sergeant Vogt at (312-742-5870) from 4-5PM , to report the incident of improper cancellation of my report, citing jurisdiction, and he refused to disclose any details about why the report was cancelled, telling me telling me "civil litigation" is an option.

510.     Deputy Chief Eric Chin took these actions to prevent the illegal audio tape from being revealed in retaliation for the Department of Education complaint which PLAINTIFF filed, in order to conceal his and the universities negligence, and their knowing harboring and supporting of a malicious criminal, Evangeline Gargula. Chin also took these actions to conceal the fact that he and Dugo were aware of the illegality of the audio tape, and still suspended me over it, which is also why PLAINTIFF filed his Department of Education Complaint, and to punish Plaintiff for filing said complaint.

511.     All of the actions taken by Dugo, Chin, and Lee, including slandering ones reputation to their therapist, especially given mental disabilities, brutal interrogation, and causing a report to be cancelled without informing them, would deter a reasonable person from complaining.

512.     The illegal conduct of the Evangeline Gargula illegally recording me and illegally submitting the tape to the university in order to have me suspended, caused the university to knowingly use it to suspend me due to bias. That suspension then caused me to file a discrimination claim with the DOE and ultimately to file the police report with CPD.

513.     The discrimination claim with the DOE caused Chin to illegally contact Plaintiff's therapist in order to slander him with an illegal audio tape, Dugo to illegally contact Plaintiff's therapist and slander Plaintiff's reputation maliciously with an illegal audio tape, Lee to aggressively and harassingly call me once, and Lee to brutally and menacingly interrogate me another time.

514.     Filing the DOE complaint about discriminatory and bias suspension later caused me to file the CPD report about the discriminatory use of the illegal audio tape in order to strengthen my discrimination complaint for legal proceedings which would occur during litigation.

515.     Filing the CPD report caused Chin to have my CPD report cancelled. Therefore, the filing DOE complaint caused me to file the CPD report, which caused Chin to have my CPD report cancelled through disability discrimination

516.     On 11/2/20 Plaintiff filed a report with the Civilian Office of Police Accountability about Chins illegal disclosure of my mental health history. On 11/5/20 the complaint Log 2020-0004964 was assigned to Sgt. Mark K Lamberg (Star# 1847) to be investigated by Chicago Police Department Bureau of Internal Affairs Division Officer Lambert, with whom I interviewed 11/9/20 at CPD Headquarters regarding the incident.

517.     On 11/3/20 Plaintiff filed an eavesdropping report again with Chicago Police Department, JD 419862. The report is currently assigned to Detective Lee of CPD with an unnamed offender.

518.     Mona Dugo, Eric Chin, and Sanghoon Lee were repeatedly informed not to contact Plaintiffs family members via text messages from plaintiff to their cells phones occurring on or around 9/28/20.

519.     On or around 11/3/20, Plaintiff learned from his brother-in-law Azam Hussien (312-303-3736) via text message that someone person or persons from the university had contacted my sister, Sophia Syed (847-347-3736) and requested discussion for "hours" about Plaintiff and his school situation without Plaintiff's knowledge or consent. This is after Plaintiff expressly forbade the university, through text message to Mona Dugo after she shared the illegal audio with Plaintiffs therapist, that no one who Plaintiff "knows" should be contacted, including most importantly: plaintiff's family members. NU and NUPD and its representatives contacted Plaintiff's sister in retaliation for his COPA report, his police report, and his DOE Report.

520.     Shortly after learning that someone had contacted Plaintiff's family in direct conflict with his wished, Plaintiff texted Defendants NU, Dugo, Chin, and Lee to determine why they had contacted Plaintiff's family and who had authorized such unlawful contact.

521.     On 11/4/20, Plaintiff sent email correspondence to NU expressing that he did not want members of his family and therapist contacted by NU and Dugo.

522.     On 11/4/20, Plaintiff received Official Northwestern Correspondence email from the Office of Community Standards indicating several more disciplinary sanctions and another UHAS hearing in retaliation for the filing of plaintiff's police report and DOE complaint. The stated pretext for this disciplinary action was

that Plaintiff was being disciplined for texting Chin, Dugo, and Lee about his DOE complaint and about the police report, about the various retaliatory measures taken against plaintiff and for the contacting of Plaintiff's sister without Plaintiff's permission. NU and NUPD and its representatives sanctioned plaintiff in retaliation for his COPA report, his police report, and his DOE Report. NU displayed awareness of the multitude of illegal and discriminatory conduct when Plaintiff texted Chin, Dugo, and Lee, who were in a position to take corrective action and failed to do so.

523.    On 11/6/20 Plaintiff was served with a protection order ("PO") (Case 200P20532) for harassment and Stalking from the Cook County Sheriff's office, in which Dugo made several misleading allegations as to my contact with her due to her official capacity as dean of students. The stated pretext was that I was sending her "100's of harassing messages" whereas in reality I was informing her of discrimination which is ongoing and pleading for her to step in and stop it due to her duty as dean of students. This pretext was a cover for her requesting both a threat assessment and a protecting order against me based SOLEY off threat from my perceived disability in retaliation for my DOE complaint. The stalking no contact order was taken especially to label me as a sexual offender in retaliation for my DOE complaint.

524.    The PO revealed that Dugo, through her official capacity at the University, contracted with "Sigma Threat" in order to harass Plaintiff in retaliation for filing his DOE Complaint and retaliation complaints to the university. The stated pretext for this was to "help evaluate his threat level" and was a cover for her contracting the service on the basis of threat from my perceived disability in retaliation for filing his DOE Complaint.

525.    In addition, she made derogatory and misleading accusations in PO about the Holy Quran Chapter 33, Verses 60-68: referring to them as "translated as sinners will die in a fire". She took the protection order for harassment and stalking based on perceived threat from Plaintiffs religion.

526.    Her allegations in support or PO were misleading or defamatory in the following ways:

(1)  She claims she "had to issue" Plaintiff "interim suspension for threatening a fellow law student w/ physical violence." This is false, she knows that the student in question, Evangeline Gargula, stalked me and then posted my information to a group chat and made derogatory statements about my disability, then called me at 1:08 am in a threatening manner and recorded BOTH the call that she made to me and the call that I made in response. These two illegal audio tapes are what Dugo actually suspended me over. She misrepresented this fact deliberately in order to make me seem like a dangerous person.

(2)  She claims I was on probation for "physically assaulting another student." This is false, she knows that there was absolutely no evidence whatsoever that I assaulted anyone aside from that single persons unsubstantiated allegations. She misrepresented this fact deliberately in order to make me seem like a dangerous person. I have filed Attorney General Case 20cv1772 pursuant to this allegation.

(3)  She claims that I have sent her "more than 150 unanswered text messages with increasingly aggressive language." This is without indicating that the messages are sent to her because of her official capacity as dean of students, and because I am telling her about discrimination committed by Deputy Chief Eric Chin of NUPD, Lee of NUPD, and others in the University and asking her to stop them. The "aggressive language" she is referring to is the increasing amount of litigation and legal proceedings that I am threatening her with if she does not cease her illegal conduct.

(4)  She claims she "has not" monitored my Facebook. This is blatantly false, because she on 8/23/20 she called me and explicitly stated  "we've been watching your facebook and other social medial posts" and she also directed detective Lee to call me and interrogate me on the basis of her perceived threat from my Facebook post about my Department of Education Complaint.

(5)  She claims that I am sending her "harassing" messages to her work email when in reality I sent her two follow emails demanding to know who contacted my sister when I told her not to.

(6)  She claims that Plaintiff called her and that she hung up the phone, which is a lie. Plaintiff called her and HE hung up the phone, not Dugo. She deliberately misrepresented this fact to

make it seem like Plaintiff was harassing her, when in reality she was harassing Plaintiff and his sister, acting far beyond the scope of her responsibilities as Dean of Students, and escalating the situation to the current severity level.

527.     On 11/11/19 at approximately 3:00 PM Plaintiff attempted to file a police report in order to get Evangeline Gargula named as the offender on the police report at Chicago 18th District and two officers obstructed me from doing so, as a result I filed COPA complaint Log 2020-0005122.

528.     On 11/17/20, Plaintiff went to domestic violence court at 555 W Harrison and stated claims for SNCO against both Evangeline Gargula (20OP78283) and Mona Dugo (20OP78277), which were deemed worth of a hearing by the Honorable Judge Thomas M. Cushing #2258.

529.     On 11/18/20 Log 2020-0005122 was assigned CPD Sergeant Lisa Eitel (Star #2075) and on 11/22/20 I interviewed with Eitel about the incident of report obstruction, and at that time she included an amendment for report JD 419862 to include Evangeline Gargula's name as the suspect.

## 2020 Retaliatory False Arrest and False Imprisonment

530.     On or around 11/17/20, Mona Dugo falsely reported to police that Plaintiff had violated the PO which she unlawfully had placed on him as a result of 11/4/20 email to the school asking for them to address the unlawful contact with his therapist and family which had taken place earlier in the month of October and which Plaintiff had reported to DOE and the University. She maliciously had the Plaintiff falsely imprisoned pursuant to case 20DV2080601, the only arrest on Plaintiff's entire criminal record, in order to retaliate against Plaintiff for his DOE report and for 20OP78277 which Plaintiff had secured on 11/17/20.

*531.*     On 11/18/20 at 11:47 AM Evanston Police Department Detective Jones #162 and Detective Cepiel #186 met with Northwestern Police Detective Sarah Stark #21 in reference to a violation of a no stalking no contact order ("EPD Report"). A copy of the EPD Report is attached as Exhibit X.

532.     On 11/19/20, at 10 AM three officers of the Evanston Police Department, including Detective Pack #176, Svendsen #164, Detective Jones #162, came to my apartment at 244 E Pearson St. Chicago, IL 60611 at approximately 11:00 AM CST and arrested me without telling me what charges they were arresting me for, without letting me take my prescribed medicine, and without reading me my rights.

533.     When I answered the door, they said they needed to "talk to me about the discrimination by Northwestern University," so I let them come into my apartment.

534.     While they were inside my apartment they repeatedly and purposefully stepped on my prayer rug even after I asked the first officer not to step on in, in direct disrespect of my religious beliefs, and laughed as they did it and I asked them not to. They made derogatory statements about the rug, saying it was "beautiful" after repeatedly stomping on it and laughing.

535.     Detective Jones arrested me inside me house without ever telling me what I was under arrest for or reading me my rights.

536.     The four officers took me to Evanston police station and the four officers made me sit in an interrogation room and made me make incriminating statements without the presence of a lawyer, while under duress, which I did not understand.

537.     During this interrogation, they said that calling a lawyer would take "several hours" and made it seem like if I requested a lawyer, that I would have to get on myself. They said they "might" be able to call the public defender, but that it would take hours. In order to clear myself of the charges, I was misled into saying that they could question me without a lawyer. This is because I was not on my medication and not in the right state of mind to understand what was happening.

538.     They never mirandized me before arresting me and they never explained what I was charged with until they had brought me to the station and questioned me in a room with four officers yelling at me, and while I did not have medication and did not know what was happening, in this way they took advantage of my ADA learning disabilities in order to force me to make incriminating statements in violation of my constitutional rights to be free of self-incriminating statements. They repeatedly told me that "they knew my people" and that they would "take care of me" in apparent reference to my sister Sgt. Syed of Evanston Police.

539.     Jones called repeatedly called me "little bro" and other derogatory statements while I was in his custody.

540.    They never allowed me to take my medicine prior to arresting me without reading me my rights, and they knowingly forced me to undergo questioning while not on my medication or in the right state of mind to adequately represent myself. This is despite them knowing that I take medications, which they learned at my apartment.

541.    They never established probable cause for the arrest and never showed me the alleged probable cause when I asked for it, despite the fact that I asked for it at least four separate times. They simply asked me what my email was, and when I told them, they falsely claimed that I had admitted to sending the alleged email in question to the states attorney.

542.    They then took my property and refused to give it back, including court documents which evidenced that I had requested a no contact order against the person who alleged that I violated the no-contact order and had me arrested. They took this property without ever intending on reviewing it for the purposed of assessing the charges against me, and without ever intending on returning the paperwork. In this way they deprived me of my right to the materials I needed to adequately represent my defense during the court proceedings for this case.

543.    Despite the fact that I told them that Mona Dugo, the complaining witness for this arrest was retaliating against me for Department of Education complaint 05-20-2444 which I had provided to them, in addition to the stalking no contact hearing, they still charged me with the offenses.  The Dean reported me and discriminated against me on the basis of his mental health, in retaliation for the Department of Education complaint, which she was fully aware through the university on 9/3/20 through an email to Lucas Christian and 9/13/20 through an email to the Office of Equity.

**Continuing Misconduct, Discrimination, and Violation of Plaintiff's Rights**

544.    On  11/24/20 at or around 1:30 PM, Plaintiff attended a court hearing for Case 200P20532. During the hearing, the judge asked if anyone had Plaintiff's allegations, and opposing counsel representing Mona Dugo for Case 200P20532 indicated that she had the complaint in front of her.

545.    The judge asked whether Plaintiff had "stated any facts" in support of his petition.

546.    The opposing counsel representing Mona Dugo for Case 200P20532 replied that he [Plaintiff] had "not stated any facts." This was a blatant act of perjury to the court, for Plaintiff had alleged over 25 separate, distinct, and numbered allegations containing many facts. Opposing counsel had the complaint in her possession and lied about the fact that Plaintiff had "stated facts" in support of his SNCO petition in order to mislead the judge.

547.    Opposing counsel, after committing perjury to the court, then requested that Plaintiff's SNCO be dismissed, without the judge ever having read Plaintiff's factual allegations, which were deemed worthy of a hearing (20 OP 78277) by the Honorable Judge Thomas M. Cushing #2258 during a hearing held on 11/17/20 at 555 W Harrison St, Chicago, IL and subsequently transferred to the Honorable Stephanie D. Saltouros #2161 for review.

548.    Opposing counsel and the complaining witness Mona Dugo violated the following pertinent section of Rule 137: "The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other document; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass."

549.    The allegations brought by Dugo and her attorney were not well-grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, but in fact were misleading attempts to retaliate against and harass plaintiff for his SNCO (20 OP 78277) and for his DOE complaint.

550.    Plaintiff FILED subpoena #1 on 12/1/2020 12:25 PM IRIS Y. MARTINEZ CIRCUIT CLERK COOK COUNTY, IL for 2020OP20532.

551.    Plaintiff served subpoena #1 on Tuesday, December 1, 2020 4:02 PM via email to "Threat Assessment" <threatassessment@northwestern.edu>

552.    Plaintiff FILED subpoena #2 on 12/1/2020 at 5:27 PM with IRIS Y. MARTINEZ CIRCUIT CLERK COOK COUNTY, IL for 2020OP20532.

553.    Plaintiff served subpoena #2 on Tuesday, December 3, 2020 10:48 AM via email to "Threat Assessment" <threatassessment@northwestern.edu>

554.    As of 12/9/20 at 9:00 AM, the complaining witness Mona Dugo, in addition to NUPD and NU, are in violation of said subpoenas #1 and #2.

555.    Complaining witness Dugo and NU and NUPD are failing to comply in order to harass Plaintiff.

556.    On 1/21/21 at approximately 2:21 PM, Special Agent Boertie and "TFO" Ferguson came to Plaintiff's residence at 244 E Pearson St. and forcibly interrogated him for nearly 45 minutes about vague and obscure and unspecified concerns. When Plaintiff asked the agents on more than 3 separate occasion to explain why they came to Plaintiff's residence, Boertia proceeded to explain that there were four "incidents" which caused him concern: (1) Plaintiff's expunged criminal record from June 2018, records which have been destroyed and only NU had access to original copies of which Plaintiff had provided to NU prior to having them expunged (2) Plaintiff's police report to Chicago Police about an NU student eavesdropping, (3) the messages which led to 20 OP 20532 order involving NU employee Mona Dugo, and (4) the false arrest 20DV2080601 which Dugo had perpetrated upon Plaintiff. The agent made several strange and vague assertions of a "safety" concern resulting from these occurrence's despite the fact that the expunged record is nearly 3 years old, Plaintiff was the victim in his eavesdropping report to Chicago Police, a series of emails and text messages of a remarkably non-threatening nature led Dugo to seek a protection order by deliberately misrepresenting the nature of the emails which threatened legal action as suggesting that they threatened her physical safety, this is when the was never a single threat to the physical safety of anyone made at any time by the Plaintiff, and the fact that the false arrest was also predicated on a single email which contained no threats and was a report of Dugo's unlawful contact with Plaintiff's sister and lies that Dugo told about being concerned for her own physical safety.

## II. STANDARD OF REVIEW FOR JOINDER

583.    A district court has broad discretion in deciding whether to sever a party pursuant to Federal Rule of Civil Procedure 21. Boyer v. Johnson Matthey, Inc., 2004 WL 835082 (E.D. Pa. Apr. 16, 2004). Rule 21 is the procedural mechanism that courts use to sever parties improperly joined under Federal Rule of Civil Procedure 20. In order to determine whether plaintiffs were misjoined, a court must decide whether they assert any right to relief "arising out of the same transaction, occurrence, or a series of transactions or occurrences, and any question of law or fact common to all plaintiffs will arise in the action." FED. R. CIV. P. 20(a) (1). Both the same transaction and the common question elements must be satisfied before joinder can be permitted.

584.    "Transaction" is a word of "flexible meaning," and may refer to a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. See Boyer, 2004 WL 835082, at *6. The second element, however, "does not require precise congruence of all factual and legal issues; indeed, joinder may be permissible if there is but one question of law or fact common to the parties." Morris v. Paul Revere Ins. Group, 986 F. Supp. 872, 885 (D.N.J. 1997).

585.    Once the court has resolved these threshold questions, it may consider additional factors in determining whether to grant a motion to sever. These factors include: (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the separable issues require the testimony of different witnesses and different documentary proof; (3) whether the party opposing the severance will be prejudiced if it is granted; and (4) whether the party requesting the severance will be prejudiced if it is not granted. German v. Fed. Home Loan Mortgage, 896 F. Supp. 1385, 1400 (S.D.N.Y.1995).

## III. DISCUSSION OF CLAIM JOINDER

586.    Northwestern University "NU" and the Northwestern University Police Department ("NUPD") failed to properly supervise and monitor: Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and in particular it's officer: Deputy Chief Eric Chin.

587.    As a result of such failure, NU and NUPD allowed for a pattern and practice of discriminatory conduct to exist whereby numerous repeated policy violations on the basis of protected class were permitted, committed, and encouraged, which effectively discriminate against male, non-white, Muslim, and disabled applicants and students. The structural pattern of this discrimination is that the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class, then take an adverse action against him, such as suspension or deferral, as a result of that discrimination, and finally place some quantity of discriminatory conditions on his eligibility to re-enroll. Once he completed his required conditions and re-enrolled, NU or NUPD would repeat this pattern and practice of discriminatory conduct again.

588.    The series of discriminatory actions from all three years (2018, 2019, 2020) arise from the same pattern or practice of discriminatory behavior, and thus each discriminatory act should be treated as part of the same transaction or occurrence for the purposes of this complaint.  "[T]he actions of [the plaintiff] arise from a similar series of transactions or occurrences, and common questions of law and fact will arise in the trial of the action." (Pls.' Br. in Opp'n to Mot. to Sever 9.) Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *3 (D.N.J. Feb. 28, 2008) ("Essentially, Plaintiffs allege that each specific discriminatory action described in the complaint stemmed from the same pattern or practice .... Thus, each discriminatory act should be considered part of the same transaction or occurrence."). "Other courts [within this circuit] have found the common transaction element met when the plaintiffs alleged that a pattern or practice of discrimination existed." Boyer, 2004 U.S. Dist. LEXIS 9802, at *7, 2004 WL 835082. This Court, therefore, finds that the allegations in the Complaint arise from the same transaction, occurrence, or series of transactions or occurrences. Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *3 (D.N.J. Feb. 28, 2008)

589.    In Lopez, the court allowed the plaintiffs to join their claims because "the allegation of a pattern or practice of excessive force is a common question of fact central to each claim." See also Boyer, 2004 U.S. Dist. LEXIS 9802, at *8, 2004 WL 835082 Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *3 (D.N.J. Feb. 28, 2008) Plaintiffs each allege that Defendants engaged in a pattern or practice of [illegal conduct]. (Final Pretrial Order 14–15, Dec. 20, 2007.) Similarly, each Plaintiff alleges that the [similarity in nature of the conduct] indicate that the City and PD failed to supervise the [individuals responsible]. (Id. at 14.) Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *4 (D.N.J. Feb. 28, 2008)

590.    Like Lopez, the allegation of a pattern or practice of discrimination by NU and NUPD is a common question of fact central to each of Plaintiff's claims from each year. The structural pattern of this discrimination is that (1) NU and NUPD failed to properly supervise and monitor: Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and in particular it's officer: Deputy Chief Eric Chin, and (2) that as a result, the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class, (3) then take an adverse action against him, such as suspension or deferral, as a result of that discrimination, and (4) finally place some quantity of discriminatory conditions on his eligibility to re-enroll. (5) Once he completed his required conditions and re-enrolled, NU or NUPD would repeat this pattern and practice of discriminatory conduct again. The end result was the Plaintiff spent over three full years, from 2018-2020, pursuing entrance into the graduate law program which he was originally admitted to in 2017, and which NU never actually intended to let him enroll in or complete due to unmitigated bias against his color, socio-economic factors such as his background and family, his disability, race, and religion.

591.    Next, in Lopez, there were "several witnesses are common to each" [of the Plaintiff's claims]. Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *4 (D.N.J. Feb. 28, 2008) Although there are other witnesses to each of the plaintiffs' claims, there is significant overlap. Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *4 (D.N.J. Feb. 28, 2008) In the instant complaint, like Lopez, there are several witnesses common to each claim, and there is significant overlap. Susie Spies-Roth, the law school Dean of Students, was informed or involved in Plaintiff's deferral from 2018, in his suspension from 2019, and in his suspension from 2020. Shannon Bartlett, the Dean of Diversity and Inclusion, was involved and aware of the hostile environment from 2019, and in the hostile environment, discrimination, and retaliation from 2020. Aggie McGrane, of "AccessibleNU" office, handled Plaintiff's disability accommodations from 2019 and 2020. NU Law Professor Emily Kadens first met Plaintiff at an admitted student's dinner in Chicago in 2018, and she was his 1L Torts professor in 2019 after his enrollment from deferral in 2018, and she was informed of and is aware of of his stalking and harassment claim from 2020, and she currently teaches the 1L student, Defendant Gargula.

592.    Additionally, the court in Lopez found that Plaintiffs would be prejudiced if the motion to sever their claims was granted, while Defendants would not be prejudiced if the motion is denied. "Because Plaintiffs have alleged a pattern or practice of excessive force, they will need to provide the jury with sufficient evidence to meet their burden that a pattern or practice actually existed. This will be difficult, if not impossible, if separate trials commence." Lopez v. City of Irvington, CIV.A.05-5323(JAG), 2008 WL 565776, at *4 (D.N.J. Feb. 28, 2008) In the instant claim, Plaintiff will need evidence from all three years in order to fully illustrate the systemic and repeating pattern of discrimination he has been subjected to.

593.    Finally, the Plaintiff in the instant case asserts a right to relief resulting a series of consistent and severe harms, which are remarkably similar in nature, and all stem from the same core set of fact: (1) NU and NUPD failed to properly supervise and monitor: Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and in particular it's officer: Deputy Chief Eric Chin; and (2) that as a result, the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class; (3) then take an adverse action against him, such as suspension or deferral, as a result of that discrimination; and (4) finally place some quantity of discriminatory conditions on his eligibility to re-enroll. (5) Once he completed his required conditions and re-enrolled, NU and/or NUPD would repeat this pattern and practice of discriminatory conduct again, resulting in almost identical harm to the Plaintiff. The end result was the Plaintiff spent over three full years, from 2018-2020, pursuing entrance into the graduate law program which he was originally admitted to in 2017, and which NU never actually intended to let him enroll in or complete due to unmitigated bias against his color, socio-economic factors such as his background and family, his disability, race, and religion.

## COUNT 1
### Violation of Title VI of the Civil Rights Act of 1964
### 42 U.S.C.A. § 2000d, et seq.
### Race and National Origin Discrimination – Disparate Treatment
### (Northwestern University)

1.    Plaintiff incorporates by reference all prior paragraphs as if fully restated herein.

2.    Title VI provides: No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

3.    By virtue of his brown skin color and the Pakistani national origin of his parent, Plaintiff is an individual covered by **Title VI of the Civil Rights Act of 1964**, 42 U.S.C.A. § 2000d.

4.    Plaintiff is otherwise qualified for the study of law at the Law School.

5.    Northwestern University, as a "university'" is a "program or activity" as defined by **Title VI of the Civil Rights Act of 1964**, 42 U.S.C.A. § 2000d.

6.    Northwestern University receives federal financial assistance, as defined by 42 U.S.C.A. § 2000d, either directly or indirectly through federal financial aid, and as such, may not discriminate against a person because of his race or national origin.

7.    At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations. Plaintiff had signed his Early Decision Admission Contract and was enrolled in the NU JD class of 2018.

8.    On April 26th, 2018 Plaintiff's 2018 Early-Decision Application and subsequent admission was subject to an unannounced post admission review which was highly irregular in process and was on the basis of "alleged inaccurate information in [Plaintiff's] Fall 2018 JD application related to [Plaintiff's] … family background." As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background."

9.    The source or intended meaning of allegations in paragraph 9 was never revealed, even after Plaintiff successfully cleared the investigation on May 21, 2018. As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit who's application was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "family background" ever successfully completed the verification without learning the source of the allegation nor the allegations themselves.

10.   As a result of this investigation, Plaintiff was forced to "defer" his admission and enrollment to 2019.

11.   Directly resulting from NU's verification based in part on Plaintiff's family background, and the resulting deferral, Plaintiff was excluded from participation in and denied the benefits of the 2018 NU JD program.

12.   Said violations were done intentionally and/or knowingly with malice or reckless indifference, and warrant the imposition of punitive damages.

13.   As a direct and proximate result of Defendants' violation Title VI Plaintiff has suffered the damages and losses set forth herein and have incurred attorneys' fees and costs.

14.   Plaintiff is suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts and misconduct, unless and until this Court grants the relief requested herein.

15.   The wrongful acts and conduct of Defendants were done with deliberate indifference to the statutory and constitutional rights of Plaintiff.


16.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under **the Civil Rights Act of 1964**, and discriminated against his in violation of **Title VI of the Civil Rights Act of 1964**;

   b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

   d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of his race or national origin or family background;

   e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

   f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

<u>**COUNT 2**</u>
**42 U.S.C. § 1983: Violation of 42 U.S.C. § 1981**
**Race and National Origin/Ethnicity Discrimination**
**(NU)**

17.    Plaintiff incorporates by reference all prior paragraphs as if fully restated herein.

18.    The relevant portion of 42 USC 1981 reads: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law. **42 U.S.C.A. § 1981 (West)**

19.    By virtue of his brown skin color and the Pakistani national origin of his parent, Plaintiff is an individual covered by **42 U.S.C.A. § 1981**

20.    Plaintiff is otherwise qualified for the study of law at the Law School.

21.    Northwestern University, as a "university'" is a "program or activity" as defined by **Title VI of the Civil Rights Act of 1964**, 42 U.S.C.A. § 2000d.

22.    Northwestern University receives federal financial assistance, as defined by 42 U.S.C.A. § 2000d, either directly or indirectly through federal financial aid, and as such, may not discriminate against a person because of his race or national origin.

23.    At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations. Plaintiff had signed his Early Decision Admission Contract and was enrolled in the NU JD class of 2018. By virtue of having singed his early decision enrollment contract, paid his seat reservation fee and withdrawing all of his pending applications from peer law schools as a stipulation of his early decision contract, Plaintiff was afforded the protections associated with this statute.

24.    On April 26th, 2018 Plaintiff's 2018 Early-Decision Application and subsequent admission was subject to an unannounced post admission review which was highly irregular in process and was on the basis of "alleged inaccurate information in [Plaintiff's] Fall 2018 JD application related to [Plaintiff's] … family background." As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background."

25.    Plaintiff asked what the intended meaning of "family background" was , even after Plaintiff successfully cleared the investigation on May 21, 2018. As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit who's application was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "family background" ever successfully completed the verification without learning the source of the allegation nor the allegations themselves.

26.    As a result of this investigation, Plaintiff was forced to "defer" his admission and enrollment to 2019.

27.    Directly resulting from NU's verification based in part on Plaintiff's family background, and the resulting deferral, Plaintiff was excluded from participation in and denied the benefits of the 2018 NU JD program.

28.    That the above actions by Defendants have resulted in the denial of equal protection rights, as a "class of one," all in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was retaliated against, harassed, disciplined against, intimidated, and required to withdraw from school, all against his will, and differently than those similarly situated students.

29.    That the actions of Defendants were the result of personal animus against the Plaintiff and said actions and denials were taken without any rational basis.

30.     That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of Plaintiff and other similarly situated students, all in violation of his constitutional rights.

31.     As a result of Defendants' actions, Plaintiff suffered and continues to suffer a deprivation of his rights secured to him by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

32.     That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

33.     The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Plaintiff is entitled to punitive damages.

34.     It has been necessary for Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

35.     WHEREFORE, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice

## COUNT 3
### Violation of Title III of the Americans with Disabilities Act (ADA),
### 42 U.S.C. 12101 et seq.
### Discrimination – Disparate Treatment
### (Northwestern University)

36.     Plaintiff repeats and realleges the allegations contained in paragraphs "1" through "593", inclusive, of this Complaint, as if fully restated herein.

37.     Title III of the ADA provides: No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases or operates a place of public accommodation. 42 U.S.C. 12182(a).

38.     By virtue of his Bi-Polar Disorder, ADHD, and co-morbid anxiety and depression, Plaintiff is a person with a "disability" as defined in 42 U.S.C. Sec 12102(1).

39.     Plaintiff was "otherwise qualified" for the study of law at the Law School.

40.     The University is a "place of public accommodation" as defined by 42 U.S.C. 12181(7).

41.     At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations.

42.     Plaintiff specifically realleges paragraphs 80-205. As described in this section of the complaint, Plaintiff was subjected to harassment based off perceived disability which, among other things, constituted a hostile learning environment under Title III. As a result of this disability harassment and discrimination, Plaintiff was placed on disciplinary probation. His return from absence was conditioned on inappropriate and unduly burdensome requirements such as a "forensic threat assessment" which was predicated directly on threat from his perceived disability. On 8/23/20, Plaintiff was suspended based directly off of his probationary status as a result of the disability discrimination he described in paragraphs 80-205. On 1/21/21, he was expelled based directly off of his probationary status as a result of the disability discrimination he described in paragraphs 80-205. At no time did NU factor these these pre-conditions which Plaintiff was forced to complete into its assessment of his risk to other students. Effectively, the "forensic risk assessment" and other activity which was ostensibly designed to assess Plaintiff's risk was a form of discriminatory obstacle which was directly predicated on Plaintiff's mental health yet served no effective purpose in NU's risk assessment. In this manner, it was discrimination based directly on Plaintiff's mental health, in violation of the ADA.

43.    Plaintiff specifically realleges paragraphs 282-300. As described in this section of the complaint, the Dean took a number of adverse actions against Plaintiff based off threat from his perceived disability, including but not limited to:

    a.    Issuing an "Interim" suspension of Plaintiff on 8/23/20, wherein she undertook a specific and implicit assumption of Plaintiff's danger to other students based off his two illegally recorded phone conversations. Although the Plaintiff made no articulable threat of violence, nor indicated any action that would warrant the concern of NU staff or any other officials, Dugo made the implicit assumption of his threat to the physical safety of others in a manner which strongly indicates that she took her actions based on her threat from Plaintiff's perceived disability. This is further indicated by the fact that she elected to institute "interim" suspension procedure, as opposed to the normal procedure, which is intended to be an extraordinary measure only undertaken upon a clear and specific danger to the safety of the NU community. There was no clear and specific danger or threat which warranted the interim suspension, which is a safety measure.

    b.    Putting an indefinite "hold" on Plaintiff's registration.

    c.    Securing PO 20532 on deliberately false and misleading pretenses based of threat from Plaintiff's perceived disability, then later falsely claiming that he violated the order in order to have him arrested.

    d.    Ordering numerous staff and administrators from the University and Law School (including personnel from the SSD Office, Counseling Office, Career Strategy Center, Office of the Law School Dean, Records and Registration Office and Student Services) to refrain from communicating with or assisting him;

    e.    Expelling Plaintiff without affording his access to University and Law School procedures that would have provided his with due process.

    f.    Unilaterally imposing unwarranted permanent marks on Plaintiff's transcript

44.    The Dean took these actions resulting from prejudice and fear of the outward and widely known symptoms of his bi-polar disability, including anger and irritability, and had constructive notice that Plaintiff suffered from a mental disability prior to unlawfully suspending Plaintiff.

45.    The Dean was aware that Plaintiff was on disciplinary probation prior to sanctioning Plaintiff, and therefore could reasonably be expected to know the reason why Plaintiff was on disciplinary probation, which in itself provided her with constructive notice of his ADA disabilities prior to suspending Plaintiff. The Dean, by virtue of her position as Dean of Students, had constructive notice of Plaintiff's status as student with disabilities.

46.    Plaintiff suffered further adverse action when, despite his attempt to notify the University of the Dean's discriminatory actions, the University ignored his complaints, violated its own procedures, and failed to adjudicate his Stalking Sexual Misconduct claim, leaving his on indefinite "leave" status and thereby effectively and constructively expelling him.

47.    On information and belief, similarly situated students without disabilities were not subjected to the adverse actions described above.

48.    Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

49.    NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had a medical condition for which he had academic accommodations.

50.    This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

51.    These facts were of no legitimate concern to the recipients of Chin's communications.

52.    The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768

53.    NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

54.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.


55.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under the ADA, and discriminated against his in violation of Title III of the ADA;

    b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of disability;

    e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

    f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

    g.  Award attorney's fees and costs; and

    h.  Award such other relief as the Court deems just and proper.

## COUNT 4
### Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.
### Interference, Coercion and Intimidation
### (Northwestern University)


56.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 593, inclusive, of this Complaint, as if fully restated herein.

57.     Plaintiff specifically realleges paragraphs 482-556.

58.     42 U.S.C. 12203(b) provides that: It shall be unlawful to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of or on account of his or his having exercised or enjoyed ... any right granted or protected by this chapter.

59.     Plaintiff was exercising his rights under the ADA when he sought reasonable academic accommodations for his disability. He was likewise exercising his rights under the ADA when he sought to avail himself of the goods, services, facilities, privileges, advantages and accommodations of the University and Law School.

60.     The Dean coerced, intimidated, threatened and interfered with Plaintiff's exercise and enjoyment of his rights by his actions and omissions as described above, including but not limited to: (a) putting his registration on an indefinite "hold"; (b) suspending him indefinitely; (c) effectively excommunicating Plaintiff from the University and Law School communities by ordering him not to communicate with University and Law School personnel; (d) interfering with Plaintiff's participation in academic pursuits, including the annual writing competition for journal membership; (e) sharing negative opinions about Plaintiff with the Plaintiff's therapist and Federal Department of Education Investigator; (f) contacting and demanding that Plaintiff's therapist meet with her and NUPD Deputy Chief Eric Chin for unspecified reasons and without Plaintiff's knowledge; and (g) interrogating, intimidating and threatening Plaintiff over the course of approximately 3 months.

61.     NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had a medical condition for which he had academic accommodations.

62.     This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

63.     These facts were of no legitimate concern to the recipients of Chin's communications.

64.     The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768

65.     Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

66.     NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

67.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

68.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under the ADA, and coerced and intimidated his in violation of Title III of the ADA;

b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of coercion and interference against Plaintiff on the basis of disability;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or other degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorney's fees and costs; and

h.  Award such other relief as the Court deems just and proper.

## COUNT 5
**Violation of Title III of the Americans with Disabilities Act (ADA),**
**42 U.S.C. 12101 et seq.**
**Retaliation**
**(Northwestern University)**

69.     Plaintiff incorporates by reference all prior paragraphs as if fully restated herein.

70.     Plaintiff specifically realleges paragraphs 482-556.

71.     When Plaintiff reported ADA disability discrimination he was engaged in a statutorily protected activity.

72.     As a direct result of, and in retaliation for, Plaintiff's exercise of his right to report ADA disability discrimination in September of 2020, the Office of Equity sanctioned him by undertaking the adverse actions alleged above, including charging him with "unauthorized sharing" of the 2019 student conduct hearing to Staff and outside governmental advocacy organizations such as the Illinois Guardianship and Advocacy Commission, I.D.H.R. and D.O.E.

73.     Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

74.     NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

75.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

76.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Enter a declaratory judgment that the University retaliated against Plaintiff in violation of Title III of the ADA;

    b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination and retaliation against Plaintiff on the basis of disability;

    e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or other degree program of similar caliber and reputation;

    f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

    g. Award attorneys fees and costs; and

    h. Award such other relief as the Court deems just and proper.

## <u>Count 6</u>
### Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.
### Harassment/Hostile Learning Environment
### (Northwestern University)

77.     Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

78.     Plaintiff specifically realleges paragraphs 80-205.

79.     As a person with a disability, Plaintiff is a member of a protected group.

80.     Plaintiff was subjected to unwelcome harassment as described above.

81.     The harassment of Plaintiff was based on his disability.

82.     The harassment was sufficiently severe and pervasive that it altered the conditions of Plaintiff's education and created an abusive education environment.

83.     Plaintiff put both the Law School and University communities on notice of the harassment, and even filed a grievance complaint with the Department of Education.

84.     The University did nothing to stop the harassment.

85.     The Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

86.     NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

87.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

88.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Enter a declaratory judgment that the University subjected Plaintiff to harassment and a hostile educational environment in violation of Title III of the ADA;

    b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d. Issue an injunction against the University to prevent the University from engaging in further acts of harassment against Plaintiff on the basis of disability;

    e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer to another law school or degree program of similar caliber and reputation;

    f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree 37 program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

    g.  Award attorney's fees and costs; and

    h.  Award such other relief as the Court deems just and proper.

<u>**Count 7**</u>
**Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.**
**Harassment/Hostile Learning Environment**
**(Northwestern University)**

89.    Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

90.    Plaintiff specifically realleges paragraphs 211-556.

91.    As a person with a disability, Plaintiff is a member of a protected group.

92.    Plaintiff was subjected to unwelcome harassment as described above.

93.    Some incidents of harassment include, but are not limited to, the following: (a) the Dean accused Plaintiff of manipulation and deceit and disparaged his character to a broad audience of Law School and University personnel; (b) The Dean inappropriately suggested that Plaintiff required mental health treatment; (c) The Dean misinformed Plaintiff's medical providers that Plaintiff was fabricating his illness; (d) on information and belief, the Dean and/or another representative from the Law School had unauthorized communications with Plaintiff's private psychiatrist(s) in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act; (e) the Dean coerced Plaintiff into providing him with confidential medical records of an extremely personal and intimate nature; (f) the Dean conditioned Plaintiff's return to the Law School on his access to Plaintiff's health care providers, as well as to Plaintiff's family members; (i) the Dean inappropriately required Plaintiff to obtain "medical clearance" in order to return to the law school; (j) NU placed plaintiff on "interim" suspension without hearing or notice due to threat from his perceived disability (k) NU made Plaintiff suffer through a wide of mental health related pre-conditions (such as a "forensic threat assessment") which had a stated pre-text of assuring the school that the risk of violence from Plaintiff was low, but those pre-conditions were not considered as mitigating factors during his expulsion process, this amounts to

94.    The Dean's harassment of Plaintiff was based on his disability.

95.    The Dean's harassment was sufficiently severe and pervasive that it altered the conditions of Plaintiff's education and created an abusive education environment.

96.    The Dean used his authority as the Associate Dean/Dean of Students for the Law School to perpetrate her harassment of Plaintiff.

97.    Plaintiff put both the Law School and University communities on notice of the harassment, and even filed a grievance complaint with the Department of Education.

98.    The University did nothing to stop the harassment.

99.    The Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

100.    NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

101.    NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

102.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    i.   Enter a declaratory judgment that the University subjected Plaintiff to harassment and a hostile educational environment in violation of Title III of the ADA;

    j.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    k.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

    l.   Issue an injunction against the University to prevent the University from engaging in further acts of harassment against Plaintiff on the basis of disability;

    m.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer to another law school or degree program of similar caliber and reputation;

    n.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree 37 program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

    o.   Award attorney's fees and costs; and

    p.   Award such other relief as the Court deems just and proper.

**<u>Count 8</u>**
**Violation of Title III of the Americans with Disabilities Act (ADA),**
**42 U.S.C. 12101 et seq.**
**Failure to Accommodate**
**(Northwestern University)**

103.    Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs, inclusive, of this Complaint, as if fully restated herein.

104.    Plaintiff had a temporary intermittent disability of vision impairment resulting from PRK eye surgery performed on both eyes on 10/22/20.

105.    On 10/24/20, Plaintiff requested accommodation of one-week extension for a University Hearing and Appeals student conduct process response and provided a doctors note which directed plaintiff of limitations on "excessive straining of the eyes and excessive computer/paperwork."

106.    Despite the doctors note, Equity failed to provide any accommodation, and as a result Plaintiff had to exert severe strain on my eyes for straining and trying to come up with my response for the hearing, and strained his eyes for over 72 hours straight without any sleep just to finish the UHAS response on my computer in time due to my multiple disabilities.

107.    Plaintiff's doctor told him that he might need to get surgery again to fix the damage he did from excessive straining.

108.    Heather Cohen knows Plaintiff and specifically refused to respond to my emails due to prejudice resulting from the complaint he filed about her on 12/19/19 resulting from her handling of a 2019 incident with the school.

109.    The vision loss associated with the PRK was a "episodic manifestation of my underlying disability" of temporary vision loss. [A]n intermittent impairment that is a characteristic manifestation of admitted disability is part of the underlying disability and, hence, condition that employer must reasonably accommodate. Americans With Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Equal Employment Opportunity Commission Procedural Regulations, § 1630.2e(j), 42 U.S.C.A. foll. § 2000e–4. <u>Vande Zande v. State of Wis. Dept. of Admin.</u>, 44 F.3d 538 (7th Cir. 1995) For purposes of ADA section defining discrimination to include employer's not making reasonable "accommodations" to the known physical or mental limitations of an otherwise qualified individual with disability, "accommodation" means that employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions to enable disabled individual to work. Americans With Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A).<u>Id.</u>

110.    Plaintiff suffers from multiple ADA learning and cognitive disabilities of bipolar disorder and ADHD, as well as anxiety and depression. One of the major characteristic manifestations of Plaintiffs bipolar disorder are "psychotic episodes" triggered by stress and other triggers which induce the symptoms of varying

levels of anger, paranoia, frustration, irritability, temper and affect his sleep and daily personal care activities. [A]n intermittent impairment that is a characteristic manifestation of admitted disability is part of the underlying disability and, hence, condition that employer must reasonably accommodate. Americans With Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Equal Employment Opportunity Commission Procedural Regulations, § 1630.2e(j), 42 U.S.C.A. foll. § 2000e–4. <u>Vande Zande v. State of Wis. Dept. of Admin.</u>, 44 F.3d 538 (7th Cir. 1995)

111.　　After Plaintiff was brutally attacked on November 1st, 2019, while at a law school event and while on school property at 357 E Chicago Ave., he requested that NU provide him with a learning environment free of harassment, specifically disability related harassment.

112.　　NU refused to accommodate Plaintiff's requests for reasonable academic accommodations, including providing a learning environment free of harassment on the Group Chat, during the 11/1/19 student conduct hearings where he was penalized based off his disability for being the victim of a vicious hate crime, and a delay in his student conduct reply due to having had eye surgery.

113.　　As a result of NU's refusal, Plaintiff was forced to write his 2020 student conduct investigation response while extremely ill and subject to the sedating effects of multiple medications.

114.　　As a result of NU's refusal, Plaintiff was subjected to a vicious disability based hate crime and false imprisonment in 2019, followed by a bias and unfounded and fraudulent student conduct process, and was suspended for 2 semesters for an incident where he was the victim.

115.　　As a result of NU's refusal, Plaintiff was subjected to a vicious disability based hate crime and false imprisonment in 2020, followed by a bias and unfounded and fraudulent student conduct process, and was suspended for 1 semesters and later expelled for an incident where he was the victim.

116.　　NU's failure to accord Plaintiff reasonable academic accommodations denied him the benefits of the services, programs, and activities to which he is otherwise entitled as a student of the Law School and University, thereby violating Plaintiff's rights under the ADA and the regulations promulgated thereunder.

117.　　As a direct and proximate result of NU's failure to accommodate her disability, Plaintiff suffered irreparable reputational, academic, and personal injury, and mental anguish.

118.　　WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

　　a.　Enter a declaratory judgment that the University discriminated against Plaintiff by failing to afford her reasonable accommodations for her disability in violation of Title III of the ADA;

　　b.　Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

　　c.　Order NU to provide any reasonable accommodations or modifications that may be necessary;

　　d.　Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of disability;

　　e.　Order Plaintiff's exam grade in her Constitutional Law class removed from her transcript;

　　f.　Award attorneys fees and costs; and

　　g.　Award such other relief as this Court deems just and proper.

<u>**COUNT 9**</u>
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Discrimination – Disparate Treatment**
**(Northwestern University)**

119.　　Plaintiff incorporates by reference all prior paragraphs as if fully restated herein.

120.　　.

121.　　The Rehabilitation Act provides: No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title shall, solely by reason of his or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance... 29 U.S.C. 794(a).

122.     By virtue of his Bi-Polar Disorder and ADHD, and co-morbid anxiety and depression, Plaintiff is an individual with a disability as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 705(20).

123.     Plaintiff is otherwise qualified for the study of law at the Law School.

124.     Northwestern University, as a "university'" is a "program or activity" as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794(b).

125.     Northwestern University receives federal financial assistance, as defined by 29 U.S.C. 794, either directly or indirectly through federal financial aid, and as such, may not discriminate against a person because of his disability.

126.     At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations.

127.     Plaintiff specifically realleges paragraphs 80-205. As described in this section of the complaint, Plaintiff was subjected to harassment based off perceived disability which, among other things, constituted a hostile learning environment under Title III. As a result of this disability harassment and discrimination, Plaintiff was placed on disciplinary probation. His return from absence was conditioned on inappropriate and unduly burdensome requirements such as a "forensic threat assessment" which was predicated directly on threat from his perceived disability. On 8/23/20, Plaintiff was suspended based directly off of his probationary status as a result of the disability discrimination he described in this section. On 1/21/21, he was expelled based directly off of his probationary status as a result of the disability discrimination he described in this section. At no time did NU factor the these pre-conditions which Plaintiff was forced to complete into its assessment of his risk to other students. Effectively, the "forensic risk assessment" and other activity which was ostensibly designed to assess Plaintiff's risk was a form of discriminatory obstacle which was directly predicated on Plaintiff's mental health yet served no effective purpose in NU's risk assessment. In this manner, it was discrimination based directly on Plaintiff's mental health, in violation of the ADA.

128.     Plaintiff specifically realleges paragraphs 282-300. As described in this section of the complaint, the Dean took a number of adverse actions against Plaintiff based off threat from his perceived disability, including but not limited to:

    h.  Issuing an "Interim" suspension of Plaintiff on 8/23/20, wherein she undertook a specific and implicit assumption of Plaintiff's danger to other students based off his two illegally recorded phone conversations. Although the Plaintiff made no articulable threat of violence, nor indicated any action that would warrant the concern of NU staff or any other officials, Dugo made the implicit assumption of his threat to the physical safety of others in a manner which strongly indicates that she took her actions based on her threat from Plaintiff's perceived disability. This is further indicated by the fact that she elected to institute "interim" suspension procedure, as opposed to the normal procedure, which is intended to be an extraordinary measure only undertaken upon a clear and specific danger to the safety of the NU community. There was no clear and specific danger or threat which warranted the interim suspension, which is a safety measure.

    i.  Putting an indefinite "hold" on Plaintiff's registration.

    j.  Securing PO 20532 on deliberately false and misleading pretenses based of threat from Plaintiff's perceived disability, then later falsely claiming that he violated the order in order to have him arrested.

    k.  Ordering numerous staff and administrators from the University and Law School (including personnel from the SSD Office, Counseling Office, Career Strategy Center, Office of the Law School Dean, Records and Registration Office and Student Services) to refrain from communicating with or assisting him;

    l.  Expelling Plaintiff without affording his access to University and Law School procedures that would have provided his with due process.

    m.  Unilaterally imposing unwarranted permanent marks on Plaintiff's transcript

129.     The Dean was aware that Plaintiff was on disciplinary probation prior to sanctioning Plaintiff, and therefore could reasonably be expected to know the reason why Plaintiff was on disciplinary probation, which in itself provided her with constructive notice of his ADA disabilities prior to suspending Plaintiff.

130.    Plaintiff suffered further adverse action when, despite his attempt to notify the University of the Dean's discriminatory actions, the University ignored his complaints, violated its own procedures, and failed to adjudicate his Stalking Sexual Misconduct claim, leaving his on indefinite "leave" status and thereby effectively and constructively expelling him.

131.    NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had a medical condition for which he had academic accommodations.

132.    This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

133.    These facts were of no legitimate concern to the recipients of Chin's communications.

134.    The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768

135.    On information and belief, similarly situated students without disabilities were not subjected to the adverse actions described above.

136.    Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

137.    Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

138.    In its disparate treatment of Plaintiff, the University acted willfully, deliberately and intentionally or with deliberate indifference toward his federally protected rights.

139.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

140.    The University wrongfully caused Plaintiff to be discriminated against and constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

141.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

142.    NU's conduct was based on Plaintiff's status as a person with a. disability.

143.    NU did not:
>        a) conduct a bona fide and proper individualized assessment;
>        b) engage in the interactive process;
>        c) explore reasonable modifications and/or accommodations; and/or
>        d) allow Plaintiff to realize the benefits of participating in the classroom in the JD and other academic and school-related recreation programs.

144.    NU unlawfully denied Plaintiff the opportunity to participate in class in its JD law program.

145.    NU is likely to continue to deny or limit Plaintiff's participation in other law school related events and programs.

146.    NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disabilities in violation of § 504 of the Rehabilitation Act of 1973.

147.

148.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
>        a. Enter a declaratory judgment that the University discriminated against Plaintiff solely by reason of his disability in violation of the Rehabilitation Act;
>        a. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;
>        b. Order NU to provide any reasonable accommodations or modifications that may be necessary;
>        c. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

d. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

e. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

f. Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

## COUNT 10
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. 701 et seq.
### Interference, Coercion and Intimidation
### (Northwestern University)

149. Plaintiff repeats and realleges the allegations contained in paragraphs [NUMBER] through [NUMBER], inclusive, of this Complaint, as if fully restated herein.

150. Plaintiff specifically realleges paragraphs 482-556.

151. Plaintiff was exercising his rights under the ADA when he sought reasonable academic accommodations for his disability. He was likewise exercising his rights under the ADA when he sought to avail himself of the goods, services, facilities, privileges, advantages and accommodations of the University and Law School.

152. The Dean coerced, intimidated, threatened and interfered with Plaintiff's exercise and enjoyment of his rights by his actions and omissions as described above, including but not limited to: (a) putting his registration on an indefinite "hold"; (b) suspending him indefinitely; (c) effectively excommunicating Plaintiff from the University and Law School communities by ordering him not to communicate with University and Law School personnel; (d) interfering with Plaintiff's participation in academic pursuits, including the annual writing competition for journal membership; (e) sharing negative opinions about Plaintiff with the Plaintiff's therapist and Federal Department of Education Investigator; (f) contacting and demanding that Plaintiff's therapist meet with her and NUPD Deputy Chief Eric Chin for unspecified reasons and without Plaintiff's knowledge; and (g) interrogating, intimidating and threatening Plaintiff over the course of approximately 3 months.

153. NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had a medical condition for which he had academic accommodations.

154. This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

155. These facts were of no legitimate concern to the recipients of Chin's communications.

156. The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768

157. Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

158. The University acted willfully, deliberately and intentionally or with deliberate indifference toward Plaintiff's federally protected rights.

159. Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

160. The University wrongfully caused Plaintiff to be discriminated against, to suffer interference, coercion and intimidation, and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

161. Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

162.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Enter a declaratory judgment that the University discriminated against Plaintiff on the basis of his disability in violation of the Rehabilitation Act;

    b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

    e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

    f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

    g.  Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

    h.  Award attorney's fees and costs; and

    i.  Award such other relief as the Court deems just and proper.

## COUNT 11
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. 701 et seq.
### Retaliation
### (Northwestern University)

163.    Plaintiff repeats and realleges the allegations contained in paragraphs [NUMBER] through [NUMBER], inclusive, of this Complaint, as if fully restated herein.

164.    Plaintiff specifically realleges paragraphs 482-556.

165.    Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

166.    In its retaliation against Plaintiff for his exercise of federally protected rights, the Defendant acted willfully, deliberately and intentionally or with deliberate indifference.

167.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

168.    The University wrongfully caused Plaintiff to be discriminated and retaliated against, and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

169.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

170.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Enter a declaratory judgment that the University retaliated against Plaintiff for the exercise of his statutorily protected rights in violation of the Rehabilitation Act;

    b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.  Issue an injunction against the University to prevent the University from engaging in further acts of retaliation and discrimination against Plaintiff solely by reason of his disability;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

h. Award attorney's fees and costs; and

i. Award such other relief as the Court deems just and proper.

## COUNT 12
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. 701 et seq.
### Harassment/Hostile Learning Environment
### (Northwestern University)

171. Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

172. Plaintiff specifically realleges paragraphs 80-205.

173. Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

174. The University acted willfully, deliberately and intentionally or with deliberate indifference in harassing (and/or acquiescing to the harassment of Plaintiff) and maintaining a hostile learning environment.

175. Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

176. The University wrongfully caused Plaintiff to be discriminated against and subject to harassment and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

177. Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

178. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University retaliated against Plaintiff for the exercise of his statutorily protected rights in violation of the Rehabilitation Act;

b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

h. Award attorney's fees and costs; and

i. Award such other relief as the Court deems just and proper.

## COUNT 13
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. 701 et seq.

**Harassment/Hostile Learning Environment**
**(Northwestern University)**

179.    Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

180.    Plaintiff specifically realleges paragraphs 211-556.

181.    Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

182.    The University acted willfully, deliberately and intentionally or with deliberate indifference in harassing (and/or acquiescing to the harassment of Plaintiff) and maintaining a hostile learning environment.

183.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

184.    The University wrongfully caused Plaintiff to be discriminated against and subject to harassment and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

185.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

186.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

j.   Enter a declaratory judgment that the University retaliated against Plaintiff for the exercise of his statutorily protected rights in violation of the Rehabilitation Act;

k.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

l.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

m.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

n.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

o.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

p.   Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

q.   Award attorney's fees and costs; and

r.   Award such other relief as the Court deems just and proper.

**Count 14**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Failure to Accommodate**
**(Northwestern University)**

187.    Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

188.    Plaintiff had a temporary intermittent disability of vision impairment resulting from PRK eye surgery performed on both eyes on 10/22/20.

189.    On 10/24/20, Plaintiff requested accommodation of one-week extension for a University Hearing and Appeals student conduct process response and provided a doctors note which directed plaintiff of limitations on "excessive straining of the eyes and excessive computer/paperwork."

190.    Despite the doctors note, Equity failed to provide any accommodation, and as a result Plaintiff had to exert severe strain on my eyes for straining and trying to come up with my response for

the hearing, and strained his eyes for over 72 hours straight without any sleep just to finish the UHAS response on my computer in time due to my multiple disabilities.

191.    Plaintiff's doctor told him that he might need to get surgery again to fix the damage he did from excessive straining.

192.    Heather Cohen knows Plaintiff and specifically refused to respond to my emails due to prejudice resulting from the complaint he filed about her on 12/19/19 resulting from her handling of a 2019 incident with the school.

193.    The vision loss associated with the PRK was a "episodic manifestation of my underlying disability" of temporary vision loss. [A]n intermittent impairment that is a characteristic manifestation of admitted disability is part of the underlying disability and, hence, condition that employer must reasonably accommodate. Americans With Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Equal Employment Opportunity Commission Procedural Regulations, § 1630.2e(j), 42 U.S.C.A. foll. § 2000e–4. Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538 (7th Cir. 1995) For purposes of ADA section defining discrimination to include employer's not making reasonable "accommodations" to the known physical or mental limitations of an otherwise qualified individual with disability, "accommodation" means that employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions to enable disabled individual to work. Americans With Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A). Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538 (7th Cir. 1995)

194.

195.    Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

196.    The University intentionally discriminated or acted with deliberate indifference in failing to provide appropriate and necessary accommodations to Plaintiff so that she could continue in her study of law at the Law School.

197.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

198.    The University wrongfully caused Plaintiff to be discriminated against, denied reasonable accommodations, and constructively and effectively expelled from the Law School, all in violation of her rights under Section 504 of the Rehabilitation Act of 1973.

199.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

200.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Enter a declaratory judgment that the University discriminated against Plaintiff by failing to afford her reasonable accommodations for her disability in violation of the Rehabilitation Act;

    b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of her disability;

    e.  Order Plaintiff's disciplinary record removed from his transcript;

    f.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

    g.  Award attorney's fees and costs; and

    h.  Award such other relief as the Court deems just and proper.

<u>**Count 15**</u>
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Deliberate Indifference**
**(NU, Christine DePilla)**

201.     Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

202.     Plaintiff specifically realleges paragraphs 132-153

203.     To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id.

204.     NU had actual notice of numerous disability complaints, both formal and informal, regarding the harassment Plaintiff experienced by students and NUPD on 11/1/19 at the MLSA event.

205.     NU had actual notice of numerous disability complaints, both formal and informal, about the conduct of NU employees during the 2019 UHAS hearings process and afterwards.

206.     Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment included a violent physical beating and attempted strangulation by students, a brutal physical assault and battery by NUPD, false imprisonment for 8 total days, and was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community for over 2 semesters. This was immediately following the death of Plaintiff's late mother from painful terminal ovarian cancer on 10/23/19.

207.     The conduct complained about in each complaint was in violation of Section 504.

208.     All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliberately prevented from accessing all school activities or learning.

209.     NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

210.     NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

211.     On information and belief, Plaintiff has submitted over 50 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

212.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation of the Rehabilitation Act;
   b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;
   c. Order NU to provide any reasonable accommodations or modifications that may be necessary;
   d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;
   e. Order Plaintiff's disciplinary record removed from his transcript;
   f. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;
   g. Award attorney's fees and costs; and
   h. Award such other relief as the Court deems just and proper.

## Count 16
### Violation of Title III of the Americans with Disabilities Act (ADA),

**42 U.S.C. 12101 et seq.**
**Deliberate Indifference**
**(NU, Christine DePilla)**

213.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

214.    Plaintiff specifically realleges paragraphs 132-153

215.    To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id.

216.    NU had actual notice of numerous disability complaints, both formal and informal, regarding the harassment Plaintiff experienced by students and NUPD on 11/1/19 at the MLSA event.

217.    NU had actual notice of numerous disability complaints, both formal and informal, about the conduct of NU employees during the 2019 UHAS hearings process and afterwards.

218.    Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment included a violent physical beating and attempted strangulation by students, a brutal physical assault and battery by NUPD, false imprisonment for 8 total days, and was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community for over 2 semesters. This was immediately following the death of Plaintiff's late mother from painful terminal ovarian cancer on 10/23/19.

219.    The conduct complained about in each complaint was in violation **of Title III of the Americans with Disabilities Act**

220.    All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliebrately prevented from accessing all school activities or learning.

221.    NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

222.    NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

223.    On information and belief, Plaintiff has submitted over 50 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

224.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   i.    Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation **of Title III of the Americans with Disabilities Act**;

   j.    Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   k.    Order NU to provide any reasonable accommodations or modifications that may be necessary;

   l.    Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

   m.   Order Plaintiff's disciplinary record removed from his transcript;

n.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

o.  Award attorney's fees and costs; and

p.  Award such other relief as the Court deems just and proper.

**Count 17**
**Violation of Title II of the Americans with Disabilities Act (ADA)**
**42 U.S.C. § 12132, et seq.**
**Deliberate Indifference**
**(NU, Christine DePilla)**

225.  Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

226.  Plaintiff specifically realleges paragraphs 132-153

227.  To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id.

228.  NU had actual notice of numerous disability complaints, both formal and informal, regarding the harassment Plaintiff experienced by students and NUPD on 11/1/19 at the MLSA event.

229.  NU had actual notice of numerous disability complaints, both formal and informal, about the conduct of NU employees during the 2019 UHAS hearings process and afterwards.

230.  Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment included a violent physical beating and attempted strangulation by students, a brutal physical assault and battery by NUPD, false imprisonment for 8 total days, and was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community for over 2 semesters. This was immediately following the death of Plaintiff's late mother from painful terminal ovarian cancer on 10/23/19.

231.  The conduct complained about in each complaint was in violation of Title II of the Americans with Disabilities Act.

232.  All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliberately prevented from accessing all school activities or learning.

233.  NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

234.  NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

235.  On information and belief, Plaintiff has submitted over 50 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

236.  WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

q.  Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation of Title II of the Americans with Disabilities Act;

r.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

s.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

t.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

u.  Order Plaintiff's disciplinary record removed from his transcript;

v.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

w.  Award attorney's fees and costs; and

x.  Award such other relief as the Court deems just and proper.

## Count 18
## Breach of Contract
## (Northwestern University)

237.  Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

238.  Plaintiff has an express and implied contract with the University.

239.  The University offered Plaintiff placement in the Law School; Plaintiff accepted the offer and in consideration thereof, paid tuition to the University.

240.  The documents distributed to students by the University, including, but not limited to, the Student Handbook, Law School Rules and Regulations, Student Affairs Office of Student Conduct and Conflict Resolution (collectively the "Rules"), form part of the contract between Plaintiff and the University.

241.  Plaintiff performed his obligations under the contract.

242.  Under the terms of its contract with Plaintiff, the University had a duty to follow the procedures set forth in its Rules.

243.  The University breached the contract by failing to afford Plaintiff the due process procedures set forth in its Rules for suspected violations of the Student Code of Conduct.

244.  The University further breached its contract with Plaintiff by failing to promptly investigate or resolve Plaintiff's discrimination grievances as set forth in its Rules.

245.  The University further breached its contract with by allowing random strangers to deliberately interfere with Plaintiff's status as a student on no less than three separate occasions, including (1) 2018 post admission application review based on unverified and undisclosed information furnished by an undisclosed source; (2) allowing a complete stranger to brutally attack and have Plaintiff involuntarily committed using NUPD in 2019, and then allowing that stranger to further participate in a student conduct hearing where he told more lies and was allowed the opportunity to have Plaintiff suspended and eventually expelled from school; (3) allowing a complete stranger to maliciously stalk and harass Plaintiff, to record their private phone calls where they viciously mock taunt and harass Plaintiff and using the felonious audio as reason to expel the Plaintiff in 2020.

246.  The University's failure to abide by its Rules was arbitrary and capricious.

247.  Plaintiff has suffered and continues to suffer substantial harm as a result of University's breach.

248.  WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the University's breach of contract in an amount to be proven at trial;

b.  Award attorneys fees and costs; and

c.  Award such other relief as the Court deems just and proper.

## Count 19
## Intentional Infliction of Emotional Distress
## (Dean Dugo and Northwestern University)

249.    Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

250.    As Dean of Students of the University, the Dean was in a position of power and authority over Plaintiff. Indeed, the Dean exerted almost complete control over the success or failure of Plaintiff's law school career and future professional possibilities.

251.    The Dean's conduct toward Plaintiff was extreme and outrageous. The Dean acted in a manner that was extreme and outrageous when she, among other things:

    a.  insisted that Plaintiff provide her with his private medical records, including a 2019 petition for involuntary commitment;

    b.  abused her authority (for example, by putting a "hold" on Plaintiff's registration, imposing permanent disciplinary notation his transcript) in order to coerce Plaintiff into producing those records;

    c.  interfered with Plaintiff's relationship with his private psychiatrist, causing him to lose psychiatric and pharmacological care with his therapist Brian Tobin;

    d.  disparaged Plaintiff's reputation with his medical provider Brian Tobin;

    e.  refuse to give a time extension and forced Plaintiff to write a 15-page response to outrageous student conduct allegations less than 5 days after having eye surgery and scheduling the response date on the one year anniversary of his mothers death on October 23rd, 2020;

    f.  on information and belief defamed Plaintiff's reputation amongst other law school deans such that Plaintiff would be unable to transfer to another law school;

    g.  inappropriately contacted Plaintiff's health care provider Brian Tobin without his knowledge or consent and against his wishes;

    h.  inappropriately contacted Plaintiff's family members Sophia Syed and Azam Hussein without his knowledge or consent and against his wishes;

    i.  inappropriately contacted Plaintiff's department of Education investigator, Chris Farrelly, without his knowledge or consent and against his wishes;

    j.  illegally hid the existence to the two audio tapes made by Evangeline Gargula during the initial phases of the 2020 disciplinary process in order to protect herself, NU, and Gargula from liability due to racial and disability bias, lying and saying that she suspended me over "group chat" comments;

    k.  after approximately 50-100 follow up emails from Plaintiff to School, revealing the existence of the audio tapes, only to use them as evidence to charge Plaintiff with additional violations of school policy;

    l.  never once attempting or even considering revealing the illegal audio to Chicago Police Department, and revealing them to NUPD only in an attempt to charge Plaintiff with criminal violation of some kind;

    m.  requesting that NUPD not prosecute the eavesdropping violation because Gargula is a white female like her;

    n.  conspiring with Chin and Lee to harass Plaintiff about this Department of Education complaint and find out how he found out about the tapes;

    o.  conspiring with Chin and Lee to harass Plaintiff by requesting a no-contact order through school in retaliation for Plaintiff finding out about the tapes and asking NUPD to take action on the eavesdropping;

    p.  NUPD giving Plaintiff a fake police report number in order to hide the fact that NUPD Detective Lee retaliated against Plaintiff for his DOE complaint and Police Report by interrogating Plaintiff about his DOE complaint;

    q.  coercing Chin to violate HIPAA by contacting Chicago Police to have Plaintiffs police report cancelled because it contained Dugo's name;

    r.  on information and belief authorized the University's IT technician to make a blanket search for Plaintiff's information on NU systems for private and nefarious use;

s.  on information and belief refused to vouch for Plaintiff's good character and fitness to the bar examiners;

t.  forced plaintiff to participate in a student conduct hearing on bad pretenses, knowing that Gargula had committed multiple felonies and hate crimes on the basis of perceived disability, during which Plaintiff was not appointed an advisor despite making multiple requests at all stages of the disciplinary process;

u.  intentionally scheduling Plaintiffs investigation report due date on the 1 year anniversary of this mothers death;

v.  forcing Plaintiff to endure over three full continuous years of unjustified sanctions, vicious false and defamatory student disciplinary proceedings and sanctions and discriminatory obstacles to education starting from the time he was admitted with a discriminatory post admission application "verification" and subsequent forced deferral, to vicous accusations and disciplinary proceedings the week after his mothers death and continuing through the 1 year anniversary of her death and into the present time, where Plaintiff was never given a chance to properly grieve or heal from her loss;

w.  rendered it impossible for Plaintiff to interview for summer associate and judicial clerkship positions;

x.  maligned Plaintiff's reputation to the Law School and University communities, rendering him a veritable pariah on campus;

y.  imposed inappropriate and burdensome conditions on Plaintiff's disciplinary process such that Plaintiff has been constructively expelled from the Law School;

z.  Deliberately expelled the Plaintiff after he spent 3 years pursuing entrance into the graduate program and completed a wide variety of pre-conditions which were predicated upon assessing his mental health condition, wherein she ignored all of the indication which spoke to Plaintiff's ability to pursue coursework and instead focused exclusively on whatever negative aspects she could find about Plaintiff in order permanently expel Plaintiff and permanently notate his transcript so that he could not transfer or apply elsewhere;

aa.  Petitioned for a Stalking No Contact Order (20 OP 20532) on false, misleading, and defamatory pretenses, including lying about prior awareness of Plaintiff's social media posts, lying about the content and nature of the call and who hung up the telephone on the call in question, making derogatory statements about the Holy Qu'ran by intentionally misspelling it as "Quaran" and referring to the content of verses in the book as "Sinners will die in fire" in her petition;

bb.  Conspiring with NUPD DC Chin and NUPD Detective Stark to illegally have Plaintiff arrested by Evanston Police (20 DV 2080601) for an alleged violation of said protection order as retaliation for:

    a.  plaintiffs protection order against her (20 OP 78277);

    b.  Plaintiff's numerous complaints about her through the university;

    c.  Plaintiff's DOE complaint

cc.  refused to give a time extension on and forced Plaintiff to write a 15-page expulsion appeal on January 4th, 2021 after Plaintiff experienced a medical emergency with his 70-year-old father on the weekend of January 2nd, 2021;

dd.  oppressed Plaintiff's right to bear arms under the 2nd amendment through use of SNCO and illegal involuntary commitment

252.  Plaintiff was particularly susceptible to emotional distress because of his disability and co-morbid anxiety and depression.

253.  The Dean was aware of Plaintiff's susceptibility and knew that his conduct would cause Plaintiff emotional distress.

254.  Plaintiff reasonably believed the Dean would carry out her threats since he was in a position of authority and had in fact already abused that authority by taking unilateral criminal actions against him, including securing a PO on false on misleading pretenses.

255.     The Dean's conduct constituted a course of acts intended to humiliate, shame and embarrass Plaintiff and to irreparably damage her reputation.

256.     As a proximate result of the intentional acts by the Dean and his abuse of his authority, Plaintiff suffered shame, humiliation, embarrassment, anguish, damage to her self-esteem and extreme emotional distress.

257.     Plaintiff's emotional distress has resulted in sleep, eating and mood disturbances, isolation and withdrawal, loss of community reputation, and exacerbation of anxiety and depression.

258.     Plaintiff has required increased medical and/or psychological/psychiatric care as a result of the malfeasance and nonfeasance of Defendants.

**259.     The acts and omissions of the University and its investigators were willful and intentional.**

**260.     The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.**

**261.     The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.**

**262.     The University's conduct and that of the investigators was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.**

**263.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.**

264.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the Defendants' intentional infliction of emotional distress in an amount to be proven at trial;
   b.   Award punitive damages;
   c.   Award attorney's fees and costs; and
   d.   Award such other relief as the Court deems just and proper.

<u>**Count 20**</u>
**Defamation (Per Se and/or Per Quod)**
**(Dugo, Chin, and NU)**

265.     Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

266.     Mona Dugo contacted Plaintiff's healthcare provider Brian Tobin without his knowledge or consent in order to defame Plaintiff by sharing illegal audio recordings. She lied and said that Plaintiff had harassed the person on the phone who was harassing him. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

267.     Mona Dugo secured a stalking PO 20532 on false and defamatory pretenses, stating that Plaintiff physically assaulted another student when she knew there was no evidence supporting that allegation. She also stated in her petition that she hung up the phone after Plaintiff called her, which is false, Plaintiff called her to tell her not to contact his family members then hung up the phone. She also stated that Plaintiff "sent her verses" from the "Quaran" which stated "sinners will die in a fire," a highly defamatory and discriminatory and offensive religious epithet about Islam. . The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation and was served with an unjustified and malicious protection order.

268.     These statements are capable of only one construction, namely, that Plaintiff is a liar and a threat to the safety of Dugo.

269.     The Dean knew these statements to be false since she had already listened to the audio wherein Plaintiff was being antagonized, threatened, and harassed and received communications from Plaintiff's indicating that he was falsely imprisoned last year and that there was no evidence supporting the assertion that he attacked anyone last year aside from the unfounded allegations of a single person.

270.     On information and belief, the Dean was already aware of Plaintiff's internal grievances prior to her suspension of Plaintiff and prior to her making the defamatory and false assertions indicated in this count.

271.     These statements were published to a broad audience in the Law School and the University. Numerous recipients of this email did not know Plaintiff and were likely unaware that Plaintiff had a disability.

272.     These recipients were individuals whose high regard for Plaintiff's character was material to his academic, professional and personal success.

273.     The Dean's statements were not privileged.

274.     The Dean made these false statements with malice and the intent to harm Plaintiff.

275.     These statements impute a lack of integrity in Plaintiff's academic work and professional ethics.

276.     These statements prejudiced Plaintiff and imputed a lack of ability in his potential to succeed as a law student and lawyer.

277.     The Dean's false and malicious statements caused irreparable damage to Plaintiff's reputation within the Law School and University community.

278.     Plaintiff filed multiple internal grievences notifying the University of the Dean's false and defamatory statements.

279.     The University failed to take any measures to redress the Dean's defamatory conduct and acted with reckless disregard for Plaintiff's reputation.

280.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a.   Award Plaintiff money reasonably calculated to compensate her for all monetary
   b.   damages sustained as a result of the Defendants' defamation in an amount to be proven at trial;
   c.   Award punitive damages;
   d.   Award attorney's fees and costs; and
   e.   Award such other relief as the Court deems just and proper.

<u>**Count 21**</u>
**Public Disclosure of Private Facts/**
**Violation Of HIPAA and IMHDDCA**
**(Mona Dugo, Eric Chin, NU)**

281.     Plaintiff re-alleges and incorporates by reference each and every allegation made in the foregoing paragraphs.

282.     On 10/11/20 Plaintiff filed a police report for eavesdropping. Sometime afterwards, report JD 395768 was illegally closed when Deputy Chief Eric Chin of Northwestern Police Illegally contacted Chicago Police Jennifer O Shaughnessy (star 1829) and illegally disclosed Plaintiff's mental health history in violation of HIPPA (Health Insurance Portability and Accountability Act) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act. Chin also contacted my therapist, Brian Tobin, without a release of information consent form, in violation of both laws.

283.     The Mental Health and Developmental Disabilities Confidentiality Act provides that "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient" and "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient," including "information which indicates that a person is a recipient," "shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/2, 3(a) (West 2000).

284.     Under Health Insurance Portability and Accountability Act (HIPAA), the general rule pertaining to the disclosure of protected health information is that a covered entity may not use or disclose protected health information without a written authorization from the individual or, alternatively,

the opportunity for the individual to agree or object. Health Insurance Portability and Accountability Act of 1996, § 101(a) et seq., 42 U.S.C.A. § 1181 et seq.; 45 C.F.R. §§ 164.508, 164.510. Isidore Steiner, DPM, PC v. Bonanni, 292 Mich. App. 265, 807 N.W.2d 902 (2011).

285.    Northwestern Memorial Hospital, which is the covered health-care provider, has business associates including Northwestern University Police Department and Northwestern University. Covered entities under Health Insurance Portability and Accountability Act (HIPAA) generally include health-care providers, health plans, and health-care clearinghouses and their business associates. 42 U.S.C.A. § 1320d. Yeager v. Dickerson, 391 S.W.3d 388 (Ky. Ct. App. 2013).

286.    NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had a medical condition for which he had academic accommodations.

287.    This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

288.    These facts were of no legitimate concern to the recipients of Chin's communications.

289.    The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

290.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of Chin and NU's public disclosure of private facts;
   b.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of Chin and NU's violation of HIPAA and IMHDDCA;
   c.   Charge Chin and NU with the appropriate civil and criminal violations as a result of these actions;
   d.   Award punitive damages;
   e.   Award attorney's fees and costs; and
   f.   Award such other relief as the Court deems just and proper.

## Count 22
## 5/31–4. Obstructing justice 720 ILCS 5/31-4
### (Eric Chin, NUPD, NU)

291.    Plaintiff re-alleges and incorporates by reference each and every allegation foregoing paragraphs

292.    (a) A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he or she knowingly commits any of the following acts: (1) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information;

293.    (b) Sentence: (1) Obstructing justice is a Class 4 felony, except as provided in paragraph (2) of this subsection (b).

294.    On 10/11/20 Plaintiff filed a police report for eavesdropping. Sometime afterwards, report JD 395768 was illegally closed when Deputy Chief Eric Chin of Northwestern Police Illegally contacted Chicago Police Jennifer O Shaughnessy (star 1829) and illegally disclosed Plaintiff's mental health history in violation of HIPPA (Health Insurance Portability and Accountability Act) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act. Chin also contacted my therapist, Brian Tobin, without a release of information consent form, in violation of both laws.

295.    The Mental Health and Developmental Disabilities Confidentiality Act provides that "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient" and "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient," including "information which indicates that a person is a

recipient," "shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/2, 3(a) (West 2000).

296.    Under Health Insurance Portability and Accountability Act (HIPAA), the general rule pertaining to the disclosure of protected health information is that a covered entity may not use or disclose protected health information without a written authorization from the individual or, alternatively, the opportunity for the individual to agree or object. Health Insurance Portability and Accountability Act of 1996, § 101(a) et seq., 42 U.S.C.A. § 1181 et seq.; 45 C.F.R. §§ 164.508, 164.510. Isidore Steiner, DPM, PC v. Bonanni, 292 Mich. App. 265, 807 N.W.2d 902 (2011).

297.    Northwestern Memorial Hospital, which is the covered health-care provider, has business associates including Northwestern University Police Department and Northwestern University. Covered entities under Health Insurance Portability and Accountability Act (HIPAA) generally include health-care providers, health plans, and health-care clearinghouses and their business associates. 42 U.S.C.A. § 1320d. Yeager v. Dickerson, 391 S.W.3d 388 (Ky. Ct. App. 2013).

298.    NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had a medical condition for which he had academic accommodations.

299.    NU and Eric Chin also told the officer that Plaintiff had given consent for the audio tapes to be recorded, which is false information.

300.    This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

301.    These facts were of no legitimate concern to the recipients of Chin's communications.

302.    The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

303.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.


## Count 23
### Tortious Interference with Contractual Relations
### (Northwestern University)


304.    Plaintiff re-alleges and incorporates by reference each and every allegation foregoing paragraphs.

305.    Mona Dugo contacted Plaintiff's healthcare provider Brian Tobin without his knowledge or consent in order to defame Plaintiff by sharing illegal audio recordings.

306.    Eric Chin contacted Plaintiff's healthcare provider Brian Tobin without his knowledge or consent in order to defame Plaintiff by sharing illegal audio recordings.

307.    Plaintiff had an express and implied contract with N. Brian Tobin, a Licensed Clinical Social Worker at GET Therapy Chicago, LLC.

308.    Brian Tobin provided mental health services to Plaintiff.

309.    The Law School was aware of Plaintiff's contract with Brian Tobin.

310.    The Law School was not authorized by Plaintiff to communicate with Brian Tobin or anyone else at GET Therapy Chicago, LLC. from whom Plaintiff sought psychiatric care.

311.    The Law School induced a breach of Plaintiff's contract with Brian Tobin by informing GET Therapy Chicago, LLC. that Plaintiff was manipulating and deceiving her medical professionals, including the psychiatric staff at GET Therapy Chicago, LLC..

312.    The Law School acted with malice and intent to harm Plaintiff.

313.    As a direct result of the Law School's communications, Brian Tobin terminated his treatment and contract with Plaintiff without notice.

314.    The abrupt termination of his mental health treatment and his resulting inability to obtain necessary psychiatric medication caused harm to Plaintiff.

315.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the University's tortious interference with contract;

b.  Award punitive damages;

c.  Award attorney's fees and costs; and

d.  Award such other relief as the Court deems just and proper.

<u>COUNT 24</u>
**State Law Intentional Interference with Economic Advantage**
**(NU, NUPD, Student Group #1 and #2, NMH, Hospital Defendants, NU Defendants, Defendant NUPD Officers, FBI, Cook County State Attorney, Kim Foxx, City of Chicago, Chicago Police, FBI Agents, Evanston Police, City of Evanston)**

316.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

317.    To prove his tortious interference claim, Plaintiff must show: (1) a reasonable expectation of entering a valid business relationship, (2) Defendant's knowledge of that expectation, (3) Defendant's purposeful interference that prevented Plaintiff's legitimate expectation from becoming a valid business relationship, and (4) damages resulting from defendant's interference. <u>Santangelo v. Crown Cork & Seal USA, Inc.</u>, 255 F. Supp. 3d 791, 811 (N.D. Ill. 2017)

318.    Plaintiff alleges that the individuals in this count intentionally interfered with his educational contract for a JD with Northwestern University Law School.

319.    Plaintiff was enrolled in his first year of graduate school at NU and had a reasonable expectation of entering into a business relationship of legal education from NU and eventually becoming a graduate and alumni and practicing lawyer from NU, thereby being entitled to the at least the average sum total of economic benefit associated with a JD from NU. Plaintiff is and was at all times fully qualified to pursue his education, having received exemplary LSAT scores and achieved satisfactory results in 10 week of classes during Fall 2019. Plaintiff was enrolled in coursework towards earning a degree at all relevant times.

320.    All Parties named were aware that Plaintiff was a student from Northwestern University Law School, where NUPD was informed at the scene of the incident, where CFD EMS and NMH staff were informed by NUPD, and where the graduate students and NU employees were aware from being in law school and university, where the City of Chicago, and Chicago Police, and state attorney's office were made aware by the filing of Plaintiff's police reports, and his subsequent activities to follow up by calling and speaking to various staff and filing various complaints and COPA reports, where the City of Evanston and Evanston Police were made aware by NUPD and NU and Detective Stark, where the FBI was made aware by NU and/or NUPD.

321.    Each named defendant, through their actions as described in the complaint, interfered with Plaintiff's legitimate expectation of receiving a legal education from becoming a valid business relationship, including but not limited to the following:

a.  Individual Student Groups #1 and #2 both participated in conspiratorial and defamatory plots and disciplinary proceedings with the express purpose of obstructing the Plaintiff's opportunity to receive education by having him falsely accused of safety violations and suspended and expelled.

b.  Individual Hospital Defendants intentionally deviated from normal standards of care and resulting in medical battery and false imprisonment of the Plaintiff at NMH for 8 days from 11/1/19-11/8/19.

c. Individual NUPD Officers Healy, Walsh, Moore and Chin committed brutal physical attack using excessive force to unlawfully seize Plaintiff in a false arrest and conspiracy and false imprisonment of Plaintiff at NMH for 8 days from 11/1/19-11/8/19. NUPD later refused to investigate the illegal activity reported by Plaintiff, and retaliated against him, further hindering and sabotaging his attempts to regain his status as a student in the JD program by refusing to investigate his eavesdropping report and having his CPD report cancelled.

d. Individual NU Defendants unlawfully subjected Plaintiff to various coercive and unjustified disciplinary measures and sanctions while willfully ignoring compelling evidence of his innocence, discriminatory pre-conditions predicated on his mental health which served no objective value in later assessments of his risk to other students, and vicious deeply personal retaliatory acts designed to hurt or offend the Plaintiff in every manner possible, from repeated derogatory actions and remarks about Plaintiffs religious beliefs, to interfering with Plaintiff's mental health so that his therapist would end their relationship and he would be left without a mental health treatment provider. NU ignored 100% of Plaintiff's internal complaints, amounting to over 100 different counts of deliberate indifference by NU over the course of Plaintiff's 3 years pursuing his JD.

e. Individual defendant EPD officers subjected Plaintiff to religious and disability discrimination, and false arrest and false imprisonment in retaliation for Plaintiff protected first amendment free speech where he was reporting discrimination by Dugo to NU.

f. Individual defendant FBI Agents subjected Plaintiff to religious and disability discrimination and profiling, and unlawful seizure in violation of the Fourth Amendment via brutal unannounced interrogation at Plaintiff's home in retaliation for Plaintiff protected first amendment free speech where he was reporting discrimination by Dugo to NU.

g. Chicago Police unlawfully cancelled Plaintiff's police report through disability-discrimination and refused to investigate subsequent one he put in for a period of almost 4 months, when doing so would have directly prevented Plaintiff's expulsion and ended his suspension and allowed him to go back to school.

h. Cook County State Attorney and Kim Foxx had a standard policy of refusing to prosecute violations of the state eavesdropping statute, directly causing the lack of investigation on the part of Chicago Police, where Plaintiff was told multiple times by Chicago Police officers that the reason they won't investigate his report is because the state attorney will not prosecute eavesdropping offenses.. As a result of this policy, Plaintiff was injured through unwarranted suspension and expulsion by the failure of police to investigate or resolve his multiple complaints.

i. Where FBI, NU, NMH, City of Chicago and City of Evanston were made aware via the activities of their respective police forces and NUPD and refused to take action to correct the illegal activities of their employees or adequately hire train or supervise employee's who would not be a risk to Plaintiff of discrimination and unlawful conduct.

j. Where Illinois Board of Higher Education willfully failed in its statutory pursuant to Every Student Succeeds Act: 5/2-3.25n(a) which reads in pertinent part: "The federal Every Student Succeeds Act requires that each state develop and implement a single, statewide accountability system applicable to all schools and school districts." Such failure was responsible for the lack of accountability for NU wherein they systematically violated Plaintiff's rights over 3 years. IBHE deliberately failed to implement the accountability system, which prevented Plaintiff from being able to submit complaints externally about NU's behavior. The inability to access external grievance procedure directly hindered Plaint's legitimate business expectation of a JD from becoming a valid business relationship. Had there been an accountability system or grievance procedure pursuant to the stature, Plaintiff's legitimate complaints about the behavior of NU students and staff would have been addressed and he would have been ale to successfully pursue his degree.

322. As a result of the actions of the defendants as described in this complaint, Plaintiff was: twice unlawfully suspended for 1 semester without notice or hearing in Fall 2019 and Fall 2020; once unlawfully

suspended for 1 semester in Spring 2020 based on illegal, discriminatory and false and defamatory pretenses; and ultimately unlawfully expelled in Fall 2020 semester based on illegal and false and defamatory and discriminatory pretenses.

323.　　WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b. Award punitive damages;
   c. Award attorney's fees and costs; and
   d. Award such other relief as the Court deems just and proper.

## COUNT 25
### First Amendment Retaliation
### (Northwestern University, NUPD, NMH, Student Group #1)

324.　　Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**325.　　To state First Amendment retaliation claim, plaintiff must have alleged that (1) he engaged in constitutionally protected speech; (2) he suffered deprivation likely to deter his free speech; and (3) his protected speech was at least motivating factor for deprivation. U.S. Const. Amend. Glickman v. Main-Niles Ass'n of Special Recreation, 18 C 4907, 2020 WL 887444 (N.D. Ill. Feb. 24, 2020)**

**326.　　Where Plaintiff was engaged in protected free speech on religious grounds at the 11/1/19 Muslim Law Students Association Dinner, and professed his religious beliefs as indicated by the information in the 2019 student conduct investigation and hearing materials.**

**327.　　He suffered a brutal physical attack both by students, and NUPD officers using unnecessary force to restrain him, and ultimately suffered false imprisonment for 8 days which were all likely to deter his speech**

**328.　　Where, as indicated in the student conduct interviews of the three attackers, they all explicitly made reference to Plaintiffs professions and statements indicating his religion beliefs as motivating factors in their approach and subsequent attack and his false imprisonment, where NUPD and NMH Staff made reference to his "beliefs" as reasons for his detainment.**

329.　　WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b. Award punitive damages;
   c. Award attorney's fees and costs; and
   d. Award such other relief as the Court deems just and proper.

## COUNT 26
### Assault 720 ILCS 5/12-1
### (NU, NUPD Officers Healy, Walsh, Moore, Individual Defendant CFD Officers, Individual Hospital Defendants, Student Group #1 )

330.　　Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

331.　　A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery.

332.　　Each and every time that Alkahawaja approached Plaintiff as indicated in his own 2019 UHAS interview put Plaintiff in reasonable apprehension of receiving a battery, for a total of four instances of unwarranted approach four counts for four counts of assault, wherein he used threatening and intimidating

language, engaged in unwanted physical contact, and used threatening body language such as extended "intense" eye contact which was meant as a means of intimidation and coercion.

333.    Maksud and Ibrahim's threatening approach prior to restraining Plaintiff put him in reasonable apprehension of receiving a battery.

334.    **NUPD Officers Healy, Walsh, Moore** threatening approach prior to restraining Plaintiff put him in reasonable apprehension of receiving a battery.

335.    **Individual Defendant CFD Officers** threatening approach prior to restraining Plaintiff put him in reasonable apprehension of receiving a battery.

336.    **Individual Hospital Defendants** threatening approach prior to restraining Plaintiff put him in reasonable apprehension of receiving a battery.

337.    **NU through the actions of its agents put Plaintiff** in reasonable apprehension of receiving a battery.

338.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b.   Award punitive damages;
   c.   Award attorney's fees and costs; and
   d.   Award such other relief as the Court deems just and proper.

## <u>COUNT 27</u>
### Aggravated assault. 720 ILCS 5/12-2
### (Northwestern University, NUPD, NMH, Student Group #1)

339.    Plaintiff specifically realleges the allegations corresponding to every count of assault

340.    Offense based on location of conduct. A person commits aggravated assault when he or she commits an assault against an individual who is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship.

341.    All of the actions the defendants in this count took place on or about a place of public accommodation, at NU school premises located at 357 E. Chicago Ave., Chicago, IL 60611.

342.    Offense based on status of victim. A person commits aggravated assault when, in committing an assault, he or she knows the individual assaulted to be any of the following: A person with a physical disability or a person 60 years of age or older and the assault is without legal justification.

343.    [A]ggravated assault requires placing victim in reasonable apprehension of receiving a battery**, People v. Krueger, 176 Ill. App. 3d 625, 531 N.E.2d 396 (2d Dist. 1988)**

**344.    Where each of the defendants in the count, through intermediary circumstances and the actions of themselves or their agents, were aware that Plaintiff suffered from a physical disability, was suffering from extreme emotional distress from his mothers death, or had tacit awareness of such.**

**345.    Where Plaintiff's original attack and imprisonment by student group #1 was unjustified and based off their perceived threat from Plaintiff's disability.**

**346.    Where Plaintiffs arrest by NUPD officers and confinement at NMH was based in part on Plaintiff's mental health diagnosis and where proper commitment procedure was violated with both falsified police reports and falsified commitment petitions;**

**347.    Where each instance of individual approach by each individual named in this count put Plaintiff in reasonable apprehension of receiving a battery and wherein Plaintiff was subsequently battered and falsely imprisoned by each individual named in this count.**

348.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
b. Award punitive damages;
c. Award attorney's fees and costs; and
d. Award such other relief as the Court deems just and proper.

## COUNT 28
### Battery 720 720 ILCS 5/12-3
**(NUPD Officers Healy, Walsh, Moore; Individual Hospital Defendants, Student Group #1)**

349. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

350. A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.

**351. But in Illinois, a defendant can be liable for contacts that are "relatively trivial ones which are merely offensive and insulting." *Cohen v. Smith*, 269 Ill.App.3d 1087, 207 Ill.Dec. 873, 648 N.E.2d 329, 332 (1995)**

352. Where Alkahawja approached Plaintiff the first time under his own admission the first time and did knowingly pat Plaintiff on back in an insulting or provoking manner and ask Plaintiff to "step outside" in an extremely aggressive and unwarranted manner.

353. Where Alkhawaja physically attacked and restrained Plaintiff with the help of Ibrahim and Maksud, where all three admitted to psychically restraining Plaintiff's freedom of movement to leave the premises against his will with the intent on initiating the civil commitment of Plaintiff based on threat from Plaintiff's perceived disability.

354. Where NUPD officers did inappropriately and viciously detain Plaintiff in handcuffs, brutally throw Plaintiff to the ground and hold him forcibly there against his will at the scene of the incident.

355. Where each of the Individual Hospital Defendants did, at various points, make offensive physical contact with the Plaintiff by restraining and inappropriately administering psychotropic medication and confining Plaintiff against his will to NMH for a period of 8 days.

356. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
b. Award punitive damages;
c. Award attorney's fees and costs; and
d. Award such other relief as the Court deems just and proper.

## COUNT 29
### Aggravated battery. ILCS 5/12-3.05
**(NUPD Officers Healy, Walsh, Moore; Individual Hospital Defendants, Student Group #1)**

357. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

358. Offense based on injury: A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she knowingly does any of the following: (5) Strangles another individual.

359. Where Alkhawaja admitted to strangling the Plaintiff in a choke hold.

360. Offense based on injury to a child or person with an intellectual disability: A person who is at least 18 years of age commits aggravated battery when, in committing a battery, he or she knowingly and without legal justification by any means: (1) causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years, or to any person with a severe or profound intellectual disability; or (2)

causes bodily harm or disability or disfigurement to any child under the age of 13 years or to any person with a severe or profound intellectual disability.

361.    Where the actions of each individual named in this count resulted in great bodily harm to the Plaintiff and resulted in his unlawful confinement for 8 days.

362.    Where each of the individuals named in this count had direct or tacit awareness that Plaintiff was a person with a profound intellectual disability and took their actions based upon knowledge of that fact.

363.    Offense based on location of conduct: A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or a domestic violence shelter, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship.

364.    The incident took place at 357 E. Chicago Ave. on NU premises, which is a school and therefore a place of public accommodation as defined in this statute.

365.    Two counts against Alkawaja for each instance of unwanted physical contact while Plaintiff, include his vicious physical assault and attempted murder of Plaintiff through strangulation.

366.    Aggravated battery as defined in subdivision (a)(3) or (g)(1) is a Class 1 felony. Aggravated battery as defined in subdivision (a)(1) is a Class 1 felony when the aggravated battery was intentional and involved the infliction of torture, as defined in paragraph (14) of subsection (b) of Section 9-1 of this Code, as the infliction of or subjection to extreme physical pain, motivated by an intent to increase or prolong the pain, suffering, or agony of the victim.

367.    Where each of the individual students in this count did knowingly attack Plaintiff with the express intention to subjecting him to extreme prolonged physical torture and pain through unlawful confinement in a psychiatric facility expressly to prolong his suffering.

368.    Aggravated battery as defined in subdivision (a)(1) is a Class 2 felony when the person causes great bodily harm or permanent disability to an individual whom the person knows to be a member of a congregation engaged in prayer or other religious activities at a church, synagogue, mosque, or other building, structure, or place used for religious worship.

369.    Where Plaintiff was known to be engaged in religious activities as part of the congregation of Muslim students at the law school event while inside the law school building.

370.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.    Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b.    Award punitive damages;
   c.    Award attorney's fees and costs; and
   d.    Award such other relief as the Court deems just and proper.

## COUNT 30
### 42 U.S.C. § 1983: Violation of Fifth Amendment Due Process
### (Northwestern University, NUPD, NMH)

371.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**372.**    The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without "due process of law." **Dusenbery v. United States,** 534 U.S. 161, 167, 122 S. Ct. 694, 699, 151 L. Ed. 2d 597 **(2002)**

**373.**    [I]ndividuals whose property interests are at stake are entitled to "notice and an opportunity to be heard." **United States v. James Daniel Good Real Property**, 510 U.S. 43, 48, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).

**374.**    We held that this notice was constitutionally defective as to known persons whose whereabouts were also known, because it was not "reasonably calculated, under all the circumstances, to apprise interested

parties of the pendency of the action and afford them an opportunity to present their objections." **Id., at 314, 319, 70 S.Ct. 652; see also id., at 315, 70 S.Ct. 652** ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it**"). Dusenbery v. United States, 534 U.S. 161, 168, 122 S. Ct. 694, 700, 151 L. Ed. 2d 597 (2002)**

**375.    Where the Plaintiff was subjected to false imprisonment without the opportunity of a fair hearing, and accordingly not given notice or opportunity to present his objections to the involuntary commitment.**

**376.    Where NUPD officers and NMH staff falsified the commitment petition, never filed it with the state or provided Plaintiff with the copy.**

**377.    Where the act of false imprisonment inflicted upon Plaintiff ultimately deprived him of his property interest in the JD program and NU by resulting in his suspension in Fall 2019 and Spring 2020, and causing the probationary status which was responsible for magnification of Plaintiff's minor alleged offenses during the Fall 2020 incident and ultimately resulted in Plaintiff's expulsion and ban from NU and permanent notation on Plaintiff's transcript.**

**378.    Where the false imprisonment continues to produce immeasurable hardships and negative repercussions in Plaintiff's life such as the cancelation of his CPD police report and production of the suspicion of safety threat from NU.**

379.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b. Award punitive damages;
   c. Award attorney's fees and costs; and
   d. Award such other relief as the Court deems just and proper.


<u>**COUNT 31**</u>
**42 U.S.C. § 1983: Violation of Fourth Amendment Unreasonable Seizure and Excessive Force NUPD Officers Healy, Walsh, and Moore; Individual Hospital Defendants, Student Group #1, NU, NMH**

380.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

381.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." Manuel's complaint seeks just that protection. Government officials, it recounts, detained—which is to say, "seiz[ed]"—Manuel for 48 days following his arrest. See App. 79–80; Brendlin v. California, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) ("A person is seized" whenever officials "restrain[ ] his freedom of movement" such that he is "not free to leave"). And that detention was "unreasonable," the complaint continues, because it was based solely on false evidence, rather than supported by probable cause. **See App. 79–80; Bailey v. United States, 568 U.S. 186, 192, 133 S.Ct. 1031, 185 L.Ed.2d 19 (2013) (** "[T]he general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime**"). <u>Manuel v. City of Joliet</u>, Ill., 137 S. Ct. 911, 917, 197 L. Ed. 2d 312 (2017)**This Court decided some four decades ago that a claim challenging pretrial detention fell within the scope of the Fourth Amendment. <u>Id.</u> Our holding—that the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process— does not exhaust the disputed legal issues in this case. It addresses only the threshold inquiry in a § 1983 suit, which requires courts to "identify the specific constitutional right" at issue. *Albright,* 510 U.S., at 271, 114 S.Ct. 807. After pinpointing that right, courts still must determine the elements of, and rules associated with, an action seeking damages for its violation. See, *e.g., Carey v. Piphus*, 435 U.S. 247, 257–258, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). <u>Id.</u>

382.    Fourth Amendment prohibition of unreasonable searches and seizures applied to treatment in field during medical emergency. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983. <u>Thompson v. Cope</u>, 900 F.3d 414 (7th Cir. 2018) Fourth Amendment forbids unreasonable seizure of persons. <u>U.S.C.A. Const. Amend. 4.</u>

McKinney v. George, 726 F.2d 1183 (7th Cir. 1984) Standard of reasonableness under Fourth Amendment is federal. U.S.C.A. Const. Amend. 4. Id. Fourth Amendment is applicable to states by virtue of due process clause of Fourteenth Amendment. Id.

383.    A person is seized by authorities when a reasonable innocent person would not feel free to leave. U.S. Const. Amend. 4. Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019) That said, if an officer obtains probable cause partway through an unlawful seizure, he is still liable under § 1983 for the portion of the seizure that occurred before probable cause was obtained. Id. No matter how much custody may be permissible, the reasonableness of a search or seizure depends on what actually happens rather than what could have happened. U.S. Const. Amend. 4. Id. Even when probable cause exists, constitutional violations may lie when searches or seizures were conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests. U.S. Const. Amend. 4. Id.

384.    Where Plaintiff was brutally attacked and unreasonable seized by Student Group #1 in the manner intended by this statutes.

385.    Where Plaintiff was brutally attacked and unreasonable seized by NUPD Officers Healy, Walsh, and Moore in the manner intended by this statutes.

386.    Where Healy, Walsh, and Moore unreasonably threw Plaintiff to the ground when Plaintiff presented no risk of safety and had made no threatening motions or gestures.

387.    Where officers failed to inform Plaintiff of his rights or the reason for his arrest and failed to establish probable cause or legal basis for Plaintiff's arrest.

388.    Where Individual Hospital Defendants unreasonably sized Plaintiff for 8 days at NMH in violation of this statute.

389.    Where individual Hospital Defendants used excessive force in the force of two forced administrations of psychotropic medications when Plaintiff made no threatening motions or gestures and posed no risk to the safety of himself or others.

390.    Where NU is liable for the actions of NUPD and NMH is liable for the actions of the hospital defendants.

391.    Where a genuine dispute of material fact exists as to the alleged existence of probable cause for the arrest as indicated by the discrepancy in the accounts of Muaaz Maksud pertaining to witnessing the alleged act of battery.

392.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;

    b.  Award punitive damages;

    c.  Award attorney's fees and costs; and

    d.  Award such other relief as the Court deems just and proper.

## Qualified Immunity

393.    The right to be free from arrests without probable cause premised on lies was clearly established. It was clearly established in July 2017 that there was right to be free from arrest without probable cause and that Fourth Amendment protected against arrests premised on lies, and thus camp counselors for municipal day camp for disabled children at city park were not entitled to qualified immunity from liability in park user's § 1983 action alleging that police officers arrested him for disorderly conduct based on counselors' false and defamatory statements about him.  U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

## COUNT 32
## State Law False Imprisonment
## (Northwestern University, NUPD, NMH, Alkhawaja, Maksud, Ibrahim, NU, Individual Hospital Defendants)

394.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

395.    In Illinois a false imprisonment "is defined as an unlawful restraint of an individual's personal liberty or freedom of locomotion," in which "a person is compelled to remain where he does not wish to remain or to go where he does not wish to go." *Lopez v. Winchell's Donut House*, 126 Ill.App.3d 46, 81 Ill.Dec. 507, 466 N.E.2d 1309, 1311 (1984) It may be accomplished by "words alone, by acts alone or both." *Id.* **Shea v. Winnebago County Sheriff's Dep't, 746 Fed. Appx. 541, 548 (7th Cir. 2018), cert. denied sub nom. Shea v. Winnebago County Sheriff's Office, 139 S. Ct. 1200, 203 L. Ed. 2d 204 (2019)**

396.    Because Mental Health and Developmental Disabilities Code protects liberty interests, strict compliance with statutory procedures is required.  In re Amanda H., App. 3 Dist.2017, 413 Ill.Dec. 866, 79 N.E.3d 215, appeal denied 417 Ill.Dec. 835, 89 N.E.3d 754.  Appeal And Error 🗝 181 The procedural safeguards in place for civil commitment are not mere technicalities to be sidestepped; rather, the legislature created them to protect people from the deprivation of a liberty interest.  In re Demir, App. 4 Dist.2001, 256 Ill.Dec. 226, 322 Ill.App.3d 989, 751 N.E.2d 616.  Mental Health 🗝 37.1 Involuntary admission procedures represent the legislature's attempt to balance the individual's interest in liberty against society's dual interests in protecting itself from dangerous mentally ill persons and caring for those who are unable to care for themselves; the Mental Health and Developmental Disabilities Code's procedural safeguard's are not mere technicalities but are essential tools to safeguard the liberty interests of respondents in mental health cases.  In re Joseph P., App. 4 Dist.2010, 348 Ill.Dec. 107, 406 Ill.App.3d 341, 943 N.E.2d 715.  Constitutional Law 🗝 4337;  Mental Health 🗝 37.1

397.    Police officers and paramedics failed to prove either that law was not clearly established or, if law was clearly established, that defendants neither knew nor should have known of relevant legal standard with respect to plaintiff's claims of illegal search and use of force in removing her from her home and subjecting her to involuntary mental examination precluding dismissal of § 1983 action on qualified immunity grounds.  Anderson v. Village of Forest Park, App. 1 Dist.1992, 179 Ill.Dec. 373, 238 Ill.App.3d 83, 606 N.E.2d 205.  Civil Rights 🗝 1376(4);  Civil Rights 🗝 1376(6)

398.    Omission of the transporting officer's names and contact information from the petition for involuntary admission could not be presumed to be harmless under Mental Health and Developmental Disabilities Code; failing to provide such information deprived patient of using testimony from the transporting officers that might have been beneficial to her, and that resulted in potential prejudice to patient.  **In re Amanda H., App. 3 Dist.2017, 413 Ill.Dec. 866, 79 N.E.3d 215, appeal denied 417 Ill.Dec. 835, 89 N.E.3d 754.**  Mental Health 🗝 45 Mental Health and Developmental Disabilities Code required that the transporting officers' names, badge numbers, and employer be identified in the petition for involuntary admission so that the officers could be called as potential witnesses; although the process of involuntary commitment was initiated by patient's father and brother, the police played an active role in restraining patient and in transporting her to the hospital against her will. Id.

399.    Patient could not be found to be person subject to involuntary admission to mental health facility, where peace officer, who took patient into custody and transported patient to mental health facility, failed to complete petition for involuntary admission.  In re John N., App. 3 Dist.2006, 302 Ill.Dec. 278, 364 Ill.App.3d 996, 848 N.E.2d 577, modified on denial of rehearing.  Mental Health 🗝 38 Petition for involuntary commitment of patient to mental hospital was invalid, where petition was completed by social worker at hospital, not by police who brought patient to hospital.  In re Demir, App. 4 Dist.2001, 256 Ill.Dec. 226, 322 Ill.App.3d 989, 751 N.E.2d 616.  Mental Health 🗝 38 Involuntary commitment order had to be reversed, where petition for involuntary commitment was filed 48 hours after involuntary admission and hospitalization of person, rather than within the statutorily mandated 24 hours, and where record failed to indicate that committed person was served with copy of petition within 12 hours of admission as required by statute.  Matter of Riviere, App. 3 Dist.1989, 132 Ill.Dec. 141, 183 Ill.App.3d 456, 539 N.E.2d 451.  Mental Health 🗝 38;  Mental Health 🗝 39;  Mental Health 🗝 45 Under statute on involuntary admission to mental health facility, when peace officer takes person who is subject of emergency petition for involuntary admission to mental health care facility into custody and transports person to mental health facility, failure of peace officer to complete petition for involuntary admission is reversible error.  In re John N., App. 3 Dist.2006, 302 Ill.Dec. 278, 364 Ill.App.3d 996, 848 N.E.2d 577, modified on denial of rehearing.  Mental Health 🗝 38;  Mental Health 🗝 45

400.     The unlawful restraint by one person of the liberty or freedom of movement of another constitutes "false imprisonment". **Hughes v. New York Cent. Sys., 20 Ill. App. 2d 224, 155 N.E.2d 809 (1st Dist. 1959)** Initially authorized detention of individual pursuant to Mental Health Code may be followed by unlawful detention, that is actionable as false imprisonment, if detention is continued despite failure to comply with filing requirements of Code. **S.H.A. 405 ILCS 5/1–100 et seq. Sassali v. DeFauw, 297 Ill. App. 3d 50, 696 N.E.2d 1217 (2d Dist. 1998)** Fact that original detention of individual may be lawful, and thus will not support false imprisonment claim, does not mean that subsequent detention is also lawful and thus not actionable. **Id.; Fulford v. O'Connor, 3 Ill.2d 490, 500–01, 121 N.E.2d 767 (1954); Weimann v. County of Kane, 150 Ill.App.3d 962, 968, 104 Ill.Dec. 110, 502 N.E.2d 373 (1986); see also Hyatt v. United States, 968 F.Supp. 96, 110 (E.D.N.Y.1997) (applying Illinois law to a false imprisonment claim).** Under involuntary commitment provisions of Mental Health Code, failure to timely file commitment petition after individual is taken into custody is error that cannot be waived, and if director of facility to which individual has been taken does not comply with requirement, he or she must either release individual, or initiate new involuntary commitment proceedings. **S.H.A. 405 ILCS 5/3–611. Sassali v. DeFauw, 297 Ill. App. 3d 50, 696 N.E.2d 1217 (2d Dist. 1998)** Individual who had been forcibly taken to hospital for initiation of involuntary commitment proceedings under Mental Health Code, but for whom hospital had not timely filed involuntary commitment petition, could plead false imprisonment claim for time between when 24-hour period for filing petition expired, and time when court issued order setting hearing date and authorizing sheriff to transport individual. **S.H.A. 405 ILCS 5/1–100 et seq. Id.**

401.     False imprisonment does not necessarily depend on the legality of the arrest, and an unlawful detention following an arrest can itself be false imprisonment. **Hughes v. New York Cent. Sys., 20 Ill. App. 2d 224, 155 N.E.2d 809 (1st Dist. 1959)**

402.     Where the law protecting Plaintiff from unjustified and brutal attack while attending a school function was clearly established at the time the incident occurred. Where the right to be free from unreasonable seizure and excessive force and false arrest, and the right to liberty and to be free of unwarranted involuntary mental confinement were clearly established. Where Plaintiff's right to attend religious gatherings free of unwarranted harassment and brutal gang assault was clearly established

403.     Where Student Group #1 were acting in their official capacities and roles as event organizers, and where NU endorsed their actions and justified them in the 2019 student conduct proceedings. Accordingly, wherein the actions of both student group #1 and

404.     Where NUPD police played an active role in restraining patient and in transporting Plaintiff to the hospital against his will.

405.     Where NUPD Officer Healy #22 failed to complete the petition for involuntary admission and where the failure to include transporting officers' names, badge numbers, and employer on the commitment petition by R.N. Jeremy Baker deprived Plaintiff of using testimony by the transporting officers that might have been beneficial to him during any proceeding which may have taken place, and that resulted in potential prejudice to Plaintiff.

406.     Osama, Muaaz, Usama, NUPD, and NMH Staff acted together.

407.     Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on a perceived threat from his disability, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

408.     In the furtherance of which Alkhawaja viciously attacked and physically restrained Plaintiff. Ibrahim aided Alkhawaja in physically restraining Plaintiff, then called the 911 and NUPD and falsely reported that Plaintiff had "battered" Alkhawaja. Maksud aided in physically restraining Plaintiff, and falsely attested to witnessing the "battery" to the responding NUPD officers during the course of their investigation. Where the three restricted Plaintiff's freedom of movement to leave the premises for the purpose of holding him there so that police could arrest him.

409.     In the furtherance of which NUPD **Healy, Walsh, Moore, and Chin** falsified a commitment petition and police report, unlawfully threw Plaintiff to ground and arrested him without any evidence of statements of threat besides lies, and based on false witness testimony that Plaintiff had committed a battery;

410.     In furtherance of which NUPD transported Plaintiff to Defendant NMH for unlawful involuntary commitment;

411.     In furtherance of which NMH staff falsified the petition for commitment, inappropriate sedated, and involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint, resulting in his false imprisonment for 8 total days.

412.     Where Plaintiff's detention was continued despite failing to comply with filing requirements of the code under which Plaintiff was committed.

**413.     That the acts and omissions of any actions by the INDIVIDUAL HOSPITAL Defendants in their individual and official capacities under the under the Eighth and Fourteenth Amendments to the Constitution, as well as 42 U.S.C. § 1983 and § 1985 were all performed under the color of the state law and were unreasonable and performed knowingly, wantonly, recklessly, maliciously, with gross negligence, callousness, and with deliberate indifference to Plaintiff's well-being and serious medical needs and in reckless disregard of his safety and thereby caused him to suffer the unnecessary and reckless infliction of pain and suffering by the forced administration of unnecessary medical treatment which resulted in his false imprisonment for a period of 8 days and because of which Plaintiff is entitled to compensatory and punitive damages.**

**414.     That the conduct of Northwestern Memorial Hospital and all of their employees, agents and/or ostensible agents, were actions under the color of the state law when they deprived Plaintiff of his clearly established rights, privileges and immunities in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution of the United States, and of 42 U.S.C. § 1983 and 42 U.S.C. § 1985, and 405 ILCS 5/Ch. III Art. VI procedures.**

**415.     That the conduct of INDIVIDUAL HOSPITAL DEFENDANTS was pursuant to, and in execution and implementation of the color of state law and was an officially sanctioned policy, regulation or custom of each of the named Defendants.**

**416.     That the individual hospital defendants acted willfully and intentionally in violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, to-wit:**

    **e.   Violation of 405 ILCS 5/3-601:**
       **i.    Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;**
      **ii.    Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;**
     **iii.    Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.**

    **f.   Violation of 405 ILCS 5/3-602:**
       **i.    Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.**

    **g.   Violation 405 ILCS 5/3-606:**
       **i.    Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.**

    **h.   Violation of 405 ILCS 5/3-608:**
       **i.    Failed to inform Plaintiff of his right to refuse treatment.**
      **ii.    Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.**

    **i.   Violation of 405 ILCS 5/3-609:**
       **i.    Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.**
      **ii.    Failed to ask Plaintiff if he desires such documents sent to any other persons**
     **iii.    Failed to allow Plaintiff to make phone 2 phone calls.**

    **j.   Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:**

      i.    Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.

     ii.    Failed to promptly file second certificate and provide a copy to the respondent.

417.    That the INDIVIDUAL HOSPITAL DEFENDANTS exhibited deliberate indifference, pursuant to the Eighth and Fourteenth Amendments to the Constitution, to serious medical needs, to-wit:

    k.    Failure to train medical personnel at hospital in the proper determination of medical emergencies and such omitted training was in willful and wanton disregard for Plaintiff's serious medical needs and were grossly negligent and reckless acts.

    l.    Failure to hire individuals whose character and personality would not pose a potential danger to Plaintiff.

    m.    Failure to determine appropriate level of medical care and attention by medical providers and the failure to recognize the danger of improperly admitting Plaintiff to the facility;

    n.    Knowingly and recklessly hired and trained physicians, nurses and/or other medical personnel who are unable to determine common medical situations which render them unfit to perform the necessary duties of the position.

    o.    Knowingly and recklessly failing to discipline, instruct, supervise or control physicians, nurses and/or other medical personnel conduct and thereby encouraging acts and omissions that contributed to the injuries visited upon Plaintiff.

    p.    Recklessly, intentionally and/or willfully forcing medical care on a patient they knew did not need serious medical attention.

418.    That Northwestern Memorial Hospital, individually, or through their employees and/or agents, participated in the implementation, execution, and omission of the official policies, training, practices, regulations, and/or customs referred to above.

419.    That NMH had a duty to adequately train and supervise all, physicians, nurses and/or other medical personnel to obtain medical treatment, supervise and provide care and treatment to Plaintiff that was not grossly negligent or that amounted to a reckless indifference to his life or liberty concerns.

420.    That the NMH and NU herein permitted the implementation of inappropriate de facto policies which reflected or represented policies, practices and customs which deviated from acceptable standards.

421.    The unconstitutional conduct of the INDIVIDUAL HOSPITAL DEFENDANTS named herein implemented and executed the following policies and customs of these Defendants:

    q.    Implicit authorization, approval and knowing acquiescence in the wrongful conduct by said Defendants and/or their employees, agents or ostensible agents in the treatment of patients;

    r.    The use of and acceptance of unconstitutional excessive force by the forcible administration of unnecessary medical care which constituted punishment of those not suffering serious medical conditions;

    s.    Failure to discipline or terminate personnel known to have engaged in the use of excessive medical care which constituted punishment of those not suffering serious medical conditions and creating an atmosphere where hospital personnel believed they would not be disciplined for abusive conduct toward patients;

    t.    Failure to eliminate hospital policies, practices and customs which deviate from applicable Federal and State standards for hospital operations;

    u.    Failure to investigate, report and follow-up on prior incidents involving the use of excessive force, medication and emergency medical care by hospital and medical personnel.

422.    That as a direct and proximate result of the wrongful conduct of the Defendants, as alleged herein, Plaintiff has suffered and will continue to suffer past, present and future conscious pain and suffering, permanent career injury, and past, present and future economic damages.

423.    That pursuant to the provisions of 42 U.S.C. § 1988, Plaintiff is entitled to recover attorney fees and costs of litigation for the causes of actions alleged under the Constitution and the laws of the United States.

424.    That as a proximate cause of the Individual Hospital Defendants ' acts and/or omissions, Plaintiff suffered false imprisonment resulting in the following:

425.    a. Medical and hospital expense and daily care expense past, present and future; b. Inhumane and tortuous conscious pain and suffering; c. Economic and non-economic compensatory damages; d. Punitive damages;

426.    e. Any and all other damages including but not limited to both attorney fees recoverable under 42 U.S.C. § 1983 § 1985 and § 1988 and any and all damages otherwise recoverable under common law.

427.    Plaintiff has exhausted all administrative remedies.

428.    WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

v.    Enter a Judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $75,000.00, and award costs, interest, and attorney fees as well as punitive and/or exemplary damages.

w.    Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

i.    The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

ii.    The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school constitute false imprisonment under Illinois law;

iii.    The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate due process and equal protections under the Fourteenth Amendment to the United States Constitution;

iv.    The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school violate the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution

x.    Award Plaintiff any compensatory and/or nominal damages he may incur as a result of Defendant's involuntary commitment without due process;

y.    Award Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and F. Grant such other and further relief as this Court deems just and proper.

## COUNT 33
### 42 U.S.C. § 1983: Fourth Amendment False Arrest
### (NUPD, NU Student Group #1)

429.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

430.    Alkhawaja viciously attacked and physically restrained Plaintiff. Ibrahim aided Alkhawaja in physically restraining Plaintiff, then called the 911 and NUPD and falsely reported that Plaintiff had "battered" Alkhawaja. Maksud aided in physically restraining Plaintiff, and falsely attested to witnessing the "battery" to the responding NUPD officers during the course of their investigation. The statements made by student group #1 formed the basis of the battery charge which Plaintiff was arrested and confined over. The statements were false and defamatory.

431. Where NUPD never established probable cause for Plaintiff's arrest or subsequent involuntary confinement.

432. Fact that police officers had probable cause for plaintiff's arrest did not necessarily mean that municipal employees had probable cause for their allegations against him, and thus prior judicial determination that officers had probable cause to arrest plaintiff based on employees' statements did not collaterally estop plaintiff from asserting Fourth Amendment false arrest claims against employees in subsequent § 1983 action. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983 **Glickman v. Main-Niles Ass'n of Special Recreation, 18 C 4907, 2020 WL 887444 (N.D. Ill. Feb. 24, 2020)** Plaintiff's conviction for disorderly conduct did not collaterally estop him from subsequently asserting Fourth Amendment false arrest claim against municipal employees who made statements to police officers that formed basis of disorderly conduct charge, where conviction was overturned. **Id.** Arrestee pled plausible Fourth Amendment false arrest claims against municipal employees under § 1983 by alleging that employees made specific false and defamatory statements to police officers, which led officers to arrest him, and that they signed criminal complaint charging him with disorderly conduct. Id.

433. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b. Award punitive damages;
   c. Award attorney's fees and costs; and
   d. Award such other relief as the Court deems just and proper.

<u>COUNT 34</u>
**42 U.S.C. § 1983: 1985 Civil Conspiracy**
**(NUPD Officers Healy, Walsh, Moore, and Chin; NU Student Group #1; Individual Hospital Defendants, NMH)**

434. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
**435.** Section 1985 allows plaintiffs to recover damages from private actors who act to deprive them of their civil rights. **42 U.S.C.A. § 1985. Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)**
**436.** Purpose of § 1985, as distinct from § 1983 claims against those acting under color of state law, is to permit recovery from a private actor who has conspired with state actors. **42 U.S.C.A. §§ 1983, 1985.**
**Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)**
437. An Illinois civil conspiracy requires three elements:
   1. a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.
438. Osama, Muaaz, Usama, NUPD, and NMH Staff acted together.
439. Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on a perceived threat from his disability, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.
440. In the furtherance of which Alkhawaja viciously attacked and physically restrained Plaintiff. Ibrahim aided Alkhawaja in physically restraining Plaintiff, then called the 911 and NUPD and falsely reported that Plaintiff had "battered" Alkhawaja. Maksud aided in physically restraining Plaintiff, and falsely attested to witnessing the "battery" to the responding NUPD officers during the course of their investigation.
441. In the furtherance of which NUPD **Healy, Walsh, Moore, and Chin** falsified a commitment petition and police report, unlawfully threw Plaintiff to ground and arrested him without any evidence of statements of threat besides lies, and based on false witness testimony that Plaintiff had committed a battery;
442. In furtherance of which NUPD transported Plaintiff to Defendant NMH for unlawful involuntary commitment;

443.    In furtherance of which NMH staff falsified the petition for commitment, inappropriate sedated, and involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint, resulting in his false imprisonment for 8 total days.

444.    Allegations that [co-conspirators] acted with the common purpose [], and committed acts of battery, assault, and false imprisonment to further that wrongful purpose, were sufficient to state civil conspiracy claim under Illinois law. **Shea v. Winnebago County Sheriff's Dep't,** 746 Fed. Appx. 541 (7th Cir. 2018), cert. denied sub nom. **Shea v. Winnebago County Sheriff's Office,** 139 S. Ct. 1200, 203 L. Ed. 2d 204

445.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
   b.  Award punitive damages;
   c.  Award attorney's fees and costs; and
   d.  Award such other relief as the Court deems just and proper.

## Count 35
### 42 U.S.C. § 1986. Action for neglect to prevent
### (NU)

446.    Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action. 42 U.S.C.A. § 1986 (West)

447.    Where NUPD Officers Healy, Walsh and Moore had knowledge of the imminent unlawful confinement of the Plaintiff and had the power to prevent it through conducting a proper and thorough investigation during the incident and refused to do so, and this resulted in the 1985 conspiracy committed by Student Group #1 being furthered by resulting in Plaintiff's unlawful confinement for 8 days.

448.    Where NU employee's were notified of the incident when it occurred and had the power to conduct a review of the procedures and policies.

449.    Where NUPD Deputy Chief Eric Chin was notified of the incident and advised his officers to file "use of force" documents, where Chin was in the position to review the policies and procedures of the commitment on the day it happened, including a review of the commitment petition and failed to act on the obvious violation of state procedures committed by NUPD officers.

450.    Where the negligence of NU of not having safety officials or other monitors or school staff at the school at the time of the event resulted in Plaintiff's brutal attack while in a secluded location in the law school.

451.    Where the negligence of NU not having any security cameras in operation prevented the Plaintiff from being able to prove the truthfulness of his claims as would have been possible if there was video evidence of the event.

452.    Where NU had, through the discrepancy between the police report account which indicated that Healy completed a petition for commitment, and the lack of actual evidence of the petition, and the ready availability of video evidence from the body worn cameras of the officers, ample knowledge that a conspiracy had been committed by student group #1 and Officers Healy, Walsh and Moore which resulted in Plaintiff's false imprisonment for 8 total days.

453.    Where the short and long term damages effectively resulted in deprivation of the Plaintiff's liberty interest through unlawful involuntary confinement for 8 days.

454.     Where the long term damages produced ongoing obstacles in the Plaintiff's life such as resulting in Plaintiff having a record in involuntary psychiatric treatment and NU using that against him as reason to suspect his threat to the safety of other students

455.     Where his health history from the confinement was used by the Chicago Police Department as a reason to suspect the authenticity of his police report and resulted in its closure and deprivation of the Plaintiff's ability to seek lawful recourse for his injuries.

456.     Where the long term consequences of the attack ultimately deprived Plaintiff of the ability to have a law degree or the career earnings associated with a JD from a top ranked 10 Law School in the US.

457.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;

    b.   Award punitive damages;

    c.   Award attorney's fees and costs; and

    d.   Award such other relief as the Court deems just and proper.

## Count 36
### Educational intimidation. 720 ILCS 5/12-7.2
### (Student Group #1,  Individual Defendant NUPD Officers)

458.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

459.     (a) A person commits educational intimidation when he knowingly interferes with the right of any [student] who is or is believed to be afflicted with a [ADA disability] to attend or participate in the activities of [any] school in this State:

460.     (1) by actual or threatened physical harm to the person or property of the [student] or the [student]'s family; or

461.     (2) by impeding or obstructing the [student]'s right of ingress to, egress from, or freedom of movement at school facilities or activities; or

462.     (3) by exposing or threatening to expose the [student], or the family or friends of the [student], to public hatred, contempt or ridicule.

463.     (c) Educational intimidation is a Class C misdemeanor, except that a second or subsequent offense shall be a Class A misdemeanor.

464.     (d) Independent of any criminal prosecution or the result thereof, any person suffering injury to his person or damage to his property as a result of educational intimidation may bring a civil action for damages, injunction or other appropriate relief. The court may award actual damages, including damages for emotional distress, or punitive damages. A judgment may include attorney's fees and costs.

465.     Where the actions of defendants both threatened and did actual physical harm to Plaintiff in his person and property at the MLSA event on 11/1/19.

466.     Where the actions of defendants obstructed Plaintiffs freedom of movement at the MLSA event on 11/1/19, a school activity which took place inside of the school facility.

467.     Where the actions of defendants did expose Plaintiff to public hatred, contempt and ridicule in the form of severely and irreparably injuring his reputation and credibility and ability to attend school at NU. As a result of the event, Plaintiff was unjustly accused of being a risk to the safety of other students and staff. Due to this event, Plaintiff suffered discrimination by NUPD and CPD by habing his criminal eavesdropping complaint cancelled. Due to the probationary status he suffered, he was expelled on 1/21/21 after being harassed by Evangeline Gargula on 8/23/20

**468.     WHEREFORE, Plaintiff demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.**

## Count 37

**42 U.S.C. § 1983: Violation of 1981 Equal Protections**
**(NUPD, NU)**

469.    Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

470.    That the City of Chicago is a municipal corporation located within the judicial district for Cook County of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

471.    At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University and working under color of law.

472.    Plaintiff brings this claim for deprivation of certain rights under **42 USC** 1981 and **1983**.

473.    On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

474.    NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

475.    Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

476.    NUPD willfully treated Plaintiff as though he was guilty before they had accurately assessed the situation based on threat from Plaintiff's perceived disability and religion. NUPD considered the claims of the similarly situated students as though they were true and based their decisions on the fact that one or more of the attackers or people on the scene told them that Plaintiff was suffering from "mental illness."

477.    That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

478.    Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including loss of his ability to attend graduate school at NU. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

479.    The arrest, seizure, detainment, force and attack of plaintiff by NUPD officers was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1983** and **42 USC** 1988, in that:

    a.    Defendant failed to properly train its police officer; and/or

    b.    Failed to properly supervise its police officers; and/or

    c.    Failed to create, maintain and enforce appropriate policies, procedures and protocols for its police officers to follow when questioning, arresting, detaining and processing members of the general public; and/or

    d.    Failed to maintain and preserve evidence of plaintiffs innocence and the wrongful conduct of defendant's employees, including the failure to maintain videotape of the arrest and attack of the plaintiff as described herein.

480.    That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

481.    The arrest of plaintiff was done without probable cause and without justification and therefore resulted in unlawful detainment.

482.    That the force displayed by NUPD officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

483.    That at all times herein mentioned, the defendant, individually and acting through NUPD officers, acted knowingly, intentionally, willfully and maliciously.

484.    That Plaintiff was intentionally treated differently than similarly situated law students solely on the basis of his perceived disability.

485.     WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, NU and NUPD, in an amount to be proven at 'trial for compensatory and punitive damages, attorney fees, expert fees and such other damages that may be authorized under 42 USC 1988.

486.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;

    b.  Award punitive damages;

    c.  Award attorney's fees and costs; and

    d.  Award such other relief as the Court deems just and proper.

### Count 38
### 42 U.S.C. § 1983: Violation of 1981 Equal Protections
### Monell Claim
### (City of Chicago)

487.     Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

488.     That the City of Chicago is a municipal corporation located within the judicial district for Cook County of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

489.     At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University and working under color of law.

490.     Plaintiff brings this claim for deprivation of certain rights under 42 USC 1981 and 1983.

491.     On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

492.     NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

493.     Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

494.     That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

495.     Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including loss of his ability to attend graduate school at NU. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

496.     The arrest, seizure, detainment, force and attack of plaintiff by NUPD officers was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, in that:

    a.  Defendant failed to properly train its police officer; and/or

    b.  Failed to properly supervise its police officers; and/or

    c.  Failed to create, maintain and enforce appropriate policies, procedures and protocols for its police officers to follow when questioning, arresting, detaining and processing members of the general public; and/or

    d.  Failed to maintain and preserve evidence of plaintiffs innocence and the wrongful conduct of defendant's employees, including the failure to maintain videotape of the arrest and attack of the plaintiff as described herein.

497.     That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

498.     The arrest of plaintiff was done without probable cause and without justification and therefore resulted in unlawful detainment.

499.     That the force displayed by NUPD officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

500.     That at all times herein mentioned, the defendant, individually and acting through NUPD officers, acted knowingly, intentionally, willfully and maliciously.

501.     That Plaintiff was intentionally treated differently than similarly situated law students solely on the basis of his perceived disability.

502.     A private entity can be deemed a state actor, when "a state delegates a 'public function' to a private entity." Blum v. Yaretsky, 457 U.S. 991, 1005 (1982)).

503.     The City of Chicago has a municipal policy and custom, pursuant to 110 ILCS 1020/1, of delegating state policing responsibilities to NUPD for incidents which occur on NU property.

504.     The custom of delegation of jurisdiction to NUPD for incidents on NU property caused the individual NUPD officers to respond to the call on 11/1/19 instead of Chicago Police Department 18th district.

505.     The NUPD officers caused Plaintiff's constitutional violation of false arrest and false imprisonment without due process.

506.     Therefore, the municipal policy of the City of Chicago was the moving force behind the constitutional violation.


507.     WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, City of Chicago, in an amount to be proven at 'trial for compensatory and punitive damages, attorney fees, expert fees and such other damages that may be authorized under 42 USC 1988.

508.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
    b.  Award punitive damages;
    c.  Award attorney's fees and costs; and
    d.  Award such other relief as the Court deems just and proper.

## Count 39
### 42 U.S.C. § 1983: Violation of 1981 Equal Protections
### (Thomas Healy)

509.     Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

510.     That the Northwestern University Police Department is located within the federal judicial district for the Northern District of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

511.     At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University's police department and working under color of law. This includes the individual police officer subject to this count of the multi-count complaint.

512.     On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

513.     NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

514.     Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

515.     NUPD willfully treated Plaintiff as though he was guilty before they had accurately assessed the situation based on threat from Plaintiff's perceived disability and religion. NUPD considered the claims of the

similarly situated students as though they were true and based their decisions on the fact that one or more of the attackers or people on the scene told them that Plaintiff was suffering from "mental illness."

516.     That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

517.     Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including serious headaches and temporary loss of vision and loss of his ability to attend graduate school at NU. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

518.     The arrest, seizure, force and attack of plaintiff by this defendant was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1981**

519.     That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

520.     The arrest of plaintiff was done without probable cause and without justification and therefore resulted in unlawful detainment.

521.     That the force displayed by NUPD officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

522.     That at all times herein mentioned, the defendant acted knowingly, intentionally, willfully and maliciously.

523.     That Plaintiff was intentionally treated differently than similarly situated law students solely on the basis of his perceived disability.

524.     The failure to maintain exculpatory evidence; including videotape of the officer's interaction with plaintiff, falsification of the police report narrative stating that he had signed the petition for commitment, and failure to complete the petition was done knowingly and intentionally.

525.     WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, Thomas Healy, in an amount to be proven at trial for actual and punitive damages for bodily injury, emotional harm, pain and suffering, attorney fees, expert fees and such other damages that may be authorized under **42 USC** 1988.

## Count 40
### 42 U.S.C. § 1983: Violation of 1981 Equal Protections
### (Frank Walsh)

526.     Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

527.     That the Northwestern University Police Department is located within the federal judicial district for the Northern District of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

528.     At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University's police department and working under color of law. This includes the individual police officer subject to this count of the multi-count complaint.

529.     On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

530.     NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

531.     Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

532.     NUPD willfully treated Plaintiff as though he was guilty before they had accurately assessed the situation based on threat from Plaintiff's perceived disability and religion. NUPD considered the claims of the similarly situated students as though they were true and based their decisions on the fact that one or more of the attackers or people on the scene told them that Plaintiff was suffering from "mental illness."

533.     That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

534.     Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including serious headaches and temporary loss of vision and loss of his ability to attend graduate school at NU. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

535.     The arrest, seizure, force and attack of plaintiff by this defendant was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1981**

536.     That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

537.     The arrest of plaintiff by this police officer, acting while in concert with other defendants, was done without probable cause and without justification.

538.     That the force displayed by this NUPD officer acting in concert with other police officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

539.     The failure to maintain exculpatory evidence; including videotape of the officer's interaction with plaintiff, falsification of the police report narrative stating that Healy had signed the petition for commitment, and failure to complete the petition was done knowingly and intentionally.

540.     That this officer willfully failed in his duty to report the failure of Healy to sign the petition for commitment.

541.     WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, Frank Walsh, in an amount to be proven at trial for actual and punitive damages for bodily injury, emotional harm, pain and suffering, attorney fees, expert fees and such other damages that may be authorized under **42 USC 1988**.


### Count 41
### 42 U.S.C. § 1983: Violation of 1981 Equal Protections
### (Donald Moore)

542.     Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

543.     That the Northwestern University Police Department is located within the federal judicial district for the Northern District of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

544.     At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University's police department and working under color of law. This includes the individual police officer subject to this count of the multi-count complaint.

545.     On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

546.     NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

547.     Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

548.     NUPD willfully treated Plaintiff as though he was guilty before they had accurately assessed the situation based on threat from Plaintiff's perceived disability and religion. NUPD considered the claims of the similarly situated students as though they were true and based their decisions on the fact that one or more of the attackers or people on the scene told them that Plaintiff was suffering from "mental illness."

549.     That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

550.     Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including serious headaches and temporary loss of vision and loss of his ability to attend graduate school at NU. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

551.     The arrest, seizure, force and attack of plaintiff by this defendant was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1981**

552.     That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

553.     The arrest of plaintiff by this police officer, acting while in concert with other defendants, was done without probable cause and without justification.

554.     That the force displayed by this NUPD officer acting in concert with other police officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

555.     The failure to maintain exculpatory evidence; including videotape of the officer's interaction with plaintiff, falsification of the police report narrative stating that Healy had signed the petition for commitment, and failure to complete the petition was done knowingly and intentionally.

556.     That this officer willfully failed in his duty to report the failure of Healy to sign the petition for commitment.

557.     WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, Donald Moore, in an amount to be proven at trial for actual and punitive damages for bodily injury, emotional harm, pain and suffering, attorney fees, expert fees and such other damages that may be authorized under **42 USC 1988**.


## Count 42
### 42 U.S.C. § 1983: Violation of 1981 Equal Protections
### (Eric Chin)

558.     Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

559.     That the Northwestern University Police Department is located within the federal judicial district for the Northern District of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

560.     At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University's police department and working under color of law. This includes the individual police officer subject to this count of the multi-count complaint.

561.     On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

562.     NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

563.     Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

564.     NUPD willfully treated Plaintiff as though he was guilty before they had accurately assessed the situation based on threat from Plaintiff's perceived disability and religion. NUPD considered the claims of the similarly situated students as though they were true and based their decisions on the fact that one or more of the attackers or people on the scene told them that Plaintiff was suffering from "mental illness."

565.     That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

566.     Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including serious headaches and temporary loss of vision and loss of his ability to attend graduate school at NU. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

567.     The arrest, seizure, force and attack of plaintiff by this defendant was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1981**

568.     That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

569.     The arrest of plaintiff was done without probable cause and without justification and therefore resulted in unlawful detainment.

570.     That the force displayed by NUPD officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

571.     That at all times herein mentioned, the defendant acted knowingly, intentionally, willfully and maliciously.

572.     That Plaintiff was intentionally treated differently than similarly situated law students solely on the basis of his perceived disability.

573.     The failure to maintain exculpatory evidence; including videotape of the officer's interaction with plaintiff, falsification of the police report narrative stating that he had signed the petition for commitment, and failure to complete the petition was done knowingly and intentionally.

574.     That Eric Chin was, on information and belief, fully informed of Healy's failure to complete the commitment petition and was responsible for the actions of NUPD officers.

575.     WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, Samuel Riney, in an amount to be proven at trial for actual and punitive damages for bodily injury, emotional harm, pain and suffering, attorney fees, expert fees and such other damages that may be authorized under **42 USC 1988.**

<u>**COUNT 43**</u>
**42 U.S.C. § 1983: 1985 Civil Conspiracy**
**(NUPD Officers Healy, Chin. Moore, and Walsh)**

576.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

577.     An Illinois civil conspiracy requires three elements: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

578.     Healy, Moore and Walsh and Chin acted together

579.     Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on a perceived threat from Plaintiff's disability in order to deprive him of his right to study law and become a lawyer, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

580.    In the furtherance of which Healy Walsh and Moore violated Plaintiff's right to equal protections by deliberately treating Plaintiff as though he was guilty of a crime without ever establishing the actual facts of the incident

581.    In the furtherance of which NUPD Thomas Healy falsified a commitment petition and police report, Healy Walsh and Moore unlawfully and violently threw Plaintiff to ground and subsequently arrested him without any evidence of statements of threat besides lies, and transported him to Defendant NMH for unlawful involuntary commitment.

582.    In furtherance of which NUPD officers deliberately failed to follow state commitment procedure by completing the commitment petition and coerced NMH staff to complete the petition and falsify the fact that Plaintff was brought in by NUPD.

583.    In furtherance of which NMH staff inappropriate sedated and involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint for 8 total days.

584.    In furtherance of which Eric Chin willfully ignored violation of state commitment procedure and deliberately suppressed evidence of wrongdoing on the part of NUPD.

585.    That the short and long term impact of the false imprisonment has effectively destroyed the Plaintiff's ability to pursue a legal education by producing innumerous unforeseen consequences and permanently and fundamentally impacted the nature of the Plaintiffs life.

586.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b.  Award punitive damages;
   c.  Award attorney's fees and costs; and
   d.  Award such other relief as the Court deems just and proper.

### <u>Count 44</u>
### 42 USC § 1986. Action for neglect to prevent
### (NU, NUPD)

587.    Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued. 42 U.S.C.A. § 1986 (West)

588.    Healy, Moore and Walsh and Chin acted together

589.    Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on a perceived threat from Plaintiff's disability in order to deprive him of his right to study law and become a lawyer, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

590.    In the furtherance of which Healy Walsh and Moore violated Plaintiff's right to equal protections by deliberately treating Plaintiff as though he was guilty of a crime without ever establishing the actual facts of the incident

591.    In the furtherance of which NUPD Thomas Healy falsified a commitment petition and police report, Healy Walsh and Moore unlawfully and violently threw Plaintiff to ground and subsequently arrested him without any evidence of statements of threat besides lies, and transported him to Defendant NMH for unlawful involuntary commitment.

592.     In furtherance of which NUPD officers deliberately failed to follow state commitment procedure by completing the commitment petition and coerced NMH staff to complete the petition and falsify the fact that Plaintiff was brought in by NUPD.

593.     In furtherance of which NMH staff inappropriate sedated and involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint for 8 total days.

594.     In furtherance of which Eric Chin willfully ignored violation of state commitment procedure and deliberately suppressed evidence of wrongdoing on the part of NUPD.

595.     That the short and long term impact of the false imprisonment has effectively destroyed the Plaintiff's ability to pursue a legal education by producing innumerous unforeseen consequences and permanently and fundamentally impacted the nature of the Plaintiffs life.

596.     NU was fully aware of and is responsible for the actions of its employee's Healy, Walsh, Moore and Chin which were committed in the course and scope of employment and under color of state law in violation of **42 U.S.C. § 1985.**

597.     NU had the power to prevent or aid in the prevention of the conspiracy by having proper training and supervision of its employees, policies, and procedures and refused or neglected to do so, resulting in the civil conspiracy and false imprisonment which caused Plaintiff's injuries.

598.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b.   Award punitive damages;
   c.   Award attorney's fees and costs; and
   z.   Award such other relief as the Court deems just and proper

## Count 45
### Intentional Infliction of Emotional Distress/Negligent Infliction of Emotional Distress
### (NUPD Officers Healy, Walsh, Moore, Chin, NUPD, NU, Student Group #1)

**599.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.**

**600.     The acts and omissions of the University and its investigators were willful and intentional.**

**601.     The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.**

**602.     The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.**

**603.     The University's conduct and that of the investigators was the direct and proximate cause of John's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.**

**604.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.**

**605.     WHEREFORE, Plaintiff demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.**

## Count 46
### 42 U.S.C. § 1983: DEPRIVATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS
### (NU)

606.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

607.    **Procedural due process.** Requires the government to use constitutionally adequate procedures to deprive someone of life, liberty, or property interests (*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

608.    **Substantive due process.** Requires the government to refrain from interfering with individuals' fundamental rights and from engaging in conscience-shocking conduct. (See *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 845-46 (1998)

609.    Plaintiff states a claim for relief for Defendant's violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is actionable pursuant to **42 U.S.C. § 1983**, and the Illinois Constitution, art I, § 2.

610.    Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees in 2019 and 2020, and was meeting the schools legitimate academic expectations, Plaintiff had a property interest in their continued participation in the JD Program, as the term "property" is understood in relation to the Fourteenth Amendment of the United States Constitution.

611.    Defendant is a "person" under **42 U.S.C. § 1983**.

612.    Defendant acted "under color" of state law under **42 U.S.C. § 1983**.

613.    Defendant terminated Plaintiffs participation in the JD Program without providing proper notice of this decision or any opportunity for a pre-suspension hearing (informal review). In doing so, Defendant violated rights secured to Plaintiff by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2.

614.    Defendant terminated Plaintiffs participation in the JD Program even though Plaintiff remained eligible for the program. Defendant did not terminate Plaintiff for a proper basis as set forth in the enumerated grounds for termination in the NU Student Handbook In doing so, Defendant violated the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2.

615.    Plaintiff has been harmed and will continue to be harmed by Defendant's actions and is entitled to injunctive and declaratory relief and monetary damages.

616.    An actual controversy exists between NU and Plaintiff concerning their rights, privileges, and obligations in that Plaintiff has contended that NU's actions have violated and will continue to violate Plaintiff's rights under federal law.

617.    WHEREFORE, Plaintiff request that this Court:

618.    A. Issue a preliminary and permanent injunction ordering Defendant to reinstate Plaintiffs participation in the JD Program;

619.    B. Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

aa.  The failure to provide a student who admitted to the university, signed his early decision contact, paid his tuition and fees, and was meeting the schools legitimate academic expectations, including Plaintiff, with a pre-suspension notice and a hearing (informal review) violates the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2;

bb.  Termination of participation in the NU JD Program, including Plaintiffs participation, without a pre-suspension notice and a hearing (informal review) or proper basis as set forth in the enumerated grounds for termination in the Official University Policies violates the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2;

cc.  To the extent that NU University Policy authorizes NU to terminate or withhold the property interest of a person in Plaintiffs position in the JD Program without notice or any opportunity to be heard because of "interim" suspension, it violates the due process clause of the Fourteenth Amendment and the Illinois Constitution, art. I, § 2;

620.    C. Permanently enjoin Defendant from terminating Plaintiff from the JD Program without granting due process as required by the Fourteenth Amendment to the United States Constitution, and the Illinois Constitution, art. I, § 2;

621.    D. Award Plaintiff any compensatory and/or nominal damages he incurred as a result of Defendant's termination without due process;

622.     E. Award Plaintiff's reasonable attorneys' fees and costs pursuant to **42 U.S.C. § 1988**; and G. Grant such other and further relief as this Court deems just and proper.

### Count 47
### 42 U.S.C. § 1983: VIOLATION OF THE FOURTH AMENDMENT
### (NU)

623.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

624.     The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

625.     Plaintiff states a claim for relief for Defendant's unreasonable seizure in violation of Fourth Amendment to the United States Constitution, which is actionable pursuant to **42 U.S.C. § 1983**.

626.     Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees in 2019 and 2020, and was meeting the schools legitimate academic expectations, Plaintiff had a property interest in his continued participation in the JD program at NU, as the term "property" is understood in relation to the Fourth Amendment of the United States Constitution.

627.     Defendant is a "person" under **42 U.S.C. § 1983**.

628.     Defendant acted "under color" of state law under **42 U.S.C. § 1983**.

629.     Defendant illegally seized Plaintiff's right to participate in the NU JD program without providing proper notice of this decision or any opportunity for a pre-interim-suspension hearing in either 2019 or 2020. In doing so, Defendant violated rights secured to Plaintiff by the Fourth Amendment to the United States Constitution.

630.     Under the Fourth Amendment, a seizure of property occurs if there is some meaningful interference with an individual's possessory interest in that property.

631.     Plaintiff had a possessory interest in his participation in the NU JD Program.

632.     Defendant, through its nonconformity with federal regulations and constitutional due process guarantees, unreasonably and meaningfully interfered with Plaintiff's property interest by terminating his interest in participating in the NU JD Program.

633.     Accordingly, Defendant violated the Fourth Amendment.

634.     Plaintiff has been harmed by Defendant's actions and are entitled to injunctive and declaratory relief and monetary damages.

635.     An actual controversy exists between NU and Plaintiff concerning their rights, privileges, and obligations since Plaintiff has contended that NU's actions have violated and will continue to violate Plaintiffs rights under federal law.


636.     WHEREFORE, Plaintiff requests that this Court:

637.     A. Issue a preliminary and permanent injunction ordering Defendant to reinstate Plaintiff's participation in the NU JD Program;

638.     B. Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

   a.  The failure to provide a student who admitted to the university, signed his early decision contact, paid his tuition and fees, and was meeting the schools legitimate academic expectations, including Plaintiff, with a pre-suspension notice and a hearing (informal review) violates the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

   b.  Termination of participation in the NU JD Program, including Plaintiffs participation, without a pre-suspension notice and a hearing (informal review) or proper basis as set forth in the enumerated grounds for termination in the Official University Policies violates the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

639.     C. Permanently enjoin Defendant from terminating Plaintiff from the Voucher Program in violation of the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

640.    D. Award Plaintiff any compensatory and/or nominal damages she may incur as a result of Defendant's termination without due process;

641.    E. Award Plaintiff's reasonable attorney's fees and costs pursuant to **42 U.S.C.** § 1988; and F. Grant such other and further relief as this Court deems just and proper.

## Count 48
### 42 U.S.C. § 1985: DEPRIVATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS
### (Individual NU Defendants, Student Group #1 and #2, Individual Defendant NUPD Officers, NU)

642.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

643.    If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; … in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. 42 U.S.C.A. § 1985 (3) (West)

644.    Mona Dugo, Christine Depilla, Heather Cohen, Amanda Desilva, Karen Tamburro, Lucas Christain, and other NU employees purposefully ignored compelling evidence of Plaintiff's innocence in both 2019 and 2020 student conduct hearings, and in both cases constructively crafted a narrative to make Plaintiff seem as though he was guilty. They worked together to suppress Plaintiff's legitimate internal grievances and ensure that his concerns were never once adequately addressed. They ensured that the procedure was fixed with Heather Cohen serving as the hearing officer in both years, despite Plaintiff making numerous complaints about Cohen both internally and externally, and despite the abundance of alternative resources available in the Office of Student Conduct to replace Cohen, and despite Plaintiff's direct request to have Cohen replaced due to bias and conflict of interest concerns.

645.    Student Group #1 acted in conspiracy both during the 11/1/19 incident to have Plaintiff involuntarily committed, and afterwards in concert with student conduct hearings to have Plaintiff expelled, and after that in continuing to complain about Plaintiff in 2020.

646.    Student Group #2 acted in conspiracy with two felonious audio tapes to have Plaintiff expelled by contacting administration and exerting influence as LGBTQ Affinity Group leader and members to ensure that Plaintiff was subjected to arbitrary and bias suspension and expulsion, including participating in student conduct hearings and giving defamatory interviews.

647.    Individual Defendant NUPD officers took various coercive and retaliatory measure described in this complaint, as well as suppressing Plaintiff lawful concerns of illegal activity such as the false imprisonment he was subjected to and the failure by Healy to sign the commitment petition in 2019. The worked together to brutally retaliate against Plaintiff and coerce and intimidate him by having his Chicago Police Report cancelled , and contacting his sister and relatives and therapist without his consent or knowledge and against his express wishes.

648.    The actions of all of the defendants named in this count had the combined effect of depriving Plaintiff of his Fourteenth Amendment right to substantive and procedural due process.

649.    At all times, defendants worked with the common goal of illegally depriving Plaintiff of his rights and property interests in a JD.

650.    **Procedural due process.** Requires the government to use constitutionally adequate procedures to deprive someone of life, liberty, or property interests (*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

651.    **Substantive due process.** Requires the government to refrain from interfering with individuals' fundamental rights and from engaging in conscience-shocking conduct. (See *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 845-46 (1998)

652.    Plaintiff states a claim for relief for Defendant's violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is actionable pursuant to **42 U.S.C. § 1985**, and the Illinois Constitution, art I, § 2.

653.    Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees in 2019 and 2020, and was meeting the schools legitimate academic expectations,  Plaintiff had a property interest in their continued participation in the JD Program, as the term "property" is understood in relation to the Fourteenth Amendment of the United States Constitution.

654.    Defendants are a "person" under **42 U.S.C. § 1985**.

655.    Defendant acted "under color" of state law under **42 U.S.C. § 1983**.

656.    Defendant terminated Plaintiffs participation in the JD Program without providing proper notice of this decision or any opportunity for a pre-suspension hearing (informal review). In doing so, Defendant violated rights secured to Plaintiff by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2.

657.    Defendant terminated Plaintiffs participation in the JD Program even though Plaintiff remained eligible for the program. Defendant did not terminate Plaintiff for a proper basis as set forth in the enumerated grounds for termination in the NU Student Handbook In doing so, Defendant violated the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2.

658.    Plaintiff has been harmed and will continue to be harmed by Defendant's actions and is entitled to injunctive and declaratory relief and monetary damages.

659.    An actual controversy exists between NU and Plaintiff concerning their rights, privileges, and obligations in that Plaintiff has contended that NU's actions have violated and will continue to violate Plaintiff's rights under federal law.

660.    WHEREFORE, Plaintiff request that this Court:

661.    A. Issue a preliminary and permanent injunction ordering Defendant to reinstate Plaintiffs participation in the JD Program;

662.    B. Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

dd. The failure to provide a student who admitted to the university, signed his early decision contact, paid his tuition and fees, and was meeting the schools legitimate academic expectations, including Plaintiff, with a pre-suspension notice and a hearing (informal review)  violates the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2;

ee. Termination of participation in the NU JD Program, including Plaintiffs participation, without a pre-suspension notice and a hearing (informal review) or proper basis as set forth in the enumerated grounds for termination in the Official University Policies violates the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2;

ff. To the extent that NU University Policy authorizes NU to terminate or withhold the property interest of a person in Plaintiffs position in the JD Program without notice or any opportunity to be heard because of "interim" suspension, it violates the due process clause of the Fourteenth Amendment and the Illinois Constitution, art. I, § 2;

663.    C. Permanently enjoin Defendant from terminating Plaintiff from the JD Program without granting due process as required by the Fourteenth Amendment to the United States Constitution, and the Illinois Constitution, art. I, § 2;

664.    D. Award Plaintiff any compensatory and/or nominal damages he incurred as a result of Defendant's termination without due process;

665.    E. Award Plaintiff's reasonable attorneys' fees and costs pursuant to **42 U.S.C. §** 1988; and G. Grant such other and further relief as this Court deems just and proper.

## Count 49
### 42 U.S.C. § 1985: DEPRIVATION OF THE FOURTH AMENDMENT RIGHTS
### (Individual NU Defendants, Student Group #1 and #2, Individual Defendant NUPD Officers, NU)

666.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein..

667.     The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

668.     Plaintiff states a claim for relief for Defendant's unreasonable seizure in violation of Fourth Amendment to the United States Constitution, which is actionable pursuant to **42 U.S.C. § 1985**.

669.     If two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; … in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. 42 U.S.C.A. § 1985 (3) (West)

670.     Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees in 2019 and 2020, and was meeting the schools legitimate academic expectations, Plaintiff had a property interest in his continued participation in the JD program at NU, as the term "property" is understood in relation to the Fourth Amendment of the United States Constitution.

671.     Mona Dugo, Christine Depilla, Heather Cohen, Amanda Desilva, Karen Tamburro, Lucas Christain, and other NU employees purposefully ignored compelling evidence of Plaintiff's innocence in both 2019 and 2020 student conduct hearings, and in both cases constructively crafted a narrative to make Plaintiff seem as though he was guilty. They worked together to suppress Plaintiff's legitimate internal grievances and ensure that his concerns were never once adequately addressed. They ensured that the procedure was fixed with Heather Cohen serving as the hearing officer in both years, despite Plaintiff making numerous complaints about Cohen both internally and externally, and despite the abundance of alternative resources available in the Office of Student Conduct to replace Cohen, and despite Plaintiff's direct request to have Cohen replaced due to bias and conflict of interest concerns.

672.     Student Group #1 acted in conspiracy both during the 11/1/19 incident to have Plaintiff involuntarily committed, and afterwards in concert with student conduct hearings to have Plaintiff expelled, and after that in continuing to complain about Plaintiff in 2020.

673.     Student Group #2 acted in conspiracy with two felonious audio tapes to have Plaintiff expelled by contacting administration and exerting influence as LGBTQ Affinity Group leader and members to ensure that Plaintiff was subjected to arbitrary and bias suspension and expulsion, including participating in student conduct hearings and giving defamatory interviews.

674.     Individual Defendant NUPD officers took various coercive and retaliatory measure described in this complaint, as well as suppressing Plaintiff lawful concerns of illegal activity such as the false imprisonment he was subjected to and the failure by Healy to sign the commitment petition in 2019. The worked together to brutally retaliate against Plaintiff and coerce and intimidate him by having his Chicago Police Report cancelled , and contacting his sister and relatives and therapist without his consent or knowledge and against his express wishes.

675.     The actions of all of the defendants named in this count had the combined effect of depriving Plaintiff of his Fourth Amendment rights against unreasonable seizure.

676.     At all times, defendants worked with the common goal of illegally depriving Plaintiff of his rights and property interests in a JD.

677.     Defendants are a "person" under **42 U.S.C. § 1985.**

678.     Defendants acted in conspiracy in violation of **42 U.S.C. § 1985.**

679.     Defendant NU illegally seized Plaintiff's right to participate in the NU JD program without providing proper notice of this decision or any opportunity for a pre-interim-suspension hearing in either 2019 or 2020. In doing so, Defendant violated rights secured to Plaintiff by the Fourth Amendment to the United States Constitution.

680.     **Individual NU Defendants, Student Group #1 and #2, and Individual Defendant NUPD Officers** illegally seized Plaintiff's right to participate in the NU JD program

681.     Under the Fourth Amendment, a seizure of property occurs if there is some meaningful interference with an individual's possessory interest in that property.

682.    Plaintiff had a possessory interest in his participation in the NU JD Program.

683.    Defendant, through its nonconformity with federal regulations and constitutional due process guarantees, unreasonably and meaningfully interfered with Plaintiff's property interest by terminating his interest in participating in the NU JD Program.

684.    Accordingly, Defendant violated the Fourth Amendment.

685.    Plaintiff has been harmed by Defendant's actions and are entitled to injunctive and declaratory relief and monetary damages.

686.    An actual controversy exists between NU and Plaintiff concerning their rights, privileges, and obligations since Plaintiff has contended that NU's actions have violated and will continue to violate Plaintiffs rights under federal law.

687.    WHEREFORE, Plaintiff requests that this Court:

688.    A. Issue a preliminary and permanent injunction ordering Defendant to reinstate Plaintiff's participation in the NU JD Program;

689.    B. Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

c.   The failure to provide a student who admitted to the university, signed his early decision contact, paid his tuition and fees, and was meeting the schools legitimate academic expectations, including Plaintiff, with a pre-suspension notice and a hearing (informal review) violates the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

d.   Termination of participation in the NU JD Program, including Plaintiffs participation, without a pre-suspension notice and a hearing (informal review) or proper basis as set forth in the enumerated grounds for termination in the Official University Policies violates the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

690.    C. Permanently enjoin Defendant from terminating Plaintiff from the Voucher Program in violation of the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

691.    D. Award Plaintiff any compensatory and/or nominal damages she may incur as a result of Defendant's termination without due process;

692.    E. Award Plaintiff's reasonable attorney's fees and costs pursuant to **42 U.S.C**. **§** 1988; and F. Grant such other and further relief as this Court deems just and proper.

## Count 50
## PETITION FOR CERTIORARI
### Northwestern University Expulsion

693.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

694.    Plaintiff seeks judicial review on certiorari, as provided by common law, of NU's final administrative decision to terminate their participation in the JD Program at NU.

695.    NU's decision to terminate Plaintiff's participation in the program is contrary to law since NU Policies and Procedures do not provide a basis for termination because of the constructive assumption of alleged safety threats and NU failed to give a proper notice or opportunity for a hearing (informal review) prior to Plaintiff's interim suspension in both years, against the manifest weight of the evidence, and constitutes a "penalty" that outweighs the "crime" of not being prevented from earning his JD at NU and being able to find adequate alternative education due to the permanent notations on his student records.

696.    WHEREFORE, Plaintiff requests that this Court:

a.   Order NU to file a record of the student conduct proceedings from 2019 and 2020;

b.   Reverse NU's decision to terminate Plaintiff's right to participate in the NU JD Program;

c.   Reinstate Plaintiff to the NU JD Program;

d.   Order NU to address the unlawful actions of the students and staff motioned in this complaint;

e.  Order NU to remove any and all notations in the Plaintiffs disciplinary record, permanent transcript, and student file associated with the 11/1/20 incident and the 8/23//20 incidents with Gargula and any other associated disciplinary issues resulting from these incidents.

f.  Order NU to arrange for the Plaintiff to transfer with equal or greater financial aid to another law institution of a similar caliber and reputation; and

g.  Grant such other relief as may be equitable and just.

<u>**Count 51**</u>
**Violation pursuant to the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution**
**42 U.S.C § 1983**
**(Northwestern Memorial Hospital, Individual Hospital Defendants)**

697.    Plaintiff hereby repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth here in full.

698.    That the acts and omissions of any actions by the INDIVIDUAL HOSPITAL Defendants in their individual and official capacities under the under the Eighth and Fourteenth Amendments to the Constitution, as well as **42 U.S.C. § 1983** and § 1985 were all performed under the color of the state law and were unreasonable and performed knowingly, wantonly, recklessly, maliciously, with gross negligence, callousness, and with deliberate indifference to Plaintiff's well-being and serious medical needs and in reckless disregard of his safety and thereby caused him to suffer the unnecessary and reckless infliction of pain and suffering by the forced administration of unnecessary medical treatment which resulted in his false imprisonment for a period of 8 days and because of which Plaintiff is entitled to compensatory and punitive damages.

699.    That the conduct of Northwestern Memorial Hospital and all of their employees, agents and/or ostensible agents, were actions under the color of the state law when they deprived Plaintiff of his clearly established rights, privileges and immunities in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution of the United States, and of **42 U.S.C. § 1983** and **42 U.S.C. § 1985, and** 405 ILCS 5/Ch. III Art. VI procedures.

700.    That the conduct of INDIVIDUAL HOSPITAL DEFENDANTS was pursuant to, and in execution and implementation of the color of state law and was an officially sanctioned policy, regulation or custom of each of the named Defendants.

701.    That the individual hospital defendants acted willfully and intentionally in violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, to-wit:

gg. Violation of 405 ILCS 5/3-601:

i.   Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;

ii.  Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;

iii. Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

hh. Violation of 405 ILCS 5/3-602:

i.   Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

ii.  Violation 405 ILCS 5/3-606:

i.   Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

jj.  Violation of 405 ILCS 5/3-608:

i.   Failed to inform Plaintiff of his right to refuse treatment.

ii.  Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based

medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

kk. Violation of 405 ILCS 5/3-609:

   i. Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.

   ii. Failed to ask Plaintiff if he desires such documents sent to any other persons

   iii. Failed to allow Plaintiff to make phone 2 phone calls.

ll. Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:

   i. Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.

   ii. Failed to promptly file second certificate and provide a copy to the respondent.

702. That the INDIVIDUAL HOSPITAL DEFENDANTS exhibited deliberate indifference, pursuant to the Eighth and Fourteenth Amendments to the Constitution, to serious medical needs, to-wit:

mm. Failure to train medical personnel at hospital in the proper determination of medical emergencies and such omitted training was in willful and wanton disregard for Plaintiff's serious medical needs and were grossly negligent and reckless acts.

nn. Failure to hire individuals whose character and personality would not pose a potential danger to Plaintiff.

oo. Failure to determine appropriate level of medical care and attention by medical providers and the failure to recognize the danger of improperly admitting Plaintiff to the facility;

pp. Knowingly and recklessly hired and trained physicians, nurses and/or other medical personnel who are unable to determine common medical situations which render them unfit to perform the necessary duties of the position.

qq. Knowingly and recklessly failing to discipline, instruct, supervise or control physicians, nurses and/or other medical personnel conduct and thereby encouraging acts and omissions that contributed to the injuries visited upon Plaintiff.

rr. Recklessly, intentionally and/or willfully forcing medical care on a patient they knew did not need serious medical attention.

703. That **Northwestern Memorial Hospital**, individually, or through their employees and/or agents, participated in the implementation, execution, and omission of the official policies, training, practices, regulations, and/or customs referred to above.

704. That NMH had a duty to adequately train and supervise all, physicians, nurses and/or other medical personnel to obtain medical treatment, supervise and provide care and treatment to Plaintiff that was not grossly negligent or that amounted to a reckless indifference to his life or liberty concerns.

705. That the INDIVIDUAL HOSPITAL DEFENDANTS herein permitted the implementation of inappropriate de facto policies which reflected or represented policies, practices and customs which deviated from acceptable standards.

706. The unconstitutional conduct of the INDIVIDUAL HOSPITAL DEFENDANTS named herein implemented and executed the following policies and customs of these Defendants:

ss. Implicit authorization, approval and knowing acquiescence in the wrongful conduct by said Defendants and/or their employees, agents or ostensible agents in the treatment of patients;

tt. The use of and acceptance of unconstitutional excessive force by the forcible administration of unnecessary medical care which constituted punishment of those not suffering serious medical conditions;

uu. Failure to discipline or terminate personnel known to have engaged in the use of excessive medical care which constituted punishment of those not suffering serious medical conditions and creating an atmosphere where hospital personnel believed they would not be disciplined for abusive conduct toward patients;

vv. Failure to eliminate hospital policies, practices and customs which deviate from applicable Federal and State standards for hospital operations;

ww. Failure to investigate, report and follow-up on prior incidents involving the use of excessive force, medication and emergency medical care by hospital and medical personnel.

707.    That as a direct and proximate result of the wrongful conduct of the **Individual Hospital Defendants**, as alleged herein, Plaintiff has suffered and will continue to suffer past, present and future conscious pain and suffering, permanent career injury, and past, present and future economic damages.

708.    That pursuant to the provisions of **42 U.S.C. § 1988**, Plaintiff is entitled to recover attorney fees and costs of litigation for the causes of actions alleged under the Constitution and the laws of the United States.

709.    That as a proximate cause of the **Individual Hospital Defendants** ' acts and/or omissions, Plaintiff suffered false imprisonment resulting in the following:

710.    a. Medical and hospital expense and daily care expense past, present and future; b. Inhumane and tortuous conscious pain and suffering; c. Economic and non-economic compensatory damages; d. Punitive damages;

e. Any and all other damages including but not limited to both attorney fees recoverable under **42 U.S.C. § 1983 § 1985** and § 1988 and any and all damages otherwise recoverable under common law.

711.    Plaintiff has exhausted all administrative remedies.

712.    WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

xx. Enter a Judgment in his favor and against the **Individual Hospital Defendants**, jointly and severally, in an amount in excess of $75,000.00, and award costs, interest, and attorney fees as well as punitive and/or exemplary damages.

yy. Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

a. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

b. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment hearing and notice procedures in this case violate the due process clause of Fifth Amendment to the United States Constitution;

c. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate due process and equal protections under the Fourteenth Amendment to the United States Constitution;

d. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school violate the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution.

e. Violation of 405 ILCS 5/3-601:

a. Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;

b. Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;

c. Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

f. Violation of 405 ILCS 5/3-602:

a. Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

g. Violation 405 ILCS 5/3-606:

a. Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

h. Violation of 405 ILCS 5/3-608:

a. Failed to inform Plaintiff of his right to refuse treatment.

b. Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against

opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

    i.   Violation of 405 ILCS 5/3-609:
- a. Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.
- b. Failed to ask Plaintiff if he desires such documents sent to any other persons
- c. Failed to allow Plaintiff to make phone 2 phone calls.

    j.   Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:
- i. Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.
- ii. Failed to promptly file second certificate and provide a copy to the respondent.

zz. Award Plaintiff any compensatory and/or nominal damages she may incur as a result of Defendant's involuntary commitment without due process;

aaa.     Award Plaintiff's reasonable attorney's fees and costs pursuant to **42 U.S.C. § 1988**; and F. Grant such other and further relief as this Court deems just and proper.

## **<u>Count 52</u>**
## **Medical Negligence**
## **(NORTHWESTERN MEMORIAL HOSPITAL)**

713.     Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1 through 42, as though set forth here in full.

714.     At all times relevant, Defendants, NORTHWESTERN MEMORIAL HOSPITAL, by and through its physicians, physician assistants, nurses and other health care providers, had a duty to provide their patients, including PLAINTIFF, with medical care consistent with the standard of care.

715.     At all times relevant, Defendants, NORTHWESTERN MEMORIAL HOSPITAL, by and through its physicians, physician assistants, nurses and other health care providers, each of whom were employees and/or actual or apparent agents acting within the scope of his/her authority, were careless and/or negligent in one or more of the following ways:

bbb.     Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

ccc.     Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

ddd.     Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

eee.     Improperly Given 5 mg haloperidol lactate (HALDOL) injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

fff. Improperly Given 5 mg midazolam (VERSED) 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

ggg.     Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

hhh.     Failed to administer appropriate medications during the incident;

iii. Failed to administer appropriate levels of sedatives during the incident;

jjj. Failed to adequately monitor the patient's condition during the incident;

kkk.     Failed to timely order termination of the involuntary commitment procedure;

716.     As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendants, NORTHWESTERN MEMORIAL HOSPITAL, Plaintiff sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

717.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 53
## Medical Negligence
## (NMH L.S.N. FRED CABRA)

718.     Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1 through 42, as though set forth here in full.

719.     At all times relevant, Defendant, FRED CABRA, L.S.N., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

720.     At all times relevant, Defendant, FRED CABRA, L.S.N., was careless and/or negligent in one or more of the following ways:

lll. Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

mmm.     Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

nnn.     Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

ooo.     Improperly Given 5 mg haloperidol lactate ⟨HALDOL⟩ injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

ppp.     Improperly Given 5 mg midazolam ⟨VERSED⟩ 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

qqq.     Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

rrr. Failed to administer appropriate medications during the incident;

sss. Failed to administer appropriate levels of sedatives during the incident;

ttt. Failed to adequately monitor the patient's condition during the incident;

uuu.     Failed to timely order termination of the involuntary commitment procedure;

721.     As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, FRED CABRA, L.S.N., Plaintiff sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

722.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 54
### Medical Negligence
### (NMH M.D. EUGENE LOZZA)

723.    Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1 through 42, as though set forth here in full.

724.    At all times relevant, Defendant, EUGENE LOZZA, M.D., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

725.    At all times relevant, Defendant, EUGENE LOZZA, M.D., was careless and/or negligent in one or more of the following ways:

vvv.        Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

www.        Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

xxx.        Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

yyy.        Improperly Given 5 mg haloperidol lactate {HALDOL} injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

zzz.        Improperly Given 5 mg midazolam {VERSED} 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

aaaa.        Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

bbbb.        Failed to administer appropriate medications during the incident;

cccc.        Failed to administer appropriate levels of sedatives during the incident;

dddd.        Failed to adequately monitor the patient's condition during the incident;

eeee.        Failed to timely order termination of the involuntary commitment procedure;

726.    95. As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, EUGENE LOZZA, M.D., PLAINTIFF sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

727.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 55
### Medical Negligence
### (NMH M.D. SCOTT A. GERSHAN)

728. Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs above, as though set forth here in full.

729. At all times relevant, Defendant, SCOTT A. GERSHAN, M.D., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

730. At all times relevant, Defendant, SCOTT A. GERSHAN, M.D., was careless and/or negligent in one or more of the following ways:

ffff. Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

gggg. Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

hhhh. Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

iiii. Improperly Given 5 mg haloperidol lactate ⟨HALDOL⟩ injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

jjjj. Improperly Given 5 mg midazolam ⟨VERSED⟩ 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

kkkk. Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

llll. Failed to administer appropriate medications during the incident;

mmmm. Failed to administer appropriate levels of sedatives during the incident;

nnnn. Failed to adequately monitor the patient's condition during the incident;

oooo. Failed to timely order termination of the involuntary commitment procedure;

731. As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, SCOTT A. GERSHAN, M.D., PLAINTIFF sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

732. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**Count 56**
**Medical Negligence**
**(NMH M.D. ANDREW J. BERG)**

733. Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1 through 42, as though set forth here in full.

734. At all times relevant, Defendant, ANDREW J. BERG, M.D., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

735. At all times relevant, Defendant, ANDREW J. BERG, M.D., was careless and/or negligent in one or more of the following ways:

pppp. Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

qqqq.     Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

rrrr.     Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

ssss.     Improperly Given 5 mg haloperidol lactate ⟨HALDOL⟩ injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

tttt.     Improperly Given 5 mg midazolam ⟨VERSED⟩ 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

uuuu.     Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

vvvv.     Failed to administer appropriate medications during the incident;

wwww.     Failed to administer appropriate levels of sedatives during the incident;

xxxx.     Failed to adequately monitor the patient's condition during the incident;

yyyy.     Failed to timely order termination of the involuntary commitment procedure;

736.     As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, ANDREW J. BERG, M.D., PLAINTIFF sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

737.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 57
### (Medical Negligence)
### (NMH R.N. JEREMY BAKER)

738.     Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs 1 through 42, as though set forth here in full.

739.     At all times relevant, Defendants, JEREMY BAKER, R.N., had a duty to provide their patients, including PLAINTIFF, with medical care consistent with the standard of care.

740.     At all times relevant, Defendants, JEREMY BAKER, R.N., were careless and/or negligent in one or more of the following ways:

zzzz.     Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

aaaaa.     Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

bbbbb.     Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

ccccc.    Improperly Given 5 mg haloperidol lactate ⟨HALDOL⟩ injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

ddddd.    Improperly Given 5 mg midazolam ⟨VERSED⟩ 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

eeeee.    Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

fffff.    Failed to administer appropriate medications during the incident;

ggggg.    Failed to administer appropriate levels of sedatives during the incident;

hhhhh.    Failed to adequately monitor the patient's condition during the incident;

iiiii.    Failed to timely order termination of the involuntary commitment procedure;

741.    As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendants, JEREMY BAKER, R.N., Plaintiff sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

742.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 58
### Medical Battery
### (Individual Hospital Defendants)

743.    Elements of a medical battery claim are: (1) an intentional act on the part of the defendant; (2) a resulting offensive contact with the plaintiff's person; and (3) a lack of consent to the defendant's conduct. Sekerez v. Rush Univ. Med. Ctr., 2011 IL App (1st) 090889, 954 N.E.2d 383 An "offensive contact," in context of medical battery claim, may be established by proof that the defendant intended to cause the plaintiff, directly or indirectly, to come into contact with a foreign substance in a manner which the plaintiff would reasonably regard as offensive. Id.

744.    Plaintiff was improperly given TWO separate dosages of psychotropic medication which was not shown to be medically necessary because plaintiff presented no immediate threat to safety of himself or others.

745.    Plaintiff was improperly physically restrained in order to apply dosages.

746.    Plaintiff did not consent to any of the contact, objected to it on religious grounds as well as legal grounds, and found the matter of contact highly offensive.

747.    It is unnecessary for a plaintiff, asserting medical battery claim, to establish hostile intent on the part of the defendant; rather, the gist of an action for battery is the absence of consent on the plaintiff's part. Sekerez v. Rush Univ. Med. Ctr., 2011 IL App (1st) 090889, 954 N.E.2d 383 A corollary to the requirement that a patient's consent must be obtained prior to the performance of a medical procedure is that a patient is entitled to refuse medical treatment. Id. Absent consent, a patient cannot be compelled to submit to a medical procedure even where the patient's life is in jeopardy. Id. Mere existence of an emergency that places a patient at risk of future harm does not give a physician a license to force medical treatment and ignore a patient's exercise of the right to refuse medical treatment. Id. Where a patient expressly refuses medical treatment, or the patient's instructions specifically preclude the treatment rendered, treatment contrary to the patient's will constitutes a battery, even when an emergency exists. Id.

748.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 59
### Medical Malpractice
### (Individual Hospital Defendants)

749.    In order to prevail in an action for medical malpractice, the plaintiff must show: (1) the standard of care in the medical community by which the physician's treatment was measured, (2) that the physician deviated from the standard of care, and (3) that a resulting injury was proximately caused by the deviation from the standard of care. Watson by Leonard v. W. Suburban Med. Ctr., 2018 IL App (1st) 162707, 103 N.E.3d 895, appeal denied sub nom. Watson v. W. Suburban Med. Ctr., 108 N.E.3d 824 (Ill. 2018)

750.    The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

751.    The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition.

752.    Standard of Care established by insurance documents by an independent board certified psychiatric review on two separate occasions and reaching the same conclusion.

753.    As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

754.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 60
### Negligence Malpractice
### (NMH M.D. ANDREW BERG, NMH M.D. EUGENE LOZZA, NMH M.D. SCOTT A. GERSHAN)

755.     Where defendants owed Plaintiff a duty to act in accordance with the specific norms of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, in the initial emergency department assessment by Dr. Berg, the actual certification by Dr. Lozza, and the requests for insurance coverage by Dr. Gershan.

756.     The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found that the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

757.     The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition. Standard of Care established by insurance documents by an independent board-certified psychiatric review on two separate occasions and reaching the same conclusion.

758.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

759.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and suffered unjust and unlawful confinement for 8 total days form 11/1/19-11/8/19. Due to the confinement, Plaintiff was unable to attend classes or complete coursework,

760.     Due to the involuntary confinement, he was suspended noting the involuntary confinement as rationale justifying his guilt in the university student conduct hearings which ensued at his graduate school in 2019. Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff. Plaintiff was suspended for two semesters as a direct result of the confinement, and placed on disciplinary probation, and was eventually expelled citing the incident of involuntary confinement as rationale justifying his guilt in the student conduct hearings at his graduate school in 2020. He endured undue medical expenses, and extreme psychological trauma and pain and suffering. He continues to suffer as a result of the confinement as his CPD police report was cancelled and he suffers continuing discrimination from his graduate school who thinks he is mentally unfit due to the false imprisonment.

761.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 61
## Express Contract Malpractice
### (NMH M.D. ANDREW BERG, NMH M.D. EUGENE LOZZA, NMH M.D. SCOTT A. GERSHAN)

762.    Where defendants owed Plaintiff a duty to act in accordance with the specific norms of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, in the initial emergency department assessment by Dr. Berg, the actual certification by Dr. Lozza, and the requests for insurance coverage by Dr. Gershan.

763.    The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found that the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

764.    The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition. Standard of Care established by insurance documents by an independent board-certified psychiatric review on two separate occasions and reaching the same conclusion.

765.    As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

766.    As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and suffered unjust and unlawful confinement for 8 total days form 11/1/19-11/8/19. Due to the confinement, Plaintiff was unable to attend classes or complete coursework,

767.    Due to the involuntary confinement, he was suspended noting the involuntary confinement as rationale justifying his guilt in the university student conduct hearings which ensued at his graduate school in 2019. Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff. Plaintiff was suspended for two semesters as a direct result of the confinement, and placed on disciplinary probation, and was eventually expelled citing the incident of involuntary confinement as rationale justifying his guilt in the student conduct hearings at his graduate school in 2020. He endured undue medical expenses, and extreme psychological trauma and pain and suffering. He continues to suffer as a result of the confinement as his CPD police report was cancelled and he suffers continuing discrimination from his graduate school who thinks he is mentally unfit due to the false imprisonment.

768.    Where Plaintiff had express oral conversations detailing the terms and conditions of appropriate treatment for Plaintiff's illness which was articulated with specificity and detail, thereby clearly establishing the rights and duties of the parties involved. These conversations occurred while in the emergency intake department during his initial assessment, and during the admission procedure where he was unjustly certified for commitment.

769.    Where each defendant made an express promise to appropriately treat Plaintiff's. medical issue and achieve the result of satisfactory medical treatment by the applicable standards of medical care.

770.     Where the Plaintiff relied upon the promise of appropriate medical treatment and transferred payment/consideration to the defendants in the form of insurance payments for the medical care in exchange for the promise by the defendants of appropriate medical care.

771.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 62
### Implied Contract Malpractice/
### Breach of Contract
### (NMH M.D. ANDREW BERG, NMH M.D. EUGENE LOZZA, NMH M.D. SCOTT A. GERSHAN)

772.     Where Plaintiff entered into an implied contract for medical care in accordance with the standards of medical in exchange for his insurance payments. Where defendants failed to meet the standards of medical care and their corresponding implied contractual obligations.

773.     Where defendants owed Plaintiff a duty to act in accordance with the specific norms of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, in the initial emergency department assessment by Dr. Berg, the actual certification by Dr. Lozza, and the requests for insurance coverage by Dr. Gershan.

774.     The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found that the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

775.     The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition. Standard of Care established by insurance documents by an independent board-certified psychiatric review on two separate occasions and reaching the same conclusion.

776.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

777.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and suffered unjust and unlawful confinement for 8 total days from 11/1/19-11/8/19. Due to the confinement, Plaintiff was unable to attend classes or complete coursework,

778.     Due to the involuntary confinement, he was suspended noting the involuntary confinement as rationale justifying his guilt in the university student conduct hearings which ensued at his graduate school in 2019. Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating

unwarranted safety concerns about Plaintiff. Plaintiff was suspended for two semesters as a direct result of the confinement, and placed on disciplinary probation, and was eventually expelled citing the incident of involuntary confinement as rationale justifying his guilt in the student conduct hearings at his graduate school in 2020. He endured undue medical expenses, and extreme psychological trauma and pain and suffering. He continues to suffer as a result of the confinement as his CPD police report was cancelled and he suffers continuing discrimination from his graduate school who thinks he is mentally unfit due to the false imprisonment.

779. Where Plaintiff anticipated treatment in accordance with applicable medical standards and was injured in his person and property as a result of defendants deviation from said standard. Had the proper standard of medical care, as documented by insurance review, been followed, Plaintiff would have been free to attend classes and complete coursework towards his graduate education.

780. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.


## <u>COUNT 63</u>
## 42 U.S.C. § 1985 Civil Conspiracy
## (NUPD Officers Healy, Walsh, Moore, and Chin; Individual Hospital Defendants)

781. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

782. An Illinois civil conspiracy requires three elements: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

783. Healy, Walsh, Moore, and Chin from NUPD worked together with NMH staff Cabra, Lozza, and Baker

784. Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on threat from perceived disability, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

785. In the furtherance of which Osama viciously attacked and physically restrained me. Usama aided Osama in physically restraining me, then called the police and falsely reported that Fahad had "battered" Osama. Muaaz aided in physically restraining Fahad, and falsely attested to witnessing the "battery" to the responding NUPD officers during the course of their investigation.

786. In the furtherance of which NUPD Thomas Healy, Walsh, and Moore and Chin falsified a commitment petition and police report, unlawfully threw Plaintiff to ground and arrested him without any evidence of statements of threat besides lies, and with CFD EMS transported him to Defendant NMH for unlawful involuntary commitment.

787. In furtherance of which NMH staff inappropriately sedated and improperly involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint.

788. Where NUPD officers and NMH staff had prior communications discussing the circumstances which led to Plaintiff's detainment by police, and where they created at that point, a conspiracy to deprive Plaintiff of his liberty and property interests through the numerous law violations and general misconduct discussed in this complaint.

789. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 64
## 42 U.S.C.A. § 1986. Action for neglect to prevent
## (NMH)

790.     Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued. 42 U.S.C.A. § 1986 (West)

791.     Where NMH had awareness of the conspiratorial actions of its employees through its normal internal operations procedures, and had the power to prevent the unjust and unwarranted involuntary confinement of Plaintiff by adhering to proper admissions procedures and performing proper oversight and supervision of its employees and patients  and failed to due so. As a result, Plaintiff suffered injury of false imprisonment and all its associated consequences such as disciplinary sanctions and ultimately expulsion from his graduate school program.

792.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 65
## Intentional/Negligent Infliction of Emotional Distress
## (NMH, Individual Hospital Defendants)

**793.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.**

**794.     The acts and omissions of NMH and its employees were willful and intentional.**

**795.     NMH knew or should have known that the employees' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.**

**796.     NMH conduct and that of the employees was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.**

**797.     NMH conduct and that of the employees was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.**

**798.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.**

799.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 66
### § 21-1. Criminal damage to property. 720 ILCS 5/21-1 (a)(1) and (J)
### (All Named Parties)

800.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

801.    (a) A person commits criminal damage to property when he or she:

802.         (1) knowingly damages any property of another;

803.    (b) When the charge of criminal damage to property exceeding a specified value is brought, theextent of the damage is an element of the offense to be resolved by the trier of fact as either exceeding or not exceeding the specified value.

804.    (H) A violation of paragraphs (1) through (6) is a Class 3 felony when the damage to property exceeds $10,000 but does not exceed $100,000.

805.    (J) A violation of paragraphs (1) through (6) is a Class 2 felony when the damage to property exceeds $100,000.

806.    The actions of all parties named damaged all relevant property interests associated with a JD from Northwestern University Law School, including educational and career opportunities and professional network, which is economically valued in excess of $100,000.

807.    The actions of all parties were taken with deliberate aim at specifically and intentionally harming Plaintiff's educational contract and opportunity.

808.    The actions of all defendants were predicated upon prior and actual knowledge, either tacit or direct, of Plaintiff's educational contract and were specifically intended to harm that contract through coercive, malicious, and unlawful means, as has been described in the factual allegations of this complaint.

809.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 67
### § 26.5-1. Transmission of obscene messages. 720 ILCS 5/26.5-1 (a)
### (Evangeline Gargula)

810.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

811.         (a) A person commits transmission of obscene messages when he or she sends messages or uses language or terms which are obscene, lewd or immoral with the intent to offend by means of or while using a telephone or telegraph facilities, equipment or wires of any person, firm or corporation engaged in the transmission of news or messages between states or within the State of Illinois.

812.         (b) The trier of fact may infer intent to offend from the use of language or terms which are obscene, lewd or immoral.

813.    GroupMe Disability Harassment "Assumed Identity" Post was a message transmitted with the use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based epithet repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

814.    She posted Plaintiff's private Facebook information which she gathered through cyberstalking, which included such as: his photograph, work history, contact information, dates about his

school history, dates of his pictures on the group chat and Facebook, and educational history in first-year Law GroupMe chat titled "NU Kids on the Block '23."

815.    She inappropriately and offensively suggested Plaintiff was under an "assumed identity," which is a stereotype about people with mental disabilities.

816.    She posted the word "psyop" which was a direct reference to mental capabilities and was directly related to mental health, and she insinuated that Plaintiff was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

817.    She posted a derogatory disability-based epithet of a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing Plaintiff's mental capacity to that of a frog, insinuating that Plaintiff's mental capacity was equivalent to a frog which is a direct reference to mental health and disability status and is an offensive stereotype about people with mental health problems and disabilities.

818.    Her actions caused Plaintiff significant emotional distress by bringing up his last year in school, which was when his mother died, he was hospitalized for grief, and had to withdraw from school for mental health concerns.

819.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 68
### § 26.5-2. Harassment by telephone. 720 ILCS 5/26.5-2(a) (1), (2), (3), (6)
### (Evangeline Gargula)

820.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

821.     (a) A person commits harassment by telephone when he or she uses telephone communication for any of the following purposes:

822.            (1) Making any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy or indecent with an intent to offend;

823.            (2) Making a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number;

824.            (3) Making or causing the telephone of another repeatedly to ring, with intent to harass any person at the called number;

825.            (6) Knowingly permitting any telephone under one's control to be used for any of the purposes mentioned herein.

826.    First Phone Call directly threatened my safety by calling me at 1:08 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly asking "Is this Fahad Syed?" then failed to identify herself after repeated inquiry, replying only with the comments: "you gave me your number" and "you told me to call you" with the intent to antagonize, threaten, intimidate, and offend.

827.    She took Plaintiff's legitimate offer to settle our grievances offline to call him at 1:08 AM threateningly and menacingly to antagonize and harass Plaintiff, instead of trying to arrange a meeting at normal hours via email or text.

828.    Wherein she repeatedly made Plaintiff's telephone ring with the intent to harass Plaintiff at his phone number.

829.    Wherein she made telephone call to Plaintiff with the intent to harass Plaintiff at his phone number.

830.    Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (2), (3) and (6) of this statute.

831.    Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

832.    GroupMe Disability Harassment "Assumed Identity" Post was a message transmitted with the use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based epithet repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

833.    She posted Plaintiff's private Facebook information which she gathered through cyberstalking, which included such as: his photograph, work history, contact information, dates about his school history, dates of his pictures on the group chat and Facebook, and educational history in first-year Law GroupMe chat titled "NU Kids on the Block '23."

834.    She inappropriately and offensively suggested Plaintiff was under an "assumed identity," which is a stereotype about people with mental disabilities.

835.    She posted the word "psyop" which was a direct reference to mental capabilities and was directly related to mental health, and she insinuated that Plaintiff was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

836.    She posted a derogatory disability-based epithet of a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing Plaintiff's mental capacity to that of a frog, insinuating that Plaintiff's mental capacity was equivalent to a frog which is a direct reference to mental health and disability status and is an offensive stereotype about people with mental health problems and disabilities.

837.    Posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class. At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

838.    Texting me at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that she had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

839.    She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety.

840.     Her actions caused Plaintiff significant emotional distress by bringing up his last year in school, which was when his mother died, he was hospitalized for grief, and had to withdraw from school for mental health concerns.

841.     As a direct result of this call, Plaintiff was suspended and then expelled from law school in Fall 2020.

842.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 69
### § 26.5-2. Harassment by telephone. 720 ILCS 5/26.5-2(a) (1), (2), (4), (6)
### (Evangeline Gargula)

843.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

844.     (a) A person commits harassment by telephone when he or she uses telephone communication for any of the following purposes:

845.           (1) Making any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy or indecent with an intent to offend;

846.           (2) Making a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number;

847.           (4) Making repeated telephone calls, during which conversation ensues, solely to harass any person at the called number;

848.           (6) Knowingly permitting any telephone under one's control to be used for any of the purposes mentioned herein.

849.     Second Phone Call with Plaintiff at 1:18 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly making suggestions that her previous disability harassment upon Plaintiff was "public" information, an obscene and lewd and lascivious and filthy suggestion made with the intent to offend.

850.     Wherein she made telephone call with Plaintiff with the intent to harass Plaintiff at his phone number.

851.     Wherein she made repeated telephone calls, consisting of this call and the prior one, solely to harass and intimidate and entrap Plaintiff at his home during a late night hour.

852.     Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (2), (4) and (6) of this statute.

853.     Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

854.     GroupMe Disability Harassment "Assumed Identity" Post was a message transmitted with the use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based epithet repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

855.     Posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class. At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

856.     Texting me at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that she had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

857.     She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety.

858.     Her actions caused Plaintiff significant emotional distress by bringing up his last year in school, which was when his mother died, he was hospitalized for grief, and had to withdraw from school for mental health concerns.

859.     As a direct result of this call, Plaintiff was suspended and then expelled from law school in Fall 2020.

860.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 70
### § 26.5-3. Harassment through electronic communications. 720 ILCS 5/26.5-3 (1), (6) (Evangeline Gargula)

861.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

862.     (a) A person commits harassment through electronic communications when he or she uses electronic communication for any of the following purposes:

863.          (1) Making any comment, request, suggestion or proposal which is obscene with an intent to offend;

864.          (6) Knowingly permitting any electronic communications device to be used for any of the purposes mentioned in this subsection (a).

865.     GroupMe Disability Harassment "Assumed Identity" Post was a message transmitted with the use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based epithet repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

866.     She posted Plaintiff's private Facebook information which she gathered through cyberstalking, which included such as: his photograph, work history, contact information, dates about his school history, dates of his pictures on the group chat and Facebook, and educational history in first-year Law GroupMe chat titled "NU Kids on the Block '23."

867. She inappropriately and offensively suggested Plaintiff was under an "assumed identity," which is a stereotype about people with mental disabilities.

868. She posted the word "psyop" which was a direct reference to mental capabilities and was directly related to mental health, and she insinuated that Plaintiff was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

869. She posted a derogatory disability-based epithet of a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing Plaintiff's mental capacity to that of a frog, insinuating that Plaintiff's mental capacity was equivalent to a frog which is a direct reference to mental health and disability status and is an offensive stereotype about people with mental health problems and disabilities.

870. Communicating to the law class about me by posting my private information in the first-year Law GroupMe chat titled "NU Kids on the Block '23 from 8/22/20-8/23/20, communicating to others about me by making and encouraging defamatory speculation and remarks directed towards ADA disabilities for the purposes of having me maliciously expelled from law school.

871. Damaged my property in terms of my character through defamatory statement and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20 in order to get me maliciously expelled from law school.

872. Her actions caused Plaintiff significant emotional distress by bringing up his last year in school, which was when his mother died, he was hospitalized for grief, and had to withdraw from school for mental health concerns.

873. As a direct result of this post, Plaintiff was suspended and then expelled from law school in Fall 2020.

874. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 71
### § 26.5-3. Harassment through electronic communications. 720 ILCS 5/26.5-3
### (Evangeline Gargula)

875. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

876. (a) A person commits harassment through electronic communication when he or she uses electronic communication for any of the following purposes:

877. (1) Making any comment, request, suggestion or proposal which is obscene with an intent to offend;

878. (5) Threatening injury to the person or to the property of the person to whom an electronic communication is directed or to any of his or her family or household members; or

879. (6) Knowingly permitting any electronic communications device to be used for any of the purposes mentioned in this subsection (a).

880. First Phone Call directly threatened my safety by calling me at 1:08 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly asking "Is this Fahad Syed?" then failed to identify herself after repeated inquiry, replying only with the comments: "you gave me your number" and "you told me to call you" with the intent to antagonize, threaten, intimidate, and offend.

881. Phone call was made with use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included derogatory disability-based harassment and antagonization which preyed on the visible symptoms of Plaintiffs disability and was repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

882.     She took Plaintiff's legitimate offer to settle our grievances offline to call him at 1:08 AM threateningly and menacingly to antagonize and harass Plaintiff, instead of trying to arrange a meeting at normal hours via email or text.

883.     Wherein she repeatedly made Plaintiff's telephone ring with the intent to harass Plaintiff at his phone number.

884.     Wherein she made telephone call to Plaintiff with the intent to harass Plaintiff at his phone number.

885.     Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (5) and (6) of this statute.

886.     Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3)  when she  recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

887.     She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety.

888.     Her actions caused Plaintiff significant emotional distress by bringing up his last year in school, which was when his mother died, he was hospitalized for grief, and had to withdraw from school for mental health concerns.

889.     As a direct result of this call, Plaintiff was suspended and then expelled from law school in Fall 2020.

890.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 72
### § 26.5-3. Harassment through electronic communications. 720 ILCS 5/26.5-3
### (Evangeline Gargula)

891.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

892.     (a) A person commits harassment through electronic communications when he or she uses electronic communication for any of the following purposes:

893.           (1) Making any comment, request, suggestion or proposal which is obscene with an intent to offend;

894.           (5) Threatening injury to the person or to the property of the person to whom an electronic communication is directed or to any of his or her family or household members; or

895.           (6) Knowingly permitting any electronic communications device to be used for any of the purposes mentioned in this subsection (a).

896.     Second Phone Call with Plaintiff at 1:18 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly making suggestions that her previous disability harassment upon Plaintiff was "public" information, an obscene and lewd and lascivious and filthy suggestion made with the intent to offend.

897.     Phone call was made with use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included derogatory disability-based harassment and antagonization which preyed on the visible symptoms of Plaintiffs disability and was repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

898.     Wherein she made telephone call with Plaintiff with the intent to harass Plaintiff at his phone number.

899.     Wherein she made repeated telephone calls, consisting of this call and the prior one, solely to harass and intimidate and entrap Plaintiff at his home during a late night hour.

900.     Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (5) and (6) of this statute.

901.     Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

902.     GroupMe Disability Harassment "Assumed Identity" Post was a message transmitted with the use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based epithet repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

903.     Posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class. At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

904.     She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety.

905.     Her actions caused Plaintiff significant emotional distress by bringing up his last year in school, which was when his mother died, he was hospitalized for grief, and had to withdraw from school for mental health concerns.

906.     As a direct result of this call, Plaintiff was suspended and then expelled from law school in Fall 2020.

907.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 73
### § 26.5-3. Harassment through electronic communications. 720 ILCS 5/26.5-3
### (Evangeline Gargula)

908.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

909.  (a) A person commits harassment through electronic communications when he or she uses electronic communication for any of the following purposes:

910.  (1) Making any comment, request, suggestion or proposal which is obscene with an intent to offend;

911.  (5) Threatening injury to the person or to the property of the person to whom an electronic communication is directed or to any of his or her family or household members; or

912.  (6) Knowingly permitting any electronic communications device to be used for any of the purposes mentioned in this subsection (a).

913.  Texting me at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that she had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

914.  Text was made with use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based harassment and antagonization which preyed on the visible symptoms of Plaintiffs disability and was repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

915.  Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (5) and (6) of this statute.

916.  ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 74
### § 12-7.5. Cyberstalking. 720 ILCS 5/12-7.5
### (Evangeline Gargula)

917.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

918.  (a) A person commits cyberstalking when he or she engages in a course of conduct using electronic communication directed at a specific person, and he or she knows or should know that would cause a reasonable person to:

919.  (1) fear for his or her safety or the safety of a third person; or

920.  (2) suffer other emotional distress.

921.  (a-3) A person commits cyberstalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions, harasses another person through the use of electronic communication and:

922.  (1) at any time transmits a threat of immediate or future bodily harm, sexual assault, confinement, or restraint and the threat is directed towards that person or a family member of that person; or

923.  (2) places that person or a family member of tha person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint; or

924.        (3) at any time knowingly solicits the commission of an act by any person which would be a violation of this Code directed towards that person or a family member of that person.

925.     (b) Sentence. Cyberstalking is a Class 4 felony; a second or subsequent conviction is a Class 3 felony.

926.    cyberstalking me on the basis of actual or perceived mental disability. She conducted surveillance of me on "Google" and "Facebook" and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history. She gathered my personal data, including my photo, from "Facebook," "Google," and other possible locations for malicious personal use on or around 8/22/20, and also to post it in first-year Law GroupMe chat titled "NU Kids on the Block '23" on or around 8/21/20.

927.    by posting my private information which she gathered through surveillance in first-year Law GroupMe chat titled "NU Kids on the Block '23" in committing harassment based on ADA disabilities and Her actions caused me significant emotional distress by bringing up my last year in school, which was when my mother died, I was hospitalized for grief, and I had to withdraw from school for mental health concerns. thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class. At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

928.    posted a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities

929.    inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities.

930.    posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

931.    encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my work and education history was something that I could not possibly have because of my mental health status and cognitive capacity. Therefore, by ridiculing and trying to poke holes in my work history and inciting hatred and speculation about me, they directed comments at my ADA disabilities.

932.    Engaged in intimidation in violation of 720 ILCS 5/12-6 (a)(1) when she engaged in harassment by telephone in violation of 720 ILCS 5/26.5-2 and directly threatened my safety by calling me at 1:08 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly asking "Is this Fahad Syed?" then failed to identify herself after repeated inquiry, replying only "you gave me your number" and "you told me to call you." She took my legitimate offer to settle our grievances offline to call me 1:08 AM threateningly and menacingly, instead of trying to arrange a meeting at normal hours via email or text. She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety. She also committed Aggravated assault in violation of 720 ILCS 5/12-2(a) by committing the assault resulting from gaining my information in "NU Kids on the Block '23" which is a school affiliated group, or a "place of public accommodation." She also committed

aggravated assault in violation of 720 ILCS 5/12-2(b)(1) by knowingly assaulting a person with ADA disabilities.

933.    She took Plaintiff's legitimate offer to settle our grievances offline to call him at 1:08 AM threateningly and menacingly to antagonize and harass Plaintiff, instead of trying to arrange a meeting at normal hours via email or text.

934.    Wherein she repeatedly made Plaintiff's telephone ring with the intent to harass Plaintiff at his phone number.

935.    Wherein she made telephone call to Plaintiff with the intent to harass Plaintiff at his phone number.

936.    Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (2), (3) and (6) of **720 ILCS 5/26.5-2**.

937.    Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

938.    Second Phone Call with Plaintiff at 1:18 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly making suggestions that her previous disability harassment upon Plaintiff was "public" information, an obscene and lewd and lascivious and filthy suggestion made with the intent to offend.

939.    Wherein she made telephone call with Plaintiff with the intent to harass Plaintiff at his phone number.

940.    Wherein she made repeated telephone calls, consisting of this call and the prior one, solely to harass and intimidate and entrap Plaintiff at his home during a late night hour.

941.    Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (2), (4) and (6) of **720 ILCS 5/26.5-2.**.

942.    Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

943.    Texting me at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that she had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

944.    Text was made with use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included incitements to hate and derogatory disability based

harassment and antagonization which preyed on the visible symptoms of Plaintiffs disability and was repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage.

945.    inciting, through the use of electronic communications, and/or influencing "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , to unfairly influence school administration to suspend me from NU on Behalf of Evangeline on 8/23/20, where Cange forwarded messages and screenshots and called Shannon Bartellete, the associate dean of Inclusion and Engagement to speak to Associate Dean and Dean of Students Susie Spies Roth and others, to participate in a student disciplinary hearing against me where she stated during an interview on 9/2/20 that "she is working on an action plan so this doesn't happen again." She also stated "(This feeling is) reciprocated among our board, because they were all taking about it [the group chat altercation] as it happened" further indicating the defamatory rumors and hate and ridicule Gargula incited about me to the law school.  Where Evangeline sent Cange and email falsely indicating that Plaintiff had initiated the phone contact between Evangeline and Plaintiff and where Evangeline and Cange had previously met and were both part of the LGBTQ affinity group.

946.    inciting, through the use of electronic communications, and/or influencing "Ishani Choski," a female transgender 2L student at Northwestern Law, to harass me six separate times with unwanted comments on Facebook on 8/23/20, where she made repeated reference to me "sliding into white girls dm's" and other harassing comments on my status posts. Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

947.    inciting, through the use of electronic communications, and/or influencing "tessaweil13," a white female incoming 1L student, to harass me with offensive statements on Dischord on 8/23/20 on Behalf of Evangeline where both Evangeline and Tessa had previously spoken and met.

948.    inciting, through the use of electronic communications, and/or influencing "Wren Chernoff," an incoming white female male-transgender 1L , to participate in a student disciplinary hearing against me where she stated during an interview on 9/1/20 that "while this semester is largely remote, [I] don't want to be in the hall with him to and from class and have some sort of confrontation," and where she said it would be "Very easy to imagine using the women's restroom" and seeing him go in and out of the restroom at the same time, "and… start a confrontation." Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

949.    encouraging, through the use of electronic communications and/or influencing "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

950.    harassment "created a hostile environment and/or substantially interfered" with my "access to a University program or activity from an objective perspective" when I was banned immediately from group chat and discord after my comments in the chat, furthermore I was immediately suspended from school, thereby effectively impeded from those university activities directly resulting from Evangeline's influence and injured in my property in educational opportunities and law career due to her malicious intent to get me expelled from school.

951.

952.    A collection of all of the acts committed by Gargula caused me substantial emotional distress by being expelled from School,  and arrested by EPD from Mona Dugo's acts which were pursuant and related to her taking actions regarding Gargula's claims.

953.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## <u>Count 75</u>
### § 14-2. Eavesdropping.720 ILCS 5/14-2

**(Evangeline Gargula)**

954.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

955.        (a) A person commits eavesdropping when he or she knowingly and intentionally:

956.            (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation; or

957.            (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

958.    Gargula recording the first phone call on 8/23/20 at 1:08 AM  in violation of (2).

959.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b. Award attorney's fees and costs;
   c. An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;
   d. Award all actual damages against the eavesdropper or his principal or both;
   e. Award any punitive damages which may be awarded by the court or by a jury;
   f. Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;
   g. Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and
   h. Award such other relief as the Court deems just and proper.

<u>**Count 76**</u>
**§ 14-2. Eavesdropping.720 ILCS 5/14-2**
**(Evangeline Gargula)**

960.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

961.        (a) A person commits eavesdropping when he or she knowingly and intentionally:

962.            (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

963.            (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

964.    Gargula recording the second phone call at 1:18 AM on 8/23/20 in violation of (2).

965.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;
   b. Award attorney's fees and costs;
   c. An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;
   d. Award all actual damages against the eavesdropper or his principal or both;
   e. Award any punitive damages which may be awarded by the court or by a jury;
   f. Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

g.   Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

h.   Award such other relief as the Court deems just and proper.

## Count 77
## § 14-2. Eavesdropping.720 ILCS 5/14-2
### (Evangeline Gargula)

966.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

967.   (a) A person commits eavesdropping when he or she knowingly and intentionally:

968.   (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

969.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

970.   On information and belief, Gargula Disclosing the first phone call to Gloria Cange in violation of (2) and (5) on or around 8/23/20, wherein she sent an email communication to Cange at 1:50 AM on 8/23/20 disclosing the existence of the recordings, and where Cange later admitted in interviews that Gargula had shared messages with her.

971.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of this particular count of the complaint;

b.   Award attorney's fees and costs;

c.   An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

d.   Award all actual damages against the eavesdropper or his principal or both;

e.   Award any punitive damages which may be awarded by the court or by a jury;

f.   Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

g.   Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

h.   Award such other relief as the Court deems just and proper.

## Count 78
## § 14-2. Eavesdropping.720 ILCS 5/14-2
### (Evangeline Gargula)

972.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

973.   (a) A person commits eavesdropping when he or she knowingly and intentionally:

974.   (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

975.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

976.     Gargula Disclosing the second phone to Gloria Cange in violation of (2) and (5) wherein she sent an email communication to Cange at 1:50 AM on 8/23/20 disclosing the existence of the recordings, and where Cange later admitted in interviews that Gargula had shared messages with her.

977.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

      a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

      b.  Award attorney's fees and costs;

      c.  An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

      d.  Award all actual damages against the eavesdropper or his principal or both;

      e.  Award any punitive damages which may be awarded by the court or by a jury;

      f.  Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

      g.  Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

      h.  Award such other relief as the Court deems just and proper.

## Count 79
### § 14-2. Eavesdropping.720 ILCS 5/14-2
### (Evangeline Gargula)

978.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

979.     (a) A person commits eavesdropping when he or she knowingly and intentionally:

980.     (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

981.     (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

982.     Gargula Disclosing the first phone call to NU in violation of (2) and (5) on or around 8/23/20.

983.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

      a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

      b.  Award attorney's fees and costs;

      c.  An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

      d.  Award all actual damages against the eavesdropper or his principal or both;

      e.  Award any punitive damages which may be awarded by the court or by a jury;

      f.  Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

      g.  Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

      h.  Award such other relief as the Court deems just and proper.

## Count 80
### § 14-2. Eavesdropping.720 ILCS 5/14-2
### (Evangeline Gargula)

984.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

985.   (a) A person commits eavesdropping when he or she knowingly and intentionally:

986.   (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

987.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

988.   Gargula Disclosing the second phone call to NU in violation of (2) and (5) on or around 8/23/20.

989.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

b.   Award attorney's fees and costs;

c.   An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

d.   Award all actual damages against the eavesdropper or his principal or both;

e.   Award any punitive damages which may be awarded by the court or by a jury;

f.   Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

g.   Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

h.   Award such other relief as the Court deems just and proper.

**Count 81**
**§ 14-2. Eavesdropping.720 ILCS 5/14-2**
**(Evangeline Gargula)**

990.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

991.   (a) A person commits eavesdropping when he or she knowingly and intentionally:

992.   (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

993.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

994.   Gargula Disclosing the first phone call to NUPD in violation of (2) and (5) on or around 8/23/20.

995.   Where Gargula specifically mentioned during the student conduct hearings that NUPD was "calling her regularly" to give her "assurances of her safety."

996.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

i.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

j.   Award attorney's fees and costs;

k.   An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

l.   Award all actual damages against the eavesdropper or his principal or both;

m.   Award any punitive damages which may be awarded by the court or by a jury;

n. Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

o. Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

p. Award such other relief as the Court deems just and proper.

**Count 82**
**§ 14-2. Eavesdropping.720 ILCS 5/14-2**
**(Evangeline Gargula)**

997. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

998. (a) A person commits eavesdropping when he or she knowingly and intentionally:

999. (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation;

1000. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1001. Gargula Disclosing the second phone call to NUPD in violation of (2) and (5) on or around 8/23/70.

1002. Where Gargula specifically mentioned during the student conduct hearings that NUPD was "calling her regularly" to give her "assurances of her safety."

1003. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

i. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

j. Award attorney's fees and costs;

k. An injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

l. Award all actual damages against the eavesdropper or his principal or both;

m. Award any punitive damages which may be awarded by the court or by a jury;

n. Award all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

o. Award any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned; and

p. Award such other relief as the Court deems just and proper.

**§ 14-4. Sentence. 720 ILCS 5/14-4**

1004. (a) Eavesdropping, for a first offense, is a Class 4 felony and, for a second or subsequent offense, is a Class 3 felony.

**§ 14-6. Civil remedies to injured parties. 720 ILCS 5/14-6**

1005. (1) Any or all parties to any conversation or electronic communication upon which eavesdropping is practiced contrary to this Article shall be entitled to the following remedies:

1006. (a) To an injunction by the circuit court prohibiting further eavesdropping by the eavesdropper and by or on behalf of his principal, or either;

1007. (b) To all actual damages against the eavesdropper or his principal or both;

1008. (c) To any punitive damages which may be awarded by the court or by a jury;

1009.            (d) To all actual damages against any landlord, owner or building operator, or any common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned;

1010.            (e) To any punitive damages which may be awarded by the court or by a jury against any landlord, owner or building operator, or common carrier by wire who aids, abets, or knowingly permits the eavesdropping concerned.

## Count 83
### § 12-7.2. Educational intimidation. 720 ILCS 5/12-7.2
### (Student Group #1,  Individual Defendant NUPD Officers)

1011.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1012.            (a) A person commits educational intimidation when he knowingly interferes with the right of any [student] who is or is believed to be afflicted with a [ADA disability] to attend or participate in the activities of [any] school in this State:

1013.                (1) by actual or threatened physical harm to the person or property of the [student] or the [student]'s family; or

1014.                (2) by impeding or obstructing the [student]'s right of ingress to, egress from, or freedom of movement at school facilities or activities; or

1015.                (3) by exposing or threatening to expose the [student], or the family or friends of the [student], to public hatred, contempt or ridicule.

1016.             (c) Educational intimidation is a Class C misdemeanor, except that a second or subsequent offense shall be a Class A misdemeanor.

1017.            (d) Independent of any criminal prosecution or the result thereof, any person suffering injury to his person or damage to his property as a result of educational intimidation may bring a civil action for damages, injunction or other appropriate relief. The court may award actual damages, including damages for emotional distress, or punitive damages. A judgment may include attorney's fees and costs.

1018.   cyberstalking 720 ILCS 5/12-7.5. She committed a Hate crime in violation of 720 ILCS 5/12-7.1 (a) by cyberstalking me on the basis of actual or perceived mental disability. She conducted surveillance of me on "Google" and "Facebook" and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history. She gathered my personal data, including my photo, from "Facebook," "Google," and other possible locations for malicious personal use on or around 8/22/20, and also to post it in first-year Law GroupMe chat titled "NU Kids on the Block '23" on or around 8/21/20.

1019.   She posted my private Facebook information on the chat, which included such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history which she gathered through surveillance in first-year Law GroupMe chat titled "NU Kids on the Block '23" in committing harassment based on ADA disabilities and Her actions caused me significant emotional distress by bringing up my last year in school, which was when my mother died, I was hospitalized for grief, and I had to withdraw from school for mental health concerns.

1020.   Indirectly threatening my safety when she posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class. At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise

have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

1021.    she inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities.

1022.    posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

1023.    posted a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities

1024.    encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my work and education history was something that I could not possibly have because of my mental health status and cognitive capacity. Therefore, by ridiculing and trying to poke holes in my work history and inciting hatred and speculation about me, they directed comments at my ADA disabilities.

1025.    directly threatened my safety by calling me at 1:08 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly asking "Is this Fahad Syed?" then paused and breathed into the phone menacingly, then failed to identify herself after repeated inquiry, replying only "you gave me your number" and "you told me to call you." She took my legitimate offer to settle our grievances offline to call me 1:08 AM threateningly and menacingly, instead of trying to arrange a meeting at normal hours via email or text. She took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety. She also committed Aggravated assault in violation of 720 ILCS 5/12-2(a) by committing the assault resulting from gaining my information in "NU Kids on the Block '23" which is a school affiliated group, or a "place of public accommodation." She also committed aggravated assault in violation of 720 ILCS 5/12-2(b)(1) by knowingly assaulting a person with ADA disabilities. illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. she used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

1026.    Second Phone Call with Plaintiff at 1:18 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly making suggestions that her previous disability harassment upon Plaintiff was "public" information, an obscene and lewd and lascivious and filthy suggestion made with the intent to offend. Phone call was made with use of language and terms which are obscene, lewd, and immoral and were made with the intent to offend, where it included derogatory disability-based harassment and antagonization which preyed on the visible symptoms of Plaintiffs disability and was repulsive by reason of crass disregard of moral or ethical principles and containing or being language regarded as taboo in polite usage. Wherein she made telephone call

with Plaintiff with the intent to harass Plaintiff at his phone number. Wherein she made repeated telephone calls, consisting of this call and the prior one, solely to harass and intimidate and entrap Plaintiff at his home during a late night hour. Wherein she knowingly permitted her telephone to be used for the purposes of harassment in violation of (1), (5) and (6) of harassment by electronic communication statute. Illegally recording the phone conversation without my knowledge or consent in violation of Eavesdropping 720 ILCS 5/14-2(a)(2) when she used an eavesdropping device, her phone and/or another recording devise, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation and Eavesdropping 720 ILCS 5/14-2(a)(3) when she recorded, or transcribed, in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does so with the consent of all parties to the private electronic communication in order to maliciously and deceitfully get me expelled from law school. She used or disclosed any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of the Article, doing so without the consent of all of the parties and disclosing that information to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

1027. inciting, encouraging, and/or influencing "Jaina Solo," an incoming female 1L , to speculate negatively "According to 2Ls, last year he escalated in his aggressive behavior and speech after being kicked out of the group me. Unfortunately in person at times. If he messages any of you, rather than engaging with him I recommend emailing [NU] with screenshots," in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20. Where Solo and Gargula had previously met and spoken.

1028. she committed intimidation in violation of 720 ILCS 5/12-6(a)(7) and 720 ILCS 5/12-6(a)(5) in cooperation with "Jake Besanceney," an incoming white male 1L , to state "Please keep further discussion about Fahad at a respectful level, and preferably at a minimum, outside of what is necessary" after removing me from in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20. Where Solo and Besanceney had previously met and spoken.

1029. inciting, encouraging, and/or influencing "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , to unfairly influence school administration to suspend me from NU on Behalf of Evangeline on 8/23/20, where Cange forwarded messages and screenshots and called Shannon Bartellete, the associate dean of Inclusion and Engagement to speak to Associate Dean and Dean of Students Susie Spies Roth and others. Where Evangeline sent Cange and email falsely indicating that Plaintiff had initiated the phone contact between Evangeline and Plaintiff and where Evangeline and Cange had previously met and were both part of the LGBTQ affinity group. Inciting Cange to participate in a student disciplinary hearing against me where she stated during an interview on 9/2/20 that "she is working on an action plan so this doesn't happen again." She also stated "(This feeling is) reciprocated among our board, because they were all taking about it [the group chat altercation] as it happened" further indicating the defamatory rumors and hate and ridicule Gargula incited about me to the law school.

1030. inciting, encouraging, and/or influencing "Ishani Choski," a female transgender 2L student at Northwestern Law, to harass me six separate times with unwanted comments on Facebook on 8/23/20, where she made repeated reference to me "sliding into white girls dm's" and other harassing comments on my status posts. Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

1031. inciting, encouraging, and/or influencing "tessaweil13," a white female incoming 1L student, to harass me with offensive statements on Dischord on 8/23/20 on Behalf of Evangeline where both Evangeline and Tessa had previously spoken and met.

1032. by inciting, encouraging, and/or influencing "Wren Chernoff," an incoming white transgender 1L , to participate in a student disciplinary hearing against me where she stated during an interview on 9/1/20 that "while this semester is largely remote, [I] don't want to be in the hall with him to and from class and have some sort of confrontation," and where she said it would be "Very easy to imagine using the women's restroom" and seeing him go in and out of the restroom at the same time,

"and… start a confrontation." Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

1033.   inciting, encouraging, and/or influencing "Andrew Lang-Reyes," an incoming gay 1L , to participate in a student disciplinary hearing against me where he falsely claimed during an interview on 10/27/20 that I was making comments "geared directly at a person's attributes" in attempting to mischaracterize and defame me as a transphobic person. Where Gargula and Lang-Reyes had previously met and were both part of the LGBTQ affinity group.

1034.   inciting, encouraging, and/or influencing "Shen Peng," an incoming 1L , to participate in a student disciplinary hearing against me where she stated during an interview on 10/27/20 that "there were rumors concerning the first time Fahad was in law school two years ago." Peng indicated that it was "rumored that due to inappropriate physical conduct, Fahad left law school two years in a row and this fall was placed in section 4." Where Peng and Gargula had previously met and knew each other.

1035.   texting me at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have me suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap me into a response. She knew that she had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

1036.   her harassment "created a hostile environment and/or substantially interfered" with my "access to a University program or activity from an objective perspective" when I was banned immediately from group chat and discord after my comments in the chat, furthermore I was immediately suspended from school, thereby effectively impeded from those university activities directly resulting from Evangeline's influence and injured in my property in educational opportunities and law career due to her malicious intent to get me expelled from school.

1037.   Her actions directly caused Plaintiff to be suspended on 8/23/20 and expelled on 1/21/21.

1038.   Where NUPD did knowingly aid and abet the felonious activity of illegally disseminating the eavesdropping audio and resulting in Plaintiff being disciplined at school, thereby directly impeding his access to the school in violation of this statute. Where NUPD gave Plaintiff a fake police report number to document the eavesdropping as a pretext to cover for their retaliatory interrogation of Plaintiff by Detective Lee as described in the complaint. Where NUPD knew about he audio and refused to prosecute it or report it to CPD, refused to take the report from Plaintiff for the eavesdropping offense, then illegally obstructed Plaintiff's lawful CPD report so that it was cancelled. Where the police report was directly impacting Plaintiffs disciplinary proceedings, as expelling Gargula would cause Plaintiff's disciplinary action at school to be dopped, wherein NUPD prevented Gargula from being investigated or prosecuted through their illegal interference and disclosure of Plaintiff's mental health records.

1039.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
   b.   Award punitive damages;
   c.   Order an injunction on Plaintiffs expulsion pending the disposition of his claims;
   d.   Award attorney's fees and costs; and
   e.   Award such other relief as the Court deems just and proper.

## Count 84
### § 12-1. Assault. 720 ILCS 5/12-1
#### (Evangeline Gargula)

1040.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1041.         (a) A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery.

1042.       (b) Sentence. Assault is a Class C misdemeanor.

1043.   Gargula's initial threatening 1 AM phone call placed to Plaintiff where she knew his name, never identified herself, and threatening antagonized and harassed Plaintiff during the phone call placed Plaintiff in reasonable apprehension of fear of receiving a battery due to the fact of the late night call, never identifying herself, sounding like a distinctly male voice on the phone, and knowing Plaintiff's name led him to believe that she knew where he lived and would come batter him after threateningly calling him.

1044.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 85
### § 12-2. Aggravated assault. 720 ILCS 5/12-2
### (Evangeline Gargula)

1045.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1046.   Offense based on location of conduct: A person commits aggravated assault when he or she commits an assault against an individual who is on or about ... a public place of accommodation ... or amusement, a sports venue, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship.

1047.   Offense based on status of victim. A person commits aggravated assault when, in committing an assault, he or she knows the individual assaulted to be any of the following: A person with a physical disability or a person 60 years of age or older and the assault is without legal justification.

1048.   Sentence: Aggravated assault as defined in subdivision (a), (b)(1), (b)(2), (b)(3), (b)(4), (b)(7), (b)(8), (b)(9), (c)(1), (c)(4), or (c)(9) is a Class A misdemeanor.

1049.   Gargula's initial threatening 1 AM phone call placed to Plaintiff where she knew his name, never identified herself, and threatening antagonized and harassed Plaintiff during the phone call placed Plaintiff in reasonable apprehension of fear of receiving a battery due to the fact of the late night call, never identifying herself, sounding like a distinctly male voice on the phone, and knowing Plaintiff's name led him to believe that she knew where he lived and would come batter him after threateningly calling him.

1050.   Gargula was aware of the Plaintiffs disability through the outward manifestations of his underlying disability in the form of anger and irritability, and also explicitly admitted to conducting her course of action on the basis of her perception of Plaintiff's disability by explicitly referencing Plaintiff's possible "assumed identity" and conducting "psyop" as her motivations for actions, which are stereotypical activities of people with mental health disabilities.

1051.   Gargula committed all of the actions indicated in this complaint wherein Plaintiff was engaged in school activities in the form of a school wide group chat forum, and when Plaintiff was at his residence at 244 E Pearson Street which is on or about Northwestern University Law and Medical Schools, which are places of public accommodation which are within approximately ¼ miles from Plaintiffs apartment.

1052.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 86
### § 12-6. Intimidation 720 ILCS 5/12-6

**(Evangeline Gargula, Gloria Cange)**

1053.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1054.   A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he or she communicates to another, directly or indirectly by any means, a threat to perform without lawful authority any of the following acts: (1) Inflict physical harm on the person threatened or any other person or on property; or (2) Commit a felony or Class A misdemeanor; or (3) Expose any person to hatred, contempt or ridicule; or (4) Bring about or continue a strike, boycott or other collective action

1055.   Sentence: Intimidation is a Class 3 felony for which an offender may be sentenced to a term of imprisonment of not less than 2 years and not more than 10 years.

1056.   Where Cange and Gargula acted with the intent of causing NU to unduly expel Plaintiff and cause Plaintiff to omit the performance of his graduate studies.

1057.   Wherein defendants actions indirectly communicated a threat to Plaintiff's property interest in the JD program at NU.

1058.   Wherein defendants actions indirectly communicated a threat to expose Plaintiff to hatred, contempt and ridicule, and did, in fact, expose Plaintiff to hatred, contempt and ridicule among the NU community.

1059.   Wherein defendants actions indirectly communicated a threat to expose Plaintiff to Bring about or continue a strike, boycott or other collective action, and did, in fact, expose Plaintiff to a strike, boycott or other collective action among the NU community.

1060.   Where Cange and Gargula's conspiratorial actions resulted in harm of Plaintiffs property interest in graduate education in the form of suspension and expulsion without due process. Where Cange and Gargula committed all of the individual felonies and misdemeanors listed in this complaint, including eavesdropping and educational intimidation and conspiracy. Where Cange and Gargula spread defamatory stories and rumors about Plaintiff to the NU community and staff, thereby exposing him to hatred, contempt, and ridicule on false allegations of transphobic actions. Where Cange and Gargula acted to bring about the collective actions of hate and ridicule of Plaintiff from students and staff.

1061.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 87
### § 12-7.1. Hate crime 720 ILCS 5/12-7.1
### (Evangeline Gargula)

1062.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1063.   A person commits hate crime when, by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual or group of individuals, regardless of the existence of any other motivating factor or factors, he or she commits assault, aggravated assault, intimidation, stalking, cyberstalking,, misdemeanor criminal damage to property,, mob action, disorderly conduct, transmission of obscene messages, harassment by telephone, or harassment through electronic communications as these crimes are defined in Sections 12-1, 12-2, 12-3(a), 12-7.3, 12-7.5, 16-1, 19-4, 21-1, 21-2, 21-3, 25-1, 26-1, 26.5-1, 26.5-2, paragraphs (a)(1), (a)(2), and (a)(3) of Section 12-6, and paragraphs (a)(2) and (a)(5) of Section 26.5-3 of this Code, respectively.

1064.   Except as provided in subsection (b-5), hate crime is a Class 4 felony for a first offense and a Class 2 felony for a second or subsequent offense.

1065.   (b-5) Hate crime is a Class 3 felony for a first offense and a Class 2 felony for a second or subsequent offense if committed:

1066. in a school or other educational facility, including ... or associated with the school or other educational facility;

1067. (b-10) Upon imposition of any sentence, the trial court shall also either order restitution paid to the victim or impose a fine in an amount to be determined by the court based on the severity of the crime and the injury or damages suffered by the victim.

1068. (c) Independent of any criminal prosecution or the result of a criminal prosecution, any person suffering injury to his or her person, damage to his or her property, intimidation as defined in paragraphs (a)(1), (a)(2), and (a)(3) of Section 12-6 of this Code, stalking as defined in Section 12-7.3 of this Code, cyberstalking as defined in Section 12-7.5 of this Code, disorderly conduct as defined in paragraph (a)(1)of Section 26-1 of this Code, transmission of obscene messages as defined in Section 26.5-1 of this Code, harassment by telephone as defined in Section 26.5-2 of this Code, or harassment through electronic communications as defined in paragraphs (a)(2) and (a)(5) of Section 26.5-3 of this Code as a result of a hate crime may bring a civil action for damages, injunction or other appropriate relief. The court may award actual damages, including damages for emotional distress, as well as punitive damages. The court may impose a civil penalty up to $25,000 for each violation of this subsection (c). A judgment in favor of a person who brings a civil action under this subsection (c) shall include attorney's fees and costs. After consulting with the local State's Attorney, the Attorney General may bring a civil action in the name of the People of the State for an injunction or other equitable relief under this subsection (c). In addition, the Attorney General may request and the court may impose a civil penalty up to $25,000 for each violation under this subsection (c).

1069. Evangeline said she is a "skeptical" person who likes doing her "due diligence" so she googled Fahad. *See* **Gargula 8/27/20 Student Conduct Interview.** She said she found his Facebook profile and noticed the profile indicated that Fahad started law school in 2019. *Id.* She said according to the profile, Fahad would have been a 2L, so she wondered if Fahad was actually who he was claiming to be in the group. *Id.* Evangeline posted this information to the GroupMe chat, raising her suspicions to the group. *Id.*

1070. When asked about her NU Kids on the Block '23 group chat posts. Evangeline said after posting Fahad's Facebook profile information, she wrote "assumed identity" and "psyop" to convey that "maybe someone is messing with us." *See* **Gargula 10/29/20 Student Conduct Interview.** When asked if she recorded the phone calls between her and Fahad, Evageline said that she did. *Id.* She explained that she recorded them for her own purposes. *Id.*

1071. Wherein Gargula performed the actions in each and every count in this complaint by reason of perceived mental disability, on the basis of suspicion that Plaintiff was acting under an assumed identity, or that he was performing a "psychological operation," which are both perceived disabilities and derogatory stereotypes about people with disabilities. Wherein she had no legitimate basis for performing any of the actions in this this complaint or suspecting that Plaintiff was a threat to the safety of any other person.

1072. *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 88
### 42 U.S.C. § 1985 Civil Conspiracy
### (Gloria Cange, Evangeline Gargula)

1073. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1074. Section 1985 allows plaintiffs to recover damages from private actors who act to deprive them of their civil rights. **42 U.S.C.A. § 1985.** **Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)** Purpose of § 1985, as distinct from § 1983 claims against those acting under color of state law, is to permit recovery from a private actor who has conspired with state actors. **Id.** To assert a prima facie claim of conspiracy to violate civil rights under § 1985, a plaintiff must show: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2)

an overt act done in pursuance of the common purpose, and (3) actual legal damage. 42 U.S.C.A. § 1985(3). **Moore v. Solanco Sch. Dist.,** **471 F. Supp. 3d 640 (E.D. Pa. 2020)** A plaintiff alleging a conspiracy to violate civil rights under § 1985 must assert specific factual allegations of combination, agreement, or understanding among all or between any defendants to plot, plan, or conspire to carry out the alleged chain of events. 42 U.S.C.A. § 1985(3). **Id.** Allegations for a claim for conspiracy to violate civil rights under § 1985 must contain particular and exacting facts that demonstrate the period of the conspiracy, object of the conspiracy, and certain other actions of the alleged conspirators to achieve the purpose. 42 U.S.C.A. § 1985(3). **Id.**

1075.   Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees in 2019 and 2020, and was meeting the schools legitimate academic expectations,  Plaintiff had a property interest in their continued participation in the JD Program, as the term "property" is understood in relation to the Fourteenth Amendment of the United States Constitution.

1076.   An Illinois civil conspiracy requires three elements: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

1077.   Gargula and Cange acted together, as indicated in the 2020 student conduct investigation reports, by exchanging messages with each other, and both contacting students and staff about Plaintiff

1078.   Gargula and Cange acted with the purpose of having Plaintiff unduly expelled from graduate school without any due process through "interim" suspension by specifically formulating a story which would initiate an "interim" suspension procedure based on their false and misleading allegations of physical "threats" from the Plaintiff to Gargula. Where Garula and Cange exchanged messages with each about how to deal with Plaintiff prior to his suspension, and then acting to effectuate his suspension so that NU brought charges on Gargula's behalf which they both actively and voluntarily participated in. They acted in order to deprive Plaintiff of his constitutional property interest in graduate education contact with NU through unlawful and coercive means and deprive Plaintiff of his right to equal protections of the law by treating him differently, singling him out and plotting and acting to have him expelled, than other students on the basis of their perceptions of his disability.

1079.   In furtherance of that goal, Cange engaged in false and defamatory student conduct interview, wherein she exaggerated the severity and nature of Plaintiffs alleged comments and actions and made them seem like they had a huge impact among the NU community in order to paint the Plaintiff in the most negative light possible. Where Cange unduly used her influence and status as "Outlaw" student group leader to effectuate Plaintiffs suspension in 2020 by directly contacting NU staff and students about Plaintiff. In furtherance of that goal where Gargula unlawfully shared two illegally recorded audio tapes with both Cange and NU for 4 separate counts of eavesdropping. In furtherance of that act where Gagula actively participated in the 2020 student conduct hearings, lied multiple times and made misleading and false and deliberately exaggerated statements, and specifically requested that Plaintiff be expelled from law school after having had the entire semester as a cooling off period.

1080.   In furtherance of which Cange and Gargula discussed how best to use the illegal audio tapes that she had made, and in doing so, acted in conspiracy to deprive Plaintiff to equal protections under the law by deliberately obscuring evidence of the audio and failing to indicate that that it existed. This displays that they were both aware of the tapes, as indicated in the email exchange between Cange and Gargula on 8/23/20 at 1:50 AM, and the description of evens in Cange's interview, where she described recieving the email and then taking actions such as contacting administration that same day, and noting that Plaintiff was suspended on 8/23/20.

**1081.**   Allegations that [so-conspirators] acted with the common purpose [], and committed acts of battery, assault, and false imprisonment to further that wrongful purpose, were sufficient to state civil conspiracy claim under Illinois law. **Shea v. Winnebago County Sheriff's Dep't,** **746 Fed. Appx. 541 (7th Cir. 2018),** **cert. denied sub nom. Shea v. Winnebago County Sheriff's Office,** **139 S. Ct. 1200, 203 L. Ed. 2d 204 (2019)**

**1082.**   In order to state a claim under 42 U.S.C.A. § 1985(3), the plaintiff must allege and prove a conspiracy whose purpose was to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws.[1] A plaintiff must also prove

an act in furtherance of the conspiracy, whereby a person is either injured in person or property or deprived of any right or privilege of a citizen of the United States. In addition, a conspiracy must be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus.[2] Conspiracies motivated by economic or commercial animus are not cognizable under the statute.[3] To state a claim under the civil rights conspiracy statute, a plaintiff must first show that the defendants conspired—that is, reached an agreement—with one another; thus, a conspiracy claim against federal officials by necessity implicates the substance of their official discussions.[4] **5 Fed. Proc. Forms § 10:89**

1083.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 89
### 42 U.S.C. § 1986. Action for neglect to prevent
### (NU)

1084.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1085.   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. 42 U.S.C.A. § 1986 (West)

1086.   Where NU was made fully aware of the conspiratorial actions of Cange and Gargula by their actions on 8/23/20 in reporting to administration the alleged "threats" made by Plaintiff while keeping secret and hidden the existence of the felonious audio tapes in a conspiratorial effort to deprive Plaintiff of his right to equal protection under the law. Where NU was aware that Cange and Gargula were singling Plaintiff out based on threat from his perceived disability.

1087.   Where Cange instigated Plaintiff's disciplinary action by exerting her influence as "Outlaw" LGBTQ affinity group leader by forwarding screenshots to administration and "demanding" that Plaintiff receive disciplinary actions.

1088.   Where NU employees were made aware of the existence of the felonious audio tapes and had the power, at any time, to halt the unwarranted disciplinary process which ultimately deprived Plaintiff of his right to equal protectios and due process under the Fourteenth Amendment and also deprived Plaintiff of his protected property interest in the JD program at NU.

1089.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 90
### Negligent/Intentional Infliction of Emotional Distress
### (NU, Student Group #2)

1090.   Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

1091.   The acts and omissions of Student Group #2, the University and its investigators were willful and intentional.

1092.   The University knew or should have known that Student Group #2's systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress. These actions included the conspiratorial concealment of felony audio tapes made by Gargula.

1093.   The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.

1094.   Gargula's conduct and that of the Cange was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

1095.   The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

1096.   The conduct of Student Group #2, the University's conduct and that of the investigators was the direct and proximate cause of John's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

1097.   As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages, and suspension and expulsion from law school, and arrested as a result of contact with Mona Dugo. Dugo was caused to contact Plaintiff by the conspiratorial actions of Student Group #2.

1098.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>COUNT 91</u>
**First Amendment Retaliation**
**(Mona Dugo, Individual Defendant EPD Officers)**

1099.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**1100.**   To state First Amendment retaliation claim, plaintiff must have alleged that (1) he engaged in constitutionally protected speech; (2) he suffered deprivation likely to deter his free speech; and (3) his protected speech was at least motivating factor for deprivation. **U.S. Const. Amend. <u>Glickman v. Main-Niles Ass'n of Special Recreation</u>, 18 C 4907, 2020 WL 887444 (N.D. Ill. Feb. 24, 2020)**

1101.   Where Plaintiff engaged in protected free speech on 11/4/19 via email to NU in reporting Dugo's unlawful contact with his therapist and sister, which was done without his knowledge or consent and against his express wishes.

1102.   As a result of the report, Plaintiff was arrested on 11/19/20, and suffered deprivation of his liberty, his property rights in a JD at NU, his Fourteenth Amendment right to equal protections and due process, and his rights against unreasonable seizure and self-increimination. The act of retaliatory false arrest was likely to deter his complaints to NU.

1103.   Plaintiff's 11/4/20 email was the direct cause of his false arrest by Evanston Police Department, and deprivation of Plaintiff's protected speech was the sole motivating factor in his false arrest.

1104.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 92
### Assault 720 ILCS 5/12-1
### (Mona Dugo, Individual Defendant EPD Officers)

1105.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1106.   A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery.

1107.   Wherein the actions of Dugo in knowing violation of PO 78277 did initiate and cause the false arrest of Plaintiff.

1108.   Wherein the conduct of the defendants in initiating and completing a false arrest without probable cause on false and misleading and retaliatory and conspiratorial pretenses did place Plaintiff in reasonable apprehension of receiving a battery by officers.

1109.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
   b.   Award punitive damages;
   c.   Award attorney's fees and costs; and
   d.   Award such other relief as the Court deems just and proper.

## COUNT 93
### Aggravated assault. 720 ILCS 5/12-2
### (Mona Dugo, Individual Defendant EPD Officers)

1110.   Offense based on location of conduct. A person commits aggravated assault when he or she commits an assault against an individual who is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship.

1111.   Offense based on status of victim. A person commits aggravated assault when, in committing an assault, he or she knows the individual assaulted to be any of the following:
   e.   A person with a physical disability or a person 60 years of age or older and the assault is without legal justification.

**1112.**   Where the assault, battery and false imprisonment took place at Plaintiff's apartment, on or about a place of public accommodation in the form of Northwestern University Law and Medical School which are in immediate proximity of Plaintiff's apartment.

**1113.**   Wherein all defendants were aware of Plaintiff's disability status, and took their actions based upon knowledge of this fact.

**1114.**   Where the assault and false imprisonment was without legal justification or probable cause.

1115.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
   b.   Award punitive damages;
   c.   Award attorney's fees and costs; and
   d.   Award such other relief as the Court deems just and proper.

## COUNT 94
### Battery 720 720 ILCS 5/12-3
### (Mona Dugo, Individual Defendant EPD Officers)

1116.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1117.   A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.

1118.   But in Illinois, a defendant can be liable for contacts that are "relatively trivial ones which are merely offensive and insulting." ***Cohen v. Smith***, **269 Ill.App.3d 1087, 207 Ill.Dec. 873, 648 N.E.2d 329, 332 (1995)**

1119.   Where the assault, battery and false imprisonment took place at Plaintiff's apartment, on or about a place of public accommodation in the form of Northwestern University Law and Medical School which are in immediate proximity of Plaintiff's apartment.

1120.   Wherein all defendants were aware of Plaintiff's disability status, and took their actions based upon knowledge of this fact.

1121.   Where the assault and false imprisonment was without legal justification or probable cause.

1122.   Wherein the contact in the false arrest and subsequent false imprisonment was insulting and provoking in nature.

1123.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b.   Award punitive damages;

    c.   Award attorney's fees and costs; and

    d.   Award such other relief as the Court deems just and proper.

**COUNT 95**
**Aggravated battery. ILCS 5/12-3.05**
**(Mona Dugo, Individual Defendant EPD Officers, NUPD Detective Stark)**

1124.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1125.   Offense based on injury to a child or person with an intellectual disability. A person who is at least 18 years of age commits aggravated battery when, in committing a battery, he or she knowingly and without legal justification by any means:

    a.   causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years, or to any person with a severe or profound intellectual disability; or

    b.   causes bodily harm or disability or disfigurement to any child under the age of 13 years or to any person with a severe or profound intellectual disability.

1126.   Offense based on location of conduct. A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or a domestic violence shelter, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship. Two counts against Osama

1127.   Aggravated battery as defined in subdivision (a)(3) or (g)(1) is a Class 1 felony.

1128.   Aggravated battery as defined in subdivision (a)(1) is a Class 1 felony when the aggravated battery was intentional and involved the infliction of torture, as defined in paragraph (14) of subsection (b) of Section 9-1 of this Code, as the infliction of or subjection to extreme physical pain, motivated by an intent to increase or prolong the pain, suffering, or agony of the victim.

1129.   Aggravated battery as defined in subdivision (a)(1) is a Class 2 felony when the person causes great bodily harm or permanent disability to an individual whom the person knows to be a member of a congregation engaged in prayer or other religious activities at a church, synagogue, mosque, or other building, structure, or place used for religious worship.

1130.   Where the assault, battery and false imprisonment took place at Plaintiff's apartment, on or about a place of public accommodation in the form of Northwestern University Law and Medical School which are in immediate proximity of Plaintiff's apartment.

1131.   Wherein all defendants were aware of Plaintiff's disability status, and took their actions based upon knowledge of this fact.

1132.   Where the assault and false imprisonment was without legal justification or probable cause.

1133.   Wherein the contact in the false arrest and subsequent false imprisonment was insulting and provoking in nature.

1134.   Wherein Dugo's actions and the actions of EPD Detective Jones and NUPD Detective Stark, were motivated by the intent to increase and prolong the pain, suffering and agony of Plaintiff who was already suffering from brutal discrimination by NU.

1135.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

     a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

     b.   Award punitive damages;

     c.   Award attorney's fees and costs; and

     d.   Award such other relief as the Court deems just and proper.

## COUNT 96
### 42 U.S.C. § 1983: Violation of Fourteenth Amendment Equal Protections and Equal Benefits
### MONELL CLAIM
### (Chicago Police Department, Cook County State Attorney's Office, Kimberly M. Foxx)

1136.   Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

1137.   The relevant portion of 720 ILCS 5/14-2 reads: (a) A person commits eavesdropping when he or she knowingly and intentionally: (2) Uses an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation; or (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1138.   The "full and equal benefit" clause of § 1981, entitling all persons to the "full and equal benefit of all laws," gives § 1981 prohibition on racial discrimination by state actors broader applicability than the mere right to contract. 42 U.S.C.A. § 1981(a).Moore v. Solanco Sch. Dist., 471 F. Supp. 3d 640 (E.D. Pa. 2020) Only state actors can be sued for intentional racial discrimination under the "full and equal benefit" clause of § 1981, which entitles all persons to the "full and equal benefit of all laws." Id. The express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 against intentional racial discrimination by state governmental units. Id. It is when execution of a municipality's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983. 42 U.S.C.A. § 1983. Id. A municipal custom, as would subject a municipality to § 1983 liability, although not authorized by written law, has the force of law because it is such a permanent and well-settled practice. 42 U.S.C.A. § 1983.Id.

1139.   Under *Monell*, a local government entity may be liable under § 1983 if the plaintiff can show either: (1) an employee acted pursuant to a formal policy or a standard operating procedure; (2) the alleged violations were taken by a person with policy-making authority; or (3) an official with such authority has ratified the unconstitutional actions of a subordinate. 42 U.S.C.A. § 1983. Id.

1140.   Currently it is the official custom, municipal custom and practice of the Chicago police department not to investigate or enforce violations of the state eavesdropping statute, effectively depriving Plaintiff of his right to equal protections and full and equal benefits of the state eavesdropping statute. Plaintiff was informed that this was the policy by numerous CPD officers and detectives that he spoke with, in addition to the assistance state attorney Bob Swartz. This custom or policy of failing to prosecute violations of the statue was the moving force behind the violation of Plaintiff's constitutional right to equal protections and benefits under the fourteenth amendment. This policy is what caused Chicago Police detectives to fail to investigate JD 395768 and JD 419862. Plaintiff was informed that this is the policy by Detective Emilio Leal (Star 20068), Detective Mcinerney (Star 21216), and Sgt. Patrick Purdy (Star 803) on no less than 4 separate occasions.

1141.   Failing to train municipal employees can be a source of liability under § 1983, but only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983. 42 U.S.C.A. § 1983. Id. A municipality's failure to train or supervise amounts to deliberate indifference, as would subject it to liability under § 1983, if it is shown: (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights. 42 U.S.C.A. § 1983. Id.

1142.   Where Chicago police failed to failed to train its employees with respect to how to handle eavesdropping complaints, which CPD and municipal policy makers know police will confront. The fact that this the eavesdropping law is a formal state statute, and that Chicago Police IUCR code is "500E" indicates that municipal policy makers within Chicago are aware that CPD employees and officers will confront police reports involving eavesdropping.

1143.   Where eavesdropping involves a an often times difficult choice or a history of employee mishandling. This situation has been traditionally difficult for the Chicago Police to handle due to the recent upsurge in civilians recording their police interactions. For liability purposes, the Chicago Police and Cook County State Attorney do not prosecute eavesdropping offenses, presumably because regular prosecution could subject Chicago Police officers to lawsuits resulting from the performance of their regular duties during routine interactions with civilians.

1144.   Where the mishandling of the complaints frequently causes the deprivation of constitutional rights to equal protections and due process, this is because people who have legitimate complaints about eavesdropping against private citizens are not able to get their reports investigated, as was the case in Plaintiff's situation with two separate reports for eavesdropping which he submitted being willfully disregarded despite the clear, severe, and irreparable injury he suffered as a result.

1145.   Failure to train, discipline, or control can only form the basis for § 1983 municipal liability if the plaintiff can show both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate. 42 U.S.C.A. § 1983. Moore v. Solanco Sch. Dist., 471 F. Supp. 3d 640 (E.D. Pa. 2020) It is not sufficient merely to show that a particular employee acted improperly to establish failure to train, discipline, or control, as a basis for § 1983 municipal liability; rather, the alleged failure to adequately supervise must also cause the violation about which the plaintiff complains. 42 U.S.C.A. § 1983. Id. Monell liability under § 1983 based on a municipal policy or custom applies only to municipalities, not to individuals. 42 U.S.C.A. § 1983. Id.

1146.   The failure by Chicago Police Department to adequately supervise and train its detectives with how to handle eavesdropping complaints directly caused the deprivation Plaintiff complained about, in that the failure to investigate the eavesdropping complaint by Detectives prevented Plaintiff from being able to receive equal benefits and protections of the formal statute for which there is a clearly defined right and due process of law for the deprivation of his protected property interest in the JD program at NU.

1147.   The actions of Defendants resulted from, and were taken, pursuant to a de facto policy of Defendant Cook County, which is implemented by the employees of the said Defendant, all acting under the color of law, who choose to violate Plaintiff's constitutional rights, without rightful authority of law.

1148.   The existence of the de facto policy described above has been known to supervisory and policy making officers and officials of Chicago Police Department and Defendant State Attorney's Office for a substantial period of time.

1149.   Despite their knowledge of the said illegal policy and practices, supervisory and policy-making officers and officials of the Defendant Chicago PState Attorney's Office have not taken steps to determine the said practices, have not disciplined or otherwise properly supervised the individual employees who engaged in the said practices, have not effectively trained the employees with regard to the proper constitutional and statutory limits on the exercise of their authority, and have instead sanctioned the policy and the practices described herein.

1150.   That Plaintiff has a clearly established right to equal access to all benefits and privileges of a JD from NU and a right to be from offensive harassment in school and to the full and equal benefits of 720 ILCS 5/14-2.

1151.   That the above actions and omissions by Defendants were deliberate and intentional and have resulted in violations of Plaintiff's rights to equal protection and due process, all in violation of the Fourteenth Amendment to the United States Constitution.

1152.   That by reason of the aforesaid actions, Defendant school district's actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of Plaintiff and other similarly situated students, all in violation of his constitutional rights, and as a direct and proximate result thereof, he sustained damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

1153.   That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction compelling the Defendant Chicago Police Department and State Attorney's Office, or its agents, to cease and desist discriminating against Plaintiff. and other similarly situated students to assure the Plaintiff. is no longer harassed, bullied, or assaulted on the premises maintained and controlled by Defendant Police Department and State Attorney's Office.

1154.   It has been necessary for the Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

1155.   A State that voluntarily removes a case to federal court waives the state's sovereign immunity to the state law claims. Lapides v. Bd. of Regents, 535 U.S. 613, 624 (2002)


1156.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:
    a.  Order Chicago Police Department to charge Evangeline Gargula with Eavesdropping and investigate her for the crimes which I reported in my two CPD police reports.
    b.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
    c.  Award punitive damages;
    d.  Award attorney's fees and costs; and
    e.  Award such other relief as the Court deems just and proper.


## COUNT 97
## (Violation of § 504 of the Rehabilitation Act of 1973
## (Chicago Police Department)

1157.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1158.   § 504 of the Rehabilitation Act provides: No otherwise qualified individual with a disability..., shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...

1159.   Chicago Police Department receives federal funding.

1160.   Chicago Police Department felony crime investigations constitute a program or activity within the meaning of the Rehabilitation Act.

1161.   The conduct of Chicago Police Department was based on Plaintiff's status as a person with a disability.

1162.   Where NUPD Officer Eric Chin did unlawfully contact Chicago Police regarding Plaintiff's CPD Report, JD 395768, and reveal Plaintiff's protected mental health treatment information and also tell the officer an express lie about Plaintiff giving consent for the recording of the phone calls by Evangeline Gargula, while knowing that Plaintiff did not actually give consent for the recording of the phone calls.

1163.   Chicago Police Officer Gil Aldahondo (Star 5142) did unlawfully cancel Plaintiff's police report, JD 395768, citing the revelation of Plaintiff's mental health treatment history as the reason that he was cancelling the report without investigation.

1164.    Chicago Police Detective Anderson of 18th district did willfully fail to investigate Plaintiff's subsequent police report, JD 419862.

1165.    Chicago Police Department did not:
   a.   conduct a bona fide individualized assessment or investigation of Plaintiff's criminal eavesdropping and hate-crime complaints, JD 395768 or JD 419862;
   b.   engage in the interactive process with Plaintiff for JD 395768 or JD 419862; and/or
   c.   explore reasonable investigation or timely complaint resolution activities for JD 395768 or JD 419862; and/or
   d.   allow Plaintiff to realize the benefits of a fully investigated felony complaint and/or properly conducted criminal investigation and resolution for JD 395768 or JD 419862;

1166.    Chicago Police Department unlawfully denied Plaintiff the benefit of a fully and properly investigated criminal complaint for eavesdropping for JD 395768 or JD 419862.

1167.    Chicago Police Department is likely to continue to deny or limit Plaintiff's participation in other Chicago Police Department events and programs.

1168.    Chicago Police Department, by virtue of the conduct described herein, discriminated against Plaintiff because of his disabilities in violation of § 504 of the Rehabilitation Act of 1973.

1169.    **WHEREFORE**, Plaintiff requests that this Court enter judgment in her favor and against Chicago Police Department as follows:
   a.   A declaratory judgment Chicago Police Department has discriminated against Plaintiff by cancelling his report, JD 395768, due to his protected health information, and failing to investigate JD 419862 due to Plaintiff's protected health information, in violation of § 504 of the Rehabilitation Act;
   b.   An order requiring Chicago Police Department to fully investigate his report for eavesdropping based on the original allegations reported in JD 395768;
   c.   An order requiring Chicago Police Department t to provide any reasonable accommodations or modifications that may be necessary;
   d.   Compensatory damages;
   e.   Attorneys' fees and costs;
   f.   order requiring Chicago Police Department t to undergo ADA and disability awareness training; and
   g.   Such other relief as the Court deems just and proper.

## COUNT 98
## Violation of Title III of the ADA
## (Chicago Police Department)

1170.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1171.    Title III of the ADA provides: No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182.

1172.    **Chicago Police Department** is a "place of public accommodation" under Title III of the ADA.

1173.    Where NUPD Officer Eric Chin did unlawfully contact Chicago Police regarding Plaintiff's CPD Report, JD 395768, and reveal Plaintiff's protected mental health treatment information and also tell the officer an express lie about Plaintiff giving consent for the recording of the phone calls by Evangeline Gargula, while knowing that Plaintiff did not actually give consent for the recording of the phone calls.

1174.    Chicago Police Officer Gil Aldahondo (Star 5142) did unlawfully cancel Plaintiff's police report, JD 395768, citing the revelation of Plaintiff's mental health treatment history as the reason that he was cancelling the report without investigation.

1175.    Chicago Police Detective Anderson of 18th district did willfully fail to investigate Plaintiff's subsequent police report, JD 419862.

1176. Chicago Police Department did not:

    e. conduct a bona fide individualized assessment or investigation of Plaintiff's criminal eavesdropping and hate-crime complaints, JD 395768 or JD 419862;

    f. engage in the interactive process with Plaintiff for JD 395768 or JD 419862; and/or

    g. explore reasonable investigation or timely complaint resolution activities for JD 395768 or JD 419862; and/or

    h. allow Plaintiff to realize the benefits of a fully investigated felony complaint and/or properly conducted criminal investigation and resolution for JD 395768 or JD 419862;

1177. Chicago Police Department unlawfully denied Plaintiff the benefit of a fully and properly investigated criminal complaint for eavesdropping for JD 395768 or JD 419862.

1178. Chicago Police Department is likely to continue to deny or limit Plaintiff's participation in other Chicago Police Department events and programs.

1179. Chicago Police Department, by virtue of the conduct described herein, discriminated against Plaintiff because of his disabilities in violation of Title III of the ADA.

1180. **Chicago Police Department**, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

1181. **Chicago Police Department** is likely to continue to deny or limit Plaintiff's participation in other **Chicago Police Department** events and programs.

1182. **WHEREFORE**, Plaintiff requests that this Court enter judgment in his favor and against CPD as follows:

    jjjjj. A declaratory judgment Chicago Police Department has discriminated against Plaintiff by cancelling his report, JD 395768, due to his protected health information, and failing to investigate JD 419862 due to Plaintiff's protected health information, in violation of Title III of the ADA;

    kkkkk. An order requiring Chicago Police Department to fully investigate his report for eavesdropping based on the original allegations reported in JD 395768;

    lllll. An order requiring Chicago Police Department to provide any reasonable accommodations or modifications that may be necessary;

    mmmmm. Compensatory damages;

    nnnnn. Attorneys' fees and costs;

    ooooo. order requiring Chicago Police Department t to undergo ADA and disability awareness training; and

    ppppp. Such other relief as the Court deems just and proper.

<u>COUNT 99</u>
**VIOLATION OF TITLE II OF THE ADA**
**((Chicago Police Department)**

1183. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1184. Title II of the ADA provides: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

1185. Chicago Police Department is a "public entity" under Title II of the ADA.

1186. Where NUPD Officer Eric Chin did unlawfully contact Chicago Police regarding Plaintiff's CPD Report, JD 395768, and reveal Plaintiff's protected mental health treatment information and also tell the officer an express lie about Plaintiff giving consent for the recording of the phone calls by Evangeline Gargula, while knowing that Plaintiff did not actually give consent for the recording of the phone calls.

1187. Chicago Police Officer Gil Aldahondo (Star 5142) did unlawfully cancel Plaintiff's police report, JD 395768, citing the revelation of Plaintiff's mental health treatment history as the reason that he was cancelling the report without investigation.

1188. Chicago Police Detective Anderson of 18th district did willfully fail to investigate Plaintiff's subsequent police report, JD 419862.

1189.  Chicago Police Department did not:
    i.   conduct a bona fide individualized assessment or investigation of Plaintiff's criminal eavesdropping and hate-crime complaints, JD 395768 or JD 419862;
    j.   engage in the interactive process with Plaintiff for JD 395768 or JD 419862; and/or
    k.   explore reasonable investigation or timely complaint resolution activities for JD 395768 or JD 419862; and/or
    l.   allow Plaintiff to realize the benefits of a fully investigated felony complaint and/or properly conducted criminal investigation and resolution for JD 395768 or JD 419862;

1190.  Chicago Police Department unlawfully denied Plaintiff the benefit of a fully and properly investigated criminal complaint for eavesdropping for JD 395768 or JD 419862.

1191.  Chicago Police Department is likely to continue to deny or limit Plaintiff's participation in other Chicago Police Department events and programs.

1192.  The actions of Chicago Police Department described herein constitute discrimination under Title II of the ADA.

1193.  Chicago Police Department is likely to continue to deny or limit Plaintiff's participation in other Chicago Police Department events and programs.

1194.  **WHEREFORE**, Plaintiff requests that this Court enter judgment in her favor and against Chicago Police Department as follows:
    qqqqq.   A declaratory judgment Chicago Police Department has discriminated against Plaintiff by cancelling his report, JD 395768, due to his protected health information, and failing to investigate JD 419862 due to Plaintiff's protected health information, in violation of Title II of the ADA;
    rrrrr.   An order requiring Chicago Police Department to fully investigate his report for eavesdropping based on the original allegations reported in JD 395768;
    sssss.   An order requiring Chicago Police Department t to provide any reasonable accommodations or modifications that may be necessary;
    ttttt.   Compensatory damages;
    uuuuu.   Attorneys' fees and costs;
    vvvvv.   order requiring Chicago Police Department to undergo ADA and disability awareness training; and
    wwwww.  Such other relief as the Court deems just and proper

## COUNT 100
### Intentional Infliction of Emotional Distress
### (City of Chicago, Chicago Police Department, Kim Foxx, Cook County State Attorney's Office)

**1195.  Plaintiff incorporates each of the above paragraphs as if fully set forth herein.**

**1196.  The acts and omissions of the Defendant Organizations and its investigators and employees were willful and intentional.**

**1197.  The Defendant Organizations knew or should have known that the investigators' and employees' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.**

**1198.  The Defendant Organizations' conduct and that of the investigators and employees' was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.**

**1199.  The Defendant Organizations' conduct and that of the investigators and employees was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.**

**1200.  As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.**

**1201.   WHEREFORE, Plaintiff demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.**

## COUNT 101
**(42 U.S.C. § 1983: Violation of Fifth Amendment Due Process)**
**(Northwestern University, NUPD, Individual Defendant EPD Officers, NUPD Detective Sarah Stark, NU)**

1202.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1203.   The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without "due process of law." **Dusenbery v. United States, 534 U.S. 161, 167, 122 S. Ct. 694, 699, 151 L. Ed. 2d 597 (2002)** [I]ndividuals whose property interests are at stake are entitled to "notice and an opportunity to be heard." **United States v. James Daniel Good Real Property, 510 U.S. 43, 48, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).** We held that this notice was constitutionally defective as to known persons whose whereabouts were also known, because it was not "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. **Id., at 314, 319, 70 S.Ct. 652; see also id., at 315, 70 S.Ct. 652** ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it"**). Dusenbery v. United States, 534 U.S. 161, 168, 122 S. Ct. 694, 700, 151 L. Ed. 2d 597 (2002)**

1204.   Where Plaintiff was not shown the probable cause for his arrest, despite having asked for it prior to his initial detainment by officers.

1205.   By adopting, promulgating, and implementing the policy and practice under which Plaintiff was subjected to coercive and involuntary custodial interrogation designed to deprive him of his right to fair notice of the pendency of the criminal complaint against him and deprive him of the opportunity to present his objections, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly violated the rights of Plaintiff to due process of law under the Fifth Amendment to the United States Constitution.

1206.   Plaintiff has no effective means of enforcing his Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

1207.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

**1208.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.**

## COUNT 102
**(42 U.S.C. § 1983: Violation of Fourth Amendment Unreasonable Seizure)**
**(Northwestern University, NUPD, Individual Defendant EPD Officers, NUPD Detective Sarah Stark, NU)**

1209.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**1210.**   The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S.C.A. Const. Amends. 4

**1211.**   This Court decided some four decades ago that a claim challenging pretrial detention fell within the scope of the Fourth Amendment. **Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 917, 197 L. Ed. 2d 312 (2017)**

1212.   Fourth Amendment forbids unreasonable seizure of persons. U.S.C.A. Const. Amend. 4. McKinney v. George, 726 F.2d 1183 (7th Cir. 1984) Standard of reasonableness under Fourth Amendment is federal. U.S.C.A. Const. Amend. 4. Id. Fourth Amendment is applicable to states by virtue of due process clause of Fourteenth Amendment. U.S.C.A. Const. Amends. 4, 14. Id.

1213.   A person is seized by authorities when a reasonable innocent person would not feel free to leave. U.S. Const. Amend. 4. Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019) That said, if an officer obtains probable cause partway through an unlawful seizure, he is still liable under § 1983 for the portion of the seizure that occurred before probable cause was obtained. Id. No matter how much custody may be permissible, the reasonableness of a search or seizure depends on what actually happens rather than what could have happened. U.S. Const. Amend. 4. Id. Even when probable cause exists, constitutional violations may lie when searches or seizures were conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests. U.S. Const. Amend. 4. Id.

1214.   Where EPD Officers did not have probable cause to make the arrest, and based their arrest on Plaintiff's assertion that the email address which they showed him belonged to him, in violation of the due process clause of the Fifth Amendment.

1215.   Where Plaintiff's arrest was based solely on false and defamatory evidence and the lies of Mona Dugo and NUPD Detective Sarah Stark. Where they both falsely claimed that Plaintiff threatened the physical safety of Dugo and others at NU.

1216.   Where, based on the evidence available, there was no probable cause to believe that Plaintiff had knowingly committed any crime.

1217.   Where EPD Officers forced Plaintiff, while under extreme duress and not on his prescribed medication and not given an opportunity to have a lawyer present, to make statements which formed the basis of the probable cause for his arrest on 11/19/20, in violation of self-incrimination clause of the Fifth Amendment.

**1218.**   Where officers willfully ignored the protection order PO 78277 which was in effect at that time, prohibiting Mona Dugo from talking about the Plaintiff, and which she did violate in order to falsely accuse Plaintiff of violating her protection order. Where EPD Officers unlawfully confiscated Plaintiff's Protection Order Papers PO 78277 in violation of the takings clause of the Fifth Amendment and deprived him of his right and ability to adequately defend himself against the unwarranted charges that EPD coerced and intimidated him into speaking about, which unjustly led to his arrest and confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie.

1219.   Where PO 78277 put EPD Officers on notice that they were conducting an unreasonable seizure in violation of the Fourth Amendment, where the PO indicated that there was no probable cause to arrest Plaintiff based on the evidene which EPD possessed at that time. Through the PO being presented to officers at the time of Plaintiff's arrest, iIt was clearly established that there was right to be free from arrest without probable cause and that Fourth Amendment protected against arrests premised on lies

1220.   By adopting, promulgating, and implementing the policy and practice under which Plaintiff was subjected to coercive and involuntary custodial interrogation designed to overcome his will and to coerce involuntary and incriminating statements from him, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly violated the rights of Plaintiff to due process of law under the Fifth Amendment to the United States Constitution.

1221.   In detaining Plaintiff without charging him with any crime and without affording him a hearing before a neutral judicial officer to determine whether there was probable cause to justify his continued detention, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly seized Plaintiff in violation of the Fourth Amendment to the United States Constitution.

1222.   Plaintiff has no effective means of enforcing his Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

1223.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

**1224.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an**

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 103
## False Imprisonment
### (Northwestern University, NUPD, Individual Defendant EPD Officers, NUPD Detective Sarah Stark, NU)

1225.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**1226.**   In Illinois a false imprisonment "is defined as an unlawful restraint of an individual's personal liberty or freedom of locomotion," in which "a person is compelled to remain where he does not wish to remain or to go where he does not wish to go." *Lopez v. Winchell's Donut House*, 126 Ill.App.3d 46, 81 Ill.Dec. 507, 466 N.E.2d 1309, 1311 (1984) It may be accomplished by "words alone, by acts alone or both." *Id.* Shea v. Winnebago County Sheriff's Dep't, 746 Fed. Appx. 541, 548 (7th Cir. 2018), cert. denied sub nom. Shea v. Winnebago County Sheriff's Office, 139 S. Ct. 1200, 203 L. Ed. 2d 204 (2019)

1227.   Where EPD Officers did not have probable cause to make the arrest, and based their arrest on Plaintiff's assertion that the email address which they showed him belonged to him, in violation of the due process clause of the Fifth Amendment.

1228.   Where Plaintiff's arrest was based solely on false and defamatory evidence and the lies of Mona Dugo and NUPD Detective Sarah Stark. Where they both falsely claimed that Plaintiff threatened the physical safety of Dugo and others at NU.

1229.   Where, based on the evidence available, there was no probable cause to believe that Plaintiff had knowingly committed any crime.

1230.   Where EPD Officers forced Plaintiff, while under extreme duress and not on his prescribed medication and not given an opportunity to have a lawyer present, to make statements which formed the basis of the probable cause for his arrest on 11/19/20, in violation of self-incrimination clause of the Firth Amendment.

**1231.**   Where officers willfully ignored the protection order PO 78277 which was in effect at that time, prohibiting Mona Dugo from talking about the Plaintiff, and which she did violate in order to falsely accuse Plaintiff of violating her protection order. Where EPD Officers unlawfully confiscated Plaintiff's Protection Order Papers PO 78277 in violation of the takings clause of the Fifth Amendment and deprived him of his right and ability to adequately defend himself against the unwarranted charges that EPD coerced and intimidated him into speaking about, which unjustly led to his arrest and confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie.

1232.   Where PO 78277 put EPD Officers on notice that they were conducting an unreasonable seizure in violation of the Fourth Amendment, where the PO indicated that there was no probable cause to arrest Plaintiff based on the evidene which EPD possessed at that time. Through the PO being presented to officers at the time of Plaintiff's arrest, iIt was clearly established that there was right to be free from arrest without probable cause and that Fourth Amendment protected against arrests premised on lies

1233.   By adopting, promulgating, and implementing the policy and practice under which Plaintiff was subjected to coercive and involuntary custodial interrogation designed to overcome his will and to coerce involuntary and incriminating statements from him, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly violated the rights of Plaintiff to due process of law under the Fifth Amendment to the United States Constitution.

1234.   In detaining Plaintiff without charging him with any crime and without affording him a hearing before a neutral judicial officer to determine whether there was probable cause to justify his continued detention, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly seized Plaintiff in violation of the Fourth Amendment to the United States Constitution.

1235.   Plaintiff has no effective means of enforcing his Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

1236.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

1237.   **WHEREFORE, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.**

## COUNT 104
### 42 U.S.C. § 1983: Violation of Fifth Amendment Due Process
### (EPD, Individual Defendant EPD Officers, NUPD Detective Sarah Stark, NU, NUPD)

1238.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1239.   The Fifth Amendment Provides: "No person shall be … be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

1240.   Where EPD Officers did not have probable cause to make the arrest, and based their arrest on Plaintiff's assertion that the email address which they showed him belonged to him, in violation of the due process clause of the Fifth Amendment.

1241.   Where EPD Officers forced Plaintiff, while under extreme duress and not on his prescribed medication and not given an opportunity to have a lawyer present, to make statements which formed the basis of the probable cause for his arrest on 11/19/20, in violation of self-incrimination clause of the Firth Amendment.

1242.   Where officers willfully ignored the protection order PO 78277 which was in effect at that time, prohibiting Mona Dugo from talking about the Plaintiff, and which she did violate in order to falsely accuse Plaintiff of violating her protection order. Where EPD Officers unlawfully confiscated Plaintiff's Protection Order Papers PO 78277 in violation of the takings clause of the Fifth Amendment and deprived him of his right and ability to adequately defend himself against the unwarranted charges that EPD coerced and intimidated him into speaking about, which unjustly led to his arrest and confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie.

1243.   By adopting, promulgating, and implementing the policy and practice under which Plaintiff was subjected to coercive and involuntary custodial interrogation designed to overcome his will and to coerce involuntary and incriminating statements from him, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly violated the rights of Plaintiff to due process of law under the Fifth Amendment to the United States Constitution.

1244.   Plaintiff has no effective means of enforcing his Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

1245.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

1246.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 105
### (42 U.S.C. § 1985 Civil Conspiracy)
### (Mona Dugo, Individual EPD Officers, NUPD Detective Stark)

1247.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1248.   Section 1985 allows plaintiffs to recover damages from private actors who act to deprive them of their civil rights. 42 U.S.C.A. § 1985. <u>Molina v. Latronico</u>, 430 F. Supp. 3d 420 (N.D. Ill. 2019) Purpose of § 1985, as distinct from § 1983 claims against those acting under color of state law, is to permit recovery from a private actor who has conspired with state actors. 42 U.S.C.A. §§ 1983, 1985. <u>Id.</u> To assert a prima facie claim of conspiracy to violate civil rights under § 1985, a plaintiff must show: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage. 42 U.S.C.A. § 1985(3). <u>Id.</u>

1249.   A plaintiff alleging a conspiracy to violate civil rights under § 1985 must assert specific factual allegations of combination, agreement, or understanding among all or between any defendants to plot, plan, or conspire to carry out the alleged chain of events. 42 U.S.C.A. § 1985(3). <u>Moore v. Solanco Sch. Dist.</u>, 471 F. Supp. 3d 640 (E.D. Pa. 2020) Allegations for a claim for conspiracy to violate civil rights under § 1985 must contain particular and exacting facts that demonstrate the period of the conspiracy, object of the conspiracy, and certain other actions of the alleged conspirators to achieve the purpose. 42 U.S.C.A. § 1985(3). <u>Id.</u>)

1250.   An Illinois civil conspiracy requires three elements: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

1251.   Where Mona Dugo and NUPD Detective Sarah Stark acted together to plot the false imprisonment of Plaintiff by coordinating and discussing and crafting a false narrative, which they documented over the course of several meetings in several police reports, which falsely alleged that Plaintiff made threats to the safety of Dugo and others at NU in order to make Plaintiff seem like a safety threat. These allegations were predicated on lies by Dugo, wherein she deliberately mischaracterized and misrepresented threats to take legal action by the plaintiff as "threats" against her safety. This is despite the fact that Plaintiff, never at any time during any of his communications with Dugo or anyone else from NU, made any comments or suggestions which even remotely threatened the physical safety of himself or others.

1252.   They started crafting this narrative well after Dugo had illegally suspended Plaintiff over felony audio recordings of his, then hidden the existence of the tapes, then contacted Plaintiff's sister and therapist in order to defame him using the tapes, in order to create a way to protect Dugo and NU from liability by having a fabricated and deliberately constructed documented narrative in the form of NUPD police reports.

1253.   Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on a perceived threat from his disability and religion, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

1254.   In the furtherance of which Dugo secured a PO 20532 on false and misleading and defamatory pretenses on 11/4/20 as specifically described in allegations 523-526, in order to shield herself from liability for her own wrongdoing by reporting that messages that she received which related to her unlawful contact of Plaintiff's therapist and sister and the felony audio tapes that she was hiding were "harassment" and "threats" when in reality they were messages from Plaintiff asking her to address all of those issues on a legitimate basis given Dugo's position as Dean of Students for NU.

1255.   In furtherance of which Dugo knowingly violated PO 78277 and falsely reported that Plaintiff harassed her resulting from protected speech of Plaintiff on 11/4/20 asking why Dugo had contacted his sister and who authorized the contact.

1256.   In the furtherance of which NUPD Sarah Stark met and discussed and reached an agreement to arrest the Plaintiff with EPD Detectives on or around 11/18/20 prior to their arrest of Plaintiff, and misleadingly and maliciously crafted the narrative that Plaintiff was a threat to the safety of Dugo and/or others and that he was harassing Dugo.

1257.   On information and belief, all defendants were aware of the existence of PO 78277, a stalking order of protection which Plaintiff had active against Dugo at that time.

1258.   NUPD Detective Sarah Stark took these actions because she willfully failed to address Plaintiff's false imprisonment from 2019 after she had been assigned to address his concerns in January 2020. Where NUPD had reason to create a false narrative against Plaintiff due to its own failure to address the

violation of state involuntary commitment statue by Healy #22 and the associated false imprisonment by Healy, Walsh, Moore, and Student Group #1 as described in other counts in this complaint.

1259.   In furtherance of which EPD Officers willfully ignored the Plaintiff's open PO 78277 in order to arrest Plaintiff without any probable cause and deliberately and recklessly violate his constitutional rights as described in the counts of this complaint.

1260.   Where NUPD, EPD and Mona Dugo acted together to achieve a lawful purpose of arresting Plaintiff by unlawful means of conspiracy and misleading and false and defamatory allegations, and willfully ignoring Plaintiff's lawful order of protection against Dugo.

1261.   Where Plaintiff was damaged in his person and property by suffering false arrest and now having to deal with two different court cases where Dugo is allowed the assistance of NU staffed attorneys to assist her with both of her cases and is able to oppress and threaten Plaintiff with false and malicious prosecution using state resources.

1262.   Where the conspiracy was motivated by Dugo and NU's threat from Plaintiff's perceived disability as described in Dugo's PO pleadings, where she described Plaintiff's false imprisonment from 11/1/19 and threat from Plaintiff's perceived religion in the form of citing verses from the Qur'an as the reason she felt threatened. Where NU has gone on record as describing Plaintiff's false imprisonment in 2019 as the reason why he is "dangerous" and the reason they want to keep him out of school.

**1263.**   Allegations that [so-conspirators] acted with the common purpose [], and committed acts of battery, assault, and false imprisonment to further that wrongful purpose, were sufficient to state civil conspiracy claim under Illinois law. **Shea v. Winnebago County Sheriff's Dep't, 746 Fed. Appx. 541 (7th Cir. 2018), cert. denied sub nom. Shea v. Winnebago County Sheriff's Office, 139 S. Ct. 1200, 203 L. Ed. 2d 204 (2019)**

**1264.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.**

## Count 106
## 42 USC § 1986. Action for neglect to prevent
## (City Of Evanston, NU, NUPD)

1265.   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action. 42 U.S.C.A. § 1986 (West)

1266.   Where NU was made aware of the existence of the conspiratorial effort to create a false narrative against Plaintiff which resulted in his false imprisonment  by supervising the actions of Dugo and NUPD detective Sarah Stark and at that point, had the power to prevent or aid in the prevention of the commission of the conspiracy through proper oversight and supervision of the activities of its employees and their actions and willfully and recklessly failed to do so, resulting in injury to the Plaintiff.

1267.   Where NUPD was made aware of the existence of the conspiratorial effort to create a false narrative against Plaintiff which resulted in his false imprisonment  by supervising the actions of Dugo and NUPD detective Sarah Stark and at that point, had the power to prevent or aid in the prevention of the commission of the conspiracy through proper oversight and supervision of the activities of its employees and their actions and willfully and recklessly failed to do so, resulting in injury to the Plaintiff.

1268.   Where EPD was made aware of the existence of the conspiratorial effort to create a false narrative against Plaintiff which resulted in his false imprisonment  by supervising the actions of NUPD

detective Sarah Stark and individual defendant EPD Officers and at that point, had the power to prevent or aid in the prevention of the commission of the conspiracy through proper oversight and supervision of the activities of its employees and their actions and willfully and recklessly failed to do so, resulting in injury to the Plaintiff.

1269.   Where NU was made aware of Plaintiff's grievances against Dugo through multiple internal complaints submitted by Plaintiff prior to this incident of false imprisonment and conspiracy occurring and at that point, had the power to prevent or aid in the prevention of the commission of the conspiracy through proper oversight and supervision of the activities of its employees and their actions and willfully and recklessly failed to do so, resulting in injury to the Plaintiff.

1270.   Where all defendants acted solely on the basis of discriminatory animus towards the Plaintiff for his internal grievances about his 11/1/19 false imprisonment, and his grievances about Dugo's unlawful actions and his unlawful suspensions.

1271.   Where all defendants acted solely on the basis of threat from Plaintiff's perceived disability and religion as evidenced by Dugo's PO 20532.

1272.   Where all defendants were actively aware of and willfully ignored, or in Dugo's case, violated, PO 78277.

1273.   Where the actions of the defendants were taken pursuant to a policy or custom of deliberately ignoring the wrongdoing of its employees by NU and NUPD and the City of Evanston and failing to take action on complaints about their conduct.

1274.   Although showing of conspiracy to interfere with civil rights, in violation of statute, is required under separate statute providing cause of action against anyone who has knowledge that such conspiracy is about to be committed, and having power to prevent or aid in preventing commission of such conspiracy, neglects or refuses so to do, latter statute does not require that defendants themselves participated in such conspiracy or shared in discriminatory animus with members of conspiracy.   Park v. City of Atlanta, C.A.11 (Ga.) 1997, 120 F.3d 1157.   Civil Rights 🔑 1039

1275.   Concerted action of private parties and state officials constitutes a sufficient allegation of "state action" necessary for seeking relief under this subchapter.   Fulton v. Emerson Elec. Co., C.A.5 (Miss.) 1969, 420 F.2d 527, certiorari denied 90 S.Ct. 1689, 398 U.S. 903, 26 L.Ed.2d 61.   Civil Rights 🔑 1396 To recover under § 1986 for neglecting to prevent civil rights violations, plaintiff must show that: defendant had actual knowledge of § 1985 conspiracy, defendant had power to prevent or aid in preventing commission of § 1985 violation, defendant neglected or refused to prevent § 1985 conspiracy, and wrongful act was committed.   Clark v. Clabaugh, C.A.3 (Pa.) 1994, 20 F.3d 1290.   Civil Rights 🔑 1039 Liability under this section is dependent on proof of actual knowledge by defendant of the wrongful conduct of his subordinates.   Hampton v. City of Chicago, Cook County, Ill., C.A.7 (Ill.) 1973, 484 F.2d 602, certiorari denied 94 S.Ct. 1413, 415 U.S. 917, 39 L.Ed.2d 471, certiorari denied 94 S.Ct. 1414, 415 U.S. 917, 39 L.Ed.2d 471.

1276.   Where complaint stated a claim for relief under § 1985 of this title and also alleged that defendants were aware of the conspiracy but did not attempt to prevent if from accomplishing its purpose, the complaint also stated a claim for relief under this section.   Thompson v. State of N. Y., N.D.N.Y.1979, 487 F.Supp. 212.   Civil Rights 🔑 1039

1277.   Showing of negligence is sufficient to maintain § 1986 claim for neglecting to prevent civil rights violations;  although discriminatory intent is essential in proving § 1985(3) conspiracy, it does not follow that defendant charged under § 1986 with neglecting to intervene in such a conspiracy has to share the class-based animus.   Clark v. Clabaugh, C.A.3 (Pa.) 1994, 20 F.3d 1290.   Civil Rights 🔑 1039

**1278.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.**

## Count 107
### 42 USC § 1983: Violation 42 USC § 1981

**(City of Evanston, NU, NUPD, Evanston Police Department, Individual Defendant EPD Officers, NUPD Officers Sarah Stark)**

1279.   Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

1280.   That the City of Evanston Police Department is a municipal corporation located within the federal judicial district for the Northern District of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

1281.   At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by the City of Evanston and/or the City of Evanston's police department and working under color of law.

1282.   Plaintiff brings this claim for deprivation of certain rights under **42 USC** 1981 and **1983**.

1283.   On November 19, 2020, plaintiff was lawfully inside his residential premises located at 244 E Pearson St., City of Chicago, County of Cook, State of Illinois.

1284.   That plaintiff was arrested and charged with violating PO 20532. See Cook County charge 20—DV-2080601.

1285.   Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to the City of Alton Police Department, plaintiff was confined to an interrogation room. During the course of this confinement, plaintiff was interrogated by multiple Evanston Police officers and NUPD Detective Sarah Stark, acting in concert and in conspiracy. He was unjustifiably and illegally assaulted and forced to incriminate himself by the aforementioned police officers. Then and there he sustained serious personal injuries, including false arrest. Upon information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

1286.   The arrest, seizure, detainment, force and attack of plaintiff by Evanston police officers was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1983** and **42 USC** 1981 and **42 USC 1985**, in that:

a.   Defendant failed to properly train its police officer; and/or

b.   Failed to properly supervise its police officers; and/or

c.   Failed to create, maintain and enforce appropriate policies, procedures and protocols for its police officers to follow when questioning, arresting, detaining and processing members of the general public; and/or

d.   Failed to maintain and preserve evidence of plaintiffs innocence and the wrongful conduct of defendant's employees, including the failure to recognize PO 78277 and it's illegal confiscation by officers; and/or

e.   Defendants illegally based their arrest on threat from Plaintiff's perceived religion and disability resulting from PO 20532.

f.   Defendants violated Plaintiff's First Amendment right to free speech by acting based on his complaint to NU administration about Dugo's unlawful behavior on 11/4/20;

g.   Defendants forced Plaintiff to incriminate himself in violation of the Fifth Amendment; and/or

h.   Defendants deprived him of his prescribed medication prior to his interrogation in violation of Title II of the ADA; and/or

i.   Defendants unlawfully seized him without probable cause in violation of the Fourth Amendment during his detainment prior to his interrogation;

j.   Defendants falsely arrested Plaintiff without establishing probable cause, where they asked Plaintiff if the email address from which alleged email was sent belonged to him and used that as the evidence for his arrest with the state attorney; and/or

k.   Defendants deprived Plaintiff of the opportunity to have an attorney present during his questioning by intimidating and coercing and manipulating and lying to him.

1287.   That as a result of the conduct of the defendant, plaintiff incurred legal expenses and emotional pain and suffering that he would have otherwise had.

1288.   The defendants officers acted pursuant to policy or custom wherein they deliberately targeted Plaintiff in a conspiratorial effort to deprive him of his civil rights by willfully ignoring his complaints and

protection order against Mona Dugo and maliciously acted to construct a false narrative through multiple police reports which misleadingly paints Dugo as the victim when she committed all of the vicious coercive dishonest acts described in this complaint, including but not limited to: suspended Plaintiff over felony audio tapes and then hiding the tapes in a conspiratorial and malicious effort where she discriminated against Plaintiff on the basis of threat from his perceived disability and religion and acted on the basis of bias towards females in failing to discipline Gargula for the blatant commission of two felonies, retaliating against Plaintiff for his department of education complaint by defaming him to his therapist and family members without his consent knowledge and against his express instructions, and where she used NUPD as her personal way of retaliating against the Plaintiff through unlawful interference and intimidation, and used NU resources to protect herself in the form of NU general counsel and Scott Warner attending court cases and speaking in her defense and on her behalf.

1289.   The arrest of plaintiff was done without probable cause and without justification and therefore resulted in unlawful detainment.

1290.   That at all times herein mentioned, the defendant, individually and acting through its police officers, acted knowingly, intentionally, willfully and maliciously

**1291.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.**

## Count 108
### § 12-7.2. Educational intimidation. 720 ILCS 5/12-7.2
### (Mona Dugo, Individual Defendant EPD Officers, City of Evanston, Evanston Police Department, NU, NUPD, NUPD Detective Sarah Stark))

1292.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1293.          (a) A person commits educational intimidation when he knowingly interferes with the right of any [student] who is or is believed to be afflicted with a [ADA disability] to attend or participate in the activities of [any] school in this State:

1294.             (1) by actual or threatened physical harm to the person or property of the [student] or the [student]'s family;

1295.             (2) by impeding or obstructing the [student]'s right of ingress to, egress from, or freedom of movement at school facilities or activities; or

1296.             (3) by exposing or threatening to expose the [student], or the family or friends of the [student], to public hatred, contempt or ridicule.

1297.          (c) Educational intimidation is a Class C misdemeanor, except that a second or subsequent offense shall be a Class A misdemeanor.

1298.          (d) Independent of any criminal prosecution or the result thereof, any person suffering injury to his person or damage to his property as a result of educational intimidation may bring a civil action for damages, injunction or other appropriate relief. The court may award actual damages, including damages for emotional distress, or punitive damages. A judgment may include attorney's fees and costs.

1299.   Where the actions of all defendants did threaten and did inflict physical harm on Plaintiff in his person in the form of false imprisonment on 11/19/20 and on his property in the form of suspension on 8/23/20 and expulsion on 1/21/21.

1300.   Where the actions of defendants did expose Plaintiff to public hatred contempt and ridicule as evidenced by NU's efforts to stay Plaintiff's motion for preliminary injunction and temporary restraining order by Scott Warner, where warner attempts to pain Plaintiff as a stalker in order to maliciously keep him out of school in a deceptive and misleading dishonest and unethical and knowingly and willfully oppressive manner.

1301.   Where the actions of defendants did intentionally interfere with Plaintiffs right to attend school while afflicted with a disability over which there is obvious and evident prejudice displayed by defendants.

1302.   **WHEREFORE**, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 109
### Negligent/Intentional Infliction of Emotional Distress
**(Mona Dugo, Individual Defendant EPD Officers, City of Evanston, Evanston Police Department, NU, NUPD, NUPD Detective Sarah Stark)**

1303.   **Plaintiff incorporates each of the above paragraphs as if fully set forth herein.**

1304.   **The acts and omissions of the Defendants and its employees were willful and intentional.**

1305.   **Defendants knew or should have known that the employees' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.**

1306.   **Defendants' conduct and that of the employees was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.**

1307.   **Defendants' conduct and that of the employees was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.**

1308.   **As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.**

1309.   **WHEREFORE**, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 110
### Violation U.S.C.A. Const. Amend. I
42 U.S.C. § 1983: **Religious Discrimination**
**(NU, NUPD)**

1310.   Plaintiff realleges and reavers all of the allegations contained in paragraphs 1 through 34 of the Complaint.

1311.   42 U.S.C. § 1983 prohibits defendants from depriving plaintiff of "rights, privileges and immunities secured by the Constitution and laws" of the United States.

1312.   Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *.

1313.   Plaintiff participated in conduct made lawful by the First Amendment to the United States Constitution, to wit, prayer and expressions of religious belief while at the 11/1/19 MLSA event.

1314.   As a result thereof, Plaintiff was brutally attacked and falsely imprisoned at Northwestern Memorial Hospital from 11/1/19-11/8/19, a period of 8 total days.

1315.   As a result thereof, plaintiff was suspended for 2 semesters unjustly and placed on probationary status. As a direct result of his probationary status from this incident, he was expelled on 1/21/21.

1316.    The original decision to suspend plaintiff from the JD class was made by and/or with the concurrence and/or approval of defendants Cohen and DePilla, and Payne-Kirchmeier, who, acting in concert, suspended Plaintiff on 11/1/19 and removed him from the JD program. In so doing, they retaliated against him for engaging in a protected activity, to wit, engaging in verbal expression of his religious beliefs, in violation of the First and Fourteenth Amendments to the United States Constitution and of the Illinois Constitution.

1317.    Plaintiff was placed on disciplinary probation for the 11/1/19 incident, which was a factor in his unjust suspension on 8/23/20.

1318.    Resulting from the suspension, Mona Dugo maliciously secured PO 20532, which contains de-facto religious discrimination in the form of incendiary and offensive description and reference to Plaintiff's expression of verses of the Holy Quran.

1319.    The decision to expel Plaintiff on 1/21/21 and the among the core substance of the objection to his motion for preliminary injunction is PO 20532, which contains de-facto religious discrimination in the form of incendiary and offensive description and reference to Plaintiff's expression of verses of the Holy Quran.

1320.    The decision to terminate plaintiff from the class was made by and/or with the concurrence and/or approval of defendants Dugo, DeSilva, Johnston, Cohen, and Ish-Orkar. Defendants, acting in concert, suspended Plaintiff on 8/23/20 based on threat from his perceived religion resulting from the 11/1/19 incident, and expelled him based in part on PO 20532. They continue to object to his preliminary injunction motion for admission to the JD program due to PO 20532. In so doing, they retaliated against him for engaging in a protected activity, to wit, expression of verses of the Holy Quran, in violation of the First and Fourteenth Amendments to the United States Constitution and the Illinois Constitution.

**1321.    *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.**

## Count 111
### Defamation
### (Mona Dugo, NU)

1322.    Plaintiff realleges and reavers all of the allegations contained in the preceding paragraphs of the Complaint.

1323.    Plaintiff specifically realleged paragraphs 523-526 of the statement of facts.

1324.    Defendant Dugo, in PO 20532 on 11/4/20 by accusing Plaintiff of committing multiple acts of physical violence including assault and threats misleadingly and knowing she had no evidence for those assertions, defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1325.    *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 112
### Defamation
### (Evangeline Gargula)

1326.    Plaintiff realleges and reavers all of the allegations contained in the preceding paragraphs of the Complaint.

1327.    Plaintiff specifically realleged paragraphs 242-247 of the statement of facts.

1328.    Defendant Gargula, on 8/223/20 in first-year Law GroupMe chat titled "NU Kids on the Block '23" by accusing Plaintiff of committing multiple acts stereotypical and derogatory behavior associated with

people with mental health disabilities such as suggesting plaintiff as under an "assumed identity" or undertaking a "psyop" and suggesting Plaintiff was a "2L" and suggesting Plaintiff was not actually in the law school, defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1329. **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 113
### State Law Libel
### (Evangeline Gargula)

1330. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1331. To establish either slander or libel, plaintiff must show that: (1) defendant made a false statement concerning plaintiff; (2) there was an unprivileged publication of the defamatory statement by defendant to a third party; and (3) plaintiff was damaged.
1332. Plaintiff specifically realleged paragraphs 242-247 of the statement of facts.
1333. Defendant Gargula, on 8/223/20 in first-year Law GroupMe chat titled "NU Kids on the Block '23" by accusing Plaintiff of committing multiple acts stereotypical and derogatory behavior associated with people with mental health disabilities such as suggesting Plaintiff as under an "assumed identity" or undertaking a "psyop" and suggesting Plaintiff was a "2L" and suggesting Plaintiff was not actually in the law school, defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.
1334. **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 114
### State Law Slander
### (Evangeline Gargula)

1335. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1336. The elements of slander of title in Illinois are: (1) a false and malicious publication by defendant, (2) that disparages plaintiff's title to the property, (3) and damages resulting from that publication.
1337. Plaintiff specifically realleged paragraphs 242-247 of the statement of facts.
1338. Defendant Gargula, on 8/223/20 in first-year Law GroupMe chat titled "NU Kids on the Block '23" by accusing Plaintiff of committing multiple acts stereotypical and derogatory behavior associated with people with mental health disabilities such as suggesting plaintiff as under an "assumed identity" or undertaking a "psyop" and suggesting Plaintiff was a "2L" and suggesting Plaintiff was not actually in the law school, defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.
1339. **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief;

and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

1340.

## COUNT 115
### Intrusion upon Seclusion
### (Evangeline Gargula)

1341.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1342.   The core of intrusion upon seclusion under Illinois law is the offensive prying into the private domain of another. Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)

**1343.**   The elements to state a claim for intrusion upon seclusion under Illinois law are: (1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering. **Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)**

1344.   Plaintiff specifically realleged paragraphs 206-210 of the statement of facts.

1345.   Plaintiff specifically realleged paragraphs 242-247 of the statement of facts.

1346.   Defendant Gargula, on 8/223/20 in first-year Law GroupMe chat titled "NU Kids on the Block '23" by accusing Plaintiff of committing multiple acts stereotypical and derogatory behavior associated with people with mental health disabilities such as suggesting plaintiff as under an "assumed identity" or undertaking a "psyop" and suggesting Plaintiff was a "2L" and suggesting Plaintiff was not actually in the law school, defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

**1347.   Defendant did commit unauthorized intrusion and prying into Plaintiff's Facebook account, which is "private" and only accessible by members of the same Facebook group as Plaintiff. Furthermore, she did subsequently inquire incite public speculation into Plaintiff's 1L year in 2019.**

**1348.   The intrusion and subsequent incitement of public speculation was highly offensive and objectionable.**

**1349.   Plaintiff was hospitalized and suspended during his 1L year in 2019, both matters which were private and not subject to public speculation or inquiry.**

**1350.   Plaintiff suffered public hatred contempt and ridicule from the entering class, and suffered grave emotional anguish and suffering and psychological trauma.**

1351.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 116
### Interference with Contract
### (Evangeline Gargula)

1352.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1353.   To establish a tortious interference with contract claim under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of the contract, (3) the defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach by the other, caused by the defendant's conduct, and (5) damages.

1354.   Plaintiff was enrolled in the entering NU JD class of 2020.

1355.   Defendant was aware of the contract, as evidenced in her public incitement to hatred of Plaintiff and co-membership in class group chat in discord.

1356.   Defendant did induce an unjustified breach by having Plaintiff suspended and expelled by intentionally calling Plaintiff, threatening and antagonizing him and feloniously recording that phone conversation  and the subsequent one without his knowledge or consent, and subsequently submitting the tapes to NU and falsely claiming Plaintiff threatened her physical safety when Plaintiff made no articulable threat to her safety or the safety of any others.

1357.   NU breached the contract by unjustly suspending Plaintiff on 8/23/20 and expelling him on 1/21/21 resulting from the defendants actions.

**1358.**   Plaintiff suffered the irreparable injury of permanent damage to his reputation and permanent notation of the incident on his transcript, effectively depriving him of the ability to pursue a career in law. He suffered tremendous emotional pain and suffering. He suffered loss of his 150K scholarship to NU Law and loss of his place in the JD program. **Plaintiff suffered public hatred contempt and ridicule from the entering class, and suffered grave emotional anguish and suffering and psychological trauma.**

1359.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 117
### False Light
### (Evangeline Gargula)

**1360.**

1361.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1362.   Illinois law identifies three elements that are necessary to state a claim for false light invasion of privacy: (1) the plaintiff was placed in a false light before the public as a result of the defendants' action; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false."

1363.   Plaintiff specifically realleged paragraphs 206-210 of the statement of facts.

1364.   Plaintiff specifically realleged paragraphs 242-247 of the statement of facts.

1365.   Defendant Gargula, on 8/223/20 in first-year Law GroupMe chat titled "NU Kids on the Block '23" by accusing Plaintiff of committing multiple acts stereotypical and derogatory behavior associated with people with mental health disabilities such as suggesting plaintiff as under an "assumed identity" or undertaking a "psyop" and suggesting Plaintiff was a "2L" and suggesting Plaintiff was not actually in the law school, defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

**1366.   Defendant did commit unauthorized intrusion and prying into Plaintiff's Facebook account, which is "private" and only accessible by members of the same Facebook group as Plaintiff. Furthermore, she did subsequently inquire incite public speculation into Plaintiff's 1L year in 2019.**

**1367.   The intrusion and subsequent incitement of public speculation was highly offensive and objectionable.**

**1368.   Plaintiff was hospitalized and suspended during his 1L year in 2019, both matters which were private and not subject to public speculation or inquiry.**

**1369.   Plaintiff suffered public hatred contempt and ridicule from the entering class, and suffered grave emotional anguish and suffering and psychological trauma.**

1370.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 118
### Defamation
### (Husch Blackwell LLP, Individual Law Firm Defendants, NU)

1371.   Plaintiff realleges and reavers all of the allegations contained in the preceding paragraphs of the Complaint.

1372.   On 1/22/21 DEFENDANT NORTHWESTERN UNIVERSITY filed its RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY with this court.

1373.   Individual Law Firm Defendants, in the defendant response, in paragraph 2 on pg. 10, in making the following false assertion: Northwestern suspended Plaintiff for "having punched a student from another school in the face" and "vicious, targeted harassment of his classmates" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1374.   Individual Law Firm Defendants, in the defendant response, in paragraph 3 on pg. 12, in making the following false assertion: "Indeed, Plaintiff punched a Law school guest in the face, engaged in a disturbing pattern of threatening and harassing communications with classmates, and engaged in similar modes of highly inappropriate communication with Northwestern staff members" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1375.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 119
### State Law Libel
### (Husch Blackwell LLP, Individual Law Firm Defendants, NU)

1376.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1377.   To establish either slander or libel, plaintiff must show that: (1) defendant made a false statement concerning plaintiff; (2) there was an unprivileged publication of the defamatory statement by defendant to a third party; and (3) plaintiff was damaged.

1378.   On 1/22/21 DEFENDANT NORTHWESTERN UNIVERSITY filed its RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY with this court.

1379.   Individual Law Firm Defendants, in the defendant response, in paragraph 2 on pg. 10, in making the following false assertion: Northwestern suspended Plaintiff for "having punched a student from another school in the face" and "vicious, targeted harassment of his classmates" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1380.   Individual Law Firm Defendants, in the defendant response, in paragraph 3 on pg. 12, in making the following false assertion: "Indeed, Plaintiff punched a Law school guest in the face, engaged in a disturbing pattern of threatening and harassing communications with classmates, and engaged in similar modes of highly inappropriate communication with Northwestern staff members" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1381.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of

SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 120
### State Law Slander
### (Husch Blackwell LLP, Individual Law Firm Defendants, NU)

1382.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1383.   On 1/22/21 DEFENDANT NORTHWESTERN UNIVERSITY filed its RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY with this court.

1384.   Individual Law Firm Defendants, in the defendant response, in paragraph 2 on pg. 10, in making the following false assertion: Northwestern suspended Plaintiff for "having punched a student from another school in the face" and "vicious, targeted harassment of his classmates" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1385.   Individual Law Firm Defendants, in the defendant response, in paragraph 3 on pg. 12, in making the following false assertion: "Indeed, Plaintiff punched a Law school guest in the face, engaged in a disturbing pattern of threatening and harassing communications with classmates, and engaged in similar modes of highly inappropriate communication with Northwestern staff members" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1386.   *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 121
### Intrusion upon Seclusion
### (Husch Blackwell LLP, Individual Law Firm Defendants, NU)

1387.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1388.   The core of intrusion upon seclusion under Illinois law is the offensive prying into the private domain of another. Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)

**1389.**   The elements to state a claim for intrusion upon seclusion under Illinois law are: (1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering. **Molina v. Latronico, 430 F. Supp. 3d 420 (N.D. Ill. 2019)**

1390.   On 1/22/21 DEFENDANT NORTHWESTERN UNIVERSITY filed its RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY with this court.

1391.   Individual Law Firm Defendants, in the defendant response, in paragraph 2 on pg. 10, in making the following false assertion: Northwestern suspended Plaintiff for "having punched a student from another school in the face" and "vicious, targeted harassment of his classmates" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1392. Individual Law Firm Defendants, in the defendant response, in paragraph 3 on pg. 12, in making the following false assertion: "Indeed, Plaintiff punched a Law school guest in the face, engaged in a disturbing pattern of threatening and harassing communications with classmates, and engaged in similar modes of highly inappropriate communication with Northwestern staff members" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

**1393. The defendants intruded upon the details of Plaintiff's 1L year in 2019.**

**1394. The intrusion and subsequent incitement of public speculation was highly offensive and objectionable.**

**1395. Plaintiff was hospitalized and suspended during his 1L year in 2019, both matters which were private and not subject to public speculation or inquiry.**

**1396. Plaintiff suffered public hatred contempt and ridicule from the entering class, and suffered grave emotional anguish and suffering and psychological trauma.**

1397. ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 122
### False Light
### (Husch Blackwell LLP, Individual Law Firm Defendants, NU)

1398. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1399. Illinois law identifies three elements that are necessary to state a claim for false light invasion of privacy: (1) the plaintiff was placed in a false light before the public as a result of the defendants' action; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false."

1400. On 1/22/21 DEFENDANT NORTHWESTERN UNIVERSITY filed its RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY with this court.

1401. Individual Law Firm Defendants, in the defendant response, in paragraph 2 on pg. 10, in making the following false assertion: Northwestern suspended Plaintiff for "having punched a student from another school in the face" and "vicious, targeted harassment of his classmates" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

1402. Individual Law Firm Defendants, in the defendant response, in paragraph 3 on pg. 12, in making the following false assertion: "Indeed, Plaintiff punched a Law school guest in the face, engaged in a disturbing pattern of threatening and harassing communications with classmates, and engaged in similar modes of highly inappropriate communication with Northwestern staff members" defamed plaintiff. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

**1403. The defendants intruded upon the details of Plaintiff's 1L year in 2019.**

**1404. The intrusion and subsequent incitement of public speculation was highly offensive and objectionable.**

**1405. Plaintiff was hospitalized and suspended during his 1L year in 2019, both matters which were private and not subject to public speculation or inquiry.**

**1406. Plaintiff suffered public hatred contempt and ridicule from the entering class, and suffered grave emotional anguish and suffering and psychological trauma.**

1407.  **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 123
## 42 U.S.C. § 1985 Civil Conspiracy
### (Individual Law Firm Defendants, Mona Dugo, Karen Tamburro, and Lucas Christain, NU)

1408.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1409.  **Procedural due process.** Requires constitutionally adequate procedures to deprive someone of life, liberty, or property interests (*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).

1410.  **Substantive due process.** Requires refrain from interfering with individuals' fundamental rights and from engaging in conscience-shocking conduct. (See *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 845-46 (1998)

1411.  Plaintiff states a claim for relief for Defendant's violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is actionable pursuant to **42 U.S.C. § 1985**, and the Illinois Constitution, art I, § 2.

1412.  Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees in 2019 and 2020, and was meeting the school's legitimate academic expectations, Plaintiff had a property interest in their continued participation in the JD Program, as the term "property" is understood in relation to the Fourteenth Amendment of the United States Constitution.

1413.  Defendant is a "person" under **42 U.S.C. § 1985**.

1414.  An Illinois civil conspiracy requires three elements: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

1415.  Law Firm Defendants worked together with NU Defendants Mona Dugo, Karen Tamburro, and Lucas Christain.

1416.  Acted with the common purpose of accomplishing an unlawful purpose by lawful means by defaming Plaintiff and oppressing him through lies and deceit in order to deprive him of his protected property interest in a JD program at NU without due process.

1417.  In the furtherance of which NU Defendants Tamburro and Christain disclosed Plaintiff's protected health information for use in court proceedings against Plaintiff's motion for preliminary injunction.

1418.  In furtherance of which Mona Dugo provided her defamatory PO 20532 as evidence supporting the law firm defendant's conspiratorial effort to deprive Plaintiff of his right and oppress him.

1419.  Where Individual Law firm defendants and NU employees had prior communications discussing the circumstances which led to Plaintiff's detainment by police, and where they created at that point, a conspiracy to deprive Plaintiff of his property interests through the numerous law violations and general misconduct discussed in this complaint, such as the creating a defamatory and false narrative indicated in count 105 of this complaint.

1420.  Where Defendants actions are motivated by discriminatory animus against Plaintiff based on his perceived disability, and where defendants openly admit to considering Plaintiff a threat to the safety of others based off the fact that he was involuntarily committed and based off his disability diagnosis and perceived religion as a result of PO 20532.

1421.  Individual Law Firm Defendants are policy makers for Husch Blackwell, LLP and NU. Their actions were pursuant to a regular policy or custom, and this policy was the moving force behind the violation of deprivation of Plaintiff's constitutional right to due process and equal protections and the deprivation of his property rights in the JD program at NU.

1422.  Defendants, through defamatory and false allegations, acted to deprive Plaintiff of his property interest in the JD program at NU without due process.

1423.   Plaintiff has been harmed and will continue to be harmed by Defendant's actions and is entitled to injunctive and declaratory relief and monetary damages.

1424.   An actual controversy exists between NU and Plaintiff concerning their rights, privileges, and obligations in that Plaintiff has contended that NU's actions have violated and will continue to violate Plaintiff's rights under federal law.

1425.   WHEREFORE, Plaintiff request that this Court:

xxxxx.    Issue a preliminary and permanent injunction ordering NU to reinstate Plaintiffs participation in the JD Program.

yyyyy.    Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

  i.    The defamatory and conspiratorial actions of defendants in this count violates the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2;

  ii.    Termination of participation in the NU JD Program, including Plaintiffs participation, without a pre-suspension notice and a hearing (informal review) or proper basis as set forth in the enumerated grounds for termination in the Official University Policies violates the due process clause of the Fourteenth Amendment to the United States Constitution and the Illinois Constitution, art. I, § 2;

  iii.    To the extent that NU University Policy authorizes NU to terminate or withhold the property interest of a person in Plaintiffs position in the JD Program by stating that Plaintiff is dangerous without ever presenting any evidence for such assertions aside from unsubstantiated allegations and hearsay, it violates the due process clause of the Fourteenth Amendment and the Illinois Constitution, art. I, § 2;

zzzzz.    Permanently enjoin Defendant from terminating Plaintiff from the JD Program without granting due process as required by the Fourteenth Amendment to the United States Constitution, and the Illinois Constitution, art. I, § 2;

aaaaaa.    Award Plaintiff any compensatory and/or nominal damages he incurred as a result of Defendant's termination without due process;

bbbbbb.    Award Plaintiff's reasonable attorneys' fees and costs pursuant to **42 U.S.C**. **§** 1988; and
G. Grant such other and further relief as this Court deems just and proper.

1426.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.


### Count 124
### 42 U.S.C.A. § 1986. Action for neglect to prevent
### (Husch Blackwell LLP, NU)

1427.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1428.   Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued. 42 U.S.C.A. § 1986 (West)

1429.   Where Husch Blackwell LLP and NU had awareness of the conspiratorial actions of its employees through its normal internal operations procedures and had the power to prevent the unjust and unwarranted conspiratorial defamation and deprivation of Plaintiff's rights by adhering to proper supervisory procedures and performing proper oversight and supervision and training of its employees and failed to do so. As a result, Plaintiff suffered injury of deprivation of his property rights and right to due process all its associated consequences such as not being able to regain his place in graduate school.

1430.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 125
## BREACH OF CONTRACT - DENIAL OF ADMISSION AND GRADUATION
### (NU)

1431.   Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

1432.   Plaintiff and NU entered into an express contractual relationship whereby Plaintiff would pay tuition and attend classes in exchange for an agreement for NU to provide a diploma upon Plaintiff's successful completion of the prerequisites for graduation.

1433.   The terms of that contract are set forth, *inter alia,* in NU's "Early Decision Certification" letter submission dated November 13, 2017. In that letter, the University states an acknowledgment that the terms of the letter constitute a contract binding on both parties.

1434.   The terms of that contract are set forth, *inter alia,* in NU's "Early Decision" admissions letter dated December 13, 2017. In that letter, the University states an acknowledgment that the terms of the letter constitute a contract binding on both parties.

1435.   Further, NU's Student Handbook clearly states that "the relationship between the University and each student is contractual ..."

1436.   Plaintiff confirmed his intent to enroll by submitting the Early Decision Candidate Response Form for the Entering Class 2018.

1437.   Plaintiff successfully completed all of the stated prerequisites for his first semester of law school prior to the post admission off-cycle investigation, withdrawing all of his applications from other schools and submitting his $750 non-refundable tuition deposit in the 2018 entering class, prior to notification to his of any Code charges and prior to being suspended from NU on November 6th, 2019.

1438.   The contract does not include the possibility of an unannounced post-admissions application review based on family background or make any reference to the University's right to withhold education or delay a student from enrollment based on such a review once he has been admitted through the early-decision program.

1439.   NU's forced deferral of Plaintiff's 2018 admission is a breach of the parties' contractual agreement that has harmed Plaintiff and will continue to harm Plaintiff now and throughout his life.

1440.   NU's failure to allow Plaintiff to attend class or graduate is a breach of the parties' contractual agreement that has harmed Plaintiff and will continue to harm Plaintiff now and throughout his life.

1441.   He is not getting the education for which he paid. Furthermore, this harsh, unfounded and unfair suspension and expulsion will be forever on his transcript. He will have a "resume gap" of three years for the rest of his life which he will be forced to explain. Plaintiff will be unable to obtain employment as a law school graduate or any other job requiring a law degree. Further, Plaintiff's job opportunities will be severely and immediately limited and his career and work life irreparably injured should Plaintiff not be awarded the degree that he has rightfully earned an opportunity to pursue from NU. He has no adequate remedy at law because his losses will be lifelong.

1442.   Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff,

and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

## Count 126
### BREACH OF CONTRACT - DENIAL OF PROPER PROCEDURES 2019
### (NU)

1443.   Plaintiff incorporates by reference paragraphs 80 through 205.

1444.   Plaintiff and NU entered into an express contractual agreement reflected in the Student Handbook. The Handbook sets forth the infractions that will result in disciplinary action for non-academic conduct and the procedures to be followed by NU in the administration of penalties for infractions of the Code.

1445.   Both explicitly, and implicitly, the Code states that each student will be judged and evaluated based on his or her own actions, and not for the actions of others.

1446.   Further, the Code does not provide notice that a student's disability status or status as male or Muslim will be a factor warranting greater punishment for infractions of the Code, or will result in said student being held to a higher standard for discipline under the Code.

1447.   The Code also states that a student accused of a Code violation shall be afforded certain rights and procedures, including but not limited to a hearing, an opportunity to hear the evidence against the student, and the opportunity to present and to question witnesses.

1448.   With regards to Plaintiff's 2019 suspension and ensuing disciplinary process, NU breached its contract with Plaintiff by not following its own rules and procedures set forth in the Code. Said breaches include, but are not limited to: (1) NU's arbitrary and capricious discipline of Plaintiff because he has a disability, is Male, or is Muslim, while other students in the same group chat, who engaged in the same or worse conduct, were not disciplined at all; (2) NU not allowing Plaintiff a hearing on the charges he alleged against the other students, nor the opportunity initially to hear the evidence against him; and (3) NU not allowing Plaintiff the opportunity to question witnesses offering testimony against him, if any.

1449.   Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

## Count 127
### BREACH OF CONTRACT - DENIAL OF PROPER PROCEDURES 2020
### (NU)

1450.   Plaintiff incorporates by reference paragraphs 206 through 481.

1451.   Plaintiff and NU entered into an express contractual agreement reflected in the Student Handbook. The Handbook sets forth the infractions that will result in disciplinary action for non-academic conduct and the procedures to be followed by NU in the administration of penalties for infractions of the Code.

1452.   Both explicitly, and implicitly, the Code states that each student will be judged and evaluated based on his or her own actions, and not for the actions of others.

1453.   Further, the Code does not provide notice that a student's disability status or status as male or Muslim will be a factor warranting greater punishment for infractions of the Code, or will result in said student being held to a higher standard for discipline under the Code.

1454.   The Code also states that a student accused of a Code violation shall be afforded certain rights and procedures, including but not limited to a hearing, an opportunity to hear the evidence against the student, and the opportunity to present and to question witnesses.

1455.   With regards to Plaintiff's 2020 suspension and ensuing disciplinary process NU breached its contract with Plaintiff by not following its own rules and procedures set forth in the Code. Said breaches include, but are not limited to: (1) NU's arbitrary and capricious discipline of Plaintiff because he has a disability, is Male, or is Muslim, while other students in the same group chat, who engaged in the same or worse conduct, were not disciplined at all; (2) NU not allowing Plaintiff a hearing on the charges he alleged

against the other students, nor the opportunity initially to hear the evidence against him in the form of the illegal audio tapes; and (3) NU not allowing Plaintiff the opportunity to question witnesses offering testimony against him, if any.

1456.   Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

## Count 128
## QUASI-CONTRACT / IMPLIED CONTRACT
## (NU)

1457.   Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

1458.   In the alternative to an express contractual agreement between the parties providing the terms for Plaintiff's education, Plaintiff is entitled to recover specific performance on a quasi-contract, or implied contract. NU has accepted payment from Plaintiff for all of the costs and expenses associated with obtaining a degree, but has refused to give an opportunity to earn said degree to Plaintiff.

1459.   There was an implied agreement between Plaintiff and NU that if Plaintiff paid the required tuition costs and expenses, successfully completed the required course work, and maintained an acceptable GPA, Plaintiff would be allowed to graduate with a degree from NU.

1460.   Prior to the alleged controversy in 2019, Plaintiff successfully completed nearly the entire semester of Fall 2019, attending classes, contributing to class discussions and engaging in group work, and had even submitted his midterm assignment and received a satisfactory grade, but is now being was wrongfully denied the opportunity to earn a degree from NU.

1461.   Plaintiff seeks relief in the form of specific performance and injunctive relief necessary to avoid irreparable harm to Plaintiff. Further, Plaintiff seeks monetary damages incurred as a result of NU's breach of its contractual obligation to provide graduate legal education to Plaintiff.

## Count 129
## QUANTUM MERUIT
## (NU)

1462.   Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

1463.   In the alternative, if there is no express or implied contract between the parties regarding the terms under which Plaintiff would be allowed to graduate from NU, Plaintiff is nonetheless entitled to relief because Plaintiff has devoted four years of his life to pursing his studies at NU and fully paid for one year of tuition with the expectation that Plaintiff would be allowed to attend classes and earn his degree.

1464.   NU has enjoyed the valuable benefit of Plaintiff's payment of tuition and other costs and expenses associated with his education at NU. NU accepted those payments, knowing that, upon completion of the prerequisites for graduation, Plaintiff expected to be awarded a JD degree from NU. NU's retention of those payments, without awarding Plaintiff a degree or credit for any coursework or the opportunity to earn a degree, constitutes unjust enrichment.

1465.   Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

## Count 130
## NEGLIGENT MISREPRESENTATION
## (NU)

1466.   Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

1467.   NU officials and agents made false promises and representations to Plaintiff regarding the JD program from NU. Those false statements included, but were not limited to, promises that if Plaintiff completed the required course work, paid his tuition, and maintained an acceptable GPA, that he would be awarded a diploma.

1468.   Plaintiff relied on NU's misrepresentations and devoted four years of his life to pursuing a degree from NU, from the first time he applied to NU until the day he was unjustly expelled. Plaintiff has been pursuing a degree in law since he was 25, which was when he first started preparing for the LSAT, and is now 31 years old, evidencing six total years pursuing entrance into the legal field.

1469.   Defendant knew or should have known that Plaintiff would rely upon its representations and failed to exercise reasonable care or competence in its communications with Plaintiff.

1470.   Plaintiff has been damaged as a result of NU's misrepresentations, and NU's refusal to award her the degree that she has earned.

1471.   Plaintiff therefore seeks damages, as well as injunctive relief, ordering Defendant to allow Plaintiff to attend law school at NU or a similarly situated law school with equal or more financial aid.

### Count 131
### Violation of Title IX of the Education Amendments of 1972
### 20 USC § 1681(a), et seq.
### Sex-Based Discrimination – Disparate Treatment
### (NU)

1472.   Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

1473.   Plaintiff specifically realleges paragraphs 66-79.

1474.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

1475.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

1476.   Upon information and belief, the University receives federal funding in from the Department of Education.

1477.   Plaintiff's gender is protected by Title IX and during the events herein, Plaintiff was a matriculated student and in attendance at NU.

1478.   Defendant discriminated against Plaintiff by permitting a pattern or practice of gender discrimination against Plaintiff in violation of Title IX as set forth herein.

1479.   Such pattern or practice constitutes a continuing violation and NU is liable to Plaintiff from August 23rd, 2020 when Gargula cyberstalked and assaulted and illegally recorded her threats and harassment via phone call to Plaintiff until when Plaintiff was expelled on 1/21/21, the Relevant Period.

1480.   Plaintiff and Gargula, a female student, were similarly situated in that both alleged that the other sexually harassed the other in violation of NU's Title IX Policy.

1481.   However, whereas NU did not initiate an action on Plaintiff's behalf against Gargula, a female student, NU did initiate an action against Plaintiff, the male student, on Gargula's behalf.

1482.   By bringing an action against Plaintiff on Gargula's behalf, Plaintiff was adversely affected and immediately separated from campus almost immediately after he had worked tremendously hard to complete a number of pre-requisites to regain his student eligibility.

1483.   However, Plaintiff's complaint that Gargula, a female student, violated NU's Policies regarding sexual misconduct, breach of confidentiality restrictions and a no contact order against him were treated with deliberate indifference by NU's representatives.

1484.   In contract, NU investigated and heard Gargula's Title IX allegations against Plaintiff and pursued her complaints regarding his violations of the student code of conduct.

1485.   NU's indifference adversely affected Plaintiff as he was vulnerable: to a) unmitigated peer harassment, b) a subsequent investigation, c) a protective order restricting his contact with the NU community,

d) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) disciplinary action based on alleged violations of a no contact order with a different student.

1486.   Plaintiff was also found responsible for class-based harassment, a violation only he, but not Gargula, (who committed blatant disability-based harassment and stalking sexual misconduct violation) had to face because NU pursued Gargula's allegations against Plaintiff, but not Plaintiff's allegations against Gargula. Plaintiff suffered academic suspension, expulsion, and severe emotional distress.

1487.   NU was also deliberately indifferent to Plaintiff's claims that Gargula a) committed disability harassment and stalking sexual misconduct violations, b) breached her duty to uphold the confidentiality of the proceeding by spreading misandrist rumors about Plaintiff and among other things called him a danger to the NU community, even going so far as to claim during the final sanctions hearing that "people like" Plaintiff "murder people like her everyday;" c) violated the Code's prohibition to not misrepresent information and lie during the Title IX 1 action; d) breached the no-contact order even though Gargula was seemingly going out of her way to maliciously antagonizes and bait Plaintiff's response—all with impunity.

1488.   Further, as NU was aware, Gargula sought and found an alleged new "victim" of Plaintiff's, Wren Chernoff, another transgender student.

1489.   By being indifferent to Gargula's violation of confidentiality restrictions, NU seized the opportunity to bring a second witness against Plaintiff based on the allegations of Gargula, a witness who Gargula mined from her circle of friends specifically to allege offense to Plaintiff's comments. In contrast, the witnesses that Plaintiff attempted to have interviewed were deliberately attempted to be excluded by NU representatives Cohen and Faith-Okar. It was only upon some 20 different requests from Plaintiff that his witnesses were interviewed, and even then they were not asked the questions which Plaintiff had requested they be asked, such as their opinion on whether Plaintiff was stalked or subjected to disability harassment.

1490.   Based on the foregoing paragraphs, the University has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of the University's guidelines and policies.

1491.   Based on the foregoing paragraphs, the University conducted the "investigation" and subsequent Hearing in a manner that was biased against the male student being accused. The female complainant was permitted to introduce felony evidence, where the plaintiff was not afforded even the most basic right to equal protections under the law. The University's Title IX coordinator also failed to disclose the felony material, which is exculpatory evidence, in the initial course of the hearing.

1492.   Based on the foregoing, the University imposed sanctions on Defendant that were vastly disproportionate to the severity of the charges levied against him, the weakness of the evidence, the strong exculpatory evidence, and without any consideration of his unblemished criminal record prior to this incidents occurrence, and without providing any basis for its decision to commit felonies in admitting the felonious evidence as part of its decision to suspend and expel Plaintiff. In using the information contained on the audio recordings in order to ascertain Plaintiff's guilt regarding the accusations of gender discrimination leveled against him by Gargula, NU and its employees have committed a violation of Eavesdropping: 720 ILCS 5/14-2 (a) (5), which states: "A person commits eavesdropping when he or she knowingly and intentionally: (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties." Given that NU representative Mona Dugo initially failed to disclose the existence of the audio recordings, until she illegally shared them with Plaintiff's therapist Brian Tobin in violation of the statute on or around 9/29/20. On information and belief, she committed at least two more counts in sharing the information on the audio with NUPD Deputy Chief Eric Chin and four more counts in sharing the information with NUPD Detectives Sarah Stark and Sanghoon Lee. In her blatantly bias, malicious, and underhanded attempt to retaliate against Plaintiff for the Department of Education complaint which he disclosed to NU on or around 9/13/20, Dugo contacted Plaintiff's therapist and illegally shared the audio without Plaintiff's consent or knowledge in order to defame Plaintiff and intentionally damage his relationship

with his therapist. As a result of her felonious conspiratorial activity, Plaintiff's therapist later cancelled his contract with Plaintiff unexpectedly.

1493. On information and belief, the University's guidelines and regulations are set up to disproportionately affect the male student population of the University community as a result of the higher incidence of women's complainants of sexual misconduct versus men's complainants of sexual misconduct.

1494. On information and belief, male respondents in sexual misconduct cases at the University are discriminated against solely on the basis of sex. They are fair more likely to be found guilty, regardless of the evidence, or lack thereof. This is strongly supported by the rampant, blatant, unchecked intentional commission of felonies by NU staff in order to pursue the charges in Plaintiff's case.

1495. As a result of the foregoing commission of eavesdropping, Plaintiff is entitled to injunctive relief as expressly provided by statute, and damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

1496. NU's suspension and subsequent expulsion of Plaintiff and its refusal to allow Plaintiff to attend law school is intentionally discriminatory against Plaintiff on the basis of his sex. The entire NU staff which Plaintiff dealt with during his disciplinary process were female, including DeSilva who was assigned to "address" Plaintiff's concerns, as well as Colleen Johnston and Karen Tamburro. Both his hearing investigators, Heather Cohen and Ish Faith-Orkar, were female, and two of three ultimate decision-makers regarding Plaintiff's punishment were female. Neither Gargula, nor any of some seven different students who engaged in targeted harassment of Plaintiff in the group chat incident were disciplined, despite many having engaged in far more egregious conduct. Moreover, Plaintiff was given extreme punishment as compared with Gargula for less offensive conduct as found by NU's own investigation. Plaintiff was undeniably held to a higher standard than the female students.

1497. Plaintiff had no opportunity or involvement in the social activities that took place prior to the group chat incident, such as the social outing many of the other students referred to in their oppressive harassment of Plaintiff during the group chat incident. Further, Plaintiff did not engage in the orientation activities as planned by NU because he was left off of the schedule by NU, and, in fact, repeatedly tried to explain this to the women class members that were harassing him or otherwise engaged in disorderly conduct by creating a hostile environment for Plaintiff which made him uncomfortable.

1498. NU's punishment of Plaintiff violated Title IX because Plaintiff was given the more severe punishment than females who engaged in repeated conduct that was far more egregious. NU's punishment of Plaintiff was based solely on his sex (male), and not based upon his culpability under the Code. Further, numerous female students who participated in the group chat harassment, who were far more aggressive and oppressive, and who engaged in far more egregious conduct than Plaintiff, were afforded no punishment at all from NU.

1499. NU discriminated against Plaintiff's gender and detrimentally and adversely affected Plaintiff's education because he is male.

1500. Furthermore, the decision to discipline Plaintiff was undeniably based on gender due to the fact that NU chose to initiate proceedings only because Evangeline Gargula identifies as a transexual and NU received pressure from the "OutLaw" LGBTQ student group immediately prior to his suspension. This confirms that gender was the sole basis for the decision to initiate disciplinary proceedings against Plaintiff, a clear and unmitigated violation of Title IX.

1501. Furthermore, in an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students." In making this assertion, there was clear selective enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

1502.

1503.   Defendant's pattern or practice of gender discrimination was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

1504.   As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has suffered extreme emotional and physical distress, mental anguish, humiliation and embarrassment.

1505.   By reason of the continuous nature Defendant's discriminatory conduct, persistent from when he was sexually assaulted in August 2020 through the Spring of 2021, Plaintiff is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

1506.   Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life. Plaintiff has been harmed by NU's unlawful conduct and seeks actual damages as well as injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks all applicable attorneys' fees and costs available under this cause of action.

1507.   By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

1508.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

   b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

   d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

   e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

   f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

   g.   Award attorney's fees and costs; and

   h.   Award such other relief as the Court deems just and proper.

## Count 132
### Violation of Title IX of the Education Amendments of 1972
### 20 USC § 1681(a), et seq.
### Selective Enforcement
### (NU)

1509.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1510.   Plaintiff specifically realleges paragraphs 66-79.

1511.   Plaintiff specifically realleges paragraphs 211-481.

1512.   "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Doe v. Cummins, 662 F. App'x 437, 452 (6th Cir. 2016). To make this showing, a plaintiff must "identif[y]... a comparator of the opposite sex who was treated more favorably by the educational institution when facing

similar disciplinary charges." Id Doe v. Case W. Reserve Univ., 1:17 CV 414, 2019 WL 1982266, at *13 (N.D. Ohio May 2, 2019), aff'd, 809 Fed. Appx. 276 (6th Cir. 2020)

1513.   Evangeline Gargula was a similarly situated female without disabilities who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. Both were incoming 1L students who were making comments on a school group chat which were allegedly against school policy, and only Plaintiff was suspended. Evangeline was not even spoken to, neither were any of the other nearly 7 harassing students which participated in the group attack on Plaintiff in the group chat.

1514.   In order to make the determination below, NU excused Gargula's harassment on the basis of mental disability because she was in "mutual contact" whereas they sanctioned Plaintiff for a safety threat and harassment based on gender identity, resulting from the same core set of facts. The only difference is that Evangeline is a female and I am male.

1515.   "Regarding the group chat messages, the Office determined that there was insufficient information to support that Evangeline's comments would cause a reasonable person to experience fear for safety or substantial emotional distress. Factors considered in this determination includ ined that Evangeline posted a screenshot of your publicly available Facebook information, a question of whether you were a 2L, and a frog meme.

1516.   Regarding the telephone communication, you alleged that Evangeline called you in a threatening manner at a late hour. You provided a screenshot of your call history indicating that Evangeline called you for 3 minutes at 1:08am on August 23, 2020. The screenshot additionally shows that you returned Evangeline's call at 1:18am, lasting 8 minutes. Further, we reviewed direct messages between you and Evangeline just before the calls, where you gave Evangeline your phone number at 12:56am on August 23rd, and sent messages to Evangeline including:

1517.   o "I'm at [phone number], if there any issues we need to resolve"

1518.   o "Lmk"

1519.   We reviewed the text messages you provided from August 23rd, where you texted, "Don't ever call me again" to which Evangeline replied, "are you okay?" Given these messages, the Office determined that you were engaged in mutual contact with Evangeline during these exchanges. Further, the messages and calls on their face do not contain sufficient information to suggest that Evangeline's behavior could rise to the level of stalking. Taking these behaviors in sum, the Office does not have sufficient information to move forward with a formal investigation of your allegations of stalking.

1520.   We noted that you raised concern in your complaint regarding potential defamation by Evangeline as evidence that she violated the University's stalking provision. You cited information from CARE's website in support of this claim. CARE is an advocacy office on campus that shares information helpful to identifying possible stalking behaviors, but the University's analysis on initial inquiry is limited to the stalking definition in the Policy on Institutional Equity as included above."

1521.   Furthermore, in an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students." In making this assertion, there was clear selective enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

1522.   Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

1523.   NU committed impermissible gender bias against the Plaintiff in the investigation and adjudication of Gargula's accusations.

1524.   NU received credible information that that Plaintiff was stalked on the basis of perceived mental disability by Gargula. NU did not encourage Plaintiff to file a complaint, consider the information, or otherwise investigate.

1525.   NU received credible information that Plaintiff was the victim of felony eavesdropping during the pendency of the investigation. NU did not encourage Plaintiff to file a complaint, consider the information, or otherwise do investigate.

1526.   NU violated Title IX by selectively enforcing its sexual assault policies on the basis of gender: (a) Regardless of plaintiff's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by Plaintiff's gender. A female student, Gargula, was in circumstances sufficiently similar to Plaintiff's and was treated more favorably by NU; (b) The severity of Plaintiff's punishment was due to his gender because NU has maintained and perpetrated an archaic view of sexuality in which men are aggressors and women are "guardians of virtue."

1527.   NU committed Impermissible gender bias against Plaintiff in the investigation and adjudication of Gargula's accusations.

1528.   NU officials and administrators who had the authority to initiate corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on Plaintiff is the result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at NU.

1529.   Defendant exhibited patterns and practices of decision-making that show that the penalties Plaintiff endured and the very decisions to initiate Title IX complaints against Plaintiff as well as the decision to not initiate a Title IX action against Gargula were motivated NU's pattern or practice of intentional animus against Plaintiff's gender.

1530.   Plaintiff and Gargula were similarly situated in that each reported to NU that the other violated NU's Title IX sexual misconduct Policy; however, NU encouraged and endorsed Gargula's claims against Plaintiff, and discouraged and did not endorse Plaintiff's claims against Gargula.

1531.   Plaintiff and Gargula were similarly situated in that Plaintiff and Gargula reported accusations that violated NU's Title IX sexual misconduct Policy, but NU encouraged and endorsed Gargula's claims by initiating an action on her behalf and discouraged and did not support Plaintiff's claims whatsoever.

1532.   As indicated by Gargula's Title IX action, NU is on alert and willing to bring a disciplinary action on behalf of a female student against a male student, but not willing to bring a disciplinary action on behalf of a male student against a female student even if the male student alleges allegations of Policy violations similar to the allegations asserted by the female student.

1533.   As indicated by Gargula's Title IX action, NU is on the alert and willing to bring a disciplinary action against a male student even when the female accuser is unwilling to participate and/or doesn't know a violation occurred, but NU is unwilling to bring a disciplinary action against a female student even when the male accuser is willing to participate.

1534.   NU's selective enforcement affected Plaintiff as he was vulnerable a) unmitigated peer harassment, b) a subsequent investigation, c) a protective order restricting his contact with the NU community, d) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) disciplinary action based on alleged violations of a no contact order with a different student.

1535.   Plaintiff was also found responsible for class-based harassment, a violation only he, but not Gargula, (who committed blatant disability-based harassment and stalking sexual misconduct violation) had to face because NU pursued Gargula's allegations against Plaintiff, but not Plaintiff's allegations against Gargula. Plaintiff suffered academic suspension, expulsion, and severe emotional distress.

1536.   NU was also deliberately indifferent to Plaintiff's claims that Gargula a) committed disability harassment and stalking sexual misconduct violations, b) breached her duty to uphold the confidentiality of the proceeding by spreading misandrist rumors about Plaintiff and among other things called him a danger to the NU community, even going so far as to claim during the final sanctions hearing that "people like" Plaintiff "murder people like her everyday;" c) violated the Code's prohibition to not misrepresent information and lie during the Title IX 1 action; d) breached the no-contact order even though Gargula was seemingly going out of her way to maliciously antagonizes and bait Plaintiff's response—all with impunity.

1537.   Further, as NU was aware, Gargula sought and found an alleged new "victim" of Plaintiff's, Wren Chernoff, another transgender student.

1538.   By being indifferent to Gargula's violation of confidentiality restrictions, NU seized the opportunity to bring a second witness against Plaintiff based on the allegations of Gargula, a witness who Gargula mined from her circle of friends specifically to allege offense to Plaintiff's comments. In contrast, the witnesses that Plaintiff attempted to have interviewed were deliberately attempted to be excluded by NU representatives Cohen and Faith-Okar. It was only upon some 20 different requests from Plaintiff that his witnesses were interviewed, and even then they were not asked the questions which Plaintiff had requested they be asked, such as their opinion on whether Plaintiff was stalked or subjected to disability harassment.

1539.   Defendant exhibited a pattern or practice of anti-male bias during Title IX 1 by the differential and selective treatment he and the female accuser received in that, among other things, the undisputed facts showed that Gargula was the aggressor and that she was acting willfully and with force.

1540.   Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential selective treatment he and Gargula received in that, among other things, Gargula alleged conclusory, false and unsubstantiated claims to which Plaintiff was forced to respond.

1541.   268. Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential and selective treatment he and Gargula and Gargula received in that, among other things, Defendant could not attribute a negative motive to Gargula or Gargula but determined that by virtue of being accused, Plaintiff could not be presumed innocent, but instead was presumed threatening and dangerous on the basis of one or more protected class characteristic.

1542.   269. NU exhibited intentional and substantial gender bias when it failed to prosecute Gargula for her actions against Plaintiff which included multiple disability hate crimes including cyberstalking, felony eavesdropping, and harassment via electronic communications.

1543.   270. Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

1544.   271. By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

1545.   NU has discriminated against Plaintiff because of sex. This discrimination is intentional and is a substantial or motivating factor for NU's actions in this case.

1546.   As a direct and proximate result of NU violations of Plaintiff's rights under Title IX, Plaintiff has suffered severe and substantial damages.

      a.   Plaintiff was denied the opportunity to attend his own graduation

      b.   Plaintiff has lost a valuable scholarship to graduate school.

      c.   Plaintiff's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined a jury and the Court.

1547.   NU is liable to Plaintiff for his damages.

1548.   Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to attorney' fees incurred in bringing this action.

1549.   Male former college student plausibly alleged female classmate was treated preferentially, and thus stated Title IX selective enforcement claim arising out of Title IX investigation into male student following female classmate's accusation of sexual assault; male student alleged information college collected during investigation could have equally supported disciplinary proceedings against female classmate for also violating sexual misconduct policy, and that college treated female classmate differently than male student. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Rollins College, 352 F. Supp. 3d 1205 (M.D. Fla. 2019). Student attacking university disciplinary proceeding on grounds of gender bias may plead in alternative that plaintiff was innocent and wrongfully

found to have committed offense, and that there was "selective enforcement" meaning that severity of penalty or decision to initiate proceeding was affected by student's gender. Education Amendments of 1972, § 901(a), as amended, 20 U.S.C.A. § 1681(a). <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 709 (2d Cir. 1994)

1550.  Interim Dean of Students Mona Dugo, The Office of Equity, and its representatives Amanda DeSilva and Colleen Johnston selectively enforced University harassment policy on the basis of gender against Plaintiff in a situation where he was intentionally targeted and maliciously "stalked" in violation of clearly stated and applicable "sexual misconduct" policy and definitions, and this unprovoked and utterly malicious act of stalking directly caused the allegations which he was ultimately expelled for. NU did this because their office and the University systematically prioritizes the rights and privileges of white females over males and students of color.

1551.  WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorney's fees and costs; and

h.  Award such other relief as the Court deems just and proper.

### <u>Count 133</u>
### Violation of Title IX of the Education Amendments of 1972
### 20 USC § 1681(a), et seq.
### Title IX peer harassment
### NU

1552.  Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1553.  Plaintiff specifically realleges paragraphs 66-79.

1554.  Plaintiff specifically realleges paragraphs 211-481.

1555.  To succeed on a Title IX peer harassment claim, a plaintiff must show that the harassment is "on the basis of sex," meaning the harassment was motivated by either the plaintiff's gender or failure to conform to gender norms.  Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

1556.  The 2019 Hostile Environment consisted of peer harassment on the basis of sexual harassment allegations, and therefor was on the basis of sex. The harassment was so severe and pervasive that Plaintiff's educational opportunities, such as group work in Law Professor Emily Kadens class and Plaintiff's CLR class, as well as social outings with BLSA were negatively impacted. As indicated, the harassment included being subjected to various derogatory terms on the basis of some unknown allegation of sexual harassment. Plaintiff was specifically informed by multiple students that the basis for the harassment was an allegation relating to allegations related to sexual misconduct. As indicated, NU did nothing to address the harassment perpetrated upon Plaintiff, yet took action to address the concerns of the female students who allegedly did not make any formal complaints.

1557.  In an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the

bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students." In making this assertion, there was clear selective enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

1558.   The 2020 Hostile Group Me Environment consisted of several instances of peer harassment on the basis of gender-identity, which is de-facto sex-based. This included stalking by Evangeline Gargula. This included harassment from Evangeline on the basis of Plaintiff's perceived gender bias, harassment from Tessa Wiel on the basis of Plaintiff's perceived gender bias, harassment from Ishani Choksi on the basis of Plaintiff's perceived gender bias. The harassment was so severe and pervasive that Plaintiff's educational opportunities, such getting suspended from school, isolated from community, kicked out of the group chat and discord, and having his reputation and future opportunities destroyed. Where Plaintiff was harassed on multiple occasions and subjected to hatred, contempt and ridicule for failing to conform to gender norms about the transexual individuals, wherein he was harassed on the basis of making allegedly "transphobic" remarks and wherein Plaintiff did not realize, understand, or agree with the allegation that his remarks were "transphobic." This peer harassment for failing to conform to gender norms was further evidenced when Plaintiff was harassed by another transexual student, with whom he had formerly good relations, and with whom he was brought into conflict as a result of his comments, which were mistakenly or deliberately misconstrued as being "transphobic" whereas in reality they evidenced a line of questioning which indicated that Plaintiff felt he was being cyberstalked by another student.

1559.   Additionally, as indicated in the specifically realleged section, Evangeline Gargula conducted a course of action towards Plaintiff in and around 8/23/20 that undeniably constituted stalking, however, despite filing some 10-15 different complaints with increasingly detailed information about the stalking, NU and in particular, Amanda DeSilva, Colleen Johnston, and Karen Tamburro took a sick, sadistic pleasure in finding some obscure and ridiculous reason for not addressing Plaintiff's complaint. Indeed, at one point Plaintiff was told by Amanda DeSilva that Plaintiff was not stalked because the "stalking was not based on a protected class." The three are vicious and sadistic felons who took pleasure in inflicting the extended pain and torture of the unwarranted suspension and expulsion upon Plaintiff, often times smiling and smirking venomously when interacting with Plaintiff and denying the substance of his concerns. As indicated in the complaint, Karen Tamburro has never addressed a single one of the over 100 different complaints which he sent to her as a result of his harassment and discrimination in 2019 and 2020. Indeed, the scale of his omissions and failures to address Plaintiff's concerns is one of the most disturbing and unsettling cases of malicious indifference in the recorded history of higher education.

1560.   Tamburro, DeSilva, and Johnston employed the most irrational, illogical, and incoherent reasoning and rationale to avoid addressing the Plaintiff's concerns that their responses were often times completely unintelligible. They made up exceptions and exemptions to every rule so that they could avoid addressing Plaintiff's concerns, such as a "mutual contact" exemption in response to Plaintiff's complaint about the stalking and harassment committed by Gargula, wherein they excused Gargula's stalking and harassment towards Plaintiff because her and Plaintiff were somehow in "mutual contact" when the initial disability harassment post was made by Gargula, even thought she initiated the harassment. This exemption only applied to her harassment towards Plaintiff and not, as the name implies, mutually between the parties. In this way, they enforced and supported their vicious hate crimes of stalking and felony eavesdropping while punishing Plaintiff for responding to harassment.

1561.   To prove a Title IX sexual-harassment claim based on conduct between students, a plaintiff must demonstrate that the school was deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.   Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

1562.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.   Award attorney's fees and costs; and

h.   Award such other relief as the Court deems just and proper.

## Count 134
### Violation of Title IX of the Education Amendments of 1972
### 20 USC § 1681(a), et seq.
### Title IX Retaliation
### NU

1563.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1564.   To establish claim for retaliation under Title IX, plaintiffs must allege that (1) they engaged in statutorily protected activity; (2) school took a materially adverse action against them; and (3) there existed a but-for causal connection between the two.   Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681 et seq.

1565.   On 9/4/20 -9/8/20 Plaintiff filed several discrimination complaints with NU about sexual misconduct and gender bias, among other things.

1566.   On 9/9/20 NU emailed Plaintiff with a notification that he was additionally charged with "unauthorized report sharing." This stated reason of "unauthorized report sharing" was a pretext for sex-based discrimination and retaliation for reporting his concerns of stalking sexual misconduct.

1567.   Had Plaintiff not submitted his internal grievance for stalking sexual misconduct, he would not have been additionally disciplined on 9/11/20.

1568.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.   Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

**Count 135**
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Title IX Erroneous Outcome**
**NU**

1569.   Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

1570.   Plaintiff specifically realleges paragraphs 66-79.

1571.   Plaintiff specifically realleges paragraphs 211-481.

1572.   Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C.A. § 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX in provides in pertinent part. "No person... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

1573.   NU is an education program or activity operated by recipients of Federal financial assistance.

1574.   Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

1575.   The decisions of the hearing process and the appeal process for Plaintiff were erroneous outcomes which were the direct result of a flawed and biased proceeding. In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. NU has reversed this process and assumed that Plaintiff was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

1576.   NU committed impermissible gender bias against Plaintiff in the investigation and adjudication of Gargula's accusations.

a. There has been substantial criticism of NU, both in the student body and in the public media (including the Internet), accusing schools of not taking seriously complaints of female students alleging assault by male student. On information and belief, NU's administration was cognizant of, and sensitive to these criticisms. As a result, NU's decision-makers and its investigators were motivated to favor the accusing female over the accused male, so as to protect themselves and NU from accusations that they had failed to protect female students from assault.

b. On information and belief, NU was motivated in this instance to accept the female's accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students from assault by male students. The investigators, hearing panel, and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid the criticism that NU turned a blind eye to alleged assaults by men.

1577.   NU has discriminated against Plaintiff because of sex. This discrimination is intentional and is a substantial or motivating factor for NU's actions in this case. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Plaintiff. These circumstances include:

a. NU, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women

b. NU has applied flawed or incorrect legal standards, employed biased or negligent investigatory techniques.

c. NU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on Plaintiff is the result of a flawed and biased bearing process. This resulted in a deprivation of access to educational opportunities at NU.

1578.   The circumstances of the investigatory process, the bearing process, and the appeal process case doubt on the accuracy of the outcome of the disciplinary proceeding. The Department of Education regulations

and guidance state that Tide IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

1579.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Plaintiff. These circumstances include:

    a.    A general atmosphere at NU where females who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on NU from OCR, DOJ, student groups, and public opinion.

    b.    The adjudication of the claims against Plaintiff occurred at the time that NU officials were developing their approach to issues involving transexual students.

    c.    The failure of NU to conduct full and fair investigations.

    d.    The failure of NU to afford accused students counsel or the opportunity to present evidence their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

    e.    The Sexual Misconduct Policy denies male students, like Plaintiff, the basic guarantees of fundamental fairness in hearings. These rights include an impartial decision-maker, the assistance of counsel, the ability to confront adverse witnesses, the right to remain silent in the face of criminal accusations, and the presumption of innocence.

1580.    NU assumed that Gargula, as an alleged female victim, was truthful and reliable. As a result of this gender bias, NU failed to adequately investigate and question Gargula's credibility.

    a.    NU ignored significant evidence that Gargula was not a credible witness, including the felonious evidence which proves she was engaged in a blatant disability based hate crime.

    b.    NU failed to consider what, if any, accommodations or benefits Gargula received that may have affected her credibility and reliability.

    c.    NU's practices and procedures appear to be hostile to men and can be seen as bias in favor of unfairly protecting "vulnerable" and "virtuous" females.

1581.    NU assumed that Plaintiff, as an accused male student, was not truthful and reliable. As a result of this gender bias, NU improperly considered character evidence, rumor, innuendo, and evidence of Plaintiff's mental health treatment history.

1582.    The circumstances of the Investigatory process, the hearing process, and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding.

1583.    NU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, NU and its agents demonstrated and acted on pervasive gender bias.

1584.    Plaintiff has been deprived of access to educational opportunities at NU.

1585.    As a direct and proximate result of NU's violations of Plaintiff rights under Tide IX, Plaintiff has suffered severe and substantial damages.

    a.    Plaintiff was denied the opportunity to attend his own graduate school.

    b.    Plaintiff has lost a valuable scholarship to graduate school.

    c.    Plaintiff's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

1586.    NU is liable to Plaintiff for his damages.

1587.    Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to their attorney's fees incurred in bringing this Action

1588.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

1589.   On September 22, 2017 the United States Department of Education, Office for Civil Rights (OCR) withdrew the Dear Colleague Letter on Sexual Violence, dated April 4, 2011 and Questions and Answers on Title IX and Sexual Violence, dated April 29, 2014 (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.), keeping in place it guidelines Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, Title IX, January 19, 2001 (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) (the OCR Standards) as well as newly issued interim guidance (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title- ix-201709.pdf), Q&A on Campus Sexual Misconduct, September 2017 (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

1590.   As set forth herein, Gargula was favored and Plaintiff was adversely treated during her Title IX action in that among other things Gargula's credibility was flawed and that Plaintiff's allegations that Gargula had assaulted him and engaged in stalking sexual misconduct without his consent were not acknowledged by NU and that Plaintiff was found responsible for assaulting Gargula.

1591.   As indicated by Gargula's Title IX action, NU is on the alert and willing to bring disciplinary actions against its male students even when the accuser is unwilling to participate. Gargula's Title IX action established the pattern or practice under which Gargula's Title IX action conclusions were erroneous.

1592.   NU exhibited a pattern or practice of intentional and substantial gender bias when it failed to prosecute Gargula for her actions against Plaintiff, which included her felony hate crimes and eavesdropping, reaching an erroneous outcome by finding Plaintiff responsible in Gargula's Title IX action and punishing him.

1593.   In Gargula's Title IX action, NU engaged in a series of actions that ultimately resulted in a separation order against Plaintiff based on a manufactured complaint from a student who did not initially file a formal complaint.

1594.   The erroneous outcome of ordering Plaintiff's separation from campus was caused in substantial part by gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by NU throughout the entire investigative process.

1595.   NU's gender bias caused such erroneous outcomes as a) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

1596.   Moreover, Plaintiff was also found responsible for allegedly violating sexual misconduct policy, a violation only he but not Gargula (who also clearly violated stalking sexual misconduct and harassment policy) had to face because NU pursued Gargula's allegations against John, but not Plaintiff's allegations against Gargula. Plaintiff suffered academic suspension and expulsion and severe emotional distress.

1597.   NU's violations of its obligations under Title IX proximately caused Plaintiff to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

1598.   Plaintiff is entitled to compensatory damages for the harm he suffered as a result of NU's violation of its Title IX obligations.

1599.   The pattern of decisions on choosing what violations to enforce are evidence of gender bias by Equity. They frequently enforce the implied and informal rights of women who have not even requested complaints such as Evangeline, in favor of the rights of similarly situated males.

1600.   Plaintiff  notes the strength of the evidence against him in several allegations is particularly weak, especially the two illegal audio tapes which prove that Evangeline was calling him  to entrap him and which the university hid in order to protect her due to its bias against males.

1601.   There were several witness allegations from Gloria Cange that she and her "OutLaw" student group put pressure on university officials to discipline Plaintiff.

1602.   Ish (Current Hearing Officer) was not provided with the compelling exculpatory evidence and instead relied exclusively on investigative report and competing narratives

1603.   Evangeline's statements to university officials were dishonest, inconsistent, and factually improbable, and she misrepresented that she called Plaintiff first, and recorded both of their phone calls.

1604.   Evangeline's behavior following the incident, as reported by multiple witnesses, was inconsistent with allegations as she claimed that she was "so afraid that she was checking the doors everyday", and also talked about how Plaintiff's comments were "a weak attempt" at insult. She claimed that she was so scared, yet on the phone is laughing and mocking Plaintiff.

1605.   Amanda Deisilva was mistaken about applicable standard of stalking that should be applied, and deliberately applied the Equity definition of stalking and not the university handbook definition on Pg 133.

1606.   Statistical evidence showed pattern of gender-based decision-making from the universities available equity data, from their enforcement of women's rights over men's in 2019 when they had a meeting with Plaintiff in August about "female concerns" rather than addressing the hostile environment, the 2020 group chat incident where they enforced Evangeline's right based on her gender identity over Plaintiff's rights as a similarly situated colored, disabled, Muslim student and 2020 and external pressure on university from student groups such as "Outlaw".

1607.   There is demonstrated gender bias on part of university and employees, including that university credited female student's purportedly implausible allegations over the accounts of male student and neutral witnesses, and is evidenced by the male witnesses and Plaintiff's allegations and accounts not believed or credited, but Evangeline, Cange, and Chernoff, who are all female were included as witnesses and their accounts believed over mine.

1608.   Northwestern violated Title IX by erroneously suspending Plaintiff based on a gender-biased sexual misconduct policy, investigation and adjudication process, when the evidence supported his innocence. Plaintiff claims he is innocent and that Northwestern wrongly found that he harassed Gargula because of Northwestern's allegedly gendered investigation and disciplinary proceedings.

1609.   There  procedural flaws in the investigatory and adjudicative processes, such as Plaintiff not being assisted effectively by his adviser, and not given any help to find another one.

1610.   He was denied opportunity to gather exculpatory evidence from the group chat messages which would support his innocence and harassment claims.

1611.   Noting inconsistencies or errors in the adjudicator's oral or written findings about how Evangeline's contact is "mutual contact" but Plaintiff's was "harassment" resulting from the same set of facts or

1612.   The group chat transcripts are missing several pages from "NU Kids on the Block" which contained comments directed at Plaintiff in harassment, and is completely missing "Meet the NU Kids '23" chat transcripts. The transcripts that are provided only show the comments which Plaintiff made in response to a variety of hidden comments.

1613.   There is substantial evidence indicating that Plaintiff was repeatedly harassed and stalked according to "CARE" stalking definition which is located on the Universities website and therefore would lead an ordinary person to believe that it was the correct definition being used by the school.

1614.   There is evidence that Plaintiff was called at 1:08 AM in a threatening manner, given the time of the call and the nature of the messages being exchanged, prior to the "threatening" messages which he allegedly sent.

1615.   There is evidence that Gargula misled the investigators by not informing them of the call and not showing them the harassing messages which she posted on the group chat which also included Plaintiff's personal information and caused him substantial emotional distress over my mother's death which she reminded him of.

1616.   There is evidence that Gargula misled the investigators recording his phone calls with her in order to entrap plaintiff, and evidence that the university was aware of it, concealed it, and used it to suspend him.

1617.   In this case, Plaintiff alleges certain procedural flaws in the investigatory and adjudicative process and also challenges the sufficiency and reliability of the evidence against him.

1618.   Because DeSilva served as Fahad's adjudicator and was ultimately responsible for determining Doe's guilt or innocence, any evidence of DeSilva's gender bias is particularly probative. If DeSilva possessed the discriminatory views of gender and sexuality alleged in Fahad's Complaint, these views would have

naturally infected the outcome of Plaintiff's Title IX disciplinary proceedings. Therefore, this allegation alone is sufficient to satisfy Plaintiff's burden to plead a fact that creates an inference of gender discrimination in Northwestern's disciplinary proceedings.

1619.   Every single complaint (100%) that he has filed with the Office of Equity has been determined not to state a cause for investigation or action of any kind whatsoever. I have filed at least 100 different complaints with that office for a variety of different concerns, not a single one was adequately addressed. Moreover, no concern was ever shown for his distress from any of the incidents.

1620.   During Fall 2019 Semester, he was viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment accusations from a white female student which were never shared with him. This culminated in a discussion with the entire law class about him taking place on the chat, which he was not allowed to participate in because a group of students kept removing him from the group over and over without NU doing anything to address it, and resulted in almost the entire school treating him like he was a sexual predator. Despite full awareness of the tremendous emotional distress that this created on him, the Office of Equity took no action to address his concerns.

1621.   In 2019, Equity failed to meaningfully or actionably address a formal complaint he filed over unwanted physical contact by Muaaz M. and Usama I. (other similarly situated law students) in relation to an incident which occurred on 11/1/19.

1622.   April 2020 - Forensic Threat Evaluation - During this evaluation, Plaintiff was asked questions about an incident which occurred in late August 2019 wherein an unidentified female claimed that he "grazed her butt." He faced disciplinary action due to this allegation earlier in the year, however, when he told administration that he was assaulted by Osama, Muaaz, and Usama, the law school failed to take any action of any kind on his behalf. In this manner the school administration violated title IX by treated me differently than a female who made similar allegations of unwanted physical contact against him, by not investigating his concern while they investigated the allegations made by the female and noted the incident in his school disciplinary record.

1623.   DeSilva addressed multiple "concerns" articulated by all female students and staff, most if not all of whom were white, in a meeting with him on August 6th, 2020.

1624.   The concerns articulated by females for "unwanted contact" were noted on my permanent student record, as indicated by my forensic threat assessment, whereas none of the complaints which he articulated about "harassment," "stalking," "battery," or any other form of concern were ever actionably or meaningfully addressed by Equity at any time during his time at this university.

1625.   The notice the he received confirms the statements and attitude articulated by DeSilva and Truelove which indicated that they were investigating the "concerns" of these white females even absent the presence of a formal complaint. Thereby indirectly displaying the bias attitude of representatives of Equity present during that meeting, who prioritize investigating the informal "concerns" of females over the formal complaints of Plaintiff, a male.

1626.   During Fall 2020 Semester, he was viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment from a white female student which unquestionably met the university standards for harassment. Despite full awareness of the tremendous emotional distress that this created on me, the Office of Equity took no action to meaningfully or actionably address my concerns.

1627.   The exact same exchange of private messages between Plaintiff and Gargula was deemed "mutual contact" in response to his harassment complaint against her, a white female. Whereas, her complaint against Plaintiff resulted in his immediate suspension, for the exact same exchange of messages.

1628.   Equity willfully and deceptively evaded Plaintiff's request to investigate Gargula for malicious school policy use in violation of the University policy, due to the fact that she deceptively failed to show investigators the messages that she posted about him in the group chat, which included Plaintiff's private information, disparaging and substantially offensive remarks which caused him significant emotional distress because of his mother's death, and a picture of a frog with the caption "NO THOUGHTS EMPTY HEAD" underneath it, all of which were unprovoked and directly caused the remarks which she later reported. Nor did she tell investigators that she had placed a call to HIM at 1:08 AM in a threatening manner prior to receiving the messages that she claimed "threatened her safety."

1629. In another blatant act of gender-bias in decision making, the University stated multiple times that GARGULA did not initiate the conduct process against Plaintiff. This further substantiates the notion that Equity prioritized the concerns of a white female, which were about a male and not formally reported, over his concerns, which were about a female and were formally reported. This can be seen in that they launched in investigation into his comments and stated that none of Gargula's conduct was harassment, nor did they forward his complaints to the appropriate student conduct resource as is clearly stated in their own institutional equity policy.

1630. Despite filing complaints against several female students, Equity did not deem even a single concern in his complaint to be worthy of investigation.

1631. The deliberate disregard for any concerns which Plaintiff articulated regarding harassment to Equity was shared by Colleen, DeSilva, and Truelove. Therefore, given the positions and seniority of each of these respective individuals in the office, and their number in comparison to the total number of resources staffed in the office, these three individuals therefore represent a statistically representative sample and by implication evidence the gender bias displayed by the Office of Equity in their decision-making process.

1632. The deliberate disregard for any concerns which I articulated regarding harassment from females in all of my formal and informal complaints, compared with the relatively severe reaction to concerns articulated by females to Equity about me, a male, represents "patterns of decision-making that [ ] tend to show the influence of gender."

1633. Furthermore, in an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students." In making this assertion, there was clear selective enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

1634. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

<u>**Count 136**</u>
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Deliberate Indifference**
**NU**

1635.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1636.   To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id.

1637.   Plaintiff specifically realleges paragraphs 66-79.

1638.   Plaintiff specifically realleges paragraph 301-455.

1639.   Plaintiff specifically realleges paragraphs 201-593.

1640.   NU had constructive notice of Plaintiff's stalking sexual misconduct and harassment complaints both during the initial phone call to suspend him on 8/23/20, and in actual notice during the multiple times he mentioned it in formal and informal complaints after the suspension and prior to his expulsion.

1641.   Stalking is considered sexual harassment under NU sexual misconduct policy, and therefor is "sexual" harassment.

1642.   The Sexual Harassment Incidents which Plaintiff experienced: "Stalking" is officially categorized as "sexual" misconduct by the University.
   a.   Stalking Incident 1 – Information Posted on Group Chat
   b.   Stalking Incident 2 – Frog Picture Posted and Defamatory Statements Made
   c.   Stalking Incident 3 – 1:08 AM Threatening Phone Call and Recording
   d.   Stalking Incident 4- 1:18 AM Threatening Phone Call and Recording

1643.   Further Impact and Results of Gargula's Harassment which NU was completely indifferent to:
   a.   Getting Plaintiff banned from Discord Chat
   b.   Getting Plaintiff banned from GroupMe chat
   c.   Getting Plaintiff suspended.
   d.   Causing RAMPANT negative speculation among the class about my mental health and general fitness and character.
   e.   Causing Tessa Wiel to harass him on Discord.
   f.   Causing Ishani Choksi to harass him on Facebook.
   g.   Causing Mona Dugo to harass Plaintiff by illegally contacting his therapist and feloniously sharing the illegal audio tape that Evangeline produced of the of time when she threatened him at 1:00AM with a phone call.
   h.   Causing NUPD Detective Lee to relentlessly harass him with no more than five different intimidating and threatening phone calls to date.
   i.   Causing Eric Chin to illegally suppress and prevent him lawful police report by illegally contacting Chicago Police and ILLEGALLY disclosing my mental health information to the detective in order to illegally have my lawful report (JD395768) cancelled WITHOUT INVESTIGATION.
   j.   Causing, indirectly, Northwestern to contact his sister, Sophia Syed, against his permission and without his knowledge or consent. On information and belief, Plaintiff's sister was contacted in order to secure negative information about Plaintiff for use during any potential litigation resulting from his unjust and unwarranted expulsion.

1644.   Due to his bipolar disorder, Plaintiff was not able to consent to Evangeline aggressive predatory behavior because of his intermittent disability and associated mood and temperament issues.

1645.   Both Gargula and Plaintiff alleged discrimination and the basis of a protected class resulting from the same interaction, and Gargula's on the basis of gender were enforced and Plaintiff's on the basis of stalking sexual misconduct or disability were not enforced, due solely to his gender.

1646.   As indicated in the specifically realleged section, Evangeline Gargula conducted a course of action towards Plaintiff in and around 8/23/20 that undeniably constituted stalking, however, despite filing some 10-15 different complaints with increasingly detailed information about the stalking, NU and in particular, Amanda DeSilva, Colleen Johnston, and Karen Tamburro took a sick, sadistic pleasure in finding some obscure and ridiculous reason for not addressing Plaintiff's complaint. Indeed, at one point Plaintiff was told by Amanda DeSilva that Plaintiff was not stalked because the "stalking was not based on a protected class." The three are vicious and sadistic felons who took pleasure in inflicting the extended pain and torture of the unwarranted suspension and expulsion upon Plaintiff, often times smiling and smirking venomously when interacting with Plaintiff and denying the substance of his concerns. As indicated in the complaint, Karen Tamburro has never addressed a single one of the over 100 different complaints which he sent to her as a result of his harassment and discrimination in 2019 and 2020. Indeed, the scale of her omissions and failures to address Plaintiff's concerns is one of the most disturbing and unsettling parts of his case.

1647.   Tamburro, DeSilva, and Johnston employed the most irrational, illogical, and incoherent reasoning and rationale to avoid addressing the Plaintiff's concerns that their responses were often times completely unintelligible. They made up exceptions and exemptions to every rule so that they could avoid addressing Plaintiff's concerns, such as a "mutual contact" exemption in response to Plaintiff's complaint about the stalking and harassment committed by Gargula, wherein they excused Gargula's stalking and harassment towards Plaintiff because her and Plaintiff were somehow in "mutual contact" when the initial disability harassment post was made by Gargula, even thought she initiated the harassment. This exemption only applied to her harassment towards Plaintiff and not, as the name implies, mutually between the parties. In this way, they enforced and supported her vicious hate crimes of stalking and felony eavesdropping while punishing Plaintiff for reacting to her harassment.

1648.   Plaintiff initiated at least 10 different complaints for stalking sexual misconduct, establishing a clear pattern of offensive behavior with increasingly detailed information, each in response to NU claiming there was "not enough information" to initiate an actual investigation. Where NU's response to Plaintiff's complaints was always the same, regardless of what the complaint contained, and not a single one has been investigated or adequately addressed to date. Over 100 legitimate complaints, both formal and informal, and relating to a variety of class-based discrimination concerns have all been dismissed over and over for illegitimate reasons. On information and belief, Desilva, Tamburro, and Johnston have deliberately devised strategies to attempt to evade Plaintiff's legitimate concerns and conspired to retaliate against Plaintiff without creating a clear line of accountability or visibility of his discipline or for their own heinous and predatory misconduct. On information and belief, Tamburro, Desilva, Johnston, Depilla, Cohen, Christain, Faith-Okar and other NU staff have been involved in a coordinated and deliberate effort to expel Plaintiff using felonious and conspiratorial means.

1649.   Remarkably, in the total over 100 different complaints to NU for class-based harassment on different basis', Tamburro's response to every single one has been to not investigate the complaint in any way, shape or form due to "lack of information." Tamburro has never actually investigated any allegation made by Plaintiff, regardless of the substance or severity. Plaintiff wants Karen Taburro charged with one count of deliberate indifference for every complaint she deliberately ignored detailing his pervasive and severe harassment, and will not settle his suit or otherwise negotiate with NU unless she is terminated from her position and charged as such.

1650.   Plaintiff was suspended from school and prevented from accessing all school activities or learning. He was eventually unjustly expelled over this incident.

1651.   In sum, the university was deliberately indifferent to known sexual harassment against Plaintiff so that university's response to that harassment was unreasonable, in that that Plaintiff and white female classmate reported each other for sexual assault occurring from the same encounter, but university chose to pursue disciplinary action against male student while failing to bring any charges against female classmate, and that university did not allow male student to assert any counterclaim or defense, took no action against female classmate for violating a confidentiality order, and failed to respond to male's complaints of female student's violation of no contact order when she requested the order on the male student and then contacted him afterwards in order to deliberately provoke a response, as she had during their original encounter.

1652.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against him in violation of Title IX of the Education Amendments of 1972;

b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.   Award attorney's fees and costs; and

h.   Award such other relief as the Court deems just and proper.


### Count 137
### Violation of Title IX of the Education Amendments of 1972
### 20 USC § 1681(a), et seq.
### Archaic Assumptions
### NU


1653.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1654.   The "archaic assumptions" standard, which has been applied where plaintiffs seek equal [educational] opportunities, finds discriminatory intent in actions resulting **\*639** from classifications based upon archaic assumptions. *See Pederson v. La. State Univ.,* 213 F.3d 858, 880–82 (5th Cir.2000); *see also Horner,* 206 F.3d at 693 n. 4 (discussing the pre-rehearing opinion in *Pederson*). Mallory v. Ohio Univ., 76 Fed. Appx. 634, 638–39 (6th Cir. 2003)

1655.   Where NU representative Amanda Desilva told Plaintiff he was not stalked because the stalking was not "based on a protected characteristic" when it was based on offenders perception that Plaintiff was under an "assumed identity" and engaged in a "psyop" where he was attempting to engage with the class and participate in normal school activities like the rest of the students.

1656.   Cohen and Depilla employed the archaic assumption that men are violent in reaching their conclusion of Plaintiff's guilt in the 2019 UHAS Hearings Process.

1657.   Desilva and Dugo and Johnston employed the archaic assumption that males are always dangerous and violent and that only women are able to be stalked. They told Plaintiff that "males cannot be stalked because the contact is not on the basis of a protected class. They employed the archaic assumption that women cannot be aggressive or predatory stalkers by excusing Gargula's aggressive and predatory and malicious sexual misconduct as "mutual contact."

1658.   Furthermore, NU representatives made the archaic and outdated assumption that the male is always the aggressor in situations involving male-female conflicts.

1659.   Furthermore, NU made the implicit and unwarranted assumption that males are always referring to physical violence, and/or that males are violent, in reaching the conclusions of Plaintiff's threat to the safety of others based off of the felony audio tapes which they feloniously listened to in the course of their malicious and predatory conspiracy to deprive Plaintiff of his rights under Title IX.

1660.   NU alleged that Plaintiff's threats of legitimate legal action in this very court equate to "highly inappropriate communication" as stated by defense counsel Scott Warner. In doing so, Warner made the

implicit archaic assumption that Plaintiff was violent based off his gender and disability status. Warner knowingly defamed Plaintiff in making the malicious and predatory accusation that Plaintiff "punched" someone "in the face" when he is fully aware that there is **NO EVIDENCE**, aside from the ***unsubstantiated allegations*** of a single person, that Plaintiff "punched" anyone "in the face." Furthermore, in making his malicious and defamatory and conspiratorial accusations, he is committing clear misconduct in violation of FCRP Rule 11, and Plaintiff moves for his immediate sanction under Rule 11 for their malicious, dishonest, oppressive, and predatory misconduct in intentionally attempting to deprive an innocent young student with disabilities of his lawful right to education using materially false allegations and malicious and deliberately constructed lies and deceit.

1661.  WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

i.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

j.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

k.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

l.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

m.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

n.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

o.  Award attorney's fees and costs; and

p.  Award such other relief as the Court deems just and proper.

## COUNT 138
## 20 U.S.C. § 1681, *et seq.*
## TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
## Hostile Education Environment/Sexual Harassment

1662.  Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1663.  Complaint alleging Title IX violations must plead sufficient factual allegations to allow court to draw reasonable inference that defendant possessed requisite discriminatory intent. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018) Title IX is enforceable through judicially implied private right of action, through which monetary damages are available. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To establish hostile environment claim under Title IX, plaintiff must allege that his educational experience was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter conditions of victim's educational environment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. A Title IX hostile-environment claim is analogous to a Title VII hostile-environment claim. *Claiborne Cty.*, 103 F.3d at 515; *see also Tumminello*, 678 Fed.Appx. at 284. Under this theory of liability, the plaintiff must allege that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotation marks omitted). Id. *Meritor* standard for determining whether conduct is actionable under Title VII as "abusive work environment" harassment requires objectively hostile or abusive environment—one that reasonable person would find hostile or

abusive—as well as victim's subjective perception that environment is abusive. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)

1664.   Plaintiff specifically realleges paragraphs 66-79.

1665.   Plaintiff specifically realleges paragraphs 301-455.

1666.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

1667.   Defendant receives federal financial assistance for research and development.

1668.   Plaintiff's gender is protected by Title IX.

1669.   During the events herein, Plaintiff was a matriculated student and in attendance at NU.

1670.   Plaintiff was subject to harassment from Evangeline Gargula when she stalking and harassed Plaintiff in violation of NU stalking sexual misconduct policy, all without his affirmative consent.

1671.   Gargula's harassment was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's education and created an abusive educational environment for Plaintiff and constituted a continuing violation.

1672.   Plaintiff reported the sexual harassment to representatives of NU who had authority to address the discriminatory harassment.

1673.   NU's representatives failed to adequately respond to or address the harassment. Indeed, NU's representative acted with deliberate indifference with respect to the sexual harassment of Plaintiff.

1674.   NU's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and NU is liable to Plaintiff.

1675.   Indeed, whereas NU has the right and does initiate Title IX disciplinary actions on behalf of alleged female victims of sexual harassment, NU did not bring an action against Gargula on Plaintiff's behalf. Moreover, NU disallowed Plaintiff from asserting a counter claim or defense against Gargula regarding in connection with his allegations.

1676.   NU's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and NU is liable to Plaintiff.

1677.   By reason of the sexual harassment Plaintiff has suffered and continues to suffer, and Plaintiff is entitled to all legal and equitable remedies available under Title IX, including an award of punitive damages, attorneys' fees and costs.

1678.   Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

1679.   By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

1680.   Both the 2020 Group Chat environment and the 2019 sexual harassment environment were hostile environments which changes the educational environment and opportunities for plaintiff as indicated.

a.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

b.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

c.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

d.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

e.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

f.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

g.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

h.  Award attorney's fees and costs; and

i.  Award such other relief as the Court deems just and proper.

## Count 139
## Violation of Equal Protection
## NU

1681.  Plaintiff realleges paragraphs 1-593 of this Complaint as though fully rewritten herein.

1682.  Plaintiff specifically realleges paragraphs 66-79.

1683.  Plaintiff specifically realleges paragraphs 301-455.

1684.  Plaintiff specifically realleges paragraphs 211-253.

1685.  Plaintiff specifically realleges paragraph 303.

1686.  To establish equal protection violation, plaintiff must allege that state made distinction that burdened fundamental right, targeted suspect class, or intentionally treated one differently from others similarly situated without any rational basis for difference. U.S. Const. Amend. 14. Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018)

1687.  Evaline was a similarly situation female who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. They are both incoming 1L students who were making comments on a school group chat which were against school policy, and only Plaintiff was suspended. Gargula was not disciplined or addressed whatsoever for her malicious felonious actions.

1688.  The Three Sexual Harassment Incidents which Plaintiff experienced: "Stalking" is officially categorized as "sexual" misconduct by the University.

a.  Stalking Incident 1 – Information Posted on Group Chat (8/22/20)

b.  Stalking Incident 2 – Frog Picture Posted and Defamatory Statements Made (8/22/20)

c.  Stalking Incident 3 – 1:08 AM Threatening Phone Call (8/23/20)

1689.  Tessa Weil was a similarly situation female who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. They were both incoming 1L students who were making comments on a school group chat which were against school policy, and only he was suspended. Tessa was not even spoken to.

1690.  Meegan Mayer was a similarly situation female who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. They are both incoming 1L students who were making comments on a school group chat which were against school policy, and only he was suspended. Meegan was not even spoken to.

1691.  Andrienne Ou was a similarly situation female who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. They are both incoming 1L students who were making comments on a school group chat which were against school policy, and only Plaintiff was suspended. Andrea was not even spoken to and neither were any of the other nearly 7 similarly situated Non-Muslim, harassing students without disabilities, all of which were white, and only one of which was male who participated in the group attack on me in the group chat.

1692.  Every single complaint (100%) that Plaintiff has filed with the Office of Equity or with NU in general has been determined not to state a cause for investigation or action of any kind whatsoever. I have filed at least 100 different complaints with that office for a variety of different concerns, not a single one was adequately addressed. Moreover, no concern was ever shown for my distress from any of the incidents.

1693.  During Fall 2019 Semester, he was viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment accusations from a white female student which were never shared with him. This culminated in a discussion with the entire law class about him taking place on the chat, which he was not allowed to participate in because a group of students at

the law school kept on removing him from the group, and resulted in almost the entire school treating him like he was a sexual predator. Despite full awareness of the tremendous emotional distress that this created on him, the Office of Equity took no action to address his concerns.

1694.   In 2019, Equity failed to meaningfully or actionably address a formal complaint Plaintiff filed over unwanted physical contact by Muaaz M. and Usama I. (other similarly situated law students) in relation to an incident which occurred on 11/1/19.

1695.   April 2020 - Forensic Threat Evaluation - During this evaluation, Plaintiff was asked questions about an incident which occurred in late August 2019 wherein an unidentified female claimed that Plaintiff "grazed her butt." Plaintiff faced disciplinary action due to this allegation earlier in the year, however, when Plaintiff told administration that Plaintiff was assaulted by Osama, Muaaz, and Usama, the law school failed to take any action of any kind on my behalf. In this manner the school administration violated title IX by treated Plaintiff differently than a female who made similar allegations of unwanted physical contact against him, by not investigating his concern while they investigated the allegations made by the female and noted the incident in his school disciplinary record.

1696.   DeSilva addressed multiple "concerns" articulated by all female students and staff, most if not all of whom were white, in a meeting with him on August 6th, 2020.

1697.   The concerns articulated by females for "unwanted contact" were noted on his permanent student record, as indicated by his forensic threat assessment, whereas none of the complaints which Plaintiff articulated about "harassment," "stalking," "battery," or any other form of concern were ever actionably or meaningfully addressed by Equity at any time during his time at this university.

1698.   The notice the Plaintiff received confirms the statements and attitude articulated by DeSilva and Truelove which indicated that they were investigating the "concerns" of these white females even absent the presence of a formal complaint. Thereby indirectly displaying the bias attitude of representatives of Equity present during that meeting, who prioritize investigating the informal "concerns" of females over the formal complaints of Plaintiff, a male.

1699.   During Fall 2020 Semester, Plaintiff was viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment from a white female student which unquestionably met the university standards for harassment. Despite full awareness of the tremendous emotional distress that this created on him, the Office of Equity took no action to meaningfully or actionably address his concerns.

1700.   The exact same exchange of private messages between Plaintiff and Evangeline was deemed "mutual contact" in response to his harassment complaint against her, a white female. Whereas, her complaint against Plaintiff resulted in my immediate suspension, for the exact same exchange of messages.

1701.   Equity willfully and deceptively evaded Plaintiff's request to investigate Evaline for malicious school policy use in violation of the University policy, due to the fact that she deceptively failed to show investigators the messages that she posted about him in the group chat, which included his private information, disparaging and substantially offensive remarks which caused him significant emotional distress because of his mother's death, and a picture of a frog with the caption "airhead" underneath it, all of which were unprovoked and directly caused the remarks which she later reported. Nor did she tell investigators that she had placed a call to him at 1:08 AM in a threatening manner prior to receiving the messages that she claimed "threatened her safety."

1702.   In another blatant act of gender-bias in decision making, the University stated multiple times that Gargula did not initiate the conduct process against him. This further substantiates the notion that Equity prioritized the concerns of a white female, which were about a male and not formally reported, over his concerns, which were about a female and were formally reported. This can be seen in that they launched in investigation into Plaintiff's comments and stated that none of Gargula's conduct was harassment, nor did they forward his complaints to the appropriate student conduct resource as is clearly stated in their own institutional equity policy.

1703.   Despite filing complaints against several female students, Equity did not deem even a single concern in his complaint to be worthy of investigation.

1704.   The deliberate disregard for any concerns which Plaintiff articulated regarding harassment to Equity was shared by Colleen, DeSilva, and Truelove. Therefore, given the positions and seniority of each of

these respective individuals in the office, and their number in comparison to the total number of resources staffed in the office, these three individuals therefore represent a statistically representative sample and by implication evidence the gender bias displayed by the Office of Equity in their decision-making process.

1705.   The deliberate disregard for any concerns which Plaintiff articulated regarding harassment from females in all of his formal and informal complaints, compared with the relatively severe reaction to concerns articulated by females to Equity about Plaintiff, a male, represents "patterns of decision-making that tend to show the influence of gender."

1706.   Male student plausibly pled that director of public university's office of ethics and student conflict resolution violated his rights under Equal Protection Clause by alleging that director had received report that both he and female student had engaged in non-consensual sexual acts against each other, in violation of university's sexual misconduct policies, but chose to pursue disciplinary action against him only. U.S. Const. Amend. 14. Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018)

1707.   Plaintiff faced unequal treatment when Northwestern University pursued disciplinary action against him because he was a man, whereas it did not do so with respect to Gargula because she was a woman.

1708.   DeSilva and Colleen and Mona were "operating under 'the same set of operative facts' when [they] decided not to initiate the disciplinary process against [Evaline]." *Doe v. Ohio State Univ.*, 239 F.Supp.3d 1048, 1083 (S.D. Ohio 2017); *see also Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (holding that for individuals to be similarly situated there must be "relevant similarity," but there need not be "exact correlation"). Doe v. Miami Univ., 882 F.3d 579, 596 (6th Cir. 2018)

1709.   The university knew that there was harassment and misconduct occurring in the group chat because they referenced the fact that they had received "multiple reports" about his "comments" when they called him initially to suspend him on 8/23/20. They were constructively informed when Plaintiff spoke to them on the phone during that conversation, and reported the comments in formal and informal reports. Thus, Dugo knew that Gargula had potentially violated the University's sexual misconduct provisions at the same time she reviewed the allegations against Plaintiff. Neither Plaintiff nor Gargula initially initiated a formal complaint themselves regarding the other's conduct, but Dugo chose to pursue disciplinary action against Plaintiff, but not Gargula. These facts show that Gargula and Plaintiff were similarly situated. Dugo had credible information that both students had potentially violated the University's sexual misconduct policy. Dugo, however, chose not to pursue disciplinary action against the female student, but only against the male student. Plaintiff notes that the exact alleged sexual misconduct of each student is not the same.

1710.   [We] have not previously required a plaintiff to allege that the misconduct giving rise to an allegedly discriminatory disciplinary outcome be of the same type and degree. *See Heyne*, 655 F.3d at 571 (holding that the plaintiff sufficiently pleaded an equal-protection claim when he alleged that he was punished more harshly for running over another student's foot with his vehicle than the other student was for threatening the plaintiff's life because of the different races of the two students). Doe v. Miami Univ., 882 F.3d 579, 597 (6th Cir. 2018)

1711.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

q.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

r.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

s.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

t.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

u.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

v.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

w.  Award attorney's fees and costs; and

x.  Award such other relief as the Court deems just and proper.

### Count 140
### BREACH OF CONTRACT - SEX DISCRIMINATION
### NU

1712.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1713.   The Handbook is a valid, binding and enforceable contract between the University and Plaintiff.

1714.   The Handbook is and was supported by valid consideration.

1715.   Plaintiff fully complied with all of his obligations under the Handbook.

1716.   The University breached its obligations under the Handbook by, inter alia, conducting a fundamentally unfair hearing, improperly placing the burden of proof on Plaintiff, failing to have UHAS members properly trained and prepared to adjudicate a sexual assault allegation, failing to involve in the hearing someone competent to testify about medical evidence, not providing Plaintiff with a competent advisor, rushing to a final judgment without hearing all relevant evidence, and making irrational, prejudicial and improper decisions about which witnesses could and could not testify. The University also did not limit repetitive testimony, discussion or witness material.

1717.   Plaintiff has incurred, and will continue to incur, significant damage as a direct result of the University's breaches of the Handbook in an amount to be determined at trial.

1718.   The relationship between Plaintiff and NU University is contractual in nature. One of the terms of that contract is NU University's express promise not to discriminate against Plaintiff on the basis of his sex. NU's contractual commitment is set forth in the NU University Student Handbook which states that "NU University provides equal educational opportunities to its students with regard to race, color, origin, sex, sexual orientation, national ethnic origin, age, disability or veteran status. The University prohibits discrimination on any of these bases and takes steps necessary to remedy any instances of such discrimination."

1719.   NU's suspension of Plaintiff and its refusal to allow Plaintiff to attend class is graduate is intentionally discriminatory against Plaintiff on the basis of his sex. Both the investigators and 2/3 of the ultimate decision-maker regarding Plaintiff's punishment were female. The female in his case was not given punishment than Plaintiff, despite having engaged more egregious conduct. Moreover, Plaintiff was given more punishment than all the other females involved in his harassment combined for unequal conduct as found by NU's own investigation. Plaintiff was undeniably held to a higher standard than the female students.

1720.   NU's punishment of Plaintiff breached its contractual obligations because Plaintiff was given the more severe punishment than females who engaged in far more egregious conduct. NU's punishment of Plaintiff was based solely on his sex (male), and not based upon his culpability under the Code. Further, numerous female students who participated in the group chat harassment, who engaged in far more egregious conduct than Plaintiff, were afforded no punishment at all from NU.

1721.   Plaintiff has been harmed by NU's unlawful conduct and seeks actual damages as well as injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks all applicable attorneys' fees and costs available under this cause of action.

a.  WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

b.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

c.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

d.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

e.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

f. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

g. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

h. Award attorney's fees and costs; and

i. Award such other relief as the Court deems just and proper.

## Count 141
## Breach of Covenant of Good Faith and Fair Dealing
## NU

1722.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 593 as if fully set forth at length herein.

1723.   Based on the aforementioned facts and circumstances, the University breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with the Plaintiff, as represented by the Student Handbook.

1724.   As a direct and foreseeable consequence of these breaches, the Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

1725.   The Plaintiff is entitled to recover damages for the University's breach of the express and/or implied contractual obligations described above.

1726.   Issuing, pursuant to 28 U.S.C.A. § 2201, a declaration that:

a. The outcome and findings made by the University at Defendant's hearing regarding Title IX and also regarding his 2019 false imprisonment be reversed;

b. Defendant's reputation be restored;

c. Defendant's disciplinary record be expunged;

d. The record of Defendant's expulsion the University be removed;

e. Any record of Defendant's Formal Grievance Hearing be permanently destroyed; and

f. The University's rules, regulations, and guidelines are unconstitutional as applied.

1727.   Awarding Plaintiff compensatory damages for the injuries he has suffered, including consequential and incidental damages, as a result of University's wrongful conduct in an amount to be determined at trial.

1728.   Awarding Plaintiff special damages in an amount to be determined at trial.

1729.   Awarding Plaintiff punitive damages in a just amount for University's willful and wanton conduct.

1730.   Awarding Plaintiff prejudgment and post-judgment interest.

1731.   Awarding Plaintiff his costs, expenses, and attorney's fees incurred in connection with this action.

1732.   Awarding Plaintiff such other relief as the Court finds just and proper.

## Count 142
## Estoppel and Reliance
## (NU)

1733.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 593 as if fully set forth at length herein.

1734.   The University's regulations and other standards, procedures and policies and principles constitute representations and promises that the Plaintiff should have reasonably expected to induce action or forbearance by the University.

1735.   The University expected or should have expected the Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied

promises that the University would not tolerate, and the Plaintiff would not suffer, harassment by fellow students and would not deny the Plaintiff his procedural rights should he be accused of a violation of the University's regulations or Student Handbook.

1736.   The Plaintiff relied to his detriment on these express and implied promises and representations made by the University.

1737.   Based on the foregoing, the University is liable to the Plaintiff based on promissory estoppel.

1738.   As a direct and foreseeable consequence of these breaches, the Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

1739.   As a result of the foregoing, Plaintiff is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

## Count 143
## Negligent/Intentional Infliction of Emotional Distress
### (NU)

1740.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 593 as if fully set forth at length herein.

1741.   During the 2020 expulsion process, the university acted in a shocking, outrageous and extreme manner by, inter alia, conducting a flawed investigation, refusing to consider exculpatory evidence, refusing to seek assistance from trained professionals in the medical community, and holding a fundamentally unfair and flawed hearing that culminated in a decision to impose discipline that has permanently damaged Plaintiff.

1742.   As a direct and proximate result of the University's actions, Plaintiff has been publicly humiliated, and felt ashamed, emotionally distraught and violated. The conduct of University demonstrated the intent to cause, or disregard of a substantial probability of causing, Plaintiff severe emotional distress.

1743.   The University's actions were a direct and proximate cause of Plaintiff' severe emotional distress.

1744.   Plaintiff has incurred, and will continue to incur, significant damage as a direct result of University's actions in an amount to be determined at trial.

1745.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
   b.  Award punitive damages;
   c.  Award attorney's fees and costs; and
   d.  Award such other relief as the Court deems just and proper.

## Count 144
## Libel
### (NU)

1746.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 593 as if fully set forth at length herein.

1747.   The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion concerned Plaintiff and was false.

1748.   The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion was widely published and not privileged in any manner.

1749.   The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion was made with reckless disregard of its truth or falsity and/or with malice.

1750.   The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion was libelous per se because it imported a charge of an indictable offense involving moral turpitude and injured Plaintiff's personal reputation.

1751.   The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion forever falsely labels and permanently damages Plaintiff as a student who was expelled from his university for violations that did not occur.

1752.   The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion permanently damages Plaintiff's personal reputation in Illinois and across the country.

1753.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

1754.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

1755.   Issuing, pursuant to 28 U.S.C.A. § 2201, a declaration that:

    a. The outcome and findings made by the University at Defendant's hearing regarding Title IX and also regarding his 2019 false imprisonment be reversed;

    b. Defendant's reputation be restored;

    c. Defendant's disciplinary record be expunged;

    d. The record of Defendant's expulsion the University be removed;

    e. Any record of Defendant's Formal Grievance Hearing be permanently destroyed

a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

b.   Award punitive damages;

c.   Award attorney's fees and costs; and

d.   Award such other relief as the Court deems just and proper.


## Count 145
## Negligence
## (NU)


1756.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 593 as if fully set forth at length herein.

1757.   The University owed duties of care to Plaintiff, including, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of misconduct against him.

1758.   The University breached those duties owed to Plaintiff.

1759.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

1760.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

1761.   WHEREFORE, Plaintiff seeks judgment as follows:

1762.   Issuing, pursuant to 28 U.S.C.A. § 2201, a declaration that:

    a. The outcome and findings made by the University at Defendant's hearing regarding Title IX and also regarding his 2019 false imprisonment be reversed;

    b. Defendant's reputation be restored;

    c. Defendant's disciplinary record be expunged;

    d. The record of Defendant's expulsion the University be removed;

    e. Any record of Defendant's Formal Grievance Hearing be permanently destroyed; and

    f. The University's rules, regulations, and guidelines are unconstitutional as applied.

e.   Awarding Plaintiff compensatory damages for the injuries he has suffered, including consequential and incidental damages, as a result of University's wrongful conduct in an amount to be determined at trial.

f.   Awarding Plaintiff special damages in an amount to be determined at trial.

g. Awarding Plaintiff punitive damages in a just amount for University's willful and wanton conduct.

h. Awarding Plaintiff prejudgment and post-judgment interest.

i. Awarding Plaintiff his costs, expenses, and attorney's fees incurred in connection with this action.

j. Awarding Plaintiff such other relief as the Court finds just and proper.

## Count 146
## Tortious Interference with Contract
## (All named Parties in Law Suit)

1763. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

1764. To establish a tortious interference with contract claim under Illinois law, a plaintiff must s how: (1) the existence of a valid and enforceable contract between the plaintiff and another, (2) the defendant's awareness of the contract, (3) the defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach by the other, caused by the defendant's conduct, and (5) damages. MG Design Associates, Corp. v. CoStar Realty Info., Inc., 267 F. Supp. 3d 1000 (N.D. Ill. 2017)

1765. (1) Plaintiff was at all times relevant enrolled as a JD student at Northwestern University School of Law.

1766. (2) All defendants were at all relevant times aware that Plaintiff was a JD student at Northwestern University School of Law.

1767. (3) The actions of each and every defendant named in this complaint were intentional and unjustified inducements of a breach of the educational contract by NU. These actions include two false imprisonments which devastated the Plaintiff's life and career and produced innumerous and ongoing harm in the Plaintiff's life, and intentionally harming Plaintiff's educational contract through malicious conspiratorial intimidation and subversive misleading and defamatory scheming efforts specifically aimed at inducing Plaintiff's expulsion from the JD program by all parties as described in their actions

1768. (4) NU did in fact breach the contract a result of each defendants conduct, through unjustified application reviews and subsequent deferral, unjustified suspensions without hearing or notice, unwarranted and arduous and defamatory disciplinary proceedings based on bad-faith pretenses and retaliatory motives, imposing countless discriminatory pre-conditions, delays, and obstacles to Plaintiffs return to school which were predicated on threat from Plaintiff's perceived disability, two false imprisonments which devastated the Plaintiff's life and career and produced innumerous and ongoing harm in the Plaintiff's life and ultimately destroyed his potential law career through outrageously cruel and unusual punishment of permanent expulsion with a permanent notion on Plaintiff's transcript which effectively destroyed his ability to pursue law at another institution after enduring years of intentional targeted physical, psychological, and emotional abuse.

1769. Plaintiff was suspended 3 times and ultimately expelled as a result of the actions of all named defendants in the various counts of this complaint.

1770. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

b. Award punitive damages;

c. Award attorney's fees and costs; and

d. Award such other relief as the Court deems just and proper.

## Count 147
## Violation of Title II of the Americans with Disabilities Act (ADA)
## Violation of Title III of the Americans with Disabilities Act (ADA)
## Violation of Section 504 of the Rehabilitation Act

**Violation of Title VI of the Civil Rights Act of 1964**
**Discrimination – Disparate Impact**
**(IBHE)**

1771.   Plaintiff incorporates and realleges the allegations in each of the above paragraphs as if fully set forth in this paragraph.

1772.   Title II of the ADA provides: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

1773.   IBHE  is a "public entity" under Title II of the ADA.

1774.   Upon information and belief, IBHE receives federal funding.

1775.   Upon information and belief, IBHE is a place of "public accommodation."

1776.   **Every Student Succeeds Act: 5/2-3.25n(a) which reads in pertinent part: "The federal Every Student Succeeds Act requires that each state develop and implement a single, statewide accountability system applicable to all schools and school districts."**

1777.   IBHE has failed its statutory duties with respect to creation and maintenance of a single, statewide accountability system applicable to all schools and school districts.

1778.   The lack of external accountability vehicles for complaints of institutional harassment has created a situation where IBHE member institutions, like NU, are not accountable for the harassment which violates the ADA, Section 504, and Title IX, and Title VI, perpetrated by their employees against innocent, and often times vulnerable, students.

1779.   This lack of external accountability creates a disparate impact on students with disabilities, students of minority colors and religions, and students suffering from gender bias.

1780.   The actions and/or failure and omission by IBHE described herein constitute discrimination under the ADA, Section 504, Title IX and Title VI.

1781.   IBHE is likely to continue to deny or limit Plaintiff participation in other School District events and programs.

1782.   Prior to the events described herein, Defendants developed and maintained policies, practices, procedures and customs exhibiting deliberate indifference to the Constitutional rights of Plaintiff, and similarly situtated class members, as defined and protected under the ADA and Section 504, which caused violation of Plaintiffs constitutional and other rights. These policies include failing to perform reasonable monitoring or audits of the discriminatory patterns and practices of the internal grievance and disciplinary procedures of the subordinate institutions in order to maintains standards of transparency, accountability, integrity and fairness among all of the member institutions.

1783.   Plaintiffs suffered harm due to the Defendants' conduct.

1784.   **WHEREFORE**, Plaintiff requests that this Court enter judgment in her favor and against School District as follows:

    a.   A declaratory judgment that IBHE has discriminated against Plaintiff by creating a disparate impact which denied him admission to School District programs and services in violation of Title II of the ADA;

    b.   An order requiring IBHE to allow Plaintiff to participate fully in JD and other programs and events without any further discriminatory restrictions or arbitrary disciplinary actions;

    c.   An order requiring School District to provide any reasonable accommodations or modifications that may be necessary;

    d.   Compensatory damages;

    e.   Attorneys' fees and costs;

    f.   An order requiring IBHE members to undergo ADA and disability awareness training; and

    g.   Such other relief as the Court deems just and proper.

<u>**Count 148**</u>
**CIVIL RIGHTS VIOLATION**

## 42 U.S.C. §1983, MONELL CLAIM
## (IBHE)

1785.   Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

1786.   **Every Student Succeeds Act: 5/2-3.25n(a) which reads in pertinent part: "The federal Every Student Succeeds Act requires that each state develop and implement a single, statewide accountability system applicable to all schools and school districts.";**

1787.   IBHE has failed its statutory duties with respect to creation and maintenance of a single, statewide accountability system applicable to all schools and school districts.

1788.   The lack of external accountability vehicles for complaints of institutional harassment has created a situation where IBHE member institutions, like NU, are not accountable for the harassment which violates the ADA, Section 504, and Title IX, and Title VI, perpetrated by their employees against innocent, and often times vulnerable, students.

1789.   This lack of external accountability creates a disparate impact on students with disabilities, students of minority colors and religions, and students suffering from gender bias.

1790.   The actions and/or failure and omission by IBHE described herein constitute discrimination under the ADA, Section 504, Title IX and Title VI.

1791.   The actions of Defendants resulted from, and were taken, pursuant to a de facto policy of Defendant school district, which is implemented by the Board members, and other employees of the said Defendant, all acting under the color of law, who choose to violate Plaintiff's constitutional rights, without rightful authority of law.

1792.   The existence of the de facto policy described above has been known to supervisory and policy making officers and officials of Defendant school board for a substantial period of time.

1793.   Despite their knowledge of the said illegal policy and practices, supervisory and policy-making officers and officials of the Defendant school board have not taken steps to determine the said practices, have not disciplined or otherwise properly supervised the individual employees who engaged in the said practices, have not effectively trained the Board members and other employees with regard to the proper constitutional and statutory limits on the exercise of their authority, and have instead sanctioned the policy and the practices described herein.

1794.   That PLAINTIFF has a clearly established right to equal access to all benefits and privileges of a public education and a right to be from offensive harassment in school

1795.   That the above actions and omissions by Defendants were deliberate and intentional and have resulted in violations of Plaintiff's, on behalf of PLAINTIFF, rights to equal protection and due process, all in violation of the Fourteenth Amendment to the United States Constitution.

1796.   That by reason of the aforesaid actions, Defendant school district's actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of PLAINTIFF and other similarly situated students, all in violation of his constitutional rights, and as a direct and proximate result thereof, he sustained damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

1797.   That by reason of the aforesaid actions, Plaintiff, on behalf of PLAINTIFF, is entitled to a Permanent Injunction compelling the Defendant school board, or its agents, to cease and desist discriminating against PLAINTIFF and other similarly situated students to assure that PLAINTIFF is no longer harassed, bullied, or assaulted on the premises maintained and controlled by Defendant school board.

1798.   It has been necessary for the Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

1799.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b.   Award punitive damages;

    c.   Award attorney's fees and costs; and

    d.   Award such other relief as the Court deems just and proper.

## Count 149
## CIVIL RIGHTS VIOLATION
## 42 U.S.C. §1983, MONELL CLAIM
## (NU, NUPD)

1800.   Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth

1801.   The actions of Defendants resulted from, and were taken, pursuant to a de facto policy of Defendant school which is implemented by the Office of Equity and the Office of Community Standards, as well as the NUPD, and other employees of the said Defendant, all acting under the color of law, who choose to violate Plaintiff's constitutional rights, without rightful authority of law.

1802.   The existence of the de facto policy described above has been known to supervisory and policy making officers and officials of Defendant school for a substantial period of time.

1803.   Despite their knowledge of the said illegal policy and practices, supervisory and policy-making officers and officials of the Defendant school have not taken steps to determine the said practices, have not disciplined or otherwise properly supervised the individual employees who engaged in the said practices, have not effectively trained the Office of Equity and the Office of Community Standards, as well as the NUPD, and other employees with regard to the proper constitutional and statutory limits on the exercise of their authority, and have instead sanctioned the policy and the practices described herein.

1804.   That PLAINTIFF has a clearly established right to equal access to all benefits and privileges of a public education and a right to be from offensive harassment in school

1805.   That the above actions and omissions by Defendants were deliberate and intentional and have resulted in violations of Plaintiff's rights to equal protection and due process, all in violation of the Fourteenth Amendment to the United States Constitution.

1806.   That by reason of the aforesaid actions, Defendant school district's actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of PLAINTIFF and other similarly situated students, all in violation of his constitutional rights, and as a direct and proximate result thereof, he sustained damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

1807.   That by reason of the aforesaid actions, Plaintiff, on behalf of PLAINTIFF, is entitled to a Permanent Injunction compelling the Defendant school, or its agents, to cease and desist discriminating against PLAINTIFF and other similarly situated students to assure that PLAINTIFF is no longer harassed, bullied, or assaulted on the premises maintained and controlled by Defendant school.

1808.   It has been necessary for the Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

1809.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;
   b.   Award punitive damages;
   c.   Award attorney's fees and costs; and
   d.   Award such other relief as the Court deems just and proper.

## Count 150
## *CIVIL RIGHTS VIOLATION*
## *42 U.S.C. §1983, EQUAL PROTECTION*
## (AGAINST ALL DEFENDANTS)

1810.   Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

1811.   That the above actions by Defendants have resulted in the denial of equal protection rights, as a "class of one," all in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was

retaliated against, harassed, disciplined against, intimidated, and required to withdraw from school, all against his will, and differently than those similarly situated students.

1812.   That the actions of Defendants were the result of personal animus against the Plaintiff and PLAINTIFF, and said actions and denials were taken without any rational basis.

1813.   That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of PLAINTIFF and other similarly situated students, all in violation of his constitutional rights.

1814.   As a result of Defendants' actions, PLAINTIFF suffered and continues to suffer a deprivation of his rights secured to him by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

1815.   That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

1816.   The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Plaintiff is entitled to punitive damages.

1817.   It has been necessary for Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

1818.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 151
### CIVIL RIGHTS VIOLATION
### 42 U.S.C. §1983, SUBSTANTIVE DUE PROCESS
### (AGAINST ALL DEFENDANTS)

1819.   Plaintiff incorporates by reference all the above related paragraphs with the same force and effect as if herein set forth.

1820.   That PLAINTIFF has a clearly established right to equal access to all benefits and privileges of a public education and a right to be free from said illegal practices and policies.

1821.   The actions of the Defendants, as described above, were arbitrary and capricious, and were not rationally related to any legitimate interest.

1822.   As a result of Defendants' actions, PLAINTIFF suffered and continues to suffer a deprivation of his rights secured to him by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

1823.   That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

1824.   The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Plaintiff is entitled to punitive damages.

1825.   It has been necessary for Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

1826.   *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 152
### Fourth Amendment: Seizure

**(FBI Defendants)**

1827.  Plaintiff incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

1828.  On 1/21/21 at approximately 2:21 PM, Special Agent Boertie and "TFO" Ferguson came to Plaintiff's residence at 244 E Pearson St. and forcibly interrogated him for nearly 45 minutes about vague and obscure and unspecified concerns. When Plaintiff asked the agents on more than 3 separate occasion to explain why they came to Plaintiff's residence, Boertia proceeded to explain that there were four "incidents" which caused him concern: (1) Plaintiff's expunged criminal record from June 2018, records which have been destroyed and only NU had access to original copies of which Plaintiff had provided to NU prior to having them expunged (2) Plaintiff's police report to Chicago Police about an NU student eavesdropping, (3) the messages which led to 20 OP 20532 order involving NU employee Mona Dugo, and (4) the false arrest 20DV2080601 which Dugo had perpetrated upon Plaintiff. The agent made several strange and vague assertions of a "safety" concern resulting from these occurrence's despite the fact that the expunged record is nearly 3 years old, Plaintiff was the victim in his eavesdropping report to Chicago Police, a series of emails and text messages of a remarkably non-threatening nature led Dugo to seek a protection order by deliberately misrepresenting the nature of the emails, which clearly threatened _legal_ action, as suggesting that they threatened her physical safety. This is when the was never a single threat to the physical safety of anyone made at any time by the Plaintiff, and the fact that the false arrest was also predicated on a single email which contained no threats and was a report of Dugo's unlawful contact with Plaintiff's sister and therapist and lies that Dugo told about being concerned for her own physical safety.

1829.  In detaining Plaintiff without charging him with any crime and without affording him a hearing before a neutral judicial officer to determine whether there was probable cause to justify their continued detention, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly seized Plaintiffs and class members in violation of the Fourth Amendment to the United States Constitution.

1830.  Plaintiffs and class members have no effective means of enforcing their Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

1831.  As a result of Defendants' unlawful conduct, Plaintiffs and class members have suffered emotional distress, humiliation, embarrassment, and monetary damages.

1832.  **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 153
### Fifth Amendment: Due Process
### (FBI Defendants)

1833.  Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

1834.  On 1/21/21 at approximately 2:21 PM, Special Agent Boertie and "TFO" Ferguson came to Plaintiff's residence at 244 E Pearson St. and forcibly interrogated him for nearly 45 minutes about vague and obscure and unspecified concerns. When Plaintiff asked the agents on more than 3 separate occasion to explain why they came to Plaintiff's residence, Boertia proceeded to explain that there were four "incidents" which caused him concern: (1) Plaintiff's expunged criminal record from June 2018, records which have been destroyed and only NU had access to original copies of which Plaintiff had provided to NU prior to having them expunged (2) Plaintiff's police report to Chicago Police about an NU student eavesdropping, (3) the messages which led to 20 OP 20532 order involving NU employee Mona Dugo, and (4) the false arrest

20DV2080601 which Dugo had perpetrated upon Plaintiff. The agent made several strange and vague assertions of a "safety" concern resulting from these occurrence's despite the fact that the expunged record is nearly 3 years old, Plaintiff was the victim in his eavesdropping report to Chicago Police, a series of emails and text messages of a remarkably non-threatening nature led Dugo to seek a protection order by deliberately misrepresenting the nature of the emails, which clearly threatened *legal* action, as suggesting that they threatened her physical safety. This is when the was never a single threat to the physical safety of anyone made at any time by the Plaintiff, and the fact that the false arrest was also predicated on a single email which contained no threats and was a report of Dugo's unlawful contact with Plaintiff's sister and therapist and lies that Dugo told about being concerned for her own physical safety.

1835.   In detaining Plaintiff without any legitimate law enforcement purpose, and without evidence that he posed a danger to the safety of anyone, Defendants, acting under color of law and their authority as federal officers, intentionally or recklessly subjected Plaintiff to arbitrary and capricious detention, taking his liberty without due process of law in violation of the Fifth Amendment to the United States Constitution.

1836.   By adopting, promulgating, and implementing the policy and practice under which Plaintiff was unreasonably detained and subjected to outrageous, excessive, and degrading conditions of confinement, Defendants, acting under color of law and their authority as federal officers, have intentionally or recklessly deprived Plaintiff of their liberty interests without due process of law in violation of the Fifth Amendment to the United States Constitution.

1837.   Plaintiff has no effective means of enforcing their Fifth Amendment due process rights other than by seeking declaratory and other relief from the Court.

1838.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

1839.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>Count 154</u>
### Fifth Amendment: Equal Protection
### (FBI Defendants)

1840.   Plaintiff incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

1841.   On 1/21/21 at approximately 2:21 PM, Special Agent Boertie and "TFO" Ferguson came to Plaintiff's residence at 244 E Pearson St. and forcibly interrogated him for nearly 45 minutes about vague and obscure and unspecified concerns. When Plaintiff asked the agents on more than 3 separate occasion to explain why they came to Plaintiff's residence, Boertia proceeded to explain that there were four "incidents" which caused him concern: (1) Plaintiff's expunged criminal record from June 2018, records which have been destroyed and only NU had access to original copies of which Plaintiff had provided to NU prior to having them expunged (2) Plaintiff's police report to Chicago Police about an NU student eavesdropping, (3) the messages which led to 20 OP 20532 order involving NU employee Mona Dugo, and (4) the false arrest 20DV2080601 which Dugo had perpetrated upon Plaintiff. The agent made several strange and vague assertions of a "safety" concern resulting from these occurrence's despite the fact that the expunged record is nearly 3 years old, Plaintiff was the victim in his eavesdropping report to Chicago Police, a series of emails and text messages of a remarkably non-threatening nature led Dugo to seek a protection order by deliberately misrepresenting the nature of the emails, which clearly threatened *legal* action, as suggesting that they threatened her physical safety. This is when the was never a single threat to the physical safety of anyone made at any time by the Plaintiff, and the fact that the false arrest was also predicated on a single email which

contained no threats and was a report of Dugo's unlawful contact with Plaintiff's sister and therapist and lies that Dugo told about being concerned for her own physical safety.

1842.   In detaining Plaintiffs and class members longer than necessary to secure their removal from the United States and subjecting them to harsh treatment not accorded similarly-situated non-citizens, Defendants, acting under color of law and their authority as federal officers, have singled out Plaintiffs and class members based on their disability, race, religion, and/or ethnic or national origin, and intentionally violated their rights under the Fifth Amendment to the United States Constitution to equal protection of the law.

1843.   Plaintiff has no effective means of enforcing their Fifth Amendment equal protection rights other than by seeking declaratory and other relief from the Court.

1844.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

1845.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 155
### U.S.C.A. Const. Amend. VIII
### Cruel and Unusual Punishment
### (NU)

1846.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

1847.   Amendment VIII provides: Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

1848.   In repeatedly violating Plaintiff's constitutional rights over a period of three full years and culminating in an unjust expulsion wherein a permanent notation was made on Plaintiff's transcript which will prevent him from being able to attend another school or pursue his dream of a legal education while having full knowledge of the various acts which NU and its employees and students subjected Plaintiff to and knowing that it is Plaintiff's greatest goal to achieve a legal education.

1849.   In subjecting Plaintiff to harsh treatment not accorded to similarly-situated students, Defendants, have singled out Plaintiff based on his race, religion, and/or ethnic or national origin, disability and sex and intentionally violated his rights under the Eight Amendment to the United States Constitution to equal protection of the law.

1850.   Where NU acted, through NUPD and EPD, under color of state law to twice deprive Plaintiff of his liberty and property interests without fair notice or due process.

1851.   Plaintiff has no effective means of enforcing Eight Amendment protection rights other than by seeking declaratory and other relief from the Court.

1852.   As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

1853.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 156
### 720 ILCS 5/10-3: Unlawful restraint
### (Student Group #1)

1854.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein

1855.   (a) A person commits the offense of unlawful restraint when he or she knowingly without legal authority detains another.

1856.   (b) Sentence. Unlawful restraint is a Class 4 felony.

1857.   Where defendants did knowingly and without legal authority detain Plaintiff, physically restricting his freedom of movement at the MLSA event on 11/1/19.

1858.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 157
### Violation Consumer Fraud Act: 815 ILCS 505/10, et seq.
### (Husch Blackwell LLP, Northwestern University)

1859.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1860.   The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other *417 unfair and deceptive business practices. It is to be liberally construed to effectuate its purpose. Cripe v. Leiter, 184 Ill.2d 185, 191, 234 Ill.Dec. 488, 703 N.E.2d 100 (1998). Unfair or deceptive practices are described in the Act as: "including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact * * * in the conduct of any trade or commerce * * *." 815 ILCS 505/2 (West 1992).

1861.   Section 10(a) of the Consumer Fraud Act creates a remedy for persons who suffer damage as a result of a violation of the Act committed by another person. 815 ILCS 505/10a(a) (West 1992).

1862.   1011 The elements of a claim under the Act are: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; and (3) the occurrence of the deception during a course of conduct involving trade or commerce. Cripe, 184 Ill.2d at 191, 234 Ill.Dec. 488, 703 N.E.2d 100. Recovery may be had for unfair as well as deceptive conduct. See Saunders v. Michigan Avenue National Bank, 278 Ill.App.3d 307, 313, 214 Ill.Dec. 1036, 662 N.E.2d 602 (1996). Robinson v. Toyota Motor Credit Corp., 201 Ill. 2d 403, 416–17, 775 N.E.2d 951, 960 (2002)

1863.   The Plaintiffs repeat, reallege and reaver paragraphs above as if expressly set forth fully herein.

1864.   The Defendant's willful and intentional conduct constitutes unfair and deceptive trade practices pursuant to **815 ILCS 505/10**, *et seq.* As a direct and proximate result of the Defendant's consumer protection violations, Plaintiff has sustained permanent and irreversible injuries warranting the imposition of treble damages, attorney's fees and costs, and any other form of relief which the Court deems just and proper. All statutory notices have been provided to the Defendant.

1865.   WHEREFORE, the Plaintiff demand judgment against Defendant Northwestern University in an amount the court deems just, together with triple damages, attorney's fees, interest and costs.

## Count 158
### Willful and wanton conduct: 745 ILCS 10/1-210
### (NU Defendants, Individual Hospital Defendants , Individual Defendant NUPD Officers, Individual Defendant EPD Officers)

1866.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1867.   Where Defendants engaged in a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety or well-being of Plaintiff and his protected property interest in the JD program at NU .

1868.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 159
### Discrimination
### Illinois Human Rights Act: 775 ILCS 5/1-101, et seq.
### (NU)

1869.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1870.   Protected Classes Covered: "The Illinois Human Rights Act (IHRA) prohibits discrimination based on actual or perceived: Race; Color; Religion; National origin; Ancestry; Sex; Protective order status; Physical or mental disability; Arrest record; or Expunged or sealed convictions. (775 ILCS 5/1-102, 5/1-103(Q), 5/2-102(A), (I), and 5/2-103(A).)"

1871.   Affected Employers: "[T]he IHRA covers any Illinois employer with at least 15 employees working 20 or more weeks in the current or preceding year (775 ILCS 5/2-101(B)(1)(a))."

1872.   Prohibited Conduct: It is a civil rights violation for an employer, based on one of the classes covered, to: Refuse to hire an applicant; Segregate an employee; Harass a worker; Discriminate regarding: recruitment; hiring; promotion; renewal of employment; selection for training or apprenticeship; discharge; discipline; tenure; or the terms, privileges, or conditions of employment. (775 ILCS 5/2-102(A), (A-10), and (D-5), and 5/2-103(A).)

1873.   Where the actions of NU in various points in the complaint discriminated against Plaintiff on the basis of sex, disability, color, race, religion, national origin, ancestry, mental disability, and arrest record in violation of IHRA.

1874.   Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

1875.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 160
### Conspiracy to Retaliate
### Additional Civil Rights Violations: 775 ILCS 5/6-101, et seq.
### (NU)

1876.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1877.   It is a civil rights violation for a person, or for two or more persons to conspire, to: (A) Retaliation. Retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in elementary, secondary, and higher education, discrimination based on citizenship status in employment, because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation,

proceeding, or hearing under this Act, or because he or she has requested, attempted to request, used, or attempted to use a reasonable accommodation as allowed by this Act; (B) Aiding and Abetting; Coercion. Aid, abet, compel or coerce a person to commit any violation of this Act;

1878.  Where the actions of NU in various points in the complaint provide ample evidence of NU employees conspiratorial activities in retaliation against Plaintiff for complaining both internally and externally about discrimination on the basis of sex, disability, color, race, religion, national origin, ancestry, mental disability, and/or arrest record.

1879.  Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

1880.  *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 161
### Discrimination
### Violation Chicago Human Rights Ordinance: Chi. Mun. Code §§ 2-160-010, et seq.
### (NU)

1881.   The Chicago Human Rights Ordinance (CHRO) prohibits discrimination based on: Race; Color; Sex; Religion; Disability; National origin; Ancestry; or Criminal history. (Chi. Mun. Code § 2-160-030. )

1882.  The CHRO covers all employers that: Employ one or more employees in the current or preceding calendar year. Either or both: are subject to one or more license requirements in Title 4 of the Chicago Municipal Code; or maintain a business facility in Chicago. (Chi. Mun. Code § 2-160-020(dd).)

1883.  An employer cannot discriminate against an individual based on one of the classes covered in: Hiring. Classification. Grading. Discharge. Discipline. Compensation. Any other term or condition of employment. (Chi. Mun. Code § 2-160-030.) The CHRO also prohibits sexual harassment. Employer liability for sexual harassment extends to conduct by non-employees or nonmanagerial and nonsupervisory employees only if the employer both: Becomes aware of the conduct and Fails to take reasonable corrective measures. (Chi. Mun. Code § 2-160-040.) An employer also cannot retaliate against an individual because the individual in good faith: Opposes an incident of unlawful discrimination or sexual harassment or Files a charge or Testifies, assists, or participates in an investigation, proceeding, or action under the CHRO. (Chi. Mun. Code § 2-160-100.)

1884.  Where the actions of NU in various points in the complaint discriminated against Plaintiff on the basis of sex, disability, color, race, religion, national origin, ancestry, mental disability, and arrest record in violation of CHRO.

1885.  Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

1886.  *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 162
## TEMPORARY RESTRAINING ORDER

1887.   Plaintiff requests that this Court immediately enjoin and prevent NU from:
   a.   Expelling Plaintiff from NU University, or otherwise taking any disciplinary action against Plaintiff that would negatively impact his academic record or ability to graduate and obtain employment.
   a.   preventing or delaying Plaintiff's enrollment in Summer 2021, or alternatively, in Fall 2021 because of disciplinary sanctions arising out of the events which occurred on August 23, 2020.
   b.   making any notation of a disciplinary infraction or penalty on Plaintiff's records at NU, including but not limited to Plaintiff's suspension from NU, because said record will be available to the public, other faculty or students, or Plaintiff's prospective employers.
   c.   making any verbal or written statement to the public that relates to Plaintiff's discipline for the events on November 1, 2019 or August 23, 2020, as such statements will irreparably harm Plaintiff's academic standing and future career.

1888.   It is probable that Plaintiff will prevail on the merits of his claims because Defendant's discipline of Plaintiff was a breach of its express and implied contractual agreements with Plaintiff. Moreover, NU negligently misrepresented Plaintiff's right to graduate in the event that Plaintiff completed the academic requirements for graduation. Lastly, the discipline suffered by Plaintiff was discriminatory on the basis of Plaintiff's sex and was in violation of 20 USC § 1681(a).

1889.   If Plaintiff's application for injunctive relief is not granted, harm is imminent because Plaintiff will be permanently expelled from NU and be unable to attend another law school due to the unwarranted permanent marks imposed on his transcript. Plaintiff will not be able to graduate from NU or any other school, despite the fact that he has fulfilled all requirements for enrollment and admission and did so prior to being disciplined by NU. Plaintiff's career will be irreparably harmed because he will be unable to gain employment in any law program, which requires a law degree as a necessary prerequisite. Lastly, Plaintiff will be unable to transfer to another university because of his disciplinary record at NU and the uniform policy at all major educational institutions disallowing transfers for students with disciplinary suspensions and/or expulsions. Furthermore, over 5 years of the Plaintiff's life will have been wasted in his pursuit of admission to the law school at NU.

1890.   Plaintiff has no adequate remedy at law because he cannot be adequately compensated in damages. Plaintiff's injuries cannot be measured by any certain pecuniary standard, due to the impossibility of placing a value on the devastating irreparable harm that Plaintiff will suffer to his career and life if he is not allowed to graduate and obtain gainful employment, and also because of the permanent gap on his resume that will result. Further, Plaintiff has no adequate remedy at law for the damages that will result because of his disciplinary record at NU and the resulting stigma attached to such record. Simply, the damage to Plaintiff's reputation and standing will be irreparable and immeasurable.

1891.   The injury faced by the Plaintiff if injunctive relief is not granted far outweighs any injury that might occur to NU if the request for relief is granted. Indeed, there will be no injury at all to NU. The granting of injunctive relief will also not adversely affect any public policy or public interest.

1892.   Plaintiff's counsel has attempted to serve notice on NU regarding this application so that it may participate in a hearing on this application. Plaintiff is willing to post adequate bond as determined by the Court.

## Count 163
## Eavesdropping: 720 ILCS 5/14-2 (5)
## (Individual NU Defendants)

1893.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1894.        (a) A person commits eavesdropping when he or she knowingly and intentionally: (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a

private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1895.   Where each NU Defendants did, at certain points in the NU disciplinary process, did use the information which was obtained from audio tape #1 made in violation of Eavesdropping 720 ILCS 5/14-2, including Cohen and Ish-Orkar, where they listened to the audio tape and used the information to decide on Plaintiff's guilt during the disciplinary process, where Tamburro and DeSilva and Johnston used the information to decide to charge Plaintiff with alleged violations of equity policy, and where others used the information to make similar decisions on whether to charge Plaintiff or ascertain his guilt at some point on information and belief.

**WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 164
### Eavesdropping: 720 ILCS 5/14-2 (5)
### (Individual NU Defendants)

1896.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1897.       (a) A person commits eavesdropping when he or she knowingly and intentionally: (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1898.   Where each NU Defendants did, at certain points in the NU disciplinary process, did use the information which was obtained from audio tape #2 made in violation of Eavesdropping 720 ILCS 5/14-2, including Cohen and Ish-Orkar, where they listened to the audio tape and used the information to decide on Plaintiff's guilt during the disciplinary process, where Tamburro and DeSilva and Johnston used the information to decide to charge Plaintiff with alleged violations of equity policy, and where others used the information to make similar decisions on whether to charge Plaintiff or ascertain his guilt at some point on information and belief.

1899.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

1900.

### Count 165
### Eavesdropping: 720 ILCS 5/14-2
### (Mona Dugo)

1901.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1902.       (a) A person commits eavesdropping when he or she knowingly and intentionally:

1903.           (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1904.   Dugo disclosing the first phone call to NU in violation of (5) on or around 8/23/20.

1905.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 166
### Eavesdropping: 720 ILCS 5/14-2
### (Mona Dugo)

1906. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1907. (a) A person commits eavesdropping when he or she knowingly and intentionally:
1908. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.
1909. Dugo disclosing the second phone call to NU in violation of (5) on or around 8/23/20.
1910. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 167
### Eavesdropping: 720 ILCS 5/14-2
### (Mona Dugo)

1911.
1912. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1913. (a) A person commits eavesdropping when he or she knowingly and intentionally:
1914. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.
1915. Dugo using first phone call to decide whether Plaintiff made threats to anyone's safety in violation of (5) on or around 8/23/20.
1916. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 168
### Eavesdropping: 720 ILCS 5/14-2
### (Mona Dugo)

1917.
1918. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1919. (a) A person commits eavesdropping when he or she knowingly and intentionally:
1920. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.
1921. Dugo using the second phone call to decide whether Plaintiff made threats to anyone's safety in violation of (5) on or around 8/23/20.
1922. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief;

and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 169
### Eavesdropping.720 ILCS 5/14-2
### (Mona Dugo)

1923.

1924. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1925. (a) A person commits eavesdropping when he or she knowingly and intentionally:

1926. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1927. Dugo disclosing the one of the phone calls to Brian Tobin in violation of (5) on or around 9/29/20.

1928. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 170
### Eavesdropping.720 ILCS 5/14-2
### (Mona Dugo)

1929. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1930. (a) A person commits eavesdropping when he or she knowingly and intentionally:

1931. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1932. Dugo disclosing the second phone call to Eric Chin in violation of (5) on or around 8/23/20.

1933. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 171
### Eavesdropping.720 ILCS 5/14-2
### (Mona Dugo)

1934. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1935. (a) A person commits eavesdropping when he or she knowingly and intentionally:

1936. (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1937. Dugo disclosing the first phone call to Eric Chin in violation of (5) on or around 8/23/20.

1938. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 172

**Eavesdropping.720 ILCS 5/14-2**
**(Mona Dugo)**

1939.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1940.   (a) A person commits eavesdropping when he or she knowingly and intentionally:
1941.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.
1942.   Dugo disclosing the second phone call to Sarah Stark in violation of (5) on or around 8/23/20.
1943.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 173
**Eavesdropping.720 ILCS 5/14-2**
**(Mona Dugo)**

1944.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1945.   (a) A person commits eavesdropping when he or she knowingly and intentionally:
1946.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.
1947.   Dugo disclosing the first phone call to Sarah Stark in violation of (5) on or around 8/23/20.
**WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 174
**Eavesdropping.720 ILCS 5/14-2**
**(Mona Dugo)**

1948.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.
1949.   (a) A person commits eavesdropping when he or she knowingly and intentionally:
1950.   (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.
1951.   Dugo disclosing the second phone call to Sanghoon Lee in violation of (5) on or around 8/23/20.
1952.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 175
**Eavesdropping.720 ILCS 5/14-2**
**(Mona Dugo)**

1953.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1954.        (a) A person commits eavesdropping when he or she knowingly and intentionally:

1955.            (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1956.    Dugo disclosing the first phone call to Sanghoon Lee in violation of (5) on or around 8/23/20.

1957.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

1958.

### Count 176
### Eavesdropping.720 ILCS 5/14-2
### (Sarah Stark)

1959.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1960.        (a) A person commits eavesdropping when he or she knowingly and intentionally:

1961.            (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1962.    Stark disclosing the first phone call to NU in violation of (5) on or around 8/23/20.

1963.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 177
### Eavesdropping.720 ILCS 5/14-2
### (Sarah Stark)

1964.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1965.        (a) A person commits eavesdropping when he or she knowingly and intentionally:

1966.            (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1967.    Stark disclosing the second phone call to NU in violation of (5) on or around 8/23/20.

1968.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 178
### Eavesdropping.720 ILCS 5/14-2
### (Eric Chin)

1969.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1970.        (a) A person commits eavesdropping when he or she knowingly and intentionally:

1971.          (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1972.   Chin using the first phone call to decide whether to charge Plaintiff with a crime in violation of (5) on or around 8/23/20.

1973.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**Count 179**
**Eavesdropping.720 ILCS 5/14-2**
**(Eric Chin)**

1974.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1975.          (a) A person commits eavesdropping when he or she knowingly and intentionally:

1976.          (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties.

1977.   Chin using the second phone call to decide whether to charge Plaintiff in violation of (5) on or around 8/23/20.

1978.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice

**Count 180**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Deliberate Indifference**
**(NU, Mona Dugo)**

1979.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1980.   Plaintiff specially realleges paragraphs 211-281.

1981.   Plaintiff specifically realleges paragraphs 482-556.

1982.   To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id.

1983.   NU had actual notice of numerous disability complaints, both formal and informal, regarding the harassment Plaintiff experienced by students and NUPD on 8/23/20 during the NU Group Chat Incident and afterwards.

1984.   NU had actual notice of numerous disability complaints, both formal and informal, about the conduct of NU employees during the 2020 UHAS hearings process and afterwards.

1985.   Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment a disturbing series of incidents of malicious targeted stalking and harassment which were based upon the offender's perception that Plaintiff had "assumed" the identity of a NU law student and was conducting a "psychological operation" by attempting to attend school and participate in school activities like the other students in the class. These incidents included two disturbing 1:00 AM phone calls which were feloniously recorded, where Plaintiff was deliberately threatened, harassed, and antagonized in a deliberate and coldly calculated effort to extract a response which could be used against him in some sort of legal or criminal action. This was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community followed by a failed attempted coverup of felony evidence which was then used in an unjust expulsion process wherein, unbelievably, every single member of NU staff who heard the audio and made a decision based off of it committed two acts of felony eavesdropping, one for each recording. This was immediately after Plaintiff had finally overcome the last of an absurd series of discriminatory obstacles that NU had placed upon his return to school, all of which were distinctly predicated upon NU's threat from his perceived disabilities.

1986.   After Plaintiff had exposed the poorly attempted coverup of the felony evidence, Dugo and Chin coercively planned and executed a conspiratorial series of retaliatory actions, where they committed obstruction of justice and unlawful intimidation followed by false imprisonment and malicious prosecution.

1987.   The conduct complained about in each complaint was in violation of Section 504.

1988.   All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliberately prevented from accessing all school activities or learning.

1989.   NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

1990.   NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

1991.   On information and belief, Plaintiff has submitted over 20 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

1992.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation of the Rehabilitation Act;

    b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

    e.  Order Plaintiff's disciplinary record removed from his transcript;

    f.  Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

    g.  Award attorney's fees and costs; and

    h.  Award such other relief as the Court deems just and proper.

<u>**Count 181**</u>
**Violation of Title III of the Americans with Disabilities Act (ADA),**
**42 U.S.C. 12101 et seq.**
**Deliberate Indifference**
**(NU, Mona Dugo)**

1993.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

1994.   Plaintiff specially realleges paragraphs 211-281.

1995.   Plaintiff specifically realleges paragraphs 482-556.

1996.   To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id.

1997.   NU had actual notice of numerous disability complaints, both formal and informal, regarding the harassment Plaintiff experienced by students and NUPD on 8/23/20 during the NU Group Chat Incident and afterwards.

1998.   NU had actual notice of numerous disability complaints, both formal and informal, about the conduct of NU employees during the 2020 UHAS hearings process and afterwards.

1999.   Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment a disturbing series of incidents of malicious targeted stalking and harassment which were based upon the offender's perception that Plaintiff had "assumed" the identity of a NU law student and was conducting a "psychological operation" by attempting to attend school and participate in school activities like the other students in the class. These incidents included two disturbing 1:00 AM phone calls which were feloniously recorded, where Plaintiff was deliberately threatened, harassed, and antagonized in a deliberate and coldly calculated effort to extract a response which could be used against him in some sort of legal or criminal action. This was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community followed by a failed attempted coverup of felony evidence which was then used in an unjust expulsion process wherein, unbelievably, every single member of NU staff who heard the audio and made a decision based off of it committed two acts of felony eavesdropping, one for each recording. This was immediately after Plaintiff had finally overcome the last of an absurd series of discriminatory obstacles that NU had placed upon his return to school, all of which were distinctly predicated upon NU's threat from his perceived disabilities.

2000.   After Plaintiff had exposed the poorly attempted coverup of the felony evidence, Dugo and Chin coercively planned and executed a conspiratorial series of retaliatory actions, where they committed obstruction of justice and unlawful intimidation followed by false imprisonment and malicious prosecution.

2001.   The conduct complained about in each complaint was in violation **of Title III of the Americans with Disabilities Act**.

2002.   All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was delieberately prevented from accessing all school activities or learning.

2003.   NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

2004.   NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

2005.   On information and belief, Plaintiff has submitted over 20 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

2006.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation **of Title III of the Americans with Disabilities Act**;

    b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

    e.   Order Plaintiff's disciplinary record removed from his transcript;

    f.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

    g.   Award attorney's fees and costs; and

    h.   Award such other relief as the Court deems just and proper.

<u>**Count 182**</u>
**Violation of Title II of the Americans with Disabilities Act (ADA)**
**42 U.S.C. § 12132, et seq.**
**Deliberate Indifference**
**(NU, Mona Dugo)**

2007.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

2008.   Plaintiff specially realleges paragraphs 211-281.

2009.   Plaintiff specifically realleges paragraphs 482-556.

2010.   To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). <u>Doe v. Miami Univ.</u>, 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). <u>Id.</u> To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). <u>Id.</u>

2011.   NU had actual notice of numerous disability complaints, both formal and informal, regarding the harassment Plaintiff experienced by students and NUPD on 8/23/20 during the NU Group Chat Incident and afterwards.

2012.   NU had actual notice of numerous disability complaints, both formal and informal, about the conduct of NU employees during the 2020 UHAS hearings process and afterwards.

2013.   Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment a disturbing series of incidents of malicious targeted stalking and harassment which were based upon the offender's perception that Plaintiff had "assumed" the identity of a NU law student and was conducting a "psychological operation" by attempting to attend school and participate in school activities like the other students in the class. These incidents included two disturbing 1:00 AM phone calls which were feloniously recorded, where Plaintiff was deliberately threatened, harassed, and antagonized in a deliberate and coldly calculated effort to extract a response which could be used against him in some sort of legal or criminal action. This was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community followed by a failed attempted coverup of felony evidence which was then used in an unjust expulsion process wherein, unbelievably, every single member of NU staff who heard the audio and made a decision based off of it committed two acts of felony eavesdropping, one for each recording. This was immediately after Plaintiff had finally overcome the last of an absurd series of

discriminatory obstacles that NU had placed upon his return to school, all of which were distinctly predicated upon NU's threat from his perceived disabilities.

2014.   After Plaintiff had exposed the poorly attempted coverup of the felony evidence, Dugo and Chin coercively planned and executed a conspiratorial series of retaliatory actions, where they committed obstruction of justice and unlawful intimidation followed by false imprisonment and malicious prosecution.

2015.   The conduct complained about in each complaint was in violation of Title II of the Americans with Disabilities Act.

2016.   All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliberately prevented from accessing all school activities or learning.

2017.   NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

2018.   NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

2019.   On information and belief, Plaintiff has submitted over 20 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

2020.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation of Title II of the Americans with Disabilities Act;

a.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

b.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

c.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

d.   Order Plaintiff's disciplinary record removed from his transcript;

e.   Award Plaintiff money reasonably calculated to compensate her for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

f.   Award attorney's fees and costs; and

g.   Award such other relief as the Court deems just and proper.

## Count 183
## PRELIMINARY INJUNCTION

2021.   Plaintiff asks the Court to set its request for temporary injunction for a hearing as soon as possible and, after the hearing, issue a temporary injunction against NU providing the same relief requested above in Plaintiff's Application for Temporary Restraining Order.

## Count 184
## PERMANENT INJUNCTION ON EXPUSION

2022.   Plaintiff asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against NU for the relief requested above.

2023.   All conditions precedent to this application have occurred.

## Count 185
## GENERAL PRAYER FOR RELIEF

2024.   Plaintiff request's the assistance of an external investigator from a local law enforcement service or the US marshal service to investigate the multiple felonies committed by NU, its representatives, and staff during the course of Plaintiff's suspension and expulsion process, including Scott Warner and Co-Counsel Karen Courteux and any other individuals from their firm who may have heard the felony audio involved in this case and/or used the information from it in some way, shape, or form.

2025.   WHEREFORE, PREMISES CONSIDERED Plaintiff respectfully requests that Defendant, Northwestern University, be cited to appear and answer and, upon final trial, Plaintiff have judgment for:

a.   actual damages;

b.   pre-judgment interest at the maximum legal rate;

c.   post-judgment interest at the maximum legal rate;

d.   costs of court;

e.   attorneys' fees;

f.   temporary restraining order;

g.   preliminary injunction;

h.   permanent injunction; and

i.   such other and further relief to which Plaintiff may show herself justly entitled.

j.   Issue an Order enjoining defendants, their agents and employs from continuing or maintaining the policy, practice and custom of denying plaintiff's rights available pursuant to the Constitution and laws of the United States and the state of Illinois, and retaliating against him for seeking to exercise those rights.

k.   Enter a declaratory judgment that the aforementioned facts and practices of defendant are in violation of the Constitution and laws of the United States and the state of Illinois.

l.   Enter judgment in favor of plaintiff, and against defendant, finding that defendants, acting individually and/or in concert with each other, and/or through agents and employs (1) retaliated against plaintiff for engaging in a protected activity, to wit, speaking out on a matter of public concern, in violation of the First and Fourteenth Amendments to the United States Constitution and the Illinois Constitution; and (2) violated plaintiff's right to due process of law, as guaranteed by the 14th Amendment to the United States Constitution, and ( c) defamed plaintiff.

m.   Enter judgment ordering the admission of plaintiff into the law school, thereby allowing pursue his legal education.

n.   Enter judgment ordering defendant to remove the disciplinary action from plaintiff student record.

o.   Enter judgment in favor of plaintiff, and against defendants, awarding plaintiff special, general compensatory and punitive damages.

p.   Award plaintiff the costs of this litigation, including reasonable attorney's fees.

q.   Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that: IBHE's failure to create and maintain an accountability system under ESSA constitutes disability discrimination under the ADA and Section 504.

r.   Issue a class action certification for students affected by unchecked disability discrimination at IBHE member institutions which was unaccounted for due to IBHE's failure to create and maintain an accountability system under ESSA.

s.   Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

a.   The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

b.   The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment hearing and notice procedures in this case violate the due process clause of Fifth Amendment to the United States Constitution;

c.   The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate due process and equal protections under the Fourteenth Amendment to the United States Constitution;

d. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school violate the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution.

e. Violation of 405 ILCS 5/3-601:
    a. Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;
    b. Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;
    c. Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

f. Violation of 405 ILCS 5/3-602:
    a. Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

g. Violation 405 ILCS 5/3-606:
    a. Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

h. Violation of 405 ILCS 5/3-608:
    a. Failed to inform Plaintiff of his right to refuse treatment.
    b. Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

i. Violation of 405 ILCS 5/3-609:
    a. Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.
    b. Failed to ask Plaintiff if he desires such documents sent to any other persons
    c. Failed to allow Plaintiff to make phone 2 phone calls.

j. Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:
    i. Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.
    ii. Failed to promptly file second certificate and provide a copy to the respondent.

## JURY DEMAND

Plaintiff Fahad Syed demands a trial by jury on all issues triable by a jury/ in the alternative plaintiff demands a jury trial for all issues possible.

Dated: [MONTH] [DAY], [YEAR]        Respectfully submitted,

By: _____/s/ Fahad Syed_____

Fahad Syed

244 E Pearson St. Apt. 711

Chicago, IL 60611

Tel: 773-564-0325

Syed.216@gmail.com

**[VERIFICATION BY CERTIFICATION PURSUANT TO SECTION 1-109**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that [he/she] verily believes the same to be true.

_____/s/ Fahad Syed_____

Fahad Syed                    2/4/21

Plaintiff

**[EXHIBIT [NUMBER/LETTER]|**