# UNITED STATES DISTRICT COURT

## NORTHERN DISRICT OF ILLINOIS

### EASTERN DIVISION

FAHAD SYED,                                          )
                                                     )
      Plaintiff,                        )
                                                     )
      vs.                               )     CASE NO. 1:21-cv-00267
                                                     )
NORTHWESTERN UNIVERSITY, and                         )     Hon. Martha M. Pacold
VICE PRESIDENT FOR STUDENT                           )
AFFAIRS JULIE PAYNE-KIRCHMEIER,                      )     Magistrate Judge Maria Valdez
INTERIM DEAN OF STUDENTS MONA                        )
DUGO, DEPUTY TITLE IX                                )
COORDINATOR AMANDA DASILVA,                          )
TITLE IX COORDINATOR COLLEEN                          )
JOHNSTON, DIRECTOR OF EQUAL                           )
OPPURTUNITY AND ACCESS KAREN                          )
TAMBURO, NU SENIOR EQUITY                             )
SPECIALIST ISH FAITH-ORKAR,                          )
ASSISTANT DIRECTOR OF                                )
COMMUNITY STANDARDS HEATHER                          )
COHEN, ASSISTANT DIRECTOR OF                         )
STUDENT CONDUCT CHRISTINE                            )
DEPILLA, ASSISTANT DEAN AND                          )
DIRECTOR OF STUDENT CONDUCT                          )
LUCAS CHRISTIAN, MELISSA                             )
SERSLAND, SAM MILGROM, DESIREE                       )
HANFORD, RON A. ALEXANDER III,                       )
SARAH K. WAKE, NORTHWESTERN                          )
UNIVERSITY POLICE DEPARTMENT                         )
("NUPD"), and NUPD DEPUTY CHIEF                      )
ERIC CHIN, NUPD COMMANDER                            )
CINDY BENSON, NUPD DECTECTIVE                        )
SARAH STARK (Badge #21), NUPD                        )
DECTECTIVE SANGHOON LEE, NUPD                        )
OFFICER THOMAS HEALY (Badge                          )
#22), NUPD OFFICER FRANK WALSH                       )
(Badge #26), NUPD SERGEANT                           )
DONALD MOORE (Badge #56);                            )
NORTHWESTERN MEMORIAL                                )
HOSPITAL ("NMH"), and NMH M.D.                       )
ANDREW J. BERG, NMH M.D. SCOTT                       )
A. GERSHAN, NMH R.N. JEREMY                          )
BAKER, NMH M.D. EUGENE LOZZA,                        )
and NMH L.S.N. FRED CABRA as                         )
individual                                          )
                                                     )
                                                     )
      Defendants.                       )
                                                     )

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Fahad Syed, Pro Se, hereby complains and alleges against all Defendants as follows:

## **INTRODUCTION**

1.      This is a Complaint for Damages and Injunctive Relief brought by a former law student of Northwestern University ("NU") School of Law. The essence of this suit lies in the valid contract for graduate education in law which Plaintiff entered into with NU, and that the latter violated repeatedly through unchecked willful and wanton conduct, negligence, discrimination, and deprivation of Plaintiffs over the course of four years. Plaintiff suffers from ADA learning and cognitive disabilities of bipolar disorder and ADHD, as well as comorbid anxiety and depression that entitle him to certain academic accommodations.

2.       messages were made jokingly and in private conversation off school grounds, rushed to judgment and unfairly expelled Jaden amid heightened concerns over school safety., a student who "was caught up in a silly game who exercised bad judgment." Now he's been dealt the "educational death penalty" by the school

3.      Over the course of three full years, Plaintiff suffered a pattern of repeated, systematic, and unmitigated discrimination and unchecked retaliation by NU employees in violation of his First Amendment Right to Free Speech, and his 14th amendment right to equal protections and due process. This is despite his filing countless complaints notifying NU administration of his mistreatment. On information and belief, NU's deliberate indifference to Plaintiffs immense suffering was such that in total Plaintiff filed over 100 separate complaints in various forms with NU over the course of his time at the university, and _not a single one_ was actioned upon or investigated to date.

4.      Starting in 2018, he was unfairly subject to an irregular post-admission application review based on unsubstantiated allegations from an unknown person or persons which led to discriminatory sanctions and pre-conditions for his deferral from the entering NU Law Class of 2018 to 2019 in violation of his 14th amendment right to equal protections and due process. Following his re-enrollment in 2019, Plaintiff was subjected to hostile learning environments on the basis of unsubstantiated sexual harassment allegations from an unknown female student starting in August, and then a hostile environment based on threat from his perceived disability and religion starting in November.

5.      On 11/1/19, for which the Plaintiff was falsely imprisoned from 11/1/19-11/8/19 directly resulting from threat from his perceived disability and retaliation against his first amendment right to free speech and religion and suspended for two semesters following highly discriminatory 2019 University Hearing And Sanctions (UHAS) process in which investigators deliberately ignored the results of their own investigative findings. At a time when most would argue that the world-wide specter of Covid-19 was beginning to infect the world, he was illegally evicted and given 5-day notice to vacate from his university affiliated residence, which upon his desperate request for more time based on the school having full knowledge of Plaintiffs familial status, was extended by only 2 days for a total of only 7-days-notice.

6.      Plaintiff had attended the event to seek consolation for his mother's death from cancer and had not slept in two days prior to his attendance due to emotional distress. While at the event, Plaintiff was repeatedly targeted and harassed with threatening and suggestive comments, intimidating behavior, invasive questioning, and unwanted physical contact by an unknown male (Alkhawaja) on four separate occasions, culminating in a vicious physical attack where he kicked Plaintiff several times on the leg, then tackled Plaintiff onto the ground, and choked Plaintiff in a headlock until Plaintiff nearly lost consciousness. Defendant Osama A. took these actions acting in agency as "Event Organizer" ("EO") for Northwestern University and based directly on his threat from Plaintiff's perceived disability. No one witnessed this vicious physical assault. He then called out to his two friends (Muaaz Maksud and Usama Ibrahim) who were nearby, and together the three physically restrained Plaintiff, restricting his freedom of movement to leave the premises and with intent to initiate his imprisonment of plaintiff based on perceived mental impairment to Plaintiff. They then called police and falsely reported to police that Plaintiff attacked one of them.

7.      Claimant was the victim of a malicious conspiracy against his civil rights, involving: assault; battery; targeting, discrimination, harassment, and false imprisonment based on perceived threat from existing ADA disability; libel; defamation; slander; tortious interference with educational contract; and tortious interference with economic advantage by individual students.

8.      Northwestern Memorial Hospital staff committed assault; battery; discrimination based on perceived threat from existing ADA disability; libel; defamation; slander; tortious interference with educational contract; and tortious interference with economic advantage by law enforcement; conspiracy,

false imprisonment and medical malpractice in violation of 405 ILCS 5/3-601 petition procedure, violation of 405 ILCS 5/3-602 patient rights advisory, violation of 405 ILCS 5/3-608 treatment refusal rights, and 405 ILCS 5/3-609 violation of his right to receive copies of petition and phone call; violation of 405 ILCS 5/3-610 filing requirements, and violation of 405 ILCS 5/3-611 notice and filing requirements and in violation of his 5th Amendment right to fair notice, 4th Amendment right against unreasonable seizure, and 14th Amendment right to due process and Equal Protections. Plaintiff has filed Illinois Guardianship and Advocacy Commission complaint #20-030-9020 substantiating his false imprisonment. Plaintiff has also filed separate suit in a related claim 20CV1772 under the Crime Victims Compensation Act for these incidents in the Court of Claims for the State of Illinois, and it was assigned to commissioner Ron Serpico on 11/24/20, further substantiating these allegations.

9.     NU Student Conduct representatives Christine Depilla and Heather Cohen willfully and maliciously disregarded and suppressed substantial evidence which indicated that Plaintiff was subjected to a conspiracy against his civil rights, and actively suppressed Plaintiff's attempts to report the unlawful behavior to NU. This incident continues to negatively impact Plaintiff until this day: It took Plaintiff almost 10 months to overcome the repeated discriminatory obstacles the school placed on his ability to re-enroll as a result of threat from his perceived disability resulting from the event, and he finally completed the last on in late July of 2020.

10.     The week of August 17th, just over a month since Plaintiff finished his effective reinstatement and re-enrolled in the entering class of 2020, he was deliberately excluded from law school orientation events and planning for the incoming JD class of 2020 in retaliation for his many internal and external grievances with NU. As a result of his deliberate exclusion on the basis of threat for his perceived disabilities, he was unable to meet any of the students in the incoming class and was forced to rely on the class group chat instead.

11.     Plaintiff was the victim of a hostile learning environment based on threat from his perceived disability effectuated through open hostility in a school-wide online chat forum, followed by multiple hate crimes and intimidation perpetrated by staff and students the weekend of August 21-23[rd], 2020. On August 21st, just one day after he had joined the group, he was cyberstalked and harassed by a fellow incoming 1L defendant Evangeline Gargula ("Gargula"), a white transgender student without

disabilities, in a vicious hate crime on the basis of perceived disability with harassing messages and two obscene 1 AM phone calls, both of which were recorded and maliciously shared with NU and other students without his consent or knowledge, and in violation of state law.

12.     On 8/23/20 defendant Eric Chin ("Chin"), acting Deputy Chief of Northwestern University Police Department ("NUPD"), and Mona Dugo ("Dugo"), Interim University Dean of Students for Northwestern University ("NU"), unilaterally determined that he was a safety threat on the basis of threat from his perceived disability, religion, color, national origin, and other protected class characteristics resulting from the two private phone calls which occurred on 8/23/20 and were recorded without the Plaintiff's knowledge or consent in violation of 720 ILCS 5/14-2 (a)(2), (a)(3), and (a)(5) and suspended Plaintiff without notice or hearing.

13.     Due to knowingly using the audio as evidence against the Plaintiff for school disciplinary proceedings, every person from NU, including his two student conduct investigators, are guilty of two felony counts of 720 ILCS 5/14-2 (a)(5), one for each of the recordings, for using the information on the audio to make a determination as to whether Plaintiff committed gender-based harassment.

14.     He was then maliciously discriminated against on the basis of sex and disability by staff, and again was the target of a brutal retaliation against his First Amendment right to report unlawful conduct, and malicious conspiracy against his right to education, by staff in a cooperative effort during his 2020 UHAS Hearings. Plaintiff filed Department of Education complaint #05-20-2444 on 8/27/20 and received a 15-day response on 10/15/20, substantiating his gender and disability discrimination claims.

15.     From August-December 2020 he was again the subject of malicious student disciplinary process in retaliation for reporting the numerous discriminatory actions of NU law current student Muaaz Maksud and former NU law student Usama Ibrahim in relation to a hate crime of false imprisonment based on disability which they committed against him in 2019, in addition to his reporting of NU employees Christine DePilla and Heather Cohen from their egregious handling of the student disciplinary process from 2019.

16.     Dugo and Chin were responsible for masterminding a coverup and suppression of two felonious audio tapes made in violation of eavesdropping 720 ILCS 5/14-2 in connection with the conspiracy, which were revealed during the course of the investigation to be the reason they suspended

Plaintiff on 8/23/20. Chin was personally responsible for suppressing the report or investigation of the felonious audio tape both within NUPD and within Chicago Police Department 18th district. On October 11, 2020 Plaintiff filed police report JD395768, and it was subsequently inappropriately closed without investigation when Eric Chin of NUPD, acting under color of state law as Deputy Chief, unlawfully disclosed the detail of Plaintiff's 2019 involuntary commission, in violation of HIPAA, to detective O Shaughnessy. He also knowingly falsely told the detective that Plaintiff had given his concern for the recordings in question, discriminating on the basis of perceived disability and directly causing in Plaintiff's report being closed without investigation.

17.     On 11/19/20, Plaintiff was again the victim of a malicious conspiracy against his civil rights and false imprisonment in cooperation with Evanston Police Department Detective Jones and NUPD Detective Stark after Dugo purposefully took the action of misleading the Second District County Court in securing a Stalking No Contact Order (SNCO) on false and misleading pretenses on 11/5/20, and then reporting an alleged violation of said SNCO on 11/19/20 on false and misleading pretenses, in retaliation for: the SNCO Hearing (20 OP 78277) that Plaintiff had entered against Dugo on 11/17/20; a Department of Education ("DOE") complaint (#05-20-2444) which Plaintiff filed against Dugo and NU for his unlawful suspension on 8/27/20; and numerous other violations of NU policy which Plaintiff reported Dugo and Chin for through the NU, including emails sent on 11/17/20 to NU resulting from Dugo's unlawful contact of Plaintiffs sister in relation for said DOE complaint, in order to maliciously tarnish the Plaintiff's unblemished criminal record.

18.     In total, Plaintiff was subjected to multiple hostile learning environment which altered the terms of his education in 2019 and 2020 based on threat from his perceived religion, numerous deprivations of his constitutional rights by NUPD acting under color of state law, and multiple malicious conspiracies against his property interest in the JD programs and freedom both in 2019 and 2020.

19.     Plaintiff was twice a victim of false imprisonment both on 11/1/19 and 11/19/20, and of severe harassment and discrimination caused by the negligence of Defendants Northwestern University and the malicious conspiratorial actions of its staff and students.

20.     With the final arbitrary and unjust suspension, NU, Chin, and Dugo continued a long-standing pattern of discrimination with various malicious, coercive and retaliatory actions and measures

against Plaintiff that culminated in his being expelled and banned from the Law School on 12/21/21, in addition to permanent notation on Plaintiff's transcript which ruins his ability to seek education from another institution and inflicting needless and unrelenting grievous suffering, psychological trauma, and emotional distress on the Plaintiff.

21.     Defendant Northwestern University's deliberate actions and negligence proximately caused all of Plaintiffs injuries.

## I. PATTERN AND PRACTICE OF DISCRIMINATORY CONDUCT

22.     Northwestern University "NU" and the Northwestern University Police Department ("NUPD") failed to properly supervise and monitor: Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and in particular it's officer: Deputy Chief Eric Chin.

23.     As a result of such failure, NU and NUPD allowed for a pattern and practice of discriminatory conduct to exist whereby numerous repeated policy violations on the basis of protected class were permitted, committed, and encouraged, which effectively discriminate against male, non-white, Muslim, and disabled applicants and students. The structural pattern of this discrimination is that the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class, then take an adverse action against him, such as suspension or deferral, as a result of that discrimination, and finally place some quantity of discriminatory conditions on his eligibility to re-enroll. Once he completed his required conditions and re-enrolled, NU or NUPD would repeat this pattern and practice of discriminatory conduct again. The end result was the Plaintiff spent over five full years, from 2017-2021, pursuing entrance into the graduate law program which he was originally admitted to in 2017, and which NU never actually intended to let him enroll in or complete due to unmitigated bias against his color, socio-economic factors such as his background and family, his disability, race, and religion.

24.     The major themes of the pattern and practice are negligent hiring, maintenance and supervision of employees who are untrained on and often times bias against certain classes of students;

the negligent maintenance of hostile learning environments permeated with persistent, severe, and unchecked harassment and intimidation; a negligent, reckless and wonton failure to accommodate students with disabilities; an oppressive climate of administrative corruption with little to no accountability or oversight of discrimination and bias laden student disciplinary process'; and a broad scope of frequent, severe, petty, and calculated retaliatory conduct for _any_ filing of legitimate grievances both inside and outside of the university.

25.     Plaintiff asserts the following federal causes of action: (1) race, color, and national origin-based discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, et seq. ("Title VI"); (2) disability-based discrimination under Title II of the Americans with Disabilities Act, 42 USCA §§ 12131, et seq. ("Title II"); (3) disability-based discrimination under Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181, et seq. ("Title III"); (4) disability-based discrimination under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq. ("Section 504"); and (5) sex-based discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), (6) racial discrimination under **42 U.S.C. § 1981**; (7) deprivation of various civil rights under **42 U.S.C. § 1983;  (8) conspiracy against civil rights under 42 U.S.C. § 1985; and (9) negligence to prevent conspiracy against civil rights under 42 U.S.C. § 1986.** Plaintiff also asserts various state claims against both NU and Dean Mona Dugo, including breach of contract, tortious interference with contract, intentional infliction of emotional distress, defamation, and public disclosure of private facts.

26.     Plaintiff seeks a declaration that Defendant violated his rights under the United States Constitution, the Illinois Constitution, and injunctive relief restoring him to the JD program, compensatory and nominal damages, and attorneys' fees. Plaintiff states his claims pursuant to **42 U.S.C. § 1983**.

## **JURISDICTION**

1.     28 U.S.C. § 1331 ("Section 1331") provides that federal district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

2.     This action arises under the U.S. and Illinois Constitutions and laws of the United States, specifically, the Due Process Clause of the Fourteenth Amendment to the United States Constitution,

prohibition against unreasonable seizure under the Fourth Amendment to the United States Constitution, Illinois Constitution, Article I, § 2, certiorari, and mandamus.

3.      This Court has jurisdiction over this matter under 28 U.S.C. § 1343 (civil rights) 28 U.S.C. § 1331 (federal question) because all of Plaintiff's claims arise under laws of the United States— specifically, the ADA, Section 504, and Title IX and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

4.      Supplemental jurisdiction over Plaintiff's pendent state law claims rests upon 28 U.S.C. 1367, since the claims arise out of the same transaction and occurrence as Plaintiff's federal claims.

5.      This Court also has jurisdiction pursuant to **42 U.S.C. § 1983**, which prohibits the deprivation of constitutional rights or rights secured by the laws of the United States by persons acting under the color of state law.

## VENUE

6.       Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. 1391(b) because violations of the above referenced laws have taken place and continue to take place in the Northern District of Illinois and Defendants are located in this district and it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

7.      Plaintiff, Fahad Syed, at all relevant times was a resident of the State of Illinois and a student at the Northwestern University School of Law ("the Law School"), a school of Northwestern University, a private university.

8.      Plaintiff is a qualified individual with a disability, as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 705(20) ("Section 504") and Title III of the Americans with Disabilities Act, 42 U.S.C. 12131(2) (the "ADA").

9.      Defendant, Northwestern University ("the University"), is an institution of higher education duly organized and existing under the laws of the State of Illinois as an Illinois not-for-profit corporation. The University receives federal financial assistance, as defined by Section 504, 29 U.S.C. 794.

10. The University, as an undergraduate and postgraduate private school, is a "place of public accommodation," as defined by 42 U.S.C. 12181(7)(j) and is therefore covered by the ADA.

11. The University employs its own police staff, including individual Defendant Northwestern University Police Officers Thomas Healy (Badge No. 22); Frank Walsh (Badge No. 26); Detective Sarah Stark (Badge No. 21); Sgt. Donald Moore (Badge No. 56); Cmd. Cindy Benson; Deputy Chief Eric Chin; Detective Sanghoon Lee; and other unknown Northwestern University Police Officers, relevant to certain incidents involving Plaintiff (and collectively referred to as the "Individual Defendant NUPD officers").

12. Individual Defendant NUPD officers are sworn officers of the NUPD and are sued in both their official and individual capacities for actions they took by virtue of their authority as police officers, which exceeded the scope of their authority.

13. Individual Defendant NUPD officers at all times relevant to this Complaint, acted under color of state law as police officers for the University, and acted in the course and within the scope of their employment.

14. Plaintiff experienced the individual Defendant NUPD officers' civil rights violations, as well as their other unlawful actions towards him, in Chicago, Cook County, Illinois.

15. Plaintiff brings claims against the individual Defendant NUPD officers pursuant to pursuant to 42 U.S.C.A. §§ 1981, 1983, 1985, and 1986 for their violations of his constitutional rights while acting under color of state law.

16. Defendant, Northwestern Memorial Hospital, is a corporation organized under Illinois law and engaged in operating a general hospital. Defendant hospital's principal place of business is at 320 E. Superior St., Chicago, Cook County, Illinois.

17. Defendant, EUGENE LOZZA M.D., ANDREW J. BERG M.D., SCOTT A. GERSHAN M.D., R.N. JEREMY BAKER, and L.S.W. FRED CABRAS (and collectively referred to as "Individual Hospital Defendants") were at all relevant times in during this complaint employed by Defendant Northwestern Memorial Hospital.

18. Plaintiff experienced the individual Hospital Defendants civil rights violations, as well as their other unlawful actions towards him, in Chicago, Cook County, Illinois.

19.     Plaintiff brings claims against the individual Hospital Defendants pursuant to pursuant to 42 U.S.C.A. §§ 1981, 1983, 1985, and 1986 for their violations of his constitutional rights, while acting under color of state law.

20.     Defendant JULIE PAYNE-KIRCHMEIER was at all relevant times, VICE PRESIDENT FOR STUDENT AFFAIRS for NU. She is named in this complaint in both her individual and official capacity.

21.     Defendant AMANDA DESILVA was at all relevant times, DEPUTY TITLE IX COORDINATOR for NU. She is named in this complaint in both her individual and official capacity.

22.     Defendant COLLEEN JOHNSTON was at all relevant times, TITLE IX COORDINATOR for NU. She is named in this complaint in both her individual and official capacity.

23.     Defendant, MONA DUGO ("Dugo"), at all times relevant was the Interim Dean/Dean of Students for the University. She is named in this complaint in both her individual and official capacity.

24.     Defendant KAREN TAMBURRO was at all relevant times, DIRECTOR OF EQUAL OPPURTUNITY AND ACCESS for NU. She is named in this complaint in both her individual and official capacity.

25.     Defendant LUCAS CHRISTAIN was at all relevant times, ASSISTANT DEAN AND DIRECTOR OF STUDENT CONDUCT for NU. He is named in this complaint in both his individual and official capacity.

26.     Defendant ISH FAITH-ORKAR was at all relevant times, SENIOR EQUITY SPECIALIST for and University Hearing Officer #3 NU. She is named in this complaint in both her individual and official capacity.

27.     Defendant, Christine DePilla ("DePilla"), at all times relevant was ASSISTANT DIRECTOR OF STUDENT CONDUCT and University Hearing Officer #1 for the University. She is named in this complaint in both her individual and official capacity.

28.     Defendant, Heather Cohen ("Cohen"), at all times relevant was the ASSISTANT DIRECTOR OF COMMUNITY STANDARDS and University Hearing Officer #2 University. She is named in this complaint in both her individual and official capacity.

29.     Defendant, Desiree Hanford ("Hanford"), at all times relevant was the University Sanctions Panel Member. She is named in this complaint in both her individual and official capacity.

30.     Defendant, Melissa Sersland ("Sersland"), at all times relevant was the University Sanctions Panel Member. She is named in this complaint in both her individual and official capacity.

31.     Defendant, Sam Milgrom ("Milgrom"), at all times relevant was the University Sanctions Panel Member. He is named in this complaint in both his individual and official capacity.

32.     Defendant, Ron A. Alexander III ("Alexander"), at all times relevant was the University Sanctions Panel Coordinator. He is named in this complaint in both his individual and official capacity.

33.     Defendant, Sarah K. Wake ("Wake"), at all times relevant was the Associate General Counsel for NU. She is named in this complaint in both his individual and official capacity.

34.     Plaintiff experienced Defendant Alexander, Wake, Hanford, Sersland, Milgrom, Payne-Kirchmeier. DeSilva, Johnston, Tamburro, Cristain, Faith-Orkar, DePilla, Cohen,  and Dugo's (and collectively referred to as "Individual NU Defendants") unlawful actions towards him in Chicago, Cook County, Illinois.

35.     Plaintiff brings claims against Individual NU Defendants pursuant to 42 U.S.C.A. §§ 1981, 1983, 1985, and 1986 for their violations of his constitutional rights.

36.     At all times relevant, Defendants' actions took place in Cook County, in the State of Illinois.

37.     Defendants committed the acts and omissions alleged in this complaint in bad faith and with knowledge that their conduct violated established and settled law.

## STATEMENT OF FACTS

### Introductory Information

36.     Plaintiff is a first-generation college graduate from a low-income, racial and ethnic minority household and was raised by a single mother, and the first in his family to attend law school. Plaintiff's parents legally separated when he was 8 years old due to his father's violence towards the children, and Plaintiff grew up in an inner-city low-income housing project, a crime-laden environment devoid of positive male role-models and influences.

37.    Plaintiff suffers from multiple ADA learning and cognitive disabilities of bipolar disorder and ADHD, as well as anxiety and depression. One of the major "episodic manifestations" of Plaintiffs bipolar disorder are "psychotic episodes" triggered by stress, which induce varying levels of anger, paranoia, frustration, irritability, temper, etc.

38.    Plaintiff first made the decision to pursue law school in 2015, at the age of 25. Plaintiff had a successful career managing IT operations at a Fortune 100 company after graduating in 2012 with a 3.0 overall GPA from a Top 50 undergrad with a Top 10 undergrad business ranking with dual bachelors degrees in busines economics and political science and 3.3 and 3.9 major GPA's respectively. In addition, plaintiff holds multiple industry standard IT certifications, further illustrating his professional competency and capabilities. Plaintiff is actively involved in community building efforts, and helped found a non-profit for refugee assistance (Iraqi Mutual Aid Society) during college, and is currently affiliated with another non-profit (Inner-City Muslim Action Network) for which he does volunteering and other work.

39.    Plaintiff's mother was diagnosed with terminal metastatic ovarian cancer and was undergoing intense chemotherapy sessions during this period and Plaintiff dedicated the next 2 years of his life to study for the Law School Admissions Test (LSAT), living at home with his mother to study full time and work part time occasionally as his mother's caretaker.

### Class of 2017 Admission and Rejection

40.    Plaintiff always wanted to attend law school at NU, and his studying eventually paid off as he took the LSAT two times in 2017, receiving two 166 (93rd Percentile) scores on both attempts, and applied for Early Decision Admission to NU Law School in 2017 by the age of 27, but subsequently received a rejection.

### Class of 2018 Early-Decision Admission

41.    Despite the rejection, Plaintiff was still determined to attend law school at NU, and studied and retook the LSAT again on two separate occasions, scoring 168 (96[rd] Percentile) and 170 (98[rd] Percentile) and successfully re-applied for admission through Early Decision ("ED") to Northwestern University Law School JD class of 2018 with 150K scholarship on December 13th, 2017 at the age of 28. This was the happiest moment of Plaintiff's life.

**2018 Discriminatory Conduct**

42.     On April 26th, 2018 Plaintiff's 2018 Early-Decision Application and subsequent admission was subject to an unannounced post admission review which was highly irregular in process and was on the basis of "alleged inaccurate information" in [Plaintiff's] Fall 2018 JD application related to "*family background.*" As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background."

43.     The source or intended meaning of allegations in paragraph 3 was never revealed, even after Plaintiff successfully cleared the investigation on May 21, 2018. As far as plaintiff knows, no other 2018 early decision admit, nor 2018 general admit who's application was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background" ever successfully completed the verification without learning the source of the allegation nor the allegations themselves.

**2018 Adverse Action and Discriminatory Sanctions**

44.     As a result of this investigation, Plaintiff was forced to "defer" his admission and enrollment to 2019, pending the completion of the first of series of repeated discriminatory measures on the basis of perceived threat from his disability:

- Behavioral Services Center Anger Management Evaluation and Treatment, which he completed by June 2018.

- Behavioral Services Center Substance Use Evaluation and Treatment, which he completed by June 2018.

45.     As far as plaintiff knows, no other similarly situated 2018 early decision admit, nor 2018 general admit who's application was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "employment history, collegiate extracurricular activities, and family background," and who successfully completed the verification without learning the source of the unsubstantiated allegations nor the allegations themselves, was forced to

"defer" his admission and enrollment to 2018 pending the completion of these two Behavioral Services Center substance abuse and anger management evaluations on the basis of perceived threat from his disability.

46.     As a further result of this sudden change plaintiff was left homeless because of poor credit and finances and forced to live at the Christian Pacific Garden Mission at 1458 S Canal St, Chicago, IL. Plaintiff's religious devotion led him to the Downtown Islamic Center at 231 S State Street and eventually met a near friend, and through him, was introduced to Inner-City Muslim Action Network (IMAN), a 501 (c)3 organization dedicated to community building and gang violence reduction efforts in Chicago's South-Side Englewood neighborhood.

47.     Plaintiff met and became friends with Rami Nashashibi and upper management of the organization and came to live in IMAN Green-Reentry Englewood housing at 6053 S. Washtenaw Ave., a half-way house for formerly incarcerated individuals, mostly convicted felons with extensive gang history and violent criminal records. There he came to meet and know Jackie Wilson and learn of detective Jon Gram Burge while doing work for the organization leading prayer and performing academic tutoring, until he was able to find the apartment where he lives now, in Streeterville, Chicago in August 2019.

**2019 Re-Enrollment**

48.     In August 2019, Plaintiff enrolled in the class of entering JD class of 2019 at NU Law School at the age of 29 and started Fall 2019 Semester.

49.     During Fall 2019 Semester, Plaintiff was dealing with tremendous family concerns as Plaintiff watched his mother slowly start to pass away from ovarian cancer because she had finally become resistant to treatment.

50.     During the months September and October of 2019, Plaintiff watched his mother slowly starved to death because she had finally become resistant to treatment, and metastatic ovarian cancer had filled her entire stomach and esophagus with tumors which made it so painful to eat that she chose to starve to death rather than be placed on a feeding machine. Because she elected his other siblings as her power of attorney and power to make health decisions, and specifically indicated a do not resuscitate order (DNR) and no life support options in her will, he

was unable by law, to even suggest that if she tried to eat or find some way to get nutrition into her body, that she would live.

51.     Despite her impending passing, and knowing that this was the last remaining time that he would have with her, because of his enrollment and commitment to law school, he sacrificed much of the precious time that he had left with his mother in order to attend classes and pursue coursework. Plaintiff would attend classes and complete coursework during the weekday working hours, come home and complete homework assignments, then travel up to Skokie from his apartment in Streeterville (1-hour trip on average) in order to spend time with his mother during the night. He sacrificed spending this time with her because his legal education and future legal career was the most important thing to him next to his late mother.

52.     Despite his family issues, Plaintiff tried to attend school and try to have relatively normal social experience by participating in social outings, joining student organizations and religious student groups, and trying to participate in the school group chat for the entering JD class of 2019.

**Hostile Environment #1 Fall 2019 Semester (Sexual Harassment)**

53.     It was some time after August 28th, 2019, his 30th birthday, when Plaintiff started to be viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment accusations from a similarly situated non-Muslim, white, female student without disabilities, which were never shared with Plaintiff at any time by any person. As far as plaintiff knows, no other similarly situated non-Muslim, white female 2019 early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 regular decision admit without disabilities was subject to this kind of vicious harassment or ridicule or banning and exclusion from school activities based on unknown sexual harassment accusations from a similarly situated non-Muslim, white female student without disabilities.

54.     These vicious rumors were allowed to circulate unchecked among the student body of the law school and culminated in a group discussion with the entire law class discussing the Plaintiff on the entering class Group Chat application ("Group Me"), which Plaintiff was

deliberately and maliciously excluded from participating in, and of which the university was fully aware of, and resulted in almost the entire school treating Plaintiff like a sexual predator. As far as plaintiff knows, no other similarly situated non-Muslim, white female 2019 early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 regular decision admit without disabilities was subject to this kind of vicious harassment or ridicule such as a public discussion about the student on the entering JD class group chat which the university was fully aware of and did nothing to address and which the student was deliberately and maliciously excluded from participating in. These actions by NU students and staff created a hostile learning environment that altered the terms and conditions of Plaintiff's education as follows:

55. No one talked to Plaintiff, or sat near Plaintiff in class, making it difficult to complete assignments requiring group work. Other students refused to participate in group assignments in in-class group work with him, and Plantiff was forced on several assignments for extra credit in Kaden's class to submit assignments solo by special permission from the instructor due to this hostility towards plaintiff in school.

56. People performed overt and childish gestures such as visibly retreating from and avoiding coming near of talking to Plaintiff in public settings in and around the law school, swerving to avoid plaintiff in hallways as if plaintiff carried a contagious disease, avoiding eye contact with Plaintiff, making obviously noticeable and sensationalized faces of disgust when seeing Plaintiff in hallways, as if Plaintiff had feces on his face. At one mock interview event in September, not a single student spoke to plaintiff during the entire event, and plaintiff was forced to talk to alumni and recruiters the whole night.

57. People made mean jokes about Plaintiff and talked behind his back, plaintiff was called "rapist" and "creep" and "disgusting" and "pig" and "terrorist" and "jahadi-fahadi" and "Jafar" and "bomb-maker-extraordinaire" and on more than one occasion by more than one, mainly female students. Plaintiff frequently walked by groups of students openly discussing him on routine occasions during his time in classes.

58. During this time, students and staff alike, through these actions and through associating my religion, Islam, with violence, misogyny, and rape, propagated and supported

negative stereotypes about my religion, specifically that myself and other adherents to my religion are violent and oppressors of women.

59.     Plaintiff was especially reviled by female students, and the subject of intense rebuke in class discussions and unwarranted objections and arguments to his point of view during class discussions.

60.     This environment of harassment and hostility went on unabated for 10 weeks. As far as plaintiff knows, no other similarly situated non-Muslim, white 2019 female early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 general admit without disabilities was subject to this kind of treatment based on allegations of sexual harassment.

61.     The school allowed these vicious rumors to circulate unchecked despite the fact that Plaintiff brought this to their attention so they had full awareness of the distress that Plaintiff was suffering from a result of it. Plaintiff was called into a meeting sometime shortly after 8/28/19 with Dean of Students Susie Spies-Roth and Shannon Bartlett in order to inform Plaintiff that the Black Law Students Association ("BLSA") student group had dis-invited Plaintiff from the annual "boat party" that Plaintiff had been invited to and was excited to attend. Plaintiff was informed that many of the students in the group felt "uncomfortable" with Plaintiff, but was not told exactly why. During this meeting which plaintiff informed them of the abusive and hostile environment and the vicious rumors and was informed that they [Susie and Shannon] were already aware of it, and that were the reason that Plaintiff was dis-invited to the boat party. As far as plaintiff knows, no other similarly situated non-Muslim, white female 2019 early decision admit without disabilities, nor similarly situated non-Muslim, white female 2019 regular decision admit without disabilities was subject to this kind of treatment based on allegations of sexual harassment which were never shared with the student and over which the student was prevented from participating in school events and social outings.

62.     On 9/19/19, Plaintiff suffered a nervous breakdown in class due to other students playing a blatant and childish prank on Plaintiff in CLR class by not intentionally not handing Plaintiff the class handouts, and participating in an bizarre coordinated act of ridicule and laughter

as a result, by all the students in the first row simultaneously turning to Plaintiff and laughing. As a result of his breakdown, Plaintiff missed his "Dean's Round Table" lunch date with the Dean of the Law School, Kimberly Yurako, which was scheduled to take place that day. Plaintiff informed his instructor, Rebeka Holman, of this abuse after the class session, and rather than addressing the behavior, she attempted to have plaintiff examined for involuntary commission to a mental institution. (By escorting plaintiff to separate room and asking plaintiff a series of questions designed to gauge the outward behavioral indications of threats of violence to self or others). As far as plaintiff knows, no other similarly situated 2019 white female early decision admit without disabilities, nor 2019 similarly situated white female general admit without disabilities was subject to this kind of open humiliation and degrading treatment from students or staff.

63.     Despite the hostile learning environment Plaintiff was faced with, he was performing academically well in his courses, and had attended all 10 weeks of classes every day with good attendance and with satisfactory grades and was actively involved in class discussions, submitted coursework for credit and also submitted the mid-term writing assignment. Plaintiff was attending professors office-hours and spending significant time and effort attending to his academic responsibilities, indeed his Torts professor, Emily Kadens, saved the *Palsgraff* (a difficult torts case) case for his in-class discussion turn, and referred to him as the "smartest" person in the class in front of all the students on one occasion, and no one objected. In addition, plaintiff actively enjoyed interacting with staff and teachers, and frequently and enthusiastically expressed his interest and enjoyment in the academic subject matter and quality of instruction to staff.

64.     Plaintiff's mother passed away on October 23rd, 2019, and after arranging her funeral and attending her burial, he spent a few days trying to rest and recover. Plaintiff then attempted to rejoin classes and school activities the next week.

65.     Professor Emily Kadens was Plaintiff's Torts professor, and shortly before this incident occurred, Plaintiff had visited her office hours to discuss assignment question #3, Assignment 20, pg. 233 of her course book. This was shortly before the incident on November 1st

occurred. She would be able to attest to the severe emotional distress that Plaintiff was feeling near the time of the indecent as a result of the harassment and death.

66.    Professor Susan Provenzano was Plaintiff's civil procedure professor. Plaintiff visited her office hours on 10/9/19 and 10/16/19, and during both of those times Plaintiff was operating under stress of his mother's, then impending, death. Provenzano would also be able to attest to the severe emotional distress that Plaintiff was feeling near the time of the indecent as a result of the harassment and death.

**Discriminatory Conduct and Hostile Environment #2 Fall 2019 Semester – False Imprisonment (Disability Harassment)**

67.    On November 1, 2019, roughly one week after his mother died on October 23rd, 2019, at approximately 6:37 PM CST Plaintiff attended a law school event in the Levy Mayer wing of the law school building located at 357 E Chicago Ave., Chicago IL 6061 attended by defendant and University of Chicago (3L) law student Osama Alkhawaja,("Alkhawaja") and defendants and fellow Northwestern University law students Usama Ibrahim (3L) ("Ibrahim") and Muaaz Maksud (2L) ("Maksud"), and approximately 60 other fellow law students from mine and other law schools in total.

68.    Plaintiff had attended the event to seek consolation for his mother's death and had not slept in 2-3 days prior to his attendance due to emotional distress. While at the event, Plaintiff was repeatedly targeted and harassed with threatening and invasive questioning and unwanted physical contact by an unknown male (Osama Alkhawja) on 4 separate occasions, culminating in a vicious physical attack where he kicked Plaintiff several times on the leg, then tackled Plaintiff onto the ground, and choked Plaintiff in a headlock until Plaintiff nearly lost consciousness. Defendant Osama A. took these actions acting in agency for Northwestern University and based directly on his perception of Plaintiff's mental health as indicated in his later student conduct interview, where he said that Ibrahim told him that Plaintiff might be "experiencing some mental health issues." As far as plaintiff knows, no other similarly situated 2019 early decision admit without disabilities, nor similarly situated 2019 general admit without disabilities was subject to this kind of vicious attack based directly on his perceived threat from their disability.

69.    No one witnessed this vicious physical assault. He then called out to his two friends (Muaaz Maksud and Usama Ibrahim) who were nearby claiming that Plaintiff had attacked him, and despite Maksud and Ibrahim not having witnessed the incident, they aided him and together the three physically restrained Plaintiff, restricting his freedom of movement to leave the premises while Ibrahim called NUPD with intent to initiate the imprisonment of plaintiff based on perceived mental impairment, as indicated in their later student conduct interviews. Where Ibrahim claimed Plaintiff was "talking about telepathy" and "telling people he was crazy and angry" and where Maksud stated that "he thought there might be a mental health concern" because Plaintiff "was asking other attendees for a pen.

70.    University Police Reporting Officers Healy #22, Walsh #26, and Sgt. Moore #56 arrived on scene and found plaintiffs being unlawfully restrained against his will by defendants Alkhawaja, Ibrahim, and Maksud, whereupon defendant Alkhawaja falsely alleged to reporting officers that plaintiff attacked him, and Maksud and/or Ibrahim told them that plaintiff was suffering from "mental illness." As a result, the officers immediately handcuffed Plaintiff and began to question him. Defendants Osama, Usama, and Muaaz took these actions based on a threat from perceived disability of plaintiff. Each of the defendant law students treated plaintiff differently than the other two similarly situated law student defendants without disabilities based solely on threat from perceived disability of the plaintiff. Each of the defendant officers treated plaintiff differently than the other three similarly situated law student defendants without disabilities based solely on threat from perceived disability of the plaintiff.

71.    When Plaintiff attempted to explain what happened to police, they abruptly brutally threw Plaintiff face-first to the ground and held him there despite the fact that Plaintiff was in handcuffs and had not made any aggressive or threatening statements or action and the fact that Alkhawaja declined to press charges. NUPD then called EMS while brutally holding Plaintiff face down on the ground, and when EMS arrived, one officer (Healy #22) forcibly transported Plaintiff in his custody via ambulance to the Northwestern Memorial Hospital (NMH) at 320 E. Superior St., along with paramedics, to be certified for involuntary inpatient admission despite lacking any clear and convincing evidence of plaintiff's threat to physical safety of self or others.

Defendant NUPD officers treated Plaintiff differently than the other similarly situated law students without disabilities by assuming, solely because someone told them that plaintiff was suffering from "mental illness," that Plaintiff had in fact attacked Alkahawaja and should be thrown to the ground and held there until he could be involuntarily committed and that they should not listen to anything Plaintiff said.

72.     At the hospital, a mental health worker, R.N. Jeremy Baker, prepared a petition for plaintiff's involuntary admission under IL ST CH 405 § 5/3-600. Section 3-601 defines a person "subject to involuntary admission" as a person with mental illness who because of mental illness is reasonably expected to inflict serious physical harm on himself or another in the near future. 405 ILCS 5/3-601 states "(b) The petition shall include all of the following: (1). A detailed statement of the reason for the assertion that the respondent is subject to involuntary admission on an inpatient basis, including the signs and symptoms of a mental illness and a description of any acts, threats, or other behavior or pattern of behavior supporting the assertion and the time and place of their occurrence.(2.) The name and address of the spouse, parent, guardian, substitute decision maker, if any, and close relative, or if none, the name and address of any known friend of the respondent whom the petitioner has reason to believe may know or have any of the other names and addresses. If the petitioner is unable to supply any such names and addresses, the petitioner shall state that diligent inquiry was made to learn this information and specify the steps taken. (3). The petitioner's relationship to the respondent and a statement as to whether the petitioner has legal or financial interest in the matter or is involved in litigation with the respondent. If the petitioner has a legal or financial interest in the matter or is involved in litigation with the respondent, a statement of why the petitioner believes it would not be practicable or possible for someone else to be the petitioner. (4.) The names, addresses and phone numbers of the witnesses by which the facts asserted may be proved." 405 ILCS 5/3-601 also states "(c) Knowingly making a material false statement in the petition is a Class A misdemeanor."

73.     NUPD Officer Healy #22 justified the involuntary commitment by claiming that Plaintiff "incoherently" attacked Osama, however the official petition Plaintiff received was completed by R.N. Jeremy Baker, and indicated that Plaintiff had not been brought in by a peace

officer, listed two staff members, Eugene Lozza and Fred Cabra, as the witnesses to the battery, and failed to provide the officers identifying information on the petition which Plaintiff was served. The petition and both certifications indicated that police brought Plaintiff in and that Plaintiff had "attacked" a fellow law student at a school event. R/O Healy then made false statements in NUPD Case #2019-00000595 report narrative, falsely indicating that he [R/O Healy] had completed the petition for commitment and falsely indicating that Muaaz Maksud had witnessed the alleged act of battery. Defendants NUPD took this action based on threat from perceived disability of plaintiff, treating the plaintiff differently than similarly situated law students (Maksud, Ibhahim, and Alkahawja) without disabilities solely on the basis of his disability.

74.     "Healy #22" deliberately violated 405 ILCS 5/3-606 procedure by failing to complete the official petition and/or failing to include identifying information in said petition. Defendant Northwestern University police and its agents took this action based on perceived mental impairment of plaintiff, and discriminated against plaintiff based solely on his disability by treating him differently than the similarly situated law students without disabilities, who's account they believed based solely on the fact that they had did not have disabilities and someone had told them that Plaintiff was suffering from "mental issues." The sole evidence that staff had supporting any threat to the safety of himself or others was the police report which falsely stated that Plaintiff had committed a battery.

75.     On information and belief, Healy #22 coerced NMH RN Jeremy Baker into knowingly falsifying information on petition on pg. 3, whereupon he [Baker] should knowingly and falsely indicate that Plaintiff had not been detained and/or brought into the hospital by a peace officer. NUPD and its agents took this action based on threat from plaintiff's perceived disability and treated Plaintiff differently than similarly situated law students without disabilities by believing everything they said and not listening to anything plaintiff said based solely on the fact that someone told him plaintiff was "experiencing mental issues."

76.     On information and belief, Defendant RN Jeremey Baker, acting on unlawful coercion from Healy #22, then knowingly made false statements in petition for involuntary

commitment indicating that no peace officer had detained Plaintiff, while indicating that Plaintiff "presents with police" in examination notations of said petition. Defendants NMH and its agents took this action based on threat and hostility towards and from perceived disability of plaintiff and treated Plaintiff differently than similarly situated law students without disabilities by believing everything they said and not listening to anything plaintiff said based solely on the fact that someone NUPD reported plaintiff was "randomly attacking people" and "experiencing mental issues."

77.     Healy intentionally committed this commitment petition falsification in conspiracy with the Osama, Usama, Muaaz, NMH employees in order to have Plaintiff falsely imprisoned  due directly to prejudice against his perceived mental health disability or threat he perceived as a result of his mental health disability; he thought Plaintiff was dangerous because someone at the scene of the incident (Cite Usama Ibrahim's comments from student conduct interview) told him Plaintiff was "experiencing mental health issues." He also acted to prevent himself from getting disciplinary action as a result of his brutal act of throwing Plaintiff to the ground unnecessarily and holding Plaintiff there against his will, in a blatant acct of unnecessary and excessive force perpetrated against Plaintiff due to his [Healy's]  perceived threat from his ADA mental health disability status, he thought Plaintiff am was a violent crazy person simply because someone told him Plaintiff was "experiencing mental health issues."

78.     The hospital staff failed to notify Plaintiff of his rights, he was not offered a chance to speak to an attorney, they did not contact any relatives or ask him if he wanted to notify anyone that he was being detained, they did not list any of his friends or relatives indicate any steps which they took to find his friends or relatives.

79.     Plaintiff's religion (Islam) strictly forbids opioid-based medication, which I informed the staff of and they completely ignored. Additionally, I informed staff of the fact that I had gone without sleep for 2-3 days because of emotional distress stemming from my mother's death. In spite of these facts, they immediately sedated me with 10MG of psychotropic medication against my will, and in blatant violation of my religious views, without me making any threatening statement or actions which were an immediate threat of safety to myself or anyone else—this fact

is reflected in the medical observational notes. They failed to notify me of my right to refuse this medication or to notify me of the associated risks or side-effect. The sole evidence that staff had supporting any threat to the safety of myself or others was the police report which falsely stated that I had committed a battery.

80.     Dr. Eugene Lozza MD, a resident in psychiatry, prepared a certificate in support pursuant to 405 ILCS 5/3-602. Section 3-602 requires that the petition be accompanied by a certificate executed by a physician, qualified examiner, psychiatrist, or clinical psychologist that states that the respondent is subject to involuntary admission and requires immediate hospitalization. Eugene Lozza MD, a psychiatrist on staff at Northwestern Memorial Hospital examined plaintiff on 11/1/19, pursuant to 405 ILCS 5/3-610. Section 3-610 states "As soon as possible but not later than 24 hours, excluding Saturdays, Sundays and holidays, after admission of a respondent pursuant to this Article, the respondent shall be personally examined by a psychiatrist. The psychiatrist may be a member of the staff of the facility but shall not be the person who executed the first certificate. If a certificate has already been completed by a psychiatrist following the respondent's admission, the respondent shall be examined by another psychiatrist or by a physician, clinical psychologist, advanced practice psychiatric nurse, or qualified examiner. If, as a result of this second examination, a certificate is executed, the certificate shall be promptly filed with the court." Section 3-610 further states that if no examination occurs within 24 hours of admission or if the examining psychiatrist does not execute a certificate, "the respondent shall be released forthwith."

81.     After examining plaintiff on 11/1/19, Eugene Lozza MD was required to either execute a second certificate or release plaintiff "forthwith." Eugene Lozza MD failed to execute the second certificate, yet he held Plaintiff in the psychiatric unit until the following morning. Eugene Lozza MD unlawfully restrained plaintiff by failing to release him "forthwith" on 11/1/19.

82.     Plaintiff was certified for involuntary inpatient admission by Eugene Lozza MD of Northwestern Memorial Hospital on 11/1/19, while sedated and not in a reasonable capacity to understand the situation, not presented an explanation of rights in the situation, and without identification of clear and convincing evidence of imminent threat to the physical safety of self or

others, in violation of 405 ILCS 5/3 admissions, hearing, and notice procedures. Defendants Northwestern Memorial Hospital and its agents took this action based on perceived mental impairment of plaintiff and hostility towards plaintiff's religion, perceived mental impairment and national origin and with willful failure to contact plaintiff's close family or relatives or make alternative arraignments for patient care. The sole evidence that staff had supporting any threat to the safety of himself or others was the police report which falsely stated that Plaintiff had committed a battery.

83.    The staff completed the petition examination and first certification for commitment within 5-6 hours of sedating Plaintiff and while Plaintiff was heavily under the influence of medication and not aware of what was going on, where Plaintiff was, or in any state to properly represent himself. Plaintiff was falsely imprisoned for seven days from November 1st-8th of 2019 in involuntary or voluntary patient admission status in the hospital against his own free will, which prevented Plaintiff from attending class or submitting coursework, ultimately resulted in a 3 semester suspension (Fall 2019, Spring 2020, and Fall 2020) directly impacting plaintiffs right to education, and long-term earnings and associated economic and benefits of education. During my time inside of the hospital, the staff forced me to take various medications and participate in various group sessions and activities in order to be released, despite the fact that I am a strictly practicing Muslim and vehemently requested that my treatment plan be limited only to prayer and religious activities. I was not informed of my right to least restricted treatment environment

84.    The hospital staff failed to file the petition, either certificate, proof of service of the petitions or my statement of rights with the court within 24-hours of my arrival, which was a Friday night, or on following Monday or Tuesday. They ultimately failed to file the petition or serve me with proof of filing at any time during my time at the hospital or after. The Illinois Guardianship and Advocacy Association is currently investigating my case. I was not given a copy of the petition to send to my attorney or guardian, nor was I asked if I wanted to send copies of the petition to anyone.

85.     These actions by NU event organizers and NUPD supervisors and employees and NMH supervisors and employees created a hostile learning environment that altered the terms and conditions of Plaintiff's education wherein Plaintiff was the victim of a brutal physical assault and falsely imprisoned for one week while at a law school student organization dinner and forced on a medical leave of absence as a result of discrimination directly related to his disability from November 1 – November 8th, 2020. As far as plaintiff knows, no other 2019 early decision admit, nor 2019 general admit was subject to this kind of treatment.

## 2019 Adverse Action and Discriminatory Sanctions

86.     On 11/1/19, Usama then called the law school Dean of Students Susie Spies-Roth and initiated a separate, school disciplinary process.

87.     NUPD Officer Healy #22 then notified his law school of the false narrative of this incident as it was recorded in the police report due directly to prejudice against his perceived mental health disability or threat he perceived as a result of his mental health disability and to save himself from disciplinary action as a result of his brutal unnecessary and excessive force perpetrated against Plaintiff due to his [Healy's] perceived threat from his ADA mental health disability status.

88.     Plaintiff was served with an interim-suspension and notice papers on November 6th 2019 stating that the school had received a report that Plaintiff struck an individual in the "mouth" during a law school event, while Plaintiff was still inside the hospital, and Plaintiff was requested to evacuate his university-affiliated residence within 5 days of leaving the hospital on November 8th 2019, under penalty of trespass and further school sanctions.

89.     After Plaintiff was released from the hospital Plaintiff received two separate letters in the mail from his insurance company denying the hospitals requests on November 5th and November 7th of 2019 for insurance coverage of continued inpatient stay, stating on both occasions, that "an independent review organization medical doctor, board certified in Psychiatry" reviewed the requests and determined that "continued inpatient stay has not been shown to be medically necessary to improve or correct your bipolar disorder."

90.     Following Plaintiffs return from medical leave, Plaintiff was forced to undergo a brutal defamatory student conduct interviews, wherein the attackers explicitly and in writing, admitted to harassing Plaintiff on the basis perceived threat from his disabilities, and Plaintiff made every effort to attempt highlight the fact that the University had failed to uphold its duty to provide students with disabilities the opportunity to pursue education free of harassment and discrimination by reporting all of the discriminatory conduct to the university.

91.     The account that was documented in the narrative of the police report (2019-00000595) was that Plaintiff had "become incoherent" while taking to "fellow law students" in the hallway and "stuck fellow law student Osama A. in the mouth" while at a law school event, and listed Muaaz on the report as witness to the battery. The report failed to document any visible injury to Osama, and to his knowledge, there was also no photographic evidence of any injury to him.

**2019 UHAS Hearing Witness Conflict of Interest**

92.     Upon the onset of the investigation, Plaintiff was asked by student conduct representative Christine DePilla, who served as his hearing officer, to provide a list of individuals who Plaintiff wanted interviewed in order to explain what they saw and heard during the incident.

### Initial Request To Have These individuals Contacted

93.     On 11/19/19 Plaintiff had articulated several reasons to interview Maksud and Ibrahim. Plaintiff initially requested that they be contacted because Maksud and Ibrahim were the NU Law students who coordinated and planned the MLSA event during which the alleged conduct incident in question occurred. Maksud and Ibrahim, close personal friends from childhood who grew up in the same part of Illinois, attended the event and were present at the time of the incident in question.  Maksud and Ibrahim were also among the NU law students who were aware of his mother's death on 10/23/19, and subsequently also attended his mother's funeral and burial on 10/24/19, at Rosehill Cemetery in Chicago.

94.     On 11/20/29 Ibrahim requested a non-contact order against Plaintiff through the university.

95.     Given Ibrahim and Maksud's friendship, Plaintiff sent an email to Depilla and Adams on 11/21/19 outlining the following concerns and requesting that the two individuals, Ibrahim and Maksud, no longer be contacted as part of his request for investigation about his student conduct resolution process AND that any damaging information that either one provides in relation to his conduct be viewed in light of the following facts.

**Conflict of Interest**

96.     The reason that I no longer consider Maksud and Ibrahim as appropriate subjects for providing testimony about this event is that Ibrahim filed a protection order against me on 11/20/19, and these two individuals (Usama and Muaaz) have a close personal relationship.

97.     These two individuals present a clear conflict of interest in providing unbiased testimony about the incident, because of the fact that they were involved with coordination of the event, for which they unjustly prevented me from inviting several individuals who shall be mentioned in the following sections.

98.     Maksud and Ibrahim justified the denial of admission of my invitees by claiming that no "non-law students" could attend.

99.     Maksud and Ibrahim subsequently invited their own personal friend, Shazeb Hassan - a non-law student (NU medical student), who attended the event with their express approval, even though he (Hassan) should have been denied permission to attend on the same grounds that my invitees were denied.

100.     Maksud and Ibrahim then, improperly and unlawfully, provided Hassan with THREE full pans of food from the event, food which they had purchased with school funding, pans of food which they (Usama and Muaaz) referred to as "leftovers."

**Prior Concerns About MLSA's Misappropriation of Student Funding**

101.     I had, prior to the MLSA event in question, expressed my concerns to both of these individuals that they were misusing/abusing and/or misappropriating the school's financial support/funding that they were receiving in order to coordinate events through the Muslim Law Students Association, hereby referred to as the "MLSA."

102.     The MLSA had historically spent significant amounts of their funding in order to take the members of the group out to dinner at various restaurants throughout the city.

103.     Plaintiff was of the opinion that the MLSA should be using their funds for philanthropic and/or charitable causes, in order to benefit the Muslim community in Chicago and in the United States. This is due to Northwestern University Law School's standing reputation as one of the premier legal institutions in the country, and the individual Islamic responsibility of a member of the Muslim Law Students Association at said law school.

### Denial of Admission for invitations I Made to Individuals For Attending the MLSA Conference on 11/1/19

104.     On 10/31/19, I expressed my desire that 3 other Muslim members of the Northwestern University community be invited to and allowed to attend the event in question. This is because Muslims are a small minority in the Northwestern University community, and I thought that we should all be allowed to attend each other's events.

105.     The individuals who I expressed interest in inviting, and who I did invite are: (1) Shazeb Hassan (410-952-8357) - Second year medical student at NU School of Medicine, (2) Ali Mahmood (708-407-5749) - Unknown year medical student at NU School of Medicine, and (3) Taha (Last name Unknown) (612-806-7196) - Unknown year medical student at NU School of Medicine.

106.     I then asked Maksud and Ibrahim for permission to bring two other Muslim, non-university affiliated guests to the event, the first is Rami Nashashibi: the executive director of the Inner-City Muslim Action Network (IMAN). He is a MacArthur "Genius Grant" Fellow and a 2018 Opus Prize laureate. He received a Ph.D. in sociology from the University of Chicago and has taught courses at multiple universities since, including a teaching appointment at the Chicago Theological Seminary. He was appointed by President Barack Obama to the President's Advisory Council on Faith-Based and Neighborhood Partnerships. Rami serves on the board of the Marguerite Casey Foundation, and is an advisor to a number of strategic initiatives across the country. His work with IMAN continues to feature in many national and international media outlets.

107. The second individual who I invited was Bilaal Evans: Unofficial Head of 501(c)(3) Inner-City Muslim Action Network Green-Re-entry Program.

108. The work of these individuals and their organization, and it's applicability to a national conference of Muslim law students at one of the nations top 10 ranked law schools is self-evident. More information about the group can be found at: https://www.imancentral.org/.

109. When I texted Usama and Muaaz to invite these aforementioned individuals, one or both responded with the following messages:

*110. "Hey bro, I'm so sorry we've had to turn away prospective law students, spouses, and others cuz it's supposed to be catered to current law students only, but we will likely have a ton of food left over and you can def get a ton if so! If it was just us hosting it, I wouldn't mind at all but we're co-hosting with U Chicago and they're the ones who've had to tell ppl no so we cant let non-law students in and put them in a bad spot"*

**2019 UHAS Interviews**

111. Despite this, student conduct chose to interview them. Usama interviewed and gave his statements on November 19th, Osama on the 20th and Muaaz on the 21st of November 2019.

112. The 3 attackers (Osama, Muaaz, and Usama) voluntarily and deliberately made false attack allegations, and additional false and defamatory allegations during a student conduct investigation conducted by his law school. Each one of the attackers made specific articulable statements during their interviews indicating that they were at least tacitly aware of his mental disability or that Plaintiff was experiencing mental health issues at that time.

113. Muaaz gave detailed accounts about how Plaintiff was "out of it" and about Plaintiff "asking people for pen" and "clapping randomly" and "rambling." He made additional unnecessary and lengthy remarks about his clothing which indicated that his true intent in giving the interview was malicious and defamatory. Both Usama and Muaaz confessed during his interview that he had not actually witnessed Plaintiff strike anyone, but had both entered the room and witnessed Osama choking Plaintiff on the ground.

114.     Osama reported in his interview that Usama told him that Plaintiff was "experiencing mental health issues." Osama confessed to repeatedly approaching and harassing Plaintiff on 4 occasions, including once when he admitted to unwanted physical contact where he touched Plaintiff on his back, out of concern about his "strange comments" and "the way Plaintiff was talking," but without ever making any specific mention to any threatening comments or threatening behavior whatsoever. Osama then claimed that Plaintiff was talking to an unidentified female, during which he apparently intervened on her behalf, and Plaintiff subsequently struck him in the "eye." Osama's comments strongly indicated that he targeted Plaintiff due specifically to "concern" about his disabilities, and this fact is reflected strongly in the interview transcript which he voluntarily participated in.

115.     All three had matching details relating to the severity and physical appearance of the alleged injury to Osama's eye in the immediate aftermath of alleged "attack" which strongly conflicted with the lack of notation in the police report or any physical pictures or evidence of injury to Osama. Plaintiff later confirmed with NUPD Deputy Police Chief Chin that standard NUPD procedure would be to document injuries of a severity which matched the description given by the three attackers.

116.     The student conduct investigation revealed that there was absolutely no evidence supporting Osama's false allegation that Plaintiff "attacked" or "battered" him. It also revealed that there was no mention made to police, staff, or administration during or immediately after the incident of the female who he and Usama alleged to have precipitated the altercation. Osama and Usama failed to identify the female during their interviews, despite their roles as event organizers. The police report made no mention of this alleged female.

117.     On 11/14/19, following the interviews with the three individuals, DePilla changed the allegations against Plaintiff from "stuck" a fellow law student in the "mouth" which was stated in the November 6th suspension notice Plaintiff received, to "stuck" them in the "face," in later versions of investigation reports, in order to maliciously proceed with conduct investigation despite full knowledge of these major discrepancies in details and blatantly illegal behavior committed by Muaaz. Student conduct also constructively omitted many of the details which

Plaintiff cited to support his defense from the final version hearing notice. They took these actions because they had already decided Plaintiff's guilt based on the fact that Plaintiff was arrested by NUPD and involuntarily committed, treating Plaintiff differently than similarly situated law students without disabilities , Maksud, Ibrahim, and Alkhawaja and propagating the negative and discriminatory stereotype that people with disabilities and Muslins are violent criminals or that they are insane, even when the facts tend to support their innocence, such as in this case.

**Discrimination, Complaints, Deliberate Indifference, and Retaliation 2019**

118.    On or around 12/5/20, Plaintiff reported the vast array of discriminatory behavior to University Student Conduct Representatives and Hearing Officers, Heather Cohen and Christine DePilla, and additionally requested to share the interview materials with NUPD in order to report disability discrimination. At that time, DePilla informed Plaintiff that "the investigation report cannot be shared, including with police." They never addressed any of my concerns at that point or at any subsequent point for the remainder of my interactions with them. Notably, when Plaintiff reported Healy's #22 violation of 405 ILCS 5/3-606 to DePilla and Cohen on 12/5/19, they failed to respond or report the matter to the Office of Equity even though this very clearly qualified as harassment based on a protected class (ADA Disability Harassment).

119.    On 12/10/19, Plaintiff sent two complaints at 2:35 AM and 3:01 AM email to all the of the people on the police board including Chief Lewis, Cmd. Benson, and DC Chin reporting the 11/1/19 false imprisonment. Plaintiff additionally submitted a disability harassment complaint to the office of equity.

120.    On 12/10/19 at 7:26 PM Plaintiff sent email to Kadens and Provenzano informing them of the battery and false imprisonment, to date they never responded.

121.    On 12/10/19 at 2:57 PM DePilla sent an email instructing DC Chin and NUPD of the following, "This document [UHAS 2019 Preliminary Hearing Report] should not be used as evidence in any follow up/investigation of the complaints filed." In this malicious act of deception, DePilla recklessly violated ADA discrimination states and brutally further victimized me by preventing my legitimate reports of discrimination and desperate pleas for help from being heard or investigated. In doing so she blatantly and deliberately and maliciously violated the schools

police on reporting and non-retaliation by failing to address my concerns, then deceptively and secretly suppressing the evidence and reports that I made about the attack or commission, or subsequent reports about her failure to act and discriminatory conduct both during and after the process.

122.     On 12/12/19 at around 9:42 AM Plaintiff filed "Ethics Point" report ("EOP 597") reporting the 11/1/19 false imprisonment and received response that NUPD was the proper party to contact.

123.     On 12/12/19 at 10:44 AM Plaintiff submitted another disability discrimination and harassment complaint to the office of equity.

124.     On 12/17/19 at 5:09 PM the director of the Office of Equity, Karen Taburro responded to Plaintiff's complaint from 12/12/19, requesting more information and indicating "our office does not process student-on-student complaints of discrimination on the bases of race, color, religion, national origin, sex, age and disability.  To the extent that the individuals you name are students, our office does not have jurisdiction over those matters."

125.     At some point DC Chin responded and assigned Detective Sarah Stark ("Stark") to supposedly to "investigate" his concerns, and on 1/1/20 at 5:46 PM plaintiff requested an investigation about the false imprisonment and other concerns. TO date, she never responded. DePilla retaliated against Plaintiff for reporting this in his 2020 student conduct hearings, it is a separate count of "sharing," in order to retaliate against him and punish him for reporting her blatant discrimination and predatory and malicious actions which were taken solely on the basis of disability, because she still treats him like he is making everything up solely on the basis that he was involuntarily committed.

126.     On 1/27/20 Tamburro responded to Plaintiff's complaints by dismissing them all for "lack of information" and indicating again that the "jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students, Usama Ibrahim and Muaaz Maksud." Although Plaintiff sent replies to the email

providing the information which was purportedly missing, Tamburro never responded to the email.

127.     Plaintiff has filed at least 10 separate complaints with the University and with NUPD about Healy's #22 violation of 405 ILCS 5/3-606, but to date they never responded.

128.     NUPD officers #22, #26, #56, and administration including Deputy Chief Eric Chin and Commander Benson have all displayed blatant bias towards Plaintiff as a direct result of his ADA disability, they think that Plaintiff is not intelligent enough for his complaints to warrant concern or investigation because of his disabilities, and have repeatedly failed to respond to his complaints or questions regarding this incident. NUPD and the Office of Equity have failed to respond to his complaints because of bias and prejudice towards his disabilities and an interest in protecting their University employees for their blatant and predatory discrimination.

129.     This hostile learning environment continued unabated despite Plaintiff's complaints to NU and NUPD managers and supervisors.

130.     DePilla and Cohen's treated non-disabled law students in Student Group #1 more favorably than Plaintiff with respect to terms and conditions of education.

131.     DePilla and Cohen's disparate treatment of Plaintiff continued unabated despite Plaintiff's complaints to NU and NUPD.

**Discrimination and Retaliation 2019**

132.     As part of the continuing pattern of harassment and discrimination, during the student conduct process, the Christine DePilla and Heather Cohen engaged in various discriminatory actions and treatment in order to find Plaintiff guilt, including:

- In the 2019 investigation outcomes report, explicitly citing the cognitive functions of "memory" and "consistency", which are conditions directly impacted by plaintiffs disabilities, in order to justify the crediting the attackers version of events as more "likely" to have occurred. In doing so, they treated the plaintiff differently than similarly situated law student Maksud and Ibrahim and Alhawaja, based solely on factors directly impacted by Plaintiff's disabilities. That justification is indicated below:

i. *"We then considered Osama's account of the evening in question. We noted that his timeline and observations about the evening's event was very detailed and aligned with the other three witness accounts in the investigative report. We also noted that a witness corroborated Osama's account that he observed you sit next to a woman and approach you thereafter. Additionally, we noted that two witnesses also observed injury to Osama's eye. Based on Osama's clear and consistent articulation of the evening's events and interactions with you, which were corroborated by others, we found his account to be more credible."* (12/19/19 Student Conduct Investigation Outcome Letter, Pg. 3-4.)

- Inappropriately relying on the fact that Plaintiff was involuntarily committed as reasons justifying his guilt and lack of credibility during the proceedings.

- Illustrating clear gender-bias by inappropriately relying on the assertion that Plaintiff simply "sat next to a woman" in order to justify Alkhajawa's harassing approach without attempting to contact the woman in question or identify her in order to substantiate the notion that the interaction warranted intervention from Alkhawaja.

- Violating Discrimination and Reporting policy Deliberately failing to report the numerous disability related discriminatory acts committed by plaintiffs attackers even after Plaintiff brought them to their attention in violation of university reporting policy, and deliberately preventing Plaintiffs numerous disability related complaints from being investigated by law enforcement or university in violation of university reporting and retaliation policy. Treating plaintiff differently than similarly situated students who are not Muslim and those without disabilities, such as Maksud, Ibrahim, and Alkhawaja.

133.    On information and belief, DePilla has blocked at least 20 different reports to current date from being investigated or heard related to the incident to date in retaliation for me

filing each one, and violated Non-Retaliation Policy each time she blocked a report, retaliating against plaintiff for reporting his concerns by secretly having them blocked without telling him, and then compiling an extensive list of the reports which she blocked in order to retaliate against me by using them in my current student conduct hearings.

134.     On information and belief, DePilla is directly responsible for adding 7 separate counts of inappropriate "sharing" to plaintiffs 2020 student conduct charges at this date and time. in retaliation for me filing each one, and violated Non-Retaliation Policy each time she blocked a report, retaliating against plaintiff for reporting his concerns by secretly and indirectly having him punished in his current student conduct investigation without being exposed to direct liability or responsibility.

135.     As part of the continuing pattern of harassment and discrimination, On December 19, 2019 DePilla and Cohen found Plaintiff guilty of "endangering myself or others" based off the testimony of his three attackers, and the police report which stated that Plaintiff battered Osama and Muaaz witnessed the battery, despite having full knowledge Muaaz had confessed to not witnessing anything except seeing Plaintiff being choked by Osama as he entered the room, and confessed to then aiding him [Osama] in physically restraining Plaintiff. Student conduct found that his attacker's repeated targeted and predatory harassment was justified because he was one of the "organizers" of the event and was concerned for vague and unspecified "safety" reasons.

136.     Additionally, they failed to address a majority of the major issues which Plaintiff raised during the investigation and in his defense. They never identified where the privileges and rights of event "organizers" were stated in the student handbook, or anywhere else. They failed to address why Osama did not notify the proper authorities rather than repeatedly attempting to confront Plaintiff for the alleged behavior that he found so concerning. Crucially, despite his vehement requests they also made absolutely no attempt to identify or contact the "woman" in question, neither through the list of attendees which was readily available through the university given their roles as university investigators, nor through asking all three of the attackers, who were also the event organizers.

137.     DePilla and Cohen's stated reasons for disciplining Plaintiff on December 19, 2019 were a pretext for disability, race, color, religion, gender, and national origin discrimination.

**Appeal of 2019 UHAS Hearings**

138.     On 1/2/20 Plaintiff sent an email to Lucan Christian of student conduct, partially outlining the major concerns Plaintiff held during the process. The purpose was to appeal the decision to find Plaintiff, Fahad Syed, responsible for violation of the 2019-2020 Endangering Self or Others policy, which prohibits "Any action (or threat of action) that endangers or threatens to endanger the health, safety, or wellbeing of any person (including oneself). Severity and/or persistence may be considered" (pg. 32). Additionally, this document sought to appeal the variety of sanctions imposed a result of the alleged violation. The grounds for appeal are outlined in the following sections below, each under the relevant subheading.

### Procedural Errors That Substantially Affected the Fairness of the UHAS 2019 Hearings

**139.     Deliberate Modification of Location of Injury in Original Allegations by Christine DePilla in Order to Knowingly Proceed with Disciplinary Process under False Pretenses and Manifest Injustice**

- On 11/6/19, while inside of Northwestern Memorial Hospital, I was served with a fax from student affairs notifying me of an immediate interim suspension. The first paragraph of the document contained the following sentence: "**Specifically, it has been alleged that during the evening of November 1, 2019 you became incoherent while speaking with fellow law students and struck a University of Chicago law student in the mouth with your fist.**"[1]

- On 11/14/19, I received an electronic copy of the notice of charges from student affairs which contained the following sentence: **"The Office of Student Conduct has received a report concerning an incident that**

[1] Documentation Attached: 11/6/19 Notice from Student Affairs

**occurred on November 1, 2019, alleging that your physically assaulted a guest at a Law School event, by punching that individual in the face."[2]**

- According to the record of the student conduct investigation conducted by Christine DePilla, she did not interview the individual making these allegations, Osama Alkhawaja, until 11/20/19. During that interview, it was apparently learned that Osama was actually allegedly stuck in his "eye."

- Christine DePilla deliberately generalized and broadened the original allegation, which was taken almost verbatim from Police Report Case #2019-00000595 on her own accord, and without any evidence to support such a modification. In doing so, she deliberately interfered with my right to receive specific notice of the allegations being made against me, and diminished my capacity to respond to those substantive allegations, thereby substantially impacting the fairness of the hearing.

- Furthermore, even after she was made aware through her interview with Osama on 11/20/19, that the original allegation was false: by his own admission, I did not strike Osama Alkhajawa in his mouth, Christine DePilla deliberately disregarded a substantial inconsistency with the original allegations in order to knowingly proceed with the student conduct disciplinary process under false pretenses, committing flagrant misconduct as a hearing officer.

140. **Failure to Follow Proper Investigation Procedure for "Complex" Investigations**

- "When more complex investigations are required, similar procedures as are outlined in Panel Hearing Investigations will apply, though a formal investigative report is not written." 2019 NU Student Handbook, pg. 114

- The investigation for this incident required interviews with five separate parties, including two interviews with me, in addition to follow up interviews

---

with R/O Healy #22 of the Chicago Police Department. Therefore, it was sufficiently "complex" as required by pg. 114 of the student handbook.

- "The reporter and the respondent will both have the opportunity to speak with the investigator, to present a list of witnesses from which they suggest the investigator solicit information, ***and to provide a list of questions they suggest the investigator ask the other party.***" 2019 NU Student Handbook, pg. 117

- I was not given an opportunity to provide a list of question to ask the other party. Had I been given this opportunity, as required by the procedure, I would have posed the following list of questions to Osama A.:

    i.   Do you know the difference between your mouth and your eye?

    ii.  Do you know the difference between your mouth and your face?

    iii. Do you know the difference between your eye and your face?

    iv.  Why did you tell the investigating police officer that you were hit in your mouth, and tell the student conduct officer that you were hit in your eye?

    v.   Can you explain why your account of the incident to the police which is recorded in the narrative of the police report is different from your account of the incident which you reported to the student conduct investigator?

    vi.  Are you aware that lying to the police is against the law?

    vii. Are you aware that coordinating a false narrative of events with other individuals in order to have someone involuntarily committed inside of a mental institution is against the law?

    viii. How long have you known Usama I. and Muaaz M.?

    ix.  Did you have any communication with Usama and/or Muaaz, after the incident in question, which pertained in any way to the incident in

question? If so, what exactly were the contents of those communications?

x.  Do you know the identity of the woman who you alleged was involved in the incident in question?

xi.  Do you acknowledge that as your role as an event organizer, that you had access to the identify of all individuals who were invited to, and/or who attended the event?

xii.  Is there any reason why you did not identify or provide the contact information of the woman who you alleged was involved in the incident in question?

xiii.  Do you have any idea why the woman who you alleged was involved in the incident would not be able to decide for herself whether she felt threatened, and if so take the appropriate actions for her own safety?

xiv.  Do you have any idea why the woman who you alleged was involved in the incident in question would not make a statement to police, or any other authorities whatsoever?

xv.  Can you explain why you failed to mention the woman who you alleged was involved in the incident in question to the investigating police officer at the time of the incident?

xvi.  Can you describe your role and duties as event organizer for the event in question?

xvii.  To your knowledge, did your role in any way involve providing security for the safety of others at the event, and if so, can you describe what those responsibilities would entail?

xviii.  Were you aware that you could call the police or contact Northwestern authorities or other event staff in order to report individuals who you felt were threatening the safety of others? If so,

why did you take it upon yourself to provide for the security of the woman who you alleged was involved in the incident in question?

xix. Were you at any time made aware that Fahad Syed may be suffering from "mental" distress of any kind prior to approaching him in any of the four recorded incidents wherein you interacted with him?

xx. Did you identify yourself and your role as event organizer at any time during the four incidents wherein you interacted Fahad Syed?

xxi. To your knowledge, did Fahad Syed make any statements which could be considered "threatening" or endangering the safety of yourself or others, and if so what were those statements?

xxii. Can you describe what walking "aggressively" looks like?

xxiii. Can you acknowledge that if someone felt they were being harassed, that they might walk away at a rate of speed higher than normal, in order to retreat from that perceived harassment?

xxiv. Can you acknowledge that harassment is a subjective concept, which is based on the perceptions of the person who is subject to harassment?

xxv. Are you aware that making "intense" eye contact while aggressively questioning someone who you do not know with with questions which they may find inappropriate could be considered threatening behavior?

xxvi. Are you aware that interrupting the personal conversation of two strangers, in order to question one party on the appropriateness of their interactions, could be considered provocative or threatening?

xxvii. Can you describe how, when observing one male sit next to a female, neither of whom you know, and observing the female leave, and the other person asking her to "stay," was an event which prompted your personal intervention?

xxviii.   Can you explain what prevented the female in question to act on her own behalf to secure her safety during this incident?

xxix.   Is there any reason why, after you were allegedly punched, why you chose to tackle Fahad Syed instead of immediately going for help or calling the police?

xxx.   Can you describe how your tackling Fahad Syed and viciously choking him was intended to provide for the safety of others, and who exactly those "others" when there was no other person in the vicinity when the alleged physical altercation occurred?

141.   The prevention of posing these questions to Osama substantially affected the fairness of the hearing because they did not allow me to highlight and illustrate the concerns about the credibility of Osama's account, which I articulated about the incident and ensuing investigation. These concerns were ultimately either deliberately discarded or intentionally evaded by the student conduct. Those concerns include the following:

- Concerns about conspiratorial efforts, both to have me involuntarily committed, and then to maliciously ruin my law school career through the student conduct process.

- Concerns about prior existing relationships between three of the individuals interviewed for the student conduct process, and further concerns about a conflict of interest which prevented those witnesses from acting as reliable and unbiased sources of testimony for the incident in question.

- Concerns about deliberate and targeted harassment, which were completely discarded by student conduct.

- Glaring inconsistencies between the police report and the student conduct interviews, which were ultimately deliberately ignored or evaded by the student representatives, despite multiple instances wherein I brought them forward.

- Evidence of malicious criminal conduct on behalf of at least 2 of the witnesses interviewed as part of the student conduct process.
- Concerns about the woman who figured prominently in the narrative of the events which led to the altercation, about whether it was appropriate for Osama to attempt to act as her personal bodyguard, and whether she actually felt threatened, and whether she was competent to speak for herself or take actions to secure her own safety, had she in fact felt threatened.
- Concerns about whether I actually spoke to this woman at all, which I stated on multiple occasions that I did not recall.

## 142.  Deliberate Disregard of Individual ADA Disability Rights

- Deliberate and malicious disregard to account for my rights as an individual with two documented ADA disabilities to attend a student function without fear of harassment or intimidation or threats or physical violence directed at me on the basis of my perceived mental condition. This is despite evidence which will be outline in the following section which clearly showed that Osama was aware of some element of mental distress and targeted me for malicious and predatory harassment specifically on the basis of that perceived mental condition.
- The failure by student conduct to consider my disabilities, or perspective on the multiple instances of targeted harassment committed by Osama during the event in question substantially affected the fairness of the hearing by allowing student conduct to justify the multiple instances of harassment committed by Osama in terms solely articulated from his perspective, thereby rendering my perspective invalid and clearing him of all wrongdoing while blaming me for being victimized repeatedly and maliciously.

## 143.  Failure to Interview or Identify Woman Alleged to Have Been Involved in Precipitating Events to Altercation

- Student conduct failure to identify or interview the woman who was alleged to have been involved in precipitating the physical altercation in question. Statements were attributed to her, and to me, which I denied. Her perspective is important as to whether she felt threatened, or whether she felt she needed Osama to intervene on her behalf, and to whether his harassment was considered threatening or provocative by student conduct. Given Osama, Usama, and Muaaz were all event organizers, they had access to the identity of all attendees and should have identified the woman that was alleged to have been involved in the precipitation of the conflict, given her central alleged role in justifying Osama's malicious harassment. If there were concerns about the protection of her identity, student conduct could easily have kept her identity anonymous after confirming that she was, in fact, involved in the precipitating events of the physical altercation in the manner alleged by Osama and Usama.

- The blatant failure by student conduct to interview, or even simply identify this woman, coupled with the deliberate use of her alleged involvement as justification for Osama's fourth consecutive instance of predatory and unwarranted harassment substantially affected the fairness of the hearing, because her alleged perspective was taken as justification by student conduct for the fourth incident of harassment committed by Osama, which directly led to the physical altercation in question.

**144.    Student Conduct's Deliberate Disregard of Investigation Results and Resultant Concerns**

- Student conduct failure to properly consider the results of their own investigation process, and to properly consider the concerns that I brought forth about the findings of the investigation process. These concerns were directed at the multiple glaring inconsistencies in the version of events presented by Muaaz, Osama, and Usama and included:

- Difference between the police report narrative of events and the narrative of events later presented by Muaaz, Osama, and Usama.

- The fact that Muaaz M. was listed as a witness to the battery police report and then in the interviews admitted to not witnessing the battery.

- The location and description of the injury in the police report and that reported and described in the interviews, in addition to the inconsistency of the description of the injury reported by R/O Healy #22.

- The absence of any mention of the woman alleged to have been involved in the incident in the police report.

- The discrepancy between the descriptions of Usama and Osama with regards to my alleged interaction with the woman alleged to be involved in the precipitating events which led to the physical altercation in question, specifically with regards to whether I was standing or seated when Osama approached and harassed me.

- The deliberate disregard by student conduct to address these concerns substantially impacted the fairness of the hearing, because the "consistency" between the witness accounts and Osama's allegation was taken as justification for concluding that his account of events was more likely to be true by student conduct.

145.   **Deliberate Disregard of Witness Credibility and Bias Witness Testimony Concerns**

- Deliberate disregard by student conduct of the concerns about conflict of interests which I had previously brought forth about Usama I. and Muaaz M. which spoke to their inability to act as impartial witnesses or provide unbiased testimony relating to the event in question. Evidence for this includes the fact that there a current protection orders between me and both aforementioned individuals issued thought the student conduct office[3]. Additionally, I sent an

---
[3] Documentation Attached: Student Conduct Protection Orders for Usama Ibrahim and Muaaz Maksud

email outlining these concerns to Christine DePilla, Dean Adams, and Student Conduct on 11/21/19[4].

- The deliberate disregard of these concerns substantially affected the fairness of the hearing because the "consistency" between the witness accounts and Osama's version of events was taken as justification for taking his version of events as more likely to be true.

### An Outcome of Findings That Was Manifestly Contrary to the Weight of the Information Presented During the 2019 UHAS Hearings

146.     The outcome of the findings of the student conduct process which found me responsible for endangering the safety of others was egregiously unsupported by the evidence at hand. Student conduct apparently disregarded almost everything that I said about feeling threatened and harassed, and wholly took Osama's fabricated narrative of events as a factual basis without even a shred of supporting evidence.

147.     The evidence consistently and strongly supports the fact that I was suffering from severe mental and emotional distress at the time of the incident in question, which left me in a vulnerable mind state, which was in turn was taken advantage of in a predatory and callous nature by Osama A. As previously stated but almost wholly ignored by Christine DePilla, a combination of my religious obligations to spend time with my dying mother, stress from conditions and circumstances of her death, circumstances related to a particular class assignment, two recognized and documented ADA disabilities, academic challenges of 1L year course load, the additional advocacy initiatives that I was engaged in, and being unable to find time to sleep or take my prescribed medication for several days prior to the conference in question, all impacted my behavior at the time of the incident. Because of the fact that I had been using and relying on my religion to help me cope with my mother's recent death, it was in my vulnerable state of mind at that time, that I felt that attending a conference where there were other people in my faith group who I could share my experience with would be beneficial to helping me mentally process and cope with my loss.

---

[4] Email Correspondence outlined concerns sent on 11/21/19.

148. The evidence clearly shows that I was maliciously targeted by Osama in repeated instances of unwarranted, and predatory harassment on the basis of my perceived mental condition, wherein he touched me inappropriately, used threatening and provocative language, and persistently presented himself as an increasingly severe threat to my physical safety on no less than four separate occasions. The evidence shows that he was informed of my mental condition, and targeted me on that specific basis. The evidence shows that all interviewed parties were aware of indicators of my mental and emotion distress, and that it was obvious and apparent to all parties involved. The evidence shows that I attempted at every instance to deescalate the situation and/or retreat from his predatory approaches, yet despite my repeated attempts to escape, he relentlessly targeted me with unwarranted harassment, and blatantly and recklessly instigated an altercation by displaying himself in an increasingly threatening and provocative manner, which ultimately led to the physical altercation in question. The evidence clearly indicates that at no time did I use any language or make any statements that could be construed as threatening to the physical safety of myself or others, nor was my physical demeanor threatening to the physical safety of myself of others in any obvious or apparent manner.

149. At all times I have maintained that I do not recall striking Osama. I distinctly and consistently recalled perceiving him as a severe threat to my physical safety immediately prior to the physical altercation in question, and I felt that he was invading my personal space immediately prior to the physical altercation in question. ***I strongly disagree with the baseless allegation that I struck Osama "without any physical touch by Osama in the contemporaneous interaction," furthermore there is no evidence substantiating that allegation whatsoever. I strongly disagree with the notion that I initiated the physical altercation in question, strongly disagree with the notion that I struck Osama without his first physically touching me during the physical altercation in question.*** I strongly disagree with the notion that I stuck Osama in any manner other than one intended in self-defense, and I have consistently articulated this fact at all times throughout this process of this investigation.

150. The evidence clearly shows Osama was the aggressive party at all times and in all four instances where he interacted with me, that approached me repeatedly without any warranted

justification, that he never identified himself or his role as event organizer, that he committed a legal act of battery without any justification whatsoever, that he acted egregiously and far beyond the scope of his responsibilities as event organizer, and that he committed serious misconduct and failed to properly execute any responsibility which he may have had relating to event security, which was only to notify the proper authorities on the basis of a perceived threat. The evidence shows that Osama heinously took advantage of my mentally distressed state to inflict malicious harassment upon me at will, abusing his authority and position as event organizer to do so, and using his position as an excuse to escape any responsibility for his heinous and predatory actions.

151.    As previously stated but deliberately ignored by student conduct, when police arrived on scene to question me, I was extremely disoriented and confused because of the physical altercation. I was frustrated that no one, especially police, was listening to my side of the story, everyone listened to Osama's false allegations. Due to my disorientation, I had difficulty trying to explain the situation, and at some point during the police questioning, I mentioned Jon Graham Burge of the Chicago Police Department. It was at that point that officers almost instantaneously started to drag me down the stairs. Due to my disorientated state, confusion, and fear, I legitimately thought that the police were going to harm me, and I started calling for help and resisting the detention.

152.    My friend and mentor Bilal Evans, from the Inner-City Muslim Action Network (IMAN), where I have been heavily involved with volunteer and advocacy efforts, told me about Burge. Though my involvement at IMAN, I also personally came to know Jackie Wilson[5], brother of the late Andrew Wilson, and was told in detail about his case, which directly resulted in uncovering the vast history of unlawful activities committed by Burge. I actually lived in the same house as Jackie for a period of almost seven months in 2019, in Englewood on the south-side of Chicago. In the week after my mother's death and prior to attending the event in question, I had visited the Center for Wrongful Convictions to inquire about the Burge case, in addition to discussing the case with Maureen Stratton in the NU Bluhm Legal Clinic. In addition, in that same

[5] Photographic Evidence Attached

week, I had discussed the case and the details extensively with NU criminal law Professor Len Robinowitz.

153.     During my student conduct interview, I specifically asked Christine DePilla to contact Maureen Stratton, Bilal Evans, and Professor Rubinowitz in order to confirm that I had recently been in contact with them about the case, yet Christine flagrantly disregarded my request. Christine then specifically mentioned how I "thrashed" about when the police were detaining me as evidence supporting the baseless and malicious accusations made by Osama, without so much as a mention of the reason I was experiencing such fear of the illegal detention. At no time during my illegal detention by police, or prior, did I make any statements which could be construed as threatening to the safety of myself or others. This fact is reflected in the involuntary commitment paperwork, where police used the battery as sole justification for the illegal involuntary commitment.

154.     Furthermore, the evidence clearly shows that Osama misrepresented the facts of the incident to the investigating police officers on the night in question in a malicious and deliberate attempt to have me involuntarily committed and evade any responsibility for his heinous attack. Muaaz Maksud deliberately and falsely claimed to witness an alleged act of battery in order to substantiate Osama's malicious allegations. The evidence further shows that Usama, Osama, and Muaaz then deliberately conspired to formulate a second fabricated narrative which they reported to the student conduct investigator, which itself held multiple glaring inconsistencies with the original fabricated narrative reported to the police, in a deliberate attempt to ruin my law school career and absolve themselves of any responsibility for their malicious actions.

**155.     Consistently Articulated Perspective of Perceived Threat from Osama from student conduct** Interview on 11/19/19

- • Fahad said he remembers being outside of a room and talking to an unknown individual. Fahad said he believes the individual went to the University of Chicago.

- • Fahad said he "felt the individual was very close to him and "invading his space." Fahad said the individual was asking questions very rapidly."

- o Fahad said he was not in the "correct state of mind" when this individual was questioning him.

- o Fahad said he does not remember what the individual was asking him.

- o Fahad said that the individual should have known to not approach someone "in that state."

- Fahad was asked how the individual would have known the reason for his current state. Fahad said, "Someone could have told him."

- • Fahad said he asked the individual to "back up."

- • Fahad said the next thing he remembers is being on the ground and people holding him. Fahad said he remembers the police talking to him.

- o Fahad said he remembers being confused about what was happening.

156. <u>Interview on 11/27/19</u>

- •Fahad was asked to explain his statement in the first interview where he said, "I do not recall attacking someone" and "I don't see evidence that this was a one-side altercation."

- o Fahad said that he "accepts the facts at hand" and accepts responsibility for his actions and he is praying that things will work out equitably.

- o Fahad said that he does not recall the incident that led to striking the individual or what led to the altercation, except that he remembers talking to the "guy" and he was in his space.

- o Fahad said he could not recall why he would do that and he is ashamed for the time "they" put in planning the event.

- o Fahad said that he "wishes he could take it back." Fahad said it has been painful to not go to class. Fahad said he would never intentionally try to ruin his own future.

- o Fahad said his time in the hospital was helpful and he was able to get back into a routine.

- Fahad was asked if he recalled sitting next to a woman who was on the phone. Fahad said he was not sitting next to her. Fahad said he thought the woman was "out there on the phone, talking about him, and wanted to know why." Fahad said he was not in the "right frame of mind at the time." [SEP]

- Fahad said he did not know Osama and did not understand why he was asking questions and presenting himself in a threatening manner. [SEP]

- o Fahad said he was surprised that Osama would approach him based on his "frame of mind," and "how he was acting that night."

- Fahad was asked if he told Osama he felt threatened by him. Fahad said he does not remember if he told Osama that he felt threatened. [SEP]

- Fahad was asked how Osama was presenting himself in a threatening manner. Fahad said he thought Osama was being aggressive because he was standing close to him and "rapidly" asking questions. [SEP]

- Fahad was asked about the questions that Osama was asking him. Fahad said he does not remember the questions.

- Fahad was asked if he recalled the individual(s) who were holding him down on the ground. Fahad said that Osama had him in a headlock. [SEP]

### 157. <u>First and Second Harassing Approaches and Use of Threatening and Provocative Language</u>

- • Meher said that Fahad stopped speaking when Osama calmly approached Fahad and said, "Let's talk about this elsewhere."

- • Usama said Osama approached Fahad and asked him to "wrap it up" and speak with him outside.

- o Usama said Fahad quieted down.

- Usama said that Osama approached Fahad again and said, "Let's go outside" and Fahad quieted down. [SEP]

- • Muaaz said one of the University of Chicago students approached Fahad and asked him to stop and allow the speakers to move on with the reception.

- o Muaaz said the individual from University of Chicago asked to him to stop again and offered to speak with him individually.

**158.** **Battery Admission**

- • Osama said he approached Fahad, touched him on the back, and said that he "appreciated the comments but to save the questions for later." Osama said that Fahad stopped.

**159.** **Statements and Evidence Admitting Tacit or Direct Awareness of Mental Distress by All Parties Interviewed**

- • Meher said that she would describe Fahad as looking disoriented.

- • Osama said that Fahad made "strange comments."

- • Osama said after the opening remarks, he approached Usama and asked, "Is this someone who will continue to interrupt?"

- o Osama said that Usama responded, "I don't know."

- o Osama said that Usama told him that Fahad might be experiencing some mental health issues.

- Osama said he decided not to press charges because he thought Fahad was mentally unwell and that he needed help as opposed to punishment. ⌊SEP⌋

- Usama I. attended my mother's funeral and burial, along with Muaaz M. and other members of the NU Muslim Law Students Association. The fact that he didn't admit that fact to anyone does not remove the fact that he was fully aware of the fact that I was suffering from mental and emotional distress over her death.

- • Muaaz said the week leading up to the conference; Fahad's mother had passed away. Muaaz said he was in contact with Fahad and tried to be there for him.

- • Muaaz said that Fahad was not "present in the moment" and not talking much. Muaaz said Fahad "seemed different from previous interactions."

**160.** <u>**Third Unwarranted and Harassing and Threatening Approach and Further Provocation and Evidence of my Efforts at De-Escalation.**</u>

- • Osama said that after dinner he was standing outside of the keynote speaker's room.

- • Osama said he approached Fahad

- • Osama said Fahad walked away. Osama said he was not afraid by this interaction

**161.** <u>**Fourth Unwarranted and Harassing and Threatening Approach Leading to Physical Altercation**</u>

- • Osama said at that point, he approached Fahad and the female and told the female she did not

- need to stay.

- • Osama said that Fahad was sitting on the bench and he was standing five feet away from him.

- o Osama said during the interaction, he and Fahad were making "intense eye contact with one another."

- • Osama said he asked Fahad, "Why did you ask her to stay?"

- • Osama said he asked Fahad "Was that appropriate?"

- • Osama said that he told Fahad, "I don't think it's appropriate what you said and the manner that you said it."

- Osama said he then lowered his head in an attempt to tackle Fahad. ⌷⌷

- Osama said he put Fahad in a "head lock" so he could not move and yelled out to Usama three times. ⌷

- Osama said that Usama and Muaaz came outside and Muaaz held Fahad's arms down. ⌷

- Osama said that Fahad said, "I can't breathe." In response, Osama said he let go of any pressure but stayed on top of his chest so he could not move. ⌷

**162.** <u>**Multiple Witness Reports of Osama Choking Me**</u>

- • Osama said he put Fahad in a "head lock" so he could not move and yelled out to Usama three times.

- • Osama said that Fahad said, "I can't breathe." In response, Osama said he let go of any pressure but stayed on top of his chest so he could not move.

- • Muaaz said he observed Fahad's arms around Osama's neck and body. Muaaz said he observed Osama trying to hold Fahad down.

- • Usama said he walked out of the room and observed Fahad on the ground and Osama was restraining him.

**163.** **No Reported Use of Threatening Language or Statements**

- You were making comments, which included; "the reasonable person standard, a six-year old could understand," and "look it up on the internet."

- Meher remembers Fahad saying phrases like, "reasonable person standard and six year old," "loves his mom and being here."

- • Muaaz said Fahad's thoughts "were all over the place" but remembers Fahad saying, "thankful for MSLA for being there for him."

- Muaaz said he only remembers the phrases, "look it up on the internet," "show in video," "the reasonable person standard, a six year old could understand."

**164.** **Fabricated and Inconsistent Reports of Alleged "Threatening" Behavior Involving "Mystery" Woman**

165.   Usama Interview

- • Usama said he and Osama were standing outside of the door and *saw Fahad sit next to a woman*. Usama said the woman was speaking to family in an "angry way" on the phone.

- • *Usama said the woman stood up and started walking away and Fahad started to follow her.*

- • *Usama said that Osama approached Fahad. Usama observed Osama and Fahad speaking "comfortably" at this time.*

166. <u>Osama Interview</u>

- • Shortly thereafter, Osama observed Fahad walk aggressively to an unknown female sitting on a bench and ***sat down next to her*** making shoulder-to-shoulder contact.

- • Osama said the female immediately got up and Fahad told the female, "stay."

- • Osama said the female responded, "I don't have to stay."

- • ***Osama said at that point, he approached Fahad and the female*** and told the female she did not need to stay.

- • ***Osama said that Fahad was sitting on the bench and he was standing five feet away from him***.

- o Osama said during the interaction, he and Fahad were making "intense eye contact with one another."

167. **<u>Osama's Inconsistent Reports of Alleged Perceived Threat.</u>**

- Osama said Fahad walked away. Osama said ***he was not afraid by this interaction***

- Osama said he then lowered his head in an attempt to tackle Fahad. Osama said ***he did not want Fahad to harm anyone else***.

- Osama said ***he did not perceive Fahad to be a threat*** so initially decided not to call 911

168. **<u>Major Inconsistencies with Police Report Narrative and Osama's Student Conduct Interview</u>**

- Police Report Case # 2019-00000595 Narrative: "Upon arrival, R/O's found the offender/law student, now known as Fahad B Syed, being restrained o the second floor by several male law students. Investigation determined that Mr Syed was talking with fellow law students in the hallway when he became incoherent and started swinging his fists. He struck fellow law student Osama

Alkhawja (law student at University of Chicago) in the mouth. R/O's placed Mr Syed into protective custody without incident."

- Please cite Osama's allegation's of the event to determine the flagrant inconsistency with the above narrative.

**169.** **Major Inconsistency with Police Report Witness and Student Conduct Interview- PROOF OF OBSTRUCTION OF JUSTICE and FALSE IMPRISONMENT**

- Police Report Case # 2019-00000595 – Lists Muaaz Maksud as "witness" to "battery" which is listed as "committed." Other than this witness, there is no other way police could have proven that I committed a battery, because there were no witnesses to the battery according to all parties involved, including the police and Osama.

- • Usama said a short time later, he heard Osama calling his name.

- • Usama said he walked out of the room and observed Fahad on the ground and Osama was restraining him.

- • Osama said no one observed the conversation and subsequent altercation between him and Fahad.

- • Muaaz said 5-10 minutes into the keynote speech; he was exiting the room to grab something and heard "thumps." Muaaz said he "rushed out of the room" and heard Osama calling out for Usama.

- In a follow-up conversation with Officer Healy on 12/5/19, he indicated that Muaaz was present at the incident. Officer Healy said he does not have a formal report regarding information shared by Muaaz.[1]

**170.** **Major Inconsistency Between Police Report Description of Injury, Student Conduct Description and Location of Injury, and Follow-Up R/O Healy #22 Description and Location of Injury**

- Police Report Case # 2019-00000595 Narrative: "He [Fahad Syed] struck fellow law student Osama A. in the mouth."

- • Usama said he then went to help set-up for the keynote speaker.

- • Usama said a short time later, he heard Osama calling his name.

- • Usama said he walked out of the room and observed Fahad on the ground and Osama was restraining him.

- • Usama said he observed Osama's eye was swollen and bleeding.

- • Osama said he felt Fahad hit him on his left eye.

- o Osama said that his eyelid was purple and red and there was a cut underneath his eye.

- o Osama said that he did not need to go to the doctor, his vision was fine, and there was no

- serious repercussions. Osama said his eye only "stung in the cold."

- During a follow-up conversation with Officer Healy on 12/5/19, he was asked to reconcile the report indicating that Osama was struck in the mouth and Osama's statement that he was struck in the eye. Officer Healy responded that he remembers that Osama was struck in the face *and observed redness and minimal amount of blood on Osama's face*.

### 171.  Inconsistent and Irrational Student Conduct Reasoning – Finding "Insufficient" Evidence of Battery yet Sufficient Evidence of "Endangering Self or Others."

- **#1 - "To make a determination, we considered your actions during this incident, which included striking an individual without any physical touch by Osama in the contemporaneous interaction, which we found to be severe."** – Please note that there is no evidence or support for this allegation.

- **#2 - "We noted that you communicated specific points in the hearing in regards to the Illinois Statute for Battery. Based on insufficient evidence, we decided that we would not consider the allegation further and therefore did not make a determination on whether a violation of the Violation of Other Policies occurred."** – The specific point which I articulated were that a criminal battery consists of unprovoked harmful

contact. To make a determination of endangering self or others, as indicated from the above statement (#1), student conduct found sufficient evidence for harmful contact. Therefore, for student conduct to find insufficient evidence for unprovoked harmful contact, they must have acknowledged that there was some manner of provocation.

- Therefore, the following statement does not rationally follow from the above two statements (#1 and #2):

- **#3 - "Thus, we did not consider Osama's behavior to be provoking or as otherwise justifying your conduct in relation to Osama, including you striking Osama in the face. We also found the manner in which Osama engaged you during the opening remarks and later before the keynote address was not threatening or provoking."**

### An Outcome of Sanctions That Was Manifestly Contrary to the Weight of the information Presented During the 2019 UHAS Hearings

172. The imposition of sanctions by student conduct was beyond unreasonable given the many glaring and unresolved inconsistencies and issues contained within police report and subsequent investigation. Furthermore, student conducts blatant disregard of nearly every concern I brought forth, and deliberate and reckless disregard of my perspective regarding the incident, including the deliberate failure to consider my basic civil rights and human decency, created a vastly disproportionate outcome of sanctions regarding the incident in question. Moreover, student conduct's deliberate disregard of the severe emotional distress and pain and suffering resulting from the interim suspension and loss of my mother, my illegal involuntary commitment, coupled with my inability to grieve upon my release due to my constant responsibility to defend myself against blatant, baseless, and malicious false allegations of wrongdoing is without question highly evident in their outrageously reckless and negligent handling of the conduct process from start to finish.

173. My mother died on 10/23/19. On 11/1/19, I attended this event where I was maliciously harassed, then falsely accused of battery, then illegally involuntarily committed to

Northwestern Memorial Hospital, in an act of negligent false imprisonment. On 11/6/19, while I was inside of the hospital, I was served with a student conduct interim suspension notice. The day of my discharge from the hospital on 11/8/19, I was given seven days to vacate my home and no other housing provision offered. No alternative housing accommodations or provisions have been made or suggested for my housing since that time. On approximately 11/14/19, student conduct began its "investigation" of this alleged incident of battery, wherein it became by 11/21/19 that the nature and location of the injury was disputed, and no person actually witnessed the alleged "battery" occur.

174.     Despite discovering the evidence of obstruction of justice and false imprisonment in her own investigation, Christine Depilla deliberately discarded the results of her own investigation in order to recklessly and negligently pursue the blatantly malicious and fabricated claims of battery advanced by Osama and his criminal accomplices Usama and Muaaz. Despite my repeated pleas for assistance from within the Northwestern University community, including professors, the office of equity, the office of equal opportunity, Dean of Students Todd Adams, Dean of Students Susie Spies-Roth, and others, no one was able to step in and stop Christine DePilla from painfully dragging on her reckless and negligent excuse of an "investigation" and ensuing "deliberation," nor her delaying rendering her bias, irrational, and negligent decision until there were only two business days left until winter break—indeed not even the standard five days left for appeal which is given to ALL other students in these situations.

175.     In the deliberate delay of rendering her blatantly bias decision, Christine disregarded almost wholly every single piece of evidence or concerns which I had brought forward, in a singularly focused attempt to craft a narrative wholly around the baseless allegations made by Osama. In doing so she disregarded any piece of evidence or support which supported my narrative of events and recklessly focused on finding some grounds for which to sanction me further. In doing so, she made the 10 weeks worth of classes and assignments that I had already completed, and the time I sacrificed spending with my dying mother, completely worthless. I was not able to take finals or earn credit for the coursework of Fall 2019 semester.

176.     Now I will never be able to get the time that I sacrificed on classes and coursework rather than spending time with my dying mother back. That notion never once crossed Christine's negligent mind in rendering her deliberately delayed and disgustingly bias, atrocious, and negligent "decision." After the rendering of this spectacularly unjust decision to level further sanctions on me, I have had a post-traumatic stress incident which saw me awakened in the dead of night in tears of horror at the realization that I will never be able to see my mother again and that I needlessly sacrificed much of the precious time I had left with her on earth because of Christine's inhumane, negligent, reckless, and irrational investigation and decision making prowess.

177.     The entire incident, interim suspension, and "investigation" process inflicted severe mental and emotional distress upon me throughout the entirety of its length, even up until this very moment. It ruined my experience of law school and my first semester, which I had dearly anticipated since the day of my admission. I missed all of the law school events that were held since these allegations were made, including career and professional development focused events. I was unable to apply for summer jobs or internships for this summer, which was my number one goal after my first year in law school. Due to her negligent decision, I was forced to spend the entirety of winter break painstakingly composing this appeal rather than enjoying the holidays like every other student at the school was able to do.

178.     In addition to the aforementioned consequences and repercussions of the incident, I have suffered severe and irreparable financial consequences from the reckless handling of the student conduct process. Over $45,000 in tuition, fees, rent, and other living expenses was incurred for this semester of classes, which was taken out of my scholarship funding, federal student loans, and private loans. All of that money was rendered completely void, and spent without anything to show for it. $45,000 disappeared because one person made a malicious and fabricated claim to get out of trouble for his act of predatory harassment, this false claim had me unlawfully involuntarily committed, and rendered nearly an entire semester's worth of classes, completed coursework, and hard work invalid. Furthermore, I have been forced to watch as the perpetrator and enablers of these malicious false allegations, which have devastated my life, go

free and unpunished, suffering no consequences or repercussions for their actions or involvement in these events.

179.	As a result of the imposition of further sanctions by student conduct, I have been forced to attempt to seek and secure new housing with no notice. I have been forced to consider breaking my current lease, which will likely damage my already weak credit. I have little to no savings, and no friends or family to take me in. It is highly likely that I will be forced to live in a homeless shelter for the rest of the winter and spring, while trying to secure work to gain funds to pay for the behavioral program which I have been required to complete. After that, I will be forced to again endure Christine DePilla as the gatekeeper for rendering her "educated" opinion on whether to allow me to re-enter classes to re-take the same courses which I had already nearly completed during fall semester, which I was unable to complete because of her negligent and flagrantly bias investigative and decision making abilities. All this because one coward took advantage of my mental distress and vulnerability after loosing my mother just days earlier, subjected me to repeated instances of vicious and predatory harassment, had me illegally involuntarily committed, and to evade responsibility, made a completely unsubstantiated allegation that I punched him in the mouth, or eye, or face.

180.	Due to Christine and Heather's blatantly bias and negligent handling of the student conduct process, and their deliberate and malicious disregard of my concerns and human decency, Plaintiff requested that someone other than Christine or Heather Cohen to be assigned to facilitating any student conduct sanctions that are assessed following the outcome of this appeal. My experience dealing with Christine and Heather has left me very painful memories and trauma, and has been the single worst experience of my entire life.

**2019 UHAS Hearing Adverse Action and Discriminatory Sanctions**

181.	As part of the continuing pattern of harassment and discrimination, Plaintiff was given further "disciplinary sanctions" on December 12, 2019.

182.	DePilla and Cohen and NU's stated reasons for disciplining Plaintiff on December 12, 2019 were a pretext for race, color, religion, gender, and national origin discrimination.

183.    Despite showing compelling exonerating evidence, Plaintiff was found guilty and subjected to various discriminatory measures on the basis of perceived threat from his disabilities, including:

- Enduring a discriminatory student conduct process conducted on bad faith pretenses which ignored obvious evidence of misconduct such as the unsigned commitment petition, the lack of identifying information for the female allegedly involved in the altercation, and glaring inconsistencies between the description and location of the injury in the police incident report and subsequent student conduct interviews.

- Having his legitimate attempts for assistance deliberately and maliciously ignored, in reckless and negligent fashion given the compounded effect of plaintiffs intense emotional order with his mothers passing from cancer, and his multiple co-morbid disabilities, and recent homelessness on Plaintiffs mental, physical, emotional and psychological well-being.

- 1-semester interim suspension for Fall 2019 during the duration of the student conduct investigation and hearing process.

- 1-semester suspension for Spring 2020 as a disciplinary sanction issued by student conduct following the results of an appeal.

- Specialized Education Program for the Prevention of Abusive and Controlling Behaviors at the Center for Contextual Change with Jessica Renner.

- Forensic threat assessment evaluation facilitation by Northwestern University Police Chief Threat Detection Officer Michelle Hoy-Watkins.

- Forensic threat assessment evaluation conducted by Midwest Behavioral Management Services and Dr. Mark Brenzingger.

- 1250-Word Essay on learning from the suspension.

- July 9th 2020 Re-Instatement meeting with Lucas Christian of Student Conduct.

- July 16th 2020 Follow-Up Re-Instatement meeting with Dean of Students Susie Spies-Roth.

- Required monthly meetings with Spies-Roth for 2 semesters following re-enrollment.

- Mandatory disclosure of Mental Health Treatment and Progress Records and ROI's with both Plaintiff's Therapist, Brian Tobin, and his psychologist, Irma Funes.

184. Despite his strong disagreements and providing copious amounts of convincing and compelling evidence against his accusers, Plaintiff again worked with the administration of the law school a year in order to complete mental health assessments and a variety of other pre-conditions which would allow Plaintiff to return to school, this is because his legal education is the most important thing to Plaintiff in the entire world. As far as Plaintiff knows, no other similarly situated student without disabilities was subjected the pre-conditions discussed in paragraph 11 prior to their re-enrollment in the law school following a medical leave of absence directly related to their disability.

185. NU and NUPD knew about DePilla and Cohen's racial, disability and religious harassment of Plaintiff, but NU and NUPD failed to take prompt and effective remedial action.

186. NU and NUPD is strictly liable to Plaintiff for the hostile educational environment created by its representatives and supervisors.

187. NU and NUPD intentionally discriminated against Plaintiff because of his race, religion, gender, and national origin.

188. The actions of NU and NUPD supervisors and employees as stated herein were done with malice or reckless indifference to Plaintiff's federally protected rights.

189. The actions of NU and NUPD supervisors and employees in intentionally engaging in and condoning discrimination and harassment against Plaintiff has caused him great mental anguish, humiliation, degradation, emotional distress, pain and suffering and other consequential damage

**2020 Re-Enrollment at NU Law in the Midst of its Longstanding Issues with Racism and Discrimination**

190.     In the wake of the George Floyd murder and the emergence of the Black Lives Matter movement, NU law had been dealing with a firestorm of controversy from students calling out its history of intentional and unequal treatment of discrete and insular minorities at the law school since at least summer 2019, when three three black faculty members abruptly left the school without explanation. Groups of students in the law school began to organize and pressure the school administration to address these problems by submitting group complaints and speaking to the media regarding the longstanding climate of racism, discrimination, and inequity which had been present at the school for a number of years. The students also voiced their frustration on social media using hashtags like #NLawInfference.

191.     Further compounding these issues of discrimination and bias, in February of 2020 a transgender student (Isahni Chokshi) initiated another wave of student organized criticism and pressure on administration when she published her account of a "gender-bias" interaction with a law school faculty member to the school wide email listserv. As a result of her publishing her story, the students at the school began collective actions demanding that the administration address "trans-rights" issues including a mass letter writing campaign to the dean and the faculty member accused in the interaction and submitting a new "community action plan" to "push the administration to take meaningful action to transform the law school into an inclusive and supportive place to all." Two of the student who led this effort were Ishani Chokshi and Gloria Cange, and as a result the Dean of the Law school committed to creating a new community action plan to address these concerns.

192.     It was in this climate of student pressure and negative media attention that NU began its frenzied efforts by NU to avoid further instances of accusations of discrimination and in which Plaintiff re-enrolled in the university. In mid-July of 2020 Plaintiff finally completed the last of his mandatory pre-conditions, and eagerly re-enrolled in the entering JD class of 2020.

**2020 Group Chat Harassment Hostile Environment**

193.    On August 21st 2020, Plaintiff was involved in disagreements of opinion with a number of law classmates after Plaintiff joined a first-year Law GroupMe chat titled "NU Kids on the Block '23" on Friday, August 21st and attempted to post a message asking other students if they wanted to meet up for drinks in accordance with safe social distancing policy. His intent was to meet a few other students before class started, due to the fact that Plaintiff was left off of orientation schedule for the incoming 1L class and therefore had not had a chance to meet other members of the class during the week. As a result of his posts, several students began to directly respond to Plaintiff in the public GroupMe in a manner that Plaintiff found offensive and provocative. Other students were being permitted to meet up in person for activities such as "walking around" and going to restaurants in small groups, other students had met up for these types of social activities and his intent was to do the same with other members of the class.

194.    The first attempt Plaintiff made at posting was in another GroupMe called "Meet the NU Kids (IRL)" and in that chat, at some point, Plaintiff began to be repeatedly engaged by other members of the class, first by an individual named "Meegan" who persisted in addressing Plaintiff after Plaintiff had acknowledged her point and asked her not to continue. Second, an individual named "Adrienne" began repeatedly attempting to engaged Plaintiff in the GroupMe in a provocative manner rather than messaging Plaintiff directly, and who Plaintiff had additionally simply asked to refrain from addressing or engaging Plaintiff.

195.    After posting indicating his misunderstanding about that group, Plaintiff left the "Meet the NU Kids (IRL)" and posted in "NU Kids on the Block '23" wherein "Meegan" and "Adrienne" continued to make comments directed at Plaintiff in that chat as well. At that point, Plaintiff expressed his feelings that Plaintiff felt Plaintiff was being attacked, and that Plaintiff was being bullied by other students and not being able to post in the GroupMe like others had been doing without being subject to several people making nasty, rude, and disrespectful comments.

196.    Plaintiff attempted to make it clear multiple times that Plaintiff was not going to let others attempt to bully Plaintiff, and Plaintiff accept that his attempts to confront what Plaintiff felt was bullying may have been construed as aggressive behavior on his part, but his intent in making his feelings known was to ultimately to create a more inclusive atmosphere by addressing

what Plaintiff felt was a situation wherein certain members of the law school were attempting to unduly exert influence on others by regulating and ultimately excluding them from the social networking platform that everyone else is using to communicate with and meet others.

197.    Meegan Mayer harassed me in the "Meet the NU kids IRL" group chat repeatedly, before driving me out and then continuing to harass me here. She made at least 8 different comments at me, most of which were inappropriate and disrespectful. She sent Plaintiff multiple messages and was pervasive and aggressive attitude and persistent after I calmly asked her to stop multiple times. Meegan stopped after the first 7 times I asked her to stop insulting and engaging me.

198.    Adrienne Ou harassed Plaintiff the worst out of everyone, including in both chats. She aggressively Direct Messaged him, other students were also witness to this, including the multiple direct and harassing messages. She was pervasive and aggressive and persistent after I calmly asked her to stop approximately 10 separate and distinct times. She made 23 separate and distinct comments towards me and about me which were disrespectful and demeaning. This included her directly tagging me in six of the messages. In the group chat she said "Funny thing is that if he'd kept his mouth shut I would have suggested a spontaneous Zoom drinking session & invited him" as if she were the owner of the group and was entitled to make decisions for me and everyone else. Over 1/3 of the total comments made at me in this group were from Adrienne Ou.

199.    During this time Plaintiff had another member of the class named "Hayden" message Plaintiff privately in what seemed like a sincere gesture to understand why Plaintiff was so agitated, who then posted a screen shot of our private conversation and wrote a post personally directed at Plaintiff indicating his personal feelings towards Plaintiff for attempting to meet up with other members of the class.

200.    During this time Plaintiff had other members of the class, such as "Anton" make posts directed at Plaintiff telling the at "Plaintiff was doing a good job of making sure that no one wanted to hang out with Plaintiff."

201.	During this time other members of the class made inappropriate and provocative comments and other forms of harassment which I have yet to have access to in the form of the group chat transcripts from both aforementioned group chats.

202.	I was only in the group chat for 3 total days, from Wednesday night until Saturday morning. In total, there were 135 comments made in the group chat. Of those 135 comments I made 72 comments in total. Of my 72 comments, 63 (88%) were responses to defamatory personal attacks or comments made about me or directed towards me.  Of the remaining 63 comments made by other students, 47 (75%) were directed at me. In total, I suffered 24 (38%) comments which directly tagged me in the posts by Adrienne Ou, Rachel Cox, Jas Sethi, Jared Stehle, Sarah Chase, Hayden Goleman, Evangeline Gargula, Jake Besanceney, Jaina Solo, and Caleb Linton.

203.	Jaina Solo spread the following defamatory and FALSE rumor about me "According to 2Ls, last year he escalated in his aggressive behavior and speech after being kicked out of the group me. Unfortunately in person at times."

204.	Plaintiff filed harassment reports about the conduct of the students in the group chat however despite every single one of his efforts and attempts, the university again failed to uphold his right as a student to pursue education free of harassment by dismissing all of his grievances. The university has offered Plaintiff absolutely no meaningful support whatsoever in this situation, and in fact has enforced a policy of brutal isolation which lasted over 1 year and was ongoing. This isolation has been a critical factor contributing to his mental health deterioration, and feelings of agitation, frustration, and harassment.

**2020 Cyberstalking and Disability Harassment and Hate Crimes**

205.	Plaintiff's Facebook is currently set to "private" mode for various reasons, as opposed to "public" mode, and no one outside of individuals who he is "friends" with on the application, and who he shares "groups" with on the application can search or find his information.

206.	Plaintiff shared "Official Northwestern Pritzker Class of 2023 Admitted Students Page" with Evangeline Gargula, a white female transgender incoming 1L student at NU Law. It is

a "private" group with 280 members because only members can see who is in the group and what they post.

207.     It is solely on account of his sharing the aforementioned Facebook group with Gargula that she was able to cyberstalk Plaintiff as indicated in the upcoming paragraphs, this is because only members can see who is in the group and what they post. Members who are outside of this group cannot search or find my profile because it is not in "public" mode.

208.     Plaintiff wishes to make abundantly clear that he has never met or interacted with Evangeline Gargula prior to these incidents in any way, shape, or form.

209.     Northwestern University defines stalking as (Pg. 133 Student Handbook):

*210.     C. Stalking: Knowingly engaging in a course of conduct directed at a specific person that one knows or should know would cause a reasonable person to fear for their safety (or the safety of a third party) or suffer emotional distress. "Emotional distress" means significant mental suffering, anxiety or alarm.*

*211.     Conduct that can amount to stalking may include two or more actions directed at another person, whether done directly, indirectly, through others, via devices, or via any other methods or means (specifically including electronic means e.g. cyberstalking), including but not limited to:*

1. *• Following a person;*

2. *• Being or remaining in close proximity to a person;*

3. *• Entering or remaining on or near a person's property, residence, or place of employment;*

4. *• Monitoring, observing, or conducting surveillance of a person;*

5. *• Threatening (directly or indirectly) a person;*

6. *• Communicating to or about a person;*

7. *• Giving gifts or objects to, or leaving items for, a person;*

8. *• Interfering with or damaging a person's property (including pets); or*

9. *• Engaging in other unwelcome contact.*

212.     On or around 8/21/20 I was stalked by Evangeline Gargula, a white female transgender incoming 1L student at NU Law on the basis of actual or perceived mental disability. She conducted surveillance of me on "Google" and "Facebook" and other possibly hitherto unknown locations, observing and monitoring those sites with information, and gathered my personal and private information such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history. She gathered my personal data, including my photo, from "Facebook," "Google," and other possible locations for malicious personal use on or around 8/22/20, and also to post it in first-year Law GroupMe chat titled "NU Kids on the Block '23" on or around 8/21/20.

213.     On 8/22/20 at 2:22 AM she posted my private information which she gathered through surveillance in first-year Law GroupMe chat titled "NU Kids on the Block '23" in committing harassment based on ADA disabilities and Her actions caused me significant emotional distress by bringing up my last year in school, which was when my mother died, I was hospitalized for grief, and I had to withdraw from school for mental health concerns.

214.     On 8/22/20 at 2:22 AM She harassing me in a first-year Law GroupMe chat titled "NU Kids on the Block '23," wherein she committed the following acts:

- **Gargula** posted a disparaging image of a frog with the title "NO THOUGHTS EMPTY HEAD" in direct reference to a stereotype about people with mental health problems and disabilities in a first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20; directly comparing my mental capacity to that of a frog, insinuating that my mental capacity was equivalent to a frog which is a direct reference to my mental health and disability status and is a stereotype about people with mental health problems and disabilities

- **Gargula** posted my private Facebook information on the chat, which included such as: my photograph, work history, contact information, dates about my school history, and dates about my pictures on a group chat and on Facebook, and educational history.

- **Gargula** inappropriately suggested I was under an "assumed identity," which is a stereotype about people with mental disabilities.

- **Gargula** posted the word "psyop" which was a direct reference to my mental capabilities and was directly related to my mental health, and she insinuated that I was undertaking a psychological operation, which is a blatant stereotype about people with mental health disabilities and other problems.

- **Gargula** encouraged rampant negative speculation among the class about my mental health status by making several mischaracterizing and intentionally malicious comments aimed at making people think I was doing multiple stereotypical activities of people with mental health problems By posting my work history and by making all of the inappropriate suggestions and bringing up dates about my pictures, she encouraged the negative stereo type that people with mental health problems are not able to hold jobs, and that somehow my work and education history was something that I could not possibly have because of my mental health status and cognitive capacity. Therefore, by ridiculing and trying to poke holes in my work history and inciting hatred and speculation about me, they directed comments at my ADA disabilities.

- **Gargula** Indirectly threatening my safety when she posted my personal information in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20, thereby exposing me to unnecessary exposure and risk which I did not consent to by exposing me to risk of someone who could use that information to track me down and hurt me, both inside and outside of the law school. This is because the group me is not officially a school moderated activity, and other people from outside of the law school can request and gain access to it, this is proven by a total list of the chat members and comparison to the total number of law students in the class, specifically there are many more members of the chat than there are members of the incoming 1L class.

At least some of those who were in the group chat were exposed to my private information as a result of Gargula's posts who would not otherwise have seen my information, absent Gargula's defamatory hate crime of posting my private information on the basis of my perceived disability.

215.    Plaintiff made strong remarks in response to the stalking behavior within that group chat, comments which were in immediate proximity to the stalking comments in the group chat which were directed at Plaintiff, and his intent in using the words was to describe actions like "stalking" and was to condemn behavior, which Plaintiff strongly felt constituted stalking, in the strongest possible terms.

216.    The university allowed Gargula to submit all of those comments in a single "screenshot" which served as misleading evidence of comments directed at her "gender identity."

217.    Gargula "created a hostile environment and/or substantially interfered" with my "access to a University program or activity from an objective perspective" when I was banned from group chat and discord after my comments in the chat.

218.    Gargula incited "Jake Besanceney," an incoming white male 1L , to state "Please keep further discussion about Fahad at a respectful level, and preferably at a minimum, outside of what is necessary" after removing me from in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20. Where Solo and Besanceney had previously met and spoken.

219.    Gargula inciting, encouraging, and/or influencing "Jaina Solo," an incoming female 1L , to speculate negatively "According to 2Ls, last year he escalated in his aggressive behavior and speech after being kicked out of the group me. Unfortunately in person at times. If he messages any of you, rather than engaging with him I recommend emailing [NU] with screenshots," in the first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/22/20. Where Solo and Gargula had previously met and spoken.

220.    Gargula or around 8/22/20, after she had harassed me on the Group chat, and I had been removed from both the Discord and Group Me by other biased students, I made a legitimate offer to Gargula to settle our grievances offline by offering my personal number and asking her to call me "if there was an issue."

221.     Gargula directly threatened my safety by calling me at 1:08 AM on 8/23/20 in a threatening manner due to the late-night hour, menacingly asking "Is this Fahad Syed?" then failed to identify herself after repeated inquiry, replying only "you gave me your number" and "you told me to call you." She took my legitimate offer to settle our grievances offline to call me 1:08 AM threateningly and menacingly, instead of trying to arrange a meeting at normal hours via email or text. When Plaintiff sent text responses, out of a strong emotional reaction of genuine fear for his own personal safety at the time, the university allowed Evaline to submit those particular text messages as evidence that Plaintiff "threatened their safety."

222.     Gargula took these actions in order to take advantage of my learning disability and vulnerability to bait and entrap me into responding, and then misleadingly misrepresent that situation to report to NU that I had threatened her safety.

223.     Gargula illegally recorded the phone conversation without my knowledge or consent in violation of state law in order to maliciously and deceitfully get me expelled from law school by falsely claiming that Plaintiff threatened her safety on the call.

224.     Gargula disclosed calls to NU representatives Ish Faith-Orkar and Heather Cohen on 8/27/20 and 10/29/20 in order to maliciously and deceitfully get me expelled from law school.

225.     On 8/23/20, Gargula incited, encouraged, and/or influenced "Ishani Choski," a female transgender 2L student at Northwestern Law, to harass me six separate times with unwanted comments on Facebook, where she made repeated reference to me "sliding into white girls dm's" and other harassing comments on my status posts. Where Gargula and Choksi had previously met and were both part of the LGBTQ affinity group.

226.     On 8/23/20, Gargula incited, encouraged, and/or influenced "tessaweil13," a white female incoming 1L student, to harass me with offensive statements on Dischord on Behalf of Evangeline where both Evangeline and Tessa had previously spoken and met.

227.     Gargula incited, encouraged, and/or influenced "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , to unfairly influence school administration to suspend me from NU on Behalf of Evangeline on 8/23/20, where Cange forwarded messages and screenshots and called Shannon Bartellete, the associate dean of

Inclusion and Engagement to speak to Associate Dean and Dean of Students Susie Spies Roth and others. Where Gargula sent Cange and email falsely indicating that Plaintiff had initiated the phone contact between herself and Plaintiff and where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

228. Gargula incited, encouraged, and/or influenced "Wren Chernoff," an incoming white transgender 1L , to participate in a student disciplinary hearing against me where she stated during an interview on 9/1/20 that "while this semester is largely remote, [I] don't want to be in the hall with him to and from class and have some sort of confrontation," and where she said it would be "Very easy to imagine using the women's restroom" and seeing him go in and out of the restroom at the same time, "and… start a confrontation." Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

229. Gargula incited, encouraged, and/or influenced "Gloria Cange," a white female lesbian NU LGBTQ Student Organization Leader to an current 2L , to participate in a student disciplinary hearing against me where she stated during an interview on 9/2/20 that "she is working on an action plan so this doesn't happen again." She also stated "(This feeling is) reciprocated among our board, because they were all taking about it [the group chat altercation] as it happened" further indicating the defamatory rumors and hate and ridicule Gargula incited about me to the law school. Where Gargula and Cange had previously met and were both part of the LGBTQ affinity group.

230. Gargula incited, encouraged, and/or influenced "Andrew Lang-Reyes," an incoming gay 1L , to participate in a student disciplinary hearing against me where he falsely claimed during an interview on 10/27/20 that I was making comments "geared directly at a person's attributes" in attempting to mischaracterize and defame me as a transphobic person. Where Gargula and Lang-Reyes had previously met and were both part of the LGBTQ affinity group.

231. Gargula incited, encouraged, and/or influenced "Shen Peng," an incoming 1L , to participate in a student disciplinary hearing against me where she stated during an interview on 10/27/20 that "there were rumors concerning the first time Fahad was in law school two years

ago." Peng indicated that it was "rumored that due to inappropriate physical conduct, Fahad left law school two years in a row and this fall was placed in section 4." Where Peng and Gargula had previously met and knew each other.

232.    Gargula communicating to the law class about me by posting my private information in the first-year Law GroupMe chat titled "NU Kids on the Block '23 from 8/22/20-8/23/20, communicating to others about me by making and encouraging defamatory speculation and remarks directed towards ADA disabilities for the purposes of having me maliciously expelled from law school.

233.    Gargula damaged my property in the form of my character and personal and professional reputation within the law school and legal profession by defaming me and inciting hatred and speculation against me in first-year Law discord chat on 8/21/20 or 8/22/20 in order to get me maliciously expelled from law school.

234.    Gargula damaged my property in terms of my character through defamatory statement and inciting hatred and speculation against me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20 in order to get me maliciously expelled from law school.

235.    Gargula damaged my property in the form of my educational opportunities by having me suspended and expelled through lies and deceit and defaming me in first-year Law GroupMe chat titled "NU Kids on the Block '23" on 8/21/20 or 8/22/20.

236.    The culmination of the hostile environment created by the multiple unchecked instances of targeted harassment committed by the aforementioned students, including the actions of Evangeline, Anton, Meegan, Adrianne, Hayden, Tessa, and Ishani created an academic environment that a reasonable person would consider to be intimidating, hostile, or offensive, and substantially interfered with, limited, or deprived me from accessing or participating in the academic environment, and/or substantially interfered with my academic performance by resulting in my suspensions and being barred from accessing all of the University resources and activities of a normal law student, including being able to attend classes, and participating in the "group chat" and "discord" servers.

237.    The university issued an "interim" suspension on Sunday August 23, with the Interim Dean of Students of the University "Mona Dugo," and NUPD Deputy Chief "Eric Chin" calling Plaintiff to inform Plaintiff that "they" had decided to suspend Plaintiff based off the comments described in the group chat August 2020 group chat. During that call Dugo referenced being aware that Plaintiff was on "probation" from a previous disciplinary infraction. On that call, with NUPD Deputy Chief Chin, Plaintiff informed both individuals that Plaintiff had been stalked and that his comments were in response to a late-night call and blatant harassment, and neither took any action whatsoever to note his concerns. They made specific mention of the fact that they were "not aware" of any of his personal concerns or grievances at that time. Dugo also explicitly stated "we've been watching your Facebook and other social medial posts." Dugo and Chin referenced the fact that Plaintiff was on "probation" and therefore could reasonably be expected to know the reason Plaintiff was on probation was related to his mental health.

238.    When Plaintiff expressed to them that Plaintiff was subjected to harassment and that evidence was only obtainable through "GroupMe" chat history which Plaintiff did not have access to because Plaintiff was maliciously banned, the university made no attempt at helping Plaintiff secure that history and expressed no interest in reviewing it. They continue to be elusive in referencing or acknowledging any of his grievances of harassment from the group chat, despite his complaint for stalking which Plaintiff filed through the university. During the conversation they made it very clear that they were not aware of any comments from the GroupMe which were directed at Plaintiff, which proves that they were not remotely interested in genuinely resolving this issue in his best interest.

239.    On August 23rd 2020, Plaintiff received an electronic notification from the university about the suspension, which indicated not only the infractions resulting from the stalking incident, but also several more charges related to a separate incident which occurred on June 18, 2020 between Plaintiff and a student who had already graduated. This incident was added onto the list of approximately five different policy violations that they accused Plaintiff of as a result of these occurrences. This alleged infraction/incident was never revealed at any point prior

to a reinstatement meeting with university officials which Plaintiff held in July 2020, and if valid should have been addressed at that meeting. The inclusion of these charges indicate that NU was seeking to create a body of charges that Plaintiff would not be able to reasonably overcome in his disciplinary hearings.

240.    Gargula texted Plaintiff at 8:34 PM on 8/23/20, after knowingly cooperating with NU to have him suspended earlier that day, in order to further target my ADA learning disabilities and associated vulnerability to maliciously provoke and entrap him into a response. She knew that he had been suspended with a no-contact order, and was attempting to again lure me into responding because, due to my ADA disability, she knew I had a irritable disposition, so then she could maliciously report me for violating the no-contact order which she was fully aware was in place resulting directly from her actions and cooperation with NU.

241.    Despite all of the other students who had committed harassment and misconduct, no other student was disciplined. Dugo suspended Plaintiff based off a threat that she perceived resulting from his ADA disability, prior to having even a basic understanding of the circumstances of this altercation. She assumed that Plaintiff was dangerous and guilty due specifically to his ADA disabilities, which she assumes makes Plaintiff a criminal. Another reason Plaintiff know the discrimination is because of his mental disability is because during his initial suspension call, Plaintiff also know that this is discrimination because they brought up alleged infractions from June 18th, 2020 which if valid, should have been addressed during or prior to his reinstatement meeting in July 2020.

**2020 Conspiracy, Disability Harassment, Discrimination, Retaliation, and Unlawful Obstruction of Justice**

242.    On  8/25/20 at 3:22 pm Plaintiff filed a sexual harassment stalking complaints and about Gargula,  and harassment complaints about the students from the group chat during the same week. In the next week, Plaintiff filed several more formal complaints about the group chat incident and including a disability harassment complaint about Gargula.

243.     On 8/27/20, Plaintiff filed Department of Education, Office of Civil Rights Complaint #05-20-2444 alleging discrimination on multiple grounds, including disability discrimination and hostile environment.

244.     On 9/3/20 at 7:45 AM, Plaintiff informally and indirectly notified the university via email to Lucas Christian of the Office of Community Standards that the Plaintiff had complained about the University to an outside entity, Illinois Department of Human Rights and Illinois Guardianship and Advocacy Commission.

245.     On 9/3/20 at 9:05 AM, Plaintiff wrote an email addressed, in part, to Dugo and Chin, requesting the chat transcripts of the incident which resulted in his suspension on 8/23/20.

246.     On 9/3/20 at 3:44 PM, NU dismissed Plaintiffs stalking complaint against Gargula because the "Office determined that [Plaintiff was] engaged in mutual contact with Evangeline during these exchanges." They never provided any basis in NU policy for which "mutual contact" provides an exception to violations of stalking policy. However, they sanctioned Plaintiff for this exact same exchange and same set of core facts.

247.     On 9/6/20 at 12:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment, to date no one responded.

248.     On 9/6/20 at 8:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment, to date no one responded.

249.     On 9/7/20 at 6:07 PM Plaintiff submitted a formal "Hate and Bias Report" about the handling of the 11/1/19 incident of false imprisonment to date no one responded.

250.     On 9/9/20, Plaintiff received Official Northwestern Correspondence email from the Office of Equity indicating several more disciplinary sanctions and another UHAS hearing in retaliation for the filing of plaintiff's police report and DOE complaint. DePilla retaliated against Plaintiff for the complaints which he submitted both against her and about the incident, including 7 separate counts of "inappropriate sharing" which he was charged with during 2020 student conduct hearing. DePilla and NU retaliated against me for reporting these items in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and

punish me for reporting discrimination. These charges of "inappropriate sharing", which violated NU's published policy on non-retaliation, included:

- On 12/10/19, Plaintiff sent two complaints at 2:35 AM and 3:01 AM email to all the of the people on the police board including Chief Lewis, Cmd. Benson, and DC Chin reporting the 11/1/19 false imprisonment.

- On 12/12/19 at around 9:42 AM Plaintiff filed "Ethics Point" report ("EOP 597") reporting the 11/1/19 false imprisonment and received response that NUPD was the proper party to contact.

- On 12/10/19 at 7:26 PM Plaintiff sent email to Kadens and Provenzano informing them of the battery and false imprisonment.

- January 1, 2020 at 5:46:45 PM CST report sent to Detective Stark regarding the false imprisonment.

- 9/6/20 at 12:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment

- On 9/6/20 at 8:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment

- On 9/7/20 at 6:07 PM Plaintiff submitted a formal "Hate and Bias Report" about the handling of the 11/1/19 incident of false imprisonment

251. On 9/13/20 at 1:49 PM Plaintiff formally notified the University via email to The Office of Equity, its employees Amanda DeSilva and Ish Faith Orkar, and Lucas Christian and Heather Cohen of the Office of Community Standards, that the Plaintiff had complained about the University to an outside entity: The Department of Education, Illinois Department of Human Rights, and Illinois Guardianship and Advocacy Commission.

252. On 9/14/20 at 5:29 PM, Chin had unauthorized telephone communications with Plaintiff's private psychiatrist(s) in violation of the IMHDDCA and HIPAA. Chin left Tobin a voicemail specifically, twice, acknowledging that he did not have an ROI for contacting him [Tobin], and requesting to "share information" with him and requesting Tobin call him back on his cell phone.

253.     On 9/14/20 at 6:11 PM PLAINTIFF was notified via email by his therapist, Brian Tobin ("Tobin"), that Deputy Chief Chin had contacted him, and he [Tobin] subsequently asked Plaintiff to sign an ROI form.

254.     On 9/15/20 at 12:11 PM, during a 6-minute incoming phone call, NUPD Detective Sanghoon Lee ("Lee") inappropriately contacted and aggressively questioned Plaintiff regarding Plaintiff's Facebook post about his discrimination complaint with the Department of Education, in order to retaliate against Plaintiff for making said complaint, and to threaten, intimidate, and coerce Plaintiff into dropping said complaint. During this call, Lee said "you know why I'm calling," mentioned Dugo by name, and instructed Plaintiff not to post anything about Dugo without "running it by [Lee's] office first." Plaintiff indicated to Lee that Plaintiff had filed the DOE complaint, gave Lee the complaint number, and directed Lee to "contact [Plaintiff's] attorney regarding the posts if he had any other questions."

255.     On 9/16/20 at 3:03 PM, Dugo had unauthorized email communications with Plaintiff's private psychiatrist, Brian Tobin, in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (IMHDDCA) and Health Insurance Portability and Accountability Act (HIPAA) under the pretext of responding to Plaintiff's 9/3/20 email requesting group transcripts. In the communication, she stated: "I'm not sure if Fahad signed a release of information when he made this request. I would like to be able to share some information with you as we have a lot of on going concerns about Fahad."

256.     On 9/22/20, The Dean knowingly and inappropriately shared an illegally obtained audio recording of Plaintiff, of a phone call with another current law student (1L Evangeline Gargula) from 8/22/20, with Tobin in order to assassinate his character in retaliation for the Department of Education complaint which she referenced during the call and is discussed in the letter from the his therapist. The Dean discriminated against me on the basis of his mental health, in retaliation for the Department of Education complaint which, and which she was fully aware through the university on 9/3/20 through an email to Lucas Christian and 9/13/20 through an email to the Office of Equity.

257.     On 9/25/20 at 3:20 PM, NU dismissed Plaintiff's complaint about Gargula's disability harassment, stating "documents do not reflect that Ms. Gargula was aware of your disability status." "[T]here is no information to suggest that Ms. Gargula was aware of your

disability status, and further, that she sent messages or posted the image because of your disability status."

258.    On or around 9/28/20, during their next session, Plaintiff's therapist, Brian Tobin, informed Plaintiff of the audio recording. It was at this time that Plaintiff realized that this was audio which was illegally submitted to his university by Evangeline Gargula and illegally resulted in his suspension sometime around 8/23/20.

259.    On or around 9/28/20 as a result of the aforementioned unlawful contact with Plaintiff's therapist, Mona Dugo, Eric Chin, and Sanghoon Lee were repeatedly informed not to contact Plaintiffs family members via text messages from plaintiff to their cells phones.

260.    On 10/10/20, at 8:33 PM PLAINTIFF attempted to file an eavesdropping charge with Northwestern University Police Deputy Chief Eric Chin via text message for a phone call which PLAINTIFF took at his apartment in the 18th district (244 E Pearson St), which was illegally recorded and submitted to his law school, resulting in his suspension. At 8:44 PM Chin responded via text and instructed Plaintiff to file a report with Chicago Police Department (CPD) because NUPD did not have jurisdiction in the matter.

261.    On 10/11/20, PLAINTIFF filed a police report for Eavesdropping in the CPD 18th district, with the non-emergency line (312-746-6000) because they have jurisdiction over a phone call which PLAINTIFF took at his apartment in the 18th district (244 E Pearson St) which was illegally recorded and submitted to his law school, resulting in his suspension. Reporting Officer Aldahhondo (Star 5142) took the report and Supervisor O Shaughnessy (Star 1829) approved it. It was report JD 395786.

262.    On 10/14/29, NUPD Detective Lee called Plaintiff and brutally interrogated Plaintiff for 18 minutes about exactly how and when Plaintiff found out about the illegal audio tape. Had the illegal audio tape not been made and the university not knowingly suspended me over it, Plaintiff would never have received such an intimidating and harassing interrogation. During the call the detective asked my CPD report number and claimed that he was filing a report with NUPD. Approximately 3 days later he called Plaintiff provided him with report 2020-0356 which he claimed was filed for the eavesdropping case.

263.    On 10/19/2020, at approximately 3:00 PM PLAINTIFF called CPD non-emergency (312-746-6000) and was told by the officer on duty, Philp (Emp #19035)  that report JD 395786.had been "cancelled without investigation," citing a "lengthy cancellation report" involving "NUPD Deputy Chief Chin and the sergeant" as the reason. The report narrative stated "investigation through a phone call with eric chin, deputy chief of northwestern university police department, revealed the SYED, FAHAD had been involuntarily committed to a hospital for an involuntary mental evaluation in November 2019. further investigation also revealed that SYED, FAHAD had given consent for Gargula, Evangeline to record the phone conversation in dispute."

264.    Sometime between 10/11/20 – 10/19/20, Chin contacted Chicago police via phone call and revealed Plaintiff's mental health history to the detective without having an ROI in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act and Health Insurance Portability and Accountability Act of 1996 (HIPAA), discriminating against Plaintiff on the basis of his mental health, in retaliation for the Department of Education complaint which PLAINTIFF filed on 8/27/20, and which he [Chin] was fully aware through the university on 9/3/20 through an email to Lucas Christian and 9/13/20 through an email to the Office of Equity. The call in question never took place on University property, and DC Chin knew that due to the prior text conversation.

265.    Chin told Chicago police that plaintiff had involuntarily committed to a hospital in November 2019 for an involuntary mental evaluation, directly and deliberately implying or stating to the detective that PLAINTIFF was crazy and his lawful report shouldn't be investigated on the basis of his mental health status.

266.    He also told the police express lie about his consent during the recording in question: telling the police that PLAINTIFF consented having his conversation recording when PLAINTIFF did not, as was the very reason why PLAINTIFF filed the eavesdropping report. PLAINTIFF did not consent to having his conversation recorded, nor did PLAINTIFF have knowledge of the recording at any time, and DC Chin knew that because I attempted to file the report with him first.

267.    As a result of the call, plaintiffs report (JD 395768) was cancelled.

268.    In approximately 10 separate follow-up calls and 50 text messages to Lee, which occurred in the weeks after my CPD report was cancelled, he never responded to my follow-ups about

report 2020-0356. This proves that his purpose in interrogating me was under the false pretext of filing a report whereas in reality he was retaliating for my CPD report and my DOE complaint. The university has deliberately failed to provide that report on my multiple email requests.

269.    On information and belief, sometime between 10/11/20 – 10/19/20, Chin called and told CPD non-emergency response officers (312-746-6000), between 12pm-6pm, not to respond to reports about eavesdropping from students at Northwestern, or informed the desk sergeant of such.

270.    PLAINTIFF called CPD non-emergency (312-746-6000) 6-7 times in a row between 3p-5pm on 10/19/2020 in order to file another report, and as soon as PLAINTIFF told them PLAINTIFF was a student from NU filing an eavesdropping report, they hung up.

271.    On information and belief, on or around on the week of 10/19/2020, Chin called Area 3 Supervising Detective Rose #982 at (312-744-8263) and asked him not to respond to reports about eavesdropping from students at Northwestern or related cancellations. On 10/19/2020 PLAINTIFF called Area 3 Supervising Detective Rose #982 at (312-744-8263) from 4-5PM , to report the incident of improper cancellation of my report, citing jurisdiction, and he refused to disclose any details about why the report was cancelled, telling me to "file another report."

272.    On information and belief, on or around on the week of 10/19/2020, Chin called and told 18th District Supervisor Sergeant Vogt at (312-742-5870) and asked him not to respond to reports about eavesdropping from students at Northwestern or related cancellations. On 10/19/2020 PLAINTIFF called 18th District Supervisor Sergeant Vogt at (312-742-5870) from 4-5PM , to report the incident of improper cancellation of my report, citing jurisdiction, and he refused to disclose any details about why the report was cancelled, telling me telling me "civil litigation" is an option.

273.    Deputy Chief Eric Chin took these actions to prevent the illegal audio tape from being revealed in retaliation for the Department of Education complaint which PLAINTIFF filed, in order to conceal his and the universities negligence, and their knowing harboring and supporting of a malicious criminal, Evangeline Gargula. Chin also took these actions to conceal the fact that he and Dugo were aware of the illegality of the audio tape, and still suspended me over it, which is also why PLAINTIFF filed his Department of Education Complaint, and to punish Plaintiff for filing said complaint.

274.     All of the actions taken by Dugo, Chin, and Lee, including slandering ones reputation to their therapist, especially given mental disabilities, brutal interrogation, and causing a report to be cancelled without informing them, would deter a reasonable person from complaining.

275.     The illegal conduct of the Evangeline Gargula illegally recording me and illegally submitting the tape to the university in order to have me suspended, caused the university to knowingly use it to suspend me due to bias. That suspension then caused me to file a discrimination claim with the DOE and ultimately to file the police report with CPD.

276.     The discrimination claim with the DOE caused Chin to illegally contact Plaintiff's therapist in order to slander him with an illegal audio tape, Dugo to illegally contact Plaintiff's therapist and slander Plaintiff's reputation maliciously with an illegal audio tape, Lee to aggressively and harassingly call me once, and Lee to brutally and menacingly interrogate me another time.

277.     Filing the DOE complaint about discriminatory and bias suspension later caused me to file the CPD report about the discriminatory use of the illegal audio tape in order to strengthen my discrimination complaint for legal proceedings which would occur during litigation.

278.     Filing the CPD report caused Chin to have my CPD report cancelled. Therefore, the filing DOE complaint caused me to file the CPD report, which caused Chin to have my CPD report cancelled through disability discrimination

279.     On 11/2/20 Plaintiff filed a report with the Civilian Office of Police Accountability about Chins illegal disclosure of his mental health history. On 11/5/20 the complaint Log 2020-0004964 was assigned to Sgt. Mark K Lamberg (Star# 1847) to be investigated by Chicago Police Department Bureau of Internal Affairs Division Officer Lambert, with whom I interviewed 11/9/20 at CPD Headquarters regarding the incident.

280.     On 11/3/20 Plaintiff filed an eavesdropping report again with Chicago Police Department, JD 419862. The report is currently assigned to Detective Brian USTASZEWSKI #20116 with Evangeline Gargula as the suspected offender.

281.     Mona Dugo, Eric Chin, and Sanghoon Lee were repeatedly informed not to contact Plaintiffs family members via text messages from plaintiff to their cells phones occurring on or around 9/28/20.

282.     On or around 11/3/20, Plaintiff learned from his brother-in-law Azam Hussien (312-303-3736) via text message that someone person or persons from the university had contacted my sister, Sophia Syed (847-347-3736) and requested discussion for "hours" about Plaintiff and his school situation without Plaintiff's knowledge or consent. This is after Plaintiff expressly forbade the university, through text message to Mona Dugo after she shared the illegal audio with Plaintiffs therapist, that no one who Plaintiff "knows" should be contacted, including most importantly: plaintiff's family members. NU and NUPD and its representatives contacted Plaintiff's sister in retaliation for his COPA report, his police report, and his DOE Report.

283.     Shortly after learning that someone had contacted Plaintiff's family in direct conflict with his wished, Plaintiff texted Defendants NU, Dugo, Chin, and Lee to determine why they had contacted Plaintiff's family and who had authorized such unlawful contact.

284.     On 11/4/20, Plaintiff sent email correspondence to NU expressing that he did not want members of his family and therapist contacted by NU and Dugo.

285.     On 11/4/20, Plaintiff received Official Northwestern Correspondence email from the Office of Community Standards indicating several more disciplinary sanctions and another UHAS hearing in retaliation for the filing of plaintiff's police report and DOE complaint. The stated pretext for this disciplinary action was that Plaintiff was being disciplined for texting Chin, Dugo, and Lee about his DOE complaint and about the police report, about the various retaliatory measures taken against plaintiff and for the contacting of Plaintiff's sister without Plaintiff's permission. NU and NUPD and its representatives sanctioned plaintiff in retaliation for his COPA report, his police report, and his DOE Report. NU displayed awareness of the multitude of illegal and discriminatory conduct when Plaintiff texted Chin, Dugo, and Lee, who were in a position to take corrective action and failed to do so.

286.     On 11/6/20 Plaintiff was served with a protection order ("PO") (Case 200P20532) for harassment and Stalking from the Cook County Sheriff's office, in which Dugo made several misleading allegations as to my contact with her due to her official capacity as dean of students. The stated pretext was that I was sending her "100's of harassing messages" whereas in reality I was informing her of discrimination which is ongoing and pleading for her to step in and stop it due to her duty as dean of students. This pretext was a cover for her requesting both a threat assessment and a protecting order

against me based SOLEY off threat from my perceived disability in retaliation for my DOE complaint. The stalking no contact order was taken especially to label me as a sexual offender in retaliation for my DOE complaint.

287. The PO revealed that Dugo, through her official capacity at the University, contracted with "Sigma Threat" in order to harass Plaintiff in retaliation for filing his DOE Complaint and retaliation complaints to the university. The stated pretext for this was to "help evaluate his threat level" and was a cover for her contracting the service on the basis of threat from my perceived disability in retaliation for filing his DOE Complaint.

288. In addition, she made derogatory and misleading accusations in PO about the Holy Quran Chapter 33, Verses 60-68: referring to them as "translated as sinners will die in a fire". She took the protection order for harassment and stalking based on perceived threat from Plaintiffs religion.

289. Her allegations in support or PO were misleading or defamatory in the following ways:

1. She claims she "had to issue" Plaintiff "interim suspension for threatening a fellow law student w/ physical violence." This is false, she knows that the student in question, Evangeline Gargula, stalked me and then posted my information to a group chat and made derogatory statements about my disability, then called me at 1:08 am in a threatening manner and recorded BOTH the call that she made to me and the call that I made in response. These two illegal audio tapes are what Dugo actually suspended me over. She misrepresented this fact deliberately in order to make me seem like a dangerous person.

2. She claims I was on probation for "physically assaulting another student." This is false, she knows that there was absolutely no evidence whatsoever that I assaulted anyone aside from that single persons unsubstantiated allegations. She misrepresented this fact deliberately in order to make me seem like a dangerous person. I have filed Attorney General Case 20cv1772 pursuant to this allegation.

3. She claims that I have sent her "more than 150 unanswered text messages with increasingly aggressive language." This is without indicating that the messages are sent to her because of her official capacity as dean of students, and because I am

telling her about discrimination committed by Deputy Chief Eric Chin of NUPD, Lee of NUPD, and others in the University and asking her to stop them. The "aggressive language" she is referring to is the increasing amount of litigation and legal proceedings that I am threatening her with if she does not cease her illegal conduct.

4.   She claims she "has not" monitored my Facebook. This is blatantly false, because she on 8/23/20 she called me and explicitly stated "we've been watching your facebook and other social medial posts" and she also directed detective Lee to call me and interrogate me on the basis of her perceived threat from my Facebook post about my Department of Education Complaint.

5.   She claims that I am sending her "harassing" messages to her work email when in reality I sent her two follow emails demanding to know who contacted my sister when I told her not to.

6.   She claims that Plaintiff called her and that she hung up the phone, which is a lie. Plaintiff called her and HE hung up the phone, not Dugo. She deliberately misrepresented this fact to make it seem like Plaintiff was harassing her, when in reality she was harassing Plaintiff and his sister, acting far beyond the scope of her responsibilities as Dean of Students, and escalating the situation to the current severity level.

290.    On 11/11/19 at approximately 3:00 PM Plaintiff attempted to file a police report in order to get Evangeline Gargula named as the offender on the police report at Chicago 18th District and two officers obstructed me from doing so, as a result I filed COPA complaint Log 2020-0005122.

291.    As a result of the aforementioned continuing pattern of harassment against Plaintiff by employees of NU which included the unlawful contact with Plaintiff's therapist, sister, and Department of Education investigator, as well as the instances of eavesdropping and the obstruction of his police reports, on 11/17/20, Plaintiff went to domestic violence court at 555 W Harrison and stated claims for SNCO against both Evangeline Gargula (20OP78283) and Mona Dugo (20OP78277) in front of the Honorable Judge Thomas M. Cushing #2258. Plaintiff sent pictures of the order to NU via email that same day, informing them of the fact that he had received the orders.

292.    On 11/18/20 Log 2020-0005122 was assigned CPD Sergeant Lisa Eitel (Star #2075) and on 11/22/20 I interviewed with Eitel about the incident of report obstruction, and at that time she included an amendment for report JD 419862 to include Evangeline Gargula's name as the suspect.

### 2020 UHAS Hearings Procedural and Substantive Unfairness

293.    NU failed to investigate them and showed deliberate indifference to Plaintiffs reported concerns. The university and its representatives showed clear bias in this suspension by enforcing the implied rights of the similarly situated female student in blatant violation of my rights as a disabled student of color not to be stalked or harassed, and doing so solely on the basis of gender. This was de-facto gender discrimination given that we are similarly situated, and the only difference from her is that I am male, Muslim, colored, and disabled, which are all protected classes. In doing this they again showed a theme of disparate impact on males in the University Hearing and Appeals process.

294.    On information and belief, Plaintiff contends that a majority of the male students who are accused of Title IX and UHAS hearing violations are found guilty in the last 3 years.

295.    On information and belief, Plaintiff contents that a majority of students found responsible for Title IX and UHAS hearing violations are male, or have male first names in the last 3 years.

296.    On information and belief, Plaintiff contents that a majority of students accused of Title IX and UHAS hearing violations are male, or have male first names in the last 3 years.

297.    Despite every single one of his efforts and attempts, the university again failed in 2020, as they had in 2019,  to uphold Plaintiff's right as a student to pursue education free of harassment by allowing a stalker to maliciously harass Plaintiff and pursue multiple dishonest and deceitful complaints against Plaintiff, ultimately resulting Plaintiff again being suspended. The university has offered Plaintiff absolutely no meaningful support whatsoever in this situation, including willfully evading 100% of his complaints in a careless and increasingly belligerent and negligent manner and blatant violation of Title IX selective enforcement policies.

298.    NU allowed unfair outside pressure from student groups to influence their decision to suspend Plaintiff. Specifically Gloria Cange, co-president of OUTlaw, a Pritzker

student organization said she forwarded the messages to Shannon Bartlett, Associate Dean of Inclusion & Engagement at 8:10 am on 8/23/21, then spoke with Shannon by phone, where she asked what actions the school was taking. Gloria said that Shannon replied she was in conversation with Associate Dean and Dean of Students Susie Spies-Roth and others.

299.     On 9/4/20, NU appointed Heath Cohen and Ish Faith-Orkar to conduct Plaintiffs student conduct hearing.

300.     On 9/11/20 at 9:51 PM Plaintiff sent an email to Lucas Christian requesting that Cohen be replaced because she represented a conflict of interest and would display bias due to her treatment of his case from the 2019 hearings and the fact that Plaintiff had filed numerous complaints about Cohen about that incident.

301.     On 9/13/20 at 9:26 AM, Lucas Christian sent Plaintiff an email refusing to replace her with another resource, even though NU had plenty of other people available to replace her.

302.     Cohen exhibited bias during the entire proceedings, by initially refusing to interview witnesses whom I had requested and by interviewing witnesses who would be bias in favor of Gargula. She interviewed Gloria Cange who had not witnessed the incidents and should not have been eligible, she also interviewed the one of the only other transgender students in the law school with whom Gargula had prior association. Both of the witnesses had prior relationships with Gargula through the LGBT affinity group. When Plaintiff brought up the fact that Cange should not have been allowed to serve as a witness, NU representatives never addressed his concerns.

303.     Cohen also intentionally and repeatedly misstated Plaintiff's comments during his interviews such that he would appear guilty. NU representatives also placed significant weight on negative opinions of the witnesses that interviewed on Gargula's side such as Cange and Chernoff, and completely ignored the witness opinions that interviewed on the Plaintiff's side, such as Shen Peng, and had expressed concerns that Plaintiff was unfairly treated.

304.     NU blatantly took one single comment out of context of the entire line of comments on the groupchat and alleged that it was directed towards gender, whereas in reality, the line of questions was: "I don't know what to call you, stalker, disgusting, creepy…." Plaintiff

indicated to NU that his comments were not aimed at Evangeline's gender identity, but rather at her actions which constituted stalking and sexual misconduct under University policy. Furthermore, there was no information to suggest that Plaintiff was aware of Gargula's gender identity at the time the comments were made, and Gargula provided no objective indication of such. Her name on the group chat was "Ev Gargula" and her photo was not indicative of her gender. Nor did her profile indicate her pronouns or gender identity.

305. During the proceedings, Plaintiff explained that his reactions in the group chat incident was a "episodic manifestation of [his] underlying disability" and my anger, frustration, irritability, temper, etc. were symptoms of a "psychotic episode" triggered by stress from the negligent maintenance of a hostile learning environment in the Group Chat. Please note that an appropriate accommodation of my disability would be a learning environment free of harassment, intimidation, or other abuse. NU's negligent maintenance of a hostile learning environment on the GroupMe, by not having a moderator, which would not have been an undue burden or hardship and would have costed almost nothing, caused Plaintiff's symptoms to be exacerbated, and caused him severe emotional and psychological distress, and resulted in an adverse action against him (suspension).

306. NU initially refused to provide full transcripts of the group chats which Plaintiff had requested, and when they finally did provide them they constructively rearraigned the transcripts to be out of order so that Plaintiff appeared to initiate the conflicts, and also omitted numerous comments which were made towards the Plaintiff by other students.

307. NU violated its non retaliation policy by sanctioning Plaintiff on 9/9/20 for his formal discrimination complaints and for reporting what he believed to be wrongful or unlawful activity to NUPD and NU staff.

308. NU selectively enforced its discrimination policies where Gargula was a similarly situated female without disabilities who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. Both were incoming 1L students who were making comments on a school group chat which were allegedly against school policy, and only Plaintiff was suspended.

309.    NU knowingly hid the existence of the illegal recordings made by Gargula in order to protect her from liability and tried to defame Plaintiff to his therapist with them. When their existence was revealed and reported to police, NU illegally exerted its influence to have the police report cancelled. Then, instead of excluding the audio from the proceedings, NU illegally used them in order to form the basis for additional sanctions on Plaintiff. The recordings were used numerous times in violation of state law, including but not limited to:

- Chin and Dugo in order to suspend Plaintiff;

- Dugo to defame Plaintiff to his therapist;

- Taburro, DeSilva and Johnston in order to create the charges which Plaintiff was faced with in his 2020 UHAS hearings;

- Cohen and Ish-Orkar in order to make a determination of guilt during the 2020 UHAS hearings;

- Ron A. Alexander III in order to coordinate Plaintiffs sanctions panel;

- Sam Milgrom, Melissa Sersland, and Desiree Hanford in order to decide Plaintiff's sanctions during his sanctions panel.

**Plaintiff's formal responses to charges 2020 UHAS Hearings**

**Situation #1 – Evangeline**

310.    **Official University Policy, Definitions, and Corresponding Violations Committed by Evangeline**

- Disorderly Conduct (b)

  *2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

- *Sexual Misconduct*

  *2019-2020 Student Handbook, p.128: Northwestern prohibits all forms of sexual misconduct, including ...stalking, dating or domestic violence, and sexual harassment.*

*2019-2020 Student Handbook, p.38: Violations of the University's policy on*

*Sexual Misconduct (see page 132), including, but not limited to,*

- *Stalking;*

- Stalking (c)

    *2019-2020 Student Handbook, p.133: Knowingly engaging in a course of*

    *conduct directed at a specific person that one knows or should know would*

    *cause a reasonable person to fear for their safety (or the safety of a third*

    *party) or suffer emotion- al distress. "Emotional distress" means significant*

    *mental suffering, anxiety or alarm. Conduct that can amount to stalking may*

    *include two or more actions directed at another person4, whether done*

    *directly, indirectly, through others, via devices, or via any other methods or*

    *means (specifically including electronic means e.g. cyberstalking), including*

    *but not limited to:*

    - *Monitoring, observing, or conducting surveillance of a person;*

    - *Threatening (directly or indirectly) a person;*

    - *Communicating to or about a person;*

    - *Interfering with or damaging a person's property (including pets);*
      *or*

    - *Engaging in other unwelcome contact.*

- Misrepresentation

    *2019-2020 Student Handbook, p.38: Acts of fraud, misrepresentation, or*

    *dishonesty, including the following:*

    - *Forgery, alteration, or misuse of University documents, records, or*
      *identification or other materials;*

    - *Knowingly furnishing false, forged, or inappropriately altered*
      *information to the University, any University official, or emergency*
      *response personnel;*

- *Intentionally initiating or causing to be initiated any false report, warning, or threat of emergency or crisis;*

- <u>Endangering Self or Others</u>

  *2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

- <u>Destruction of Property</u>

  *2019-2020 Student Handbook, p.28: Destroying, damaging, defacing, or vandalizing property.*

- <u>Discrimination and Harassment</u>

  *2019-2020 Student Handbook, p.28: Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, services, or in the educational programs or activities it operates.*

**311.** **Conclusion and Reponses to Charges**

- <u>Disorderly Conduct (b)</u>

  *2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

  - Not Guilty – My conduct did not impede Evangeline's or anyone else's access to anything. Similar to how Evangeline's contact with me was deemed non-threatening and harassing due to her "mutual contact" with me, my conduct was the result of "mutual contact" with Evangeline and therefore non-threatening or harassing.

- <u>Endangering Self or Others</u>

  *2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

  - Not Guilty – My conduct was misleadingly framed as being the aggressor, when it was in reality all self-defense and in reaction to Evangeline's blatantly malicious behavior. Similar to how Evangeline's contact with me was deemed non-threatening and harassing due to her "mutual contact" with me, my conduct was the result of "mutual contact" with Evangeline and therefore non-threatening or harassing.

- <u>Harassment</u>

  *2020-2021 Policy on Institutional Equity, p.4: Prohibited harassment is verbal or physical conduct or conduct using technology directed toward someone because of their membership (or perceived membership) in a protected class that has the purpose or effect of: Substantially interfering with, limiting or depriving a member of the community from accessing or participating in the academic or employment environment, and/or substantially interfering with an individual's academic performance or work performance; or Creating an academic or working environment that a reasonable person would consider to be intimidating, hostile, or offensive. In determining whether the conduct is sufficiently severe or pervasive so as to meet the above standards, OE examines the context, nature, scope, frequency, duration, and location of incidents, as well as the relationships of the persons involved. A person's subjective belief that behavior is intimidating, hostile, or offensive does not make that behavior prohibited harassment under this Policy. The behavior must create a hostile environment and/or substantially*

*interfere with access to a University program or activity from an objective perspective.*

- Not Guilty – My comments were not aimed at Evangeline's gender identity, but rather at her actions which constituted stalking and sexual misconduct under University policy. Furthermore, I had no idea that she was a transgender student, and she provided no objective indication of such. In addition, my activities did not prevent Evangeline from accessing any University resource because I was banned and suspended immediately, and they did not create a hostile environment for the same reason. Similar to how Evangeline's contact with me was deemed non-threatening and harassing due to her "mutual contact" with me, my conduct was the result of "mutual contact" with Evangeline and therefore non-threatening or harassing.

**Evangeline Gargula's Interview Statements:**

312.    Gargula said that Plaintiff was saying "frightening" things and "losing control" in the group chat prior to her initial comments about him.

- Despite Plaintiff's request to NU to ask Gargula for clarification on what things was he saying which were "frightening" and why and what things was he saying and/or doing which were "losing control" and why, she never specifically articulated a single comment.

313.    Evangeline said she is a "skeptical" person who likes doing her "due diligence" so she googled Fahad. She said she found his Facebook profile and noticed the profile indicated that Fahad started law school in 2019. She said according to the profile, Fahad would have been a 2L, so she wondered if Fahad was actually who he was claiming to be in the group. Evangeline said that she searched for his name, clicked on his Facebook, and shared what was available. Evangeline described her post as "publicly available information," and she believed the rest of the class should have been aware of this information.

- Plaintiff's facebook security setting were set to "private" and a google search would not list his Facebook profile in the results. Therefore, his Facebook profile information was private information which was not "publicly available."

314. Evangeline said after posting Fahad's Facebook profile information, she wrote "assumed identity" and "psyop" to convey that "maybe someone is messing with us." Evangeline said shortly thereafter, at about 1:00 am on Saturday, Fahad began sending her direct messages on GroupMe. She said Fahad left his phone number in one of the messages, and asked her to call him.

- Plaintiff's messages clearly indicated that he took offense to Gargula's post and Gargula should stop stalking him. Plaintiff's message with his contact information stated "I'm at [number] if there are any issues we need to resolve" and clearly indicated that she should contact him only if she had a problem with him.

315. Evangeline said she then called to see what was going on. Evangeline said she wanted to see if Fahad would be more reasonable on the phone. Evangeline said Fahad kept getting angry that she called him at 1:00 a.m. she recalled saying were, "Is this Fahad?" when she first called, and later, when he asked her to meet him at Pearson and Chestnut to sort things out, she asked, "What do you mean?" She said that for the rest of the call Fahad was mostly yelling and going into "tirades" about the time at which she called him. She said Fahad was trying to get her to meet him somewhere. Evangeline said she understood him to mean to "fight or something." Evangeline said that Fahad hung up on that call and began texting her.

- Gargula called at 1:08 a.m. and asked "Is this Fahad Syed." When Plaintiff asked who the caller was, she repeatedly responded with only "you told me to call you" in an antagonizing and threatening fashion.

- Plaintiff never made any articulable threat to Gargula, and the messages he sent after the call were in in self-defense in response to harassment, and while Plaintiff was in genuine fear for his own safety.

316. Evangeline said that a few minutes later, Fahad called her back and continued to "threaten" her.

- Plaintiff never made any articulable threat to Gargula, and the call was in self-defense in response to harassment, and while Plaintiff was in genuine fear for his own safety.

317. When asked if she recorded the phone calls between her and Fahad, Evageline said that she did. She explained that she recorded them for her own purposes.

318. She said she did not know how Fahad had knowledge that she was transgender, as her name in the group isn't "super gendered."

**NU's Misrepresentations and Misstatements Regarding Plaintiff's Interview and Statements:**

319. NU repeatedly stated that "Fahad asked Evangeline to call him," while failing to acknowledge that Plaintiff's message clearly indicated that she should contact him only if she had a problem with him.

320. Fahad said he interpreted the frog picture as an attempt to reference his disability because it was calling him an "airhead" which is he said is "like a mentally disabled person."

- Plaintiff actually said that the picture was an derogatory epithet referring to disability because the frog is dumb, like a perceived mentally disabled person AND "NO THOUGHTS EMPTY HEAD" as the caption is EXPLICILTY in reference to mental capacity of a mentally disabled person.

321. He indicated that an individual can only exist peacefully for so long.

- Plaintiff actually said that an individual can only exist peacefully for so long WHILE BEING REPEATDIDLY and MALICOUSLY HARRASSED.

322. He said there were "uncalled for" statements that referenced his disabilities and his mother.

- NU repeatedly failed to document that Gargula's comments of "psyop" and "assumed identity" were disability harassment in the form of offensive stereotypes about people with disabilities, that the frog was derogatory epithet referring to disability, and that Gargula encouraging speculation about Plaintiff's 1L year brought up painful memories of Plaintiff's mother's death.

323.     Fahad said he began getting messages on Facebook from people that were upset with him

- Plaintiff actually specifically articulated that he was being harassed by multiple students, NU refused to acknowledge that Plaintiff felt harassed.

324.     Fahad said he felt his removal from the group chat was initiated by "Caucasian females pelting me with their rules and regulations." Fahad said he was ultimately banned because "another Caucasian female" (Evangeline) wanted to harass him unprovoked and mischaracterize what he said. Fahad said that he characterized this as "white privilege" and noted that the owner of the group chat was also white. Fahad further stated that it was "another Caucasian female" involved in the situation "last year."

- Plaintiff specifically explained that last year a white female accused him of some kind sexual assault which was never revealed to me and he was labeled as a sexual predator by the student body, as a result of the rumor spreading due to other students who harassed him on GroupMe by repeatedly removing him from the group.

325.     Fahad said that he thought Evangeline was "hiding behind her gender." He said that she took deliberate actions to provoke him, and then hid behind her gender identity to "get out of them." Fahad said that no one asked Evangeline to conduct surveillance on him, post on a group chat and ridicule him.

- NU failed to indicate that Gargula had also called him at 1 AM and record the phone call IN ORDER to MALICIOUSLY have him expelled from school.

326.     Fahad said that that as someone with disabilities that "you know" isn't able to control their impulses.

- Plaintiff actually stated that as a person with disabilities, he has intermittent manifestations of psychosis during which I lose touch with reality and become angry and paranoid. During those intermittent manifestations, the impulses of anger, frustration, and impatience are difficult to control.

327.     Fahad said he thought his information on Facebook was private.

- NU repeatedly suggested that Plaintiff's Facebook information was publicly available despite being told numerous times that his security settings were private.

328. Fahad said that on his first attempt to meet with students in real life, he was repeatedly engaged by Meegan (Mayer) even after he told her not to engage with him.

- Plaintiff actually stated that she harassed him in the "Meet the NU kids IRL" group chat repeatedly, before driving me out and then continuing to harass him in the main group chat. She made at least 8 different comments at me, most of which were inappropriate and disrespectful. And hd desecribed her pervasive and aggressive attitude and persistence after he calmly asked her to stop at least twice. She was a bully and you are hiding it. I asked her and Adrienne to stop approximately 10 separate and distinct times.

329. Fahad said another student, Adrienne, was basically doing the same thing as Meegan.

- Plaintiff actually described in detail how she harassed him the worst out of everyone, including in both chats. She aggressively Direct Messaged him and her pervasive and aggressive attitude and persistence after he calmly asked her to stop at least 10 times. Further, he described how she made 23 separate and distinct comments, directly disregarding his request, towards him and about him which were disrespectful and demeaning. In the group chat she said "Funny thing is that if he'd kept his mouth shut I would have suggested a spontaneous Zoom drinking session & invited him" as if she were the owner of the group and was entitled to make decisions for me and everyone else.

330. Regarding his comments to Evangeline, Fahad stated that "...all except one of them were referring to Evangeline's membership in the "stalker" class, not her gender identity."

- Plaintiff actually stated that NONE of the comments were directed at her gender, ALL were directed at NOT KNOWING how to address her. That is why my line of questioning was "I don't know what to call you, stalker, disgusting, etc."

331.     Fahad added the he believes "a lot of these things" are being taken out of context and are being mis-characterized.

- He specifically described that his "He she it" comment is being taken out of context of the rest of my comments and being used to mischaracterize his comments as transphobic.

332.     Fahad said that all of the comments he made to Evangeline, apart from "he-she-it" comment, were directed at her stalking behavior.

- Plaintiff actually stated that NONE of the comments were directed at her gender, ALL were directed at NOT KNOWING how to address her. That is why my line of questioning was "I don't know what to call you, stalker, disgusting, etc."

**Wren Chernoff's Misrepresentative and Defamatory Interview Statements:**

333.     Wren said that she specifically became aware of the comments from student Fahad Syed attempting to encourage people to go out and arrange some sort of bar night. Wren said that people responded about Wildcat Wellness, and commented that any meet ups should be conducted in a safe and socially distanced way. Wren said Fahad became very angry at those suggestions,

- Plaintiff was actually attempting to meet up in accordance with safe social distancing policy like other students had done. This is supported by Shen Peng. He wanted to meet up with a few people for drinks because I didn't meet anyone because I was deliberately and maliciously excluded from the orientation schedule by NU and other people were actvily discouraging it.

334.     She described Plaintiff's comment as "blatant transphobia." She further stated that "It's definitely increased my concern about the community as a whole as looking through various groups in the law school, wanting to have assurance about their trans-friendliness." However, in regards to the same comments she indicated that she immediately reached out to Evangeline, and Evangeline said it was a pretty lame attempt at an insult. Further, when asked about the impact of these interactions, Wren said "my feeling is kind of similar to Evangeline's on the surface, kind of a weak insult."

335.     Wren said that, at least in her limited interactions with him, "...he's prone to challenging people to physical confrontations."

- She never provided any basis for these statements, nor did NU ask for any basis.

**Gloria Cange Interview Statements:**

336.     At the time of the interview, Gloria serves as the co-president of OUTlaw, a Pritzker student organization. Gloria said that at 1:50 am, the student (Evangeline) sent Gloria an email to say she was becoming concerned because Fahad contacted Evangeline directly. Gloria said that approximately a half hour later she forwarded screenshots people were sending her to Shannon. Gloria said she then spoke with Shannon by phone, where she asked what actions the school was taking. Gloria said that Shannon replied she was in conversation with Associate Dean and Dean of Students Susie Spies-Roth and others.

**Shen Peng's Interview and Statements:**

337.     Shen said she first heard of Fahad at a friend's birthday party, prior to the beginning of the fall 2020 semester.  Shen said there were rumors shared concerning the first time Fahad was in law school two years ago. She indicated that it was rumored that due to inappropriate physical conduct,

338.     She described how Fahad asked if anyone was up for a drink and Meegan told him that meeting up was "against policy." Shen remarked that this wasn't true, because several students were getting together in person.

339.     Shen said this made her uncomfortable, and she felt there was a "double standard" imposed concerning Fahad. She noted that Fahad had joined the group chat later and wanted to meet people. She said she did not think he was fairly treated.

340.     Shen stated that a member of the group who "spoke" up, Evangeline, wanted to "mix words." Shen described her as a "character." Shen said that earlier in the group chat, Evangeline was in an "oral fight" with another girl from section 1.

341.     She said she [Evangeline] "exaggerates stuff sometimes."

342.     Shen stated that Hayden had not said anything like that to the thirty of them who had gotten together prior to that interaction. She said Fahad "was pretty pissed" about that, and noted that Fahad had been removed from both group chats.

343.     Shen said she did not contribute any statements to the group chat because she worried that if she spoke up for Fahad she would be "attacked." She referenced a student who spoke up for Fahad after he was removed from the group, and suggested that Fahad be "given a second chance." Shen indicated that the suggestion was not met with a favorable response.

**Situation #2 – Usama Ibrahim**

344.     **Official University Policy, Definitions, and Corresponding Violations Committed by Usama**

- Disorderly Conduct (b)

  *2019-2020 Student Handbook, p.29: Disorderly conduct or disruptive acts, including the following...No member of the University community may impede (or attempt to impede) others from participating in a University activity.*

- Misrepresentation

  *2019-2020 Student Handbook, p.38: Acts of fraud, misrepresentation, or dishonesty, including the following:*

  - *Forgery, alteration, or misuse of University documents, records, or identification or other materials;*

  - *Knowingly furnishing false, forged, or inappropriately altered information to the University, any University official, or emergency response personnel;*

  - *Intentionally initiating or causing to be initiated any false report, warning, or threat of emergency or crisis;*

- Endangering Self or Others

  *2019-2020 Student Handbook, p.32: Any action (or threat of action) that endangers or threatens to endanger the health, safety, or well-being of any person (including oneself). Severity and/or persistence may be considered.*

- Destruction of Property

  *2019-2020 Student Handbook, p.28: Destroying, damaging, defacing, or vandalizing property.*

- Discrimination and Harassment

  *2019-2020 Student Handbook, p.28: Northwestern University does not discriminate or permit discrimination by any member of its community against any individual on the basis of race, color, religion, national origin, sex, pregnancy, sexual orientation, gender identity, gender expression, parental status, marital status, age, disability, citizenship status, veteran status, genetic information, or any other classification protected by law in matters of admissions, employment, housing, services, or in the educational programs or activities it operates.*

**Analysis**

345. Scope of the Code of Conduct

- *2019-2020 Student Handbook, p.37: The Student Code of Conduct applies to the following situations. The University reserves the right to investigate and resolve reports of alleged misconduct in all of these situations:*

  - *Involving students, a group of students, or a student organization affiliated with any school or department or the University as a whole (undergraduate or graduate).*

  - *Occurring from the time of a student's application for admission through the actual awarding of a degree*

- Usama was not a student and his degree had already been awarded in May. The conduct in question occurred after the degree was awarded in June 2020. Therefore, he was not within the scope of enforcement of student conduct.

346. Conclusion and Reponses to Charges

- Misconduct within the Student Conduct Process (d)

2019-2020 Student Handbook, p.37: Misconduct related to the student

conduct process (University Hearing and Appeals System) or a Title IX

investigation, including: Any action that attempts to retaliate against,

intimidate, threaten, coerce, discriminate against, or improperly influence any

student for reporting alleged violations of policy or concern for the health or

safety of a Northwestern community member, assisting another in making

such a report, or participating in an investigation or resolution of such matters.

- Not Guilty – Usama was not a student and his degree had already been awarded

  The conduct in question occurred after the degree was awarded in May 2020.

  Therefore, he was not within the scope of enforcement of student conduct.

  Furthermore, Misconduct within the Student Conduct Process (d) clearly states

  "Any action that attempts to retaliate against, intimidate, threaten, coerce,

  discriminate against, or improperly influence any *student"* and Usama was not a

  student at the time of the allegations.

**Situation #3 – UHAS Report Disclosure**

347.   <u>Allegations:</u>

- You are alleged to have shared copies of documents from a UHAS hearing related

  to a November 1, 2019 incident (e.g., investigative report, outcome letter, appeal

  outcome) with one or more individuals without authorization. Additionally, it has

  been alleged that this occurred after you were instructed by the Office of

  Community Standards that these documents and the information included in them

  is confidential and not to be shared outside of the student conduct process

348.   <u>Charges:</u>

- Misconduct within the Student Conduct Process (e) *2019-2020 Student

  Handbook, p.38*: Misconduct related to the student conduct process (University

  Hearing and Appeals System) or a Title IX investigation, including: Unauthorized

  release or disclosure of information related to a student conduct proceeding.

349.   <u>Official University Policy and Definitions</u>

- Non-Retaliation Policy Statement

    *2019-2020 POLICY ON NON-RETALIATION p.1: Northwestern strictly prohibits retaliation against any member of its community for reporting or inquiring in good faith about what the member believes to be wrongful or unlawful activity, or for participating in an investigation or proceeding related to such activity. The University considers such reporting, inquiring, or participating to be protected activities in which all members of the Northwestern community may freely engage.*

- Reporting Obligation

    *2019-2020 POLICY ON NON-RETALIATION p.2: Northwestern encourages members of its community to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination, harassment.*

- Protection from Retaliation

    *2019-2020 POLICY ON NON-RETALIATION p.2-3: Examples of materially adverse actions that could constitute retaliation include, but are not limited to: removing one from a student organization, academic program, or lab;*
    *2019-2020 POLICY ON NON-RETALIATION p.3: In addition, no community member may be retaliated against for refusing to carry out a directive ordering the member to engage in wrongful or unlawful activity.*

- In good faith

    *2019-2020 POLICY ON NON-RETALIATION, p.1: done with honest belief that wrongful or unlawful activity may have occurred.*

- Materially adverse

    *2019-2020 POLICY ON NON-RETALIATION, p.1: sufficiently harmful to deter a reasonable person from engaging in protected activities.*

- Protected activities

*2019-2020 POLICY ON NON-RETALIATION, p.1: include (i) reporting (whether internally or externally) or inquiring, in good faith, about suspected wrongful or unlawful activity; (ii) assisting others in making such a report; or (iii) participating in an investigation or proceeding related to suspected wrongful or unlawful activity.*

- Retaliation

  *2019-2020 POLICY ON NON-RETALIATION, p.1: an action, performed directly or through others, that is aimed to deter a reasonable person from engaging in a protected activity or is done in retribution for engaging in a protected activity. Retaliation can take many forms, as described in Section II below. Action in response to a protected activity is not retaliatory unless (i) it has a materially adverse effect on the working, academic, or other University-related environment of an individual; and (ii) it would not have occurred in the absence of the protected activity.*

- Wrongful or unlawful activity

  *2019-2020 POLICY ON NON-RETALIATION, p2: activity of a community member that violates the law, Northwestern policy, or professional standards of conduct, including the laws, policies, and standards referenced in Section I below.*

350. Official University Policy, Definitions, and Corresponding Violations Committed by Christine DePilla

- On December 5th, 2019, in an email response to my request to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination, or harassment, Christine DePilla stated "the investigative report cannot be shared, including with the police." She unlawfully prevented me from university reporting policy, in violation of the non-retaliation policy.  (Email is containing in the attachments produced with this report.)

- On December 5th, 2019, in an email response to Eric Chin of my request to report all information regarding any activity they reasonably believe to be wrongful or unlawful, including activities that may constitute: discrimination, or harassment, Christine DePilla directed Eric Chin of the following with regards to using the report: "This document should not be used as evidence in any follow up/investigation of the complaints filed." She prevented my lawful reports from being investigated, in violation of the non-retaliation policy. (Email is containing in the attachments produced with this report.)

351. <u>Exceptional Circumstances</u>

- All of the reported instances charges were protected activities made in good faith that wrongful activity may have occurred, in accordance with the Policy on Non-Retaliation.

- The report in question contains evidence of obstruction of justice and conspiracy to commit false imprisonment committed against me in relation to the 11/1/19 incident. [Cite Equity Complaint]

- Please note that reporting ADA disability discrimination is considered a protected reporting activity and any attempt at preventing or discouraging its report is considered unlawful obstruction.

- Prior to Depilla's email dated 12/5/20, my understanding of the confidentiality of the report was unclear. I was under the understanding that I could share the report with staff and/or faculty if I had concerns about the inherent fairness of the process – and at that time I was attempting to report ADA disability targeting to the University, but did not know who the proper authorities were or what the process was because I was new to the school.

- Prior to ever sharing the report with law enforcement, I contacted the Northwestern University Police Department and received explicit confirmation that I was able to share the details of the report in accordance with applicable state and federal law in order to provide evidence of direct targeting because of my

ADA disabilities, and other criminal acts which were perpetrated against me by Osama A. Usama I. and Muaaz M. and contained within the details of the report.

- During my UHAS Hearing on 12/9/20, I was instructed by student conduct representatives DePilla and Cohen that I should share my concerns about violations of the law with the police, and I immediately did so. They were fully aware of the concerns of illegal targeting based on my disabilities which I expressed repeatedly throughout the course of the UHAS hearing and investigation process, and they failed to report them to the proper authorities at that time, in violation of university reporting policy.

- Please note: At this time "Cohen" presents a direct conflict of interest with serving as my UHAS officer for this charge due to her role as a witness to the explicit verbal authorization statements made during my UHAS hearing on 12/9/20.

- Please be advised of the following ACTIVE State and Federal Investigations Related to 11/1/19 UHAS Incident and the 8/23/20 UHAS Incident:
    - Dept. of Ed., OCR Complaint #05-20-2444
    - Illinois Guardianship and Advocacy Commission Case #20-030-9015
    - Illinois Department of Human Rights (IDHR) Case # 2020CH2546; HUD Case #05-20-9282-8

352. <u>Intent</u>

- To notify the authorities of the ADA disability harassment and vicious hate crime which I experienced on 11/1/19, in addition to my illegal eviction notice, which I am free to do by law. To promote an academic, research, and work environment that encourages community members to report any activity they believe in good faith to be wrongful or unlawful.

353. <u>Conclusion and Reponses to Charges</u>

- <u>Misconduct within the Student Conduct Process (e)</u>

*2019-2020 Student Handbook, p.38*: Misconduct related to the student conduct process (University Hearing and Appeals System) or a Title IX investigation, including: Unauthorized release or disclosure of information related to a student conduct proceeding.

- Not Guilty – I received explicit authorization from both Christine DePilla and Heather Cohen in my UHAS hearing on 12/9/20 prior to sharing my concerns with NUPD, and then I received explicit authorization from NUPD to share my concerns from the hearing report with NUPD and other law enforcement agencies. I reported Usama and the others indicated in the report because I had good faith that wrongful or unlawful activity had occurred when Usama initiated a malicious process using lies and deceit, which was illegal and unjust and unethical. I had good faith that he engaged in a wrongful and unlawful activity, for which I filed a report, which is a protected activity under the retaliation policy. Now I am being retaliated against by the University and Christine DePilla and Heather Cohen for filing my legitimate reports about disability discrimination, which are protected activities under the non-retaliation policy. All of the times which are noted in the report were protected reporting activities, made on a good faith basis that wrongful activity had occurred, and are therefore all protected under the university non-retaliation policy.

354. Predictably, on 12/1/20 NU representatives Cohen and Faith-Orkar found Plaintiff guilty of all charges and responsible for violating the anti-harassment provision of the University's Policy on Institutional Equity and for violating multiple provisions of the Student Handbook. In doing so, they either summarily dismissed or willfully ignored all of Plaintiff's defenses and objections.

355. On 12/18/20, a Sanctioning Panel convened to determine appropriate sanctions consistent with the applicable process. The Sanctioning Panel determined that Plaintiff should be expelled from the

University and precluded from attending the University in the future. That sanction decision was reflected in a December 22, 2020 letter to Plaintiff. Plaintiff submitted an appeal of the expulsion on 1/4/21 and the appellate panel denied the appeal in a 1/21/21 letter to Plaintiff.

356.    Upon Plaintiff's expulsion, NU had willfully failed to acknowledge and/or address any of Plaintiff's complaints including: of disability harassment and false imprisonment by NUPD Healy and well as his violation of state commitment procedure by failing to sign the commitment petition and falsifying the police report stating that he did, and further falsifying the police report stating Maksud had witnessed the alleged battery, disability based harassment by Gargula nor her commission of two felonies by making the audio tapes, disability based harassment by Maksud and Ibrahim, disability based harassment by Chin for cancelling his police report, disability discrimination and bias by Cohen, Plaintiff's complaints of Dugo contacting his therapist to defame him; his complaints for the contacting of his sister, and his complaints about Dugo and Chin hiding the felony audio tapes which he was suspended over.

### 2020 Retaliatory False Arrest and False Imprisonment

357.    On or around 11/17/20, Mona Dugo falsely reported to NUPD officers Stark, Benson, Chin, and NU employee Sarah Wake that Plaintiff had violated the PO which she unlawfully had placed on him as a result of a 11/4/20 email to the school asking them to address the unlawful contact with his therapist and family which had taken place earlier in the month of October and which Plaintiff had reported to DOE and the University. They formed an agreement to conspire with several officers from the Evanston Police Department to have Plaintiff falsely imprisoned pursuant to case 20DV2080601, the only arrest on Plaintiff's entire criminal record, in order to retaliate against Plaintiff for his DOE report and for 20OP78277 which Plaintiff had secured on 11/17/20.

*358.*    On 11/18/20 at 11:47 AM Evanston Police Department Detective Jones #162 and Detective Cepiel #186 met with Northwestern Police Detective Sarah Stark #21 in reference to the alleged violation of a no stalking no contact order ("EPD Report 20010154").

359.    On 11/19/20, at 10 AM NUPD Detective Stark and three officers of the Evanston Police Department, including Detective Pack #176, Svendsen #164, Detective Jones #162 came to Plaintiff's apartment at 244 E Pearson St. Chicago, IL 60611 at approximately 11:00 AM CST and arrested him

without telling him what charges they were arresting him for, without letting him take his prescribed medicine, and without reading him his rights.

360.    They knocked on his door announcing themselves as Evanston Police and when Plaintiff answered, they said they needed to "talk to [him] about the discrimination by Northwestern University," so he let them come into the apartment.

361.    While they were inside the apartment they repeatedly and purposefully stepped on his Muslim prayer mat even after he asked the first officer not to step on in, in direct disrespect of his religious beliefs, and laughed as they did it and I asked them not to. They made derogatory and incendiary statements about the rug, saying it was "beautiful" after repeatedly stomping on it and laughing.  They took these actions in order to intentionally provoke Plaintiff.

362.    Plaintiff immediately showed them the court order of protection, 20 OP 78277, which he had received against Dugo on 11/17/20 in order to substantiate his own claims of harassment by Dugo.

363.    Despite the fact that Plaintiff told them that Mona Dugo, the complaining witness for this arrest was retaliating against him for Department of Education complaint 05-20-2444 which he had filed, in addition to the stalking no contact hearing, at approximately 11 AM CST Detective Jones placed Plaintiff into handcuffs without ever telling him what he was under arrest for or reading him his rights. At that time, Plaintiff explicitly informed them of the fact that he suffered from a disability them that he had not taken his prescription bi-polar medication which was sitting on a shelf in plain view of all of the officers, however the officers refused to let Plaintiff take his medication.

364.    The four officers transported Plaintiff to Evanston police station at 1454 Elmwood Ave, Evanston, IL 60201 and made him sit in an interrogation room and coercively manipulated Plaintiff into make incriminating statements without the presence of a lawyer, while under duress, which he did not understand.

365.    Prior to being interrogated by the officers, Plaintiff asked for a lawyer. The officers claimed that calling a lawyer would take "several hours" and misleadingly made it seem like if Plaintiff requested a lawyer, that he would have to hire one himself. They said they "might" be able to call the public defender, but that it would take hours. In order to clear his self of the charges, Plaintiff was

coercively manipulated into allowing them to question him without a lawyer. This is because he was not on his medication and not in the right state of mind to understand what was happening.

366.    They never mirandized him before arresting him and they never explained what he was charged with until they had brought him to the station and questioned me him a room with four officers yelling at him, and while he did not have medication and did not know what was happening, in this way they took advantage of his disabilities in order to force him to make incriminating statements in violation of his constitutional rights to be free of self-incriminating statements. They repeatedly told him that "they knew [his] people" and that they would "take care of [him]" in apparent reference to his sister, Sgt. Syed of Evanston Police.

367.    Jones called repeatedly called Plaintiff "little bro" and other derogatory statements while he was in his custody.

368.    They never allowed him to take his medicine prior to arresting him without reading him his rights, and they knowingly forced him to undergo questioning while not on his medication or in the right state of mind to adequately represent himself. This is despite them knowing that he took medications, which they learned at his apartment.

369.    They never established probable cause for the arrest and never showed him the alleged probable cause when he asked for it, despite the fact that I asked for it at least four separate times. They simply asked him what his email was, and when he told them, they falsely reported to the states attorney that he had admitted to sending the alleged email in question.

370.    They also confiscated his protections order, 20 OP 78277, and refused to give it back. They took this property without ever intending on reviewing it for the purposed of assessing the charges against me, and without ever intending on returning the paperwork. They purposefully took this action in order to deprive Plaintiff of his right to the materials he needed to adequately represent his defense during the court proceedings for this case.

371.    Even though Plaintiff told them that Mona Dugo, the complaining witness for this arrest was retaliating against him for Department of Education complaint 05-20-2444 which he had provided to them, in addition to the stalking no contact hearing, they still charged him with the offense.  The Dean reported Plaintiff and discriminated against him on the basis of mental health, in retaliation for 20

PO 78277 and his Department of Education complaint, which she was fully aware through the university on 9/3/20 through an email to Lucas Christian and 9/13/20 through an email to the Office of Equity.

372.     Plaintiff's counsel for 20DV208060 provided him with the documentation which provided the basis for the state attorney's prosecution of the case. The documentation revealed that, beginning in October 2020 after Plaintiff had filed CPD report JD 395768, NUPD detective Stark had authored a series of police reports fabricating incidents of purported harassment by Plaintiff against Dugo, and NU general counsel Sarah K. Wake drafted the charges and provided them to the state prosecutors so that they could proceed with charging Plaintiff with the alleged violation of protection order. NU, Stark and Dugo took these actions to create an artificial paper trail in order to shield Dugo and NU from litigation regarding their numerous instances of eavesdropping violations, retaliation, harassment, and discrimination which they had perpetrated against Plaintiff.

**Continuing Harassment and Intimidation**

373.     On 1/21/21 at approximately 2:21 PM, FBI Special Agents Boertie and "TFO" Ferguson came to Plaintiff's residence at 244 E Pearson St. and forcibly interrogated him for nearly 45 minutes about vague and obscure and unspecified concerns. When Plaintiff asked the agents on more than 3 separate occasion to explain why they came to Plaintiff's residence, Boertia proceeded to explain that there were four "incidents" which caused him concern: (1) Plaintiff's expunged criminal record from June 2018, records which have been destroyed and only NU had access to original copies of which Plaintiff had provided to NU prior to having them expunged (2) Plaintiff's police report to Chicago Police about an NU student eavesdropping, (3) the messages which led to 20 OP 20532 order involving NU employee Mona Dugo, and (4) the false arrest 20DV2080601 which Dugo had perpetrated upon Plaintiff. The agent made several strange and vague assertions of a "safety" concern resulting from these occurrence's despite the fact that the expunged record is nearly 3 years old, Plaintiff was the victim in his eavesdropping report to Chicago Police, a series of emails and text messages of a remarkably non-threatening nature led Dugo to seek a protection order by deliberately misrepresenting the nature of the emails which threatened legal action as suggesting that they threatened her physical safety, this is when the was never a single threat to the physical safety of anyone made at any time by the Plaintiff, and the fact

that the false arrest was also predicated on a single email which contained no threats and was a report of Dugo's unlawful contact with Plaintiff's sister and lies that Dugo told about being concerned for her own physical safety.

374. On information and belief, these FBI agents were sent by NU in order to harass and intimidate Plaintiff.

## II. PATTERN AND PRACTICE OF DISCRIMINATION

375. Northwestern University "NU" failed to properly supervise and monitor: the Northwestern University Police Department ("NUPD"); Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and in particular it's officer: Deputy Chief Eric Chin.

376. As a result of such failure, NU and NUPD allowed for a pattern and practice of discriminatory conduct to exist whereby numerous repeated policy violations on the basis of protected class were permitted, committed, and encouraged, which effectively discriminate against male, non-white, Muslim, and disabled applicants and students. The structural pattern of this discrimination is that the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class, then take an adverse action against him, such as suspension or deferral, as a result of that discrimination, and finally place some quantity of discriminatory conditions on his eligibility to re-enroll. Once he completed his required conditions and re-enrolled, NU or NUPD would repeat this pattern and practice of discriminatory conduct again.

377. The series of discriminatory actions from all three years (2018, 2019, 2020) arise from the same pattern or practice of discriminatory behavior, and thus each discriminatory act should be treated as part of the same transaction or occurrence for the purposes of this complaint.

*378.* The NU Defendants engaged in a pattern or practice of discrimination and that the similarity in nature of the conduct indicate that NU failed to supervise the individuals responsible.

379.    The allegation of a pattern or practice of discrimination by NU and NUPD is a common question of fact central to each of Plaintiff's claims from each year and Plaintiff in the instant case asserts a right to relief resulting from a series of consistent and severe harms, which are remarkably similar in nature, and all stem from this same core set of facts. The structural pattern of this discrimination is that (1) NU and NUPD failed to properly supervise and monitor: Northwestern's Law Admissions Department; Northwestern University Office of Equity, and in particular it's representatives: Mona Dugo and Karen Tamburro; Student Affairs Department, and in particular it's representatives: Christine DePilla and Heather Cohen; Behavioral Consultation Team (BCT), and the Police Advisory Board, and in particular it's officer: Deputy Chief Eric Chin, and (2) that as a result, the University or its agents would discriminate against the Plaintiff, treating him differently than other similarly situated students on the basis of a protected class, (3) then take an adverse action against him, such as suspension or deferral, as a result of that discrimination, and (4) finally place some quantity of discriminatory conditions on his eligibility to re-enroll. (5) Once he completed his required conditions and re-enrolled, NU or NUPD would repeat this pattern and practice of discriminatory conduct again. The end result was the Plaintiff spent five full years, from 2017-2021, pursuing entrance into the graduate law program which he was originally admitted to in 2017, and which NU never actually intended to let him enroll in or complete due to unmitigated bias against his color, socio-economic factors such as his background and family, his disability, race, and religion.

380.    In the instant complaint there are several witnesses common to each claim, and there is significant overlap. Susie Spies-Roth, the law school Dean of Students, was informed or involved in Plaintiff's deferral from 2018, in his suspension from 2019, and in his suspension from 2020. Shannon Bartlett, the Dean of Diversity and Inclusion, was involved and aware of the hostile environment from 2019, and in the hostile environment, discrimination, and retaliation from 2020. Aggie McGrane, of "AccessibleNU" office, handled Plaintiff's disability accommodations from 2019 and 2020. NU Law Professor Emily Kadens first met Plaintiff at an admitted student's dinner in Chicago in 2018, and she was his 1L Torts professor in 2019 after his

enrollment from deferral in 2018, and she was informed of and is aware and of his stalking and

harassment claim from 2020, and she currently teaches the 1L student, Defendant Gargula.

381.    In the instant claim, Plaintiff will need evidence from all three years in order to

fully illustrate the systemic and repeating pattern of discrimination he has been subjected to.

**COUNT 1**
**Violation of Title VI of the Civil Rights Act of 1964**
**42 U.S.C.A. § 2000d, et seq.**
**Race and National Origin Discrimination – Disparate Treatment**
**(Northwestern University)**

1.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380,

inclusive, of this Complaint, as if fully restated herein.

2.    Title VI provides: No person in the United States shall, on the ground of race, color, or

national origin, be excluded from participation in, be denied the benefits of, or be subjected

to discrimination under any program or activity receiving Federal financial assistance.

3.    By virtue of his brown skin color and the Pakistani national origin of his parent, Plaintiff

is an individual covered by **Title VI of the Civil Rights Act of 1964**, 42 U.S.C.A. § 2000d.

4.    Plaintiff was otherwise qualified for the study of law at the Law School because his 97th

percentile LSAT score was above the 75th percentile of accepted applicants and his high marks in his

major and his extracurricular activities warranted admission.

5.    Northwestern University, as a "university'" is a "program or activity" as defined by **Title**

**VI of the Civil Rights Act of 1964**, 42 U.S.C.A. § 2000d.

6.    Northwestern University receives federal financial assistance, as defined by 42 U.S.C.A.

§ 2000d, either directly or indirectly through federal financial aid, and as such, may not discriminate

against a person because of his race or national origin.

7.    At all times relevant hereto, Plaintiff was meeting the University's and the Law School's

legitimate academic expectations. Plaintiff was admitted through the Early Decision program, had signed

his Early Decision Admission Contract and was enrolled in the NU JD class of 2018.

8.    On April 26th, 2018 Plaintiff's 2018 Early-Decision Application and subsequent

admission was subject to an unannounced post admission review which was highly irregular in process

and was on the basis of "information in [Plaintiff's] Fall 2018 JD application related to [Plaintiff's] …

family background." As far as plaintiff knows, no other non-brown or non-Pakistani 2018 early decision admit or 2018 general admit was subject to this kind of irregular post admission review based on "alleged inaccurate information" related to "family background."

9.      As a result of this review, Plaintiff was forced to "defer" his admission and enrollment to 2019.

10.     Directly resulting from NU's verification based in part on Plaintiff's family background, and the resulting deferral, Plaintiff was excluded from participation in and denied the benefits of the 2018 NU JD program.

11.     Said violations were done intentionally and/or knowingly with malice or reckless indifference, and warrant the imposition of punitive damages.

12.     As a direct and proximate result of Defendants' violation Title VI Plaintiff has suffered the damages and losses set forth herein and have incurred attorneys' fees and costs.

13.     Plaintiff is suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts and misconduct, unless and until this Court grants the relief requested herein.

14.     The wrongful acts and conduct of Defendants were done with deliberate indifference to the statutory and constitutional rights of Plaintiff.

15.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment  of his rights under **the** Civil Rights Act of 1964, and discriminated against his in violation of Title VI of the Civil Rights Act of 1964;

   b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of his race or national origin or family background;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorney's fees and costs; and

h.  Award such other relief as the Court deems just and proper.

## COUNT 2
### Violation of 42 U.S.C. § 1981
### Race and Ancestry/Ethnicity Discrimination
### (NU)

16.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

17.  The relevant portion of 42 USC 1981 reads: All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law. **42 U.S.C.A. § 1981 (West)**

18.  By virtue of his brown skin color and his Punjabi ethnicity and ancestry, Plaintiff is an individual covered by **42 U.S.C.A. § 1981**

19.    Plaintiff was otherwise qualified for the study of law at the Law School because his 97th percentile LSAT score was above the 75th percentile of accepted applicants and his high marks in his major and his extracurricular activities warranted admission.

20.    Plaintiff's 2017 "Early Decision" Northwestern University is a "contract" as defined by **42 U.S.C.A. § 1981**.

21.    Northwestern University receives federal financial assistance, as defined by 42 U.S.C.A. § 2000d, either directly or indirectly through federal financial aid, and as such, may not discriminate against a person because of his race or national origin.

22.    At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations. Plaintiff was admitted to the school, signed his Early Decision Admission Contract and was enrolled in the NU JD class of 2018. By virtue of having singed his early decision enrollment contract, paid his seat reservation fee and withdrawing all of his pending applications from peer law schools as a stipulation of his early decision contract, Plaintiff was afforded the protections associated with this statute.

23.    On April 26th, 2018 Plaintiff's 2018 Early-Decision Application and subsequent admission was subject to an unannounced post admission review which was highly irregular in process and was on the basis of "alleged inaccurate information in [Plaintiff's] Fall 2018 JD application related to [Plaintiff's] … family background." As far as plaintiff knows, no other non-brown or non-Punjabi 2018 early decision admit or 2018 general admit was subject to this kind of irregular "verification" based on "alleged inaccurate information" related to "family background."

24.    As a result of this investigation, Plaintiff was forced to "defer" his admission and enrollment to 2019.

25.    Directly resulting from NU's verification based in part on Plaintiff's family background, and the resulting deferral, Plaintiff was excluded from participation in and denied the benefits of the 2018 NU JD program.

26.    That the actions of Defendants were the result of discriminatory animus towards brown students of Punjabi ethnicity as supported by NU laws historical admission statistics and trends which

routinely admit a disproportionately low number of brown students of Punjabi ethnicity despite outstanding qualifications.

27.     That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of Plaintiff and other similarly situated students, all in violation of his constitutional rights.

28.     That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

29.     The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Plaintiff is entitled to punitive damages.

30.     Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

31.     WHEREFORE, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to  42 U.S.C. §1988, and further relief as justice

### COUNT 3
**Violation of Title III of the Americans with Disabilities Act (ADA),**
**42 U.S.C. 12101 et seq.**
**Discrimination – Disparate Treatment**
**(Northwestern University)**

32.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

33.     Title III of the ADA provides: No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases or operates a place of public accommodation. 42 U.S.C. 12182(a).

34. By virtue of his Bi-Polar Disorder, ADHD, and co-morbid anxiety and depression, Plaintiff is a person with a "disability" as defined in 42 U.S.C. Sec 12102(1).

35. Plaintiff was "otherwise qualified" for the study of law at the Law School.

36. The University is a "place of public accommodation" as defined by 42 U.S.C. 12181(7).

37. At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations.

38. Plaintiff specifically realleges paragraphs 67-77. As described, Plaintiff was falsely imprisoned by NUPD based directly off threat from his perceived disability.

39. Plaintiff specifically realleges paragraphs 85-180. As described, Plaintiff was subjected to a discriminatory and bias student disciplinary process on the basis of disability. As a result of this disability harassment and discrimination, Plaintiff had been suspended was later placed on disciplinary probation.

40. Plaintiff specifically realleges paragraphs 181-189.. As described, Plaintiff's return from absence was conditioned on inappropriate and unduly burdensome requirements such as a "forensic threat assessment" which was predicated directly on threat from his perceived disability. Effectively, the "forensic risk assessment" and other activity which was ostensibly designed to assess Plaintiff's risk was a form of discriminatory obstacle which was directly predicated on Plaintiff's mental health yet served no effective purpose in NU's risk assessment. In this manner, it was discrimination based directly on Plaintiff's mental health, in violation of the ADA.

41. Plaintiff specifically realleges paragraphs 205-241. As described, On 8/23/20, Plaintiff was again suspended based directly off of his probationary status as a result of experiencing disability based harassment and discrimination.

42. Plaintiff specifically realleges paragraphs 242-356.. As described,, Plaintiff was subjected to severe Conspiracy, Disability Harassment, Discrimination, Retaliation, and Unlawful Obstruction of Justice ultimately resulting in his expulsion. This included blatant retaliation for reporting submitting disability discrimination complaints as described in paragraph 250. As described in paragraph 252 and 255-256 Dugo and Chin discriminated against Plaintiff when they had unauthorized email communications with Plaintiff's private psychiatrist, Brian Tobin, in violation of the Illinois Mental

Health and Developmental Disabilities Confidentiality Act (IMHDDCA) and Health Insurance Portability and Accountability Act (HIPAA) in order to defame and deprive Plaintiff of his therapist, and they succeeded as Plaintiff's therapist severed their relationship

43.    As described in paragraph 263, Eric Chin discriminated against Plaintiff on the basis of disability by lying about Plaintiff's consent to the Gargula audio tapes and illegally disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship. He took these actions in order to cause the cancellation of Plaintiff's police investigation. This information was revealed and the facts were of no legitimate concern to the recipients of Chin's communications. The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

44.    As described in paragraph 356, Plaintiff was ultimately completely barred from being able to complaint of discrimination or harassment and was expelled while having numerous outstanding grievances of disability based harassment which were willfully ignored by NU. During the course of Plaintiff's enrollment, he submitted over 100 separate complaints of discrimination and harassment and NU either dismissed or ignored every single one without a single exception.

45.    Plaintiff specifically realleges paragraphs 357-372. As described, Plaintiff was further subjected to disability based discrimination by being coercively intimidated and falsely arrested and maliciously prosecuted while deprived of his medication.

46.    As described in this complaint, Plaintiff was subjected to severe discrimination and harassment based off perceived disability which, among other things, constituted a hostile learning environment under Title III.

47.    As described in the complaint, the Dean took a number of adverse actions against Plaintiff based off threat from his perceived disability, including but not limited to:

  a.    Issuing an "Interim" suspension of Plaintiff on 8/23/20, wherein she undertook a specific and implicit assumption of Plaintiff's danger to other students based off his two illegally

recorded phone conversations. Although the Plaintiff made no articulable threat of violence, nor indicated any action that would warrant the concern of NU staff or any other officials, Dugo made the implicit assumption of his threat to the physical safety of others in a manner which strongly indicates that she took her actions based on her threat from Plaintiff's perceived disability. This is further indicated by the fact that she elected to institute "interim" suspension procedure, as opposed to the normal procedure, which is intended to be an extraordinary measure only undertaken upon a clear and specific danger to the safety of the NU community. There was no clear and specific danger or threat which warranted the interim suspension, which is a safety measure.

    b.   Putting an indefinite "hold" on Plaintiff's registration.

    c.   Securing PO 20532 on deliberately false and misleading pretenses based of threat from Plaintiff's perceived disability, then later falsely claiming that he violated the order in order to have him arrested.

    d.   Ordering numerous staff and administrators from the University and Law School (including personnel from the SSD Office, Counseling Office, Career Strategy Center, Office of the Law School Dean, Records and Registration Office and Student Services) to refrain from communicating with or assisting him;

    e.   Expelling Plaintiff without affording his access to University and Law School procedures that would have provided his with due process.

    f.   Unilaterally imposing unwarranted permanent marks on Plaintiff's transcript

48.    The Dean took these actions resulting from prejudice and fear of the outward and widely known symptoms of his bi-polar disability, including anger and irritability, and had constructive notice that Plaintiff suffered from a mental disability prior to unlawfully suspending Plaintiff.

49.    The Dean was aware that Plaintiff was on disciplinary probation prior to sanctioning Plaintiff, and therefore could reasonably be expected to know the reason why Plaintiff was on disciplinary probation, which in itself provided her with constructive notice of his ADA disabilities prior to suspending Plaintiff. The Dean, by virtue of her position as Dean of Students, had constructive notice of Plaintiff's status as student with disabilities.

50. Plaintiff suffered further adverse action when, despite his attempt to notify the University of the Dean's discriminatory actions, the University ignored his complaints, violated its own procedures, and failed to adjudicate his Stalking Sexual Misconduct claim, leaving his on indefinite "leave" status and thereby effectively and constructively expelling him.

51. On information and belief, similarly situated students without disabilities were not subjected to the adverse actions described above.

52. Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

53. NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

54. NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

55. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under the ADA, and discriminated against his in violation of Title III of the ADA;

   b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

   d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of disability;

   e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

## COUNT 4
### Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.
### Interference, Coercion and Intimidation
### (Northwestern University)

56. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

57. 42 U.S.C. 12203(b) provides that: It shall be unlawful to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of or on account of his or his having exercised or enjoyed ... any right granted or protected by this chapter.

58. Plaintiff was exercising his rights under the ADA when he sought reasonable academic accommodations for his disability. He was likewise exercising his rights under the ADA when he sought to avail himself of the goods, services, facilities, privileges, advantages and accommodations of the University and Law School.

59. The Dean coerced, intimidated, threatened and interfered with Plaintiff's exercise and enjoyment of his rights by his actions and omissions as described above, including but not limited to: (a) putting his registration on an indefinite "hold"; (b) suspending him indefinitely; (c) effectively excommunicating Plaintiff from the University and Law School communities by ordering him not to communicate with University and Law School personnel; (d) interfering with Plaintiff's participation in academic pursuits,; (e) sharing negative opinions about Plaintiff with the Plaintiff's therapist and Federal Department of Education Investigator; (f) contacting and demanding that Plaintiff's therapist meet with her and NUPD Deputy Chief Eric Chin for unspecified reasons and without Plaintiff's knowledge; and (g) interrogating, intimidating and threatening Plaintiff over the course of approximately 3 months. And Securing PO 20532 on deliberately false and misleading pretenses based of threat from Plaintiff's

perceived disability, then later falsely claiming that he violated the order in order to have him arrested and maliciously prosecuted pursuant to 20DV208060.

60.     NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntary committed.

61.     This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

62.     These facts were of no legitimate concern to the recipients of Chin's communications.

63.     The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768

64.     Plaintiff specifically realleges paragraphs 242-356.. As described,, Plaintiff was subjected to severe Conspiracy, Disability Harassment, Discrimination, Retaliation, and Unlawful Obstruction of Justice ultimately resulting in his expulsion. This included blatant retaliation for reporting submitting disability discrimination complaints as described in paragraph 250. As described in paragraph 252 and 255-256 Dugo and Chin discriminated against Plaintiff when they had unauthorized email communications with Plaintiff's private psychiatrist, Brian Tobin, in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (IMHDDCA) and Health Insurance Portability and Accountability Act (HIPAA) in order to defame and deprive Plaintiff of his therapist, and they succeeded as Plaintiff's therapist severed their relationship

65.     As described in paragraph 263, Eric Chin discriminated against Plaintiff on the basis of disability by lying about Plaintiff's consent to the Gargula audio tapes and illegally disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship. He took these actions in order to cause the cancellation of Plaintiff's police investigation. This information was revealed and the facts were of no legitimate concern to the recipients of Chin's communications. The disclosure of these facts was highly embarrassing and

offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

66.     Plaintiff specifically realleges paragraphs 118-126. As described, Plaintiff was actively prevented from reporting discrimination by Depilla obstruction and actively prevented from being able to complain of discrimination by Tamburro. As described in paragraph 356, Plaintiff was ultimately completely barred from being able to complaint of discrimination or harassment and was expelled while having numerous outstanding grievances of disability based harassment which were willfully ignored by NU. During the course of Plaintiff's enrollment, he submitted over 100 separate complaints of discrimination and harassment and NU either dismissed or ignored every single one without a single exception.

67.     Plaintiff specifically realleges paragraphs 357-372. As described, Plaintiff was further subjected to disability based discrimination by being coercively intimidated and falsely arrested and maliciously prosecuted while deprived of his medication

68.     Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

69.     NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

70.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

71.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under the ADA, and coerced and intimidated his in violation of Title III of the ADA;

    b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of coercion and interference against Plaintiff on the basis of disability;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or other degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorney's fees and costs; and

h.  Award such other relief as the Court deems just and proper.

## COUNT 5
### Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.
### Retaliation
### (Northwestern University)

72.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

73.  On 9/9/20, Plaintiff received Official Northwestern Correspondence email from the Office of Equity indicating several more disciplinary sanctions and another UHAS hearing in retaliation for the filing of plaintiff's police report and DOE complaint. DePilla retaliated against Plaintiff for the complaints which he submitted both against her and about the incident, including 7 separate counts of "inappropriate sharing" which he was charged with during 2020 student conduct hearing. DePilla and NU retaliated against me for reporting these items in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting discrimination. These charges of "inappropriate sharing", which violated NU's published policy on non-retaliation, included:

- On 12/10/19, Plaintiff sent two complaints at 2:35 AM and 3:01 AM email to all the of the people on the police board including Chief Lewis, Cmd. Benson, and DC Chin reporting the 11/1/19 false imprisonment.

- On 12/12/19 at around 9:42 AM Plaintiff filed "Ethics Point" report ("EOP 597") reporting the 11/1/19 false imprisonment and received response that NUPD was the proper party to contact.

- On 12/10/19 at 7:26 PM Plaintiff sent email to Kadens and Provenzano informing them of the battery and false imprisonment.

- January 1, 2020 at 5:46:45 PM CST report sent to Detective Stark regarding the false imprisonment.

- 9/6/20 at 12:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment

- On 9/6/20 at 8:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment

- On 9/7/20 at 6:07 PM Plaintiff submitted a formal "Hate and Bias Report" about the handling of the 11/1/19 incident of false imprisonment

74.     When Plaintiff reported ADA disability discrimination he was engaged in a statutorily protected activity.

75.     As a direct result of, and in retaliation for, Plaintiff's exercise of his right to report ADA disability discrimination in September of 2020, the Office of Equity sanctioned him by undertaking the adverse actions alleged above, including charging him with "unauthorized sharing" of the 2019 student conduct hearing to Staff and outside governmental advocacy organizations such as the Illinois Guardianship and Advocacy Commission, I.D.H.R. and D.O.E.

76.     When Plaintiff submitted his Department of Education Complaint he was engaged in a statutorily protected activity. As a direct result NU retaliated by contacting his investigator in order to disparage Plaintiff.

77.     When Plaintiff reported Gargula and Dugo for eavesdropping in CPD police report, JD 395768, he was engaged in a statutorily protected activity.

78.     Eric Chin retaliated by discriminated against Plaintiff on the basis of disability by lying about Plaintiff's consent to the Gargula audio tapes and illegally disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and

Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship. He took these actions in order to cause the cancellation of Plaintiff's police investigation. This information was revealed and the facts were of no legitimate concern to the recipients of Chin's communications. The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

79.     When Plaintiff complained about the unlawful contact of his sister to NU he was engaged in a statutorily protected activity. Dugo reltaliated by falsely claiming that he violated her PO in order to have him arrested and maliciously prosecuted pursuant to 20DV208060.

80.     Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

81.     NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

82.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

83.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Enter a declaratory judgment that the University retaliated against Plaintiff in violation of Title III of the ADA;

   b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

   d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination and retaliation against Plaintiff on the basis of disability;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or other degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorneys fees and costs; and

h.  Award such other relief as the Court deems just and proper.

## <u>Count 6</u>
### Violation of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 et seq.
### Harassment/Hostile Learning Environment
### (Northwestern University)

84.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

85.  Plaintiff specifically realleges paragraphs 66-77.

86.  Plaintiff specifically realleges paragraphs 193-236

87.  As a person with a disability, Plaintiff is a member of a protected group.

88.  Plaintiff was subjected to unwelcome harassment as described above.

89.  The harassment of Plaintiff was based on his disability.

90.  The harassment was sufficiently severe and pervasive that it altered the conditions of Plaintiff's education and created an abusive education environment.

91.  Plaintiff put both the Law School and University communities on notice of the harassment, and even filed a grievance complaint with the Department of Education.

92.  The University did nothing to stop the harassment.

93.  The Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

94.  NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disability in violation of Title III of the ADA.

95.     NU is likely to continue to deny or limit Plaintiff's participation in other NU programming and law school related events and programs.

96.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.  Enter a declaratory judgment that the University subjected Plaintiff to harassment and a hostile educational environment in violation of Title III of the ADA;

b.  Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of harassment against Plaintiff on the basis of disability;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree 37 program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorney's fees and costs; and

h.  Award such other relief as the Court deems just and proper.

a.  Award such other relief as the Court deems just and proper.

**Count 8**
**Violation of Title III of the Americans with Disabilities Act (ADA),**
**42 U.S.C. 12101 et seq.**
**Failure to Accommodate**
**(Northwestern University)**

97.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

98.     Plaintiff had a temporary intermittent disability of vision impairment resulting from PRK eye surgery performed on both eyes on 10/22/20.

99.     On 10/24/20, Plaintiff requested accommodation of one-week extension for a University Hearing and Appeals student conduct process response and provided a doctors note which directed plaintiff of limitations on "excessive straining of the eyes and excessive computer/paperwork."

100.    Despite the doctors note, Equity failed to provide any accommodation, and as a result Plaintiff had to exert severe strain on my eyes for straining and trying to come up with my response for the hearing, and strained his eyes for over 72 hours straight without any sleep just to finish the UHAS response on my computer in time due to my multiple disabilities. As a result, Plaintiff was deprived of the ability to adequately defend himself against the conduct charges and substantially contributed to Plaintiff's being found guilty for all charges. In contrast, when Plaintiff was adequately given an opportunity to defend himself against charges from 2019, he was able beat one of the charges against him.

101.    Plaintiff's doctor told him that he might need to get surgery again to fix the damage he did from excessive straining.

102.    Heather Cohen knows Plaintiff and specifically refused to respond to my emails due to prejudice resulting from the complaint he filed about her on 12/19/19 resulting from her handling of a 2019 incident with the school.

103.    The vision loss associated with the PRK was a "episodic manifestation of my underlying disability" of temporary vision loss. An intermittent impairment that is a characteristic manifestation of admitted disability is part of the underlying disability and, hence, condition that NU must reasonably accommodate.

104.    Plaintiff suffers from multiple ADA learning and cognitive disabilities of bipolar disorder and ADHD, as well as anxiety and depression. One of the major characteristic manifestations of Plaintiffs bipolar disorder are "psychotic episodes" triggered by stress and other triggers which induce the symptoms of varying levels of anger, paranoia, frustration, irritability, temper and affect his sleep and daily personal care activities.

105.     After Plaintiff was brutally attacked on November 1st, 2019, while at a law school event and while on school property at 357 E Chicago Ave., he requested that NU accommodate him with a learning environment free of harassment, specifically disability related harassment.

106.     NU refused to accommodate Plaintiff's requests for reasonable academic accommodations, including providing a learning environment free of harassment on the Group Chat and a delay in his student conduct reply due to having had eye surgery.

107.     As a result of NU's refusal, Plaintiff was forced to write his 2020 student conduct investigation response while extremely ill and subject to the sedating effects of multiple medications.

108.     As a result of NU's refusal, Plaintiff was subjected to a vicious disability based hate crime and false imprisonment in 2019, followed by a bias and unfounded and fraudulent student conduct process, and was suspended for 2 semesters for an incident where he was the victim.

109.     As a result of NU's refusal, Plaintiff was subjected to a vicious disability based hate crime and false imprisonment in 2020, followed by a bias and unfounded and fraudulent student conduct process, and was suspended for 1 semesters and later expelled for an incident where he was the victim.

110.     NU's failure to accord Plaintiff reasonable academic accommodations denied him the benefits of the services, programs, and activities to which he is otherwise entitled as a student of the Law School and University, thereby violating Plaintiff's rights under the ADA and the regulations promulgated thereunder.

111.     As a direct and proximate result of NU's failure to accommodate her disability, Plaintiff suffered irreparable reputational, academic, and personal injury, and mental anguish.

112.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Enter a declaratory judgment that the University discriminated against Plaintiff by failing to afford her reasonable accommodations for her disability in violation of Title III of the ADA;

    b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of disability;

e. Order Plaintiff's exam grade in her Constitutional Law class removed from her transcript;

f. Award attorneys fees and costs; and

g. Award such other relief as this Court deems just and proper.

### COUNT 9
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. 701 et seq.
### Discrimination – Disparate Treatment
### (Northwestern University)

113. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

114. The Rehabilitation Act provides: No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title shall, solely by reason of his or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance... 29 U.S.C. 794(a).

115. By virtue of his Bi-Polar Disorder and ADHD, and co-morbid anxiety and depression, Plaintiff is an individual with a disability as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 705(20).

116. Plaintiff is otherwise qualified for the study of law at the Law School.

117. Northwestern University, as a "university'" is a "program or activity" as defined by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794(b).

118. Northwestern University receives federal financial assistance, as defined by 29 U.S.C. 794, either directly or indirectly through federal financial aid, and as such, may not discriminate against a person because of his disability.

119. At all times relevant hereto, Plaintiff was meeting the University's and the Law School's legitimate academic expectations.

120.     Plaintiff specifically realleges paragraphs 67-77. As described, Plaintiff was falsely imprisoned by NUPD based directly off threat from his perceived disability.

121.     Plaintiff specifically realleges paragraphs 85-180. As described, Plaintiff was subjected to a discriminatory  and bias student disciplinary process on the basis of disability. As a result of this disability harassment and discrimination, Plaintiff had been suspended was later placed on disciplinary probation.

122.     Plaintiff specifically realleges paragraphs 181-189.. As described, Plaintiff's return from absence was conditioned on inappropriate and unduly burdensome requirements such as a "forensic threat assessment" which was predicated directly on threat from his perceived disability. Effectively, the "forensic risk assessment" and other activity which was ostensibly designed to assess Plaintiff's risk was a form of discriminatory obstacle which was directly predicated on Plaintiff's mental health yet served no effective purpose in NU's risk assessment. In this manner, it was discrimination based directly on Plaintiff's mental health, in violation of the ADA.

123.     Plaintiff specifically realleges paragraphs 205-241. As described, On 8/23/20, Plaintiff was again suspended based directly off of his probationary status as a result of experiencing disability based harassment and discrimination.

124.     Plaintiff specifically realleges paragraphs 242-356.. As described,, Plaintiff was subjected to severe Conspiracy, Disability Harassment, Discrimination, Retaliation, and Unlawful Obstruction of Justice ultimately resulting in his expulsion. This included blatant retaliation for reporting submitting disability discrimination complaints as described in paragraph 250. As described in paragraph 252 and 255-256 Dugo and Chin discriminated against Plaintiff when they had unauthorized email communications with Plaintiff's private psychiatrist, Brian Tobin, in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (IMHDDCA) and Health Insurance Portability and Accountability Act (HIPAA) in order to defame and deprive Plaintiff of his therapist, and they succeeded as Plaintiff's therapist severed their relationship

125.     As described in paragraph 263, Eric Chin discriminated against Plaintiff on the basis of disability by lying about Plaintiff's consent to the Gargula audio tapes and illegally disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois

Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship. He took these actions in order to cause the cancellation of Plaintiff's police investigation. This information was revealed and the facts were of no legitimate concern to the recipients of Chin's communications. The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

126.    Plaintiff specifically realleges paragraphs 118-126. As described, Plaintiff was actively prevented from reporting discrimination by Depilla obstruction and actively prevented from being able to complain of discrimination by Tamburro. As described in paragraph 356, Plaintiff was ultimately completely barred from being able to complaint of discrimination or harassment and was expelled while having numerous outstanding grievances of disability based harassment which were willfully ignored by NU. During the course of Plaintiff's enrollment, he submitted over 100 separate complaints of discrimination and harassment and NU either dismissed or ignored every single one without a single exception.

127.    Plaintiff specifically realleges paragraphs 357-372. As described, Plaintiff was further subjected to disability based discrimination by being coercively intimidated and falsely arrested and maliciously prosecuted while deprived of his medication.

128.    As described in this complaint, Plaintiff was subjected to severe discrimination and harassment based off perceived disability which, among other things, constituted a hostile learning environment under Title III.

129.    As described in the complaint, the Dean took a number of adverse actions against Plaintiff based off threat from his perceived disability, including but not limited to:

g.    Issuing an "Interim" suspension of Plaintiff on 8/23/20, wherein she undertook a specific and implicit assumption of Plaintiff's danger to other students based off his two illegally recorded phone conversations. Although the Plaintiff made no articulable threat of violence, nor indicated any action that would warrant the concern of NU staff or any other officials, Dugo made the implicit assumption of his threat to the physical safety of

others in a manner which strongly indicates that she took her actions based on her threat from Plaintiff's perceived disability. This is further indicated by the fact that she elected to institute "interim" suspension procedure, as opposed to the normal procedure, which is intended to be an extraordinary measure only undertaken upon a clear and specific danger to the safety of the NU community. There was no clear and specific danger or threat which warranted the interim suspension, which is a safety measure.

h.  Putting an indefinite "hold" on Plaintiff's registration.

i.  Securing PO 20532 on deliberately false and misleading pretenses based of threat from Plaintiff's perceived disability, then later falsely claiming that he violated the order in order to have him arrested.

j.  Ordering numerous staff and administrators from the University and Law School (including personnel from the SSD Office, Counseling Office, Career Strategy Center, Office of the Law School Dean, Records and Registration Office and Student Services) to refrain from communicating with or assisting him;

k.  Expelling Plaintiff without affording his access to University and Law School procedures that would have provided his with due process.

l.  Unilaterally imposing unwarranted permanent marks on Plaintiff's transcript

130.    The Dean took these actions resulting from prejudice and fear of the outward and widely known symptoms of his bi-polar disability, including anger and irritability, and had constructive notice that Plaintiff suffered from a mental disability prior to unlawfully suspending Plaintiff.

131.    The Dean was aware that Plaintiff was on disciplinary probation prior to sanctioning Plaintiff, and therefore could reasonably be expected to know the reason why Plaintiff was on disciplinary probation, which in itself provided her with constructive notice of his ADA disabilities prior to suspending Plaintiff. The Dean, by virtue of her position as Dean of Students, had constructive notice of Plaintiff's status as student with disabilities.

132.    Plaintiff suffered further adverse action when, despite his attempt to notify the University of the Dean's discriminatory actions, the University ignored his complaints, violated its own procedures,

and failed to adjudicate his Stalking Sexual Misconduct claim, leaving his on indefinite "leave" status and thereby effectively and constructively expelling him.

133.    On information and belief, similarly situated students without disabilities were not subjected to the adverse actions described above.

134.    Plaintiff suffered an interruption of his program of legal studies, a delay in his career, loss of income and opportunity, mental anguish, and irreparable reputational, academic, and personal injury.

135.    Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

136.    In its disparate treatment of Plaintiff, the University acted willfully, deliberately and intentionally or with deliberate indifference toward his federally protected rights.

137.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

138.    The University wrongfully caused Plaintiff to be discriminated against and constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

139.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

140.    NU's conduct was based on Plaintiff's status as a person with a. disability.

141.    NU did not:

   a) conduct a bona fide and proper individualized assessment;

   b) engage in the interactive process;

   c) explore reasonable modifications and/or accommodations; and/or

   d) allow Plaintiff to realize the benefits of participating in the classroom in the JD and other academic and school-related recreation programs.

142.    NU unlawfully denied Plaintiff the opportunity to participate in class in its JD law program.

143.    NU is likely to continue to deny or limit Plaintiff's participation in other law school related events and programs.

144. NU, by virtue of the conduct described herein, discriminated against Plaintiff because of his disabilities in violation of § 504 of the Rehabilitation Act of 1973.

145. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University discriminated against Plaintiff solely by reason of his disability in violation of the Rehabilitation Act;

a. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

b. Order NU to provide any reasonable accommodations or modifications that may be necessary;

c. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

d. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

e. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

f. Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

**COUNT 10**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Interference, Coercion and Intimidation**
**(Northwestern University)**

146.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

147.     Plaintiff was exercising his rights under the ADA when he sought reasonable academic accommodations for his disability. He was likewise exercising his rights under the ADA when he sought to avail himself of the goods, services, facilities, privileges, advantages and accommodations of the University and Law School.

148.     The Dean coerced, intimidated, threatened and interfered with Plaintiff's exercise and enjoyment of his rights by his actions and omissions as described above, including but not limited to: (a) putting his registration on an indefinite "hold"; (b) suspending him indefinitely; (c) effectively excommunicating Plaintiff from the University and Law School communities by ordering him not to communicate with University and Law School personnel; (d) interfering with Plaintiff's participation in academic pursuits,; (e) sharing negative opinions about Plaintiff with the Plaintiff's therapist and Federal Department of Education Investigator; (f) contacting and demanding that Plaintiff's therapist meet with her and NUPD Deputy Chief Eric Chin for unspecified reasons and without Plaintiff's knowledge; and (g) interrogating, intimidating and threatening Plaintiff over the course of approximately 3 months. And Securing PO 20532 on deliberately false and misleading pretenses based of threat from Plaintiff's perceived disability, then later falsely claiming that he violated the order in order to have him arrested and maliciously prosecuted pursuant to 20DV208060.

149.     NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntary committed.

150.     This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

151.     These facts were of no legitimate concern to the recipients of Chin's communications.

152.     The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768

153.     Plaintiff specifically realleges paragraphs 242-356.. As described,, Plaintiff was subjected to severe Conspiracy, Disability Harassment, Discrimination, Retaliation, and Unlawful Obstruction of Justice ultimately resulting in his expulsion. This included blatant retaliation for reporting submitting disability discrimination complaints as described in paragraph 250. As described in paragraph 252 and 255-256 Dugo and Chin discriminated against Plaintiff when they had unauthorized email communications with Plaintiff's private psychiatrist, Brian Tobin, in violation of the Illinois Mental Health and Developmental Disabilities Confidentiality Act (IMHDDCA) and Health Insurance Portability and Accountability Act (HIPAA) in order to defame and deprive Plaintiff of his therapist, and they succeeded as Plaintiff's therapist severed their relationship

154.     As described in paragraph 263, Eric Chin discriminated against Plaintiff on the basis of disability by lying about Plaintiff's consent to the Gargula audio tapes and illegally disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship. He took these actions in order to cause the cancellation of Plaintiff's police investigation. This information was revealed and the facts were of no legitimate concern to the recipients of Chin's communications. The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

155.     Plaintiff specifically realleges paragraphs 118-126. As described, Plaintiff was actively prevented from reporting discrimination by Depilla obstruction and actively prevented from being able to complain of discrimination by Tamburro. As described in paragraph 356, Plaintiff was ultimately completely barred from being able to complaint of discrimination or harassment and was expelled while having numerous outstanding grievances of disability based harassment which were willfully ignored by NU. During the course of Plaintiff's enrollment, he submitted over 100 separate complaints of discrimination and harassment and NU either dismissed or ignored every single one without a single exception.

156. Plaintiff specifically realleges paragraphs 357-372. As described, Plaintiff was further subjected to disability based discrimination by being coercively intimidated and falsely arrested and maliciously prosecuted while deprived of his medication

157. Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

158. The University acted willfully, deliberately and intentionally or with deliberate indifference toward Plaintiff's federally protected rights.

159. Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

160. The University wrongfully caused Plaintiff to be discriminated against, to suffer interference, coercion and intimidation, and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

161. Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

162. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Enter a declaratory judgment that the University discriminated against Plaintiff on the basis of his disability in violation of the Rehabilitation Act;

    b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

    e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.   Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

h.   Award attorney's fees and costs; and

i.   Award such other relief as the Court deems just and proper.

**COUNT 11**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Retaliation**
**(Northwestern University)**

163.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

164.   On 9/9/20, Plaintiff received Official Northwestern Correspondence email from the Office of Equity indicating several more disciplinary sanctions and another UHAS hearing in retaliation for the filing of plaintiff's police report and DOE complaint. DePilla retaliated against Plaintiff for the complaints which he submitted both against her and about the incident, including 7 separate counts of "inappropriate sharing" which he was charged with during 2020 student conduct hearing. DePilla and NU retaliated against me for reporting these items in my 2020 student conduct hearing, it is a separate count of "sharing," in order to retaliate against me and punish me for reporting discrimination. These charges of "inappropriate sharing", which violated NU's published policy on non-retaliation, included:

- On 12/10/19, Plaintiff sent two complaints at 2:35 AM and 3:01 AM email to all the of the people on the police board including Chief Lewis, Cmd. Benson, and DC Chin reporting the 11/1/19 false imprisonment.

- On 12/12/19 at around 9:42 AM Plaintiff filed "Ethics Point" report ("EOP 597") reporting the 11/1/19 false imprisonment and received response that NUPD was the proper party to contact.

- On 12/10/19 at 7:26 PM Plaintiff sent email to Kadens and Provenzano informing them of the battery and false imprisonment.
- January 1, 2020 at 5:46:45 PM CST report sent to Detective Stark regarding the false imprisonment.
- 9/6/20 at 12:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment
- On 9/6/20 at 8:15 AM Plaintiff submitted a formal discrimination report about the 11/1/19 incident of false imprisonment
- On 9/7/20 at 6:07 PM Plaintiff submitted a formal "Hate and Bias Report" about the handling of the 11/1/19 incident of false imprisonment

165.    When Plaintiff reported ADA disability discrimination he was engaged in a statutorily protected activity.

166.    As a direct result of, and in retaliation for, Plaintiff's exercise of his right to report ADA disability discrimination in September of 2020, the Office of Equity sanctioned him by undertaking the adverse actions alleged above, including charging him with "unauthorized sharing" of the 2019 student conduct hearing to Staff and outside governmental advocacy organizations such as the Illinois Guardianship and Advocacy Commission, I.D.H.R. and D.O.E.

167.    When Plaintiff submitted his Department of Education Complaint he was engaged in a statutorily protected activity. As a direct result NU retaliated by contacting his investigator in order to disparage Plaintiff.

168.    When Plaintiff reported Gargula and Dugo for eavesdropping in CPD police report, JD 395768, he was engaged in a statutorily protected activity.

169.    Eric Chin retaliated by discriminated against Plaintiff on the basis of disability by lying about Plaintiff's consent to the Gargula audio tapes and illegally disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship. He took these actions in order to cause the cancellation of Plaintiff's

police investigation. This information was revealed and the facts were of no legitimate concern to the recipients of Chin's communications. The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

170. When Plaintiff complained about the unlawful contact of his sister to NU he was engaged in a statutorily protected activity. Dugo reltaliated by falsely claiming that he violated her PO in order to have him arrested and maliciously prosecuted pursuant to 20DV208060.

171. Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

172. In its retaliation against Plaintiff for his exercise of federally protected rights, the Defendant acted willfully, deliberately and intentionally or with deliberate indifference.

173. Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

174. The University wrongfully caused Plaintiff to be discriminated and retaliated against, and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

175. Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

176. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Enter a declaratory judgment that the University retaliated against Plaintiff for the exercise of his statutorily protected rights in violation of the Rehabilitation Act;

    b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of retaliation and discrimination against Plaintiff solely by reason of his disability;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

h.  Award attorney's fees and costs; and

i.  Award such other relief as the Court deems just and proper.

**COUNT 12**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Harassment/Hostile Learning Environment**
**(Northwestern University)**

177.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

178.  Plaintiff specifically realleges paragraphs 66-77.

179.  Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

180.  The University acted willfully, deliberately and intentionally or with deliberate indifference in harassing (and/or acquiescing to the harassment of Plaintiff) and maintaining a hostile learning environment.

181.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

182.    The University wrongfully caused Plaintiff to be discriminated against and subject to harassment and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

183.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

184.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.    Enter a declaratory judgment that the University retaliated against Plaintiff for the exercise of his statutorily protected rights in violation of the Rehabilitation Act;

b.    Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.    Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.    Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

e.    Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.    Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.    Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

h.    Award attorney's fees and costs; and

i.   Award such other relief as the Court deems just and proper.

**COUNT 13**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Harassment/Hostile Learning Environment**
**(Northwestern University)**

185.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

186.   Plaintiff specifically realleges paragraphs 193-236.

187.   Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

188.   The University acted willfully, deliberately and intentionally or with deliberate indifference in harassing (and/or acquiescing to the harassment of Plaintiff) and maintaining a hostile learning environment.

189.   Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

190.   The University wrongfully caused Plaintiff to be discriminated against and subject to harassment and to be constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

191.   Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

192.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Enter a declaratory judgment that the University retaliated against Plaintiff for the exercise of his statutorily protected rights in violation of the Rehabilitation Act;

b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another law school or degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.   Award Plaintiff money reasonably calculated to compensate his for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

h.   Award attorney's fees and costs; and

i.   Award such other relief as the Court deems just and proper.

**Count 14**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Failure to Accommodate**
**(Northwestern University)**

193.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

194.   Plaintiff had a temporary intermittent disability of vision impairment resulting from PRK eye surgery performed on both eyes on 10/22/20.

195.   On 10/24/20, Plaintiff requested accommodation of one-week extension for a University Hearing and Appeals student conduct process response and provided a doctors note which directed plaintiff of limitations on "excessive straining of the eyes and excessive computer/paperwork."

196.   Despite the doctors note, Equity failed to provide any accommodation, and as a result Plaintiff had to exert severe strain on my eyes for straining and trying to come up with my response for the hearing, and strained his eyes for over 72 hours straight without any sleep just to

finish the UHAS response on my computer in time due to my multiple disabilities. As a result, Plaintiff was deprived of the ability to adequately defend himself against the conduct charges and substantially contributed to Plaintiff's being found guilty for all charges. In contrast, when Plaintiff was adequately given an opportunity to defend himself against charges from 2019, he was able beat one of the charges against him.

197.    Plaintiff's doctor told him that he might need to get surgery again to fix the damage he did from excessive straining.

198.    Heather Cohen knows Plaintiff and specifically refused to respond to my emails due to prejudice resulting from the complaint he filed about her on 12/19/19 resulting from her handling of a 2019 incident with the school.

199.    The vision loss associated with the PRK was a "episodic manifestation of my underlying disability" of temporary vision loss. An intermittent impairment that is a characteristic manifestation of admitted disability is part of the underlying disability and, hence, condition that NU must reasonably accommodate.

200.    Solely by reason of his disability, Plaintiff was excluded from the participation in, denied the benefits of, and subjected to discrimination at the University.

201.    The University intentionally discriminated or acted with deliberate indifference in failing to provide appropriate and necessary accommodations to Plaintiff so that he could continue in his study of law at the Law School.

202.    Such acts, omissions and failures by the University proximately caused injuries to Plaintiff.

203.    The University wrongfully caused Plaintiff to be discriminated against, denied reasonable accommodations, and constructively and effectively expelled from the Law School, all in violation of his rights under Section 504 of the Rehabilitation Act of 1973.

204.    Plaintiff was deprived by the University of the opportunity to complete his study of law, obtain a juris doctorate degree, and pursue a legal career.

205.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University discriminated against Plaintiff by failing to afford her reasonable accommodations for her disability in violation of the Rehabilitation Act;

b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of her disability;

e. Order Plaintiff's disciplinary record removed from his transcript;

f. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

**Count 15**
**Violation of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. 701 et seq.**
**Deliberate Indifference**
**(NU, Christine DePilla, Tamburro)**

206. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

207. TAmburro as the director of the office of equity had authority to institute corrective measures had actual notice of, and was deliberately indifferent to every single one of Plaintiff's reports of misconduct and disability discrimination and harassment.

208. Depilla as Plaintiff's 2019 UHAS investigator had authority to institute corrective measures had actual notice of, and was deliberately indifferent to Plaintiff's reports of misconduct and disability discrimination and harassment resulting from the 11/1/19 incident

209. Tamburro and Depilla had actual notice of numerous disability complaints, both formal and informal, regarding the disability harassment Plaintiff experienced by students and NUPD on 11/1/19 at the MLSA event.

210. Tamburro had actual notice of numerous disability complaints, both formal and informal, about the bias conduct of NU employees during the 2019 UHAS hearings process and afterwards.

211. Tamburro had actual notice of numerous disability complaints, both formal and informal, regarding the disability harassment Plaintiff experienced by Gargula and other students during the 2020 group chat incident.

212. Tamburro had actual notice of numerous disability complaints, both formal and informal, regarding the disability harassment Plaintiff experienced by Dugo and Chin during the 2020 expulsion proceedings

213. Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment included a violent physical beating and attempted strangulation by students, a brutal physical assault and battery by NUPD, false imprisonment for 8 total days, and was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community for over 2 semesters. This was immediately following the death of Plaintiff's late mother from painful terminal ovarian cancer on 10/23/19.

214. The conduct complained about in each complaint was in violation of Section 504.

215. All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliberately prevented from accessing all school activities or learning.

216. NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

217. NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he

experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

218.     On information and belief, Plaintiff has submitted over 50 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

219.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation of the Rehabilitation Act;

    b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

    e.   Order Plaintiff's disciplinary record removed from his transcript;

    f.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

    g.   Award attorney's fees and costs; and

    h.   Award such other relief as the Court deems just and proper.

**Count 16**
**Violation of Title III of the Americans with Disabilities Act (ADA),**
**42 U.S.C. 12101 et seq.**
**Deliberate Indifference**
**(NU, Tamburro, Christine DePilla)**

220.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

221.     TAmburro as the director of the office of equity had authority to institute corrective measures had actual notice of, and was deliberately indifferent to every single one of Plaintiff's reports of misconduct and disability discrimination and harassment.

222.     Depilla as Plaintiff's 2019 UHAS investigator had authority to institute corrective measures had actual notice of, and was deliberately indifferent to Plaintiff's reports of misconduct and disability discrimination and harassment resulting from the 11/1/19 incident

223.     Tamburro and Depilla had actual notice of numerous disability complaints, both formal and informal, regarding the disability harassment Plaintiff experienced by students and NUPD on 11/1/19 at the MLSA event.

224.     Tamburro had actual notice of numerous disability complaints, both formal and informal, about the bias conduct of NU employees during the 2019 UHAS hearings process and afterwards.

225.     Tamburro had actual notice of numerous disability complaints, both formal and informal, regarding the disability harassment Plaintiff experienced by Gargula and other students during the 2020 group chat incident.

226.     Tamburro had actual notice of numerous disability complaints, both formal and informal, regarding the disability harassment Plaintiff experienced by Dugo and Chin during the 2020 expulsion proceedings

227.     Each complaint detailed disability-based harassment that was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff's access to educational opportunity or benefit. This harassment included a violent physical beating and attempted strangulation by students, a brutal physical assault and battery by NUPD, false imprisonment for 8 total days, and was immediately followed by a protracted and vicious student disciplinary process for which Plaintiff was suspended and isolated from the NU community for over 2 semesters. This was immediately following the death of Plaintiff's late mother from painful terminal ovarian cancer on 10/23/19.

228.     The conduct complained about in each complaint was in violation **of Title III of the Americans with Disabilities Act**

229.     All of these events and actions barred Plaintiffs access to educational benefit and opportunity from that point up until the present time, and have produced severe and unwarranted permanent effects on the quality of Plaintiff's life. When Plaintiff was suspended from school he was deliberately prevented from accessing all school activities or learning.

230.    NU had authority, based on the complaints, to institute corrective measure and failed to do so repeatedly.

231.    NU was deliberately indifferent to the disability harassment perpetrated on Plaintiff for each complaint, both formal and informal, that he submitted regarding the disability harassment he experiences, because each complaint provided actual notice and also gave NU authority to take corrective action to address the issue and deliberately failed to do so.

232.    On information and belief, Plaintiff has submitted over 50 complaints about the harassment, each complaint is a separate "count" of deliberate indifference.

233.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Enter a declaratory judgment that the University was deliberately indifferent to harassment of Plaintiff which was in violation **of Title III of the Americans with Disabilities Act**;

    b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

    c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

    d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff solely by reason of his disability;

    e. Order Plaintiff's disciplinary record removed from his transcript;

    f. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of the discrimination by Defendants in an amount to be proven at trial;

    g. Award attorney's fees and costs; and

    h. Award such other relief as the Court deems just and proper.

**Count 18**
**Breach of Contract**
**(Northwestern University)**

234. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

235. Plaintiff has an express and implied contract with the University.

236. The University offered Plaintiff placement in the Law School; Plaintiff accepted the offer and in consideration thereof, paid tuition to the University.

**237.** The documents distributed to students by the University, including, but not limited to, the Student Handbook, **POLICY ON NON-RETALIATION, POLICY ON DISCRIMINATION & HARASSMENT,** Law School Rules and Regulations, Student Affairs Office of Student Conduct and Conflict Resolution (collectively the "Rules"), form part of the contract between Plaintiff and the University.

238. Plaintiff performed his obligations under the contract.

239. Under the terms of its contract with Plaintiff, the University had a duty to follow the procedures set forth in its Rules.

240. The University breached the contract by failing to afford Plaintiff the due process procedures set forth in its Rules for suspected violations of the Student Code of Conduct during Plaintiff's 2019 hearings such as giving Plaintiff and opportunity to present questions the investigator(s) might ask the other party, and 2020 student conduct proceedings failing to address the conflict of interest concern by having Heather Cohen as investigator, refusing to interview Plaintiffs list of factual witnesses while allowing Gargula to have witnesses who did not witness the alleged events.

241. The University breached the contract by selectively enforcing its equity policy on discrimination by refusing to address Plaintiff's complaints against Maksud and Ibrahim for disability harassment by stating the did not handle student on student complaint and that their jurisdiction was limited to complaints against NU employees, whereas they vigorously pursued and sanctioned Plaintiff for alleged "gender" based harassment against Gargula where the complaint was initiated by Cange and Gargula;

242. The University breached the contract by selectively enforcing its Student Handbook policy which states "Actions that violate federal, state, or local laws or ordinances or that violate other University policies may also be violations of the Student Code of Conduct" such that Plaintiff was

charged with a violation for his alleged 2019 battery, whereas the University used Gargulas illegal audio recordings as basis for charging Plaintiff with more violations of the Rules in the 2020 hearing. Furthermore, NU breached the contract by aiding and abetting Gargula in committing her felony eavesdropping, obstructing Plaintiff's CPD report in order to prevent Gargula from being prosecuted, and committing numerous more felonies by using the tapes to defame Plaintiff and as basis to suspend and expel him. They further breached the contract by failing to report the violations to law enforcement or to allow NUPD to prosecute them.

243.     NU breached the contact by finding Plaintiff guilty for violation of his "probation" despite the fact that his probationary terms were never explained anywhere or at any time and as such could not form the basis of a binding contract on his behavior. In enforcing his "probationary" terms in this manner, NU effectively had free reign consider any and all actions as violations of his probation, as his probationary terms were never clearly stated nor explained to Plaintiff at any time.

244.     NU further breached it's contract by charging Plaintiff with violations of the student code of conduct for things which fell out of its scope, such as Plaintiff's interaction with Ibrahim in 2020, for which they found him guilty of "retaliation" despite the fact that Ibrahim was not a student at the time.

245.     The University further breached its contract with Plaintiff by failing to investigate or resolve Plaintiff's discrimination grievances, stalking complaints, or harassment complaints as set forth in its Rules and by deliberately obstructing Plaintiffs complaints to NUPD from being investigated or actioned upon.

246.     The University further breached its contract with Plaintiff by failing to uphold or enforce violations of the Rules which were committed against Plaintiff and for which he filed numerous internal grievances, thereby depriving Plaintiff of his rights as a student not to be harassed, assaulted, stalked, or subjected to discrimination as described in the Student Code of Conduct. Further, they breached the contract by failing to address any of Plaintiff's complaints of disability harassment and false imprisonment by NUPD Healy and well as his violation of state commitment procedure by failing to sign the commitment petition and falsifying the police report stating that he did, and further falsifying the police report stating Maksud had witnessed the alleged battery, disability based harassment by Gargula, disability based harassment by Chin for cancelling his police report, disability discrimination and bias by

Cohen, Plaintiff's complaints of Dugo contacting his therapist to defame him; his complaints for the contacting of his sister, and his complaints about Dugo and Chin hiding the felony audio tapes which he was suspended over.

247.     NU further breached the contract by viciously and conspiratorially preventing Plaintiff from having any of his complaints adequately addressed through suppression by Depilla and Chin, and violating its own non-retaliation policies whereby Plaintiff was sanctioned in 2020 hearings for eight different instances of his good faith reporting of discrimination thought internal grievance procedures.

248.     The University further breached its contract with by allowing random strangers to deliberately interfere with Plaintiff's status as a student on no less than three separate occasions, including (1) 2018 post admission application review based on unverified and undisclosed information furnished by an undisclosed source; (2) allowing a complete stranger to brutally attack and have Plaintiff involuntarily committed using NUPD in 2019, and then allowing that stranger to further participate in a student conduct hearing where he told more lies and was allowed the opportunity to have Plaintiff suspended and eventually expelled from school; (3) allowing a complete stranger to maliciously stalk and harass Plaintiff, to record their private phone calls where they viciously mock taunt and harass Plaintiff and violating state law by using the audio as reason to expel the Plaintiff in 2020.

249.     The University's failure to abide by its Rules was arbitrary and capricious.

250.     Plaintiff has suffered and continues to suffer substantial harm as a result of University's breach.

251.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of the University's breach of contract in an amount to be proven at trial;

b.   Award attorneys fees and costs; and

c.   Award such other relief as the Court deems just and proper.

### Count 19
### Intentional Infliction of Emotional Distress
### (Dugo and Northwestern University)

252.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

253.     As Dean of Students of the University, the Dean was in a position of power and authority over Plaintiff. Indeed, the Dean exerted almost complete control over the success or failure of Plaintiff's law school career and future professional possibilities.

254.     The Dean's conduct toward Plaintiff was extreme and outrageous. The Dean and NU administrators acted in a manner that was extreme and outrageous when they, among other things:

    a.   insisted that Plaintiff provide them with his private medical records, including a 2019 petition for involuntary commitment;

    b.   abused her authority (for example, by putting a "hold" on Plaintiff's registration, imposing permanent disciplinary notation his transcript) in order to coerce Plaintiff into producing those records;

    c.   interfered with Plaintiff's relationship with his private psychiatrist, causing him to lose psychiatric and pharmacological care with his therapist Brian Tobin;

    d.   maliciously attempting to disparaged Plaintiff's reputation with his medical provider Brian Tobin by misleadingly sharing only a portion of the audio where Plaintiff was responding to threats and antagonization from Gargula,

    e.   refuse to give a time extension and forced Plaintiff to write a 15-page response to outrageous student conduct allegations less than 5 days after having eye surgery and scheduling the response date on the one year anniversary of his mothers death on October 23rd, 2020;

    f.   defamed Plaintiff's reputation amongst other law school deans such that Plaintiff would be unable to transfer to another law school;

    g.   inappropriately contacted Plaintiff's health care provider Brian Tobin without his knowledge or consent and against his wishes;

    h.   inappropriately contacted Plaintiff's family members Sophia Syed and Azam Hussein without his knowledge or consent and against his wishes;

i. inappropriately contacted Plaintiff's department of Education investigator, Chris Farrelly, without his knowledge or consent and against his wishes;

j. aidding and abetting Gargula's felonious actions by using the illegal audio tapes she created as the basis for Plaintiff's suspension, and further committing multiple more felonies by sharing the tapes with NU employees and attempting to yuse them to defame Plaintiff with his therapsit,

k. hid the existence to the two audio tapes made by Evangeline Gargula during the initial phases of the 2020 disciplinary process in order to protect herself, NU, and Gargula from liability due to racial and disability bias, lying and saying that she suspended him over "group chat" comments;

l. after approximately 50-100 follow up emails from Plaintiff to School, revealing the existence of the audio tapes, only to use them as evidence to charge Plaintiff with additional violations of school policy;

m. never once attempting or even considering revealing the illegal audio to Chicago Police Department, and revealing them to NUPD only in an attempt to charge Plaintiff with criminal violation of some kind;

n. requesting that NUPD not prosecute the eavesdropping violation because Gargula is a white female like her;

o. conspiring with Chin and Lee to harass Plaintiff about this Department of Education complaint and find out how he found out about the tapes;

p. conspiring with Chin and Lee to harass Plaintiff by requesting a no-contact order through school in retaliation for Plaintiff finding out about the tapes and asking NUPD to take action on the eavesdropping;

q. NUPD giving Plaintiff a fake police report number in order to hide the fact that NUPD Detective Lee retaliated against Plaintiff for his DOE complaint and Police Report by interrogating Plaintiff about his DOE complaint;

r. coercing Chin to violate HIPAA by contacting Chicago Police to have Plaintiffs police report cancelled because it contained Dugo's name;

s. on information and belief authorized the University's IT technician to make a blanket search for Plaintiff's information on NU systems for private and nefarious use;

t. on information and belief refused to vouch for Plaintiff's good character and fitness to the bar examiners;

u. forced plaintiff to participate in a student conduct hearing on bad pretenses, knowing that Gargula had committed multiple felonies and hate crimes on the basis of perceived disability, during which Plaintiff was not appointed an advisor despite making multiple requests at all stages of the disciplinary process;

v. forcing Plaintiff to endure over three full continuous years of unjustified sanctions, vicious false and defamatory student disciplinary proceedings and sanctions and discriminatory obstacles to education starting from the time he was admitted with a discriminatory post admission application "verification" and subsequent forced deferral, to vicous accusations and disciplinary proceedings the week after his mothers death and continuing through the 1 year anniversary of her death and into the present time, where Plaintiff was never given a chance to properly grieve or heal from her loss;

w. rendered it impossible for Plaintiff to interview for summer associate and judicial clerkship positions;

x. maligned Plaintiff's reputation to the Law School and University communities, rendering him a veritable pariah on campus;

y.  imposed inappropriate and burdensome conditions on Plaintiff's disciplinary process such that Plaintiff has been constructively expelled from the Law School;

z. Deliberately expelled the Plaintiff after he spent 3 years pursuing entrance into the graduate program and completed a wide variety of pre-conditions which were predicated upon assessing his mental health condition, wherein she ignored all of the indication which spoke to Plaintiff's ability to pursue coursework and instead focused exclusively on whatever negative aspects she could find about Plaintiff in order permanently expel Plaintiff and permanently notate his transcript so that he could not transfer or apply elsewhere;

aa. Petitioned for a Stalking No Contact Order (20 OP 20532) on false, misleading, and defamatory pretenses using her position as Dean and the help of NUPD, including claiming that Plaintiff called her on her "personal" phone despite the fact that she had first intitiated contact with Plaintiff using that number and never once stated that it was her "personal" number, lying about the content and nature of the call and who hung up the telephone on the call in question, claiming that Plaintiff's text saying that he was going to contact her sister threatened her safety despite the fact that she doesn't have a sister and knowingly contacted Plaintiff's sister and making derogatory statements about the Holy Qu'ran by intentionally misspelling it as "Quaran" and referring to the content of verses in the book as "Sinners will die in fire" in her petition;

bb. Maliciously seeking to completely ruin Plaintiff's life and future and prevent him from being able to attend another law school or graduate school by having him arrested and maliciously prosecuted, after knowingly breaking multiple laws in order to ensure that he would be expelled from NU, by conspiring with NUPD DC Chin and NUPD Detective Stark to illegally have Plaintiff arrested by Evanston Police (20 DV 2080601) for an alleged violation of said protection order as retaliation for:

    a. plaintiffs protection order against her (20 OP 78277);

    b. Plaintiff's numerous complaints about her through the university;

    c. Plaintiff's DOE complaint

cc. Abusing her position as Dean in order to gain access to lawyers provided by the school to aid her in her in malicouly prosecuting Plaintiff;

dd. refused to give a time extension on and forced Plaintiff to write a 15-page expulsion appeal on January 4th, 2021 after Plaintiff experienced a medical emergency with his 70-year-old father on the weekend of January 2nd, 2021;

ee. oppressed Plaintiff's right to bear arms under the 2nd amendment through use of SNCO and illegal involuntary commitment

ff. On information and belief used her authority to get the FBI to harass Plaintiff after he had been expelled;

255.     Plaintiff was particularly susceptible to emotional distress because of his disability and co-morbid anxiety and depression.

256.     The Dean was aware of Plaintiff's susceptibility and knew that his conduct would cause Plaintiff emotional distress.

257.     Plaintiff reasonably believed the Dean would carry out her threats since she was in a position of authority and had in fact already abused that authority by taking unilateral criminal actions against him, including securing a PO on false on misleading pretenses.

258.     The Dean's conduct constituted a course of acts intended to humiliate, shame and embarrass Plaintiff and to irreparably damage his reputation and ruin his future and career prospects and bar him from ever becoming a lawyer;

259.     As a proximate result of the intentional acts by the Dean and her abuse of her authority, Plaintiff suffered false arrest, false imprisonment, malicious prosecution, suspension, expulsion, an unwarranted criminal record, a stalking order against him, loss of his therapist, shame, humiliation, embarrassment, anguish, damage to his self-esteem and extreme emotional distress.

260.     Plaintiff's emotional distress has resulted in sleep, eating and mood disturbances, isolation and withdrawal, loss of community reputation, and exacerbation of anxiety and depression.

261.     Plaintiff has required increased medical and/or psychological/psychiatric care as a result of the malfeasance and nonfeasance of Defendants.

262.     The acts and omissions of the University and its investigators were willful and intentional.

263.     The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.

264.     The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

265.     The University's conduct and that of the investigators was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

266.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

267.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of the Defendants' intentional infliction of emotional distress in an amount to be proven at trial;

    b.   Award punitive damages;

    c.   Award attorney's fees and costs; and

    d.   Award such other relief as the Court deems just and proper.

**<u>Count 20</u>**
**Defamation (Per Se and/or Per Quod)**
**(Dugo, Chin, and NU)**

268.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

269.     Mona Dugo contacted Plaintiff's healthcare provider Brian Tobin without his knowledge or consent in order to defame Plaintiff by sharing illegal audio recordings. She lied and said that Plaintiff had harassed the person on the phone who was harassing him. The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff was injured as a result thereof in his good name and reputation.

270.     Mona Dugo secured a stalking PO 20532 on false and defamatory pretenses, stating that Plaintiff physically assaulted another student when she knew there was no evidence supporting that allegation. She also stated in her petition that she hung up the phone after Plaintiff called her, which is false, Plaintiff called her to tell her not to contact his family members then hung up the phone. She also stated that Plaintiff "sent her verses" from the "Quaran" which stated "sinners will die in a fire," a highly defamatory and discriminatory and offensive religious epithet about Islam. . The allegation was defamatory "per se." It was communicated to others. The allegation was false and malicious, and plaintiff

was injured as a result thereof in his good name and reputation and was served with an unjustified and malicious protection order.

271.     These statements are capable of only one construction, namely, that Plaintiff is a liar and a threat to the safety of Dugo.

272.     The Dean knew these statements to be false since she had already listened to the audio wherein Plaintiff was being antagonized, threatened, and harassed and received communications from Plaintiff's indicating that he was falsely imprisoned last year and that there was no evidence supporting the assertion that he attacked anyone last year aside from the unfounded allegations of a single person.

273.     On information and belief, the Dean was already aware of Plaintiff's internal grievances prior to her suspension of Plaintiff and prior to her making the defamatory and false assertions indicated in this count.

274.     These statements were published to a broad audience in the Law School and the University. Numerous recipients of this email did not know Plaintiff and were likely unaware that Plaintiff had a disability.

275.     These recipients were individuals whose high regard for Plaintiff's character was material to his academic, professional and personal success.

276.     The Dean's statements were not privileged.

277.     The Dean made these false statements with malice and the intent to harm Plaintiff.

278.     These statements impute a lack of integrity in Plaintiff's academic work and professional ethics.

279.     These statements prejudiced Plaintiff and imputed a lack of ability in his potential to succeed as a law student and lawyer.

280.     The Dean's false and malicious statements caused irreparable damage to Plaintiff's reputation within the Law School and University community.

281.     Plaintiff filed multiple internal grievenees notifying the University of the Dean's false and defamatory statements.

282.     The University failed to take any measures to redress the Dean's defamatory conduct and acted with reckless disregard for Plaintiff's reputation.

283. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Award Plaintiff money reasonably calculated to compensate him for all monetary

    b.   damages sustained as a result of the Defendants' defamation in an amount to be proven at trial;

    c.   Award punitive damages;

    d.   Award attorney's fees and costs; and

    e.   Award such other relief as the Court deems just and proper.

**<u>Count 21</u>**
**Public Disclosure of Private Facts/**
**Violation Of HIPAA and IMHDDCA**
**(Mona Dugo, Eric Chin, NU)**

284. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

285. On 10/11/20 Plaintiff filed a police report for eavesdropping. Sometime afterwards, report JD 395768 was cancelled without investigation when Deputy Chief Eric Chin of Northwestern Police spoke to Chicago Police Jennifer O Shaughnessy (star 1829) and illegally disclosed Plaintiff's mental health history in violation of HIPPA (Health Insurance Portability and Accountability Act) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act. Chin also contacted Plaintiff's therapist, Brian Tobin, without a release of information consent form, in violation of both laws.

286. The Mental Health and Developmental Disabilities Confidentiality Act provides that "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient" and "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient," including "information which indicates that a person is a recipient," "shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/2, 3(a) (West 2000).

287. Under Health Insurance Portability and Accountability Act (HIPAA), the general rule pertaining to the disclosure of protected health information is that a covered entity may not use

or disclose protected health information without a written authorization from the individual or, alternatively, the opportunity for the individual to agree or object.

288.     Northwestern Memorial Hospital, which is the covered health-care provider, has business associates including Northwestern University Police Department and Northwestern University. Covered entities under Health Insurance Portability and Accountability Act (HIPAA) generally include health-care providers, health plans, and health-care clearinghouses and their business associates.

289.     NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH in 2019.

290.     This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

291.     These facts were of no legitimate concern to the recipients of Chin's communications.

292.     The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

293.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of Chin and NU's public disclosure of private facts;

    b.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of Chin and NU's violation of HIPAA and IMHDDCA;

    c.   Charge Chin and NU with the appropriate civil and criminal violations as a result of these actions;

    d.   Award punitive damages;

    e.   Award attorney's fees and costs; and

    f.   Award such other relief as the Court deems just and proper.

## Count 22
**5/31–4. Obstructing justice 720 ILCS 5/31-4**

294.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

295.    On 10/11/20 Plaintiff filed a police report for eavesdropping. Sometime afterwards, report JD 395768 was illegally closed when Deputy Chief Eric Chin of Northwestern Police spoke to Chicago Police Jennifer O Shaughnessy (star 1829) and illegally disclosed Plaintiff's mental health history in violation of HIPPA (Health Insurance Portability and Accountability Act) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act.

296.    The Mental Health and Developmental Disabilities Confidentiality Act provides that "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient" and "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient," including "information which indicates that a person is a recipient," "shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/2, 3(a) (West 2000).

297.    Under Health Insurance Portability and Accountability Act (HIPAA), the general rule pertaining to the disclosure of protected health information is that a covered entity may not use or disclose protected health information without a written authorization from the individual or, alternatively, the opportunity for the individual to agree or object.

298.    Northwestern Memorial Hospital, which is the covered health-care provider, has business associates including Northwestern University Police Department and Northwestern University. Covered entities under Health Insurance Portability and Accountability Act (HIPAA) generally include health-care providers, health plans, and health-care clearinghouses and their business associates.

299.    NU and Eric Chin, through the actions of Eric Chin, disclosed information protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Illinois Mental Health and Developmental Disabilities Confidentiality Act, specifically that Plaintiff had been involuntarily committed to NMH in 2019.

300.     NU and Eric Chin also told the officer that Plaintiff had given consent for the audio tapes to be recorded, which is false information.

301.     This information was revealed to the investigating CPD police officers with respect to JD 395786 with whom Plaintiff had a special relationship.

302.     These facts were of no legitimate concern to the recipients of Chin's communications.

303.     The disclosure of these facts was highly embarrassing and offensive to Plaintiff, and resulted in the improper closure without investigation of his CPD police report, JD 395768.

304.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 23
**Tortious Interference with Contractual Relations**
**(Northwestern University)**

305.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

306.     Mona Dugo contacted Plaintiff's healthcare provider Brian Tobin without his knowledge or consent in order to defame Plaintiff by sharing illegal audio recordings.

307.     Eric Chin contacted Plaintiff's healthcare provider Brian Tobin without his knowledge or consent in order to defame Plaintiff by sharing illegal audio recordings.

308.     Plaintiff had an express and implied contract with N. Brian Tobin, a Licensed Clinical Social Worker at GET Therapy Chicago, LLC.

309.     Brian Tobin provided mental health services to Plaintiff.

310.     The Law School was aware of Plaintiff's contract with Brian Tobin.

311.     The Law School was not authorized by Plaintiff to communicate with Brian Tobin or anyone else at GET Therapy Chicago, LLC. from whom Plaintiff sought psychiatric care.

312.     The Law School induced a breach of Plaintiff's contract with Brian Tobin by informing GET Therapy Chicago, LLC. that Plaintiff was manipulating and deceiving his medical professionals, including the psychiatric staff at GET Therapy Chicago, LLC..

313.     The Law School acted with malice and intent to harm Plaintiff.

314.     As a direct result of the Law School's communications, Brian Tobin terminated his treatment and contract with Plaintiff without notice.

315.     The abrupt termination of his mental health treatment and his resulting inability to obtain necessary psychiatric medication caused harm to Plaintiff.

316.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of the University's tortious interference with contract;

    b.  Award punitive damages;

    c.  Award attorney's fees and costs; and

    d.  Award such other relief as the Court deems just and proper.

### COUNT 24
### State Law Intentional Interference with Economic Advantage
### (All Defendants)

317.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

318.     Plaintiff alleges that the individuals in this count intentionally interfered with his educational contract for a JD with Northwestern University Law School.

319.     Plaintiff was enrolled in his first year of graduate school at NU and had a reasonable expectation of entering into a business relationship of legal education from NU and eventually becoming a graduate and alumni and practicing lawyer from NU, thereby being entitled to the at least the average sum total of economic benefit associated with a JD from NU. Plaintiff is and was at all times fully qualified to pursue his education, having received exemplary LSAT scores and achieved satisfactory results in 10 week of classes during Fall 2019. Plaintiff was enrolled in coursework towards earning a degree at all relevant times.

320. All Parties named were aware that Plaintiff was a student from Northwestern University Law School, where NUPD was informed at the scene of the incident, where NMH staff were informed by NUPD, and where the graduate students and NU employees were aware from being in law school.

321. Each named defendant, through their actions as described in the complaint, interfered with Plaintiff's legitimate expectation of receiving a legal education from becoming a valid business relationship, including but not limited to the following:

   a. Individual Hospital Defendants intentionally deviated from normal standards of care and resulting in medical battery and false imprisonment of the Plaintiff at NMH for 8 days from 11/1/19-11/8/19.

   b. Individual NUPD Officers Healy, Walsh, Moore and Chin committed brutal physical attack using excessive force to unlawfully seize Plaintiff in a false arrest and conspiracy and false imprisonment of Plaintiff at NMH for 8 days from 11/1/19-11/8/19. NUPD later refused to investigate the illegal activity reported by Plaintiff, and retaliated against him, further hindering and sabotaging his attempts to regain his status as a student in the JD program by refusing to investigate his eavesdropping report and having his CPD report cancelled.

   c. Individual NU Defendants unlawfully subjected Plaintiff to various coercive and unjustified disciplinary measures and sanctions while willfully ignoring compelling evidence of his innocence, discriminatory pre-conditions predicated on his mental health which served no objective value in later assessments of his risk to other students, and vicious deeply personal retaliatory acts designed to hurt or offend the Plaintiff in every manner possible, from repeated derogatory actions and remarks about Plaintiffs religious beliefs, to interfering with Plaintiff's mental health so that his therapist would end their relationship and he would be left without a mental health treatment provider. NU ignored 100% of Plaintiff's internal complaints, amounting to over 100 different counts of deliberate indifference by NU over the course of Plaintiff's 3 years pursuing his JD.

   d. Where NU, NMH were made aware via the activities of their respective employees and refused to take action to correct the illegal activities of their employees or adequately hire

train or supervise employee's who would not be a risk to Plaintiff of discrimination and unlawful conduct.

322. As a result of the actions of the defendants as described in this complaint, Plaintiff was: twice unlawfully suspended for 1 semester without notice or hearing in Fall 2019 and Fall 2020; once unlawfully suspended for 1 semester in Spring 2020 based on illegal, discriminatory and false and defamatory pretenses; and ultimately unlawfully expelled in Fall 2020 semester based on illegal and false and defamatory and discriminatory pretenses.

323. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b. Award punitive damages;

   c. Award attorney's fees and costs; and

   d. Award such other relief as the Court deems just and proper.

## COUNT 26
### Assault 720 ILCS 5/12-1
**(NU, NUPD Officers Healy, Walsh, Moore, Individual Hospital Defendants)**

324. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

325. A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery.

326. **NUPD Officers Healy, Walsh, Moore** threatening approach prior to restraining and battering Plaintiff put him in reasonable apprehension of receiving a battery on 11/1/19.

327. **Individual Hospital Defendants** threatening approach prior to restraining Plaintiff and injecting his with put him in reasonable apprehension of receiving a battery. on 11/1/19.

328. **NU and NMH are liable through the actions of its agents which were committed within the course and scope of their employment and which exceeded their authority**.

329.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b.   Award punitive damages;

   c.   Award attorney's fees and costs; and

   d.   Award such other relief as the Court deems just and proper.

**COUNT 27**
**Aggravated assault. 720 ILCS 5/12-2**
**(NU, NUPD Officers Healy, Walsh, Moore, Individual Hospital Defendants, NMH)**

330.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

331.     Offense based on location of conduct. A person commits aggravated assault when he or she commits an assault against an individual who is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or in a church, synagogue, mosque, or other building, structure, or place used for religious worship.

332.     Where NUPD officers assault of plaintiff on 11/1/19 took place on or about a place of public accommodation, at NU school premises located at 357 E. Chicago Ave., Chicago, IL 60611.

333.     Where Individual Hospital Defendants assault of Plaintiff on 11/1/19 took place at NMH, a place of public accommodation.

334.     Where each of the defendants in the count, through intermediary circumstances and the actions of themselves or their agents, were aware that Plaintiff suffered from a disability, was suffering from extreme emotional distress from his mothers death, or had tacit awareness of such. In addition, as indicated in student conduct interviews, someone at the scene of the attack told NUPD that plaintiff was suffering from mental disability.

335.     Where Plaintiffs assault by NUPD officers and assault at NMH was based in part on Plaintiff's mental health diagnosis and where proper commitment procedure was violated with both falsified police reports and falsified commitment petitions;

336.     **NU and NMH are liable through the actions of its agents which were committed within the course and scope of their employment and which exceeded their authority**.

337.     Where each instance of individual approach by each individual named in this count put Plaintiff in reasonable apprehension of receiving a battery and wherein Plaintiff was subsequently battered and falsely imprisoned by each individual named in this count and the assault was without legal justification.

338.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b.   Award punitive damages;

   c.   Award attorney's fees and costs; and

   d.   Award such other relief as the Court deems just and proper.

### <u>COUNT 28</u>
### Battery 720 ILCS 5/12-3
### (NU, NUPD Officers Healy, Walsh, Moore, Individual Hospital Defendants, NMH)

339.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

340.     A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.

341.     But in Illinois, a defendant can be liable for contacts that are "relatively trivial ones which are merely offensive and insulting." *Cohen v. Smith*, **269 Ill.App.3d 1087, 207 Ill.Dec. 873, 648 N.E.2d 329, 332 (1995)**

342.     Where Alkahawja approached Plaintiff the first time under his own admission the first time and did knowingly pat Plaintiff on back in an insulting or provoking manner and ask Plaintiff to "step outside" in an extremely aggressive and unwarranted manner.

343.     Where Alkhawaja physically attacked and restrained Plaintiff with the help of Ibrahim and Maksud, where all three admitted to psychically restraining Plaintiff's freedom of movement to leave

the premises against his will with the intent on initiating the civil commitment of Plaintiff based on threat from Plaintiff's perceived disability.

344. **NU is liable for the actions of** Alkhawaja Ibrahim and Maksud **who though their role as event organizers were acting as its agents and committed their acts committed within the course and scope of their agency and which exceeded their authority**.

345. On 11/1/19 NUPD officers did inappropriately and viciously detain Plaintiff in handcuffs without legal justification, and brutally throw Plaintiff to the ground and hold him forcibly there against his will at the scene of the incident, causing bodily harm of an insulting and provoking nature.

346. On 11/1/19, where each of the Individual Hospital Defendants did, at various points, make offensive physical contact with the Plaintiff by restraining and inappropriately administering psychotropic medication without legal justification and confining Plaintiff against his will to NMH for a period of 8 days.

347. **NU and NMH are liable through the actions of its agents which were committed within the course and scope of their employment and which exceeded their authority**.

348. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b. Award punitive damages;

    c. Award attorney's fees and costs; and

    d. Award such other relief as the Court deems just and proper.

**<u>COUNT 30</u>**
**42 U.S.C. § 1983: Violation of Fourteenth Amendment Due Process and 4th Amendment**
**(NUPD Officers Healy, Walsh, and Moore; Individual Hospital Defendants, NU, NMH)**

349. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

350. The Due Process Clause of the Fourteenth Amendment states that no person shall be "deprived of life, liberty, or property without due process of law." Individuals whose protected interests are at stake are entitled to "notice and an opportunity to be heard."

351.     Once Plaintiff was admitted to the university, signed his early decision contact, paid his tuition and fees, and was meeting the schools legitimate academic expectations,  Plaintiff entered into an implied and express contract with NU.

352.     The documents distributed to students by the University, including, but not limited to, the Student Handbook, POLICY ON NON-RETALIATION, POLICY ON DISCRIMINATION & HARASSMENT, Law School Rules and Regulations, Student Affairs Office of Student Conduct and Conflict Resolution (collectively the "Rules"), form part of the contract between Plaintiff and the University.

353.     In exchange for Plaintiff's tuition payments this contract entitled Plaintiff to a "property" interest in continuing his education in the JD program at NU in a learning environment which is free from harassment, discrimination, retaliation, bias, and to a fair and impartial code of student conduct which entitled him not to be suspended or expelled without good cause and a fair hearing, as the term "property" is understood in relation to the Fourth and Fourteenth Amendment of the United States Constitution.

354.     Plaintiff also had a right to liberty and to be free from bodily restraint and forcible injection of medication, as the term "liberty" is understood in relation to the Fourteenth Amendment of the United States Constitution.

355.     Each defendant is a "person" under 42 U.S.C. § 1983.

356.     Each defendant acted "under color" of state law under 42 U.S.C. § 1983.

357.     When Defendants Healy, Walsh, and Moore arrived on scene, Healy unreasonably seized Plaintiff by immediately detaining him in handcuffs without having established probable cause or doing any investigation whatsoever. NUPD Officers Healy, Walsh, and Moore manufactured and fabricated evidence against Plaintiff in NUPD police report (2019-00000595) in order to justify probable cause for his seizure and commitment by falsely indicating that Plaintiff was talking "fellow law students" and, had committed a battery by punching Alkhawaja in the mouth, that Muaaz Maksud witnessed the alleged battery, and that Healy had completed the petition for commitment.. All of these details were disputed by Plaintiff's attackers during their NU student conduct interviews and from the commitment petition. Healy, Walsh and Moore further withheld the existence and disclosure of exculpatory evidence in the form of the Body Worn Camera footage from the incident.

358.    Individual Hospital Defendants twice directed and/or administered the forcible injection of psychotropic medication into Plaintiff's nonconsenting body representing a substantial interference with his liberty without due process in violation of the 14th Amendment,  and unreasonably seized Plaintiff for 8 days at NMH by involuntarily committing him without probable cause based on Alkhawaja's false and defamatory statements about him and the manufactured and fabricated evidence against Plaintiff in NUPD police report (2019-00000595).

359.    NUPD officers and NMH staff acted under color of state law and willfully and intentionally violated 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure falsified the commitment petition, never filed it with the state or provided Plaintiff with the copy. As a result, Plaintiff was subjected to false imprisonment without the opportunity of a fair hearing, and accordingly not given notice or opportunity to present his objections to the involuntary commitment. In doing so, defendants deprived Plaintiff of his liberty without due process in violation of the 14th Amendment.

360.    By confining him to NMH for 8 days and not allowing him to attend class, Defendants illegally seized Plaintiff's right to participate in the NU JD program without providing proper notice of this decision or any opportunity for a hearing. In doing so, Defendant violated rights secured to Plaintiff by the Fourth Amendment to the United States Constitution.

361.    Under the Fourth Amendment, a seizure of property occurs if there is some meaningful interference with an individual's possessory interest in that property.

362.    Plaintiff had a possessory interest in his participation in the NU JD Program.

363.    Defendants, through their nonconformity with state regulations and constitutional due process guarantees, unreasonably and meaningfully interfered with Plaintiff's property interest by terminating his interest in participating in the NU JD Program.

364.    Accordingly, Defendants violated the Fourth Amendment.

365.    Furthermore, the false narrative in the police report directly caused Plaintiff's interim suspension in Fall 2019 and formed the basis of his guilt determination resulting in suspension in Spring 2020, and caused the probationary status which was responsible for magnification of Plaintiff's minor alleged offenses during the Fall 2020 incident and ultimately resulted in Plaintiff's expulsion and ban from NU and permanent notation on Plaintiff's transcript. By creating the false police report, NUPD

unreasonably and meaningfully interfered with Plaintiff's property interest by terminating his interest in participating in the NU JD Program.

366. Where the false imprisonment continues to produce immeasurable hardships and negative repercussions in Plaintiff's life such as the cancelation of his CPD police report and production of the suspicion of safety threat from NU.

367. An actual controversy exists between Defendants and Plaintiff concerning their rights, privileges, and obligations in that Plaintiff has contended that Defendant's actions have violated and will continue to violate Plaintiff's rights under federal law.

368. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b. Award punitive damages;

   c. Award attorney's fees and costs; and

   d. Award such other relief as the Court deems just and proper.

## COUNT 31
**42 U.S.C. § 1983: Fourth Amendment False Arrest, False Imprisonment and Excessive Force (NUPD Officers Healy, Walsh, and Moore; Individual Hospital Defendants, NU, NMH)**

369. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

370. The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures."

371. The term "seized" is understood in relation to the Fourth Amendment of the United States Constitution as whenever officials acting under "under color" of state law "restrain" an individuals "freedom of movement" such that he is "not free to leave". Seizure without probable cause or seizure premised on lies is an unreasonable seizure prohibited by the Fourth Amendment.

372. On 11/1/19, Plaintiff's right to be free from seizure without probable cause premised on lies was clearly established. It was also clearly established that Plaintiff had right to be free from seizure without probable cause and that Fourth Amendment protected against seizure premised on lies.

373. Each defendant is a "person" under 42 U.S.C. § 1983.

374. Each defendants acted "under color" of state law under 42 U.S.C. § 1983.

375. When Defendants Healy, Walsh, and Moore arrived on scene, Healy unreasonably seized Plaintiff by immediately detaining him in handcuffs without having established probable cause or doing any investigation whatsoever. In doing so, Defendants violated rights against false arrest secured to Plaintiff by the Fourth Amendment to the United States Constitution.

376. When Plaintiff attempted to explain his side of the story, Healy and Walsh brutally slammed Plaintiff on the ground and held him face down despite the fact that Plaintiff was restrained in handcuffs and posed no threat, nor had he made any aggressive or threatening statements or actions. In doing so, Defendants violated rights against excessive force secured to Plaintiff by the Fourth Amendment to the United States Constitution.

377. Furthermore, assaulting a restrained detainee was clearly established as a constitutional violation at the time the conduct occurred. At the time the Defendant Officers used force against Plaintiff, it was clearly established that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.

378. Defendant Healy further violated rights secured against false imprisonment to Plaintiff by the Fourth Amendment to the United States Constitution by initiating Plaintiff's involuntary commitment to NMH based on Alkhawaja's false and defamatory statements about him.

379. NUPD Officers Healy, Walsh, and Moore then manufactured and fabricated evidence against Plaintiff in NUPD police report (2019-00000595) in order to justify probable cause for his seizure and commitment by falsely indicating that Plaintiff was talking "fellow law students" and, had committed a battery by punching Alkhawaja in the mouth, that Muaaz Maksud witnessed the alleged battery, and that Healy had completed the petition for commitment.. All of these details were disputed by Plaintiff's attackers during their NU student conduct interviews and from the commitment petition. Healy, Walsh and Moore further withheld the existence and disclosure of exculpatory evidence in the form of the Body Worn Camera footage from the incident.

380. Individual Hospital Defendants unreasonably seized Plaintiff for 8 days at NMH by involuntarily committing him without probable cause and based on Alkhawaja's false and defamatory

statements about him and the manufactured and fabricated evidence against Plaintiff in NUPD police report (2019-00000595). In doing so, Defendants violated rights secured to Plaintiff against false imprisonment by the Fourth Amendment to the United States Constitution.

381.    Where **EUGENE LOZZA M.D** used excessive force in the force of two forced administrations of psychotropic medications when Plaintiff made no threatening motions or gestures and posed no risk to the safety of himself or others.

382.    Where NU is liable for the actions of NUPD and NMH is liable for the actions of the hospital defendants.

383.    Where a genuine dispute of material fact exists as to the alleged existence of probable cause for the arrest as indicated by the discrepancy in the student conduct interview statements of Muaaz Maksud pertaining to witnessing the alleged act of battery and in the NUPD police report narrative.

384.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b.   Award punitive damages;

   c.   Award attorney's fees and costs; and

   d.   Award such other relief as the Court deems just and proper.

**COUNT 32**
**State Law False Imprisonment**
**(Healy, Walsh, Moore, Chin, NU, Individual Hospital Defendants, NMH)**

385.    On 11/1/19 Where the law protecting Plaintiff from unjustified and brutal attack while attending a school function was clearly established at the time the incident occurred. Where the right to be free from unreasonable seizure and excessive force and false arrest, and the right to liberty and to be free of unwarranted involuntary mental confinement were clearly established. Where Plaintiff's right to attend religious gatherings free of unwarranted harassment and brutal gang assault was clearly established The right to be free from arrests without probable cause premised on lies was clearly established. It was clearly established that there was right to be free from arrest without probable cause and that Fourth Amendment protected against arrests premised on lies,

386.     NUPD defendants knew or should have known of relevant legal standard with respect to plaintiff's claims of false arrest and use of force in removing him from the school and subjecting him to involuntary mental examination

387.     NUPD arrested Plaintiff without probable cause as there were no witnesses to the alleged battery and Plaintiff posed no threats to the safety of them or others, and further initiated his involuntary commitment based on a fabricated police report which falsely stated the Plaintiff had committed a battery and Maksud had witnessed it. In Doing so NU defendants committed false imprisonment.

388.     Where NUPD police played an active role in restraining patient and in transporting Plaintiff to the hospital against his will.

389.     Where NUPD Officer Healy #22 failed to complete the petition for involuntary admission and where the failure to include transporting officers' names, badge numbers, and employer on the commitment petition by R.N. Jeremy Baker deprived Plaintiff of using testimony by the transporting officers that might have been beneficial to him during any proceeding which may have taken place, and that resulted in potential prejudice to Plaintiff.

390.     NUPD, and NMH Staff acted together.

391.     Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on a perceived threat from his disability, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

392.     In the furtherance of which NUPD **Healy, Walsh, Moore, and Chin** falsified a commitment petition and police report, unlawfully threw Plaintiff to ground and arrested him without any evidence of statements of threat besides lies, and falsey that Plaintiff had committed a battery;

393.     In furtherance of which NUPD transported Plaintiff to Defendant NMH for unlawful involuntary commitment;

394.     In furtherance of which NMH staff falsified the petition for commitment, inappropriate sedated, and involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint, resulting in his false imprisonment for 8 total days.

395.     Where Plaintiff's detention was continued despite failing to comply with filing requirements of the code under which Plaintiff was committed.

396.     That the acts and omissions of any actions by the INDIVIDUAL HOSPITAL Defendants in their individual and official capacities were all performed under the color of the state law and were unreasonable and performed knowingly, wantonly, recklessly, maliciously, with gross negligence, callousness, and with deliberate indifference to Plaintiff's well-being and serious medical needs and in reckless disregard of his safety and thereby caused him to suffer the unnecessary and reckless infliction of pain and suffering by the forced administration of unnecessary medical treatment which resulted in his false imprisonment for a period of 8 days and because of which Plaintiff is entitled to compensatory and punitive damages.

397.     That the conduct of Northwestern Memorial Hospital and all of their employees, agents and/or ostensible agents, were actions under the color of the state law when they deprived Plaintiff of his clearly established rights, privileges and immunities in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution of the United States, and of 42 U.S.C. § 1983 and 42 U.S.C. § 1985, and 405 ILCS 5/Ch. III Art. VI procedures.

398.     That the conduct of INDIVIDUAL HOSPITAL DEFENDANTS was pursuant to, and in execution and implementation of the color of state law and was an officially sanctioned policy, regulation or custom of each of the named Defendants.

399.     That the individual hospital defendants acted willfully and intentionally in violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, to-wit:

e.  Violation of 405 ILCS 5/3-601:

  i.   Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;

  ii.  Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;

  iii. Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

f.  Violation of 405 ILCS 5/3-602:

    i.    Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

g.  Violation 405 ILCS 5/3-606:

    i.    Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

h.  Violation of 405 ILCS 5/3-608:

    i.    Failed to inform Plaintiff of his right to refuse treatment.

    ii.    Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

i.  Violation of 405 ILCS 5/3-609:

    i.    Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.

    ii.    Failed to ask Plaintiff if he desires such documents sent to any other persons

    iii.    Failed to allow Plaintiff to make phone 2 phone calls.

j.  Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:

    i.    Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.

    ii.    Failed to promptly file second certificate and provide a copy to the respondent.

400.    That the INDIVIDUAL HOSPITAL DEFENDANTS exhibited deliberate indifference, pursuant to the Eighth and Fourteenth Amendments to the Constitution, to serious medical needs, to-wit:

k.  Failure to train medical personnel at hospital in the proper determination of medical emergencies and such omitted training was in willful and wanton disregard for Plaintiff's serious medical needs and were grossly negligent and reckless acts.

l. Failure to hire individuals whose character and personality would not pose a potential danger to Plaintiff.

m. Failure to determine appropriate level of medical care and attention by medical providers and the failure to recognize the danger of improperly admitting Plaintiff to the facility;

n. Knowingly and recklessly hired and trained physicians, nurses and/or other medical personnel who are unable to determine common medical situations which render them unfit to perform the necessary duties of the position.

o. Knowingly and recklessly failing to discipline, instruct, supervise or control physicians, nurses and/or other medical personnel conduct and thereby encouraging acts and omissions that contributed to the injuries visited upon Plaintiff.

p. Recklessly, intentionally and/or willfully forcing medical care on a patient they knew did not need serious medical attention.

401. That Northwestern Memorial Hospital, individually, or through their employees and/or agents, participated in the implementation, execution, and omission of the official policies, training, practices, regulations, and/or customs referred to above.

402. That NMH had a duty to adequately train and supervise all, physicians, nurses and/or other medical personnel to obtain medical treatment, supervise and provide care and treatment to Plaintiff that was not grossly negligent or that amounted to a reckless indifference to his life or liberty concerns.

403. That the NMH and NU herein permitted the implementation of inappropriate de facto policies which reflected or represented policies, practices and customs which deviated from acceptable standards.

404. The unconstitutional conduct of the INDIVIDUAL HOSPITAL DEFENDANTS named herein implemented and executed the following policies and customs of these Defendants:

q. Implicit authorization, approval and knowing acquiescence in the wrongful conduct by said Defendants and/or their employees, agents or ostensible agents in the treatment of patients;

r.    The use of and acceptance of unconstitutional excessive force by the forcible
administration of unnecessary medical care which constituted punishment of those not
suffering serious medical conditions;

s.    Failure to discipline or terminate personnel known to have engaged in the use of
excessive medical care which constituted punishment of those not suffering serious
medical conditions and creating an atmosphere where hospital personnel believed they
would not be disciplined for abusive conduct toward patients;

t.    Failure to eliminate hospital policies, practices and customs which deviate from
applicable Federal and State standards for hospital operations;

u.    Failure to investigate, report and follow-up on prior incidents involving the use of
excessive force, medication and emergency medical care by hospital and medical
personnel.

405.    That as a direct and proximate result of the wrongful conduct of the Defendants, as
alleged herein, Plaintiff has suffered and will continue to suffer past, present and future conscious pain
and suffering, permanent career injury, and past, present and future economic damages.

406.    That Plaintiff is entitled to recover attorney fees and costs of litigation

407.    That as a proximate cause of the Individual Hospital Defendants ' acts and/or omissions,
Plaintiff suffered false imprisonment resulting in the following:

408.    a. Medical and hospital expense and daily care expense past, present and future; b.
Inhumane and tortuous conscious pain and suffering; c. Economic and non-economic compensatory
damages; d. Punitive damages;

409.    e. Any and all other damages including but not limited to both attorney fees recoverable
under 42 U.S.C. § 1983 § 1985 and § 1988 and any and all damages otherwise recoverable under
common law.

410.    Plaintiff has exhausted all administrative remedies.

411.    WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

a. Enter a Judgment in his favor and against the Defendants, jointly and severally, in an amount in excess of $75,000.00, and award costs, interest, and attorney fees as well as punitive and/or exemplary damages.

b. Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

    i. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

    ii. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school constitute false imprisonment under Illinois law;

    iii. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate due process and equal protections under the Fourteenth Amendment to the United States Constitution;

    iv. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school violate the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution

c. Award Plaintiff any compensatory and/or nominal damages he may incur as a result of Defendant's involuntary commitment without due process;

d. Award Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

e. Grant such other and further relief as this Court deems just and proper.

<u>**COUNT 34**</u>
**42 U.S.C. § 1985 Civil Conspiracy**
**(NUPD Officers Chin and Lee; and Dugo)**

412.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

413.    NUPD Deputy Chief Eric Chin, Detective Sanghoon Lee, and Mona Dugo conspired to deprive Plaintiff of his Fourteenth Amendment Rights to Due Process, right to Equal Protection under the law, First Amendment right to freedom of speech, and the occupational liberty interest to pursue a career in law. Defendants conspired to discredit Plaintiff's Department of Education complaint, and prevent Plaintiff from seeking aid from law enforcement for violations of state eavesdropping law committed by Chin, Dugo, and Gargula, by manufacturing false statements to cause the cancellation of Plaintiff's CPD police report JD 395786, and the conspiracy was born of disability-based animus.

414.    Chin and Dugo first tried to hide the existence of the illegal audio recordings, and then when they were discovered Chin acted to prevent Plaintiff's request for investigation by NUPD. Although Chin and Dugo knew that the recordings were illegal, Chin refused his responsibility as NUPD Deputy Chief to prosecute the offenses or report the violations of state law to Chicago Police. Next, Chin and NUPD Detective Sanghoon Lee, under color of law, and in conspiracy with Dugo that was based on disability animus, used Lee's officer status in order to intimidate Plaintiff into revealing his CPD police report number, and used Chin's officer status, unlawful disclosure of Plaintiff's protected health information, and false claims about Plaintiff's consent to the illegal audio recordings made by Gargula, in order to coerce Chicago Police to cancel Plaintiff's CPD police report JD 395786. Plaintiff was treated differently than similarly situated law student Gargula, who's complaint of violations had been addressed by NU, whereas Plaintiff's report of violations resulting from the same incident were actively barred and obstructed by NU. The failure by NU to report or enforce violations of state law and to obstruct Chicago Police reports was a significant departure from the typical procedures of NU.

415.    As a result of the cancellation, Plaintiff's eavesdropping claim was never investigated and he was robbed of the ability to seek law enforcement for the crimes committed against him and expelled as a result of the illegal recordings. Had the crimes been investigated, Gargula would have been charged with two felonies and expelled from school and the NU student disciplinary charges against Plaintiff relating to that incident dropped and Plaintiff would likely have been able to retain his place in school. Additionally, it is likely that Dugo and Chin could have been charged with violations of the

eavesdropping statute for sharing the audio recordings with Plaintiff's therapist for the purposes of defaming and discrediting him.

416.     As a result of the expulsion, Plaintiff lost his ability to study law, Plaintiff lost a 150K merit scholarship, suffered 40K in federal loan debt, 20K in private loan debt, in thousands in other expenses to be enumerated at trial. Permanent notation. on his transcript effectively ruined his ability to seek admission to any other graduate program He also suffered grievous mental and emotional trauma and suffering.

417.     The University's conduct and that of the officers was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

418.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

419.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b.  Award punitive damages;

    c.  Award attorney's fees and costs; and

    d.  Award such other relief as the Court deems just and proper.

**Count 35**
**42 U.S.C. § 1986. Action for neglect to prevent**
**(NU,** JULIE PAYNE-KIRCHMEIER, KAREN TAMBURO, LUCAS CHRISTAIN)

420.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

421.     NU administration including VP of student affairs and Office of Equity were aware of the existence of the illegal audio recordings and the conspiracy to prevent Plaintiff from seeking help of law

enforcement and had the power to prevent it through conducting a proper and thorough investigation during the incident and refused to do so. As a result of this failure to act, Plaintiff was harmed by the conspiracy to deprive him of his rights to equal protections by not having his police report investigated.

422.    The University's conduct and that of the investigators was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

423.    As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

424.    Where the conspiracy ultimately deprived Plaintiff of the ability to have a law degree or the career earnings associated with a JD from a top ranked 10 Law School in the US.

425.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b.   Award punitive damages;

   c.   Award attorney's fees and costs; and

   d.   Award such other relief as the Court deems just and proper.

### Count 37
### 42 U.S.C. § 1983: Violation of Equal Protections
### (NU, Healy, Walsh, Moore, Chin)

426.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 380, inclusive, of this Complaint, as if fully restated herein.

427.    Plaintiff is a resident of the County of Cook and citizen of the State of Illinois. He resides in the City of Chicago.

428.     That the City of Chicago is a municipal corporation located within the judicial district for Cook County of Illinois; the district wherein all material events and omissions occurred and in which defendant maintains offices and/or resides.

429.     At all times relevant hereto, the individuals whose conduct gives rise to the complaint were employed by Northwestern University and working under color of law.

430.     Plaintiff brings this claim for deprivation of certain rights under 42 USC **1983**.

431.     On November 1, 2019, plaintiff was lawfully on school premises located at 357 E Chicago Avenue, City of Chicago, County of Cook, State of Illinois.

432.     NUPD Officers Healy, Walsh, and Moore arrived at the scene responding to the allegations as documented in NUPD Police Report 2019-00000595

433.     Plaintiff was unjustifiably and illegally assaulted, battered, brutalized and forced to the ground by the aforementioned police officers.

434.     NUPD willfully treated Plaintiff as though he was guilty before they had accurately assessed the situation based on threat from Plaintiff's perceived disability and religion. Where there were no witnesses or evidence to the alleged act of battery and were both Plaintiff and similarly situated law students Alkhawaja, Ibrahim, and Maksud claimed that the other had attacked them. NUPD considered the claims of the similarly situated students as though they were true and based their decision to arrest Plaintiff and not his attackers on the fact that one or more of the attackers or people on the scene told them that Plaintiff was suffering from "mental illness."

435.     That plaintiff was arrested and charged with having committed a battery. See NUPD charges State\0460\720-5|12-3\Battery. He was never formally charged with battery by the Cook County State's attorney.

436.     Subsequent to his arrest, subsequent to being placed in handcuffs, and after he was transferred to Northwestern Memorial Hospital with the EMS officers of the City of Chicago Fire Department, plaintiff was unlawfully confined to NMH for 8 days. During the course of this confinement, plaintiff was attacked by multiple hospital staff, acting in concert and in conspiracy. Then and there he sustained serious personal injuries, including loss of his ability to attend graduate school at NU. Upon

information and belief, some, if not all, of the interaction between plaintiff and the defendants was videotaped.

437. The arrest, seizure, detainment, force and attack of plaintiff by NUPD officers was illegal and violated plaintiffs right under the United States Constitution and Constitution of the State of Illinois, as well as **42 USC 1983** and **42 USC** 1988, in that:

    a. Defendant failed to properly train its police officer; and/or

    b. Failed to properly supervise its police officers; and/or

    c. Failed to create, maintain and enforce appropriate policies, procedures and protocols for its police officers to follow when questioning, arresting, detaining and processing members of the general public; and/or

    d. Failed to maintain and preserve evidence of plaintiffs innocence and the wrongful conduct of defendant's employees, including the failure to maintain videotape of the arrest and attack of the plaintiff as described herein.

438. That as a result of the conduct of the defendant, plaintiff incurred doctor and hospital bills and lost wages that he would have otherwise earned.

439. The arrest of plaintiff was done without probable cause and without justification and therefore resulted in unlawful detainment.

440. That the force displayed by NUPD officers after the illegal arrest of the plaintiff was excessive, not legally justified and exerted with malice toward plaintiff.

441. That at all times herein mentioned, the defendant, individually and acting through NUPD officers, acted knowingly, intentionally, willfully and maliciously.

442. That Plaintiff was intentionally treated differently than similarly situated law students Alkhajawa, Maksud and Ibrahim solely on the basis of his perceived disability.

443. That the above actions by Defendants have resulted in the denial of equal protection rights all in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was physically assaulted, falsely imprisoned, retaliated against, harassed, disciplined against, intimidated, and required to withdraw from school, all against his will, and differently than those similarly situated students.

444. That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of PLAINTIFF and other similarly situated students, all in violation of his constitutional rights.

445. As a result of Defendants' actions, PLAINTIFF suffered and continues to suffer a deprivation of his rights secured to him by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

446. That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

447. The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Plaintiff is entitled to punitive damages.

448. Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

449. WHEREFORE, plaintiff prays for judgment in his favor and against the defendant, NU, in an amount to be proven at 'trial for compensatory and punitive damages, attorney fees, expert fees and such other damages that may be authorized under **42 USC** 1988.

450. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b. Award punitive damages;

    c. Award attorney's fees and costs; and

    d. Award such other relief as the Court deems just and proper.

### Count 45
**Intentional Infliction of Emotional Distress/Negligent Infliction of Emotional Distress**
**(NUPD Officers Healy, Walsh, Moore, Chin, NU)**

451. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

452. Reuslting from the 11/1/19 incident the acts and omissions of the University and its police officers were willful and intentional.

453.     The University knew or should have known that the officers systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.

454.     The University's conduct and that of the officers was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

455.     The University's conduct and that of the officers was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

456.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

457.     WHEREFORE, Plaintiff demands that judgment be entered in his favor and against the University for compensatory and punitive damages in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), in addition to prejudgment interest, attorneys' fees, expenses, costs and any other appropriate relief.


## Count 46
### 42 U.S.C. § 1983: Violation of Equal Protections
### (NU, Eric Chin, Sanghoon Lee)

458.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

459.     Plaintiff states a claim for relief for Defendant's violation of the Fourteenth Amendment to the United States Constitution, which is actionable pursuant to **42 U.S.C. § 1983**, and the Illinois Constitution, art I, § 2.

460.     NUPD Deputy Chief Eric Chin, Detective Sanghoon Lee, and Mona Dugo conspired to deprive Plaintiff of his Fourteenth Amendment Rights to Due Process, right to Equal Protection under the law, First Amendment right to freedom of speech, and the occupational liberty interest to pursue a career in law. Defendants conspired to discredit Plaintiff's Department of Education complaint, and prevent Plaintiff from seeking aid from law enforcement for violations of state eavesdropping law committed by

Chin, Dugo, and Gargula, by manufacturing false statements to cause the cancellation of Plaintiff's CPD police report JD 395786, and the conspiracy was born of disability-based animus.

461.    Chin and Dugo first tried to hide the existence of the illegal audio recordings, and then when they were discovered Chin acted to prevent Plaintiff's request for investigation by NUPD. Although Chin and Dugo knew that the recordings were illegal, Chin refused his responsibility as NUPD Deputy Chief to report the violations of state law to Chicago Police. Next, Chin and NUPD Detective Sanghoon Lee, under color of law, and in conspiracy with Dugo that was based on disability animus, used Lee's officer status in order to intimidate Plaintiff into revealing his CPD police report number, and used Chin's officer status, unlawful disclosure of Plaintiff's protected health information, and false claims about Plaintiff's consent to the illegal audio recordings made by Gargula, in order to coerce Chicago Police to cancel Plaintiff's CPD police report JD 395786. Plaintiff was treated differently than similarly situated law student Gargula, who's complaint of violations had been addressed by NU, whereas Plaintiff's report of violations resulting from the same incident were actively barred and obstructed by NU. The failure by NU to report or enforce violations of state law and to obstruct Chicago Police reports was a significant departure from the typical procedures of NU.

462.    As a result of the cancellation, Plaintiff's eavesdropping claim was never investigated and he was robbed of the ability to seek law enforcement for the crimes committed against him and expelled as a result of the illegal recordings. Had the crimes been investigated, Gargula would have been charged with two felonies and expelled from school and the NU student disciplinary charges against Plaintiff relating to that incident dropped and Plaintiff would likely have been able to retain his place in school. Additionally, it is likely that Dugo and Chin could have been charged with violations of the eavesdropping statute for sharing the audio recordings with Plaintiff's therapist for the purposes of defaming and discrediting him.

463.    As a result of the expulsion, Plaintiff lost his ability to study law, Plaintiff lost a 150K merit scholarship, suffered 40K in federal loan debt, 20K in private loan debt, in thousands in other expenses to be enumerated at trial. Permanent notation. on his transcript effectively ruined his ability to seek admission to any other graduate program He also suffered grievous mental and emotional trauma and suffering.

464.    That the above actions by Defendants have resulted in the denial of equal protection rights in violation of the Fourteenth Amendment to the United States Constitution, as Plaintiff was retaliated against, harassed, disciplined against, intimidated, and required to withdraw from school, all against his will, and differently than those similarly situated students.

465.    That the actions of Defendants were the result of personal animus against the Plaintiff, and said actions and denials were taken solely on the basis of perceived disability.

466.    That by reason of the aforesaid actions, Defendants' actions exhibit deliberate indifference to and/or reckless disregard for the constitutional rights of PLAINTIFF and other similarly situated students, all in violation of his constitutional rights.

467.    As a result of Defendants' actions, PLAINTIFF suffered and continues to suffer a deprivation of his rights secured to him by the Fourteenth Amendment to the United States Constitution, and is thus entitled to an award of monetary damages from the individual Defendants.

468.    That by reason of the aforesaid actions, Plaintiff is entitled to a Permanent Injunction requiring all Defendants, or their agents, to cease all unlawful and unconstitutional acts that they currently engage in.

469.    The acts, conduct and behavior of each of the individual Defendants was performed knowingly, intentionally, oppressively, and maliciously, by reason of which Plaintiff is entitled to punitive damages.

470.    Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

471.    WHEREFORE, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 50
### PETITION FOR CERTIORARI
### Northwestern University Expulsion

472.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

473.    Plaintiff seeks judicial review on certiorari, as provided by common law, of NU's final administrative decision to terminate his participation in the JD Program at NU.

474.    NU's decision to terminate Plaintiff's participation in the program is contrary to law since NU Policies and Procedures do not provide a basis for termination because of the constructive assumption of alleged safety threats and NU failed to give a proper notice or opportunity for a hearing (informal review) prior to Plaintiff's interim suspension in both years, against the manifest weight of the evidence, and constitutes a "penalty" that outweighs the "crime" of not being prevented from earning his JD at NU and being able to find adequate alternative education due to the permanent notations on his student records.

475.    The basis for Plaintiff's expulsion consisted of the following:

a.  Sanctions in retaliation for Plaintiff's complaints of discrimination school stemming from the 2019 false imprisonment and UHAS disciplinary process. This was a violation of the schools clearing stated policy on non-retaliation as well as federal retaliation law.

b.  Sanctions for alleged interactions with a student who had already graduated and thus was not within the school of student conduct policy.

c.  Sanctions resulting from Plaintiff's language on two illegally recorded phone calls which formed the basis of his guilt for "gender-based" harassment.

d.  Probationary status resulting from discriminatory 2019 student conduct hearings and sanctions resulting from violation of unclear probationary terms which were never clearly indicated or expressed at any time and as such could not constitute as a binding contract governing Plaintiff's behavior nor as the basis for disciplinary action.

476.    WHEREFORE, Plaintiff requests that this Court:

a.  Order NU to file a record of the student conduct proceedings from 2019 and 2020;

b.  Reverse NU's decision to terminate Plaintiff's right to participate in the NU JD Program;

c.  Reinstate Plaintiff to the NU JD Program;

d.   Order NU to address the unlawful actions of the students and staff motioned in this complaint;

e.   Order NU to remove any and all notations in the Plaintiffs disciplinary record, permanent transcript, and student file associated with the 11/1/20 incident and the 8/23//20 incidents with Gargula and any other associated disciplinary issues resulting from these incidents.

f.   Order NU to arrange for the Plaintiff to transfer with equal or greater financial aid to another law institution of a similar caliber and reputation; and

g.   Grant such other relief as may be equitable and just.

<u>**Count 51**</u>
**Violation pursuant to the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution**
**42 U.S.C § 1983**
**(Northwestern Memorial Hospital, Individual Hospital Defendants)**

477.   Plaintiff hereby repeats and realleges each and every allegation contained in the preceding paragraphs as though set forth here in full.

478.   That the acts and omissions of any actions by the INDIVIDUAL HOSPITAL Defendants in their individual and official capacities under the Eighth and Fourteenth Amendments to the Constitution, as well as **42 U.S.C. § 1983** and § 1985 were all performed under the color of the state law and were unreasonable and performed knowingly, wantonly, recklessly, maliciously, with gross negligence, callousness, and with deliberate indifference to Plaintiff's well-being and serious medical needs and in reckless disregard of his safety and thereby caused him to suffer the unnecessary and reckless infliction of pain and suffering by the forced administration of unnecessary medical treatment which resulted in his false imprisonment for a period of 8 days and because of which Plaintiff is entitled to compensatory and punitive damages.

479.   That the conduct of Northwestern Memorial Hospital and all of their employees, agents and/or ostensible agents, were actions under the color of the state law when they deprived Plaintiff of his clearly established rights, privileges and immunities in violation of the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution of the United States, and of **42 U.S.C. § 1983** and**, and** 405 ILCS 5/Ch. III Art. VI procedures.

480.   That the conduct of INDIVIDUAL HOSPITAL DEFENDANTS was pursuant to, and in execution and implementation of the color of state law and was an officially sanctioned policy, regulation or custom of each of the named Defendants.

481. That the individual hospital defendants acted willfully and intentionally in violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, to-wit:

a. Violation of 405 ILCS 5/3-601:

    v. Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;

    vi. Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;

    vii. Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

b. Violation of 405 ILCS 5/3-602:

    viii. Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

c. Violation 405 ILCS 5/3-606:

    ix. Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

d. Violation of 405 ILCS 5/3-608:

    x. Failed to inform Plaintiff of his right to refuse treatment.

    xi. Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

e. Violation of 405 ILCS 5/3-609:

    xii. Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.

    xiii. Failed to ask Plaintiff if he desires such documents sent to any other persons

    xiv. Failed to allow Plaintiff to make phone 2 phone calls.

f.  Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:

    xv.  Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.

    xvi.  Failed to promptly file second certificate and provide a copy to the respondent.

482.  That the INDIVIDUAL HOSPITAL DEFENDANTS exhibited deliberate indifference, pursuant to the Eighth and Fourteenth Amendments to the Constitution, to serious medical needs, to-wit:

g.  Failure to train medical personnel at hospital in the proper determination of medical emergencies and such omitted training was in willful and wanton disregard for Plaintiff's serious medical needs and were grossly negligent and reckless acts.

h.  Failure to hire individuals whose character and personality would not pose a potential danger to Plaintiff.

i.  Failure to determine appropriate level of medical care and attention by medical providers and the failure to recognize the danger of improperly admitting Plaintiff to the facility;

j.  Knowingly and recklessly hired and trained physicians, nurses and/or other medical personnel who are unable to determine common medical situations which render them unfit to perform the necessary duties of the position.

k.  Knowingly and recklessly failing to discipline, instruct, supervise or control physicians, nurses and/or other medical personnel conduct and thereby encouraging acts and omissions that contributed to the injuries visited upon Plaintiff.

l.  Recklessly, intentionally and/or willfully forcing medical care on a patient they knew did not need serious medical attention.

483.  That **Northwestern Memorial Hospital**, individually, or through their employees and/or agents, participated in the implementation, execution, and omission of the official policies, training, practices, regulations, and/or customs referred to above.

484.  That NMH had a duty to adequately train and supervise all, physicians, nurses and/or other medical personnel to obtain medical treatment, supervise and provide care and treatment to Plaintiff that was not grossly negligent or that amounted to a reckless indifference to his life or liberty concerns.

485.    That the INDIVIDUAL HOSPITAL DEFENDANTS herein permitted the implementation of inappropriate de facto policies which reflected or represented policies, practices and customs which deviated from acceptable standards.

486.    The unconstitutional conduct of the INDIVIDUAL HOSPITAL DEFENDANTS named herein implemented and executed the following policies and customs of these Defendants:

m.  Implicit authorization, approval and knowing acquiescence in the wrongful conduct by said Defendants and/or their employees, agents or ostensible agents in the treatment of patients;

n.  The use of and acceptance of unconstitutional excessive force by the forcible administration of unnecessary medical care which constituted punishment of those not suffering serious medical conditions;

o.  Failure to discipline or terminate personnel known to have engaged in the use of excessive medical care which constituted punishment of those not suffering serious medical conditions and creating an atmosphere where hospital personnel believed they would not be disciplined for abusive conduct toward patients;

p.  Failure to eliminate hospital policies, practices and customs which deviate from applicable Federal and State standards for hospital operations;

q.  Failure to investigate, report and follow-up on prior incidents involving the use of excessive force, medication and emergency medical care by hospital and medical personnel.

487.    That as a direct and proximate result of the wrongful conduct of the **Individual Hospital Defendants**, as alleged herein, Plaintiff has suffered and will continue to suffer past, present and future conscious pain and suffering, permanent career injury, and past, present and future economic damages.

488.    That pursuant to the provisions of **42 U.S.C. §** 1988, Plaintiff is entitled to recover attorney fees and costs of litigation for the causes of actions alleged under the Constitution and the laws of the United States.

489.    That as a proximate cause of the **Individual Hospital Defendants** ' acts and/or omissions, Plaintiff suffered false imprisonment resulting in the following:

490.     a. Medical and hospital expense and daily care expense past, present and future; b. Inhumane and tortuous conscious pain and suffering; c. Economic and non-economic compensatory damages; d. Punitive damages;

e. Any and all other damages including but not limited to both attorney fees recoverable under **42 U.S.C. § 1983 § 1985** and § 1988 and any and all damages otherwise recoverable under common law.

491.     Plaintiff has exhausted all administrative remedies.

492.     WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

r.     Enter a Judgment in his favor and against the **Individual Hospital Defendants**, jointly and severally, in an amount in excess of $75,000.00, and award costs, interest, and attorney fees as well as punitive and/or exemplary damages.

s.     Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

a.     The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

b.     The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment hearing and notice procedures in this case violate the due process clause of Fifth Amendment to the United States Constitution;

c.     The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate due process and equal protections under the Fourteenth Amendment to the United States Constitution;

d.     The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school violate the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution.

e.     Violation of 405 ILCS 5/3-601:

a.　Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;

　　　b.　Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;

　　　c.　Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

f.　Violation of 405 ILCS 5/3-602:

　　　a.　Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

g.　Violation 405 ILCS 5/3-606:

　　　a.　Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

h.　Violation of 405 ILCS 5/3-608:

　　　a.　Failed to inform Plaintiff of his right to refuse treatment.

　　　b.　Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

i.　Violation of 405 ILCS 5/3-609:

　　　a.　Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.

　　　b.　Failed to ask Plaintiff if he desires such documents sent to any other persons

　　　c.　Failed to allow Plaintiff to make phone 2 phone calls.

j.　Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:

      i.   Failed to file 2 copies of the petition, the first certificate, and proof of

            service of the petition and statement of rights upon the respondent

            with the court in the county in which the facility is located within 24

            hours after respondents admission.

      ii.   Failed to promptly file second certificate and provide a copy to the

            respondent.

t.   Award Plaintiff any compensatory and/or nominal damages she may incur as a result of

    Defendant's involuntary commitment without due process;

u.   Award Plaintiff's reasonable attorney's fees and costs pursuant to **42 U.S.C. §** 1988; and

    F. Grant such other and further relief as this Court deems just and proper.

### Count 52
**Medical Negligence**
**(NORTHWESTERN MEMORIAL HOSPITAL)**

493.    Plaintiff hereby repeats and realleges each and every allegation as though set forth here in full.

494.    At all times relevant, Defendants, NORTHWESTERN MEMORIAL HOSPITAL, by and through its physicians, physician assistants, nurses and other health care providers, had a duty to provide their patients, including PLAINTIFF, with medical care consistent with the standard of care.

495.    At all times relevant, Defendants, NORTHWESTERN MEMORIAL HOSPITAL, by and through its physicians, physician assistants, nurses and other health care providers, each of whom were employees and/or actual or apparent agents acting within the scope of his/her authority, were careless and/or negligent in one or more of the following ways:

    v.   Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency

        Commitment procedure;

    w.   Repeatedly deviated from the appropriate standard of medical care for Plaintiff as

        indicated in Plaintiff's County Care insurance documents, which indicate that an

        independent review organization medical doctor, board certified in Psychiatry, reviewed

        the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19,

        and on both occasions found hat the medical information did not show a need for an

inpatient level of care and that continued inpatient stay was not shown to be medically

necessary to correct Plaintiff's bipolar disorder;

x.  Falsification of Commitment Petition incorrectly stating that patient was not brought in

by a peace officer;

y.  Improperly Given 5 mg haloperidol lactate (HALDOL) injection in Left Anterior Thigh 5

mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

z.  Improperly Given 5 mg midazolam (VERSED) 5 mg/mL injection in Left Anterior Thigh

5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

aa.  Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

bb.  Failed to administer appropriate medications during the incident;

cc.  Failed to administer appropriate levels of sedatives during the incident;

dd.  Failed to adequately monitor the patient's condition during the incident;

ee.  Failed to timely order termination of the involuntary commitment procedure;

496.    As a proximate result of one or more of the aforesaid careless and negligent acts and/or

omissions of Defendants, NORTHWESTERN MEMORIAL HOSPITAL, Plaintiff sustained injuries of a

personal and pecuniary nature, including but not limited to a permanent disability, and will continue to

suffer from those injuries in the future.

497.    *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's

favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other

attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**Count 53**
**Medical Negligence**
**(NMH L.S.N. FRED CABRA)**

498.    Plaintiff hereby repeats and realleges each and every allegation as though set forth here in

full.

499. At all times relevant, Defendant, FRED CABRA, L.S.N., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

500. At all times relevant, Defendant, FRED CABRA, L.S.N., was careless and/or negligent in one or more of the following ways:

ff. Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

gg. Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

hh. Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

ii. Improperly Given 5 mg haloperidol lactate (HALDOL) injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

jj. Improperly Given 5 mg midazolam (VERSED) 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

kk. Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

ll. Failed to administer appropriate medications during the incident;

mm. Failed to administer appropriate levels of sedatives during the incident;

nn. Failed to adequately monitor the patient's condition during the incident;

oo. Failed to timely order termination of the involuntary commitment procedure;

501. As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, FRED CABRA, L.S.N., Plaintiff sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

502.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**<u>Count 54</u>**
**Medical Negligence**
**(NMH M.D. EUGENE LOZZA)**

503.     Plaintiff hereby repeats and realleges each and every allegation contained as though set forth here in full.

504.     At all times relevant, Defendant, EUGENE LOZZA, M.D., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

505.     At all times relevant, Defendant, EUGENE LOZZA, M.D., was careless and/or negligent in one or more of the following ways:

pp.  Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

qq.  Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

rr.  Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

ss.  Improperly Given 5 mg haloperidol lactate {HALDOL} injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

tt. Improperly Given 5 mg midazolam {VERSED} 5 mg/mL injection in Left Anterior Thigh

5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

uu. Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

vv. Failed to administer appropriate medications during the incident;

ww.    Failed to administer appropriate levels of sedatives during the incident;

xx. Failed to adequately monitor the patient's condition during the incident;

yy. Failed to timely order termination of the involuntary commitment procedure;

506.    95. As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, EUGENE LOZZA, M.D., PLAINTIFF sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

507.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 55
### Medical Negligence
### (NMH M.D. SCOTT A. GERSHAN)

508.    Plaintiff hereby repeats and realleges each and every allegation contained in paragraphs above, as though set forth here in full.

509.    At all times relevant, Defendant, SCOTT A. GERSHAN, M.D., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

510.    At all times relevant, Defendant, SCOTT A. GERSHAN, M.D., was careless and/or negligent in one or more of the following ways:

zz. Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency

Commitment procedure;

aaa. Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

bbb. Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

ccc. Improperly Given 5 mg haloperidol lactate (HALDOL) injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

ddd. Improperly Given 5 mg midazolam (VERSED) 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

eee. Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

fff. Failed to administer appropriate medications during the incident;

ggg. Failed to administer appropriate levels of sedatives during the incident;

hhh. Failed to adequately monitor the patient's condition during the incident;

iii. Failed to timely order termination of the involuntary commitment procedure;

511.    As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, SCOTT A. GERSHAN, M.D., PLAINTIFF sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

512.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 56
### Medical Negligence
### (NMH M.D. ANDREW J. BERG)

513.     Plaintiff hereby repeats and realleges each and every allegation as though set forth here in full.

514.     At all times relevant, Defendant, ANDREW J. BERG, M.D., had a duty to provide its patients, including PLAINTIFF, with medical care consistent with the standard of care.

515.     At all times relevant, Defendant, ANDREW J. BERG, M.D., was careless and/or negligent in one or more of the following ways:

jjj.  Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

kkk.     Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

lll.  Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

mmm.     Improperly Given 5 mg haloperidol lactate {HALDOL} injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

nnn.     Improperly Given 5 mg midazolam {VERSED} 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

ooo.     Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

ppp.      Failed to administer appropriate medications during the incident;

qqq.      Failed to administer appropriate levels of sedatives during the incident;

rrr.  Failed to adequately monitor the patient's condition during the incident;

sss. Failed to timely order termination of the involuntary commitment procedure;

516.    As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendant, ANDREW J. BERG, M.D., PLAINTIFF sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

517.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 57
### (Medical Negligence)
### (NMH R.N. JEREMY BAKER)

518.    Plaintiff hereby repeats and realleges each and every allegation as though set forth here in full.

519.    At all times relevant, Defendants, JEREMY BAKER, R.N., had a duty to provide their patients, including PLAINTIFF, with medical care consistent with the standard of care.

520.    At all times relevant, Defendants, JEREMY BAKER, R.N., were careless and/or negligent in one or more of the following ways:

ttt.  Violation of numerous procedural requirements of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure;

uuu.      Repeatedly deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19,

and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

vvv.     Falsification of Commitment Petition incorrectly stating that patient was not brought in by a peace officer;

www.     Improperly Given 5 mg haloperidol lactate {HALDOL} injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:30 PM CDT For 1 dose;

xxx.     Improperly Given 5 mg midazolam {VERSED} 5 mg/mL injection in Left Anterior Thigh 5 mg, Intramuscular, ONCE, Fri 11/1/19 at 2242, 10:31 PM CDT. For 1 dose;

yyy.     Improperly admitted Plaintiff to facility when inpatient care was not medically necessary;

zzz. Failed to administer appropriate medications during the incident;

aaaa.     Failed to administer appropriate levels of sedatives during the incident;

bbbb.     Failed to adequately monitor the patient's condition during the incident;

cccc.     Failed to timely order termination of the involuntary commitment procedure;

521.     As a proximate result of one or more of the aforesaid careless and negligent acts and/or omissions of Defendants, JEREMY BAKER, R.N., Plaintiff sustained injuries of a personal and pecuniary nature, including but not limited to a permanent disability, and will continue to suffer from those injuries in the future.

522.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>**Count 58**</u>
**Medical Battery**
**(Individual Hospital Defendants)**

523.     Plaintiff was improperly given TWO separate dosages of psychotropic medication which was not shown to be medically necessary because plaintiff presented no immediate threat to safety of himself or others.

524.     Plaintiff was improperly physically restrained in order to apply dosages.

525.     Plaintiff did not consent to any of the contact, objected to it on religious grounds as well as legal grounds, and found the matter of contact highly offensive.

526.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 59
### Medical Malpractice
### (Individual Hospital Defendants)

527.     The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found hat the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

528.     The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and

assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition.

529.    Standard of Care established by insurance documents by an independent board certified psychiatric review on two separate occasions and reaching the same conclusion.

530.    As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

531.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## <u>Count 60</u>
### Negligence Malpractice
### (NMH M.D. ANDREW BERG, NMH M.D. EUGENE LOZZA, NMH M.D. SCOTT A. GERSHAN)

532.    Where defendants owed Plaintiff a duty to act in accordance with the specific norms of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, in the initial emergency department assessment by Dr. Berg, the actual certification by Dr. Lozza, and the requests for insurance coverage by Dr. Gershan.

533.    The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the

requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found that the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

534.     The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition. Standard of Care established by insurance documents by an independent board-certified psychiatric review on two separate occasions and reaching the same conclusion.

535.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

536.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and suffered unjust and unlawful confinement for 8 total days form 11/1/19-11/8/19. Due to the confinement, Plaintiff was unable to attend classes or complete coursework,

537.     Due to the involuntary confinement,  he was suspended noting the involuntary confinement as rationale justifying his guilt in the university student conduct hearings which ensued at his graduate school in 2019. Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness causing concern about Plaintiff's abilities to complete his education from Northwestern

University and creating unwarranted safety concerns about Plaintiff. Plaintiff was suspended for two semesters as a direct result of the confinement, and placed on disciplinary probation, and was eventually expelled citing the incident of involuntary confinement as rationale justifying his guilt in the student conduct hearings at his graduate school in 2020. He endured undue medical expenses, and extreme psychological trauma and pain and suffering. He continues to suffer as a result of the confinement as his CPD police report was cancelled and he suffers continuing discrimination from his graduate school who thinks he is mentally unfit due to the false imprisonment.

538.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 61
### Express Contract Malpractice
**(NMH M.D. ANDREW BERG, NMH M.D. EUGENE LOZZA, NMH M.D. SCOTT A. GERSHAN)**

539.    Where defendants owed Plaintiff a duty to act in accordance with the specific norms of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, in the initial emergency department assessment by Dr. Berg, the actual certification by Dr. Lozza, and the requests for insurance coverage by Dr. Gershan.

540.    The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found that the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

541.    The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment

authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition. Standard of Care established by insurance documents by an independent board-certified psychiatric review on two separate occasions and reaching the same conclusion.

542.　　As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

543.　　As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and suffered unjust and unlawful confinement for 8 total days form 11/1/19-11/8/19. Due to the confinement, Plaintiff was unable to attend classes or complete coursework,

544.　　Due to the involuntary confinement, he was suspended noting the involuntary confinement as rationale justifying his guilt in the university student conduct hearings which ensued at his graduate school in 2019. Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff. Plaintiff was suspended for two semesters as a direct result of the confinement, and placed on disciplinary probation, and was eventually expelled citing the incident of involuntary confinement as rationale justifying his guilt in the student conduct hearings at his graduate school in 2020. He endured undue medical expenses, and extreme psychological trauma and pain and suffering. He continues to suffer as a result of the confinement as his

CPD police report was cancelled and he suffers continuing discrimination from his graduate school who thinks he is mentally unfit due to the false imprisonment.

545.     Where Plaintiff had express oral conversations detailing the terms and conditions of appropriate treatment for Plaintiff's illness which was articulated with specificity and detail, thereby clearly establishing the rights and duties of the parties involved. These conversations occurred while in the emergency intake department during his initial assessment, and during the admission procedure where he was unjustly certified for commitment.

546.     Where each defendant made an express promise to appropriately treat Plaintiff's. medical issue and achieve the result of satisfactory medical treatment by the applicable standards of medical care.

547.     Where the Plaintiff relied upon the promise of appropriate medical treatment and transferred payment/consideration to the defendants in the form of insurance payments for the medical care in exchange for the promise by the defendants of appropriate medical care.

548.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 62
### Implied Contract Malpractice/
### Breach of Contract

**(NMH M.D. ANDREW BERG, NMH M.D. EUGENE LOZZA, NMH M.D. SCOTT A. GERSHAN)**

549.     Where Plaintiff entered into an implied contract for medical care in accordance with the standards of medical in exchange for his insurance payments. Where defendants failed to meet the standards of medical care and their corresponding implied contractual obligations.

550.     Where defendants owed Plaintiff a duty to act in accordance with the specific norms of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedure, in the initial emergency department assessment by Dr. Berg, the actual certification by Dr. Lozza, and the requests for insurance coverage by Dr. Gershan.

551.     The standard of care was following proper admission procedure for involuntary admission and treatment of "mentally ill" individuals. Defendants deviated from the appropriate standard of medical care for Plaintiff as indicated in Plaintiff's County Care insurance documents, which indicate that an independent review organization medical doctor, board certified in Psychiatry, reviewed the requests for insurance coverage of inpatient treatment received 11/5/19 and 11/7/19, and on both occasions found that the medical information did not show a need for an inpatient level of care and that continued inpatient stay was not shown to be medically necessary to correct Plaintiff's bipolar disorder;

552.     The insurance documents which indicated that inpatient admission was not warranted in Plaintiff's case on at least two different occasion when NMH staff attempted to receive payment authorization. NMH staff deviated from the standard of care and improperly applied 10 mg of psychotropic medication with no immediate threat presented from Plaintiff and improperly involuntarily committed Plaintiff without any specific articulation of his threat to self or others, and failed to follow proper admission procedure as alleged in the complaint by falsifying the petition stating Plaintiff was not brought in by peace officer, failing to provide alternative or least restrictive treatments options and assessments, ignoring Plaintiffs religious objections to medication, failing to file or serve the commitment petition or either certificate within the stator timeframe, and failing to contact Plaintiff's friends or relatives or listing any attempts to contact them, and failing to list Police as potential witnesses in the petition. Standard of Care established by insurance documents by an independent board-certified psychiatric review on two separate occasions and reaching the same conclusion.

553.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness which proximately caused his suspension and eventual expulsion from graduation and continues to produce unforeseen consequences such as causing Plaintiffs Chicago Police Department report for eavesdropping to be cancelled and causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff.

554.     As a result of the deviation from the standard of care, Plaintiff suffered unjust and unwarranted involuntary committed and suffered unjust and unlawful confinement for 8 total days from 11/1/19-11/8/19. Due to the confinement, Plaintiff was unable to attend classes or complete coursework,

555.    Due to the involuntary confinement,  he was suspended noting the involuntary confinement as rationale justifying his guilt in the university student conduct hearings which ensued at his graduate school in 2019. Plaintiff suffered unjust and unwarranted involuntary committed and a record of mental illness causing concern about Plaintiff's abilities to complete his education from Northwestern University and creating unwarranted safety concerns about Plaintiff. Plaintiff was suspended for two semesters as a direct result of the confinement, and placed on disciplinary probation, and was eventually expelled citing the incident of involuntary confinement as rationale justifying his guilt in the student conduct hearings at his graduate school in 2020. He endured undue medical expenses, and extreme psychological trauma and pain and suffering. He continues to suffer as a result of the confinement as his CPD police report was cancelled and he suffers continuing discrimination from his graduate school who thinks he is mentally unfit due to the false imprisonment.

556.    Where Plaintiff anticipated treatment in accordance with applicable medical standards and was injured in his person and property as a result of defendants deviation from said standard. Had the proper standard of medical care, as documented by insurance review, been followed, Plaintiff would have been free to attend classes and complete coursework towards his graduate education.

557.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### COUNT 63
**42 U.S.C. § 1985 Civil Conspiracy**
**(NUPD Officers Healy, Walsh, Moore, and Chin; Individual Hospital Defendants)**

558.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

559.    Defendants conspired to deprive Plaintiff of his liberty without due process in violation of the Fourteenth Amendment by reacing and agreement to falsify Plaintiff's petition for involuntary commitment by falsely indicating that Plaintiff had not been brought in by a peace officer and failing to

include said officers identifying information on the paperwork. Failing to provide such information deprived Plaintiff of using testimony by the transporting officers that might have been beneficial to him, and that resulted in potential prejudice to Plaintiff.

560. Mental Health and Developmental Disabilities Code required that the transporting officers' names, badge numbers, and employer be identified in the petition for involuntary admission so that the officers could be called as potential witnesses.

561. Healy, Walsh, Moore, and Chin from NUPD worked together with NMH staff Cabra, Lozza, and Baker

562. Acted with the common purpose of instigating Plaintiff's unlawful involuntarily civil commitment based on threat from perceived disability, and without any evidence of any threatening acts or statements beyond what they falsely and maliciously attributed to him.

563. In the furtherance of which NUPD Thomas Healy, Walsh, and Moore and Chin falsified a commitment petition and police report, unlawfully threw Plaintiff to ground and arrested him without any evidence of statements of threat besides lies, and with CFD EMS transported him to Defendant NMH for unlawful involuntary commitment.

564. In furtherance of which NMH staff inappropriately sedated and improperly involuntarily admitted plaintiff in violation of numerous state laws mentioned in this complaint.

565. Where NUPD officers and NMH staff had prior communications discussing the circumstances which led to Plaintiff's detainment by police, and where they created at that point, a conspiracy to deprive Plaintiff of his liberty and property interests through the numerous law violations and general misconduct discussed in this complaint.

566. ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 64
42 U.S.C.A. § 1986. **Action for neglect to prevent**

567.     Where NMH had awareness of the conspiratorial actions of its employees through its

normal internal operations procedures, and had the power to prevent the unjust and unwarranted

involuntary confinement of Plaintiff by adhering to proper admissions procedures and performing proper

oversight and supervision of its employees and patients  and failed to due so. As a result, Plaintiff

suffered injury of false imprisonment and all its associated consequences such as disciplinary sanctions

and ultimately expulsion from his graduate school program.

568.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's

favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other

attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 65
**Intentional/Negligent Infliction of Emotional Distress**
**(NMH, Individual Hospital Defendants)**

569.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

570.     The acts and omissions of NMH and its employees in falsely imprisoning Plaintiff on

11/1/19 were willful and intentional.

571.     NMH knew or should have known that the employees' systematically improper acts and

omissions set forth above would cause Plaintiff severe emotional distress.

572.     NMH conduct and that of the employees was extreme and outrageous, beyond the bounds

of decency, and utterly intolerable in a civilized community.

573.     NMH conduct and that of the employees was the direct and proximate cause of Plaintiff's

severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to

concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

574.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct,

Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to

physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

575. **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 66
### § 21-1. Criminal damage to property. 720 ILCS 5/21-1 (a)(1) and (J)
### (All Named Parties)

576. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

577. The actions of all parties named damaged all relevant property interests associated with a JD from Northwestern University Law School, including educational and career opportunities and professional network, which is economically valued in excess of $100,000.

578. The actions of all parties were taken with deliberate aim at specifically and intentionally harming Plaintiff's educational contract and opportunity.

579. The actions of all defendants were predicated upon prior and actual knowledge, either tacit or direct, of Plaintiff's educational contract and were specifically intended to harm that contract through coercive, malicious, and unlawful means, as has been described in the factual allegations of this complaint.

580. **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 90
## Negligent/Intentional Infliction of Emotional Distress
### (NU)

581.     Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

582.     The acts and omissions , the University and its investigators in the conspiratorial concealment of felony audio tapes made by Gargula. were willful and intentional.

583.     The University knew or should have known that Student Group #2's systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress. These actions included the conspiratorial concealment of felony audio tapes made by Gargula.

584.     The University knew or should have known that the investigators' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.

585.     , the University and its investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

586.     The University's conduct and that of the investigators was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

587.     the University's conduct and that of the investigators was the direct and proximate cause of severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

588.     As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages, and suspension and expulsion from law school, and arrested as a result of contact with Mona Dugo.

589.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### COUNT 92
### Assault 720 ILCS 5/12-1
### (Mona Dugo, NU)

590.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

591.     Wherein the actions of Dugo did initiate and cause the false arrest of Plaintiff.

592.     Wherein the conduct of the defendants in initiating and completing a false arrest without probable cause on false and misleading and retaliatory and conspiratorial pretenses did place Plaintiff in reasonable apprehension of receiving a battery by officers.

593.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b.   Award punitive damages;

   c.   Award attorney's fees and costs; and

   d.   Award such other relief as the Court deems just and proper.

### COUNT 103
### False Imprisonment
### (NU, Stark, Chin, Benson, Dugo, Wake)

594.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

595.     Where EPD Officers did not have probable cause to make the arrest on 11/19/20 and based their arrest on Plaintiff's assertion that his NU email address belonged to him.

596.     Where Plaintiff's arrest was based solely on false and defamatory evidence and the lies of Mona Dugo and NUPD Detective Sarah Stark. Where they both falsely claimed that Plaintiff threatened the physical safety of Dugo and others at NU.

597.     Where, based on the evidence available, there was no probable cause to believe that Plaintiff had knowingly committed any crime.

598.     Where EPD Officers forced Plaintiff, while under extreme duress and not on his prescribed medication and not given an opportunity to have a lawyer present, to make statements which formed the basis of the probable cause for his arrest on 11/19/20, in violation of self-incrimination clause of the Firth Amendment.

**599.**    Where officers willfully ignored the protection order PO 78277 which was in effect at that time, prohibiting Mona Dugo from talking about the Plaintiff, and which she did violate in order to falsely accuse Plaintiff of violating her protection order. Where EPD Officers unlawfully confiscated Plaintiff's Protection Order Papers PO 78277 in violation of the takings clause of the Fifth Amendment and deprived him of his right and ability to adequately defend himself against the unwarranted charges that EPD coerced and intimidated him into speaking about, which unjustly led to his arrest and confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie.

600.     Where PO 78277 put EPD Officers on notice that they were conducting an unreasonable seizure in violation of the Fourth Amendment, where the PO indicated that there was no probable cause to arrest Plaintiff based on the evidence which EPD possessed at that time. Through the PO being presented to officers at the time of Plaintiff's arrest, iIt was clearly established that there was right to be free from arrest without probable cause and that Fourth Amendment protected against arrests premised on lies

601.     By adopting, promulgating, and implementing the policy and practice under which Plaintiff was subjected to coercive and involuntary custodial interrogation designed to overcome his will and to coerce involuntary and incriminating statements from him, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly violated the rights of Plaintiff to due process of law under the Fifth Amendment to the United States Constitution.

602.     In detaining Plaintiff without charging him with any crime and without affording him a hearing before a neutral judicial officer to determine whether there was probable cause to justify his continued detention, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly seized Plaintiff in violation of the Fourth Amendment to the United States Constitution.

603.     Plaintiff has no effective means of enforcing his Fourth Amendment rights other than by seeking declaratory and other relief from the Court.

604.     As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

605.     *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 104
### 42 U.S.C. § 1983: Violation of Fourteenth, Fifth, and Sixth Amendment
### (NUPD Detective Sarah Stark, NU)

606.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

607.     The Fifth Amendment Provides: "No person shall be … be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."

608.     The Six Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to… have the assistance of counsel for his defense."

609.     Where on 11/19/20, Stark, under color of law using her position as a police officer for NUPD, in conspiracy with several officers of the Evanston Police Department, through coercion, manipulation, intimidation and false statements, actively prevented Plaintiff from securing an attorney prior to his questioning for alleged violations of PO 20532. In doing so these officers deprived Plaintiff of his right to counsel in violation of the Sixth Amendment.

610.     Where Stark and EPD Officers conducted a coercive interrogation which forced Plaintiff, while under extreme duress and not on his prescribed medication and not given an opportunity to have a lawyer present, to make statements which formed the basis of the probable cause for his arrest on 11/19/20, in violation of self-incrimination clause of the Firth Amendment. See Cook County charge 20—DV-208060.

611.     Where officers intentionally confiscated Plaintiff's protection order PO 78277 which was in effect at that time, prohibiting Mona Dugo from talking about the Plaintiff, and which she did violate in order to falsely accuse Plaintiff of violating her protection order. Where EPD Officers unlawfully confiscated Plaintiff's Protection Order Papers PO 78277 in violation of the takings clause of the Fifth Amendment and deprived him of his right and ability to adequately defend himself against the unwarranted charges that EPD coerced and intimidated him into speaking about, which unjustly led to his arrest and confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie. In confiscating Plaintiff's legal documents, Defendants violated Plaintiff's right to due process under the 14th Amendment.

612.     By adopting, promulgating, and implementing the policy and practice under which Plaintiff was subjected to coercive and involuntary custodial interrogation designed to overcome his will and to coerce involuntary and incriminating statements from him without the presence of an attorney, Defendants, acting under color of law and their authority as police officers, have intentionally or recklessly violated the rights of Plaintiff to due process of law under the Fifth and Fourteenth Amendment to the United States Constitution.

613.     Plaintiff has no effective means of enforcing his Fifth Amendment rights other than by seeking declaratory and other relief from the Court.

614.     As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, humiliation, embarrassment, and monetary damages.

615.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 105
### 42 U.S.C. § 1983 – Violation of 1st, 4th, and 14th Amendment
### (Mona Dugo, NUPD Stark, Chin, Benson, Sarah Wake, NU)

616. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

617. After being put on notice of Plaintiff's plans to pursue litigation against the school and its employees for violations of the state eavesdropping statute, unlawful contact with his therapist, sister, and DOE investigator, and obstruction of his CPD police report, as well as the pendency of his discrimination complaint with the Department of Education, the defendants conspired to deprive Plaintiff of his Fourteenth Amendment Rights to Due Process, right to Equal Protection under the law, as well as First Amendment right to freedom of speech and the right to be free from unreasonable seizure.

618. Defendants conspired to manufacture evidence in the form of a fabricated series of NUPD police reports starting on 10/19/20 in order to the influence state action of securing the issuance a protection order for Dugo on false and misleading pretenses, and then falsely report a violation of said order in order to further influence the state action of the arrest of Plaintiff by the Evanston Police Department and his prosecution by the State Attorney's office, and that conspiracy was born out of both religious animus and disability-based animus. Defendants acted with the purpose of (and were successful at) getting Plaintiff arrested and jailed because of religious and disability animus.

619. Where Dugo and Stark, who acted under color of law in her capacity as an NUPD police officer and under orders and supervision from Chin and Benson, acted together to plot the false imprisonment of Plaintiff by coordinating and crafting a false narrative, which they documented over the course of several meetings in two NUPD police reports, which falsely alleged that Plaintiff made threats to the safety of Dugo and others at NU in order to make Plaintiff seem like a safety threat.

620. They started crafting this narrative on 10/19/20, the same day the Plaintiff informed them that he was aware of the obstruction of his police report, and well after Dugo had illegally suspended Plaintiff over felony audio recordings of his, then hidden the existence of the tapes, then contacted Plaintiff's sister and therapist in order to defame him using the tapes, in order to create a way to damage Plaintiff's reputation and discredit his position in potential litigation and protect Dugo and NU from liability by having a fabricated and deliberately constructed documented narrative in the form of NUPD police reports. This was further done in order to discredit Plaintiffs' Department of Education complaint.

621.     Stark then acted under color of law and used her status as a police officer in order to influence the judge and assist Dugo to secure a PO 20532 on false and misleading and defamatory pretenses on 11/4/20 as specifically described in allegation 295. These allegations were predicated on lies by Dugo, wherein she deliberately mischaracterized and misrepresented plaintiff's protected speech in the form of complaints of harassment and discrimination as "harassment," and displayed religious animus by willfully misinterpreting sections of religious text from the Qur'an as "threats" against her safety. This is despite the fact that Plaintiff, never at any time during any of his communications with Dugo or anyone else from NU, made any comments or suggestions which even remotely threatened the physical safety of anyone. Furthermore, evidence of animus towards Plaintiff's disability was displayed when Chin obstructed Plaintiff's CPD report by lying about Plaintiffs consent to the Gargula recordings solely on the basis that Plaintiff had been involuntarily committed.

622.     On 11/17/20, Plaintiff secured PO 78277 against Dugo and notified NU by sending a picture of the order via email. Later that day, Dugo, Stark, Benson, Chin and Wake collectively decided to have Dugo falsely report that Plaintiff violated the PO resulting from an email that Plaintiff originally sent to NU on 11/4/20 asking why Dugo had contacted his sister and who authorized the contact. In doing so they violated Plaintiff's First Amendment rights to free speech.

623.     In the furtherance of which Stark, under color of law, used her status as a police officer to meet with Evanston police on 11/18/20 and convince them to arrest the Plaintiff despite the absence of probable cause.

624.     As a result of the conspiratorial actions, Plaintiff was falsely arrested without probable cause at his home in violation of his Fourth Amendment Rights. Plaintiff's court order, PO 78277, which he showed to the officers and which they subsequently confiscated, would have put a reasonable officer on notice that the arrest was unreasonable.

625.     At Evanston police station, Plaintiff was subjected to coercive and involuntary custodial interrogation by Stark and EPD Officers designed to overcome his will and to coerce involuntary and incriminating statements from him without the presence of an attorney, and falsely imprisoned by EPD on 11/19/20 and subject to confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie, all in violation of his fourth Amendment rights against false

imprisonment. Where they had asked Plaintiff if his NU email address belonged to him, and used that as the basis for his arrest and prosecution.

626. Wake drafted the charges against Plaintiff and provided them to the State Attorney in order to maliciously prosecute Plaintiff.

627. On information and belief, all defendants were aware of the existence of PO 78277, a stalking order of protection which Plaintiff had active against Dugo at that time, and took some or all of their actions in order to retaliate against Plaintiff and discredit his case.

628. Plaintiff was damaged in his person and property by incurring attorneys fees, permanent irreparable damage to his career prospects and reputation creating a criminal history which effectively barred him from being able to pursue a legal education or any other kind of graduate education, as well as severe mental, physical and emotional distress.

629. *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 105
### 42 U.S.C. § 1985 Civil Conspiracy/ State Law Civil Conspiracy
### (Mona Dugo, NUPD Stark, Chin, Benson, Sarah Wake, NU)

630. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

631. After being put on notice of Plaintiff's plans to pursue litigation against the school and its employees for violations of the state eavesdropping statute, unlawful contact with his therapist, sister, and DOE investigator, and obstruction of his CPD police report, as well as the pendency of his discrimination complaint with the Department of Education, the defendants conspired to deprive Plaintiff of his Fourteenth Amendment Rights to Due Process, right to Equal Protection under the law, as well as First Amendment right to freedom of speech and the right to be free from unreasonable seizure.

632.     Defendants conspired to manufacture evidence in the form of a fabricated series of NUPD police reports starting on 10/19/20 in order to the influence state action of securing the issuance a protection order for Dugo on false and misleading pretenses, and then falsely report a violation of said order in order to further influence the state action of the arrest of Plaintiff by the Evanston Police Department and his prosecution by the State Attorney's office, and that conspiracy was born out of both religious animus and disability-based animus. Defendants acted with the purpose of (and were successful at) getting Plaintiff arrested and jailed because of religious and disability animus.

633.     Where Dugo and Stark, who acted under color of law in her capacity as an NUPD police officer and under orders and supervision from Chin and Benson, acted together to plot the false imprisonment of Plaintiff by coordinating and crafting a false narrative, which they documented over the course of several meetings in two NUPD police reports, which falsely alleged that Plaintiff made threats to the safety of Dugo and others at NU in order to make Plaintiff seem like a safety threat.

634.     They started crafting this narrative on 10/19/20, the same day the Plaintiff informed them that he was aware of the obstruction of his police report, and well after Dugo had illegally suspended Plaintiff over felony audio recordings of his, then hidden the existence of the tapes, then contacted Plaintiff's sister and therapist in order to defame him using the tapes, in order to create a way to damage Plaintiff's reputation and discredit his position in potential litigation and protect Dugo and NU from liability by having a fabricated and deliberately constructed documented narrative in the form of NUPD police reports. This was further done in order to discredit Plaintiffs' Department of Education complaint.

635.     Stark then acted under color of law and used her status as a police officer in order to influence the judge and assist Dugo to secure a PO 20532 on false and misleading and defamatory pretenses on 11/4/20 as specifically described in allegation 295. These allegations were predicated on lies by Dugo, wherein she deliberately mischaracterized and misrepresented plaintiff's protected speech in the form of complaints of harassment and discrimination as "harassment, " and displayed religious animus by willfully misinterpreting sections of religious text from the Qur'an as "threats" against her safety. This is despite the fact that Plaintiff, never at any time during any of his communications with Dugo or anyone else from NU, made any comments or suggestions which even remotely threatened the physical safety of anyone. Furthermore, evidence of animus towards Plaintiff's disability was displayed when Chin

obstructed Plaintiff's CPD report by lying about Plaintiffs consent to the Gargula recordings solely on the basis that Plaintiff had been involuntarily committed.

636.     On 11/17/20, Plaintiff secured PO 78277 against Dugo and notified NU by sending a picture of the order via email. Later that day, Dugo, Stark, Benson, Chin and Wake collectively decided to have Dugo falsely report that Plaintiff violated the PO resulting from an email that Plaintiff originally sent to NU on 11/4/20 asking why Dugo had contacted his sister and who authorized the contact. In doing so they violated Plaintiff's First Amendment rights to free speech.

637.     In the furtherance of which Stark, under color of law, used her status as a police officer to meet with Evanston police on 11/18/20 and convince them to arrest the Plaintiff despite the absence of probable cause.

638.     As a result of the conspiratorial actions, Plaintiff was falsely arrested without probable cause at his home in violation of his Fourth Amendment Rights. Plaintiff's court order, PO 78277, which he showed to the officers and which they subsequently confiscated, would have put a reasonable officer on notice that the arrest was unreasonable.

639.     At Evanston police station, Plaintiff was subjected to coercive and involuntary custodial interrogation by Stark and EPD Officers designed to overcome his will and to coerce involuntary and incriminating statements from him without the presence of an attorney, and falsely imprisoned by EPD on 11/19/20 and subject to confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie, all in violation of his fourth Amendment rights against false imprisonment.  Where they had asked Plaintiff if his NU email address belonged to him, and used that as the basis for his arrest and prosecution.

640.     Wake drafted the charges against Plaintiff and provided them to the State Attorney in order to maliciously prosecute Plaintiff.

641.     On information and belief, all defendants were aware of the existence of PO 78277, a stalking order of protection which Plaintiff had active against Dugo at that time, and took some or all of their actions in order to retaliate against Plaintiff and discredit his case.

642.     Plaintiff was damaged in his person and property by incurring attorneys fees, permanent irreparable damage to his career prospects and reputation creating a criminal history which effectively

barred him from being able to pursue a legal education or any other kind of graduate education, as well as severe mental, physical and emotional distress.

643.    That at all times herein mentioned, the defendant, individually and acting through its police officers, acted knowingly, intentionally, willfully and maliciously

644.    *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 106
### 42 USC § 1986. Action for neglect to prevent
### (NU, JULIE PAYNE-KIRCHMEIER, KAREN TAMBURO, LUCAS CHRISTAIN)

645.    Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action. 42 U.S.C.A. § 1986 (West)

646.    Where NU was made aware of the existence of the conspiratorial effort to create a false narrative against Plaintiff which resulted in his false imprisonment by supervising the actions of Dugo and NUPD officers Stark, Benson, and Chin and at that point, had the power to prevent or aid in the prevention of the commission of the conspiracy through proper oversight and supervision of the activities of its employees and their actions and willfully and recklessly failed to do so, resulting in injury to the Plaintiff.

647.    Where NU was made aware of Plaintiff's grievances against Dugo through multiple internal complaints submitted by Plaintiff prior to this incident of false imprisonment and conspiracy occurring and at that point, had the power to prevent or aid in the prevention of the commission of the

conspiracy through proper oversight and supervision of the activities of its employees and their actions and willfully and recklessly failed to do so, resulting in injury to the Plaintiff.

648.     Plaintiff was damaged in his person and property by incurring attorneys fees, permanent irreparable damage to his career prospects and reputation creating a criminal history which effectively barred him from being able to pursue a legal education or any other kind of graduate education, as well as severe mental, physical and emotional distress.

649.     That at all times herein mentioned, the defendant, individually and acting through its police officers, acted knowingly, intentionally, willfully and maliciously

650.     *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 108
### Educational intimidation. 720 ILCS 5/12-7.2
### (Mona Dugo, NUPD Detective Sarah Stark))

651.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

652.     Where the actions of all defendants did threaten and did inflict physical harm on Plaintiff in his person in the form of false imprisonment on 11/19/20 and on his property in the form of suspension on 8/23/20 and expulsion on 1/21/21.

653.     Where the actions of defendants did expose Plaintiff to public hatred contempt and ridicule as evidenced by NU's efforts to stay Plaintiff's motion for preliminary injunction and temporary restraining order by Scott Warner, where warner attempts to pain Plaintiff as a stalker in order to maliciously keep him out of school in a deceptive and misleading dishonest and unethical and knowingly and willfully oppressive manner.

654. Where the actions of defendants did intentionally interfere with Plaintiffs right to attend school while afflicted with a disability over which there is obvious and evident prejudice displayed by defendants.

655. *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 109
### Negligent/Intentional Infliction of Emotional Distress
### (Mona Dugo, Wake, Chin, Benson, Detective Sarah Stark)

656. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

657. Where the conspiratorial actions of the defendants caused the false arrest and malicoius prosecution of Plaintiff and destroyed his furture by creating an arrest record and explsuion record that effectively bars Plaintiff from being able to attend any law school or graduate school.

658. The acts and omissions of the Defendants and its employees were willful and intentional.

659. Defendants knew or should have known that the employees' systematically improper acts and omissions set forth above would cause Plaintiff severe emotional distress.

660. Defendants' conduct and that of the employees was extreme and outrageous, beyond the bounds of decency, and utterly intolerable in a civilized community.

661. Defendants' conduct and that of the employees was the direct and proximate cause of Plaintiff's severe emotional distress, which includes symptoms of depression, extreme anxiety, loss of the ability to concentrate, intense feelings of hopelessness and sadness, and the inability to sleep through the night.

662. As a direct, proximate, and foreseeable consequence of the aforementioned conduct, Plaintiff sustained significant damages, including but not limited to, severe emotional distress, damages to physical well-being, emotional and psychological damages, damages to reputation, and other direct and consequential damages.

663.    *WHEREFORE*, Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 125
### BREACH OF CONTRACT - DENIAL OF ADMISSION AND GRADUATION
### (NU)

664.    Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

665.    Plaintiff and NU entered into an express contractual relationship whereby Plaintiff would pay tuition and attend classes in exchange for an agreement for NU to provide a diploma upon Plaintiff's successful completion of the prerequisites for graduation.

666.    The terms of that contract are set forth, *inter alia,* in NU's "Early Decision Certification" letter submission dated November 13, 2017. In that letter, the University states an acknowledgment that the terms of the letter constitute a contract binding on both parties.

667.    The terms of that contract are set forth, *inter alia,* in NU's "Early Decision" admissions letter dated December 13, 2017. In that letter, the University states an acknowledgment that the terms of the letter constitute a contract binding on both parties.

668.    Further, NU's Student Handbook clearly states that "the relationship between the University and each student is contractual ..."

669.    Plaintiff confirmed his intent to enroll by submitting the Early Decision Candidate Response Form for the Entering Class 2018.

670.    Plaintiff successfully completed all of the stated prerequisites for his first semester of law school prior to the post admission off-cycle investigation, withdrawing all of his applications from other schools and submitting his $750 non-refundable tuition deposit in the 2018 entering class, prior to notification to his of any Code charges and prior to being suspended from NU on November 6th, 2019.

671.     The contract does not include the possibility of an unannounced post-admissions application review based on family background or make any reference to the University's right to withhold education or delay a student from enrollment based on such a review once he has been admitted through the early-decision program.

672.     NU's forced deferral of Plaintiff's 2018 admission is a breach of the parties' contractual agreement that has harmed Plaintiff and will continue to harm Plaintiff now and throughout his life.

673.     NU's failure to allow Plaintiff to attend class or graduate is a breach of the parties' contractual agreement that has harmed Plaintiff and will continue to harm Plaintiff now and throughout his life.

674.     He is not getting the education for which he paid. Furthermore, this harsh, unfounded and unfair suspension and expulsion will be forever on his transcript. He will have a "resume gap" of three years for the rest of his life which he will be forced to explain. Plaintiff will be unable to obtain employment as a law school graduate or any other job requiring a law degree. Further, Plaintiff's job opportunities will be severely and immediately limited and his career and work life irreparably injured should Plaintiff not be awarded the degree that he has rightfully earned an opportunity to pursue from NU. He has no adequate remedy at law because his losses will be lifelong.

675.     Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

### Count 126
### BREACH OF CONTRACT - DENIAL OF PROPER PROCEDURES 2019
### (NU)

676.     Plaintiff and NU entered into an express contractual agreement reflected in the Student Handbook. The Handbook sets forth the infractions that will result in disciplinary action for non-academic conduct and the procedures to be followed by NU in the administration of penalties for infractions of the Code.

677. Both explicitly, and implicitly, the Code states that each student will be judged and evaluated based on his or her own actions, and not for the actions of others.

678. Further, the Code does not provide notice that a student's disability status or status as male or Muslim will be a factor warranting greater punishment for infractions of the Code, or will result in said student being held to a higher standard for discipline under the Code.

679. The Code also states that a student accused of a Code violation shall be afforded certain rights and procedures, including but not limited to a hearing, an opportunity to hear the evidence against the student, and the opportunity to present and to question witnesses.

680. With regards to Plaintiff's 2019 suspension and ensuing disciplinary process, NU breached its contract with Plaintiff by not following its own rules and procedures set forth in the Code. Said breaches include, but are not limited to: (1) NU's arbitrary and capricious discipline of Plaintiff because he has a disability, is Male, or is Muslim, while other students in the same group chat, who engaged in the same or worse conduct, were not disciplined at all; (2) NU not allowing Plaintiff a hearing on the charges he alleged against the other students, nor the opportunity initially to hear the evidence against him; and (3) NU not allowing Plaintiff the opportunity to question witnesses offering testimony against him, if any.

681. Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

### Count 127
### BREACH OF CONTRACT - DENIAL OF PROPER PROCEDURES 2020
### (NU)

682. Plaintiff and NU entered into an express contractual agreement reflected in the Student Handbook. The Handbook sets forth the infractions that will result in disciplinary action for non-academic conduct and the procedures to be followed by NU in the administration of penalties for infractions of the Code.

683. Both explicitly, and implicitly, the Code states that each student will be judged and evaluated based on his or her own actions, and not for the actions of others.

684. Further, the Code does not provide notice that a student's disability status or status as male or Muslim will be a factor warranting greater punishment for infractions of the Code, or will result in said student being held to a higher standard for discipline under the Code.

685. The Code also states that a student accused of a Code violation shall be afforded certain rights and procedures, including but not limited to a hearing, an opportunity to hear the evidence against the student, and the opportunity to present and to question witnesses.

686. With regards to Plaintiff's 2020 suspension and ensuing disciplinary process NU breached its contract with Plaintiff by not following its own rules and procedures set forth in the Code. Said breaches include, but are not limited to: (1) NU's arbitrary and capricious discipline of Plaintiff because he has a disability, is Male, or is Muslim, while other students in the same group chat, who engaged in the same or worse conduct, were not disciplined at all; (2) NU not allowing Plaintiff a hearing on the charges he alleged against the other students, nor the opportunity initially to hear the evidence against him in the form of the illegal audio tapes; and (3) NU not allowing Plaintiff the opportunity to question witnesses offering testimony against him, if any.

687. Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

## **Count 128**
## **QUASI-CONTRACT / IMPLIED CONTRACT**
## **(NU)**

688. Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

689. In the alternative to an express contractual agreement between the parties providing the terms for Plaintiff's education, Plaintiff is entitled to recover specific performance on a quasi-contract, or

implied contract. NU has accepted payment from Plaintiff for all of the costs and expenses associated with obtaining a degree, but has refused to give an opportunity to earn said degree to Plaintiff.

690.     There was an implied agreement between Plaintiff and NU that if Plaintiff paid the required tuition costs and expenses, successfully completed the required course work, and maintained an acceptable GPA, Plaintiff would be allowed to graduate with a degree from NU.

691.     Prior to the alleged controversy in 2019, Plaintiff successfully completed nearly the entire semester of Fall 2019, attending classes, contributing to class discussions and engaging in group work, and had even submitted his midterm assignment and received a satisfactory grade, but is now being was wrongfully denied the opportunity to earn a degree from NU.

692.     Plaintiff seeks relief in the form of specific performance and injunctive relief necessary to avoid irreparable harm to Plaintiff. Further, Plaintiff seeks monetary damages incurred as a result of NU's breach of its contractual obligation to provide graduate legal education to Plaintiff.

<u>**Count 129**</u>
**QUANTUM MERUIT**
**(NU)**

693.     Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

694.     In the alternative, if there is no express or implied contract between the parties regarding the terms under which Plaintiff would be allowed to graduate from NU, Plaintiff is nonetheless entitled to relief because Plaintiff has devoted four years of his life to pursing his studies at NU and fully paid for one year of tuition with the expectation that Plaintiff would be allowed to attend classes and earn his degree.

695.     NU has enjoyed the valuable benefit of Plaintiff's payment of tuition and other costs and expenses associated with his education at NU. NU accepted those payments, knowing that, upon completion of the prerequisites for graduation, Plaintiff expected to be awarded a JD degree from NU. NU's retention of those payments, without awarding Plaintiff a degree or credit for any coursework or the opportunity to earn a degree, constitutes unjust enrichment.

696.     Plaintiff seeks specific performance on his contract with NU and injunctive relief necessary to avoid irreparable harm to Plaintiff, all damages caused by NU's breach of its contractual

obligations to Plaintiff, and any and all injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks attorneys' fees and any other relief to which he may be entitled for NU's breach of its contractual agreement.

## Count 130
## NEGLIGENT MISREPRESENTATION
## (NU)

697.     Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

698.     NU officials and agents made false promises and representations to Plaintiff regarding the JD program from NU. Those false statements included, but were not limited to, promises that if Plaintiff completed the required course work, paid his tuition, and maintained an acceptable GPA, that he would be awarded a diploma.

699.     Plaintiff relied on NU's misrepresentations and devoted four years of his life to pursuing a degree from NU, from the first time he applied to NU until the day he was unjustly expelled. Plaintiff has been pursuing a degree in law since he was 25, which was when he first started preparing for the LSAT, and is now 31 years old, evidencing six total years pursuing entrance into the legal field.

700.     Defendant knew or should have known that Plaintiff would rely upon its representations and failed to exercise reasonable care or competence in its communications with Plaintiff.

701.     Plaintiff has been damaged as a result of NU's misrepresentations, and NU's refusal to award her the degree that she has earned.

702.     Plaintiff therefore seeks damages, as well as injunctive relief, ordering Defendant to allow Plaintiff to attend law school at NU or a similarly situated law school with equal or more financial aid.

## Count 131
## Violation of Title IX of the Education Amendments of 1972
## 20 USC § 1681(a), et seq.
## Sex-Based Discrimination – Disparate Treatment
## (NU)

703.     Plaintiff incorporates by all of the preceding paragraphs herein as if they were set forth fully.

704.     NU acted to suspend Plaintiff as a result of the media pressure and student organizing efforts indicated in paragraphs 190-191 as a direct result of the request by Cange.

705.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

706.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

707.     Upon information and belief, the University receives federal funding in from the Department of Education.

708.     Plaintiff's gender is protected by Title IX and during the events herein, Plaintiff was a matriculated student and in attendance at NU.

709.     Defendant discriminated against Plaintiff by permitting a pattern or practice of gender discrimination and bias against Plaintiff in violation of Title IX as set forth herein.

710.     During the course of his time at the university, NU Office of Equity exhibited a pattern of bias in favor of resolving both the informal and formal concerns of females, many of which were low severity, over any the formally reported concerns of Plaintiff, may of which were extremely severe in nature.

711.     Defendants pattern or practice of gender discrimination and bias was first illustrated when, on August 6th, 2020, Office of Equity representatives held a formal disciplinary meeting with Plaintiff wherein they discussed the "concerns" of female students resulting from a NU social event on the night of Plaintiff's 30th birthday on 8/28/19, when Plaintiff was heavily intoxicated. NU pursued and addressed these female "concerns" on the female students behalf in a formal disciplinary meeting with Plaintiff even though there had been no formal complaints made. The nature of these concerns was that Plaintiff had been giving "too many hugs" and an unidentified female claimed that he "grazed her butt" during the outing.

712.     Such pattern or practice constitutes a continuing violation and NU is liable to Plaintiff from August 23rd, 2020 when Gargula cyberstalked and assaulted and illegally recorded her threats and harassment via phone call to Plaintiff until when Plaintiff was expelled on 1/21/21, the Relevant Period.

713.     Plaintiff and Gargula, a female student, were similarly situated in that both alleged that the other sexually harassed the other in violation of NU's Title IX Policy.

714.     However, whereas NU did not initiate an action on Plaintiff's behalf against Gargula, a female student, NU did initiate an action against Plaintiff, the male student, on Gargula's behalf.

715.     By bringing an action against Plaintiff on Gargula's behalf, Plaintiff was adversely affected and immediately separated from campus almost immediately after he had worked tremendously hard to complete a number of pre-requisites to regain his student eligibility.

716.     However, Plaintiff's complaint that Gargula, a female student, violated NU's Policies regarding sexual misconduct, breach of confidentiality restrictions and a no contact order against him were treated with deliberate indifference by NU's representatives.

717.     In contrast, NU investigated and heard Gargula's Title IX allegations against Plaintiff and pursued her complaints regarding his violations of the student code of conduct.

718.     NU's indifference adversely affected Plaintiff as he was vulnerable: to a) unmitigated peer harassment, b) a subsequent investigation, c) a protective order restricting his contact with the NU community, d) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) disciplinary action based on alleged violations of a no contact order with a different student.

719.     Plaintiff was also found responsible for class-based harassment, a violation only he, but not Gargula, (who committed blatant disability-based harassment and stalking sexual misconduct violation) had to face because NU pursued Gargula's allegations against Plaintiff, but not Plaintiff's allegations against Gargula. Plaintiff suffered academic suspension, expulsion, and severe emotional distress.

720.     NU was also deliberately indifferent to Plaintiff's claims that Gargula a) committed disability harassment and stalking sexual misconduct violations, b) breached her duty to uphold the

confidentiality of the proceeding by spreading misandrist rumors about Plaintiff and among other things called him a danger to the NU community, even going so far as to claim during the final sanctions hearing that "people like" Plaintiff "murder people like her everyday;" c) violated the Code's prohibition to not misrepresent information and lie during the Title IX 1 action; d) breached the no-contact order even though Gargula was seemingly going out of her way to maliciously antagonizes and bait Plaintiff's response—all with impunity.

721.    Further, as NU was aware, Gargula sought and found an alleged new "victim" of Plaintiff's, Wren Chernoff, another transgender student.

722.    By being indifferent to Gargula's violation of confidentiality restrictions, NU seized the opportunity to bring a second witness against Plaintiff based on the allegations of Gargula, a witness who Gargula mined from her circle of friends specifically to allege offense to Plaintiff's comments. In contrast, the witnesses that Plaintiff attempted to have interviewed were deliberately attempted to be excluded by NU representatives Cohen and Faith-Okar. It was only upon some 20 different requests from Plaintiff that his witnesses were interviewed, and even then they were not asked the questions which Plaintiff had requested they be asked, such as their opinion on whether Plaintiff was stalked or subjected to disability harassment.

723.    Based on the foregoing paragraphs, the University has deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of the University's guidelines and policies.

724.    Based on the foregoing paragraphs, the University conducted the "investigation" and subsequent Hearing in a manner that was biased against the male student being accused. The female complainant was permitted to introduce felony evidence, where the plaintiff was not afforded even the most basic right to equal protections under the law. The University's Title IX coordinator also failed to disclose the felony material, which is exculpatory evidence, in the initial course of the hearing.

725.    Based on the foregoing, the University imposed sanctions on Defendant that were vastly disproportionate to the severity of the charges levied against him, the weakness of the

evidence, the strong exculpatory evidence, and without any consideration of his unblemished criminal record prior to this incidents occurrence, and without providing any basis for its decision to commit felonies in admitting the felonious evidence as part of its decision to suspend and expel Plaintiff. In using the information contained on the audio recordings in order to ascertain Plaintiff's guilt regarding the accusations of gender discrimination leveled against him by Gargula. NU and its employees exhibited clear bias towards females by committing violations of Eavesdropping: 720 ILCS 5/14-2 (a) (5), which states: "A person commits eavesdropping when he or she knowingly and intentionally: (5) Uses or discloses any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties." NU representatives Dugo and Chin initially failed to disclose the existence of the illegal audio recordings in order to allow NU to enforce the rights of a female student without subjecting her to legal repercussions. Chin refused to prosecute the illegal audio recordings in order to enforce the rights of a female student without subjecting her to legal repercussions. Chin even went so far as to illegally interfere with Plaintiff's lawful CPD police report regarding the illegal audio in order to have it cancelled to allow NU to enforce the rights of a female student without subjecting her to legal repercussions.

726.    On information and belief, the University's guidelines and regulations are set up to disproportionately affect the male student population of the University community as a result of the higher incidence of women's complainants of sexual misconduct versus men's complainants of sexual misconduct.

727.    On information and belief, male respondents in sexual misconduct cases at the University are discriminated against solely on the basis of sex. They are fair more likely to be found guilty, regardless of the evidence, or lack thereof. This is strongly supported by the rampant, blatant, unchecked intentional commission of felonies by NU staff in order to pursue the charges in Plaintiff's case.

728.    As a result of the foregoing commission of eavesdropping, Plaintiff is entitled to injunctive relief as expressly provided by statute, and damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

729.    NU's suspension and subsequent expulsion of Plaintiff and its refusal to allow Plaintiff to attend law school is intentionally discriminatory against Plaintiff on the basis of his sex. The entire NU staff which Plaintiff dealt with during his disciplinary process were female, including DeSilva who was assigned to "address" Plaintiff's concerns, as well as Colleen Johnston and Karen Tamburro. Both his hearing investigators, Heather Cohen and Ish Faith-Orkar, were female, and two of three ultimate decision-makers regarding Plaintiff's punishment were female. Neither Gargula, nor any of some seven different students who engaged in targeted harassment of Plaintiff in the group chat incident were disciplined, despite many having engaged in far more egregious conduct. Moreover, Plaintiff was given extreme punishment as compared with Gargula for less offensive conduct as found by NU's own investigation. Plaintiff was undeniably held to a higher standard than the female students.

730.    Plaintiff had no opportunity or involvement in the social activities that took place prior to the group chat incident, such as the social outing many of the other students referred to in their oppressive harassment of Plaintiff during the group chat incident. Further, Plaintiff did not engage in the orientation activities as planned by NU because he was left off of the schedule by NU, and, in fact, repeatedly tried to explain this to the women class members that were harassing him or otherwise engaged in disorderly conduct by creating a hostile environment for Plaintiff which made him uncomfortable.

731.    NU's punishment of Plaintiff violated Title IX because Plaintiff was given the more severe punishment than females who engaged in repeated conduct that was far more egregious. NU's punishment of Plaintiff was based solely on his sex (male), and not based upon his culpability under the Code. Further, numerous female students who participated in the group chat harassment, who were far more aggressive and oppressive, and who engaged in far more egregious conduct than Plaintiff, were afforded no punishment at all from NU.

732.    NU discriminated against Plaintiff's gender and detrimentally and adversely affected Plaintiff's education because he is male.

733.    Furthermore, the decision to discipline Plaintiff was undeniably based on gender due to the fact that NU chose to initiate proceedings only because Evangeline Gargula identifies as a transexual and NU received pressure from the "OutLaw" LGBTQ student group immediately prior to his suspension. This confirms that gender was the sole basis for the decision to initiate disciplinary proceedings against Plaintiff, a clear and unmitigated violation of Title IX.

734.    Furthermore, in an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students." In making this assertion, there was clear selective enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

735.    Defendant's pattern or practice of gender discrimination was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

736.    As a direct and proximate result of Defendant's aforementioned conduct, Plaintiff has suffered extreme emotional and physical distress, mental anguish, humiliation and embarrassment.

737.    By reason of the continuous nature Defendant's discriminatory conduct, persistent from when he was sexually assaulted in August 2020 through the Spring of 2021, Plaintiff is entitled to the application of the continuing violation doctrine to all of the violations alleged herein.

738.    Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme

emotional distress, and loss of capacity for the enjoyment of life. Plaintiff has been harmed by NU's unlawful conduct and seeks actual damages as well as injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks all applicable attorneys' fees and costs available under this cause of action.

739. By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

740. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

**<u>Count 132</u>**
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Selective Enforcement**

741.    Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

742.    "To prevail on a 'selective enforcement' claim, the plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Doe v. Cummins, 662 F. App'x 437, 452 (6th Cir. 2016). To make this showing, a plaintiff must "identif[y]... a comparator of the opposite sex who was treated more favorably by the educational institution when facing similar disciplinary charges." Id Doe v. Case W. Reserve Univ., 1:17 CV 414, 2019 WL 1982266, at *13 (N.D. Ohio May 2, 2019), aff'd, 809 Fed. Appx. 276 (6th Cir. 2020)

743.    Evangeline Gargula was a similarly situated female without disabilities who was treated more favorably by Northwestern when facing similar charges in the complaint which Plaintiff filed against her for harassment. Both were incoming 1L students who were making comments on a school group chat which were allegedly against school policy, and only Plaintiff was suspended. Evangeline was not even spoken to, neither were any of the other nearly 7 harassing students which participated in the group attack on Plaintiff in the group chat.

744.    In order to make the determination below, NU excused Gargula's harassment on the basis of mental disability because she was in "mutual contact" whereas they sanctioned Plaintiff for a safety threat and harassment based on gender identity, resulting from the same core set of facts. The only difference is that Evangeline is a female and Plaintiff is male.

745.    "Regarding the group chat messages, the Office determined that there was insufficient information to support that Evangeline's comments would cause a reasonable person to experience fear for safety or substantial emotional distress. Factors considered in this determination included that Evangeline posted a screenshot of your publicly available Facebook information, a question of whether you were a 2L, and a frog meme.

746.    Regarding the telephone communication, you alleged that Evangeline called you in a threatening manner at a late hour. You provided a screenshot of your call history indicating that Evangeline called you for 3 minutes at 1:08am on August 23, 2020. The screenshot additionally shows that you returned Evangeline's call at 1:18am, lasting 8 minutes. Further, we reviewed direct messages

between you and Evangeline just before the calls, where you gave Evangeline your phone number at 12:56am on August 23rd, and sent messages to Evangeline including:

    a.   "I'm at [phone number], if there any issues we need to resolve"

    b.   "Lmk"

747.    We reviewed the text messages you provided from August 23rd, where you texted, "Don't ever call me again" to which Evangeline replied, "are you okay?" Given these messages, the Office determined that you were engaged in mutual contact with Evangeline during these exchanges. Further, the messages and calls on their face do not contain sufficient information to suggest that Evangeline's behavior could rise to the level of stalking. Taking these behaviors in sum, the Office does not have sufficient information to move forward with a formal investigation of your allegations of stalking.

748.    We noted that you raised concern in your complaint regarding potential defamation by Evangeline as evidence that she violated the University's stalking provision. You cited information from CARE's website in support of this claim. CARE is an advocacy office on campus that shares information helpful to identifying possible stalking behaviors, but the University's analysis on initial inquiry is limited to the stalking definition in the Policy on Institutional Equity as included above."

749.    Furthermore, in an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students." In making this assertion, there was clear selective enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

750.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

751. NU committed impermissible gender bias against the Plaintiff in the investigation and adjudication of Gargula's accusations.

752. NU received credible information that that Plaintiff was stalked on the basis of perceived mental disability by Gargula. NU did not encourage Plaintiff to file a complaint, consider the information, or otherwise investigate.

753. NU received credible information that Plaintiff was the victim of felony eavesdropping during the pendency of the investigation. NU did not encourage Plaintiff to file a complaint, consider the information, or otherwise do investigate.

754. NU violated Title IX by selectively enforcing its sexual assault policies on the basis of gender: (a) Regardless of plaintiff's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by Plaintiff's gender. A female student, Gargula, was in circumstances sufficiently similar to Plaintiff's and was treated more favorably by NU; (b) The severity of Plaintiff's punishment was due to his gender because NU has maintained and perpetrated an archaic view of sexuality in which men are aggressors and women are "guardians of virtue."

755. NU committed Impermissible gender bias against Plaintiff in the investigation and adjudication of Gargula's accusations.

756. NU officials and administrators who had the authority to initiate corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on Plaintiff is the result of a flawed and biased hearing process. This resulted in a deprivation of access to educational opportunities at NU.

757. Defendant exhibited patterns and practices of decision-making that show that the penalties Plaintiff endured and the very decisions to initiate Title IX complaints against Plaintiff as well as the decision to not initiate a Title IX action against Gargula were motivated NU's pattern or practice of intentional animus against Plaintiff's gender.

758. Plaintiff and Gargula were similarly situated in that each reported to NU that the other violated NU's Title IX sexual misconduct Policy; however, NU encouraged and endorsed Gargula's claims against Plaintiff, and discouraged and did not endorse Plaintiff's claims against Gargula.

759.     Plaintiff and Gargula were similarly situated in that Plaintiff and Gargula reported accusations that violated NU's Title IX sexual misconduct Policy, but NU encouraged and endorsed Gargula's claims by initiating an action on her behalf and discouraged and did not support Plaintiff's claims whatsoever.

760.     As indicated by Gargula's Title IX action, NU is on alert and willing to bring a disciplinary action on behalf of a female student against a male student, but not willing to bring a disciplinary action on behalf of a male student against a female student even if the male student alleges allegations of Policy violations similar to the allegations asserted by the female student.

761.     As indicated by Gargula's Title IX action, NU is on the alert and willing to bring a disciplinary action against a male student even when the female accuser is unwilling to participate and/or doesn't know a violation occurred, but NU is unwilling to bring a disciplinary action against a female student even when the male accuser is willing to participate.

762.     NU's selective enforcement affected Plaintiff as he was vulnerable a) unmitigated peer harassment, b) a subsequent investigation, c) a protective order restricting his contact with the NU community, d) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) disciplinary action based on alleged violations of a no contact order with a different student.

763.     Plaintiff was also found responsible for class-based harassment, a violation only he, but not Gargula, (who committed blatant disability-based harassment and stalking sexual misconduct violation) had to face because NU pursued Gargula's allegations against Plaintiff, but not Plaintiff's allegations against Gargula. Plaintiff suffered academic suspension, expulsion, and severe emotional distress.

764.     NU was also deliberately indifferent to Plaintiff's claims that Gargula a) committed disability harassment and stalking sexual misconduct violations, b) breached her duty to uphold the confidentiality of the proceeding by spreading misandrist rumors about Plaintiff and among other things called him a danger to the NU community, even going so far as to claim during the final sanctions hearing that "people like" Plaintiff "murder people like her everyday;" c) violated the Code's prohibition to not

misrepresent information and lie during the Title IX 1 action; d) breached the no-contact order even though Gargula was seemingly going out of her way to maliciously antagonizes and bait Plaintiff's response—all with impunity.

765.     Further, as NU was aware, Gargula sought and found an alleged new "victim" of Plaintiff's, Wren Chernoff, another transgender student.

766.     By being indifferent to Gargula's violation of confidentiality restrictions, NU seized the opportunity to bring a second witness against Plaintiff based on the allegations of Gargula, a witness who Gargula mined from her circle of friends specifically to allege offense to Plaintiff's comments. In contrast, the witnesses that Plaintiff attempted to have interviewed were deliberately attempted to be excluded by NU representatives Cohen and Faith-Okar. It was only upon some 20 different requests from Plaintiff that his witnesses were interviewed, and even then they were not asked the questions which Plaintiff had requested they be asked, such as their opinion on whether Plaintiff was stalked or subjected to disability harassment.

767.     Defendant exhibited a pattern or practice of anti-male bias during Title IX 1 by the differential and selective treatment he and the female accuser received in that, among other things, the undisputed facts showed that Gargula was the aggressor and that she was acting willfully and with force.

768.     Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential selective treatment he and Gargula received in that, among other things, Gargula alleged conclusory, false and unsubstantiated claims to which Plaintiff was forced to respond.

769.     Defendant exhibited a pattern or practice of anti-male bias during the disciplinary action by the differential and selective treatment he and Gargula and Gargula received in that, among other things, Defendant could not attribute a negative motive to Gargula or Gargula but determined that by virtue of being accused, Plaintiff could not be presumed innocent, but instead was presumed threatening and dangerous on the basis of one or more protected class characteristic.

770.     NU exhibited intentional and substantial gender bias when it failed to prosecute Gargula for her actions against Plaintiff which included multiple disability hate crimes including cyberstalking, felony eavesdropping, and harassment via electronic communications.

771.	Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including emotional distress, and loss of capacity for the enjoyment of life.

772.	By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

773.	NU has discriminated against Plaintiff because of sex. This discrimination is intentional and is a substantial or motivating factor for NU's actions in this case.

774.	As a direct and proximate result of NU violations of Plaintiff's rights under Title IX, Plaintiff has suffered severe and substantial damages.

　　　　a.	Plaintiff was denied the opportunity to attend his own graduation

　　　　b.	Plaintiff has lost a valuable scholarship to graduate school.

　　　　c.	Plaintiff's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages in an amount to be determined a jury and the Court.

775.	NU is liable to Plaintiff for his damages.

776.	Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to attorney' fees incurred in bringing this action.

777.	Male former college student plausibly alleged female classmate was treated preferentially, and thus stated Title IX selective enforcement claim arising out of Title IX investigation into male student following female classmate's accusation of sexual assault; male student alleged information college collected during investigation could have equally supported disciplinary proceedings against female classmate for also violating sexual misconduct policy, and that college treated female classmate differently than male student. Education Amendments of 1972

§ 901, 20 U.S.C.A. § 1681(a). <u>Doe v. Rollins College</u>, 352 F. Supp. 3d 1205 (M.D. Fla. 2019).
Student attacking university disciplinary proceeding on grounds of gender bias may plead in
alternative that plaintiff was innocent and wrongfully found to have committed offense, and that
there was "selective enforcement" meaning that severity of penalty or decision to initiate
proceeding was affected by student's gender. Education Amendments of 1972, § 901(a), as
amended, 20 U.S.C.A. § 1681(a). <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 709 (2d Cir. 1994)

778.     Interim Dean of Students Mona Dugo, The Office of Equity, and its representatives
Amanda DeSilva and Colleen Johnston selectively enforced University harassment policy on the
basis of gender against Plaintiff in a situation where he was intentionally targeted and maliciously
"stalked" in violation of clearly stated and applicable "sexual misconduct" policy and definitions,
and this unprovoked and utterly malicious act of stalking directly caused the allegations which he
was ultimately expelled for. NU did this because their office and the University systematically
prioritizes the rights and privileges of white females over males and students of color.

779.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment
in favor of Plaintiff making the following findings and granting the following relief:

   a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of
        his rights under Title IX and discriminated against his in violation of Title IX of the
        Education Amendments of 1972;

   b.   Order NU to allow Plaintiff to participate fully in law school and other related NU
        programs without unnecessary and burdensome restrictions or conditions;

   c.   Order NU to provide any reasonable accommodations or modifications that may be
        necessary;

   d.   Issue an injunction against the University to prevent the University from engaging in
        further acts of discrimination against Plaintiff on the basis of sex;

   e.   Order the University to expunge all negative materials from Plaintiff's student record and
        to facilitate Plaintiff's transfer or admission to another law school or degree program of
        similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with

Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's

application to the bar, and with Plaintiff's future education and career prospects;

g.   Award attorney's fees and costs; and

h.   Award such other relief as the Court deems just and proper.

### Count 133
### Violation of Title IX of the Education Amendments of 1972
### 20 USC § 1681(a), et seq.
### Title IX peer harassment
### (NU)

780.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs

of this Complaint as though fully rewritten herein.

781.   To succeed on a Title IX peer harassment claim, a plaintiff must show that the

harassment is "on the basis of sex," meaning the harassment was motivated by either the plaintiff's gender

or failure to conform to gender norms.   Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

782.   The 2019 Hostile Environment consisted of peer harassment on the basis of sexual

harassment allegations, and therefor was on the basis of sex. The harassment was so severe and pervasive

that Plaintiff's educational opportunities, such as group work in Law Professor Emily Kadens class and

Plaintiff's CLR class, as well as social outings with BLSA were negatively impacted. As indicated, the

harassment included being subjected to various derogatory terms on the basis of some unknown allegation

of sexual harassment. Plaintiff was specifically informed by multiple students that the basis for the

harassment was an allegation relating to allegations related to sexual misconduct. As indicated, NU did

nothing to address the harassment perpetrated upon Plaintiff, yet took action to address the concerns of

the female students who allegedly did not make any formal complaints.

783.   In an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in

response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with

respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the

jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of

Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against

Northwestern students."   In making this assertion, there was clear selective enforcement of NU policies,

wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

784.    The 2020 Hostile Group Me Environment consisted of several instances of peer harassment on the basis of gender-identity, which is de-facto sex-based. This included stalking by Evangeline Gargula. This included harassment from Evangeline on the basis of Plaintiff's perceived gender bias, harassment from Tessa Wiel on the basis of Plaintiff's perceived gender bias, harassment from Ishani Choksi on the basis of Plaintiff's perceived gender bias. The harassment was so severe and pervasive that Plaintiff's educational opportunities, such getting suspended from school, isolated from community, kicked out of the group chat and discord, and having his reputation and future opportunities destroyed. Where Plaintiff was harassed on multiple occasions and subjected to hatred, contempt and ridicule for failing to conform to gender norms about the transexual individuals, wherein he was harassed on the basis of making allegedly "transphobic" remarks and wherein Plaintiff did not realize, understand, or agree with the allegation that his remarks were "transphobic." This peer harassment for failing to conform to gender norms was further evidenced when Plaintiff was harassed by another transexual student, with whom he had formerly good relations, and with whom he was brought into conflict as a result of his comments, which were mistakenly or deliberately misconstrued as being "transphobic" whereas in reality they evidenced a line of questioning which indicated that Plaintiff felt he was being cyberstalked by another student.

785.    Additionally, as indicated in the specifically realleged section, Evangeline Gargula conducted a course of action towards Plaintiff in and around 8/23/20 that undeniably constituted stalking, however, despite filing some 10-15 different complaints with increasingly detailed information about the stalking, NU and in particular, Amanda DeSilva, Colleen Johnston, and Karen Tamburro took a sick, sadistic pleasure in finding some obscure and ridiculous reason for not addressing Plaintiff's complaint. Indeed, at one point Plaintiff was told by Amanda DeSilva that Plaintiff was not stalked because the "stalking was not based on a protected class." The three are vicious and sadistic felons who took pleasure

in inflicting the extended pain and torture of the unwarranted suspension and expulsion upon Plaintiff, often times smiling and smirking venomously when interacting with Plaintiff and denying the substance of his concerns. As indicated in the complaint, Karen Tamburro has never addressed a single one of the over 100 different complaints which he sent to her as a result of his harassment and discrimination in 2019 and 2020. Indeed, the scale of his omissions and failures to address Plaintiff's concerns is one of the most disturbing and unsettling cases of malicious indifference in the recorded history of higher education.

786.    Tamburro, DeSilva, and Johnston employed the most irrational, illogical, and incoherent reasoning and rationale to avoid addressing the Plaintiff's concerns that their responses were often times completely unintelligible. They made up exceptions and exemptions to every rule so that they could avoid addressing Plaintiff's concerns, such as a "mutual contact" exemption in response to Plaintiff's complaint about the stalking and harassment committed by Gargula, wherein they excused Gargula's stalking and harassment towards Plaintiff because her and Plaintiff were somehow in "mutual contact" when the initial disability harassment post was made by Gargula, even thought she initiated the harassment. This exemption only applied to her harassment towards Plaintiff and not, as the name implies, mutually between the parties. In this way, they enforced and supported her vicious hate crimes of stalking and felony eavesdropping while punishing Plaintiff for responding to harassment.

787.    To prove a Title IX sexual-harassment claim based on conduct between students, a plaintiff must demonstrate that the school was deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.   Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

788.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.    Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b.    Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.  Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.  Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e.  Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.  Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.  Award attorney's fees and costs; and

h.  Award such other relief as the Court deems just and proper.

**<u>Count 134</u>**
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Title IX Retaliation**
**(NU)**

789.  Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

790.  To establish claim for retaliation under Title IX, plaintiffs must allege that (1) they engaged in statutorily protected activity; (2) school took a materially adverse action against them; and (3) there existed a but-for causal connection between the two.   Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681 et seq.

791.  On 9/4/20 -9/8/20 Plaintiff filed several discrimination complaints with NU about sexual misconduct and gender bias, among other things.

792.  On 9/9/20 NU emailed Plaintiff with a notification that he was additionally charged with "unauthorized report sharing." This stated reason of "unauthorized report sharing" was a pretext for sex-based discrimination and retaliation for reporting his concerns of stalking sexual misconduct.

793.  Had Plaintiff not submitted his internal grievance for stalking sexual misconduct, he would not have been additionally disciplined on 9/11/20.

794.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.   Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

   b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

   c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

   d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

   e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

   f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

   g.   Award attorney's fees and costs; and

   h.   Award such other relief as the Court deems just and proper.

**Count 135**
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Title IX Erroneous Outcome**
**(NU)**

795.     Plaintiffs repeat and incorporate all of the allegations of this Complaint, as if fully set forth herein.

796.     Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C.A. § 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX in provides in pertinent part. "No person... shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

797.    NU is an education program or activity operated by recipients of Federal financial assistance.

798.    Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

799.    The decisions of the hearing process and the appeal process for Plaintiff were erroneous outcomes which were the direct result of a flawed and biased proceeding. In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. NU has reversed this process and assumed that Plaintiff was guilty because he was a male accused of sexual assault rather than evaluating the case on its own merits.

800.    NU committed impermissible gender bias against Plaintiff in the investigation and adjudication of Gargula's accusations.

   a.   There has been substantial criticism of NU, both in the student body and in the public media (including the Internet), accusing schools of not taking seriously complaints of female students alleging assault by male student. On information and belief, NU's administration was cognizant of, and sensitive to these criticisms. As a result, NU's decision-makers and its investigators were motivated to favor the accusing female over the accused male, so as to protect themselves and NU from accusations that they had failed to protect female students from assault.

   b.   On information and belief, NU was motivated in this instance to accept the female's accusation of sexual assault so as to show the student body and the public that the University is serious about protecting female students from assault by male students. The investigators, hearing panel, and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid the criticism that NU turned a blind eye to alleged assaults by men.

801.    NU has discriminated against Plaintiff because of sex. This discrimination is intentional and is a substantial or motivating factor for NU's actions in this case. Particular circumstances suggest

that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Plaintiff. These circumstances include:

    a. NU, encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women

    b. NU has applied flawed or incorrect legal standards, employed biased or negligent investigatory techniques.

    c. NU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on Plaintiff is the result of a flawed and biased bearing process. This resulted in a deprivation of access to educational opportunities at NU.

802. The circumstances of the investigatory process, the bearing process, and the appeal process case doubt on the accuracy of the outcome of the disciplinary proceeding. The Department of Education regulations and guidance state that Tide IX requires a fair and equitable process for the adjudication of allegations of sexual misconduct.

803. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Plaintiff. These circumstances include:

    a. A general atmosphere at NU where females who lodge a complaint of sexual assault are immediately treated as "survivors." This general atmosphere is a direct result of pressure on NU from OCR, DOJ, student groups, and public opinion.

    b. The adjudication of the claims against Plaintiff occurred at the time that NU officials were developing their approach to issues involving transexual students.

    c. The failure of NU to conduct full and fair investigations.

    d. The failure of NU to afford accused students counsel or the opportunity to present evidence their defense and to effectively cross-examine their accusers under the auspices of "protecting" victims.

    e. The Sexual Misconduct Policy denies male students, like Plaintiff, the basic guarantees of fundamental fairness in hearings. These rights include an impartial decision-maker, the

assistance of counsel, the ability to confront adverse witnesses, the right to remain silent in the face of criminal accusations, and the presumption of innocence.

804.    NU assumed that Gargula, as an alleged female victim, was truthful and reliable. As a result of this gender bias, NU failed to adequately investigate and question Gargula's credibility.

    a.    NU ignored significant evidence that Gargula was not a credible witness, including the felonious evidence which proves she was engaged in a blatant disability based hate crime.

    b.    NU failed to consider what, if any, accommodations or benefits Gargula received that may have affected her credibility and reliability.

    c.    NU's practices and procedures appear to be hostile to men and can be seen as bias in favor of unfairly protecting "vulnerable" and "virtuous" females.

805.    NU assumed that Plaintiff, as an accused male student, was not truthful and reliable. As a result of this gender bias, NU improperly considered character evidence, rumor, innuendo, and evidence of Plaintiff's mental health treatment history.

806.    The circumstances of the Investigatory process, the hearing process, and the appeal process cast doubt on the accuracy of the outcome of the disciplinary proceeding.

807.    NU officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. On information and belief, throughout the disciplinary proceedings, NU and its agents demonstrated and acted on pervasive gender bias.

808.    Plaintiff has been deprived of access to educational opportunities at NU.

809.    As a direct and proximate result of NU's violations of Plaintiff' rights under Tide IX, Plaintiff has suffered severe and substantial damages.

    a.    Plaintiff was denied the opportunity to attend his own graduate school.

    b.    Plaintiff has lost a valuable scholarship to graduate school.

    c.    Plaintiff's damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

810.    NU is liable to Plaintiff for his damages.

811. Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to their attorney's fees incurred in bringing this Action

812. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dept. of Education); 28 C.F.R. § 54.135(b) (Dept. of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

813. On September 22, 2017 the United States Department of Education, Office for Civil Rights (OCR) withdrew the Dear Colleague Letter on Sexual Violence, dated April 4, 2011 and Questions and Answers on Title IX and Sexual Violence, dated April 29, 2014 (https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.), keeping in place it guidelines Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, Title IX, January 19, 2001 (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) (the OCR Standards) as well as newly issued interim guidance (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title- ix-201709.pdf), Q&A on Campus Sexual Misconduct, September 2017 (https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

814. As set forth herein, Gargula was favored and Plaintiff was adversely treated during her Title IX action in that among other things Gargula's credibility was flawed and that Plaintiff's allegations that Gargula had assaulted him and engaged in stalking sexual misconduct without his consent were not acknowledged by NU and that Plaintiff was found responsible for assaulting Gargula.

815. As indicated by Gargula's Title IX action, NU is on the alert and willing to bring disciplinary actions against its male students even when the accuser is unwilling to participate. Gargula's Title IX action established the pattern or practice under which Gargula's Title IX action conclusions were erroneous.

816. NU exhibited a pattern or practice of intentional and substantial gender bias when it failed to prosecute Gargula for her actions against Plaintiff, which included her felony hate crimes and

eavesdropping, reaching an erroneous outcome by finding Plaintiff responsible in Gargula's Title IX action and punishing him.

817.    In Gargula's Title IX action, NU engaged in a series of actions that ultimately resulted in a separation order against Plaintiff based on a manufactured complaint from a student who did not initially file a formal complaint.

818.    The erroneous outcome of ordering Plaintiff's separation from campus was caused in substantial part by gender bias against males in cases involving allegations of sexual misconduct. This bias is reflected in the patterns of decision making and procedural missteps demonstrated by NU throughout the entire investigative process.

819.    NU's gender bias caused such erroneous outcomes as a) a protective order limiting his access to campus, c) a sanction that is not only a cloud on his academic record, but as a pre-existing record makes him vulnerable to further sanctions, d) a second investigation, e) immediate and unwarranted separation from campus, f) a lengthy investigation in violation of the Policy's and the OCR's 60-day rule, and g) threats of disciplinary action based on alleged violations of the no contact order.

820.    Moreover, Plaintiff was also found responsible for allegedly violating sexual misconduct policy, a violation only he but not Gargula (who also clearly violated stalking sexual misconduct and harassment policy) had to face because NU pursued Gargula's allegations against John, but not Plaintiff's allegations against Gargula. Plaintiff suffered academic suspension and expulsion and severe emotional distress.

821.    NU's violations of its obligations under Title IX proximately caused Plaintiff to sustain tremendous damages, including, without limitation, emotional distress, economic injuries, reputational damages, and the loss of educational and post-graduate opportunities and other direct and consequential damages.

822.    Plaintiff is entitled to compensatory damages for the harm he suffered as a result of NU's violation of its Title IX obligations.

823.    The pattern of decisions on choosing what violations to enforce are evidence of gender bias by Equity. They frequently enforce the implied and informal rights of women who have not even requested complaints such as Evangeline, in favor of the rights of similarly situated males.

824.    Plaintiff  notes the strength of the evidence against him in several allegations is particularly weak, especially the two illegal audio tapes which prove that Evangeline was calling him  to entrap him and which the university hid in order to protect her due to its bias against males.

825.    There were several witness allegations from Gloria Cange that she and her "OutLaw" student group put pressure on university officials to discipline Plaintiff.

826.    Ish (Current Hearing Officer) was not provided with the compelling exculpatory evidence and instead relied exclusively on investigative report and competing narratives

827.    Evangeline's statements to university officials were dishonest, inconsistent, and factually improbable, and she misrepresented that she called Plaintiff first, and recorded both of their phone calls.

828.    Evangeline's behavior following the incident, as reported by multiple witnesses, was inconsistent with allegations as she claimed that she was "so afraid that she was checking the doors everyday", and also talked about how Plaintiff's comments were "a weak attempt" at insult. She claimed that she was so scared, yet on the phone is laughing and mocking Plaintiff.

829.    Amanda Deisilva was mistaken about applicable standard of stalking that should be applied, and deliberately applied the Equity definition of stalking and not the university handbook definition on Pg 133.

830.    Statistical evidence showed pattern of gender-based decision-making from the universities available equity data, from their enforcement of women's rights over men's in 2019 when they had a meeting with Plaintiff in August about "female concerns" rather than addressing the hostile environment, the 2020 group chat incident where they enforced Evangeline's right based on her gender identity over Plaintiff's rights as a similarly situated colored, disabled, Muslim student and 2020 and external pressure on university from student groups such as "Outlaw".

831.    There is demonstrated gender bias on part of university and employees, including that university credited female student's purportedly implausible allegations over the accounts of male student and neutral witnesses, and is evidenced by the male witnesses and Plaintiff's allegations and accounts not believed or credited, but Evangeline, Cange, and Chernoff, who are all female were included as witnesses and their accounts believed over mine.

832.     Northwestern violated Title IX by erroneously suspending Plaintiff based on a gender-biased sexual misconduct policy, investigation and adjudication process, when the evidence supported his innocence. Plaintiff claims he is innocent and that Northwestern wrongly found that he harassed Gargula because of Northwestern's allegedly gendered investigation and disciplinary proceedings.

833.     There  procedural flaws in the investigatory and adjudicative processes, such as Plaintiff not being assisted effectively by his adviser, and not given any help to find another one.

834.     He was denied opportunity to gather exculpatory evidence from the group chat messages which would support his innocence and harassment claims.

835.     Noting inconsistencies or errors in the adjudicator's oral or written findings about how Evangeline's contact is "mutual contact" but Plaintiff's was "harassment" resulting from the same set of facts or

836.     The group chat transcripts are missing several pages from "NU Kids on the Block" which contained comments directed at Plaintiff in harassment, and is completely missing "Meet the NU Kids '23" chat transcripts. The transcripts that are provided only show the comments which Plaintiff made in response to a variety of hidden comments.

837.     There is substantial evidence indicating that Plaintiff was repeatedly harassed and stalked according to "CARE" stalking definition which is located on the Universities website and therefore would lead an ordinary person to believe that it was the correct definition being used by the school.

838.     There is evidence that Plaintiff was called at 1:08 AM in a threatening manner, given the time of the call and the nature of the messages being exchanged, prior to the "threatening" messages which he allegedly sent.

839.     There is evidence that Gargula misled the investigators by not informing them of the call and not showing them the harassing messages which she posted on the group chat which also included Plaintiff's personal information and caused him substantial emotional distress over my mother's death which she reminded him of.

840.     There is evidence that Gargula misled the investigators recording his phone calls with her in order to entrap plaintiff, and evidence that the university was aware of it, concealed it, and used it to suspend him.

841.     In this case, Plaintiff alleges certain procedural flaws in the investigatory and adjudicative process and also challenges the sufficiency and reliability of the evidence against him.

842.     Because DeSilva served as Fahad's adjudicator and was ultimately responsible for determining Doe's guilt or innocence, any evidence of DeSilva's gender bias is particularly probative. If DeSilva possessed the discriminatory views of gender and sexuality alleged in Fahad's Complaint, these views would have naturally infected the outcome of Plaintiff's Title IX disciplinary proceedings. Therefore, this allegation alone is sufficient to satisfy Plaintiff's burden to plead a fact that creates an inference of gender discrimination in Northwestern's disciplinary proceedings.

843.     Every single complaint (100%) that he has filed with the Office of Equity has been determined not to state a cause for investigation or action of any kind whatsoever. I have filed at least 100 different complaints with that office for a variety of different concerns, not a single one was adequately addressed. Moreover, no concern was ever shown for his distress from any of the incidents.

844.     During Fall 2019 Semester, he was viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment accusations from a white female student which were never shared with him. This culminated in a discussion with the entire law class about him taking place on the chat, which he was not allowed to participate in because a group of students kept removing him from the group over and over without NU doing anything to address it, and resulted in almost the entire school treating him like he was a sexual predator. Despite full awareness of the tremendous emotional distress that this created on him, the Office of Equity took no action to address his concerns.

845.     In 2019, Equity failed to meaningfully or actionably address a formal complaint he filed over unwanted physical contact by Muaaz M. and Usama I. (other similarly situated law students) in relation to an incident which occurred on 11/1/19.

846.     April 2020 - Forensic Threat Evaluation - During this evaluation, Plainitiff was asked questions about an incident which occurred in late August 2019 wherein an unidentified female claimed that he "grazed her butt." He faced disciplinary action due to this allegation earlier in the year, however, when he told administration that he was assaulted by Osama, Muaaz, and Usama, the law school failed to take any action of any kind on his behalf. In this manner the school administration violated title IX by

treated me differently than a female who made similar allegations of unwanted physical contact against him, by not investigating his concern while they investigated the allegations made by the female and noted the incident in his school disciplinary record.

847.    DeSilva addressed multiple "concerns" articulated by all female students and staff, most if not all of whom were white, in a meeting with him on August 6th, 2020.

848.    The concerns articulated by females for "unwanted contact" were noted on my permanent student record, as indicated by my forensic threat assessment, whereas none of the complaints which he articulated about "harassment," "stalking," "battery," or any other form of concern were ever actionably or meaningfully addressed by Equity at any time during his time at this university.

849.    The notice the he received confirms the statements and attitude articulated by DeSilva and Truelove which indicated that they were investigating the "concerns" of these white females even absent the presence of a formal complaint. Thereby indirectly displaying the bias attitude of representatives of Equity present during that meeting, who prioritize investigating the informal "concerns" of females over the formal complaints of Plaintiff, a male.

850.    During Fall 2020 Semester, he was viciously harassed and ridiculed on the school group chat multiple times and excluded and banned from it unfairly based on sexual harassment from a white female student which unquestionably met the university standards for harassment. Despite full awareness of the tremendous emotional distress that this created on me, the Office of Equity took no action to meaningfully or actionably address my concerns.

851.    The exact same exchange of private messages between Plaintiff and Gargula was deemed "mutual contact" in response to his harassment complaint against her, a white female. Whereas, her complaint against Plaintiff  resulted in his immediate suspension, for the exact same exchange of messages.

852.    Equity willfully and deceptively evaded Plaintiff's request to investigate Gargula for malicious school policy use in violation of the University policy, due to the fact that she deceptively failed to show investigators the messages that she posted about him in the group chat, which included Plaintiff's private information, disparaging and substantially offensive remarks which caused him significant emotional distress because of his mother's death, and a picture of a frog with the caption "NO

THOUGHTS EMPTY HEAD" underneath it, all of which were unprovoked and directly caused the remarks which she later reported. Nor did she tell investigators that she had placed a call to HIM at 1:08 AM in a threatening manner prior to receiving the messages that she claimed "threatened her safety."

853.    In another blatant act of gender-bias in decision making, the University stated multiple times that GARGULA did not initiate the conduct process against Plaintiff. This further substantiates the notion that Equity prioritized the concerns of a white female, which were about a male and not formally reported, over his concerns, which were about a female and were formally reported. This can be seen in that they launched in investigation into his comments and stated that none of Gargula's conduct was harassment, nor did they forward his complaints to the appropriate student conduct resource as is clearly stated in their own institutional equity policy.

854.    Despite filing complaints against several female students, Equity did not deem even a single concern in his complaint to be worthy of investigation.

855.    The deliberate disregard for any concerns which Plaintiff articulated regarding harassment to Equity was shared by Colleen, DeSilva, and Truelove. Therefore, given the positions and seniority of each of these respective individuals in the office, and their number in comparison to the total number of resources staffed in the office, these three individuals therefore represent a statistically representative sample and by implication evidence the gender bias displayed by the Office of Equity in their decision-making process.

856.    The deliberate disregard for any concerns which I articulated regarding harassment from females in all of my formal and informal complaints, compared with the relatively severe reaction to concerns articulated by females to Equity about me, a male, represents "patterns of decision-making that [ ] tend to show the influence of gender."

857.    Furthermore, in an email from Karen Tamburro dates 1/27/20 at 5:41 PM, she stated the following in response to Plaintiff's complaint of harassment about fellow NU students: "Please be advised that with respect to the bases you identified (race, color, religion, national origin, sex, age and disability), the jurisdiction of the Office of Equity is limited to complaints and concerns made against employees of Northwestern University. Accordingly, our office cannot proceed as to any of your complaints against Northwestern students."  In making this assertion, there was clear selective

enforcement of NU policies, wherein Tamburro refused to investigate Plaintiff's claims about other students, however as noted in this case, NU fully and aggressively pursued female Gargula's claim, who is an NU student, against Plaintiff was also a student. In doing so, Tamburro and NU showed clear selective enforcement gender discrimination in the application of NU policies in comparable situations solely on the basis that Plaintiff is male.

858. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

**<u>Count 136</u>**
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Deliberate Indifference**
**(NU)**

859. Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

860. To establish deliberate indifference claim under Title IX, plaintiff attacking university disciplinary proceeding on grounds of gender bias must demonstrate that official of institution who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, misconduct. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). <u>Doe v. Miami Univ.</u>, 882 F.3d 579 (6th Cir. 2018). Deliberate indifference claim under Title IX premised on student-on-student misconduct must allege harassment that is so severe, pervasive, and objectively offensive that it effectively bars victim's access to educational opportunity or benefit. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). <u>Id.</u> To plead sufficiently Title IX deliberate indifference claim, misconduct alleged must be sexual harassment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). <u>Id.</u>

861. NU had constructive notice of Plaintiff's stalking sexual misconduct and harassment complaints both during the initial phone call to suspend him on 8/23/20, and in actual notice during the multiple times he mentioned it in formal and informal complaints after the suspension and prior to his expulsion.

862. Stalking is considered sexual harassment under NU sexual misconduct policy, and therefor is "sexual" harassment.

863. The Sexual Harassment Incidents which Plaintiff experienced: "Stalking" is officially categorized as "sexual" misconduct by the University.

   a. Stalking Incident 1 – Information Posted on Group Chat

   b. Stalking Incident 2 – Frog Picture Posted and Defamatory Statements Made

   c. Stalking Incident 3 – 1:08 AM Threatening Phone Call and Recording

   d. Stalking Incident 4- 1:18 AM Threatening Phone Call and Recording

864. Further Impact and Results of Gargula's Harassment which NU was completely indifferent to:

   e. Getting Plaintiff banned from Discord Chat

   f. Getting Plaintiff banned from GroupMe chat

   g. Getting Plaintiff suspended.

h. Causing RAMPANT negative speculation among the class about my mental health and general fitness and character.

i. Causing Tessa Wiel to harass him on Discord.

j. Causing Ishani Choksi to harass him on Facebook.

k. Causing Mona Dugo to harass Plaintiff by illegally contacting his therapist and feloniously sharing the illegal audio tape that Evangeline produced of the of time when she threatened him at 1:00AM with a phone call.

l. Causing NUPD Detective Lee to relentlessly harass him with no more than five different intimidating and threatening phone calls to date.

m. Causing Eric Chin to illegally suppress and prevent him lawful police report by illegally contacting Chicago Police and ILLEGALLY disclosing my mental health information to the detective in order to illegally have my lawful report (JD395768) cancelled WITHOUT INVESTIGATION.

n. Causing, indirectly, Northwestern to contact his sister, Sophia Syed, against his permission and without his knowledge or consent. On information and belief, Plaintiff's sister was contacted in order to secure negative information about Plaintiff for use during any potential litigation resulting from his unjust and unwarranted expulsion.

865. Due to his bipolar disorder, Plaintiff was not able to consent to Evangeline aggressive predatory behavior because of his intermittent disability and associated mood and temperament issues.

866. Both Gargula and Plaintiff alleged discrimination and the basis of a protected class resulting from the same interaction, and Gargula's on the basis of gender were enforced and Plaintiff's on the basis of stalking sexual misconduct or disability were not enforced, due solely to his gender.

867. As indicated in the specifically realleged section, Evangeline Gargula conducted a course of action towards Plaintiff in and around 8/23/20 that undeniably constituted stalking, however, despite filing some 10-15 different complaints with increasingly detailed information about the stalking, NU and in particular, Amanda DeSilva, Colleen Johnston, and Karen Tamburro took a sick, sadistic pleasure in finding some obscure and ridiculous reason for not addressing Plaintiff's complaint. Indeed, at one point Plaintiff was told by Amanda DeSilva that Plaintiff was not stalked because the "stalking was not based

on a protected class." The three are vicious and sadistic felons who took pleasure in inflicting the extended pain and torture of the unwarranted suspension and expulsion upon Plaintiff, often times smiling and smirking venomously when interacting with Plaintiff and denying the substance of his concerns. As indicated in the complaint, Karen Tamburro has never addressed a single one of the over 100 different complaints which he sent to her as a result of his harassment and discrimination in 2019 and 2020. Indeed, the scale of her omissions and failures to address Plaintiff's concerns is one of the most disturbing and unsettling parts of his case.

868.    Tamburro, DeSilva, and Johnston employed the most irrational, illogical, and incoherent reasoning and rationale to avoid addressing the Plaintiff's concerns that their responses were often times completely unintelligible. They made up exceptions and exemptions to every rule so that they could avoid addressing Plaintiff's concerns, such as a "mutual contact" exemption in response to Plaintiff's complaint about the stalking and harassment committed by Gargula, wherein they excused Gargula's stalking and harassment towards Plaintiff because her and Plaintiff were somehow in "mutual contact" when the initial disability harassment post was made by Gargula, even thought she initiated the harassment. This exemption only applied to her harassment towards Plaintiff and not, as the name implies, mutually between the parties. In this way, they enforced and supported her vicious hate crimes of stalking and felony eavesdropping while punishing Plaintiff for reacting to her harassment.

869.    Plaintiff initiated at least 10 different complaints for stalking sexual misconduct, establishing a clear pattern of offensive behavior with increasingly detailed information, each in response to NU claiming there was "not enough information" to initiate an actual investigation. Where NU's response to Plaintiff's complaints was always the same, regardless of what the complaint contained, and not a single one has been investigated or adequately addressed to date. Over 100 legitimate complaints, both formal and informal, and relating to a variety of class-based discrimination concerns have all been dismissed over and over for illegitimate reasons. On information and belief, Desilva, Tamburro, and Johnston have deliberately devised strategies to attempt to evade Plaintiff's legitimate concerns and conspired to retaliate against Plaintiff without creating a clear line of accountability or visibility of his discipline or for their own heinous and predatory misconduct. On information and belief, Tamburro,

Desilva, Johnston, Depilla, Cohen, Christain, Faith-Okar and other NU staff have been involved in a coordinated and deliberate effort to expel Plaintiff using felonious and conspiratorial means.

870.    Remarkably, in the total over 100 different complaints to NU for class-based harassment on different basis', Tamburro's response to every single one has been to not investigate the complaint in any way, shape or form due to "lack of information." Tamburro has never actually investigated any allegation made by Plaintiff, regardless of the substance or severity. Plaintiff wants Karen Taburro charged with one count of deliberate indifference for every complaint she deliberately ignored detailing his pervasive and severe harassment, and will not settle his suit or otherwise negotiate with NU unless she is terminated from her position and charged as such.

871.    Plaintiff was suspended from school and prevented from accessing all school activities or learning. He was eventually unjustly expelled over this incident.

872.    In sum, the university was deliberately indifferent to known sexual harassment against Plaintiff so that university's response to that harassment was unreasonable, in that that Plaintiff and white female classmate reported each other for sexual assault occurring from the same encounter, but university chose to pursue disciplinary action against male student while failing to bring any charges against female classmate, and that university did not allow male student to assert any counterclaim or defense, took no action against female classmate for violating a confidentiality order, and failed to respond to male's complaints of female student's violation of no contact order when she requested the order on the male student and then contacted him afterwards in order to deliberately provoke a response, as she had during their original encounter.

873.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.    Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against him in violation of Title IX of the Education Amendments of 1972;

b.    Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

**<u>Count 137</u>**
**Violation of Title IX of the Education Amendments of 1972**
**20 USC § 1681(a), et seq.**
**Archaic Assumptions**
**(NU)**

874. Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

875. The "archaic assumptions" standard, which has been applied where plaintiffs seek equal [educational] opportunities, finds discriminatory intent in actions resulting **\*639** from classifications based upon archaic assumptions. *See Pederson v. La. State Univ.,* 213 F.3d 858, 880–82 (5th Cir.2000); *see also Horner,* 206 F.3d at 693 n. 4 (discussing the pre-rehearing opinion in *Pederson*). <u>Mallory v. Ohio Univ.</u>, 76 Fed. Appx. 634, 638–39 (6th Cir. 2003)

876. Where NU representative Amanda Desilva told Plaintiff he was not stalked because the stalking was not "based on a protected characteristic" when it was based on offenders perception that Plaintiff was under an "assumed identity" and engaged in a "psyop" where he was attempting to engage with the class and participate in normal school activities like the rest of the students.

877. Cohen and Depilla employed the archaic assumption that men are violent in reaching their conclusion of Plaintiff's guilt in the 2019 UHAS Hearings Process.

878.     Desilva and Dugo and Johnston employed the archaic assumption that males are always dangerous and violent and that only women are able to be stalked. They told Plaintiff that "males cannot be stalked because the contact is not on the basis of a protected class. They employed the archaic assumption that women cannot be aggressive or predatory stalkers by excusing Gargula's aggressive and predatory and malicious sexual misconduct as "mutual contact."

879.     Furthermore, NU representatives made the archaic and outdated assumption that the male is always the aggressor in situations involving male-female conflicts.

880.     Furthermore, NU made the implicit and unwarranted assumption that males are always referring to physical violence, and/or that males are violent, in reaching the conclusions of Plaintiff's threat to the safety of others based off of the felony audio tapes which they feloniously listened to in the course of their malicious and predatory conspiracy to deprive Plaintiff of his rights under Title IX.

881.     NU alleged that Plaintiff's threats of legitimate legal action in this very court equate to "highly inappropriate communication" as stated by defense counsel Scott Warner. In doing so, Warner made the implicit archaic assumption that Plaintiff was violent based off his gender and disability status. Warner knowingly defamed Plaintiff in making the malicious and predatory accusation that Plaintiff "punched" someone "in the face" when he is fully aware that there is **<u>NO EVIDENCE</u>**, aside from the ***<u>unsubstantiated allegations</u>*** of a single person, that Plaintiff "punched" anyone "in the face." Furthermore, in making his malicious and defamatory and conspiratorial accusations, he is committing clear misconduct in violation of FCRP Rule 11, and Plaintiff moves for his immediate sanction under Rule 11 for their malicious, dishonest, oppressive, and predatory misconduct in intentionally attempting to deprive an innocent young student with disabilities of his lawful right to education using materially false allegations and malicious and deliberately constructed lies and deceit.

882.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a.    Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b.   Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c.   Order NU to provide any reasonable accommodations or modifications that may be necessary;

d.   Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e.   Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f.   Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g.   Award attorney's fees and costs; and

h.   Award such other relief as the Court deems just and proper.

### COUNT 138
**20 U.S.C. § 1681, *et seq.***
**TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**
**Hostile Education Environment/Sexual Harassment**
**(NU)**

883.   Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

884.   Complaint alleging Title IX violations must plead sufficient factual allegations to allow court to draw reasonable inference that defendant possessed requisite discriminatory intent. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018) Title IX is enforceable through judicially implied private right of action, through which monetary damages are available. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. To establish hostile environment claim under Title IX, plaintiff must allege that his educational experience was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive so as to alter conditions of victim's educational environment. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a). Id. A Title IX hostile-environment claim is analogous to a Title VII hostile-

environment claim. *Claiborne Cty.*, 103 F.3d at 515; *see also Tumminello*, 678 Fed.Appx. at 284. Under this theory of liability, the plaintiff must allege that his educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotation marks omitted). Id. *Meritor* standard for determining whether conduct is actionable under Title VII as "abusive work environment" harassment requires objectively hostile or abusive environment—one that reasonable person would find hostile or abusive—as well as victim's subjective perception that environment is abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)

885. Plaintiff specifically realleges paragraphs 66-79.

886. Plaintiff specifically realleges paragraphs 301-455.

887. Title IX of the Education Amendments of 1972 provides, in relevant part, that: No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

888. Defendant receives federal financial assistance for research and development.

889. Plaintiff's gender is protected by Title IX.

890. During the events herein, Plaintiff was a matriculated student and in attendance at NU.

891. Plaintiff was subject to harassment from Evangeline Gargula when she stalking and harassed Plaintiff in violation of NU stalking sexual misconduct policy, all without his affirmative consent.

892. Gargula's harassment was sufficiently severe and/or pervasive to alter the conditions of Plaintiff's education and created an abusive educational environment for Plaintiff and constituted a continuing violation.

893. Plaintiff reported the sexual harassment to representatives of NU who had authority to address the discriminatory harassment.

894. NU's representatives failed to adequately respond to or address the harassment. Indeed, NU's representative acted with deliberate indifference with respect to the sexual harassment of Plaintiff.

895.     NU's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and NU is liable to Plaintiff.

896.     Indeed, whereas NU has the right and does initiate Title IX disciplinary actions on behalf of alleged female victims of sexual harassment, NU did not bring an action against Gargula on Plaintiff's behalf. Moreover, NU disallowed Plaintiff from asserting a counter claim or defense against Gargula regarding in connection with his allegations.

897.     NU's conduct as set forth herein was in violation of Title IX's strictures against sexual harassment and NU is liable to Plaintiff.

898.     By reason of the sexual harassment Plaintiff has suffered and continues to suffer, and Plaintiff is entitled to all legal and equitable remedies available under Title IX, including an award of punitive damages, attorneys' fees and costs.

899.     Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed and he has suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages and has suffered damages including extreme emotional distress, and loss of capacity for the enjoyment of life.

900.     By reason of the forgoing, Plaintiff is entitled to all legal and equitable remedies available including an award of all applicable damages, prejudgment interest, attorneys' fees, costs and other compensation in an amount to be determined upon the trial of this action.

901.     Both the 2020 Group Chat environment and the 2019 sexual harassment environment were hostile environments which changes the educational environment and opportunities for plaintiff as indicated.

    a.     WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    b.     Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

c. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

d. Order NU to provide any reasonable accommodations or modifications that may be necessary;

e. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

f. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

g. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

h. Award attorney's fees and costs; and

i. Award such other relief as the Court deems just and proper.

## <u>Count 140</u>
## BREACH OF CONTRACT - SEX DISCRIMINATION
## (NU)

902. Plaintiff realleges and incorporates all the allegations contained in preceding paragraphs of this Complaint as though fully rewritten herein.

903. The Handbook is a valid, binding and enforceable contract between the University and Plaintiff.

904. The Handbook is and was supported by valid consideration.

905. Plaintiff fully complied with all of his obligations under the Handbook.

906. The University breached its obligations under the Handbook by, inter alia, conducting a fundamentally unfair hearing, improperly placing the burden of proof on Plaintiff, failing to have UHAS members properly trained and prepared to adjudicate a sexual assault allegation, failing to involve in the hearing someone competent to testify about medical evidence, not providing Plaintiff with a competent advisor, rushing to a final judgment without hearing all relevant evidence, and making irrational,

prejudicial and improper decisions about which witnesses could and could not testify. The University also did not limit repetitive testimony, discussion or witness material.

907.    Plaintiff has incurred, and will continue to incur, significant damage as a direct result of the University's breaches of the Handbook in an amount to be determined at trial.

908.    The relationship between Plaintiff and NU University is contractual in nature. One of the terms of that contract is NU University's express promise not to discriminate against Plaintiff on the basis of his sex. NU's contractual commitment is set forth in the NU University Student Handbook which states that "NU University provides equal educational opportunities to its students with regard to race, color, origin, sex, sexual orientation, national ethnic origin, age, disability or veteran status. The University prohibits discrimination on any of these bases and takes steps necessary to remedy any instances of such discrimination."

909.    NU's suspension of Plaintiff and its refusal to allow Plaintiff to attend class is graduate is intentionally discriminatory against Plaintiff on the basis of his sex. Both the investigators and 2/3 of the ultimate decision-maker regarding Plaintiff's punishment were female. The female in his case was not given punishment than Plaintiff, despite having engaged more egregious conduct. Moreover, Plaintiff was given more punishment than all the other females involved in his harassment combined for unequal conduct as found by NU's own investigation. Plaintiff was undeniably held to a higher standard than the female students.

910.    NU's punishment of Plaintiff breached its contractual obligations because Plaintiff was given the more severe punishment than females who engaged in far more egregious conduct. NU's punishment of Plaintiff was based solely on his sex (male), and not based upon his culpability under the Code. Further, numerous female students who participated in the group chat harassment, who engaged in far more egregious conduct than Plaintiff, were afforded no punishment at all from NU.

911.    Plaintiff has been harmed by NU's unlawful conduct and seeks actual damages as well as injunctive relief necessary to avoid irreparable harm to Plaintiff. Plaintiff further seeks all applicable attorneys' fees and costs available under this cause of action.

   a.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

a. Enter a declaratory judgment that the University interfered with Plaintiff's enjoyment of his rights under Title IX and discriminated against his in violation of Title IX of the Education Amendments of 1972;

b. Order NU to allow Plaintiff to participate fully in law school and other related NU programs without unnecessary and burdensome restrictions or conditions;

c. Order NU to provide any reasonable accommodations or modifications that may be necessary;

d. Issue an injunction against the University to prevent the University from engaging in further acts of discrimination against Plaintiff on the basis of sex;

e. Order the University to expunge all negative materials from Plaintiff's student record and to facilitate Plaintiff's transfer or admission to another law school or degree program of similar caliber and reputation;

f. Order the University to direct the Dean to refrain from further interference with Plaintiff's transcript, with Plaintiff's transfer to another degree program, with Plaintiff's application to the bar, and with Plaintiff's future education and career prospects;

g. Award attorney's fees and costs; and

h. Award such other relief as the Court deems just and proper.

## Count 141
### Breach of Covenant of Good Faith and Fair Dealing
### (NU)

912. Plaintiff repeats and realleges the allegations set forth in paragraphs as if fully set forth at length herein.

913. Based on the aforementioned facts and circumstances, the University breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with the Plaintiff, as represented by the Student Handbook.

914. As a direct and foreseeable consequence of these breaches, the Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

915. The Plaintiff is entitled to recover damages for the University's breach of the express and/or implied contractual obligations described above.

916. Issuing, pursuant to 28 U.S.C.A. § 2201, a declaration that:

a. The outcome and findings made by the University at Defendant's hearing regarding Title IX and also regarding his 2019 false imprisonment be reversed;

b. Defendant's reputation be restored;

c. Defendant's disciplinary record be expunged;

d. The record of Defendant's expulsion the University be removed;

e. Any record of Defendant's Formal Grievance Hearing be permanently destroyed; and

f. The University's rules, regulations, and guidelines are unconstitutional as applied.

917. Awarding Plaintiff compensatory damages for the injuries he has suffered, including consequential and incidental damages, as a result of University's wrongful conduct in an amount to be determined at trial.

918. Awarding Plaintiff special damages in an amount to be determined at trial.

919. Awarding Plaintiff punitive damages in a just amount for University's willful and wanton conduct.

920. Awarding Plaintiff prejudgment and post-judgment interest.

921. Awarding Plaintiff his costs, expenses, and attorney's fees incurred in connection with this action.

922. Awarding Plaintiff such other relief as the Court finds just and proper.

## Count 142
### Estoppel and Reliance
### (NU)

923. Plaintiff repeats and realleges the allegations set forth in paragraphs as if fully set forth at length herein.

924. The University's regulations and other standards, procedures and policies and principles constitute representations and promises that the Plaintiff should have reasonably expected to induce action or forbearance by the University.

925.     The University expected or should have expected the Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that the University would not tolerate, and the Plaintiff would not suffer, harassment by fellow students and would not deny the Plaintiff his procedural rights should he be accused of a violation of the University's regulations or Student Handbook.

926.     The Plaintiff relied to his detriment on these express and implied promises and representations made by the University.

927.     Based on the foregoing, the University is liable to the Plaintiff based on promissory estoppel.

928.     As a direct and foreseeable consequence of these breaches, the Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

929.     As a result of the foregoing, Plaintiff is entitled to injunctive relief and damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

## Count 143
### Negligent/Intentional Infliction of Emotional Distress
### (NU)

930.     Plaintiff repeats and realleges the allegations set forth in paragraphs as if fully set forth at length herein.

931.     During the 2020 expulsion process, the university acted in a shocking, outrageous and extreme manner by, inter alia, conducting a flawed investigation, refusing to consider exculpatory evidence, refusing to seek assistance from trained professionals in the medical community, and holding a fundamentally unfair and flawed hearing that culminated in a decision to impose discipline that has permanently damaged Plaintiff.

932.     As a direct and proximate result of the University's actions, Plaintiff has been publicly humiliated, and felt ashamed, emotionally distraught and violated. The conduct of University demonstrated the intent to cause, or disregard of a substantial probability of causing, Plaintiff severe emotional distress.

933. The University's actions were a direct and proximate cause of Plaintiff' severe emotional distress.

934. Plaintiff has incurred, and will continue to incur, significant damage as a direct result of University's actions in an amount to be determined at trial.

935. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

    a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b. Award punitive damages;

    c. Award attorney's fees and costs; and

    d. Award such other relief as the Court deems just and proper.

## Count 144
### Libel
### (NU)

936. Plaintiff repeats and realleges the allegations set forth in paragraphs as if fully set forth at length herein.

937. The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion concerned Plaintiff and was false.

938. The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion was widely published and not privileged in any manner.

939. The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion was made with reckless disregard of its truth or falsity and/or with malice.

940. The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion was libelous per se because it imported a charge of an indictable offense involving moral turpitude and injured Plaintiff's personal reputation.

941. The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion forever falsely labels and permanently damages Plaintiff as a student who was expelled from his university for violations that did not occur.

942. The University's published statement regarding his 2019 and 2020 suspensions and his 2020 expulsion permanently damages Plaintiff's personal reputation in Illinois and across the country.

943. As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

944. WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

945. Issuing, pursuant to 28 U.S.C.A. § 2201, a declaration that:

    a. The outcome and findings made by the University at Defendant's hearing regarding Title IX and also regarding his 2019 false imprisonment be reversed;

    b. Defendant's reputation be restored;

    c. Defendant's disciplinary record be expunged;

    d. The record of Defendant's expulsion the University be removed;

    e. Any record of Defendant's Formal Grievance Hearing be permanently destroyed

    a. Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

    b. Award punitive damages;

    c. Award attorney's fees and costs; and

    d. Award such other relief as the Court deems just and proper.

**Count 145**
**Negligence**
**(NU)**

946. Plaintiff repeats and realleges the allegations set forth in paragraphs as if fully set forth at length herein.

947. The University owed duties of care to Plaintiff, including, without limitation, a duty of reasonable care in the conduct and investigation of the allegations of misconduct against him.

948. The University breached those duties owed to Plaintiff.

949. As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational, athletic, and future career opportunities, economic injuries and other direct and consequential damages.

950. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorney's fees, expenses, costs, and disbursements.

951. WHEREFORE, Plaintiff seeks judgment as follows:

a. Issuing, pursuant to 28 U.S.C.A. § 2201, a declaration that:

a. The outcome and findings made by the University at Defendant's hearing regarding Title IX and also regarding his 2019 false imprisonment be reversed;

b. Defendant's reputation be restored;

c. Defendant's disciplinary record be expunged;

d. The record of Defendant's expulsion the University be removed;

e. Any record of Defendant's Formal Grievance Hearing be permanently destroyed; and

f. The University's rules, regulations, and guidelines are unconstitutional as applied.

b. Awarding Plaintiff compensatory damages for the injuries he has suffered, including consequential and incidental damages, as a result of University's wrongful conduct in an amount to be determined at trial.

c. Awarding Plaintiff special damages in an amount to be determined at trial.

d. Awarding Plaintiff punitive damages in a just amount for University's willful and wanton conduct.

e. Awarding Plaintiff prejudgment and post-judgment interest.

f. Awarding Plaintiff his costs, expenses, and attorney's fees incurred in connection with this action.

g. Awarding Plaintiff such other relief as the Court finds just and proper.

### Count 146
### Tortious Interference with Contract
### (All named Parties in Law Suit)

952. Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

953.    (1) Plaintiff was at all times relevant enrolled as a JD student at Northwestern University School of Law.

954.    (2) All defendants were at all relevant times aware that Plaintiff was a JD student at Northwestern University School of Law.

955.    (3) The actions of each and every defendant named in this complaint were intentional and unjustified inducements of a breach of the educational contract by NU. These actions include two false imprisonments which devastated the Plaintiff's life and career and produced innumerous and ongoing harm in the Plaintiff's life, and intentionally harming Plaintiff's educational contract through malicious conspiratorial intimidation and subversive misleading and defamatory scheming efforts specifically aimed at inducing Plaintiff's expulsion from the JD program by all parties as described in their actions

956.    (4) NU did in fact breach the contract a result of each defendants conduct, through unjustified application reviews and subsequent deferral, unjustified suspensions without hearing or notice, unwarranted and arduous and defamatory disciplinary proceedings based on bad-faith pretenses and retaliatory motives, imposing countless discriminatory pre-conditions, delays, and obstacles to Plaintiffs return to school which were predicated on threat from Plaintiff's perceived disability, two false imprisonments which devastated the Plaintiff's life and career and produced innumerous and ongoing harm in the Plaintiff's life and ultimately destroyed his potential law career through outrageously cruel and unusual punishment of permanent expulsion with a permanent notion on Plaintiff's transcript which effectively destroyed his ability to pursue law at another institution after enduring years of intentional targeted physical, psychological, and emotional abuse.

957.    Plaintiff was suspended 3 times and ultimately expelled as a result of the actions of all named defendants in the various counts of this complaint.

958.    WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter a judgment in favor of Plaintiff making the following findings and granting the following relief:

   a.  Award Plaintiff money reasonably calculated to compensate him for all monetary damages sustained as a result of this particular count of the complaint;

   b.  Award punitive damages;

   c.  Award attorney's fees and costs; and

d.   Award such other relief as the Court deems just and proper.

### COUNT 157
### Violation Consumer Fraud Act: 815 ILCS 505/10, et seq.
### (NU, NMH)

959.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

960.   The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other *417 unfair and deceptive business practices. It is to be liberally construed to effectuate its purpose. Cripe v. Leiter, 184 Ill.2d 185, 191, 234 Ill.Dec. 488, 703 N.E.2d 100 (1998). Unfair or deceptive practices are described in the Act as: "including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact * * * in the conduct of any trade or commerce * * *." 815 ILCS 505/2 (West 1992).

961.   Section 10(a) of the Consumer Fraud Act creates a remedy for persons who suffer damage as a result of a violation of the Act committed by another person. 815 ILCS 505/10a(a) (West 1992).

962.   The Plaintiffs repeat, reallege and reaver paragraphs above as if expressly set forth fully herein.

963.   The Defendant's willful and intentional conduct constitutes unfair and deceptive trade practices pursuant to **815 ILCS 505/10**, *et seq.* As a direct and proximate result of the Defendant's consumer protection violations, Plaintiff has sustained permanent and irreversible injuries warranting the imposition of treble damages, attorney's fees and costs, and any other form of relief which the Court deems just and proper. All statutory notices have been provided to the Defendant.

964.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>**Count 158**</u>
**Willful and wanton conduct: 745 ILCS 10/1-210**
**(All Defendants)**

965.　　Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

966.　　Where Defendants engaged in a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety or well-being of Plaintiff and his protected property interest in the JD program at NU .

967.　　***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>**Count 162**</u>
**TEMPORARY RESTRAINING ORDER**
**(NU)**

968.　　Plaintiff requests that this Court immediately enjoin and prevent NU from:

a.　Expelling Plaintiff from NU University, or otherwise taking any disciplinary action against Plaintiff that would negatively impact his academic record or ability to graduate and obtain employment.

a.　preventing or delaying Plaintiff's enrollment in Summer 2021, or alternatively, in Fall 2021 because of disciplinary sanctions arising out of the events which occurred on August 23, 2020.

b.　making any notation of a disciplinary infraction or penalty on Plaintiff's records at NU, including but not limited to Plaintiff's suspension from NU, because said record will be available to the public, other faculty or students, or Plaintiff's prospective employers.

c.  making any verbal or written statement to the public that relates to Plaintiff's discipline for the events on November 1, 2019 or August 23, 2020, as such statements will irreparably harm Plaintiff's academic standing and future career.

969.  It is probable that Plaintiff will prevail on the merits of his claims because Defendant's discipline of Plaintiff was a breach of its express and implied contractual agreements with Plaintiff. Moreover, NU negligently misrepresented Plaintiff's right to graduate in the event that Plaintiff completed the academic requirements for graduation. Lastly, the discipline suffered by Plaintiff was discriminatory on the basis of Plaintiff's sex and was in violation of 20 USC § 1681(a).

970.  If Plaintiff's application for injunctive relief is not granted, harm is imminent because Plaintiff will be permanently expelled from NU and be unable to attend another law school due to the unwarranted permanent marks imposed on his transcript. Plaintiff will not be able to graduate from NU or any other school, despite the fact that he has fulfilled all requirements for enrollment and admission and did so prior to being disciplined by NU. Plaintiff's career will be irreparably harmed because he will be unable to gain employment in any law program, which requires a law degree as a necessary prerequisite. Lastly, Plaintiff will be unable to transfer to another university because of his disciplinary record at NU and the uniform policy at all major educational institutions disallowing transfers for students with disciplinary suspensions and/or expulsions. Furthermore, over 5 years of the Plaintiff's life will have been wasted in his pursuit of admission to the law school at NU.

971.  Plaintiff has no adequate remedy at law because he cannot be adequately compensated in damages. Plaintiff's injuries cannot be measured by any certain pecuniary standard, due to the impossibility of placing a value on the devastating irreparable harm that Plaintiff will suffer to his career and life if he is not allowed to graduate and obtain gainful employment, and also because of the permanent gap on his resume that will result. Further, Plaintiff has no adequate remedy at law for the damages that will result because of his disciplinary record at NU and the resulting stigma attached to such record. Simply, the damage to Plaintiff's reputation and standing will be irreparable and immeasurable.

972.  The injury faced by the Plaintiff if injunctive relief is not granted far outweighs any injury that might occur to NU if the request for relief is granted. Indeed, there will be no injury at all to NU. The granting of injunctive relief will also not adversely affect any public policy or public interest.

973.     Plaintiff's counsel has attempted to serve notice on NU regarding this application so that it may participate in a hearing on this application. Plaintiff is willing to post adequate bond as determined by the Court.

## Count 163
### Eavesdropping: 720 ILCS 5/14-2 (5)
**(PAYNE-KIRCHMEIER, DESILVA, JOHNSTON, TAMBURRO, CHRISTAIN, FAITH-ORKAR, Cohen)**

974.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

975.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

976.     Where each NU Defendants did, at certain points in the NU disciplinary process, did use the information which was obtained from audio tape #1 made in violation of Eavesdropping 720 ILCS 5/14-2, including Cohen and Ish-Orkar, where they listened to the audio tape and used the information to decide on Plaintiff's guilt during the disciplinary process, where Tamburro and DeSilva and Johnston used the information to decide to charge Plaintiff with alleged violations of equity policy, and where others used the information to make similar decisions on whether to charge Plaintiff or ascertain his guilt at some point on information and belief.

977.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 164
### Eavesdropping: 720 ILCS 5/14-2 (5)
**(PAYNE-KIRCHMEIER, DESILVA, JOHNSTON, TAMBURRO, CHRISTAIN, FAITH-ORKAR, Cohen)**

978.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

979.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

980.    Where each NU Defendants did, at certain points in the NU disciplinary process, did use the information which was obtained from audio tape #2 made in violation of Eavesdropping 720 ILCS 5/14-2, including Cohen and Ish-Orkar, where they listened to the audio tape and used the information to decide on Plaintiff's guilt during the disciplinary process, where Tamburro and DeSilva and Johnston used the information to decide to charge Plaintiff with alleged violations of equity policy, and where others used the information to make similar decisions on whether to charge Plaintiff or ascertain his guilt at some point on information and belief.

981.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 165
### Eavesdropping: 720 ILCS 5/14-2
### (Mona Dugo)

982.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

983.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

984.    Dugo disclosing the information on first phone call to NU in violation of (5) on or around 8/23/20.

985.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**Count 166**
**Eavesdropping: 720 ILCS 5/14-2**
**(Mona Dugo)**

986.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

987.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

988.     Dugo disclosing the information on the second phone call to NU in violation of (5) on or around 8/23/20.

989.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**Count 167**
**Eavesdropping: 720 ILCS 5/14-2**
**(Mona Dugo)**

990.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

991.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

992.     Dugo using the information on first phone call to decide whether Plaintiff made threats to anyone's safety in violation of (5) on or around 8/23/20.

993.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 168
**Eavesdropping: 720 ILCS 5/14-2**
**(Mona Dugo)**

994.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

995.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

996.     Dugo using the the information on second phone call to decide whether Plaintiff made threats to anyone's safety in violation of (5) on or around 8/23/20.

997.     *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 169
**Eavesdropping.720 ILCS 5/14-2**
**(Mona Dugo)**

998.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

999.     Wherein Defendant was explicitly informed by NUPD that calls violated state eavesdropping statutes prior to their use.

1000.     Dugo disclosing the information on one of the phone call (1/2) to Brian Tobin in violation of (5) on or around 9/29/20.

1001.     *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other

attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 170
### Eavesdropping.720 ILCS 5/14-2
### (Mona Dugo)

1002.　　Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth

herein.

1003.　　Wherein Defendant was explicitly informed by NUPD that calls violated state

eavesdropping statutes prior to their use.

1004.　　Dugo disclosing the information on one of the phone call (2/2) to Brian Tobin in

violation of (5) on or around 9/29/20.

1005.　　***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's

favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other

attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 171
### Eavesdropping.720 ILCS 5/14-2
### (Mona Dugo)

1006.　　Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth

herein.

1007.　　Wherein on information and belief Defendant was explicitly aware that calls violated

state eavesdropping statutes prior to their use.

1008.　　Dugo disclosing the information on the second phone call to Eric Chin in violation of (5)

on or around 8/23/20.

1009.　　***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's

favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in

excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 172
### Eavesdropping.720 ILCS 5/14-2
### (Mona Dugo)

1010.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1011.   Wherein on information and belief Defendant was explicitly aware that calls violated state eavesdropping statutes prior to their use.

1012.   Dugo disclosing the information on the first phone call to Eric Chin in violation of (5) on or around 8/23/20.

1013.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 179
### Eavesdropping.720 ILCS 5/14-2
### (Eric Chin)

1014.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1015.   Wherein on information and belief Defendant was explicitly aware that calls violated state eavesdropping statutes prior to their use.

1016.   Chin using the information on the first phone call to decide whether to charge Plaintiff with a crime in violation of (5) on or around 8/23/20.

1017.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**Count 180**
**Eavesdropping.720 ILCS 5/14-2**
**(Eric Chin)**

1018.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1019.    Wherein on information and belief Defendant was explicitly aware that calls violated state eavesdropping statutes prior to their use.

1020.    Chin using the the information on second phone call to decide whether to charge Plaintiff in violation of (5) on or around 8/23/20.

1021.    *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice

**COUNT 194**
**State Law Defamation**
**(NU)**

1022.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1023.    In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed gender bias to a single statement which was willfully and obviously taken out of context in order to defame Plaintiff as a gender bias individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1024.    The defendant published the 2020 Student Conduct Materials; and communication contains statement of facts that Plaintiff's physically assaulted someone in 2019 and that he made gender bias comments and committed "gender-based" harassment ; and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 nor did he make gender bias comments or commit "gender-based" harassment and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was bias against transexuals; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and NU knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently labeled as an expelled student and so is marked and cannot attain graduate school anywhere else and the defendant abused its privilege to publish the communication.

1025.    The communication was defamatory; and the persons receiving the communication understood it to be defamatory; the defendant knew that the communication was false or negligently failed to recognize that it was false and acted with malice; and the communication caused actual injury to the plaintiff's reputation; and defendant abused its privilege to publish the communication.

1026.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 195
### State Law Libel
### (NU)

1027.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1028.    In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed gender bias to a single statement which was willfully and obviously taken out of context in order to defame Plaintiff as a gender bias individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1029.    The defendant published the 2020 Student Conduct Materials; and communication contains statement of facts that Plaintiff's physically assaulted someone in 2019 and that he made gender bias comments and committed "gender-based" harassment ; and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 nor did he make gender bias comments or commit "gender-based" harassment and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was bias against transexuals; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and NU knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently labeled as an expelled student and so is marked and cannot attain graduate school anywhere else and the defendant abused its privilege to publish the communication.

1030.    The communication was defamatory; and the persons receiving the communication understood it to be defamatory; the defendant knew that the communication was false or negligently failed to recognize that it was false and acted with malice; and the communication caused actual injury to the plaintiff's reputation; and defendant abused its privilege to publish the communication.

1031.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 196
### State Law Slander
### (NU)

1032.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1033.    In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed gender bias to a single statement which was willfully and obviously taken out of context in order to defame Plaintiff as a gender bias individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1034.    The defendant published the 2020 Student Conduct Materials; and communication contains statement of facts that Plaintiff's physically assaulted someone in 2019 and that he made gender bias comments and committed "gender-based" harassment ; and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 nor did he make gender bias comments or commit "gender-based" harassment and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was bias against transexuals; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and NU knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently labeled as an expelled student and so is marked and cannot attain graduate school anywhere else and the defendant abused its privilege to publish the communication.

1035.    The communication was defamatory; and the persons receiving the communication understood it to be defamatory; the defendant knew that the communication was false or negligently

failed to recognize that it was false and acted with malice; and the communication caused actual injury to the plaintiff's reputation; and defendant abused its privilege to publish the communication.

1036.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**COUNT 197**
**Intrusion upon Seclusion**
**(NU)**

1037.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1038.   In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed gender bias to a single statement which was willfully and obviously taken out of context in order to defame Plaintiff as a gender bias individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1039.   The defendant published the 2020 Student Conduct Materials; and communication contains statement of facts that Plaintiff's physically assaulted someone in 2019 and that he made gender bias comments and committed "gender-based" harassment ; and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 nor did he make gender bias comments or commit "gender-based" harassment and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was bias against transexuals; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and NU knew that the communication was false or negligently

failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently labeled as an expelled student and so is marked and cannot attain graduate school anywhere else and the defendant abused its privilege to publish the communication.

**1040.    Where Defendants did pry and intrude into Plaintiff's private domain of educational contract with NU in an attempt to have him expelled in a manner highly offensive or objectionable to a reasonable person. Where the matter involved Plaintiff's private educational contact with NU and the intrusion** caused the plaintiffs anguish and suffering **through embarrassment, public debasement, suspension, and expulsion.**

1041.    The communication was defamatory; and the persons receiving the communication understood it to be defamatory; the defendant knew that the communication was false or negligently failed to recognize that it was false and acted with malice; and the communication caused actual injury to the plaintiff's reputation; and defendant abused its privilege to publish the communication.

1042.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>**COUNT 198**</u>
**False Light**
**(NU)**

1043.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1044.    In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed gender bias to a single statement which was willfully and obviously taken out of context in order to defame Plaintiff as a gender bias individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him

of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1045.    The defendant published the 2020 Student Conduct Materials; and communication contains statement of facts that Plaintiff's physically assaulted someone in 2019 and that he made gender bias comments and committed "gender-based" harassment ; and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 nor did he make gender bias comments or commit "gender-based" harassment and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was bias against transexuals; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and NU knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently labeled as an expelled student and so is marked and cannot attain graduate school anywhere else and the defendant abused its privilege to publish the communication.

1046.    Where Defendants did pry and intrude into Plaintiff's private domain of educational contract with NU in an attempt to have him expelled in a manner highly offensive or objectionable to a reasonable person. Where the matter involved Plaintiff's private educational contact with NU and the intrusion caused the plaintiffs anguish and suffering through embarrassment, public debasement, suspension, and expulsion.

1047.    The communication was defamatory; and the persons receiving the communication understood it to be defamatory; the defendant knew that the communication was false or negligently failed to recognize that it was false and acted with malice; and the communication caused actual injury to the plaintiff's reputation; and defendant abused its privilege to publish the communication.

1048.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 200
### State Law respondent superior
### (AGENCY for NU)

1049.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1050.    Where each of students who attacked Plaintiff on 11/1/19 was a 11/1/19 MLSA event organizer and attendee and had a relationship which existed prior to the event. The event was hosted by the MLSA Student Group at NU and group acted in agency in that respect for NU and where NU had the right to control their conduct as event organizers for the university. Group were reporting to people from NU and working with NU staff to coordinate and plan and execute the event. When Defendant Alkhawaja repeatedly approached and battered Plaintiff, it was done in the course and scope of his agency as event organizer for NU. Furthermore, NU condoned their actions in the investigation findings which they produced for the student conduct hearings for the incident.

1051.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: Issue declaratory judgement holding NU responsible for the actions of Students.

## Count 202
### Eavesdropping.720 ILCS 5/14-2
### (Desiree Hanford, Melissa Sersland, Sam Milgrom)

1052.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1053.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1054.    Using the information on first phone call to decide whether to sanction Plaintiff in violation of (5) on or around December 2020.

1055.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an

amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 203
### Eavesdropping.720 ILCS 5/14-2
### (Desiree Hanford, Melissa Sersland, Sam Milgrom)

1056.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1057.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1058.    Using the information on second phone call to decide whether to sanction Plaintiff in violation of (5) on or around December 2020.

1059.    *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (Ron A. Alexander III)

1060.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1061.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1062.    Disclosing the information on first phone call to **Desiree Hanford** coordinate and execute sanctions meeting in December 2020.

1063.    *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 209
### Eavesdropping.720 ILCS 5/14-2
### (Ron A. Alexander III)

1064.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1065.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1066.    Disclosing the information on second phone call to **Desiree Hanford** coordinate and execute sanctions meeting in December 2020.

1067.    *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 210
### State Law Malicious Prosecution
### 2019 False Arrest
### (NU, Healy, Walsh, Moore, Chin)

1068.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1069.    Where NUPD commenced a criminal proceeding in the form of charging plaintiff with a battery in the 11/1/19 NUPD incident report. Where the proceedings were terminated in favor of Plaintiff where he was never charged with any battery by the state attorney. Where there was the absence of probable cause as to the proceeding with regards to the allegations of battery as the police report listed Muaaz Maksud as a witness however Maksud's 2019 student conduct interviews indicated that he never witnessed said battery. Where NUPD officers acted with malice towards Plaintiff by physically assaulting him and then interfering with his education at NU by having him involuntarily committed. Where Plaintiff was involuntarily confined for 8 days at NMH and suffered permanent damage to his reputation

as well as physical mental and emotional trauma and where the incident ultimately contributed to his suspension and expulsion from law school.

1070. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 211
### State Law Defamation
### (Northwestern University, NUPD)

1071. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1072. In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed a physical assault in order to defame Plaintiff as a violent and mentally unfit individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1073. The defendant published the 2019 Student Conduct Materials; and communication contains a false statement of facts that Plaintiff's physically assaulted someone in 2019 and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was mentally unfit to pursue coursework; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and defendants knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the

communication caused actual injury to the plaintiff's reputation as he was permanently as labeled as violent unstable student and so was placed on probation and ultimately expelled as a result of the defamatory accusations. Defendant NU abused its privilege to publish the communication as they has direct evidence of the contradictory information contained in the police reports and later conduct investigations as well as Plaintiff's numerous formal and informal complaints.

1074.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**COUNT 212**
**State Law Libel**
**(Northwestern University, NUPD,)**

1075.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1076.    In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed a physical assault in order to defame Plaintiff as a violent and mentally unfit individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1077.    The defendant published the 2019 Student Conduct Materials; and communication contains a false statement of facts that Plaintiff's physically assaulted someone in 2019 and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was mentally unfit to pursue

coursework; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and defendants knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently as labeled as violent unstable student and so was placed on probation and ultimately expelled as a result of the defamatory accusations. Defendant NU abused its privilege to publish the communication as they has direct evidence of the contradictory information contained in the police reports and later conduct investigations as well as Plaintiff's numerous formal and informal complaints.

1078.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 213
### State Law Slander
### (Northwestern University, NUPD, NMH,)

1079.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1080.   In order to unfairly expel Plaintiff, each of the defendants did willingly participate in student conduct investigation wherein they falsely attributed a physical assault in order to defame Plaintiff as a violent and mentally unfit individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1081.   The defendant published the 2019 Student Conduct Materials; and communication contains a false statement of facts that Plaintiff's physically assaulted someone in 2019 and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not

attack anyone in 2019 and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was mentally unfit to pursue coursework; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and defendants knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently as labeled as violent unstable student and so was placed on probation and ultimately expelled as a result of the defamatory accusations. Defendant NU abused its privilege to publish the communication as they has direct evidence of the contradictory information contained in the police reports and later conduct investigations as well as Plaintiff's numerous formal and informal complaints.

1082.    ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### COUNT 214
**Intrusion upon Seclusion**
**(Northwestern University, NUPD Healy, Walsh, Moore, Individual Hospital Defendants, NMH,)**

1083.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1084.    NUPD officers prying into the private domain of Plaintiff's mental health by attributing it to unwellness and instability and causing them to commit his false arrest and false imprisonment. Furthermore, Plaintiff's liberty and personal bodily integrity was his private domain and was intruded upon by NUPD in a highly offensive and objectionable manner wherein they immediately placed him under arrest upon reaching the scene, then threw him to the ground when he attempt to explain the situation, and later involuntarily committed him. The intrusion would be highly offensive or objectionable to a reasonable person and the matters upon which the intrusion occurred-Plaintiff's mental health - were

private and the intrusion caused anguish and suffering in the form of pronged defamatory suspension and student conduct hearings on 11/6/19, just after being released from an 8 day false imprisonment which had occurred on 11/1/19 and just weeks after watching his mother's brutal and prolonged bout with cancer end tragically on 10/23/19.

1085.   Individual Hospital Defendants prying into the private domain of Plaintiff's mental health by attributing it to unwellness and instability and causing them to commit his false imprisonment. Furthermore, Plaintiff's liberty and personal bodily integrity was his private domain and was intruded upon by Individual Hospital Defendants in a highly offensive and objectionable manner wherein they immediately placed him under arrest upon reaching the scene, then threw him to the ground when he attempt to explain the situation, and later involuntarily committed him. The intrusion would be highly offensive or objectionable to a reasonable person and the matters upon which the intrusion occurred- Plaintiff's mental health - were private and the intrusion caused anguish and suffering in the form of pronged defamatory suspension and student conduct hearings on 11/6/19, just after being released from an 8 day false imprisonment which had occurred on 11/1/19 and just weeks after watching his mother's brutal and prolonged bout with cancer end tragically on 10/23/19.

1086.   In order to unfairly expel Plaintiff, each of Student Group #1 did willingly participate in student conduct investigation wherein they falsely attributed a physical assault in order to defame Plaintiff as a violent and mentally unfit individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

**1087.**   The defendant published the 2019 Student Conduct Materials; and communication contains a false statement of facts that Plaintiff's physically assaulted someone in 2019 and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was mentally unfit to pursue coursework; and the persons

receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and defendants knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently as labeled as violent unstable student and so was placed on probation and ultimately expelled as a result of the defamatory accusations. Defendant NU abused its privilege to publish the communication as they has direct evidence of the contradictory information contained in the police reports and later conduct investigations as well as Plaintiff's numerous formal and informal complaints.

1088.   Where Defendants did pry and intrude into Plaintiff's private domain of educational contract with NU in an attempt to have him expelled in a manner highly offensive or objectionable to a reasonable person. Where the matter involved Plaintiff's private educational contact with NU and the intrusion caused the plaintiffs anguish and suffering through embarrassment, public debasement, suspension, and expulsion.

1089.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

<u>**COUNT 215**</u>
**False Light**
**(Northwestern University, NUPD Healy, Walsh, Moore, Individual Hospital Defendants, NMH, Student Group #1)**

1090.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1091.   Plaintiff specifically realleges paragraphs 80-131.

1092.   Illinois law identifies three elements that are necessary to state a claim for false light invasion of privacy: (1) the plaintiff was placed in a false light before the public as a result of the defendants' action; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the

1093. Where Alkhawaja repeatedly approached Plaintiff despite Plaintiff's obvious attempts to retreat from further persistent and invasive questioning and harassment on 11/1/19 at the MLSA event and later accused Plaintiff of randomly physically attacking him. The intrusion would be highly offensive or objectionable to a reasonable person and the matters upon which the intrusion occurred were private such as asking Plaintiff's severe persistent and invasive questions about who Plaintiff knew and the intrusion caused anguish and suffering when Plaintiff was later brutally attacked and strangled, brutalized by NUPD, and wrongfully involuntarily committed, suspended, and expelled.

1094. NUPD officers prying into the private domain of Plaintiff's mental health by attributing it to unwellness and instability and causing them to commit his false arrest and false imprisonment. Furthermore, Plaintiff's liberty and personal bodily integrity was his private domain and was intruded upon by NUPD in a highly offensive and objectionable manner wherein they immediately placed him under arrest upon reaching the scene, then threw him to the ground when he attempt to explain the situation, and later involuntarily committed him. The intrusion would be highly offensive or objectionable to a reasonable person and the matters upon which the intrusion occurred-Plaintiff's mental health - were private and the intrusion caused anguish and suffering in the form of pronged defamatory suspension and student conduct hearings on 11/6/19, just after being released from an 8 day false imprisonment which had occurred on 11/1/19 and just weeks after watching his mother's brutal and prolonged bout with cancer end tragically on 10/23/19.

1095. Individual Hospital Defendants prying into the private domain of Plaintiff's mental health by attributing it to unwellness and instability and causing them to commit his false imprisonment. Furthermore, Plaintiff's liberty and personal bodily integrity was his private domain and was intruded upon by Individual Hospital Defendants in a highly offensive and objectionable manner wherein they immediately placed him under arrest upon reaching the scene, then threw him to the ground when he attempt to explain the situation, and later involuntarily committed him. The intrusion would be highly offensive or objectionable to a reasonable person and the matters upon which the intrusion occurred-Plaintiff's mental health - were private and the intrusion caused anguish and suffering in the form of pronged defamatory suspension and student conduct hearings on 11/6/19, just after being released from

an 8 day false imprisonment which had occurred on 11/1/19 and just weeks after watching his mother's brutal and prolonged bout with cancer end tragically on 10/23/19.

1096.    Where Ibrahim and Maksud prying into the private domain of Plaintiff's mental health by attributing it to unwellness and instability in the 2019 student conduct interviews. The intrusion would be highly offensive or objectionable to a reasonable person and the matters upon which the intrusion occurred-Plaintiff's mental health and his mothers death- were private and the intrusion caused anguish and suffering in the form of pronged defamatory suspension and student conduct hearings on 11/6/19, just after being released from an 8 day false imprisonment which had occurred on 11/1/19 and just weeks after watching his mother's brutal and prolonged bout with cancer end tragically on 10/23/19.

1097.    In order to unfairly expel Plaintiff, each of Student Group #1 did willingly participate in student conduct investigation wherein they falsely attributed a physical assault in order to defame Plaintiff as a violent and mentally unfit individual and sabotage his attempts to secure justice through the normal disciplinary process by providing negative speculation and remarks falsely painting Plaintiff as a threat to the safety of others in order to deprive him of his constitutional right to the JD program at NU. In doing so they made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.

1098.    The defendant published the 2019 Student Conduct Materials; and communication contains a false statement of facts that Plaintiff's physically assaulted someone in 2019 and the communications were concerning the plaintiff and the statement of fact was false Plaintiff did not attack anyone in 2019 and communication was defamatory made a fundamental attribution of the Plaintiff's fitness to pursue education that was completely unwarranted under the circumstances.by asserting that he was a threat to the safety of others and that he was mentally unfit to pursue coursework; and the persons receiving the communication understood it to be defamatory and used it as reason to expel Plaintiff from his JD; and defendants knew that the communication was false or negligently failed to recognize that it was false and acted with malice and the communication caused actual injury to the plaintiff's reputation as he was permanently as labeled as violent unstable student and so was placed on probation and ultimately expelled as a result of the defamatory accusations. Defendant NU abused its privilege to publish the

communication as they has direct evidence of the contradictory information contained in the police reports and later conduct investigations as well as Plaintiff's numerous formal and informal complaints.

1099.   Where Defendants did pry and intrude into Plaintiff's private domain of educational contract with NU in an attempt to have him expelled in a manner highly offensive or objectionable to a reasonable person. Where the matter involved Plaintiff's private educational contact with NU and the intrusion caused the plaintiffs anguish and suffering through embarrassment, public debasement, suspension, and expulsion.

1100.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### COUNT 216
**State Law Negligent Training and Supervision**
**(Northwestern University, Individual NU Defendants)**

1101.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1102.   Wherein NU had a duty to supervise Ibrahim Maksud Alkahawja who committed wrongful acts within the course and scope of their agency for NU and where NU failed to supervise them which proximately caused Plaintiff's battery, false imprisonments, suspension and expulsion.

1103.   Wherein NU had a duty to supervise NUPD officers and individual NU defendants who committed wrongful acts within the course and scope of their employment and where NU failed to supervise them which proximately caused Plaintiff's battery, false imprisonments, suspension and expulsion.

**1104.**   Wherein NU had a duty to supervise Student Group #2 who committed wrongful acts within the course and scope of their agency for NU and where NU failed to supervise them which proximately caused Plaintiff's battery, false imprisonments, suspension and expulsion .

1105.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**COUNT 217**
**State Law Negligent Hiring**
**(Northwestern University, Individual NU Defendants)**

1106.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1107.    Where NU knew of should have known that its employees had particular unfitness for their respective positions so as to create a danger of harm to students and staff. NU had constructive and direct knowledge of the wrongdoing and subsequent unfitness of its employees both through internal and external grievances Plaintiff had submitted and through their own internal administrative procedures. These grievances and complaints highlighted the unfitness of the defendant employees to perform the work of policing and college administration with young and vulnerable students. The unsuitability of the complained about employees should spoke to fundamental personal attributes and characteristics which are static and should have nee known at the time of each employees hiring or retention, such as severe psychopathic lack of empathy and understanding of basic logical reasoning, as well as a fundamental understanding of basic human rights and federal and state laws which were required for each position they were hired for. These characteristics and fundamental personal attributes of each of the complained about employees in this count are what caused each of plaintiff's injuries, including but not limited to every count in this complaint naming NU employees, students, or NUPD.

1108.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 218
### Negligence
### (NU)

1109.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1110.    Defendant NU, its agents, servants and employees improperly, carelessly, unlawfully and negligently (1) owned, operated, managed and/or maintained 357 E Chicago Ave. and in particular the common areas, hallways and bathrooms in said building; (2) failed to provide adequate security and, (3) negligently failed to take adequate precautions to protect the safety of its patrons and student, including Plaintiff.

1111.    As a result of the carelessness and negligence by Defendant Northwestern, the Plaintiff was viciously assaulted and falsely imprisoned on 11/1/19, while lawfully on the premises of 357 E Chicago Ave.

1112.    As the direct result of Defendant Northwestern's negligence, carelessness, and unlawful conduct, Plaintiff, , has suffered physical injury, severe emotional distress and continues to suffer physically and emotionally and has incurred costs and expense for medical treatment as well as suffering and incurring other damages.

1113.    **_WHEREFORE,_** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 219
### Negligence
### (NU)

1114.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1115.     Defendant NU, its agents, servants and employees improperly, carelessly, unlawfully and negligently (1) owned, operated, managed and/or maintained first-year Law GroupMe chat in Fall Semester 2019 (2) failed to provide adequate security and, (3) negligently failed to take adequate precautions to protect the safety of its patrons and student, including Plaintiff. As a result of the carelessness and negligence by Defendant Northwestern, the Plaintiff was viciously taunted and subjected to severe and pervasive sexual harassment while lawfully on the school group chat.

1116.     Defendant NU, its agents, servants and employees improperly, carelessly, unlawfully and negligently (1) owned, operated, managed and/or maintained first-year Law GroupMe chat titled "NU Kids on the Block '23.; (2) failed to provide adequate security and, (3) negligently failed to take adequate precautions to protect the safety of its patrons and student, including Plaintiff. As a result of the carelessness and negligence by Defendant Northwestern, the Plaintiff was viciously assaulted on 8/23/20, while lawfully on the school group chat and later expelled.

1117.     As the direct result of Defendant Northwestern's negligence, carelessness, and unlawful conduct, Plaintiff, , has suffered physical injury, severe emotional distress and continues to suffer physically and emotionally and has incurred costs and expense for medical treatment as well as suffering and incurring other damages.

1118.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 220
**(Loss of Consortium
(Northwestern University)**

1119.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1120.   Where Plaintiff invested 10 weeks worth of classes in Fall 2019 instead of spending that time with his mother who was passing away of cancer and NU's unjust suspension caused all of the time he invested to be worthless and not counted for credit.

1121.   As a direct and proximate result of the improper, careless, unlawful and negligent conduct by Defendant, Northwestern University, the Plaintiff has suffered loss of consortium, grievous pain of body and mind, mental anguish and distress, as a result of the death of his mother.

1122.   **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 221
### Negligence
### (NUPD)

1123.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1124.   NUPD is a shell corporation owned and controlled by Northwestern University as a pseudo identity of Northwestern University. Defendant Northwestern, its agents, servants and employees improperly, carelessly, unlawfully and negligently (1) owned, operated, managed and/or maintained 357 E Chicago Ave. and in particular the common areas, hallways and bathrooms in said building; (2) failed to provide adequate security and, (3) negligently failed to take adequate precautions to protect the safety of its patrons and customers, including Plaintiff.

1125.   As a result of the carelessness, negligence, and improper and unlawful maintenance of 357 E Chicago Ave. by Defendant NUPD, the Plaintiff was viciously assaulted and falsely imprisoned on 11/1/19, while lawfully on the premises of 357 E Chicago Ave.

1126.   As the direct result of the negligence, carelessness, and unlawful conduct of Defendant NUPD, Plaintiff, , has suffered physical injury, severe emotional distress and continues to suffer

physically and emotionally and has incurred costs and expense for medical treatment as well as suffering and incurring other damages.

1127. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 222
### Negligence
### (NMH)

1128. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1129. Defendant NNM, its agents, servants and employees improperly, carelessly, unlawfully and negligently (1) owned, operated, managed and/or maintained 320 E. Superior St and in particular the emergency room and psychiatric ward in said building; (2) failed to provide adequate security and, (3) negligently failed to take adequate precautions to protect the safety of its patrons and customers, including Plaintiff.

1130. As a result of the carelessness, negligence, and improper and unlawful maintenance of 320 E. Superior St by Defendant NNM, the Plaintiff was viciously assaulted and falsely imprisoned on *11/1/19*, while lawfully on the premises of 320 E. Superior St.

1131. As the direct result of the negligence, carelessness, and unlawful conduct of Defendant NNM, Plaintiff, , has suffered physical injury, severe emotional distress and continues to suffer physically and emotionally and has incurred costs and expense for medical treatment as well as suffering and incurring other damages.

1132. **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### COUNT 223
### State Law Negligent Training and Supervision
### (NMH, Individual Hospital Defendants)

1133.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1134.   Where NMH has a duty to supervise each of the Individual Hospital Defendants and failed and/or negligently supervised them, which led to Plaintiff's medical battery and false imprisonment at NMH from 11/1/19-11/8/19 and his subsequent suspension and eventual expulsion from NU law.

1135.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### COUNT 224
### State Law Negligent Hiring
### (NMH, Individual Hospital Defendants)

1136.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1137.   Where NMH should have known about the inability of Individual Hospital Defendants to perform the duties of medical care and adhere to state and federal procedures at the time of each employees hiring and/or retention and these inabilities proximately caused Plaintiff's medical battery and false imprisonment at NMH from 11/1/19-11/8/19 and his subsequent suspension and eventual expulsion from NU law.

1138.   ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and

declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## COUNT 231
**42 U.S.C. 1983 Claim for Deprivation of Right to Fair Trial and for Wrongful Prosecution**
**20-DV-2080601**
**(Mona Dugo, Sarah Wake, Stark, Benson, Chin, NU)**

1139.    Defendants, individually, jointly, and in conspiracy, caused the wrongful charging and pursuit of prosecution and conviction of Plaintiff for the Dugo email, and/or the continuation of said wrongful prosecution, by fabricating and coercing the false admissions which formed the basis for Plaintiff's said charging and prosecution and conviction, by withholding from the prosecutors, judges and defense attorneys involved in Plaintiff's prosecution the fact that these admissions were false, fabricated, and coerced, by suppressing additional exculpatory findings and evidence, as well as other exculpatory evidence, by giving a false and incomplete version of events to prosecutors, by writing false reports and giving false testimony, by improperly influencing the judges hearing Plaintiff's case, *inter alia,* by making false public statements, by obstructing investigations which would have led to discovery of further exculpatory evidence, and by the additional wrongdoing set forth above, thereby unconstitutionally depriving Plaintiff of his liberty and violating his right to a fair and impartial trial and not to be wrongfully convicted, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

1140.    The actions of Defendants Warner, Hickey, Dugo, Stark, Wake, NU, individual Defendant EPD officers, Flesch, and Civella, in depriving Plaintiff of his right to a fair trial and not to be wrongfully convicted were the direct and proximate cause of the injuries to Plaintiff which are set forth above.

1141.    WHEREFORE, Plaintiff demands judgment against Defendants Warner, Hickey, Dugo, Stark, Wake, NU, Individual Defendant EPD officers, Flesch, and Civella for substantial compensatory damages, and, because these Defendants acted maliciously, willfully, wantonly, and/or with reckless disregard for Plaintiff's constitutional rights, for substantial punitive damages, plus the costs of this action, attorneys' fees and such other relief as this Court deems equitable and just.

1142.    Plaintiff asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against NU for the relief requested above.

## Count 208
## Eavesdropping.720 ILCS 5/14-2
### (Ron A. Alexander III)

1372.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1373.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1374.     Disclosing the information on first phone call to **Melissa Sersland,** coordinate and execute sanctions meeting in December 2020.

1375.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 209
## Eavesdropping.720 ILCS 5/14-2
### (Ron A. Alexander III)

1376.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1377.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1378.     Disclosing the information on second phone call to **Melissa Sersland to** coordinate and execute sanctions meeting in December 2020.

1379.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this

action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (Ron A. Alexander III)

1380.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1381.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1382.     Disclosing the information on first phone call to **Sam Milgrom** coordinate and execute sanctions meeting in December 2020.

1383.     *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 209
### Eavesdropping.720 ILCS 5/14-2
### (Ron A. Alexander III)

1384.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1385.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1386.     Disclosing the information on second phone call to **Sam Milgrom** coordinate and execute sanctions meeting in December 2020.

1387.     *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00);

(c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 208
### Eavesdropping.720 ILCS 5/14-2
### (NU)

1388.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1389.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1390.    NU Appellate Panel Coordinator Jeremy Schenk disclosing the information on first phone call to **Appellate Panel Member # 1** coordinate and execute Appellate Panel meeting in January 2021

1391.    *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

## Count 209
### Eavesdropping.720 ILCS 5/14-2
### , NU)

1392.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1393.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1394.    NU Appellate Panel Coordinator Jeremy Schenk disclosing the information on second phone call to **Appellate Panel Member # 1** coordinate and execute Appellate Panel meeting in January 2021

**WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (NU)

1395.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1396.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1397.    NU Appellate Panel Coordinator Jeremy Schenk disclosing the information on first phone call to **Appellate Panel Member # 2** coordinate and execute Appellate Panel meeting in January 2021

1398.    **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 209
### Eavesdropping.720 ILCS 5/14-2
### , NU)

1399.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1400.    Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1401.     NU Appellate Panel Coordinator Jeremy Schenk disclosing the information on second phone call to **Appellate Panel Member # 2 to** coordinate and execute Appellate Panel meeting in January 2021

**WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant attorney's fees pursuant

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (NU)

1402.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1403.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1404.     NU Appellate Panel Coordinator Jeremy Schenk disclosing the information on first phone call to **Appellate Panel Member # 3** coordinate and execute Appellate Panel  meeting in January 2021

1405.     ***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 209
### Eavesdropping.720 ILCS 5/14-2
### , NU)

1406.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1407.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1408.     NU Appellate Panel Coordinator Jeremy Schenk disclosing the information on second phone call to **Appellate Panel Member # 3 to** coordinate and execute Appellate Panel meeting in January 2021

**WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (NU)

1409.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1410.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1411.     NU Appellate Panel Member #1 using the information on first phone call to **decide on Plaintiff's appeal at the** Appellate Panel meeting in January 2021

1412.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 209
### Eavesdropping.720 ILCS 5/14-2
### , NU)

1413.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1414.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1415.     NU Appellate Panel Member #1 using the information on second phone call to **decide on Plaintiff's appeal at the** Appellate Panel meeting in January 2021

*WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (NU)

1416.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1417.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1418.     NU Appellate Panel Member #2 using the information on first phone call to **decide on Plaintiff's appeal at the** Appellate Panel meeting in January 2021

1419.     *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 209
### Eavesdropping.720 ILCS 5/14-2
### , NU)

1420.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1421.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1422.     NU Appellate Panel Member #2 using the information on second phone call to **decide on Plaintiff's appeal at the** Appellate Panel meeting in January 2021

*WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant attorney's fees pursuant

### Count 208
### Eavesdropping.720 ILCS 5/14-2
### (NU)

1423.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

1424.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state eavesdropping statutes prior to their use.

1425.     NU Appellate Panel Member #3 using the information on first phone call to **decide on Plaintiff's appeal at the** Appellate Panel meeting in January 2021

1426.     *WHEREFORE,* Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

### Count 209
### Eavesdropping.720 ILCS 5/14-2
### , NU)

1427.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully
set forth herein.

1428.     Wherein Defendant was explicitly informed by Plaintiff that calls violated state
eavesdropping statutes prior to their use.

1429.     NU Appellate Panel Member #3 using the information on second phone call to
**decide on Plaintiff's appeal at the**  Appellate Panel  meeting in January 2021

***WHEREFORE,*** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against
the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-
FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of
SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and
(d) together with the costs and disbursements of this action and such other attorney's fees pursuant


## COUNT 235
### State Law Claim for Malicious Prosecution
### (Dugo, Stark, Chin, Benson, Wake, NU)

1430.     Defendant, individually, jointly, and in conspiracy, initiated and continued a
malicious prosecution without probable cause against Plaintiff pursuant to 20-DV-2080601. Said
prosecution was ultimately terminated in Plaintiff's favor when the charges were dismissed.. The
Defendants' actions were done in a willful and wanton manner, and directly and proximately caused
the injury and damage to Plaintiff set forth above.

1431.     WHEREFORE, Plaintiff demands actual or compensatory damages against
Defendants in an amount in excess of Seventy-Five Thousand ($75,000) dollars, and because these
Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, punitive damages,
and such other and additional relief as this Court deems equitable and just.

## COUNT 236
### (State Law Claim for Intentional Infliction of Emotional Distress)
### (Dugo, Stark, Benson Wake, NU)

1432.     Defendants, *inter alia,* by securing a false confession from Plaintiff, by
fabricating the details of said confession, by pursuing his prosecution and conviction pursuant to 20-
DV-2080601for an act he did not commit by means of said false confession, by fabricating, coercing,

and suppressing other evidence, by making false and defamatory statements, and by otherwise abusing and defaming Plaintiff, engaged in extreme and outrageous conduct.

1433.     Defendants intended, by subjecting Plaintiff to such humiliating, degrading conduct, to inflict severe emotional distress on Plaintiff, and knew that their conduct would cause Plaintiff and his family severe emotional distress.

1434.     As a direct and proximate result of Defendants' outrageous conduct, Plaintiff was injured, and has experienced, and continues to experience, severe emotional distress, including fear of execution, nightmares, sleep disruption, symptoms of post traumatic stress disorder, anxiety, depression, and inability to focus or concentrate.

1435.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**COUNT 237**
**(State Law Claim for Defamation)**
(Chin, Benson, Dugo, Stark, Wake, NU)

1436.     Defendants Dugo, Stark, Wake, NU publicly and repeatedly made false statements accusing Plaintiff of committing the crime of stalking, thereby committing defamation *per se*.

1437.     Additionally, these false and defamatory statements by Defendants Dugo, Stark, Wake caused the Plaintiff special damages and pecuniary loss.

1438.     **WHEREFORE,** Plaintiff prays that this Honorable Court: Enter judgment in Plaintiff's favor, and against the Defendants, and each of them: (a) for compensatory damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (b) for punitive damages each in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (c) for injunctive and declaratory relief; and (d) together with the costs and disbursements of this

action and such other attorney's fees pursuant to 42 U.S.C. §1988, and further relief as justice requires.

**COUNT 238**
**State Claim for Conspiracy**
(Chin, Benson, Dugo, Stark, Wake, NU)

1439.    Defendants Chin, Dugo, Stark, Wake, NU with other unsued co-conspirators, including police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to falsely imprison, maliciously prosecute, to defame and to intentionally inflict severe emotional distress on Plaintiff pursuant to 20-DV-2080601.

1440.    After being put on notice of Plaintiff's plans to pursue litigation against the school and its employees for violations of the state eavesdropping statute, unlawful contact with his therapist, sister, and DOE investigator, and obstruction of his CPD police report, as well as the pendency of his discrimination complaint with the Department of Education, the defendants conspired to deprive Plaintiff of his Fourteenth Amendment Rights to Due Process, right to Equal Protection under the law, as well as First Amendment right to freedom of speech and the right to be free from unreasonable seizure.

1441.    Defendants conspired to manufacture evidence in the form of a fabricated series of NUPD police reports starting on 10/19/20 in order to the influence state action of securing the issuance a protection order for Dugo on false and misleading pretenses, and then falsely report a violation of said order in order to further influence the state action of the arrest of Plaintiff by the Evanston Police Department and his prosecution by the State Attorney's office, and that conspiracy was born out of both religious animus and disability-based animus. Defendants acted with the purpose of (and were successful at) getting Plaintiff arrested and jailed because of religious and disability animus.

1442.    Where Dugo and Stark, who acted under color of law in her capacity as an NUPD police officer and under orders and supervision from Chin and Benson, acted together to plot the false imprisonment of Plaintiff by coordinating and crafting a false narrative, which they documented over the course of several meetings in two NUPD police reports, which falsely alleged

that Plaintiff made threats to the safety of Dugo and others at NU in order to make Plaintiff seem like a safety threat.

1443.     They started crafting this narrative on 10/19/20, the same day the Plaintiff informed them that he was aware of the obstruction of his police report, and well after Dugo had illegally suspended Plaintiff over felony audio recordings of his, then hidden the existence of the tapes, then contacted Plaintiff's sister and therapist in order to defame him using the tapes, in order to create a way to damage Plaintiff's reputation and discredit his position in potential litigation and protect Dugo and NU from liability by having a fabricated and deliberately constructed documented narrative in the form of NUPD police reports. This was further done in order to discredit Plaintiffs' Department of Education complaint.

1444.     Stark then acted under color of law and used her status as a police officer in order to influence the judge and assist Dugo to secure a PO 20532 on false and misleading and defamatory pretenses on 11/4/20 as specifically described in allegation 295. These allegations were predicated on lies by Dugo, wherein she deliberately mischaracterized and misrepresented plaintiff's protected speech in the form of complaints of harassment and discrimination as "harassment," and displayed religious animus by willfully misinterpreting sections of religious text from the Qur'an as "threats" against her safety. This is despite the fact that Plaintiff, never at any time during any of his communications with Dugo or anyone else from NU, made any comments or suggestions which even remotely threatened the physical safety of anyone. Furthermore, evidence of animus towards Plaintiff's disability was displayed when Chin obstructed Plaintiff's CPD report by lying about Plaintiffs consent to the Gargula recordings solely on the basis that Plaintiff had been involuntarily committed.

1445.     On 11/17/20, Plaintiff secured PO 78277 against Dugo and notified NU by sending a picture of the order via email. Later that day, Dugo, Stark, Benson, Chin and Wake collectively decided to have Dugo falsely report that Plaintiff violated the PO resulting from an email that Plaintiff originally sent to NU on 11/4/20 asking why Dugo had contacted his sister and who authorized the contact. In doing so they violated Plaintiff's First Amendment rights to free speech.

1446.     In the furtherance of which Stark, under color of law, used her status as a police officer to meet with Evanston police on 11/18/20 and convince them to arrest the Plaintiff despite the absence of probable cause.

1447.     As a result of the conspiratorial actions, Plaintiff was falsely arrested without probable cause at his home in violation of his Fourth Amendment Rights. Plaintiff's court order, PO 78277, which he showed to the officers and which they subsequently confiscated, would have put a reasonable officer on notice that the arrest was unreasonable.

1448.     At Evanston police station, Plaintiff was subjected to coercive and involuntary custodial interrogation by Stark and EPD Officers designed to overcome his will and to coerce involuntary and incriminating statements from him without the presence of an attorney, and falsely imprisoned by EPD on 11/19/20 and subject to confinement for over 24 hours at Evanston Police Department and Cook Country Corrections Facility in Skokie, all in violation of his fourth Amendment rights against false imprisonment.  Where they had asked Plaintiff if his NU email address belonged to him, and used that as the basis for his arrest and prosecution.

1449.     Wake drafted the charges against Plaintiff and provided them to the State Attorney in order to maliciously prosecute Plaintiff.

1450.     On information and belief, all defendants were aware of the existence of PO 78277, a stalking order of protection which Plaintiff had active against Dugo at that time, and took some or all of their actions in order to retaliate against Plaintiff and discredit his case.

1451.     Plaintiff was damaged in his person and property by incurring attorneys fees, permanent irreparable damage to his career prospects and reputation creating a criminal history which effectively barred him from being able to pursue a legal education or any other kind of graduate education, as well as severe mental, physical and emotional distress.

1452.     Said conspiracy and overt acts were and are continuing in nature.

1453.     Defendants' and their co-conspirators' overt acts, as set forth above, which were committed jointly and/or while conspiring together to falsely imprison, maliciously prosecute, defame, and intentionally inflict emotional distress on the Plaintiff, constitute the tort of conspiracy as set forth above.

1454. WHEREFORE Plaintiff demands compensatory damages in an amount in excess of Seventy-Five ($75, 000) dollars, jointly and severally from the Defendants named in this Count, and, because these Defendants acted in a malicious, willful and/or wanton manner toward Plaintiff, for punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT 239
### (State Law Respondeat Superior Claim)

1455. Individual NU Defendants and Individual NUPD Officers were, at all times material to this complaint, employees of the Defendant NU, were acting within the scope of their employment, and their acts which violated state law are directly chargeable to the Defendant University under state law pursuant to *respondeat superior*.

1456. WHEREFORE, Plaintiff demands judgment against the Defendants for any and all compensatory damages awarded on Plaintiff's state law claims, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## COUNT 240
### 745 ILCS 10/9-102
### (NU)

1457. Plaintiff re-alleges paragraphs 1 through 593.

1458. Defendant NU was the employer of Defendants Chin, Healy, Walsh, Moore, Lee, Stark, and Benson at all times relevant and material to this complaint.

1459. These Defendants committed the acts alleged above under color of law and in the scope of their employment as employees of NU.

1460. WHEREFORE, Plaintiff, pursuant to 745 ILCS 10/9-102, demands judgment against the Defendants NU in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest, and for whatever additional relief this Court deems equitable and just.

## Count 242
### PRELIMINARY INJUNCTION ON EXPULSION

1461.     Plaintiff asks the Court to set its request for temporary injunction for a hearing as soon as possible and, after the hearing, issue a temporary injunction against NU providing the same relief requested above in Plaintiff's Application for Temporary Restraining Order.

## Count 243
**PERMANENT INJUNCTION ON EXPUSION**

1462.     Plaintiff asks the Court to set its request for permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against NU for the relief requested above.

1463.     All conditions precedent to this application have occurred.

## Count 244
**GENERAL PRAYER FOR RELIEF**

1464.     Plaintiff request's the assistance of an external investigator from a local law enforcement service or the US marshal service to investigate the multiple felonies committed by NU, its representatives, and staff during the course of Plaintiff's suspension and expulsion process, including Scott Warner and Co-Counsel Karen Courteux and any other individuals from their firm who may have heard the felony audio involved in this case and/or used the information from it in some way, shape, or form.

1465.     WHEREFORE, PREMISES CONSIDERED Plaintiff respectfully requests that Defendant, Northwestern University, be cited to appear and answer and, upon final trial, Plaintiff have judgment for:

a.   actual damages;

b.   pre-judgment interest at the maximum legal rate;

c.   post-judgment interest at the maximum legal rate;

d.   costs of court;

e.   attorneys' fees;

f.   temporary restraining order;

g.   preliminary injunction;

h.   permanent injunction; and

i.   such other and further relief to which Plaintiff may show herself justly entitled.

j.  Issue an Order enjoining defendants, their agents and employs from continuing or maintaining the policy, practice and custom of denying plaintiff's rights available pursuant to the Constitution and laws of the United States and the state of Illinois, and retaliating against him for seeking to exercise those rights.

k.  Enter a declaratory judgment that the aforementioned facts and practices of defendant are in violation of the Constitution and laws of the United States and the state of Illinois.

l.  Enter judgment in favor of plaintiff, and against defendant, finding that defendants, acting individually and/or in concert with each other, and/or through agents and employs (1) retaliated against plaintiff for engaging in a protected activity, to wit, speaking out on a matter of public concern, in violation of the First and Fourteenth Amendments to the United States Constitution and the Illinois Constitution; and (2) violated plaintiff's right to due process of law, as guaranteed by the 14th Amendment to the United States Constitution, and ( c) defamed plaintiff.

m.  Enter judgment ordering the admission of plaintiff into the law school, thereby allowing pursue his legal education.

n.  Enter judgment ordering defendant to remove the disciplinary action from plaintiff student record.

o.  Enter judgment in favor of plaintiff, and against defendants, awarding plaintiff special, general compensatory and punitive damages.

p.  Award plaintiff the costs of this litigation, including reasonable attorney's fees.

q.  Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that: IBHE's failure to create and maintain an accountability system under ESSA constitutes disability discrimination under the ADA and Section 504.

r.  Issue a class action certification for students affected by unchecked disability discrimination at IBHE member institutions which was unaccounted for due to IBHE's failure to create and maintain an accountability system under ESSA.

s.  Issue a declaratory judgment, pursuant to 735 ILCS 5/2-701, declaring that:

a. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate the prohibition against illegal seizure under the Fourth Amendment to the United States Constitution;

b. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment hearing and notice procedures in this case violate the due process clause of Fifth Amendment to the United States Constitution;

c. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case violate due process and equal protections under the Fourteenth Amendment to the United States Constitution;

d. The violation of 405 ILCS 5/Ch. III Art. VI Emergency Commitment procedures in this case, combined with the conspiratorial acts of the defendants which resulted in Plaintiff's unjust and unlawful confinement for 8 days which directly resulted in his suspension and eventual expulsion from graduate school violate the prohibition against cruel and unusual punishment under the Eight Amendment to the United States Constitution.

e. Violation of 405 ILCS 5/3-601:

   a. Failed to indicate a justifiable rationale of acts supporting the notion that Plaintiff needed immediate hospitalization to prevent harm to himself or others;

   b. Failed to indicate the name and address of a family member or close-kin and failed to make a diligent inquiry as to friends or relatives and failed to indicate steps taken to find a close friend or relative;

   c. Failed to indicate names addresses and phone numbers of witnesses to the facts which supported Plaintiffs involuntary commitment.

f. Violation of 405 ILCS 5/3-602:

   a. Failed to include a statement as to whether the respondent was advised of his rights under Section 3-208.

g. Violation 405 ILCS 5/3-606:

      a. Willfully falsified the petition section indicating, falsely, that Plaintiff had not been brought in by a peace officer and failing to indicate NUPD Officer Healy #22 identifying information.

  h. Violation of 405 ILCS 5/3-608:

      a. Failed to inform Plaintiff of his right to refuse treatment.

      b. Forced administration of two doses for total of 10MG psychotropic medication against Plaintiff's open objections due to his religious beliefs and prohibition against opioid-based medication and when it was not necessary to prevent the respondent from causing serious harm to himself or others.

  i. Violation of 405 ILCS 5/3-609:

      a. Failed to give a copy of the petition and a statement to Plaintiff as provided in Section 3-206.

      b. Failed to ask Plaintiff if he desires such documents sent to any other persons

      c. Failed to allow Plaintiff to make phone 2 phone calls.

  j. Violation of 405 ILCS 5/3-610 and 405 ILCS 5/3-611:

        i. Failed to file 2 copies of the petition, the first certificate, and proof of service of the petition and statement of rights upon the respondent with the court in the county in which the facility is located within 24 hours after respondents admission.

        ii. Failed to promptly file second certificate and provide a copy to the respondent.

## **JURY DEMAND**

Plaintiff Fahad Syed demands a trial by jury on all issues triable by a jury/ in the alternative plaintiff demands a jury trial for all issues possible.


Dated: January 31th, 2022.        Respectfully submitted,

        By: _____/s/ Fahad Syed_____

        Fahad Syed

4606 N Hermitage Ave. Apt. 110
Chicago, IL 60640
Tel: 773-564-0325
Syed.216@gmail.com

**VERIFICATION BY CERTIFICATION PURSUANT TO SECTION 1-109**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that [he/she] verily believes the same to be true.

_/s/Fahad Syed_____
Fahad Syed                          1/31/22
Plaintiff

**[EXHIBIT [NUMBER/LETTER]]**